# EXHIBIT A

**Prince, Niles 12/11/2009**

1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   EASTERN DISTRICT OF NEW YORK
 4   -------------------------------x
 5   DWAYNE KINTE ROBERTSON,
 6              Plaintiff,
 7        v.    07 CV 1416 (JG)(LB)
 8
 9   OFFICER MATTHEW SULLIVAN,
10   Shield #29723; OFFICER NILES
11   PRINCE, Shield #22353;
12   SERGEANT DIMITRI DAGLAS,
13   Shield #01647; and THE CITY OF
14   NEW YORK,
15              Defendants.
16   -------------------------------x
17        December 11, 2009
18        10:04 a.m.
19
20
21        Videotaped deposition of NILES PRINCE,
22   taken by Defendants, at the offices of Cravath,
23   Swaine & Moore LLP, 825 Eighth Avenue, New York,
24   New York, before Brandon Rainoff, a Federal
25   Certified Realtime Reporter and Notary Public of
26   the State of New York.
27
28
29
```

2

```
 1
 2   A P P E A R A N C E S :
 3
 4   CRAVATH, SWAINE & MOORE LLP
 5   Attorneys for Plaintiff
 6        Worldwide Plaza
 7        825 Eighth Avenue
 8        New York, New York 10019-7475
 9   BY:   JESSICA R. HOLLOWAY, ESQ.
10        GABRIEL FERNANDO SOLEDAD, ESQ.
11        MEGAN WALL-WOLFF, ESQ.
12        STUART GOLD, ESQ.
13
14
15   ASSISTANT CORPORATION COUNSEL
16   SPECIAL FEDERAL LITIGATION DIVISION
17   New York City Law Department
18   Officer of the Corporation Counsel
19   Attorneys for Defendants
20        100 Church Street
21        New York, New York 10007
22   BY:   JEFFREY BROOKS, ESQ.
23        RACHEL SELIGMAN, ESQ.
24
25   ALSO PRESENT:  JAMES ROBERTS, Videographer
```

3

```
 1
 2
 3              INDEX OF EXAMINATION
 4
 5   1 Document Bates Stamped NYC31 through 32 ........7
 6   2 Document Bates Stamped NYC-416 through 417 ....11
 7   3 Document Bates Stamped NYC28 .................40
 8   4 Document Bates Stamped NYC29 .................40
 9   5 Document Bates Stamped NYC256 through 257 ....115
10   6 Document Bates Stamped NYC258 through 259 ....115
11   7 Document Bates Stamped NYC30  ...............125
12   8 Document Bates Stamped NYC-260 through 261 ...130
13
14
15
16              INDEX OF EXAMINATION
17
18   Witness
19   Niles Prince
20
21   Examination
22   By Ms. Holloway....................page 5
23
24   Confidential section..............pages 65-68
25
```

4

```
 1
 2        THE VIDEOGRAPHER:  Good morning.  We
 3   are going on the record.  My names is James
 4   Roberts of Veritext Reporting, with offices in
 5   New York City, New York.
 6        Today's date is December 11, 2009.
 7   The time is approximately 10:04 a.m.  This
 8   deposition is being held in the office of
 9   Cravath, Swaine & Moore located at 825 8th
10   Avenue, New York City, New York.  The caption of
11   the case, Dwayne K. Robertson versus Officer
12   Matthew Sullivan, Shield No. 29723, et al., in
13   the U.S. District Court, Eastern District of New
14   York, Order No. 07-CV-1416.
15        The name of the witness is Dwayne
16   Robertson.
17        At this time the attorneys will please
18   identify themselves and the parties they
19   represent.
20        MS. HOLLOWAY:  The witness is not
21   Dwayne Robertson.
22        THE VIDEOGRAPHER:  Oh, I apologize.
23        MS. HOLLOWAY:  No problem.  The
24   witness is Officer Niles Prince.
25        Jessica Holloway of Cravath, Swaine &
```

5

1
2    Moore for plaintiff Dwayne Robertson.
3        MR. SOLEDAD:  Gabriel Soledad for
4    plaintiff Dwayne Robertson, Cravath, Swaine &
5    Moore.
6        MR. BROOKS:  Jeffrey Brooks, New York
7    City Law Department for defendants.
8        MS. SELIGMAN:  And Rachel Seligman
9    also for the defendant from the New York City
10   Law Department.
11       THE VIDEOGRAPHER:  Our court reporter,
12   Brandon Rainoff, also from Veritext, will please
13   swear in the witness.
14   DETECTIVE NILES PRINCE,
15       having been duly sworn, was examined and
16       testified as follows:
17   EXAMINATION
18   BY MS. HOLLOWAY:
19       Q.   Good morning, Mr. Prince.
20       A.   Good morning.
21       Q.   You are a police officer, correct?
22       A.   Yes.
23       Q.   With the New York City Police
24   Department?
25       A.   Yes.

6

1
2        Q.   How long have you been a police
3    officer with the New York City Police
4    Department?
5        A.   Approximately six years.
6        Q.   So you were -- you became a police
7    officer in 2004, is that correct?
8        A.   Yes.
9        Q.   Are you familiar with the plaintiff in
10   this litigation, Dwayne Robertson?
11       A.   Yes.
12       Q.   In fact, you arrested him on April 15,
13   2006, is that correct?
14       MR. BROOKS:  Objection.  You can
15   answer.
16       MS. HOLLOWAY:  What's the basis of the
17   objection?
18       MR. BROOKS:  You are assuming he
19   arrested him.  You are assuming facts that
20   aren't in evidence.
21   BY MS. HOLLOWAY:
22       Q.   Did you arrest Mr. Robertson on April
23   15, 2006?
24       A.   I did not arrest him.
25       Q.   Were you -- did you and other officers

7

1
2    arrest Mr. Robertson on 2006?
3        MR. BROOKS:  Objection.  You can
4    answer.
5        A.   Yes.
6        Q.   Prior to your encounter with Mr.
7    Robertson on April 15, did you ever see Mr.
8    Robertson before?
9        A.   No.
10       Q.   Did you know of him?
11       A.   No.
12       MS. HOLLOWAY:  Once it's been marked
13   I'm going to be passing to the witness
14   Plaintiff's Exhibit 1.
15       (Exhibit 1, Document Bates Stamped
16   NYC31 through 32, marked for identification)
17   BY MS. HOLLOWAY:
18       Q.   Mr. Prince, can you identify what's
19   been marked Plaintiff's Exhibit 1 and placed in
20   front of you?
21       A.   Yes.
22       Q.   What is it?
23       A.   Complaint, I believe.
24       Q.   Excuse me?
25       A.   A complaint report, I believe.

8

1
2        Q.   A complaint report.  Do you know who
3    filled out that complaint report?
4        A.   Yes.
5        Q.   Who filled it out?
6        A.   Detective Sullivan.
7        Q.   Did you review that report after
8    Detective Sullivan filled it out?
9        A.   No.
10       Q.   Did you provide any information to Mr.
11   Sullivan that he used to your knowledge to fill
12   out that report?
13       A.   No.
14       Q.   Did you yourself write any reports
15   relating to the arrest of Mr. Robertson?
16       A.   I don't recall.
17       Q.   Do you recall taking any notes
18   relating to the arrest of Mr. Robertson?
19       A.   I don't recall.
20       Q.   Do you not recall taking any notes?
21   Could you have taken notes?
22       MR. BROOKS:  Objection.
23       A.   You can answer.
24       A.   I could have taken notes, yes.
25       Q.   But sitting here today you don't

9

1
2  recall whether you took any notes or filled out
3  any reports relating to the arrest of Mr.
4  Robertson, is that correct?
5      MR. BROOKS:  Objection to form.
6  Q.  You can answer.
7  A.  Yes.
8  Q.  You said you recognized that as a
9  complaint report, correct?
10  A.  Yes.
11  Q.  When I say that I mean Exhibit 1.
12  Sorry.
13      Does that complaint report relate to
14  the April 15, 2006 arrest of Mr. Dwayne
15  Robertson?
16  A.  Yes.
17  Q.  Do you know who the arresting officer
18  was on April 15 in the arrest of Dwayne
19  Robertson?
20  A.  Yes.
21  Q.  Who was that?
22  A.  Detective Sullivan.
23  Q.  Were you with Detective Sullivan when
24  he arrested Mr. Dwayne Robertson?
25  A.  Yes.

10

1
2  Q.  How did you come to arrest -- how
3  did -- withdrawn.
4      How did you and Mr. Sullivan come to
5  arrest Mr. Robertson on April 15, 2006?
6      MR. BROOKS:  Objection to form.
7  A.  I don't understand the question.
8  Q.  Let's take a step back, then.
9      Let's start on April 15.  Do you
10  recall whether you were scheduled to work on
11  April 15?
12  A.  I do recall, yes.
13  Q.  Were you scheduled to work?
14  A.  Yes.
15  Q.  What was your shift to be on April 15?
16  A.  I would actually have to refer to my
17  memo book to get the exact time.
18      MR. BROOKS:  At this time defendants
19  are providing counsel with a copy of Detective
20  Prince's memo book entries for the date in
21  question.  It's Bates marked NYC 416 to 417.
22      MS. HOLLOWAY:  Just noting for the
23  record, were these documents that were produced
24  to us prior to this morning?
25      MR. BROOKS:  I do not believe so, no.

11

1
2      MS. HOLLOWAY:  When did you become
3  aware of the existence of this memo book?
4      MR. BROOKS:  When I met with the
5  detective.
6      MS. HOLLOWAY:  When was that?
7      MR. BROOKS:  Yesterday, and I would
8  prefer that you direct the questions to the
9  witness and not to me.
10      MS. HOLLOWAY:  You produced a document
11  to me and I was just asking when you became
12  aware of this document as I believe I have a
13  right to do.  Okay.
14      We can mark this as Exhibit 2.
15      (Exhibit 2, Document Bates Stamped
16  NYC-416 through 417, marked for identification)
17  BY MS. HOLLOWAY:
18  Q.  Do you recognize this document that's
19  been marked as Exhibit 2, Mr. Prince?
20  A.  Yes, ma'am.
21  Q.  What is it?
22  A.  My memo book.
23  Q.  Is this the entirety of your memo book
24  or an excerpt from your memo book?
25      MR. BROOKS:  Objection to form.

12

1
2  Q.  Is this an excerpt from your memo
3  book?
4  A.  I don't understand the question.
5  Q.  Does your memo book have more than one
6  page, Mr. Prince?
7  A.  Yes, ma'am.
8  Q.  And this exhibit has two pages,
9  correct?
10  A.  Yes, ma'am.
11  Q.  Is the first page the cover page of
12  your memo book?
13  A.  Yes, ma'am.
14  Q.  What's the second page of the exhibit?
15  A.  A copy of a page of my memo book.
16  Q.  Can you read for me the text that has
17  not been redacted on the second page?
18  A.  Excuse me?
19  Q.  Can you read for me the text that has
20  not been redacted or blacked out on the second
21  page?
22  A.  4-14-06, 1730 by 0205, 1730 PFD, 207
23  EOT, PO Prince 934076.
24  Q.  Can we walk through each of those and
25  if you could, could you explain to me what those

13

2  notations mean?  So starting 4-14-06, is that
3  the date on which this note was taken?
4    A.  4-14-06 is the date.
5    Q.  Next to that you read 1730 X 0205.
6  What does that mean?
7    A.  1730 is 5:30 military time, and
8  zero -- by X is to 0205.
9    Q.  I'm sorry but I don't understand.
10    A.  The X represents what the tour -- in
11  between tour.  You are working from 5:30 to
12  0205.
13    Q.  To 0205.  So does that indicate that
14  your shift was from 5:30 p.m. to 2:05 a.m.?
15    A.  Yes, ma'am.
16    Q.  How about the next line, you read, I
17  believe, 1730 PFD.  What does that mean?
18    A.  1730 or PFD?
19    Q.  1730.
20    A.  1730 means 5:30 p.m.
21    Q.  And PFD?
22    A.  PFD, present for duty.
23    Q.  Take a step back, Mr. Prince.  Is this
24  your handwriting on this page?
25    A.  This is my handwriting, yes.

14

2    Q.  Just wanted to confirm.
3  Do these reflect notes that you took
4  on April 14, 2006?
5    MR. BROOKS:  Objection.
6    Q.  You can answer.
7    MR. BROOKS:  You can answer.
8    A.  Yes.
9    Q.  How about the next line, you read that
10  quickly but I believe you said 0205 EOT, is that
11  correct?
12    A.  Yes.
13    Q.  What does that mean?
14    A.  Which one?
15    Q.  0205 and then EOT if you could.
16    A.  0205, that's 2:05 a.m.
17    Q.  And EOT?
18    A.  End of tour.
19    Q.  The note to the right of EOT, what
20  does that say and what does that mean?
21    A.  PO.
22    Q.  And the rest of the line?
23    A.  Prince, 934076.
24    Q.  I take it the PO Prince refers to you,
25  am I correct?

15

2    A.  Yes.
3    Q.  And the numbers after PO Prince, what
4  do those refer to?
5    A.  My tax number.
6    Q.  Does this refresh your recollection of
7  what shift you were scheduled to work on April
8  14, 2006?
9    A.  Yes.
10    Q.  The notes on the second line, 1730
11  PFD, does that reflect that you did indeed
12  report for duty at 5:30 on April 14, 2006?
13    A.  Yes.
14    Q.  Do you recall with whom you were
15  scheduled to work during this shift on April 14,
16  2006?
17    MR. BROOKS:  Objection.  You can
18  answer.
19    A.  Yes.
20    Q.  With whom were you scheduled to work?
21    A.  Sergeant Daglas and Detective
22  Sullivan.
23    Q.  Had you worked with Sergeant Daglas
24  before April 14, 2006?
25    A.  Yes.

16

2    Q.  Had you worked with Detective Sullivan
3  before April 14?
4    A.  Yes.
5    Q.  To what unit were you assigned that
6  evening?
7    A.  Anticrime.
8    Q.  Is that your usual assignment --
9  rather, withdrawn.
10  Was that your usual assignment during
11  2006?
12    A.  No.
13    Q.  What is anticrime?
14    A.  Anticrime is a unit that addresses
15  specific crimes in the precinct.
16    Q.  What do you mean by specific crimes?
17    A.  Robbery patterns, drug patterns,
18  shootings.
19    Q.  How often were you assigned to
20  anticrime during 2006?
21    A.  I don't understand the question.
22    Q.  I believe earlier I asked you if you
23  were always assigned to anticrime, correct?  And
24  you said no.
25  Is that a correct statement of your

17

2   testimony?

3       A.   Yes.

4       Q.   Were you assigned to anticrime on

5   specific shifts?

6       A.   I still don't understand the question.

7       Q.   You were a patrol officer assigned to

8   the 75th Precinct on April 14, 2006, is that

9   correct?

10      A.   I was an anticrime officer in the 75th

11   Precinct, April 2006.

12      Q.   So anticrime was your unit during

13   2006?

14      A.   Anticrime was my unit during April

15   2006.

16      Q.   You have any specific assignments on

17   the evening of April 14, 2006?

18      A.   Anticrime.

19      Q.   What did you understand that to mean?

20      A.   Performing my duties.

21      Q.   What were those duties?

22      A.   Patrol the streets of east New York.

23      Q.   Were you patrolling the streets of

24   east New York in a vehicle --

25      A.   Yes.

18

2       Q.   -- that evening?  And with whom were

3   you in that vehicle, who else -- withdrawn.

4       Who else was in that vehicle with you

5   on that evening?

6       A.   Myself, Detective Sullivan, Sergeant

7   Daglas.

8       Q.   Was it customary for there to be three

9   officers in a vehicle --

10      MR. BROOKS:  Objection.

11      Q.   -- when you were patrolling the

12   streets, performing your duties?

13      A.   I don't understand the question.

14      Q.   Withdrawn, we'll come back to it.

15      How long between the start of your

16   shift on April 14 -- withdrawn.

17      How many hours between the start of

18   your shift -- how many hours were there between

19   the start of your shift and when you first

20   encountered Mr. Robertson on that evening?

21      A.   I don't recall.

22      Q.   Do you recall when you first saw Mr.

23   Robertson?

24      A.   I don't understand the question.

25      Q.   Did there come a time on April 14 that

19

2   you saw Mr. Robertson?

3       A.   Yes.

4       Q.   Do you recall approximately what time

5   that was?

6       A.   No.

7       Q.   Was it at around midnight, do you

8   recall?

9       A.   No.

10      Q.   So you have no recollection at all

11   about what time it was when you first

12   encountered Mr. Robertson?

13      A.   I would have to refer to Exhibit 1.

14      Q.   Feel free to refer to Exhibit 1.

15      A.   What was your question?

16      Q.   Do you recall approximately what time

17   you first encountered Mr. Robertson on April 14?

18      A.   No.

19      Q.   Did your review of Exhibit 1 help

20   refresh your recollection of what time you

21   encountered Mr. Robertson?

22      A.   No.

23      Q.   Do you recall first seeing Mr.

24   Robertson on April 14, 2006?

25      A.   I don't understand the question.

20

2       Q.   Do you recall seeing Mr. Robertson

3   while you were patrolling the streets of east

4   New York in April 14, 2006?

5       A.   Yes.

6       Q.   What do you recall about seeing him?

7       MR. BROOKS:  Objection.

8       A.   I don't understand the question.

9       Q.   What can you recall about seeing Mr.

10   Robertson for the first time on April 14, 2006?

11      MR. BROOKS:  Objection.

12      MS. HOLLOWAY:  What's the basis of the

13   objection?

14      MR. BROOKS:  That's an extraordinarily

15   broad question.  If you want to narrow it down a

16   little bit for him?  You are asking him to

17   recount the entirety of the incident in that one

18   question.

19   BY MS. HOLLOWAY:

20      Q.   Mr. Prince, do you understand my

21   question?

22      A.   No.

23      Q.   Okay.  Let's start from the beginning,

24   then.

25      Do you recall where you were seated in

21

1
2  the vehicle that you were in on April 14?
3  A.  Yes.
4  Q.  Where were you seated?
5  A.  The back seat.
6  Q.  Who was driving the car?
7  A.  Detective Sullivan.
8  Q.  Where was Sergeant Daglas seated?
9  A.  The passenger -- he was a passenger in
10  the front seat.
11  Q.  Passenger in the front seat.  Okay.
12  Where were you located when you first
13  saw Mr. Robertson?
14  A.  In the vicinity of 75th Precinct.
15  Q.  Would you recall what street you were
16  on?
17  Pitkin Avenue.
18  Q.  Do you recall what direction you were
19  traveling on Pitkin Avenue?
20  A.  No.
21  Q.  Can you describe Pitkin Avenue for me?
22  A.  Yes.
23  Q.  Would you, please?
24  A.  Yes.  Pitkin Avenue is an industrial
25  area that has fixed street light posts and light

22

1
2  fixtures on each building.
3  Q.  So is Pitkin Avenue a two-way street?
4  A.  Yes.
5  Q.  How many lanes does it have?
6  A.  I'm not sure.
7  Q.  Do you recall which direction you were
8  traveling on Pitkin Avenue?
9  A.  No.
10  Q.  What kind of a vehicle were you
11  traveling in?
12  A.  An unmarked RMP.
13  Q.  What does RMP stand for?
14  A.  Radio motor patrol.
15  Q.  Does that car have any lights on it?
16  A.  I don't understand the question.
17  Q.  Putting aside headlights, does that
18  car have a bar light on the top of the vehicle?
19  A.  No, that car doesn't have a bar light
20  on top of the vehicle.
21  Q.  Does it have any kind of floodlights
22  or flashing lights?
23  MR. BROOKS:  Objection to form.
24  Q.  You can answer.
25  A.  I don't understand the question.

23

1
2  Q.  Does the car have any kind of flashing
3  light that you can turn on?
4  A.  Yes.
5  Q.  Does it have any other kind of lights
6  other than those flashing lights?
7  A.  Brake lights, yes.
8  Q.  When you approached Mr. Robertson,
9  were the flashing lights on in that vehicle?
10  A.  I don't recall.
11  Q.  Would it have been customary for you
12  to turn on those flashing lights before you
13  approached someone on the street?
14  MR. BROOKS:  Objection.
15  A.  I don't understand the question.
16  Q.  In your experience do you usually turn
17  on flashing lights in your vehicle before
18  approaching a person on the street?
19  A.  I don't understand the question.
20  Q.  Were there other officers in your
21  vicinity on Pitkin Avenue on April 14?
22  A.  Myself, Sergeant Daglas and Detective
23  Sullivan, yes.
24  Q.  Were there other vehicles with
25  officers in them in that vicinity?

24

1
2  A.  I don't recall.
3  Q.  Do you recall being in radio contact
4  with any other cars with officers in them in
5  your vicinity on that evening?
6  A.  I don't understand the question.
7  Q.  Did you make radio contact or were you
8  in radio contact with other officers in the
9  vicinity of Pitkin Avenue that evening?
10  A.  I don't recall.
11  MR. BROOKS:  Can we take a quick
12  break?
13  MS. HOLLOWAY:  Sure.
14  THE VIDEOGRAPHER:  Off the record,
15  10:29 a.m.
16  (Recess.)
17  THE VIDEOGRAPHER:  Back on the record,
18  10:41 a.m.
19  BY MS. HOLLOWAY:
20  Q.  Detective Prince, you described Pitkin
21  Avenue as being industrial, is that correct?
22  A.  Yes, ma'am.
23  Q.  Do you recall on the evening of April
24  15 when you saw Mr. Robertson on Pitkin Avenue,
25  was he the only person on the street?

25

1
2      A.   I don't recall.
3      Q.   Would you describe the area as being
4   deserted?
5      A.   Yes.
6      Q.   Was it dark?
7      A.   It was in the evening, yes.
8      Q.   Are there street lights on the street?
9      A.   Yes.
10     Q.   Were those street lights on?
11     A.   Yes.
12     Q.   How far away from Mr. Robertson were
13   you in your vehicle when you first saw him?
14     A.   Approximately two car lengths.
15     Q.   Can you describe for me what you saw?
16     A.   I saw -- I observed the individual
17   walking.
18     Q.   What was he wearing?
19     A.   I don't recall.
20     Q.   Was he doing anything other than
21   walking?
22     A.   He was smoking at that time what I
23   believed to be a marijuana cigarette.
24     Q.   Why did you believe it to be a
25   marijuana cigarette?

26

1
2      A.   Because of the smell.
3      Q.   So you smelled marijuana when you were
4   in your car two car lengths away from Mr.
5   Robertson, is that correct?
6      A.   Yes.
7      Q.   Is that the only reason you believed
8   it was a marijuana cigarette?
9      A.   At that time, yes.
10     Q.   Did there come a time when you had
11   other reason to believe that it was a marijuana
12   cigarette?
13     A.   Yes.
14     Q.   When was that?
15     A.   When we got closer to Mr. Robertson.
16     Q.   Okay.  So let's take a step back.
17          Going back to what you saw when you
18   first saw Mr. Robertson, he was walking down the
19   street, you say, correct?
20     A.   Yes.
21     Q.   And you observed him to be smoking
22   what you believed to be a marijuana cigarette,
23   correct?
24     A.   Yes.
25     Q.   What happened next?

27

1
2      A.   Can you rephrase the question?
3      Q.   Did you drive the car closer to Mr.
4   Robertson?
5      A.   When we observed Mr. Robertson, did we
6   move the vehicle closer to Mr. Robertson?
7      Q.   Hm-hmm.
8      A.   Yes.
9      Q.   Why was the decision made to move the
10   vehicle closer to Mr. Robertson?
11          MR. BROOKS:  Objection.
12          MS. HOLLOWAY:  I'll rephrase the
13   question.
14     Q.   Was a decision made to approach Mr.
15   Robertson in the vehicle?
16     A.   Yes.
17     Q.   Who made that decision?
18     A.   We all did.
19     Q.   And did you have an understanding as
20   to why?
21     A.   Because in New York state it is
22   illegal to smoke marijuana.
23     Q.   What did Mr. Robertson do as you
24   approached him in the vehicle?
25     A.   When we approached Mr. Robertson I

28

1
2   exited the vehicle and we identified ourselves
3   and Mr. Robertson ran.
4      Q.   Did any of the officers in the car
5   speak to Mr. Robertson prior to your exiting the
6   vehicle?
7      A.   I don't recall.
8      Q.   Did Mr. Robertson say anything to any
9   of the officers in the car prior to your exiting
10   the vehicle?
11     A.   I don't recall.
12     Q.   Do you recall whether Mr. Robertson
13   was still moving when you exited the car?
14     A.   When I exited the vehicle he started
15   to run.
16     Q.   How long between when you exited the
17   vehicle -- let me rephrase that.
18          How long was it after you exited the
19   vehicle when Mr. Robertson started to run?
20     A.   I don't understand the question.
21     Q.   Did Mr. Robertson run the moment you
22   stepped out of the vehicle?
23     A.   Yes.
24     Q.   Had you closed the door before Mr.
25   Robertson started to run?

29

1
2     A.   Yes.
3     Q.   Had you said anything to Mr. Robertson
4     before Mr. Robertson started to run?
5     A.   Yes.
6     Q.   What did you say?
7     A.   I identified myself.
8     Q.   Did you say anything else?
9     A.   I don't understand the question.
10    Q.   Did you say anything else to Mr.
11    Robertson other than identifying yourself as a
12    police officer?
13    A.   No.  No.
14    Q.   Did Mr. Robertson say anything to you?
15    A.   I don't recall if he did.
16    Q.   Was your badge visible as you
17    approached Mr. Robertson?
18    A.   Yes.
19    Q.   Where was it?
20    A.   Around my neck.
21    Q.   And what were you wearing?
22    A.   I don't recall.
23    Q.   Were you in a police uniform?
24    A.   No.
25    Q.   Was there anything to identify you as

30

1
2     a police officer other than the badge around
3     your neck?
4     A.   The color of the day.
5     Q.   What's the color of the day?
6     A.   The color of the day is a sweat band
7     or wrist band that we wear around our arm on the
8     outer most garment to identify ourselves as
9     police officers to other police officers.
10    Q.   Does the color of that band change
11    every day?
12    A.   Yes.
13    Q.   Would there have been a reason for Mr.
14    Robertson to recognize your color of the day
15    band?
16         MR. BROOKS:  Objection.
17    Q.   You can answer the question.
18    A.   No.
19    Q.   What weapons were you carrying with
20    you when you exited the vehicle?
21    A.   My service pistol.
22    Q.   Where was that pistol?
23    A.   On my hip.
24    Q.   In a holster?
25    A.   Yes, ma'am.

31

1
2     Q.   And did you have your hand on that
3     pistol as you approached Mr. Robertson?
4     A.   No.
5     Q.   Is there a safety latch on your
6     holster?
7     A.   Yes.
8     Q.   Was that closed or open when you
9     approached Mr. Robertson?
10    A.   Closed.
11    Q.   What happened next?
12    A.   When I exited the vehicle?
13    Q.   Yes.
14    A.   Mr. Robertson ran and I chased him.
15    Q.   At that point did any other officers
16    exit the vehicle?
17    A.   No.
18    Q.   Which way was your vehicle pointed on
19    Pitkin Avenue?
20    A.   I don't recall.
21    Q.   Was Mr. Robertson -- you said earlier,
22    I believe, that Pitkin Avenue is a two-way
23    street, correct?
24    A.   Yes.
25    Q.   So was your vehicle located in the

32

1
2     right-hand lane, whichever direction you were
3     facing?
4     A.   I don't -- I don't recall.
5     Q.   So you don't recall whether your
6     vehicle was traveling with traffic or against
7     traffic, is that correct?
8     A.   Well, Pitkin Avenue is a two --
9     two-way lane, so it is either you are going with
10    traffic or against -- or -- you are either going
11    with traffic or with traffic east or west.
12    Q.   Let me clarify my question.
13         Was there a lane between your vehicle
14    and Mr. Robertson on the sidewalk?
15    A.   I don't recall.
16    Q.   So you don't recall whether your
17    vehicle was against the curb of the sidewalk
18    where Mr. Robertson was walking, is that
19    correct?
20    A.   Your question is, was my vehicle
21    against a curb when Mr. Robertson was walking?
22    Q.   Hm-hmm.
23    A.   Yes.
24    Q.   It was?
25    A.   Yes.

33

1
2     Q.   You testified that you chased Mr.
3  Robertson, correct?
4     A.   Yes.
5     Q.   At some point did you catch Mr.
6  Robertson?
7     A.   Yes.
8     Q.   How did you catch him?
9     A.   Well, when I was chasing Mr.
10  Robertson, Mr. Robertson turned back towards me
11  and started running towards me and that's when I
12  apprehended him.
13     Q.   Did you have an understanding as to
14  why Mr. Robertson turned back toward you?
15        MR. BROOKS:  Objection.  You can
16  answer.
17     A.   Yes.
18     Q.   Why?
19     A.   Because the two other officers in the
20  vehicle, Detective Sullivan, Sergeant Daglas,
21  they continued to drive the vehicle ahead of Mr.
22  Robertson.
23     Q.   So the vehicle continued to move along
24  and follow Mr. Robertson as well, am I
25  understanding you correctly?

34

1
2     A.   Yes.
3     Q.   What happened after Mr. Robertson
4  turned around and came back toward you?
5     A.   I tackled Mr. Robertson.
6     Q.   What did Mr. Robertson do?
7     A.   He resisted.
8     Q.   How did he resist?
9     A.   By fighting.
10     Q.   How did he fight?
11     A.   Well, when I tackled him we both fell
12  to the ground and he was kicking and punching.
13     Q.   So were his hands in fists?
14     A.   Yes.
15     Q.   Was he lying on his back on the
16  ground?
17     A.   We were both rolling.
18     Q.   Did you strike Mr. Robertson?
19        MR. BROOKS:  Objection.
20     A.   I don't understand your question.
21     Q.   Were your hands in fists?
22     A.   No.
23     Q.   And did you hit Mr. Robertson with
24  your hands in any way?
25        MR. BROOKS:  Objection.

35

1
2     A.   I don't understand the question.
3     Q.   What don't you understand?
4     A.   You asked me did I hit Mr. Robertson
5  in any way with my hands.
6     Q.   Yes.
7     A.   I don't understand the question.
8     Q.   Did you hit Mr. Robertson with your
9  hands?
10     A.   With my hands I was actually trying to
11  restrain Mr. Robertson.
12     Q.   So where were your hands on Mr.
13  Robertson?
14     A.   At the time of the struggle?  I don't
15  recall.
16     Q.   Did you put your hands around his neck
17  at all?
18     A.   No.
19     Q.   Did there come a time when Mr.
20  Robertson stopped struggling?
21     A.   Yes.
22     Q.   When was that?
23     A.   When handcuffs were applied.
24     Q.   So he didn't stop struggling until the
25  handcuffs were applied, is that correct?

36

1
2     A.   Yes.
3     Q.   Did you subdue Mr. Sullivan with the
4  assistance of other officers?
5        MR. BROOKS:  Objection.
6        I think you mean Robertson also.
7     A.   I don't understand the question.
8        MS. HOLLOWAY:  Hmm?
9        MR. BROOKS:  You said Sullivan.
10        MS. HOLLOWAY:  Oh, my apologies.
11     Q.   Did you -- when you handcuffed Mr.
12  Robertson, where were the other officers?
13     A.   Detective Sullivan and Sergeant
14  Daglas?
15     Q.   Yes.
16     A.   Assisting me.
17     Q.   Were they also struggling with Mr.
18  Robertson?
19     A.   I don't understand the question.
20     Q.   How were they assisting you?
21     A.   They assisted me with bringing Mr.
22  Robertson's hands behind his back, placing him
23  in handcuffs.
24     Q.   Did both Sergeant Daglas and Detective
25  Sullivan assist you in putting Mr. Robertson's

37

```
1
2    hands behind his back?
3      A.   Yes.
4      Q.   Did you observe any of the officers
5    strike Mr. Robertson with a baton?
6         MR. BROOKS:  Objection.
7      A.   No.
8      Q.   Did you strike Mr. Robertson with a
9    baton?
10     A.   No.
11     Q.   Was a baton used in any way to subdue
12   Mr. Robertson?
13        MR. BROOKS:  Objection.
14     A.   No.
15     Q.   So it's your testimony that neither
16   you nor Detective Sullivan nor Sergeant Daglas
17   used your batons in any way to strike or subdue
18   Mr. Robertson?
19        MR. BROOKS:  Objection.
20     Q.   On April 15, is that correct?
21        MR. BROOKS:  Objection.
22     A.   It's my testimony that I did not use a
23   baton, yes.
24     Q.   Did Detective Sullivan use a baton?
25     A.   No.  Not to my knowledge, no.
```

38

```
1
2      Q.   Did Sergeant Daglas use a baton?
3      A.   No, not to my knowledge.
4      Q.   Let's take a step back in time.
5           As you were approaching Mr. Robertson
6    in your vehicle, what was your intention?
7         MR. BROOKS:  Objection.
8      A.   Can you rephrase the question?
9      Q.   Absolutely.  Did you intend to arrest
10   Mr. Robertson?
11     A.   When we approached Mr. Robertson?
12     Q.   Yes.
13     A.   Marijuana is illegal in New York
14   state, so, yes, we -- when we found out he was
15   in possession of marijuana, we intended to
16   arrest him, yes.
17     Q.   When did you find that he was in
18   possession of marijuana?
19     A.   When we approached him we actually --
20   I observed what I believed to be a marijuana
21   cigarette.
22     Q.   What did Mr. Robertson do if anything
23   with that marijuana cigarette before he ran?
24     A.   I believe he threw it -- tossed it,
25   tossed it.
```

39

```
1
2      Q.   Did you or any of the other officers
3    attempt to locate that marijuana cigarette?
4         MR. BROOKS:  Objection.
5      A.   I don't understand the question.
6      Q.   You testified that Mr. Robertson threw
7    the marijuana cigarette, correct?
8      A.   Yes.
9      Q.   He threw it on the ground?
10     A.   Yes.
11     Q.   Did there come a time when you
12   searched for that marijuana cigarette?
13     A.   No.
14     Q.   Did Mr. Sullivan to your knowledge
15   search for that marijuana cigarette?
16     A.   I don't recall.
17     Q.   To your knowledge did Sergeant Daglas
18   search for that marijuana cigarette?
19     A.   I don't recall.
20     Q.   Do you recall whether that marijuana
21   cigarette was ever retrieved from the ground?
22     A.   I would actually have to review the
23   vouchers to see if it was vouchered.
24     Q.   Okay.  Let's do that.
25        MS. HOLLOWAY:  Mark as Exhibit 3.
```

40

```
1
2         (Exhibit 3, Document Bates Stamped
3    NYC28, marked for identification)
4         (Exhibit 4, Document Bates Stamped
5    NYC29, marked for identification)
6    BY MS. HOLLOWAY:
7      Q.   I have marked and passed to the
8    witness what's been marked as Exhibits 3 and 4.
9           Detective Prince, do you recognize
10   these documents?
11     A.   Yes, ma'am.
12     Q.   What are they?
13     A.   Property clerk invoice.
14     Q.   What is a property clerk invoice?
15     A.   A voucher.
16     Q.   What is a voucher?
17     A.   A voucher -- it's something that we
18   use to document what -- document evidence taken
19   into police custody.
20     Q.   Can you take a moment and review these
21   vouchers and let me know when you are done
22   whether you see the marijuana cigarette that we
23   discussed earlier.
24        (Pause)
25     A.   No, I do not see the cigarette.
```

41

```
 1
 2     Q.  If the marijuana cigarette had been
 3   recovered, would a property invoice had to have
 4   been prepared for it under proper procedures?
 5         MR. BROOKS:  Objection.
 6     A.  Yes.
 7     Q.  Does this refresh your recollection as
 8   to whether the marijuana cigarette was
 9   retrieved?
10     A.  Yes.
11     Q.  So what is your present recollection
12   as to whether the marijuana cigarette was
13   retrieved from the ground?
14     A.  It wasn't retrieved.
15     Q.  Do you have an understanding as to why
16   it was not retrieved?
17     A.  Can you rephrase the question?
18     Q.  Do you know why the marijuana
19   cigarette was not collected?
20     A.  No, I don't know why.
21     Q.  Did you see Mr. Robertson drop
22   anything while he was running?
23     A.  Yes.
24     Q.  What did you observe Mr. Robertson
25   drop?
```

42

```
 1
 2     A.  A black object.
 3     Q.  Where did he drop it?
 4     A.  On the street.
 5     Q.  Was this before he turned and returned
 6   back toward you?
 7     A.  Was it before he --
 8     Q.  Before he turned and ran back toward
 9   you?
10     A.  It was actually while he was turning,
11   running back towards me.
12     Q.  Did he throw this black object -- did
13   you observe Mr. Robertson throw the black object
14   on the ground?
15     A.  Yes.
16     Q.  Do you know if an officer recovered
17   that object?
18     A.  Yes.
19     Q.  Do you know which officer recovered
20   it?
21     A.  No, I don't recall.
22     Q.  Do you know if the object was on the
23   ground or in a sewer when it was recovered?
24         MR. BROOKS:  Objection.
25     A.  In a sewer?
```

43

```
 1
 2     Q.  Do you know where the object was
 3   located when it was recovered?
 4     A.  No.
 5     Q.  Did you observe either Officer
 6   Sullivan or Sergeant Daglas collecting that
 7   black object?
 8         MR. BROOKS:  Objection.
 9     A.  No.
10     Q.  If you would, let's go back to -- you
11   said at a point Mr. Robertson had been
12   handcuffed and was on the ground, is that
13   correct?
14     A.  Yes, ma'am.
15     Q.  How was he lying when he was
16   handcuffed?
17     A.  When he was handcuffed?  Face down.
18     Q.  Did you see any injuries on Mr.
19   Robertson?
20         MR. BROOKS:  Objection.
21     A.  I don't recall.
22     Q.  When Mr. Robertson was lying face down
23   and handcuffed, was he bleeding?
24     A.  I don't recall.
25     Q.  Did Mr. Robertson say anything to you
```

44

```
 1
 2   as he was lying there handcuffed?
 3     A.  I don't recall.
 4     Q.  Do you recall saying anything to Mr.
 5   Robertson?
 6         MR. BROOKS:  Objection.
 7     A.  I don't understand the question.
 8     Q.  Do you recall saying anything to Mr.
 9   Robertson while he was handcuffed on -- laying
10   face down?
11     A.  I don't recall.
12     Q.  What happened next?
13     A.  What happened next when?
14     Q.  After he was lying face down and
15   handcuffed?
16     A.  We picked him up and we walked to the
17   vehicle.
18     Q.  Who is we?
19     A.  Myself, Detective Sullivan, Sergeant
20   Daglas.
21     Q.  Did all three officers pick up Mr.
22   Robertson and put him in the vehicle?
23         MR. BROOKS:  Objection.
24     A.  I don't recall.
25     Q.  Was Mr. Robertson struggling at that
```

45

1
2  point?
3    A.  When handcuffed?  No.
4    Q.  Have you been taught about when it is
5  appropriate to strike someone in the head with a
6  baton?
7        MR. BROOKS:  Objection.
8    A.  Can you rephrase the question?
9    Q.  Sure.  You attended the police
10  academy, correct?
11    A.  Yes, ma'am.
12    Q.  And did you receive training at the
13  police academy about the appropriate use of
14  force?
15    A.  Yes.
16    Q.  Specifically did you receive training
17  about the appropriate use of a baton?
18    A.  Yes.
19    Q.  Were you carrying a baton with you
20  that evening?
21    A.  No.
22    Q.  Do you know whether Mr. -- whether
23  Detective Sullivan was carrying a baton with him
24  that evening?
25    A.  I don't know.

46

1
2    Q.  Do you know whether Sergeant Daglas
3  was carrying a baton with him that evening?
4    A.  I don't know.
5    Q.  Is a baton a standard issue weapon for
6  officers in the anticrime unit?
7        MR. BROOKS:  Objection.
8    A.  Is a baton a standard issue weapon for
9  officers in anticrime?  A baton is a tool
10  used -- a tool that we are allowed -- a tool
11  that we have at our disposal as police officers,
12  yes.
13    Q.  Did you receive any training after the
14  police academy about the appropriate use of
15  force?
16        MR. BROOKS:  Objection.
17    A.  Can you rephrase the question?
18    Q.  Sure.  Do you have -- you did testify,
19  correct, that you received training about the
20  appropriate use of force at the police academy?
21    A.  Yes.
22        MR. BROOKS:  Objection.  You can
23  answer.
24    A.  Yes.
25    Q.  Have you received any what we in the

47

2  legal profession would call continuing
3  education --
4        MR. BROOKS:  Objection.
5    Q.  -- after the -- after your graduation
6  from the police academy about the appropriate
7  use of force?
8        MR. BROOKS:  Objection.
9    A.  Yes.
10    Q.  At any point while you were at the
11  police academy or after the police academy, did
12  you receive any instruction about when it is
13  appropriate to strike a subject in the head with
14  a baton?
15        MR. BROOKS:  Objection.
16    A.  Say the question one more time,
17  please.
18    Q.  While you were attending the police
19  academy or any time thereafter?
20    A.  Yes.
21    Q.  Did you ever receive any instruction
22  about when it is appropriate to strike a subject
23  in the head with a baton?
24        MR. BROOKS:  Objection.
25    A.  I have never received training when it

48

1
2  is appropriate to strike someone in the head
3  with a baton.
4    Q.  Is it appropriate to strike someone in
5  the head with a baton?
6        MR. BROOKS:  Objection.
7    A.  You are asking me is it appropriate?
8    Q.  Yes.
9    A.  No.
10    Q.  What's the basis for your belief that
11  it's inappropriate?
12        MR. BROOKS:  Objection.
13    A.  What's the basis for my belief?
14    Q.  Hm-hmm.
15    A.  When I think it's inappropriate to
16  strike someone in the head with a baton?  It
17  isn't appropriate.
18    Q.  Why isn't it appropriate?
19    A.  Because someone can die.
20    Q.  So would you -- is it your
21  understanding that striking someone in the head
22  with a baton is deadly force?
23        MR. BROOKS:  Objection.
24    A.  Yes.
25    Q.  What is deadly force?

49

1
2          MR. BROOKS:  Objection.
3     A.   What is deadly force?
4     Q.   Hm-hmm.  What's your understanding of
5  what that term means?
6     A.   My understanding of deadly force is
7  when you use a degree of force that can be
8  fatal.
9     Q.   In your view when is it appropriate to
10  use deadly force?
11     A.   In my view when is it appropriate to
12  use deadly force?  When my life or another
13  individual's life is at risk of deadly force or
14  at risk of death.
15     Q.   Was deadly force called for in your
16  contact with Mr. Robertson on April 15?
17          MR. BROOKS:  Objection.
18     A.   I don't understand the question.
19     Q.   In your view would the use of deadly
20  force have been appropriate on April 15 in your
21  contact with Mr. Robertson?
22          MR. BROOKS:  Objection.
23     A.   No.
24     Q.   We have been discussing your view
25  about the use of the baton and deadly force.

50

1
2        Are you aware of any police department
3  regulations regarding the appropriate use of a
4  baton?
5          MR. BROOKS:  Objection, and I note for
6  the record this witness is not a policy witness
7  pursuant to Rule 30(b)(6) of the Federal Rules
8  of Civil Procedure, so he can only testify as to
9  his knowledge.
10          MS. HOLLOWAY:  And that was my
11  question.
12     Q.   Are you aware of any regulations
13  within the police department regarding the
14  appropriate use of a baton?
15          MR. BROOKS:  Objection.
16     A.   Can you rephrase the question?
17     Q.   Do you have a -- does the police
18  department issue a policy manual of any kind?
19          MR. BROOKS:  Objection.
20     A.   Yes.
21     Q.   Does that policy manual include a
22  section regarding the appropriate use of a
23  baton?
24          MR. BROOKS:  Objection.
25     A.   That policy manual has a section used

51

1
2  to provide a policy for the use of deadly force,
3  yes.
4     Q.   Does it also discuss the use of other
5  types of force?
6          MR. BROOKS:  Objection.
7     A.   I would have to review the policy.
8     Q.   Do you have a copy of the policy?
9          MR. BROOKS:  Objection.
10     A.   Here right now?
11     Q.   Do you have one at, you know, at the
12  precinct?
13          MR. BROOKS:  Objection.
14     A.   To my knowledge there probably is a
15  policy in the precinct, yes.
16     Q.   But you personally haven't reviewed
17  it?
18          MR. BROOKS:  Objection.
19     Q.   Is that correct?
20     A.   I personally don't have one here
21  present.
22     Q.   Returning to a topic we discussed a
23  moment ago, did you receive training in the
24  police academy as to how to use a baton?
25     A.   Yes.

52

1
2          MR. BROOKS:  Objection.
3     Q.   Is it -- is striking someone in the
4  legs with a baton an appropriate use of a baton?
5          MR. BROOKS:  I'm going to instruct the
6  witness not to answer.  The City of New York and
7  its policies and practices are not at issue in
8  this case.  You can only speak as to the actions
9  of the individual police officers as they are
10  consistent with the constitution and not the
11  policies and practices of the City of New York.
12        The Monell claim against the City of
13  New York was dismissed.  The policies and
14  professionals of the city are not an issue.
15  It's merely the appropriateness of his actions
16  as related to the constitution.
17          MS. HOLLOWAY:  So you are instructing
18  the witness not to answer that question?
19          MR. BROOKS:  That's correct.  And I'm
20  going to interpose the same instruction to any
21  question regarding any policy of the New York
22  City Police Department.
23          MS. HOLLOWAY:  It's my view that this
24  line of questioning is entirely appropriate
25  because it reflects the state of mind of the

53

1
2    officers on the night in question.  But if you
3    are going to instruct the witness not to answer,
4    then that's your instruction.
5        MR. BROOKS:  Yes, I'm going to --
6    BY MS. HOLLOWAY:
7        Q.   You are going to follow your counsel's
8    instruction?
9        MR. BROOKS:  He doesn't have a choice.
10       MS. HOLLOWAY:  Okay.
11       Q.   Do you recall on the evening of April
12   15 whether at any point Mr. Robertson asked to
13   be taken to the hospital?
14       A.   I don't recall, no.
15       Q.   So you have no recollection of his
16   saying:  I need some medical attention or please
17   call me an ambulance?  You don't have any
18   recollection of that?
19       MR. BROOKS:  Objection to form.
20       A.   No, because I went to the hospital.
21       MS. SELIGMAN:  One moment.  Can we
22   confer?
23       MR. BROOKS:  One second.
24       MS. HOLLOWAY:  Off the record for a
25   moment?

54

1
2        MR. BROOKS:  Yes.
3        MS. SELIGMAN:  For one moment, yes.
4        MS. HOLLOWAY:  Going off the record.
5        THE VIDEOGRAPHER:  Off the record,
6    11:12 a.m.
7        (Recess.)
8        THE VIDEOGRAPHER:  Going back on the
9    record at 11:28 a.m.  This is the beginning of
10   disk two in the deposition of Niles Prince.
11   BY MS. HOLLOWAY:
12       Q.   To return to the topic we were
13   discussing just prior to the break, what did
14   they tell you at the police academy about when
15   it was appropriate to use a baton?
16       MR. BROOKS:  I'm going to instruct him
17   again not to answer.  These questions are not
18   relevant now that the City and Monell have been
19   dismissed from the case.
20       MS. HOLLOWAY:  Just so I understand
21   the scope of this instruction, are you
22   instructing Detective Prince not to answer any
23   questions regarding the policy and practice of
24   the New York City Police Department regarding
25   the appropriate use of force?

55

1
2        MR. BROOKS:  And his training thereof,
3    yes.
4        MS. HOLLOWAY:  And even his
5    understanding of the policy and practice of the
6    Police Department regarding the appropriate use
7    of force?
8        MR. BROOKS:  Yes, that's correct, even
9    his understanding of the training is irrelevant
10   because the only question that remains in this
11   case is whether his actions were consistent with
12   the constitutional rights of your client.
13       MS. HOLLOWAY:  Just so I can
14   understand because I'm considering taking this
15   issue to Judge Bloom, what's your basis in the
16   federal rules for instructing him not to answer?
17       MR. BROOKS:  It's outside the scope of
18   this deposition.  These claims are not part of
19   the deposition, they are no longer permissible
20   to be explored.
21       MS. HOLLOWAY:  Because of the
22   dismissal of the Monell claim?
23       MR. BROOKS:  Yes.
24       MS. HOLLOWAY:  So it's essentially a
25   relevance objection if I understand you

56

1
2    correctly?
3        MR. BROOKS:  No, it's not a relevance
4    objection.  It's outside the scope of what he's
5    here to testify about.  He's here to testify
6    about the incident, not about his training.
7    Those claims are not at issue in this case.
8        MS. HOLLOWAY:  Okay.  Thank you.
9        Q.   To return to the scene, Detective
10   Prince, Mr. Robertson is handcuffed, face down
11   on the ground, correct?
12       A.   Yes, ma'am.
13       Q.   Where are you?
14       MR. BROOKS:  At that time?
15   BY MS. HOLLOWAY:
16       Q.   At that time where are you?
17       A.   Well, I was also on the ground and I
18   got up.
19       Q.   Are you straddling Mr. Robertson?
20       A.   I don't understand.
21       Q.   Are you standing over him?
22       A.   At that time I was also on the ground
23   and I got up.
24       Q.   Once he's handcuffed, do you have your
25   hands on his handcuffed hands?

57

1
2    A.   To bring him up?  Yes, that's what
3    normally takes place.
4    Q.   Where is Detective Daglas standing at
5    this point?
6    A.   Sergeant Daglas?
7    Q.   Sorry.  Where is Sergeant Daglas
8    standing at this point?
9    A.   I don't recall where he is standing.
10   Q.   Do you recall whether Detective
11   Sullivan was standing?
12   A.   No, I don't recall.
13   Q.   Do you recall whether you could see
14   them while you were pulling Mr. Robertson up
15   from the front?
16   A.   Yes, I can see them.
17   Q.   Was Mr. Robertson always in your sight
18   as you were pulling him up from the ground?
19   A.   Yes.
20   Q.   Was Mr. Robertson complaining about
21   being uncomfortably handcuffed?
22        MR. BROOKS:  Objection.
23   A.   I don't recall.
24   Q.   Do you recall anything that Mr.
25   Robertson said at that point?

58

1
2    A.   No.
3    Q.   Do you recall the position of Mr.
4    Robertson's body when he was on the ground?  Was
5    he looking up?
6        MR. BROOKS:  Objection.
7    A.   Was his body looking up or was his
8    head looking up?
9    Q.   Was his head looking up?
10   A.   I don't recall.
11   Q.   Have you ever used a baton before to
12   subdue someone who is resisting arrest?
13        MR. BROOKS:  Objection.
14   A.   Have I?
15   Q.   Have you?
16   A.   No.
17   Q.   In your view would it be appropriate
18   to use a baton to subdue someone who is
19   resisting arrest?
20        MR. BROOKS:  Objection.
21   A.   In my view?  Would it be appropriate
22   to use a baton if someone is resisting arrest?
23   Yes.
24   Q.   Would you strike someone in the legs,
25   for example, with a baton?

59

1
2        MR. BROOKS:  Objection.
3    A.   I don't understand the question.
4    Q.   How might you use a baton to subdue
5    someone who is resisting arrest?
6    A.   Well, there are a number of ways you
7    can use a baton.  You can use a baton to help
8    restrain someone's arms in the back position to
9    handcuff them.
10   Q.   How would you do that?
11   A.   How would you do that?  You would put
12   the baton in between their arm and pry their arm
13   back if they have their arm clutched together
14   like this.
15        MR. BROOKS:  Indicating crossed arms.
16   Q.   Okay.  What might be another way that
17   you would use a baton to subdue someone who is
18   resisting arrest?
19   A.   You can also strike someone with a
20   baton.
21   Q.   Have you ever struck someone in the
22   head with a baton?
23   A.   Have I ever struck someone?
24   Q.   Yes.
25   A.   No.

60

1
2    Q.   Have you ever struck someone in the
3    face with a baton?
4    A.   Have I ever struck someone --
5    Q.   Yes.
6    A.   No.
7    Q.   Have you ever used a baton on a
8    subject who has already been handcuffed?
9    A.   Has I -- myself?
10   Q.   You, you yourself, yes.
11   A.   No.
12   Q.   In your view would that be
13   appropriate?
14        MR. BROOKS:  Objection.
15   A.   Can you rephrase the question?
16   Q.   In your view would it be appropriate
17   to strike someone with a baton after they have
18   been handcuffed?
19   A.   In my view, no.
20   Q.   Were you present in the vehicle with
21   Mr. Robertson once he was handcuffed?
22   A.   I don't recall.
23   Q.   When Mr. Robertson was placed in the
24   vehicle, were there any other vehicles in the
25   vicinity?

61

1
2      A.   I don't recall.
3      Q.   So you don't recall any other either
4    marked or unmarked police cars in the vicinity?
5      A.   No, I don't recall.
6      Q.   Do you recall whether you, Sergeant
7    Daglas or Officer Sullivan or Detective Sullivan
8    made a radio call to request any kind of back
9    up?
10         MR. BROOKS:   Objection.  You can
11   answer.
12     A.   No, I don't recall.
13     Q.   So did you ride in the car with Mr.
14   Robertson back to the precinct?
15     A.   I don't recall if he was in the
16   vehicle with me.
17     Q.   But you did testify there was just one
18   vehicle, correct?
19         MR. BROOKS:   Objection.
20     A.   Yes, ma'am.  Just one vehicle I was
21   working in, yes, ma'am.
22     Q.   Was Mr. Robertson taken back to the
23   precinct in the vehicle?
24     A.   He was taken back to the precinct in a
25   vehicle, yes, ma'am.

62

1
2      Q.   Were you in that same vehicle with Mr.
3    Robertson?
4      A.   I don't recall.
5      Q.   If you weren't in the vehicle with Mr.
6    Robertson, where could you possibly have been?
7      A.   I was in a vehicle, but I'm not sure
8    if Mr. Robertson was in that vehicle with me.
9      Q.   I don't mean to be difficult --
10     A.   That's okay.
11     Q.   -- Detective Prince, but we have
12   established that Mr. Robertson was taken back to
13   the precinct in --
14     A.   In a vehicle.
15     Q.   -- in a vehicle?
16     A.   Yes.
17     Q.   We have established that you arrived
18   at the scene in a vehicle?
19     A.   Yes.
20     Q.   And that you do not recall there being
21   any other police vehicle in the vicinity at the
22   time of Mr. Robertson's arrest, correct?
23     A.   Yes.
24     Q.   So if Mr. Robertson was taken back to
25   the precinct in a vehicle --

63

1
2      A.   And I was taken back to --
3      Q.   -- and you were taken back to the
4    precinct in a vehicle --
5      A.   We both got back to the precinct --
6      Q.   -- I would imagine that you both got
7    back to the precinct --
8      A.   Yes.
9      Q.   So were you -- I understand that you
10   don't specifically recall --
11     A.   If there were other vehicles there.
12     Q.   Okay.  So let's, just to be absolutely
13   clear to clarify the record, you got back to the
14   police precinct in a vehicle, Mr. Robertson got
15   back to the police precinct in a vehicle,
16   correct?
17     A.   Yes, ma'am.
18     Q.   You don't have any specific
19   recollection of being in a vehicle with Mr.
20   Robertson, correct?
21     A.   Yes, ma'am.
22     Q.   And you don't have any specific
23   recollection as to whether or not another
24   vehicle arrived that may have taken you back to
25   the precinct, is that correct?

64

1
2      A.   Yes, ma'am.
3      Q.   Do you recall whether an ambulance was
4    called to that location?
5          MR. BROOKS:   Objection.
6      A.   An ambulance wasn't called to that
7    location.
8      Q.   And you don't recall whether you and
9    Mr. Robertson left the scene in the same
10   vehicle?
11     A.   Yes, ma'am.
12     Q.   And you don't recall whether you
13   arrived at the police precinct in the same
14   vehicle, correct?
15     A.   Yes, ma'am, because I went to the
16   hospital.
17     Q.   Did you go directly to the hospital
18   from the scene?
19     A.   I don't recall that.
20     Q.   Do you recall being at the police
21   precinct with Mr. Robertson?
22     A.   No, I don't recall that.
23     Q.   What hospital did you go to?
24   (Pages 65 through 68 designated confidential)
25

65

```
1           NILES PRINCE - CONFIDENTIAL
2       MR. BROOKS:  Before we get into this
3   line of questioning relating to the injuries,
4   I'm going to designate this part of the record
5   confidential pursuant to the protective order,
6   and when we are done talking about injuries we
7   can go back.
8       MS. HOLLOWAY:  Certainly.
9       Q.  Do you recall what hospital you were
10  taken to?
11      A.  Yes.
12      Q.  What hospital was that?
13      A.  Jamaica, Jamaica Hospital.
14      Q.  How long were you at the hospital that
15  evening?
16      A.  I don't recall.
17      Q.  Do you recall what kind of treatment
18  you received if any at the hospital?
19      A.  I don't recall what kind of treatment
20  I received.
21      Q.  Do you recall the injuries that you
22  were taken to the hospital for?
23      A.  Yes, ma'am.
24      Q.  What were those injuries?
25      A.  For my back and my wrist.
```

66

```
1           NILES PRINCE - CONFIDENTIAL
2       Q.  What happened to your back?
3       A.  I injured my lower back.
4       Q.  How did you injure your lower back?
5       A.  From rolling around the ground --
6   rolling around on the ground with the defendant.
7       Q.  And your wrist, how did injure your
8   wrist?
9       A.  From rolling around the ground with
10  the defendant.
11      Q.  Do you recall when you were released
12  from Jamaica Hospital?
13      A.  No, I don't recall at the time, no.
14      Q.  Did you receive any followup treatment
15  for those injuries?
16      A.  For my back and wrist injuries?
17      Q.  Yes.
18      A.  I don't understand the question.
19      Q.  Did you -- let's take them one at a
20  time.
21      A.  Okay.
22      Q.  After leaving Jamaica Hospital on -- I
23  guess at this point we are on the morning of
24  April 15 -- did you go to see any other
25  healthcare provider about that injury to your
```

67

```
1           NILES PRINCE - CONFIDENTIAL
2   back?
3       A.  Well, occasionally I -- I received spa
4   treatments for my back, yes, massages, yes.
5       Q.  Had you received any of those massages
6   or spa treatments prior to Mr. Robertson's
7   arrest?
8       A.  No.
9       Q.  How about for your wrist, did you seek
10  any additional medical care for your wrist
11  injury subsequent to your time at Jamaica
12  Hospital?
13      A.  Can you repeat the question?
14      Q.  Did you seek any further treatment for
15  your wrist injury after you were released from
16  Jamaica Hospital on April 15?
17      A.  No.
18      Q.  Returning to your back injury, you
19  said you received massages and spa treatments.
20  Were those treatments performed by a doctor?
21      A.  No.
22      Q.  Were they prescribed by a doctor?
23      A.  Were the massages prescribed by a
24  doctor?
25      Q.  Hm-hmm.
```

68

```
1           NILES PRINCE - CONFIDENTIAL
2       A.  No.
3       Q.  Are you aware whether Mr. Robertson
4   was taken to a hospital on the evening of April
5   15?
6       A.  No, because I was at the hospital.
7       Q.  Did there come a time that you were
8   made aware that Mr. Robertson was taken to the
9   hospital?
10      A.  No.
11      Q.  After you were released from Jamaica
12  Hospital, where did you go?
13      A.  To the precinct.
14      Q.  Do you recall when you got to the
15  precinct whether Mr. Robertson was there?
16      A.  I don't recall.
17      Q.  Do you recall seeing Mr. Robertson
18  again after leaving the scene of the arrest?
19      A.  No, I don't recall.
20      MR. BROOKS:  Jessica, are you done
21  with the medical questions so we can go back on
22  to the regular record?
23      MS. HOLLOWAY:  Yes, I think I am for
24  now.
25      (End of confidential section)
```

69

1
2  BY MS. HOLLOWAY:
3      Q.   Do you have an understanding of
4  whether charges were brought against Mr.
5  Robertson for the events of April 15?
6      A.   By charges, what do you mean?
7      Q.   Whether -- are you aware whether the
8  District Attorney pursued any charges against
9  Mr. Robertson for the arrest that evening?
10     A.   I'm not aware of that, no.
11     Q.   I know earlier we discussed whether
12 you had any recollection about preparing any
13 reports or preparing any notes and you said you
14 had no recollection, correct?
15     A.   Yes.
16     Q.   Do you recall speaking to anyone from
17 the District Attorney's office about the arrest
18 of Mr. Robertson on the evening of 15th?
19     A.   No, I don't recall.
20     Q.   When you say you don't recall, do you
21 mean you don't know whether you did or you
22 recall not having -- specifically not having
23 those conversations?
24     MR. BROOKS:  Objection.
25     A.   I recall not having those

70

1  conversations.
2      Q.   Are you aware of any hearings held
3  regarding charges brought against Mr. Robertson
4  relating to the arrest of April 15?
5      MR. BROOKS:  Objection.
6      A.   Am I aware of any hearings?
7      Q.   Yes.
8      A.   No, I'm not aware of any hearings.
9      Q.   And did you appear in court at any
10 hearings related to -- or any court proceedings
11 relating to Mr. Robertson's arrest on April 15?
12     MR. BROOKS:  Objection.  Other than
13 the instant case we are here about?
14     MS. HOLLOWAY:  I'm sorry.  I think I
15 specified the instant case but I can rephrase it
16 if it's not clear.
17     Q.   Did you appear at any court
18 proceedings relating to the arrest of Mr.
19 Robertson on April 15?
20     MR. BROOKS:  Objection.
21     A.   Other than this hearing?  Other than
22 this?
23     Q.   Other than this deposition.
24     A.   No.
25

71

1
2      Q.   Are you aware that the charges brought
3  against Mr. Robertson for the April 15 arrest
4  were dismissed?
5      MR. BROOKS:  Objection.
6      A.   Am I aware of that?
7      Q.   Yes.
8      A.   No, I wasn't aware of that.
9      Q.   Are you married, Detective Prince?
10     MR. BROOKS:  Objection.  You can
11 answer the question.
12     A.   No.
13     Q.   What is your current salary as a
14 police officer?
15     MR. BROOKS:  Objection.
16     A.   My current salary as a police
17 officer -- 84,000.
18     Q.   What was your salary in 2006?
19     MR. BROOKS:  Objection.
20     A.   I don't recall.
21     Q.   Do you have any other sources of
22 income other than your salary as a police
23 officer?
24     MR. BROOKS:  Objection.
25     A.   No.

72

1
2      Q.   Prior to coming here to give your
3  testimony today, did you review what we have
4  marked as Exhibit No. 1?
5      A.   Yes.
6      Q.   When did you review it?
7      A.   Yesterday.
8      Q.   Did you review anything else in
9  preparation for this deposition?
10     MR. BROOKS:  I'm going to instruct the
11 witness not to answer.  The documents that he
12 reviewed with me are attorney work product as my
13 selection of those documents is indicative of my
14 thought processes related to litigating my
15 case.
16     MS. HOLLOWAY:  Understood.
17     MR. BROOKS:  All documents that he
18 reviewed were produced to you and are part of
19 discovery, so I'm instructing him not to answer
20 the question.
21 BY MS. HOLLOWAY:
22     Q.   Without specifically identifying what
23 other documents you may have reviewed, did you
24 review any other documents in preparation for
25 your deposition today?

73

1
2    A.   Yes.
3    Q.   Prior to coming to give your testimony
4    today, did you discuss with anyone other than
5    your attorneys your testimony?
6    A.   No.
7    Q.   Did you discuss with anyone other than
8    your attorneys the fact that you were coming to
9    testify here today?
10   A.   I don't understand the question.
11   Q.   Did you discuss with anyone other than
12   your attorneys the fact that you were coming to
13   testify in this action here today?
14   A.   Well, I have to -- I actually get
15   notified through the department to appear here,
16   yes.
17   Q.   So you -- I imagine that you spoke to
18   someone about scheduling and --
19   A.   I didn't speak to anyone about
20   scheduling, but I received notification that I
21   have to come here, yes.
22   Q.   Okay.  Thank you.
23       If a jury finds for the plaintiff, for
24   Mr. Robertson in this action and awards Mr.
25   Robertson damages in this action, what is your

74

1
2    understanding, or do you have an understanding
3    of who will pay those damages?
4        MR. BROOKS:  Objection.
5    A.   Can you rephrase the question?
6    Q.   Sure.  Are you aware that the action
7    in which you are testifying today is an action
8    brought by Mr. Robertson for damages?
9    A.   Yes.
10       MR. BROOKS:  Objection.  You can
11   answer.
12   A.   Yes.
13   Q.   Do you have an understanding as to if
14   a jury in fact awards Mr. Robertson damages, who
15   will pay those damages?
16   A.   Do I have an idea of who will pay for
17   the damages?
18   Q.   Yes.
19   A.   Yes.
20   Q.   Did that understanding come -- what is
21   your understanding of who will pay those
22   damages?
23   A.   From my understanding, the City of New
24   York.
25   Q.   To your knowledge, has anyone ever

75

2    complained about his treatment by you?
3        MR. BROOKS:  Objection.  Who?
4    BY MS. HOLLOWAY:
5    Q.   For example, citizen complaints?  To
6    your knowledge have any complaints been filed by
7    people you have arrested, for example, regarding
8    the way they were treated by you?
9        MR. BROOKS:  Objection.
10   A.   I think I understand the question.  To
11   your knowledge have I ever received complaints
12   made by citizens?
13   Q.   Yes.
14   A.   Yes.
15   Q.   Are you aware of how many of those
16   complaints have been made against you?
17   A.   Against me?  No.
18   Q.   Are you aware of whether any
19   complaints have been made against you by
20   citizens in your capacity as a police officer
21   for the use of excessive force?
22       MR. BROOKS:  Objection.
23   A.   Am I aware that -- can you rephrase
24   the question?
25   Q.   Sure.  We can take a step back to make

76

1
2    it a little bit clearer.
3    A.   Okay.
4    Q.   So my understanding is that you --
5    citizens can file complaints against you for the
6    way that they have been treated by you in your
7    capacity as a police officer, is that your
8    understanding as well?
9    A.   Yes.
10   Q.   Are you aware of whether any
11   complaints -- any such complaints have been
12   filed against you for your use of force?
13   A.   Am I aware if any other complaints
14   have been filed against me for the use of force?
15   Q.   Yes.
16   A.   I'm aware, yes.
17   Q.   Do you have any understanding of how
18   many complaints have been filed against you for
19   the use of excessive force?
20       MR. BROOKS:  Objection.
21   A.   No.
22   Q.   Do you know whether any of the
23   complaints that have been filed against you for
24   use of excessive force were substantiated
25   complaints?

77

1
2    A.   To my knowledge, yes.
3    Q.   How did you come to that
4    understanding?
5         MR. BROOKS:  Objection.
6    A.   Because I had to go down to CCRB, the
7    complaint review board.
8    Q.   Approximately how many times have you
9    had to go down to CCRB, the complaint board
10   to -- to address a citizen complaint?
11   A.   I don't -- I don't know offhand how
12   many times.
13   Q.   Do you know how many complaints for
14   use of force have been substantiated against
15   you?
16   A.   To my knowledge, only one.
17   Q.   Can you describe the incident from
18   which that complaint derived?
19   A.   No.
20        MR. BROOKS:  Objection.
21   A.   No, I don't recall.
22   Q.   You don't recall?
23   A.   No.
24   Q.   Do you recall when that incident was?
25   A.   No, I don't recall.

78

1
2    Q.   If I told you that that incident was
3    in April of 2006, does that sound about right to
4    you?
5         MR. BROOKS:  Objection.
6    A.   I would actually have to review a copy
7    of the complaints made against me to determine
8    whether or not it was made in 2006.
9    Q.   Have you been assigned to the 75th
10   Precinct for your entire career as a police
11   officer?
12   A.   No.
13   Q.   Where else have you been assigned?
14   A.   Manhattan North Vice, OCCB.
15   Q.   When were you assigned to Manhattan
16   North Vice?
17   A.   I would say approximately April
18   2006 -- no, no, sorry -- I'm not -- I'm not
19   really sure.  I don't remember offhand.
20   Q.   Were you assigned to Manhattan North
21   Vice at the time of Mr. Robertson's arrest?
22   A.   No.  No.
23   Q.   Were you assigned to Manhattan North
24   Vice during 2006?
25   A.   No.

79

1
2    Q.   What were your assignments during
3    2006?
4         MR. BROOKS:  Objection.
5    A.   What was my assignment in 2006?  To
6    police the streets of New York.
7    Q.   I'm sorry, let me be more specific.
8         You had said you were assigned to
9    Manhattan North Vice at a certain point?
10   A.   I am assigned --
11   Q.   You are assigned to Manhattan --
12   A.   To Manhattan North Vice, yes.
13   Q.   Do you recall when you received that
14   assignment?
15   A.   No, I don't recall.
16   Q.   But it was after 2006, correct?
17   A.   After 2006, yes, ma'am.
18   Q.   Prior to your assignment to Manhattan
19   North Vice, where were you assigned?
20   A.   Seventy-fifth Precinct.
21   Q.   You were assigned to the 75th
22   Precinct, if I understand you correctly, from
23   2004 when you first became a police officer
24   until your assignment to Manhattan North Vice
25   sometime after 2006, is that correct?

80

1
2    A.   Yes, ma'am.
3    Q.   And do you -- how did your transfer to
4    Manhattan North Vice come about?
5         MR. BROOKS:  Objection.
6    A.   Can you explain -- rephrase --
7    rephrase the question?
8    Q.   You, at some point in time, you came
9    to be assigned to Manhattan North Vice, so my
10   question is, how did that reassignment come
11   about?
12        MR. BROOKS:  Objection.
13   A.   I put in for a reassignment.
14   Q.   Why did you put in for reassignment?
15   A.   To pursue a career as a detective.
16   Q.   Could you not pursue a career as a
17   detective in the 75th Precinct?
18   A.   As a patrol officer, no.
19   Q.   But could you pursue a career as a
20   detective in the 75th Precinct?
21   A.   If I were assigned to the 75th
22   Precinct detective squad, yes.
23   Q.   Was it your decision to not apply to
24   the 75th Precinct detective squad?
25   A.   Yes.

Prince, Niles  12/11/2009  12:00:00 PM

81

2  Q.  Can you -- why?

3  A.  I don't understand the question.

4  Q.  My understanding is you chose to apply

5  for a position in Manhattan North Vice?

6  A.  OCCB, yes.

7  Q.  OCCB, and not a position in the

8  detective squad 75th Precinct, is that correct?

9  A.  Yes.

10  Q.  Why did you make that decision?

11  A.  Because at that time I wanted to go to

12  OCCB.

13  Q.  Did you not want to stay in the 75th

14  Precinct?

15  MR. BROOKS:  Objection.

16  A.  Did I not want to stay in the 75th

17  Precinct?  I wanted to go to OCCB.

18  Q.  Okay.  Do you receive performance

19  reviews periodically?

20  MR. BROOKS:  Objection.

21  A.  Yes.

22  Q.  Are you aware of when those

23  performance reviews are made?

24  A.  Am I aware of when a supervisor does a

25  performance review?

82

2  Q.  Hm-hmm.

3  A.  It's brought to my attention, yes.

4  Q.  Do you review the performance reviews

5  that are made of you by your supervisors?

6  A.  Yes.

7  Q.  In fact, you review and sign them,

8  isn't that correct?

9  A.  Yes.

10  Q.  Do you recall reviewing any

11  performance reviews during the year 2006?

12  MR. BROOKS:  Objection.

13  A.  No, I don't recall.

14  Q.  Do you recall knowing that you had

15  been reviewed at all during 2006?

16  A.  I don't recall, no.

17  Q.  In your experience do you get reviewed

18  with some regularity?

19  A.  Yes.

20  Q.  Is there -- is it your understanding

21  that there is a pattern to when these reviews

22  happen?

23  A.  Is there an understanding -- there is

24  a pattern, yes, ma'am.

25  Q.  What's that pattern?

83

2  A.  I'm not sure offhand but I would

3  say -- I would guess quarterly.

4  Q.  So even though you have no specific

5  recollection of being reviewed in 2006, given

6  what you just said, it would make sense that you

7  would have been reviewed in 2006, is that

8  correct?

9  MR. BROOKS:  Objection.

10  A.  Given what I just said, yes, it would

11  make sense.

12  Q.  Are you aware of any reason why you

13  would not have been reviewed in 2006 as you sit

14  here today?

15  MR. BROOKS:  Objection.

16  A.  I'm not aware of anything, no.

17  Q.  Do you maintain copies of those

18  reviews?

19  MR. BROOKS:  Objection.

20  A.  I don't maintain copies, no.

21  Q.  Do you have any understanding of where

22  copies of those reviews are maintained?

23  A.  New York City Police Department.

24  MS. HOLLOWAY:  I just want to note for

25  the record that in the personnel file that we

84

2  received from Mr. Prince -- from defendants'

3  counsel there are no performance reviews from

4  the year 2006, so to the extent those

5  performance reviews exist, given that this

6  arrest occurred in April of 2006, we request

7  that you hand that over to us as well.

8  MR. BROOKS:  I would request that you

9  put your request to me in writing.

10  MS. HOLLOWAY:  Absolutely.

11  MR. BROOKS:  And we'll deal with it

12  appropriately.

13  MS. HOLLOWAY:  Absolutely.

14  MR. BROOKS:  I will represent that I

15  have produced to you everything that I have

16  received from the department.

17  BY MS. HOLLOWAY:

18  Q.  Can we turn back to Exhibit No. 1?  I

19  believe we have established that this is an

20  arrest report prepared by Detective Sullivan,

21  correct?

22  A.  This is a complaint report.

23  Q.  I'm sorry, a complaint report, I

24  misspoke, prepared by Detective Sullivan, is

25  that correct?

85

1
2   A.   Yes, ma'am.
3   Q.   What's the purpose of preparing a
4   complaint report?
5       MR. BROOKS:  Objection.
6   A.   What's the purpose of preparing it?  A
7   complaint report is compared -- prepared when an
8   individual makes a complaint or when an arrest
9   is made.
10  Q.   So it's something that an arresting
11  officer has to do as part of his duty, is that
12  correct?
13      MR. BROOKS:  Objection.
14  A.   I don't understand the question.
15  Q.   Is an arrest report something that an
16  officer -- an arresting officer must fill out
17  after an arrest as part of his job?
18      MR. BROOKS:  Objection.
19  A.   An arrest report is something that the
20  arresting officer fills out as part of his job,
21  but a complaint report is not necessarily always
22  filled out when an arrest is made.
23  Q.   When is a complaint report filled out?
24  A.   When someone makes a complaint or when
25  an arrest is made within a precinct.

86

1
2   Q.   When a complaint report is filled out,
3   is an arrest report also filled out?
4   A.   Not all the time, no.
5       MR. BROOKS:  I just want to note for
6   the record before you go on that the document
7   that has been marked as Exhibit 1 is Bates
8   stamped NYC 31, NYC 32.
9   BY MS. HOLLOWAY:
10  Q.   Do you know whether a separate arrest
11  report was prepared regarding the arrest of Mr.
12  Robertson?
13      MR. BROOKS:  Objection.
14  A.   An arrest report was prepared, yes.
15  Q.   Exhibit 1 is not that arrest report?
16  A.   Exhibit 1 is a complaint report.
17  Q.   Why did Detective Sullivan -- why was
18  Detective Sullivan the officer to fill out this
19  report?
20      MR. BROOKS:  Objection.
21  A.   Because Detective Sullivan was at the
22  location when -- with myself and Sergeant Daglas
23  when this incident took place.
24  Q.   Why didn't you fill out the complaint
25  report?

87

1
2   A.   Because I was at Jamaica Hospital.
3   Q.   If you could look in the first box on
4   the first page of Exhibit 1?
5   A.   The first box?
6   Q.   The first box in the left hand side,
7   it says perpetrator.  I guess that's the second
8   box.
9   A.   Okay.
10      MR. BROOKS:  The first larger --
11      MS. HOLLOWAY:  The first larger box.
12      MR. BROOKS:  Okay.
13      MS. HOLLOWAY:  Where it says
14  perpetrator on the left-hand side.
15  Q.   Toward the bottom of that larger box,
16  do you see a little box that says physical
17  force?
18  A.   Yes.
19  Q.   Do you see that "used" has an X in it,
20  correct?
21  A.   Yes.
22  Q.   What do you understand that to mean?
23  A.   The X indicating that force was used,
24  physical force was used.
25  Q.   Can you -- does that mean that

88

1
2   physical force was used by the arresting
3   officer?
4       MR. BROOKS:  Objection.
5   A.   Can you rephrase the question?
6   Q.   I'm just trying to understand this
7   form, and I see on the left-hand side it says
8   perpetrator.  So my question is, this little
9   physical force box, does that indicate that
10  physical force was used by a police officer, or
11  alternatively that physical force was used by
12  the perpetrator?
13  A.   This indicates that physical force was
14  used to apprehend a perpetrator.
15  Q.   Okay.  Turning to the second page of
16  Exhibit 1 which is marked NYC 32, the second
17  larger box in the left-hand side which is marked
18  arresting officer on the left-hand side?
19  A.   Yes.
20  Q.   Toward the bottom, see a little box
21  that says force used, and what's checked under
22  force used?
23  A.   Yes.
24  Q.   So what does that mean to you?
25  A.   That means force was used.

89

1
2     Q.    Force was used in apprehending the
3  perpetrator?
4     A.    Yes.
5     Q.    Then the next box to the right, type,
6  what does that type box indicate?  It's directly
7  to the right of the force used box.
8     A.    Type?
9     Q.    Yes.
10    A.    Yes.
11    Q.    What is that box?
12    A.    The type of force used.
13    Q.    What's checked in that box?
14    A.    Physical force and baton.
15    Q.    But I believe you testified earlier
16  that to your knowledge a baton was not used in
17  arresting Mr. Robertson, is that correct?
18    A.    Yes.
19    Q.    So do you have an understanding as to
20  why the baton box was checked on this complaint
21  form?
22        MR. BROOKS:  Objection.
23    A.    No, I don't have an understanding to
24  why it was checked.
25    Q.    Did you review this complaint form at

90

1  any time before it was submitted?
2     A.    No.
3     Q.    If you look all the way to the
4  right-hand side on that same line, there is a
5  box that says arresting officer injured directly
6  to the right of the force used box?
7     A.    Okay.
8     Q.    You see both the no and the yes boxes
9  are checked, right?  And then the yes box is
10  circled?
11    A.    Okay.
12    Q.    What do you understand those markings
13  to mean?
14    A.    I don't know.  I didn't prepare the
15  report.
16    Q.    Before you reviewed that report, I
17  believe you said it was yesterday, had you had
18  an opportunity to review this report prior to
19  yesterday?
20    A.    No.
21    Q.    Do you recall any conversations you
22  had with Mr. Sullivan about the preparation of
23  this report?
24    A.    No, I don't recall any conversations I

91

1
2  had with Detective Sullivan with preparing this
3  report, no.
4     Q.    Do you recall any conversations you
5  had with Sergeant Daglas about preparing this
6  report if any?
7     A.    No, I don't recall any.
8     Q.    So just to be absolutely clear, you do
9  not have any understanding as to why the baton
10  box is checked in the type of force used in this
11  complaint report?
12        MR. BROOKS:  Objection.
13    A.    I don't have any understanding, no.
14    Q.    Do you usually review complaint
15  reports from arrests in which you were involved?
16        MR. BROOKS:  Objection.
17    A.    Do I usually review a complaint report
18  when I'm the arresting officer?
19    Q.    Hm-hmm.
20    A.    Well, when I'm the arresting officer I
21  fill out the complaint report.
22    Q.    Right, but when you are involved in an
23  arrest but not the arresting officer, is it your
24  practice to review the complaint reports?
25        MR. BROOKS:  Objection.

92

1
2     A.    It's not my practice, no.
3     Q.    Why was Mr. Sullivan -- why was
4  Detective Sullivan the arresting officer in this
5  arrest?
6     A.    Because I was in the hospital.
7     Q.    So you would have been the arresting
8  officer if you had not gone to the hospital?
9        MR. BROOKS:  Objection.
10    A.    No, not necessarily.
11    Q.    What does the term arresting officer
12  mean?
13    A.    What does the term arresting officer
14  mean?
15    Q.    Hm-hmm.
16    A.    Arresting officer.  Can you be a
17  little more specific?  That's a little broad.
18    Q.    Sure.  I understand your confusion,
19  but I'm also confused which is why I'm asking
20  the question.
21        From our discussion of the incident
22  earlier?
23    A.    Okay.
24    Q.    In common parlance I would describe
25  you as the arresting officer?

93

1
2      A.   Okay, I understand.
3      Q.   So my question is, you know, what --
4    is arresting officer a term of art used in the
5    police department?
6         MR. BROOKS:  Objection.
7      A.   When you work with a partner, either
8    you or your partner can be the arresting
9    officer.
10     Q.   Is Detective Sullivan or was Detective
11   Sullivan in April 2006 your partner?
12        MR. BROOKS:  Objection.
13     A.   On this day the concerned Detective
14   Sullivan was who I was working with at the time,
15   yes.
16     Q.   Did you have a usual partner during
17   April 2006?
18     A.   During April of 2006 I was assigned a
19   usual partner?
20     Q.   Hm-hmm.
21     A.   No.
22     Q.   Why not?
23     A.   I work with a team.
24     Q.   Is that team the anticrime unit?
25     A.   Yes.

94

1
2      Q.   How many officers are members of that
3    team?
4         MR. BROOKS:  Objection.
5      Q.   Rather -- let me rephrase, be specific
6    as to time.
7         During April of 2006, how many
8    officers were members of the anticrime unit?
9      A.   Well, during this date in question, at
10   that time it was just myself, Detective Sullivan
11   and Sergeant Daglas.
12     Q.   I understand that at the arrest of Mr.
13   Robertson you were the three members of the
14   anticrime unit, but was the anticrime -- did the
15   anticrime unit have any other members who were
16   not at the arrest of Mr. Robertson?
17     A.   Are there other members assigned to
18   anticrime unit?
19     Q.   Yes.
20     A.   Is that your question?
21     Q.   Yes, that is my question.
22     A.   There are other members assigned to
23   anticrime --
24     Q.   How many members?
25     A.   On my team?

95

1
2      Q.   Hm-hmm.
3      A.   There were, including the sergeant,
4    four other members.
5      Q.   Was it -- why was Sergeant Daglas with
6    you in your vehicle on April 15, 2006?
7         MR. BROOKS:  Objection.
8      Q.   Well, do you have an understanding as
9    to why Sergeant Daglas was in your vehicle?
10     A.   No, I don't.
11     Q.   Was that a common occurrence during
12   April 2006?
13        MR. BROOKS:  Objection.
14     A.   Was that a common occurrence for
15   Sergeant Daglas to be in my vehicle on April of
16   2006?
17     Q.   In April of 2006.
18     A.   It's not a common occurrence.  He
19   can -- he has the option of riding in any
20   vehicle as a sergeant.
21     Q.   If you can estimate, what percentage
22   of the time would Sergeant Daglas join you in
23   your vehicle?
24        MR. BROOKS:  Objection.
25     Q.   In 2006?

96

1
2      A.   Can you rephrase the question?
3      Q.   Sure.  In 2006, if you can estimate,
4    how often did Sergeant Daglas travel with you in
5    your vehicle when you were on shift?
6      A.   That I can't estimate.
7      Q.   Was it less than 50 percent of the
8    time?
9      A.   I can't estimate that.
10     Q.   You can't estimate whether it was less
11   than 50 percent or more than 50 percent of the
12   time?
13     A.   In 2006, well, as a team if there are
14   four other officers on this team including
15   myself and Sergeant Daglas making him the fifth,
16   there could, yes, be a 50 percent chance that
17   he's either in the vehicle with myself and
18   another one of those individuals, or two other
19   individuals excluding myself.
20     Q.   Excluding Sergeant Daglas, I believe
21   you said there were four other members of your
22   anticrime unit team?
23     A.   There are four members --
24     Q.   Four members --
25     A.   Yes.

97

1
2     Q.   -- not four other members, four
3   members.
4       On the evening of April 15, 2006,
5   where -- do you have any understanding of where
6   those other two members were?
7       MR. BROOKS:  Objection.
8     A.   No.
9     Q.   You don't know whether they were also
10  patrolling the streets of east New York that
11  evening?
12    A.   No, I don't recall.
13    Q.   Just to be absolutely clear, is
14  Detective Sullivan a member of the anticrime
15  unit, or was Detective Sullivan a member of the
16  anticrime unit, your team in the anticrime unit
17  in April 2006?
18    A.   Yes.
19    Q.   Turning back to Exhibit 1 -- actually,
20  strike that.  Let's not look at Exhibit 1.
21      Do you recall -- did you make any
22  arrests during your shift on April 15, 2006,
23  prior to the arrest of Mr. Robertson?
24    A.   I don't recall.
25    Q.   Do you recall whether you stopped

98

1
2   anyone else on the street to speak with him on
3   the evening of April 15 before you spoke to Mr.
4   Robertson?
5     A.   No, I don't recall.
6     Q.   Do you have any recollection as to
7   what you were doing on your shift prior to
8   stopping Mr. Robertson on April 15?
9     A.   No, I don't have any recollection to
10  what I was doing.
11    Q.   Absolutely no recollection?
12    A.   To what I was doing, no.
13    Q.   Do you recall where you were
14  geographically?
15    A.   Geographically I was in my area of
16  employment, New York City.
17    Q.   And you were in the east New York
18  neighborhood in Brooklyn?
19    A.   Yes, ma'am.
20    Q.   Do you recall whether you were driving
21  around the streets in east New York?
22      MR. BROOKS:  Objection.
23    Q.   On April 2006?
24    Q.   Hm-hmm.
25    A.   Do I recall if I was driving around

99

1
2   the streets?
3     Q.   Hm-hmm.
4     A.   Of east New York?  Yes, I was driving
5   around the streets.
6     Q.   Did you have -- do you recall whether
7   you had any specific objectives that evening?
8     A.   No.
9       MR. BROOKS:  Objection.
10    A.   I don't recall.
11      MS. HOLLOWAY:  Could we take a
12  two-minute break?
13      THE VIDEOGRAPHER:  Off the record,
14  12:15 p.m.
15      (Recess)
16      THE VIDEOGRAPHER:  Back on the record,
17  12:31 p.m.
18  BY MS. HOLLOWAY:
19    Q.   I would like to just go back for a
20  moment to the time preceding Mr. Robertson's
21  arrest on the evening of the 15th.
22      Did you turn -- did your vehicle turn
23  on to Pitkin Avenue because had you seen Mr.
24  Robertson?
25    A.   I don't recall that.

100

1
2     Q.   Do you recall whether you had seen Mr.
3   Robertson on the street prior to turning on to
4   Pitkin Avenue?
5     A.   Can you rephrase the question?
6     Q.   Sure.  Did you see Mr. Robertson on
7   the street from your vehicle before turning on
8   to Pitkin Avenue?
9     A.   Well, I don't recall whether or not --
10  we may have been on Pitkin Avenue or turned on
11  Pitkin Avenue, I don't recall which one.
12    Q.   But you -- but you do recall seeing
13  Mr. Robertson from your vehicle when your
14  vehicle was located on Pitkin Avenue, correct?
15    A.   Yes.
16    Q.   Did you approach Mr. Robertson in your
17  vehicle?
18    A.   Yes, we approached Mr. Robertson.
19    Q.   Was a decision made to approach Mr.
20  Robertson in the vehicle?
21    A.   Your question is, did we decide as a
22  group whether or not we were going to approach
23  Mr. Robertson?
24    Q.   Hm-hmm.
25    A.   I don't recall if we did that.

101

1
2    Q.   Did the vehicle at any point pull off
3    to the side or accelerate or change course in
4    any way in order to approach Mr. Robertson?
5         MR. BROOKS:  Objection.
6    A.   I don't recall.
7    Q.   You don't recall?
8    A.   No.
9    Q.   But you do recall smelling marijuana?
10   A.   Yes.
11   Q.   And you smelled the marijuana from
12   inside the car?
13   A.   Yes.
14   Q.   To clarify, when you were inside --
15   A.   Yes, I was in --
16   Q.   -- the car you smelled marijuana?
17   Were the windows of the car open?
18   A.   All the windows were rolled down, yes,
19   ma'am.
20   Q.   Is that your practice when on patrol
21   to keep the windows rolled down?
22        MR. BROOKS:  Objection.
23   A.   That is my practice, yes, ma'am.
24   Q.   Why is that your practice?
25   A.   Because you can hear when people

102

1
2    scream for help.
3    Q.   You can also smell marijuana
4    presumably from the window, correct?
5    A.   Yes, ma'am.
6    Q.   Do you remember whether it was a cold
7    evening or a warm evening?
8         MR. BROOKS:  Objection.
9    A.   I don't recall, no, I don't recall.
10   Q.   How soon after smelling the marijuana
11   did you exit the vehicle?
12   A.   I exited the vehicle when we
13   approached the defendant, Mr. Robertson.
14   Q.   But you exited the vehicle after you
15   had noticed the smell of marijuana, is that
16   correct?
17   A.   Yes, ma'am.
18   Q.   Did you have any other reason to exit
19   the vehicle and approach Mr. Robertson other
20   than the smell of marijuana?
21   A.   Well, when we approached Mr. Robertson
22   I observed what I believed to be a marijuana
23   cigarette, yes.
24   Q.   Other than the smell of marijuana and
25   observing the marijuana cigarette, did you have

103

1
2    any other reason to approach Mr. Robertson?
3    A.   No.
4    Q.   You didn't observe him carrying a
5    weapon, for example?
6         MR. BROOKS:  Objection.
7    A.   Did I observe Mr. Robertson carrying a
8    weapon?  No, I did not.
9    Q.   To confirm, it was your intention, I
10   believe you testified, when you exited the
11   vehicle to arrest Mr. Robertson, is that
12   correct?
13        MR. BROOKS:  Objection.
14   A.   Yes.
15   Q.   Was it your intention to arrest him
16   for smoking the marijuana cigarette that you
17   observed?
18   A.   Yes.
19   Q.   And yet you didn't seek to locate or
20   collect that marijuana cigarette, did you?
21        MR. BROOKS:  Objection.
22   A.   Can you rephrase the question?
23   Q.   I believe we established earlier that
24   neither you nor Sergeant Daglas nor Detective
25   Sullivan collected that marijuana cigarette and

104

1
2    placed it into evidence with the property
3    clerk's office, is that correct?
4         MR. BROOKS:  Objection.
5    A.   Yes, we established that.
6    Q.   So -- and you didn't do that in spite
7    of the fact that the marijuana cigarette was
8    your reason for exiting the car and seeking to
9    arrest Mr. Robertson, is that correct?
10        MR. BROOKS:  Objection.
11   A.   I didn't -- you are saying I didn't
12   obtain the marijuana cigarette, is that your --
13   Q.   You didn't and Sergeant Daglas didn't
14   and Officer Sullivan didn't, correct?
15        MR. BROOKS:  Objection.
16   A.   I can only speak on what I do.  I did
17   not recover a marijuana cigarette, no.
18   Q.   And I believe you testified earlier
19   that to the best of your recollection neither
20   Detective Sullivan nor Sergeant Daglas recovered
21   that marijuana cigarette either, correct?
22   A.   Yes, yes.
23   Q.   We spoke earlier about a black object
24   that you observed Mr. Robertson throw while he
25   was running, correct?

Prince, Niles  12/11/2009  12:00:00 PM

105

2   A.   Yes, ma'am.

3   Q.   Did there come a time when you came to

4   understand what that black object was?

5   A.   There came a time, yes, ma'am.

6   Q.   How did you find out what that black

7   object was?

8   A.   Through the observations of the

9   vouchers.

10   Q.   Do you recall an officer collecting

11   that black object while you were on Pitkin

12   Avenue with Mr. Robertson?

13   A.   I don't recall who recovered it, no.

14   Q.   But do you recall that it was

15   recovered?

16   A.   I recall that it was recovered, yes.

17   Q.   Do you recall observing it being

18   recovered?

19   A.   No, I don't recall observing it, no.

20   Q.   Do you recall how long after it was

21   discarded it was recovered, discarded by Mr.

22   Robertson it was recovered?

23   A.   No, no, I don't.

24   Q.   Do you recall whether an officer

25   approached Mr. Robertson holding that black

106

2   object?

3   MR. BROOKS:  Objection.

4   A.   Rephrase the question, please?

5   Q.   Sure.  I'm just trying to understand,

6   it was collected, you will agree with me that it

7   was collected?

8   A.   Yes.

9   Q.   And it was collected by an officer and

10   that's been confirmed by those property

11   invoices, correct?

12   A.   Yes, ma'am.

13   Q.   Did any of the officers at the scene

14   to the best of your recollection tell Mr.

15   Robertson what it is they had collected at the

16   scene?

17   MR. BROOKS:  Objection.

18   A.   I don't recall that.

19   Q.   You don't recall that?

20   A.   No.

21   Q.   And you don't recall Mr. Robertson

22   saying anything about that object, whether it

23   was his or not his or he didn't throw it, you

24   don't recall any conversation like that?

25   A.   No, ma'am.

107

2   MR. BROOKS:  Objection.

3   Q.   So you have no recollection, then,

4   about who collected the black object, correct?

5   A.   Yes, ma'am.

6   Q.   And no recollection as to from where

7   it was collected, is that correct?

8   A.   Yes, ma'am.

9   Q.   And no recollection seeing it after it

10   had been collected at the scene on Pitkin

11   Avenue, is that correct?

12   A.   Yes, ma'am.

13   Q.   What is the FTU impact unit?

14   A.   What does FTU stand for?

15   Q.   Yes.

16   A.   FTU -- it stands for field training

17   unit.

18   Q.   What is that?

19   A.   That's a unit -- when a newly

20   appointed police officer goes -- is assigned to

21   a precinct they normally start off in FTU unit,

22   a field training unit.

23   Q.   Returning back to the scene, we have

24   established that you were on the ground with Mr.

25   Robertson and you handcuffed Mr. Robertson,

108

2   correct?

3   A.   Yes, ma'am.

4   Q.   Just to confirm, did you at any time

5   strike Mr. Robertson with your hands?

6   MR. BROOKS:  Objection.

7   A.   Did I strike Mr. Robertson?

8   Q.   Hm-hmm.

9   A.   I don't recall striking him.

10   Q.   Do you recall hitting him in the back

11   of the head as you were trying to handcuff him?

12   MR. BROOKS:  Objection.

13   A.   I don't recall hitting him in the back

14   of the head.

15   Q.   And you don't recall choking him in

16   any way while you were trying to arrest him, do

17   you?

18   MR. BROOKS:  Objection.

19   A.   No.  I don't recall.

20   Q.   Did it bother you that Mr. Robertson

21   ran when you exited the vehicle?

22   MR. BROOKS:  Objection.

23   A.   No.

24   Q.   Do you recall anything that Mr.

25   Robertson might have said to you as he was

109

1
2    running?
3        A.   No, I don't recall.
4        Q.   So you weren't bothered or angry once
5    you finally caught Mr. Robertson?
6            MR. BROOKS:  Objection.
7        A.   No.
8        Q.   You weren't angry?
9        A.   No.
10       Q.   Would it surprise you if I told you
11   that there were five complaints made to the
12   Citizen Complaint Review Board in 2006 for your
13   use of force?
14           MR. BROOKS:  Objection.
15       A.   Would it surprise me?
16       Q.   Hm-hmm.
17       A.   No.
18       Q.   Do you have -- would it surprise you
19   if I told you that you had over the course of
20   all the other years for which we have your
21   personnel records, fewer than five for all the
22   remaining years that you were a police officer
23   in the 75th Precinct?
24           MR. BROOKS:  Objection.
25       A.   Say it again?

110

1
2        Q.   Would it surprise you if I told you
3    that the total of your -- of the complaints made
4    against you in years other than 2006 was less
5    than five?
6        A.   Would it surprise me?
7        Q.   Hm-hmm.
8        A.   If you told me?
9        Q.   Hm-hmm.
10       A.   No.
11       Q.   Was there anything different about
12   your assignments during 2006 than 2004 and 2005?
13       A.   There may have been, yes.
14       Q.   Do you recall anything specific?
15       A.   Well, in 2004 more than likely I was
16   probably assigned to FTU, field training unit.
17       Q.   What is that -- how does that mean
18   that your patrol assignments are different?
19       A.   In FTU you are in uniform and you are
20   actually assigned a foot post.
21       Q.   As opposed to when you are not in FTU
22   you are not assigned a foot post?
23       A.   As opposed to being assigned to a
24   special unit or patrol you are not in a foot
25   post, yes.

111

1
2        Q.   Were you assigned to the anticrime
3    unit in 2005?
4        A.   I don't recall when I went to -- the
5    exact date, year.
6        Q.   Can we return for a moment as well to
7    discussing the anticrime unit?  You said that
8    the anticrime unit was assigned to specific
9    crimes, I believe you said?
10       A.   Yes, ma'am.
11       Q.   Can you explain for me if -- to the
12   best of your ability, the purpose of the
13   anticrime unit?
14           MR. BROOKS:  Objection.
15       A.   The anticrime unit is a plain clothes
16   unit that's assigned to precincts to address
17   specific crimes in that precinct.
18       Q.   Do the specific crimes vary from
19   precinct to precinct?
20       A.   Yes.
21       Q.   In the 75th Precinct, what are the
22   specific crimes that the anticrime unit is
23   assigned to address?
24       A.   In the 75th Precinct, what are the
25   specific crimes that are addressed?

112

1
2        Q.   Hm-hmm, yes.
3        A.   Robberies, drugs, rape, burglary, a
4    number of crimes.
5        Q.   That sounds like quite a long list of
6    crimes, would you agree?
7        A.   Yes.
8            MR. BROOKS:  Objection.
9        A.   Yes.
10       Q.   How does the anticrime unit carry out
11   that objective?
12           MR. BROOKS:  Objection.
13       Q.   I can rephrase the question.
14       A.   Yes, please.
15       Q.   How does the anticrime unit, then,
16   differ from an ordinary patrol unit?
17       A.   An ordinary patrol unit -- they
18   respond to calls that are made and handled jobs
19   that way.
20       Q.   When they are not assigning -- when
21   they are not responding to calls that are made,
22   what is an ordinary patrol unit ordinarily
23   doing?
24           MR. BROOKS:  Objection.
25       A.   Patrolling.

113

```
 1
 2    Q.   Patrolling?
 3    A.   Yes.
 4    Q.   Is that patrol in some way different
 5    from the patrolling that the anticrime unit
 6    does?
 7    A.   Yes.
 8    Q.   How?
 9    A.   An anticrime unit doesn't respond to
10    911 calls per se.
11    Q.   Instead, the anticrime unit only
12    patrols, is that correct?
13         MR. BROOKS:  Objection.
14    A.   Yes.
15    Q.   When -- in your experience on the
16    anticrime unit, what are you -- what are you
17    trying to accomplish as you patrol?
18    A.   In my experience, an anticrime unit,
19    from my knowledge, the best of my knowledge, the
20    job of the anticrime unit, basically to address
21    specific crimes and helping in the reduction of
22    those crimes.
23    Q.   How is that accomplished?
24    A.   By making arrests.
25    Q.   You are not responding to specific
```

114

```
 1
 2    calls, correct, you are patrolling and observing
 3    people and things out the windows of your car
 4    and then making arrests, is that a fair
 5    description of what a patrol in the anticrime
 6    unit is like?
 7         MR. BROOKS:  Objection.
 8    A.   I wouldn't say that's a fair
 9    description, but I would say it's a description,
10    yes.
11    Q.   How would you describe whether the
12    anticrime -- how the anticrime unit effects
13    arrests?
14         MR. BROOKS:  Objection.
15    A.   They effect arrest by observing crimes
16    take place.
17    Q.   Okay.
18         MS. HOLLOWAY:  Can we mark -- I'm
19    going to mark as Exhibits 5 and 6 -- Exhibit 5
20    is a document Bates stamped NYC 256 to 257, and
21    Exhibit 6 is a document Bates stamped NYC 258 to
22    259.
23              (Exhibit 5, Document Bates Stamped
24    NYC256 through 257, marked for identification.)
25              (Exhibit 6, Document Bates Stamped
```

115

```
 2    NYC258 through 259, marked for identification.)
 3         MR. BROOKS:  Take a minute and read
 4    them.
 5    BY MS. HOLLOWAY:
 6    Q.   Have you had a moment to review
 7    Exhibit 5 and 6?
 8    A.   Yes.
 9    Q.   Do you recognize Exhibit 5?
10    A.   Yes.
11    Q.   What is it?
12    A.   An Omni system arrest report.
13    Q.   What is an Omni system arrest report?
14    A.   It's an arrest report that's prepared
15    in an Omni system.
16    Q.   And take a look at Exhibit 6.  Do you
17    recognize Exhibit 6?
18    A.   Yes.
19    Q.   What's Exhibit 6?
20    A.   An Omniform system complaint report.
21    Q.   We spoke earlier when we were looking
22    at Exhibit No. 1 and I believe you described
23    Exhibit No. 1 as a complaint report, is that
24    right?
25    A.   Yes, ma'am.
```

116

```
 2    Q.   So what is the relationship if any
 3    between Exhibit 1, the complaint report, and
 4    Exhibit 6, complaint report?
 5    A.   What's the relationship between the
 6    two?
 7    Q.   Yes.
 8    A.   Exhibit 1 would be called -- well,
 9    would generally be called a scratch copy and
10    Exhibit 6 would be in hard copy.
11    Q.   When you say a scratch copy, is
12    scratch meant to indicate that it's handwritten?
13    A.   Yes, ma'am.
14    Q.   Who transfers the information from the
15    handwritten copy into Exhibit 6 which is the
16    electronic copy?
17         MR. BROOKS:  Objection.
18    A.   Who -- the computer transferred it,
19    the computer transfers --
20    Q.   Does the information in Exhibit No. 1
21    get entered into the Omni system?
22    A.   Yes, ma'am.
23    Q.   And is that information entered by a
24    police officer into the Omni system?
25    A.   It is, yes.
```

117

1
2     Q.   Do you have any understanding as to
3   who would have transferred that information into
4   the Omni system with regard to the complaint
5   report for Mr. Robertson's arrest?
6     A.   May I review --
7     Q.   Absolutely.
8     A.   According to the complaint report it
9   was entered by PO Casey.
10    Q.   Where are you looking to obtain that
11  information?
12    A.   On the second page marked NYC 259.
13    Q.   I see that.  Are you familiar with POM
14  Casey --
15    A.   Am I familiar?  Yes, I'm familiar.
16    Q.   Is POM Casey a police officer in the
17  anticrime unit?
18    A.   No.
19    Q.   Is he a police officer or was he at
20  this time a police officer in the 75th Precinct?
21    A.   At the time of this occurrence?
22    Q.   Yes.
23    A.   Yes, he was a police officer in the
24  75th Precinct.
25    Q.   If you could turn back to Exhibit 5,

118

1
2   this is the Omniform system arrest report, is
3   that correct?
4     A.   Yes, ma'am.
5     Q.   Is this the Omniform arrest report for
6   Mr. Robertson's arrest on April 15?
7     A.   Yes.
8     Q.   Does this -- does the existence of
9   these Omniform system arrest reports indicate to
10  you that there was a scratch copy arrest report?
11    MR. BROOKS:  Objection.
12    A.   Does this report indicate to me that a
13  scratch copy was prepared?
14    Q.   Yes.
15    A.   This doesn't indicate to me that a
16  scratch copy was prepared.
17    Q.   If you turn to page 2 of Exhibit 5, I
18  just mean the second page of Exhibit 5, once
19  again on the bottom you will note:  Report
20  prepared by POM Casey, correct?
21    A.   Yes, ma'am.
22    Q.   So do you have any understanding of
23  where Officer Casey would have gotten the
24  information to fill out this arrest report?
25    A.   From a scratch copy.

119

1
2     Q.   From a scratch copy?
3     A.   Yes, ma'am.
4     Q.   Would he have obtained this
5   information from Exhibit -- the Exhibit 1
6   scratch copy?
7     MR. BROOKS:  Objection.
8     No.
9     Q.   So he would have obtained -- to the
10  best of your understanding, he would have
11  obtained that information from a scratch copy of
12  an arrest report?
13    A.   Yes.
14    Q.   And Exhibit 1 is not that scratch
15  copy, Exhibit 1 is a scratch copy of the
16  complaint report, is that correct?
17    A.   Yes, ma'am.
18    Q.   Turn once again to Exhibit 6.  Is
19  there a place on this complaint report where the
20  use of force by an arresting officer would be
21  indicated?
22    A.   From what I can see I don't see any.
23    Q.   Then turning to Exhibit 5 which is the
24  arrest report, I believe that on this report
25  there is a box for use of force, if you turn to

120

1
2   the second page.
3     Can you confirm that that's the case?
4     A.   That's on the front -- first page,
5   right?
6     MR. BROOKS:  Second page.
7     A.   Second page?  Yes.
8     Q.   I'll just note for the record that the
9   witness also pointed to the -- on the first page
10  there is also a box that says physical force
11  that I believe you were pointing to as well,
12  correct?
13    A.   Yes.
14    Q.   But turning to the box on the second
15  page that I directed you to, is there any
16  indication on this Omnifom report that a baton
17  was used during the arrest?
18    A.   Is there any indication that a baton
19  was used?
20    Q.   Yes.
21    A.   There is no indication, no.
22    Q.   But earlier we did note that there was
23  an indication that a baton was used in the
24  scratch copy of the complaint report, Exhibit 1,
25  correct?

121

1
2      A.   Yes, correct.
3      Q.   I see that we have, as we have been
4   discussing, Exhibit 5 and Exhibit 6 are a
5   complaint report and an arrest report.
6         What's the relationship between those
7   two reports?
8      MR. BROOKS:  Objection.  You can
9   answer.
10     A.   The relationship between the reports,
11  the reports are prepared -- well, both reports
12  are prepared when an arrest is made.  If an
13  arrest is made an arrest report is prepared and
14  the complaint report is prepared.
15     Q.   Why are there two separate reports, do
16  you have an understanding as to why there are
17  two separate reports?
18     MR. BROOKS:  Objection.
19     A.   Well, to my understanding, a complaint
20  report is prepared with an arrest report to --
21  essentially a precinct number -- to be entered
22  in the precinct system.
23     Q.   And the arrest report isn't entered in
24  the precinct system?
25     A.   It is, it's -- it's hard for me to

122

1
2   explain because --
3      Q.   Let me take a stab.
4         Did they serve two different record
5   keeping functions?
6      A.   Yes, they do.
7      Q.   When we spoke earlier about your --
8   the complaints that have been filed against you
9   with the Citizen Complaint Review Board, you
10  said you weren't surprised that there had been
11  five complaints against you for use of force
12  filed in 2006.  Why were you not surprised?
13     MR. BROOKS:  Objection.
14     A.   Because I had to go down to the
15  complaint review board for those complaints.
16     Q.   Do you have any recollection of -- let
17  me strike that.
18        Were you interviewed when you went
19  down to the Citizen Complaint Review Board for
20  those complaints?
21     A.   Yes.
22     Q.   Do you have any recollection of any of
23  those interviews?
24     A.   No.
25     Q.   So you have no recollection of an

123

1
2   interview relating to a complaint filed in April
3   of 2006 regarding the excessive use of force, is
4   that correct?
5      A.   That is correct.
6      Q.   And even if I told you that that
7   complaint was deemed substantiated, that that
8   doesn't refresh your recollection about any
9   complaint that was filed against you in April of
10  2006?
11     A.   No, ma'am.
12     Q.   Are you aware of whether any other
13  complaints have been substantiated against you?
14     A.   To my knowledge, no other complaint --
15  no other -- I haven't received any other
16  substantiated complaints against me.
17     Q.   And the fact that this is the only
18  complaint that has been substantiated against
19  you doesn't make it stand out in your memory in
20  any way?
21     MR. BROOKS:  Objection.
22     A.   No.  No.
23     Q.   We talked earlier about the scratch
24  copies for the two Omniform reports, correct?
25     A.   Yes.

124

1
2      Q.   Is it customary practice for the
3   scratch copy to be discarded after the
4   information is input into the Omniform system?
5      MR. BROOKS:  Objection.
6      A.   Is it a customary practice -- no, it's
7   not.
8      MR. BROOKS:  I just want to note for
9   the record, I represent that I believe we have
10  produced the scratch copies for both documents.
11     MS. HOLLOWAY:  We'll go back to the
12  production and we'll check.  I just want to
13  confirm with the witness what the practice is
14  with regard to each of these documents.
15     MR. BROOKS:  That's fine.  He only can
16  only testify to his knowledge of these
17  practices.  Again, he's not testifying as to the
18  practice itself.
19     MS. HOLLOWAY:  Absolutely.
20     Q.   But, Mr. Prince, Detective Prince, you
21  have prepared scratch copies of arrest reports
22  in your career as a police officer, correct?
23     A.   Yes, ma'am.
24     Q.   And have you entered the information
25  from scratch reports into the Omni system?

125

1
2      A.   Myself?
3      Q.   Yes.
4      A.   Yes, ma'am.
5      Q.   Is it your practice to retain those
6   scratch reports after the information has been
7   entered into the system?
8      A.   It's my practice, yes, ma'am.
9      Q.   Where do you retain those scratch
10  copies?
11     A.   In a file cabinet.
12     Q.   Going to mark one more document.  I'm
13  marking as Exhibit 7 and passing to the witness
14  a document marked NYC 30.
15          (Exhibit 7, Document Bates Stamped
16  NYC30 , marked for identification)
17  BY MS. HOLLOWAY:
18     Q.   Do you recognize this document?
19     A.   Yes, ma'am.
20     Q.   What is it?
21     A.   Precinct LAPS cover sheet.
22     Q.   Is this the scratch copy of the arrest
23  report we were discussing previously?
24     A.   No.
25     Q.   What is this document?

126

1
2      A.   This is a cover sheet that's prepared
3   when an arrest is made and given to a LAPS
4   officer to enter an arrest report or complaint
5   report into the system.
6      Q.   What is a LAPS officer?
7      A.   A LAPS officer is someone who works in
8   a computer room and enters what's on the scratch
9   copy into the computer.
10     Q.   Understood.  Is or was Officer Casey
11  at the time of this arrest a LAPS officer?
12          MR. BROOKS:  Objection.
13     A.   Well, according to the documents, the
14  reports were entered by Officer Casey, yes.
15     Q.   Just what does LAPS stand for, is it
16  an acronym?
17     A.   It may be but I don't know what it
18  stands for.
19     Q.   Fair enough.  On the right-hand side
20  of this document it says:  Impact arrest:
21  Yes/no.
22          What does that mean?
23     A.   Impact meaning was it an arrest that
24  took place by a FTU officer, a field
25  training -- an officer in that field training

127

1
2   unit.
3      Q.   So are arrests made by FTU officers
4   referred to as impact arrests?
5      A.   Yes, ma'am.
6      Q.   Do you have any understanding as to
7   why?
8          MR. BROOKS:  Objection.
9      A.   No.
10     Q.   Detective Prince, did you attend high
11  school?
12     A.   Yes.
13     Q.   Did you graduate from high school?
14     A.   Yes.
15     Q.   Did you attend college?
16     A.   Yes.
17     Q.   Did you graduate from college?
18     A.   Yes.
19     Q.   What year did you graduate from
20  college?
21     A.   I graduated a couple months ago.
22     Q.   Were you ever in the military?
23     A.   Yes.
24     Q.   When?
25     A.   From 1998 to 2002.

128

1
2      Q.   Have you been deposed before?
3      A.   I don't understand the question.
4      Q.   What we are doing now is taking your
5   deposition, I am taking your deposition.
6          Have you ever testified in a
7   deposition before?
8      A.   As a police officer?
9      Q.   We can take them in order.  As a
10  police officer, yes.
11     A.   Yes.
12     Q.   How many times?
13     A.   To my recollection, one time.
14     Q.   Can you describe the circumstances of
15  that deposition to me?
16          MR. BROOKS:  Objection.
17     A.   I don't recall.
18     Q.   Was it a lawsuit brought against the
19  City of New York?
20          MR. BROOKS:  Objection.
21     A.   Yes.
22     Q.   Do you have any recollection of the
23  allegations in that lawsuit?
24     A.   No, I don't have any recollection.
25     Q.   Were you a defendant in that lawsuit?

129

1
2     A.   I was a defendant, yes.
3     Q.   And yet you have no recollection of
4   the allegations in that lawsuit?
5     A.   No recollection, yes, ma'am.
6     Q.   Do you have -- do you recall when that
7   deposition was approximately?
8     A.   No.
9     Q.   Was it more than two years ago?
10    A.   I really don't recall.
11    Q.   You don't recall at all, you can't
12  estimate when that deposition took place?
13       MR. BROOKS:  Objection.
14    Q.   Are you aware of what the resolution
15  of that lawsuit was?
16    A.   No, I'm not aware, I wasn't aware.
17    Q.   Are you aware whether the lawsuit has
18  been resolved or concluded?
19    A.   I believe it's been concluded.
20    Q.   But you have no understanding or
21  recollection of how that lawsuit was concluded,
22  is that correct?
23    A.   Yes, ma'am.
24       MS. HOLLOWAY:  Let's take one minute
25  and -- then to figure out whether we have

130

1
2   anything left and then we'll come back.
3       THE VIDEOGRAPHER:  Off the record,
4   1:06 p.m.
5       (Recess.)
6       (Exhibit 8, Document Bates Stamped
7   NYC-260 through 261, marked for identification)
8       THE VIDEOGRAPHER:  Back on the record,
9   1:14 p.m.
10  BY MS. HOLLOWAY:
11    Q.   Detective Prince, I have placed in
12  front of you a document we have marked as
13  Exhibit No. 8.  It is Bates No. NYC-260 to 261.
14       Do you recognize this document?
15    A.   Yes.
16       MR. BROOKS:  I want to note for the
17  record that Exhibit 8 has been designated
18  confidential pursuant to the protective order.
19  BY MS. HOLLOWAY:
20    Q.   Setting aside the redactions to this
21  document which your attorney has done, is this a
22  document that you recognize and have seen
23  before?
24    A.   Yes, ma'am.
25    Q.   What is it?

131

1
2     A.   It's a history of the complaint made
3   against me through CCRB.
4     Q.   Is this history generated out of a
5   computer system as far as you know?
6       MR. BROOKS:  Objection.
7     A.   I don't understand.
8     Q.   When did you -- when do you have the
9   opportunity to review this document?
10    A.   Today.
11    Q.   Putting aside any documents you may
12  have reviewed with your attorney, have you
13  reviewed this document outside of that context?
14    A.   No.
15    Q.   If you look in the middle of the page,
16  there is a complaint number 200604488, with a
17  report date of April 10, 2006, do you see that?
18    A.   Yes, ma'am.
19    Q.   Do you see in the fourth column from
20  the left under disposition, it says
21  substantiated charges?
22    A.   I see that.
23    Q.   Does this document or that entry
24  refresh your recollection regarding a complaint
25  this was made against you in April of 2006

132

1
2   regarding the use of force?
3     A.   No, ma'am.
4     Q.   Has any disciplinary action ever been
5   taken against you for your conduct as a police
6   officer?
7       MR. BROOKS:  Objection.
8     A.   No.  Discipline action meaning what?
9     Q.   I see in the fifth column from the
10  left here under disposition it says no
11  disciplinary action next to the complaint we
12  were talking about before.  So I am using the
13  word "disciplinary action" in the way that it is
14  used in this report.
15    A.   No.
16    Q.   If you turn to the next page, NYC-261,
17  see that the last entry on this report is dated
18  March 5, 2007, you see that?
19    A.   Yes, ma'am.
20    Q.   Do you have any understanding of
21  whether any civilian complaints have been filed
22  against you for your conduct in office
23  subsequent to March 5, 2007?
24    A.   No, I don't have any recollection of
25  that.

133

1
2    Q.   You don't have any recollection of
3    that?  You are not aware of any complaints filed
4    against you in the past two years, 2008, 2009,
5    is that correct?
6    A.   Yes.
7        MS. HOLLOWAY:  I have no further
8    questions.
9        I would like to note for the record
10   that we'll review the documents that have been
11   produced, but it's my current understanding that
12   we do not have any performance reviews from 2006
13   and also have the we do not have the scratch copy of
14   the arrest report that we had discussed during
15   today's deposition.
16       And I will, of course, as we have
17   discussed, follow that up with a letter.  I just
18   wanted to note it for the record, and also like
19   to note that I would like to leave the record
20   open as, Jeff, I believe you and I had
21   previously discussed in light of both these
22   documents and any subsequent production and
23   examination of evidence that's going to be
24   taking place.
25       MR. BROOKS:  To the extent that we've

134

1
2    agreed to that, that's fine, yes.  I have no
3    questions.  Defendants request reading and
4    signing of the transcript pursuant to Rule 30,
5    and I guess we are done.
6        MS. HOLLOWAY:  Okay.  Thanks.
7        THE WITNESS:  Thank you.
8        THE VIDEOGRAPHER:  Going off the
9    record, 1:18 p.m.  This is the end of disk two.
10   This conclusion the deposition of Niles Prince.
11
12
13       _____
14       NILES PRINCE
15
16
17   Subscribed and sworn to before me
18   this _____ day of _____, 20___.
19
20   _____
21       Notary Public
22
23
24
25

135

1        ERRATA SHEET
2    VERITEXT REPORTING COMPANY
3        1350 BROADWAY
4    NEW YORK, NEW YORK 10018
5        800-362-2520
6    CASE: ROBERTSON VS. OFFICER MATTHEW SULLIVAN
7    DEPOSITION DATE: DECEMBER 11, 2009
8    DEPONENT:  NILES PRINCE
9    PAGE LINE(S)  CHANGE        REASON
10   ___|___|___|_____|_____
11   ___|___|___|_____|_____
12   ___|___|___|_____|_____
13   ___|___|___|_____|_____
14   ___|___|___|_____|_____
15   ___|___|___|_____|_____
16   ___|___|___|_____|_____
17   ___|___|___|_____|_____
18   ___|___|___|_____|_____
19   ___|___|___|_____|_____
20   ___|___|___|_____|_____
21   ___|___|___|_____|_____
22   ___|___|___|_____|_____
23
24       _____
25
26   SUBSCRIBED AND SWORN TO BEFORE ME
27   THIS _____ DAY OF _____, 20____.
28
29   _____    _____
30   (NOTARY PUBLIC)       MY COMMISSION EXPIRES:

136

1
2
3        C E R T I F I C A T E
4    STATE OF NEW YORK
5    COUNTY OF NEW YORK
6
7        I, BRANDON RAINOFF, a Federal
8    Certified Realtime Reporter and Notary Public
9    within and for the State of New York, do hereby
10   certify:
11       That NILES PRINCE, the witness whose
12   deposition is hereinbefore set forth, was duly
13   sworn by me and that such deposition is a true
14   record of the testimony given by the witness.
15       I further certify that I am not
16   related to any of the parties to this action by
17   blood or marriage, and that I am in no way
18   interested in the outcome of this matter.
19       IN WITNESS WHEREOF, I have hereunto
20   set my hand this 14th day of December, 2009.
21
22
23       _____
24       BRANDON RAINOFF, FCRR, CM
25

**Deglas, Dimitri 12/17/2009**

1

1  UNITED STATES DISTRICT COURT
2
3  EASTERN DISTRICT OF NEW YORK
4  -------------------------------x
5  DWAYNE KINTE ROBERTSON,
6                  Plaintiff,
7        v.      07 CV 1416 (JG)(LB)
8
9  OFFICER MATTHEW SULLIVAN,
10  Shield #29723; OFFICER NILES
11  PRINCE, Shield #22353;
12  SERGEANT DIMITRI DAGLAS,
13  Shield #01647, and THE CITY OF
14  NEW YORK,
15                  Defendants.
16  -------------------------------x
17            December 17, 2009
18            10:08 a.m
19
20
21
22        Videotaped deposition of DIMITRI
23  DEGLAS, taken by Plaintiffs, at the offices of
24  Cravath, Swaine & Moore LLP, 825 Eighth Avenue,
25  New York, New York, before Brandon Rainoff, a
26  Federal Certified Realtime Reporter and Notary
27  Public of the State of New York.
28
29
30

2

1
2  A P P E A R A N C E S :
3
4  CRAVATH, SWAINE & MOORE LLP
5  Attorneys for Plaintiff
6        Worldwide Plaza
7        825 Eighth Avenue
8        New York, New York 10019-7475
9  BY:    JESSICA R. HOLLOWAY, ESQ.
10        GABRIEL FERNANDO SOLEDAD, ESQ.
11        MEGAN WALL-WOLFF, ESQ.
12
13
14  ASSISTANT CORPORATION COUNSEL
15  SPECIAL FEDERAL LITIGATION DIVISION
16  New York City Law Department
17  Officer of the Corporation Counsel
18  Attorneys for Defendants
19        100 Church Street
20        New York, New York 10007
21  BY:    JEFFREY BROOKS, ESQ.
22
23
24
25  ALSO PRESENT:  JAMES ROBERTS, Videographer

3

            INDEX OF EXHIBITS

9  Document Bates Stamped NYC 418 through 419 ....14

            INDEX OF EXHIBITS PREVIOUSLY MARKED

1  Document Bates Stamped NYC 31 through 32 .......9
5  Document Bates Stamped NYC 256 through 257 ....63
6  Document Bates Stamped NYC 258 through 259 ....63

4

1
2        THE VIDEOGRAPHER:  Good morning.  We
3  are going on the record.  My names is James
4  Robertson of Veritext Reporting with offices in
5  New York City, New York.  Today's date is
6  December 17, 2009.  The time is approximately
7  10:08 a.m.
8        This deposition is being held in the
9  office of Cravath, Swaine & Moore located at 825
10  Eighth Avenue, New York City, New York.  The
11  caption of the case, Dwayne Robertson versus
12  Officer Matthew Sullivan, et al., in the U.S.
13  District Court, Eastern District of New York,
14  Case No. 07 CV 1416.
15        The name of the witness is Dimitri
16  Deglas.  At this time the attorneys will please
17  identify themselves and the parties they
18  represent.
19        MS. HOLLOWAY:  Jessica Holloway,
20  Cravath, Swaine & Moore, for plaintiff Dwayne
21  Robertson.
22        MR. SOLEDAD:  Gabriel Soledad,
23  Cravath, Swaine & Moore, plaintiff Dwayne
24  Robertson.
25        MR. BROOKS:  Jeffrey Brooks from the

5

1
2      New York City Law Department for the defendants.
3          THE VIDEOGRAPHER:  Our court reporter,
4      Brandon Rainoff, also from Veritext, will please
5      swear in the witness.
6      DIMITRI DEGLAS,
7          having been duly sworn, was examined
8          and testified as follows:
9      EXAMINATION
10     BY MS. HOLLOWAY:
11     Q.  Good morning.
12     A.  Good morning.
13     Q.  Sergeant Deglas -- and it is sergeant,
14     correct?
15     A.  Yes.
16     Q.  You are a police officer, correct?
17     A.  I'm a sergeant.
18     Q.  And you are a sergeant in the New York
19     City Police Department, is that correct?
20     A.  Yes, that's right.
21     Q.  How long have you been with the New
22     York City Police Department?
23     A.  In January it will be 22 years.
24     Q.  How long have you been a sergeant with
25     the police department?

6

1
2      A.  Since February of 2004.
3      Q.  What is your current position with the
4      police department?
5      A.  I'm currently assigned to the central
6      robbery section.
7      Q.  How long have you been assigned to the
8      central robbery section?
9      A.  Since May of 2009.
10     Q.  Before your assignment to the central
11     robbery section, what was your position with the
12     police department?
13     A.  I was working for the chief of patrols
14     office.
15     Q.  How long were you working with the
16     chief of patrols office?
17     A.  Since July of 2007.
18         MS. HOLLOWAY:  Could we go off the
19     record for a moment?
20         THE VIDEOGRAPHER:  Off the record,
21     10:10 a.m.
22         (Pause)
23         THE VIDEOGRAPHER:  Back on the record
24     10:10 a.m.
25     BY MS. HOLLOWAY:

7

1
2      Q.  You have been in the chief of patrols
3      office since July 2007, is that correct?
4      A.  Yes, prior to this position, yes.
5      Q.  Prior to that position, what was your
6      position with the police department?
7      A.  I was assigned to the 75th Precinct.
8      Q.  What was your position with the 75th
9      Precinct?
10     A.  I was the anticrime supervisor.
11     Q.  How long did you hold that position?
12     A.  Approximately a year and a half.
13     Q.  When did you take that position?
14     A.  February of 2006.
15     Q.  What were your primary
16     responsibilities as the anticrime supervisor in
17     the 75th Precinct?
18     A.  The anticrime unit is part of the
19     special operations team of the precinct,
20     primarily is responsible for violent street
21     crimes including gun possession, robberies,
22     assaults.
23         And my primary duty as a supervisor
24     was to correlate crime trends that were
25     happening in the precinct, and based on those

8

1
2      crime trends, I would make my decisions on how I
3      was going to deploy my men that evening in
4      consultation with the precinct commander.
5      Q.  How many men were in the anticrime
6      unit during 2006?
7      A.  Initially it was myself, Police
8      Officer Sullivan and Police Officer Prince, so
9      there was just two officers working at the time.
10     Q.  You said initially.  Did there come a
11     time that there were more officers?
12     A.  Yes.
13     Q.  Reporting to --
14     A.  During the summer of 2006, two
15     additional officers were eventually added.
16     Q.  You said that you would deploy your
17     officers in the precinct, correct?
18     A.  Yes.
19     Q.  Would you accompany them on their
20     patrol?
21     A.  Yes.
22     Q.  How often?
23     A.  Always.
24     Q.  Are you familiar with Mr. Dwayne
25     Robertson?

9

1
2   A.   Yes.
3   Q.   You are aware that you are here
4   testifying today in a lawsuit brought by Mr.
5   Robertson, correct?
6   A.   Yes.
7   Q.   Do you recall arresting Mr. Robertson
8   on April 15, 2006?
9        MR. BROOKS:  Objection.  You can
10  answer.
11  A.   Yes, I recall, but it was actually
12  April 14, I believe.
13  Q.   I believe it was late on the evening
14  of April 14th, is that correct?
15  A.   Yes.  A little after midnight, yes.
16  Q.   Prior to arresting Mr. Robertson on
17  that date, did you ever see Mr. Robertson or
18  know of him?
19  A.   No.
20  Q.   I would like to show you what's been
21  previously marked as Plaintiff's Exhibit 1.
22  Sergeant Deglas, do you recognize this document?
23  A.   Yes.
24  Q.   What is it?
25  A.   It looks like an online booking sheet.

10

1
2   Q.   Would you describe it as a complaint
3   report?
4   A.   No, I would describe it as an online
5   booking sheet.  A complaint report is a
6   different document.  This document will specify
7   the charges and give a brief narrative of the
8   events that took place and also gives prisoner
9   pedigree and basic officer information.
10  Q.   Do you know who filled out this online
11  booking sheet?
12  A.   It says that Police Officer Sullivan
13  filled it out.
14  Q.   Is this the online booking sheet for
15  the arrest of Mr. Robertson on the 14th, 15th of
16  April, 2006?
17  A.   Yes.
18  Q.   Did review Exhibit 1 after it was
19  completed?
20  A.   Yes.
21  Q.   Did you write any reports or take any
22  notes relating to Mr. Robertson's arrest?
23  A.   No.
24       MR. BROOKS:  Objection.
25  Q.   Did you provide any information to Mr.

11

1
2   Sullivan that was used to prepare this booking
3   sheet, Exhibit 1?
4        MR. BROOKS:  Objection.  You can
5   answer.
6   A.   Yes, we, of course, discussed the
7   charges that we would be bringing against Mr.
8   Robertson.
9   Q.   Have you been deposed before, Sergeant
10  Deglas?
11  A.   Yes.
12  Q.   How many times have you been deposed?
13  A.   Three to four times throughout my
14  career.
15  Q.   Did any of those matters -- strike
16  that.
17       Were you a defendant in any of those
18  matters?
19  A.   No.
20  Q.   Were any of those matters lawsuits
21  against the City of New York?
22  A.   Yes.
23  Q.   How many?
24  A.   All of them.
25  Q.   But you were not a named party in any

12

1
2   of those lawsuits against the city?
3   A.   No.
4   Q.   Were any of those lawsuits relating to
5   police officers' conduct in office?
6        MR. BROOKS:  Objection.  You can
7   answer.
8   A.   Yes, in a general sense, yes.
9   Q.   Were any of those lawsuits brought
10  against the City for excessive use of force?
11       MR. BROOKS:  Objection.
12  A.   No.
13  Q.   Turning back for a moment to Exhibit
14  1, just to confirm, you did review this report
15  before it was submitted, is that correct?
16  A.   Yes, in fact -- yes, and I signed off
17  on it.
18  Q.   So if you turn to the second page of
19  that exhibit, NYC 32 at the very bottom, do you
20  recognize your signature on that page?
21  A.   Yes, that's my handwriting.
22  Q.   If we could turn to the evening of
23  April 14th, 2006, do you recall what time your
24  shift began that evening?
25  A.   Yes.  It started at 7:30 at night.

Deglas, Dimitri  12/17/2009  12:00:00 PM

13

1
2      Q.   On April 14, 2006, were detectives
3   Prince and Sullivan the only officers in the
4   anticrime unit?
5      A.   Yes.
6      Q.   What -- you mentioned earlier that you
7   would make decisions as to how to deploy the
8   officers in the anticrime unit.  Do you recall
9   what decision you made that evening regarding
10   deployment?
11      A.   No, not this day, no, I could not
12   recall specifically what I -- what we had
13   planned that night.
14      Q.   Is there anything that I could show
15   that you could show to refresh your recollection as to
16   what specifically you had planned that night?
17      A.   Sure, if -- you have something you can
18   show me?
19      Q.   I'm asking you if there is anything --
20   well, why don't we mark, as
21   Plaintiff's Exhibit 9 a document marked NYC 418
22   to 419.
23          (Exhibit 9, Document Bates Stamped NYC
24   418 through 419, marked for identification)
25   BY MS. HOLLOWAY:

14

1
2      Q.   Sergeant Deglas, do you recognize
3   Exhibit 9?
4      A.   Yes.
5      Q.   What is it?
6      A.   It's my memo book from the period of
7   July 3rd, 1999, to the period of April 15, 2006.
8      Q.   You'll see that this exhibit just has
9   two pages, correct?
10      A.   Yes.
11      Q.   So is the second page a single page
12   from that memo book that you just described?
13      A.   It's in fact the last page of that
14   memo book, yes.
15      Q.   Thank you.  Is this your handwriting
16   that I see on the page, NYC 419?
17      A.   Yes.
18      Q.   If we could, just starting from the
19   top, if you could read your handwriting for me?
20          MR. BROOKS:  Now the page is upside
21   down -- starting from the bottom --
22          MS. HOLLOWAY:  Yes.
23      A.   It starts with the date, Friday, April
24   14, 2006.  This is a tour of duty which is 1930
25   by 0414, assignment.  Has a meal, 0100 hours.

15

1
2   Color of the day, which was white.  Partners,
3   Police Officer Sullivan, Police Officer Prince.
4   At 1930 it says present for duty.  At 2005 it
5   says RMP 8042, Police Officer Sullivan operator,
6   Police Officer Prince recorder.  At 0044, one
7   under by operator, corner of Williams Avenue and
8   Pitkin Avenue.  0046, 75th Precinct station
9   house.  0150, one MOS to Jamaica Hospital.
10   0410, 75th Precinct station house.  0514, end of
11   tour.  And then my signature with my shield
12   number.
13      Q.   Thank you.  I have a few questions
14   about these notes.
15      A.   Sure.
16      Q.   The fifth line from the top, I believe
17   you read 2005 RMP 8072, Police Officer Sullivan
18   operating, correct?
19      A.   Right.
20      Q.   Is RMP the vehicle in which you and
21   Officers Prince and Sullivan were riding that
22   evening?
23      A.   Yes.
24      Q.   What -- does PO Sullivan operating
25   indicate that Officer Sullivan was operating

16

1
2   that vehicle?
3      A.   Yes.
4      Q.   I believe you read next line PO Prince
5   recording.  What does that mean?
6      A.   Recorder.  That means he was the front
7   seat passenger.
8      Q.   Why is the front seat passenger called
9   the recorder?
10      A.   That's just a New York City Police
11   Department term for the partner of the operator.
12   He's responsible for taking down -- whenever a
13   radio assignment comes over he's the one who is
14   going to record it in his memo book.  He's the
15   one -- essentially the administrative half of
16   the partnership for the evening, because
17   obviously if you are operating a vehicle you
18   can't concern yourself with those things.
19      Q.   The next line of your notes, I believe
20   you read one under by operator, corner of
21   Williams and Pitkin Avenue?
22      A.   Yes.
23      Q.   What does that mean?
24      A.   That means that one person was placed
25   under arrest by the operator of the vehicle.

17

1
2      Q.   And the operator of the vehicle was
3   Police Officer Sullivan, correct?
4      A.   Yes.
5      Q.   So that would indicate that a person
6   was placed under arrest at the corner of
7   Williams and Pitkin by Officer Sullivan,
8   correct?
9      A.   Yes.
10      Q.   Does that indication mean that Officer
11   Sullivan was the officer to handcuff the person
12   who was placed under arrest?
13      A.   No, not necessarily.
14      Q.   What's the significance of noting
15   Officer Sullivan as the officer who placed the
16   person under arrest?
17          MR. BROOKS:  Objection.  You can
18   answer.
19      A.   Officer Sullivan was the arresting
20   officer so he would be processing the arrest, he
21   would be responsible for all the paperwork
22   relating to the arrest.
23      Q.   Two lines below the line we were just
24   discussing it says 0076, 75th Precinct, is that
25   correct?

18

1
2      A.   0046.
3      Q.   46.  Thank you.  Does that indicate
4   that at that time 0046 you were at the 75th
5   Precinct?
6      A.   Yes, in the station house.
7      Q.   Station house.
8          And the next line, MOS to Jamaica
9   Hospital, what does that mean?
10      A.   It means that Police Officer Prince
11   was removed to Jamaica Hospital for injuries
12   that he sustained during the arrest.
13      Q.   Did Police Officer Prince, do you
14   recall whether Police Officer Prince accompanied
15   you to the 75th Precinct at 0046?
16      A.   Yes, we were -- it was myself, Police
17   Officer Sullivan, Mr. Robertson and Police
18   Officer Prince.
19      Q.   And the indication in the next line
20   that Police Officer Prince was removed to
21   Jamaica Hospital, does that indicate that you
22   drove him or took him to Jamaica Hospital?
23      A.   I accompanied him to the hospital,
24   yes.
25      Q.   Do you recall whether you accompanied

19

1
2   him -- strike that.
3      Q.   How long after the start of your shift
4   did you first see Mr. Robertson on April 14?
5      A.   Well, may I look at the exhibit?
6      Q.   Yes, you may.
7      A.   My shift started at 7:30 p.m. and we
8   saw Mr. Robertson at approximately quarter to
9   one on that evening in the morning.
10      Q.   Do you have any recollection of what
11   happened on that shift prior to your seeing Mr.
12   Robertson?
13      A.   No specific recollection.  We were on
14   patrol, but there was no incident that I recall
15   of any -- that sticks out in my mind as to what
16   happened.
17      Q.   Do you recall if you made any arrest
18   before you saw Mr. Robertson?
19      A.   Definitely not.
20      Q.   Do you recall making any stops of any
21   individuals on the street before seeing Mr.
22   Robertson?
23      A.   I don't recall, no.
24      Q.   Is there a log of what occurred on
25   your shift prior to stopping Mr. Robertson?

20

1
2      A.   No, in fact, my memo book would be the
3   only record of anything that happened that
4   evening.
5      Q.   Where were you when you first observed
6   Mr. Robertson, do you recall?
7      A.   At the -- I was in the rear seat of --
8   the rear seat passenger of the vehicle, and when
9   I first observed Mr. Robertson he was on Pitkin
10   Avenue approaching Williams Avenue.
11      Q.   Do you recall why you were on Pitkin
12   Avenue?
13      A.   No, there was no specific reason why
14   we were.  We were simply on patrol.
15      Q.   You said that you first saw Mr.
16   Robertson when he was on Pitkin approaching
17   Williams.  Where were you at that time?
18      A.   You mean where was he -- I was in the
19   back seat of the car.
20      Q.   Where was the car?
21      A.   At the vicinity of Pitkin Avenue and
22   Williams Avenue.
23      Q.   So the car was on Pitkin Avenue, is
24   that correct?
25      A.   Yes.

21

```
1
2     Q.   Which direction was the car traveling
3  on Pitkin Avenue?
4     A.   We were proceeding westbound.
5     Q.   Is Pitkin Avenue a two-way street?
6     A.   Yes.
7     Q.   Were you proceeding westbound in the
8  right-hand lane?
9     A.   Yes.
10    Q.   Do you recall which side of the street
11 Mr. Robertson was on when you first observed
12 him?
13    A.   Yes, he was on the south side of the
14 street.  We were proceeding westbound so he
15 would be to our left.
16    Q.   He would be to your left and the lane
17 of traffic traveling eastbound was between your
18 car and Mr. Robertson, is that correct?
19    A.   Yes.
20    Q.   What kind of car is an RMP?
21         MR. BROOKS:  Objection.  You can
22 answer.
23    A.   An RMP is a radio motor patrol.
24 That's a generic term that the police department
25 uses to refer to its police vehicles.  Now,
```

22

```
1
2  there is two types of RMPs.  There is the fully
3  marked ones that you see with the light bars in
4  the blue and white, and then there is unmarked
5  ones, too.  And we were in an unmarked one.
6     Q.   So what kind of car is an unmarked
7  RMP?
8     A.   Back then, three, four years ago, that
9  was a -- I believe it was a Chevy Impala,
10 unmarked, tinted windows.
11    Q.   Were you traveling with the headlights
12 on in that vehicle when you were traveling down
13 Pitkin Avenue?
14    A.   Yes, in fact, headlights are automatic
15 on that car so it's impossible not to turn them
16 on.
17    Q.   Were there any other lights on the car
18 on?
19    A.   No.
20    Q.   Does the car have other lights that
21 you could have turned on?
22    A.   The car is fully -- has a fully
23 equipped light package, so it has lights and
24 sirens.
25    Q.   And those lights and sirens weren't on
```

23

```
1
2  when you were traveling down Pitkin Avenue?
3     A.   No, there was no emergency at the
4  time.
5     Q.   Is -- when -- strike that.
6         Are the lights on an RMP turned on
7  only in an emergency?
8         MR. BROOKS:  Objection.
9     A.   I'm going to say no because there are
10 instances where you'll turn on lights and it's
11 not going to be an emergency.
12    Q.   What's an example of an instance where
13 you would turn on lights when there isn't an
14 emergency?
15    A.   If you want to get somebody's
16 attention, when you are pulling somebody over
17 there would be -- it's not always an emergency
18 when you are conducting a car stop.  Somebody
19 could just commit a traffic infraction, or if
20 you want to get somebody out of the way, maybe.
21    Q.   So would it be fair to say that when
22 you want to alert someone that the car you are
23 traveling in is a police vehicle, you would turn
24 those lights on?
25         MR. BROOKS:  Objection.  You can
```

24

```
1
2  answer.
3     A.   Yes, that would be an instance.
4     Q.   Were the windows of your vehicle up or
5  down when you first saw Mr. Robertson?
6     A.   My window was maybe a quarter of the
7  way down.  Sullivan's was all the way down
8  because he was freezing me out.  I remember
9  yelling at him several times during the
10 evening.  And Prince's was about halfway down to
11 almost three quarters of the way down.
12    Q.   Was the car -- was your car traveling
13 in the same direction as Mr. Robertson was
14 walking?
15    A.   Yes.  And I would like to clarify that
16 by saying that's the moment when I first saw
17 him.  Is it possible that the vehicle was
18 traveling in the opposite direction prior to my
19 observing him?  That's possible.
20    Q.   Can you describe Pitkin Avenue for me?
21    A.   Sure.  Pitkin Avenue is a two-lane
22 street that runs east and westbound.  It goes
23 all the way from, I believe, the Van Wyck
24 Expressway all the way down to East 98th Street
25 in Brooklyn, so it's a very long avenue.  But
```

25

1
2  that's not within the confines of the 75th
3  Precinct.
4      Q.   Can you describe the blocks
5  surrounding Pitkin and Williams for me?
6      A.   At that particular location?
7      Q.   At that particular time, yes.
8      A.   Yes, it's primarily a commercial
9  industrial area, very few residences in the
10  area, mostly factories and businesses.
11      Q.   Are there street lights on the corner
12  of Pitkin and Williams?
13      A.   Yes, numerous street lights.
14      Q.   Were those street lights on in the
15  evening of April 14, 2006?
16      A.   Yes.
17      Q.   When you first saw Mr. Robertson on
18  Pitkin Avenue, was he standing under a street
19  light?
20      A.   He wasn't standing, he was actually
21  walking, and there are street lights on the
22  corner.  There were also building lights he was
23  walking by, so --
24      Q.   Would you describe Pitkin Avenue as
25  deserted?

26

1
2      MR. BROOKS:  Objection.
3      A.   At that particular instance it was
4  very, very light traffic.  There was no other
5  pedestrian traffic in the area that I can --
6  that I can remember.
7      Q.   Did there come a time where yourself
8  or any of the other officers in the car made a
9  decision to approach Mr. Robertson in the
10  vehicle?
11      MR. BROOKS:  Objection.  You can
12  answer.
13      A.   Yes.
14      Q.   Who made that decision?
15      A.   Well, since Police Officer Sullivan
16  was driving, he made the decision to approach
17  him, but I don't remember who actually observed
18  Mr. Robertson first.
19      Q.   Do you have an understanding as to why
20  the decision was made to approach Mr. Robertson
21  in the vehicle?
22      A.   At the initial -- prior to the initial
23  moment of contact?  No, I didn't know because,
24  again, I was the rear seat passenger and I don't
25  know what my attention was being drawn to at

27

1
2  that time.
3      Understand, there is three people in
4  the car looking in three different directions.
5  So I can't really speak to what Police Officer
6  Sullivan and Police Officer Prince saw at that
7  moment that prompted them to make that decision
8  to approach Mr. Robertson.
9      Q.   Were you sitting behind Officer Prince
10  or behind Officer Sullivan?
11      A.   Behind Officer Prince.
12      Q.   Did the car you were traveling in
13  cross the lanes of traffic to approach Mr.
14  Robertson?
15      A.   Yes.
16      Q.   So at the time that the vehicle was
17  approaching Mr. Robertson, was it pointing
18  the -- what would be the wrong way in traffic?
19      MR. BROOKS:  Objection.
20      A.   Yes, it had crossed on to -- into the
21  eastbound lane of traffic.
22      Q.   At any time between when you first saw
23  Mr. Robertson and when the car began to approach
24  Mr. Robertson, did you smell marijuana coming
25  through the open windows of the car?

28

1
2      A.   I did not, no.
3      Q.   Did you observe Mr. Robertson during
4  that time smoking a marijuana cigarette?
5      A.   I did not, no.
6      Q.   Did there come a time that evening
7  when you did smell marijuana?
8      A.   No -- well, yes, actually, let me
9  correct that, because we did recover marijuana,
10  so I did smell it, later on during the evening I
11  did smell it.
12      Q.   But was there a time before Mr.
13  Robertson was handcuffed that you smelled
14  marijuana smoke?
15      A.   No, and I wasn't really looking for
16  it, no.  I would say no.
17      Q.   Can you describe what you remember
18  seeing when you saw Mr. Robertson for the first
19  time on that evening?
20      A.   Yes, when my attention eventually
21  focused on him, he was walking at a pretty brisk
22  pace.
23      Q.   Do you recall what he was wearing?
24      A.   To the best of my recollection he was
25  wearing a dark jacket, possibly black, heavy,

29

1
2    heavy jacket.  I don't remember what his pants
3    were, his footwear was.  I don't recall.
4        Q.  Do you recall any conversation among
5    the officers in the car as the car was
6    approaching Mr. Robertson?
7        A.  I wouldn't be able to repeat it
8    verbatim, but it was something to the effect of,
9    you know, let's check out that guy, I think he's
10   smoking something.  I don't know.  I don't
11   remember what it was.
12       Q.  At the point the car is approaching
13   Mr. Robertson, did you believe that Mr.
14   Robertson was a threat to his safety or any
15   other officer's safety?
16           MR. BROOKS:  Objection.
17       A.  Well, that's a difficult question to
18   answer because of the nature of the work that we
19   do.  Unfortunately, police work, you never know,
20   when you are approaching somebody you don't know
21   who they are or what they just did just a mere
22   minutes ago.  So we unfortunately have to view
23   pretty much everybody as a threat and possibly
24   armed, especially considering the time and the
25   circumstances and the neighborhood, so --

30

1
2        Q.  Did you have reason to believe that
3    Mr. Robertson had committed, was committing or
4    was going to commit a violent crime?
5           MR. BROOKS:  Objection.
6        A.  No, but I had no reason to believe he
7    wasn't, either.
8        Q.  What happened after the car that you
9    were traveling in approached Mr. Robertson?
10       A.  As the car approached over the double
11   yellow lines to approach Mr. Robertson, Police
12   Officer Sullivan said something to the effect
13   of:  Yo, my man, police.  Can we talk to you for
14   a minute?  Words to that effect.  I don't know
15   the exact words.
16       Q.  Do you recall what if anything Mr.
17   Robertson said in response to that?
18       A.  He didn't say anything, his response
19   was to start running.
20       Q.  Did there come a time when Officer
21   Prince got out of the vehicle?
22       A.  Yes.
23       Q.  Did Mr. Robertson start running before
24   Mr. Prince got out of the vehicle?
25       A.  Yes.

31

1
2        Q.  Was there just -- let me just step
3    back for a moment, clarify, make sure I
4    understand something correctly.
5           Before Mr. Robertson started running,
6    did you become aware that either Officer Prince
7    or Officer Sullivan had observed Mr. Robertson
8    smoking marijuana?
9        A.  No, because events like that tend to
10   happen very, very fast, so there is often, you
11   know, 90 percent of the time there is no time
12   for discussion.  So his initial approach was a
13   decision that he made on his own that I wasn't
14   able to make any kind of judgment about at the
15   time, but since he was approaching, that's when
16   I actually focused my attention on Mr. Robertson
17   and then that's when the events unfolded the way
18   they did, so --
19       Q.  Do you know whether any of the
20   officers in the car had the intent to arrest
21   Mr. Robertson as the car was approaching him?
22       A.  That I really couldn't say, you know,
23   I don't know.
24       Q.  Did Mr. Sullivan identify himself as a
25   police officer as the car approached Mr.

32

1
2    Robertson?
3        A.  Again, I don't remember what the exact
4    words were, but as I stated before, it was
5    something to the effect of:  Yo, my man, please,
6    can we talk to you a minute?
7        Q.  How far away from Mr. Robertson was
8    the car when Mr. Sullivan spoke approximately
9    those words?
10       A.  Maybe 10, 15 feet away at the most,
11   maybe closer, I don't really know, because the
12   car was moving so the distance was continually
13   getting shorter.
14       Q.  Did Officer Sullivan communicate to
15   Mr. Robertson any intent to arrest him at that
16   point?
17       A.  No.  The intention based on what I
18   remember was just to speak to him, not to arrest
19   him.
20       Q.  Did there come a time where that
21   intention changed?
22       A.  Yes.
23       Q.  When was that?
24       A.  When he was placed under arrest.
25       Q.  Did you speak to Mr. Robertson from

33

1

2    the car?

3    A.  No.

4    Q.  Did Officer Prince speak to Mr.

5    Robertson from the car?

6    A.  From the car, no.

7    Q.  At what point did Mr. Prince -- did

8    Officer Prince get out of the vehicle?

9    A.  As Mr. Robertson started to run or

10   just after he started to run.

11   Q.  What did Officer Prince do?

12   A.  He began to chase him, so Police

13   Officer Prince was in a foot pursuit.  Mr.

14   Robertson at that point had turned southbound on

15   to Williams Avenue and Police Officer Sullivan.

16   I told him to drive ahead of Mr. Robertson so he

17   could cut off his avenue of escape, which he

18   did.  So he positioned the vehicle sideways so

19   that Mr. Robertson would be running into it.

20        When I got out, what I observed was

21   Mr. Robertson and Police Officer Prince in an

22   altercation in the middle of the street.

23   Q.  Do you recall hearing Officer Prince

24   say anything to Mr. Robertson as he exited the

25   car?

34

1

2    A.  No, I don't.

3    Q.  Did you at any point when Officer

4    Prince was pursuing Mr. Robertson hear him say

5    anything to Mr. Robertson?

6    A.  No, because the roar of the engine

7    probably drowned it.  I mean, no, I didn't hear

8    anything.

9    Q.  Did you observe when Mr. Robertson was

10   caught by Officer Prince?

11   A.  No, I didn't observe that initial

12   moment when he made contact, physical contact

13   with him.  But the time I got of the car he had

14   already apprehended him, and like I said, he was

15   involved in a physical altercation with Mr.

16   Robertson in the middle of Williams Avenue.

17   Q.  When you say he had already

18   apprehended him, do you mean he had sort of made

19   physical contact with him?

20   A.  Yes.

21   Q.  When you say they were in an

22   altercation in the street, what do you mean by

23   altercation?

24   A.  They were fighting.

25   Q.  Were they striking one another?

35

1

2    MR. BROOKS:  Objection.

3    A.  Yes, I mean, Mr. Robertson was trying

4    to get away and in his effort to get away he was

5    pushing and his arms were flailing and he was

6    trying to hit Police Officer Prince.

7    Q.  Do you recall whether Mr. Robertson

8    had his hands in fists?

9    A.  Yes, he did, yes.

10   Q.  He did?

11   A.  Yes.

12   Q.  Was he using those fists to strike Mr.

13   Prince, Officer Prince?

14   A.  Let me be clear, he wasn't squaring

15   off with him.  Like I said, he was trying to get

16   away from him.  So Police Officer Prince had him

17   and he was holding on to him and he was trying

18   to push away and trying to hit him to get away.

19   Q.  Were Officer Prince and Mr. Robertson

20   both on the ground at that point?

21   A.  Yes.  Yes.  Yes, Police Officer Prince

22   was on his knees and Mr. Robertson was on his

23   back at that point.

24   Q.  Did there come a point when Mr.

25   Robertson turned over and was on his front on

36

1

2    the ground?

3    A.  Not at that -- he was moving around,

4    you know, like I said, he was trying to get away

5    so he was trying to turn away.  But at the time

6    I first observed him when I got out of the car

7    he was on his back.

8    Q.  What did you do when you got out of

9    the car?

10   A.  I saw that Police Officer Prince

11   needed assistance because it was clear that he

12   was not in full control of Mr. Robertson at that

13   point, so I ran over.  As I was running I

14   removed my expandable baton from its holster.  I

15   deployed it.  In other words, it extended to the

16   full length, and I went right over to where they

17   were and I struck Mr. Robertson twice in the

18   left leg with my baton.

19   Q.  Where was Officer Sullivan when you

20   got out of the car?

21   A.  I think he was putting the car in park

22   because the car hadn't stopped moving yet, so.

23   Q.  Did there come a point when Officer

24   Sullivan got out of the car?

25   A.  Yes.

37

1
2      Q.   Where was Officer Sullivan while you
3   were running to meet Officer Prince and Mr.
4   Robertson in the street?
5      A.   Honestly I don't know because my
6   attention was -- I had tunnel vision at that
7   point.  I was focused on my officer and I was
8   worried about his safety, so -- but there was no
9   reason to assume that he wasn't directly behind
10  me, so that would be -- he was behind me.
11     Q.   When is the next time that you recall
12  seeing Officer Sullivan?
13     A.   When he was assisting us to handcuff
14  Mr. Robertson.
15     Q.   You said that you took your expandable
16  baton out of --
17     A.   Holster.
18     Q.   Holster, out of its holster and
19  deployed it, did you do that while you were
20  running?
21     A.   Yes.
22     Q.   How far away were you from Officer
23  Prince and Mr. Robertson when you did that?
24     A.   No more than maybe 20, 24 feet at the
25  most.

38

1
2      Q.   What was the -- approximately the
3   distance between where the car was parked and
4   Officer Sullivan and Mr. Robertson were on the
5   ground in the street?
6      A.   You mean Police Officer Prince, right?
7      Q.   I'm sorry, yes.
8      A.   The same distance, because from where
9   the car was parked, the distance -- I got out to
10  run to them, the car was at the same distance,
11  20 to 24 feet at the most.
12     Q.   So, then, you removed your baton from
13  its holster when you were close to the RMP,
14  correct?
15         MR. BROOKS:  Objection.
16     A.   I don't remember the exact moment when
17  I did because I think the movement was pretty
18  instinctive.  As I started to run over I reached
19  for -- I reached for it, so I think I deployed
20  it once I cleared the car because I couldn't do
21  it inside the car so -- I don't know the exact
22  moment, you know, I would say probably about
23  halfway to where Mr. Robertson and Police
24  Officer Prince were, between halfway from the
25  car, you know, the distance in between.

39

1
2      Q.   You said that deploying your baton was
3   instinctive.  Is that because you had used it
4   before in similar situations?
5      A.   Yes.
6      Q.   Did you assist Officer Prince in
7   handcuffing Mr. Robertson?
8      A.   Yes, all three of us did at that
9   point.
10     Q.   Do you recall anything that you said
11  to Mr. Robertson as you were assisting Officer
12  Prince to handcuff him?
13     A.   Yes, yes, I do.
14     Q.   What did you say?
15     A.   I said stop resisting, you know, about
16  three or four times.
17     Q.   Did you say anything to Mr. Robertson
18  prior to striking him in the leg with the baton?
19     A.   No.  Those words were in conjunction
20  with the strikes.
21         MS. HOLLOWAY:  Can we take a
22  two-minute break?
23         MR. BROOKS:  Sure.
24         THE VIDEOGRAPHER:  Off the record,
25  10:47 a.m.

40

1
2         (Recess.)
3         THE VIDEOGRAPHER:  Back on the record,
4   11:02 a.m.
5   BY MS. HOLLOWAY:
6      Q.   Getting back to the topic we were
7   discussing right before the break, how many
8   times did you hit Mr. Robertson with the baton?
9      A.   Twice.
10     Q.   Both of those times you hit him in the
11  leg?
12     A.   Yes.
13     Q.   Is it your practice to use a baton
14  when a subject is resisting arrest?
15     A.   Not always, it's depends on the
16  situation.
17     Q.   What are some factors in your mind
18  that would mean it is appropriate to use a baton
19  on someone who is resisting arrest?
20         MR. BROOKS:  Objection to form.  You
21  can answer.
22     A.   Primary use is to overcome resistance,
23  prevent escape.  Again, my primary concern was
24  for my officer.  I didn't want him to get
25  injured in any way, so -- to be quite honest I

Deglas, Dimitri  12/17/2009  12:00:00 PM

41

1
2    didn't know if Mr. Robertson had any kind of
3    weapon.  I was also concerned that he might get
4    hold of my officer's weapon which is always a
5    very real possibility.  So those are the kinds
6    of things that go through your mind, or my mind,
7    actually.
8        Q.  In your view what's an appropriate way
9    to use a baton?
10       A.  The only appropriate way to use that
11   baton is in a manner that's entirely consistent
12   with the way I was trained to use it by the New
13   York City Police Department.  What that entails
14   is strikes to the legs, to the arms, but no
15   strikes to the head, completely prohibited.
16       Why?  Because they are dangerous, they
17   could lead to serious injury or death, so it's a
18   tool and -- it's a tool that's used to, like I
19   said before, to overcome resistance during
20   arrest, to prevent escape or to prevent injury
21   to another officer.  But that's the only
22   appropriate way to use that baton is in the
23   manner in which I was trained to use it.
24       Q.  So you didn't consider using the baton
25   to strike Mr. Robertson in the head, is that

42

1
2    correct?
3        A.  That would be entirely inconsistent
4    with what I was trained.  So, no, absolutely
5    not, because I realized the consequences of
6    doing that.
7        Q.  Is it appropriate to use a baton on a
8    perpetrator after he has been handcuffed?
9        A.  No, absolutely not.  Any force that's
10   used on a suspect after he's handcuffed is
11   completely inappropriate.  No.  Can't think of
12   an instance where there would be.
13       Q.  So you struck Mr. Robertson in the
14   legs with the baton before he was handcuffed, is
15   that correct?
16       A.  Yes.  Yes.  Absolutely.
17       Q.  Are you aware whether Officer Prince
18   was in a position to observe you strike Mr.
19   Robertson in the legs with the baton?
20       MR. BROOKS:  Objection.
21       A.  I believe Officer Prince had his back
22   to me at the time.  In fact, he was kind of in
23   between myself and Mr. Robertson's head.  So
24   Prince had his back to me, yes, as I came up,
25   so --

43

1
2        Q.  When you say his back to you, wasn't
3    Officer Prince on the ground with Mr. Robertson?
4        A.  He was on -- he was on -- I think --
5    the situation was fluid, but at one point he was
6    on two knees, at one point he was on one knee.
7    He was trying to control him.  Mr. Robertson who was
8    trying to get up at that point.
9        Q.  As you approached Officer Prince and
10   Mr. Robertson, was Officer Prince or Mr.
11   Robertson closer to you?
12       A.  Technically Mr. Robertson was because
13   his legs were closer to me.  His feet -- in
14   other words, his head was facing northbound and
15   his feet were facing southbound as I approached.
16   Again, the situation was fluid.  He was moving
17   around.
18       Q.  Did Mr. Robertson say anything to you
19   after he had been struck by the baton?
20       A.  Did he say anything?  You know what?
21   I wasn't really paying attention to what he was
22   saying at that point, because my concern with
23   him -- my primary concern at that point was my
24   officer, both my officers, whether they were not
25   injured and safe.

44

1
2        And then after Mr. Robertson had been
3    handcuffed and he was lying on his stomach at
4    that point, I noticed that there was a pool of
5    blood forming underneath his -- under like where
6    his head was.  So we turned him over and sat him
7    up.
8        Police Officer Sullivan actually
9    removed the bandanna that Mr. Robertson had in
10   his pocket, I forget which one, and applied
11   direct pressure to the wound.  And I said, well,
12   you know, let's get him an ambulance.  So we
13   actually did that.
14       When we responded to the station house
15   an ambulance arrived shortly after to treat his
16   wounds and -- but as far as did he say anything
17   to me?  I don't think he said anything.  I mean,
18   he was -- got to remember, he just had been
19   chased by the police and just fighting.  I think
20   he was just -- you know, I think he might have
21   said something like what did I do or what
22   happened, something like that, but nothing that
23   I really paid attention to.
24       Q.  You said you noticed a pool of blood
25   form under his face.  Did you see the wound from

45

1
2    where that blood was coming?
3       A.   Yes, of course, when we turned him up
4    I saw there was a cut above his eye, I believe.
5       MR. BROOKS:  Indicating his left eye?
6       THE WITNESS:  Yes, his left eye.
7    BY MS. HOLLOWAY:
8       Q.   Do you have any understanding as to
9    how that cut came about?
10      A.   No, I don't.  I could speculate on it
11   but I don't know the exact points of occurrence
12   on that wound.  You know, did it happen when he
13   fell in the street?  Was it a result of a strike
14   from Police Officer Prince?  I don't know, I
15   don't know what it was from.
16      Q.   Did you observe Officer Prince
17   striking Mr. Robertson at any point during your
18   encounter with Mr. Robertson that evening?
19      A.   Yes, again, when I first got out of
20   the car they were clearly in a physical
21   altercation, and by that I mean they were
22   exchanging blows.  Mr. Robertson was clearly
23   trying to get away and he was in that -- that
24   mode where he just -- he was going to do
25   everything he could to get away, you know.

46

1
2       Q.   Going back to the wound on Mr. --
3    above Mr. Robertson's left eye, how large was
4    the wound, do you recall?
5       A.   I really don't know because it was
6    obscured by blood at that time but -- you know,
7    I'm familiar with head injuries.  I know there
8    is always a lot of blood.  Very consistent with
9    head injuries, whether it's scalp or face.  I
10   mean, if you look at any boxing match or -- you
11   have seen matches, happens quite a bit, so --
12      Q.   Did Mr. Robertson have any other
13   injuries on his head and his face other than
14   that wound above his left eye?
15      MR. BROOKS:  Objection.
16      A.   Not that I remember.  It's possible
17   that he did but I don't remember.  That's the
18   only one that I paid attention to.
19      Q.   Do you recall Mr. Robertson
20   complaining of any pain or of any injury at any
21   time after he was handcuffed?
22      MR. BROOKS:  Objection.
23      A.   Specifically, no, I don't, but it's --
24   that's not entirely impossible that he didn't.
25   I don't know.

47

1
2       Q.   Do you recall Mr. Robertson asking for
3    an ambulance or asking to be taken to the
4    hospital?
5       MR. BROOKS:  Objection.
6       A.   He didn't have to because even before
7    any mention was made of it I said let's get him
8    an ambulance, because obviously it was an open
9    wound that needed to be treated.
10      Q.   At any point during your encounter
11   with Mr. Robertson that evening did you observe
12   him throwing a black object?
13      A.   He threw something, but -- just after
14   he had started to run, but I couldn't make out
15   what it was.  It could have been -- it was a
16   dark object but I don't know what it was.
17   Again, I'm in the back seat of a car that's
18   moving.  You know, I saw a furtive motion but I
19   don't know what it was.
20      Q.   Do you recall when you saw that, were
21   you in the vehicle still?
22      A.   Yes, I was still in the vehicle.
23      Q.   Did there come a time that you had an
24   understanding as to what that object was that he
25   threw?

48

1
2       A.   Yes.
3       Q.   What was that?
4       A.   After he was placed under arrest, a
5    black glove containing marijuana, small bags of
6    marijuana was recovered from the vicinity where
7    he had started to run, so right on the corner of
8    Williams and Pitkin.
9       Q.   Who recovered it?
10      A.   Police Officer Sullivan.
11      Q.   Did you observe Police Officer
12   Sullivan recovering it?
13      A.   I watched him and Prince walk over to
14   that area, but I was -- at that point I had to
15   stay with the prisoner so -- in case he decided
16   to run, because people have run on me when they
17   are still handcuffed.
18      So I stayed with Mr. Robertson.  They
19   went back to the initial point where he started
20   to run, and when they came back Police Officer
21   Sullivan had a black glove in his possession in
22   one hand, actually, and he had the marijuana in
23   the other.
24      That's the only time I saw the object,
25   whatever -- that's what they came back with was

49

1
2    a black glove with marijuana.
3        Q.   Do you recall any conversation between
4    yourself and Officers Prince and/or Sullivan
5    before they went back to that area?
6            MR. BROOKS:  Objection.
7        Q.   Where he started running?
8        A.   I think I might have directed them to
9    go back and -- I don't know who I told it to.  I
10   said something like go see what he threw over
11   there or what did he throw over there, and they
12   both started to walk over while I remained with
13   Mr. Robertson.
14       Q.   You said you saw Mr. Robertson make, I
15   think you said, a furtive motion?
16       A.   Yes.
17       Q.   And you gestured with your hand toward
18   your side.  What did you mean by a furtive
19   motion?
20       A.   Well, he reached like in the area of
21   list waistband or his pocket.  I'm not really
22   sure.  But it came from this area and it just
23   seemed like he -- as he was running he threw
24   something down.  I saw something but I really
25   couldn't tell you what it was at the time.

50

1
2            MR. BROOKS:  You are indicating his
3    right side?
4            THE WITNESS:  Yes, his right side.
5    But, you know, it was a dark object, I don't
6    know what it was.
7    BY MS. HOLLOWAY:
8        Q.   Are you aware of whether -- strike
9    that.
10           Do you know whether the glove and the
11   marijuana that Officers Prince and Sullivan
12   brought back were recovered from the street or
13   in the sewer?
14           MR. BROOKS:  Objection.
15       A.   I believe it was the sewer, like a
16   sewer right on the corner of the street.  I
17   don't know what those things are called.
18   Sewer -- I don't know what --
19       Q.   So you believe that they were
20   recovered then from a sort of sewer grate next
21   to the curb, customarily, on the street?
22       A.   Yes, where rain would flow into it,
23   yes.
24       Q.   Did Officer Sullivan or Officer Prince
25   tell you that that's where the marijuana and the

51

1
2    glove were recovered from?
3        A.   Yes.  Yes.
4        Q.   Do you have any understanding as to
5    how the marijuana and the glove were recovered
6    from in the sewer?
7        A.   No, because, again, I was with Mr.
8    Robertson, so I didn't see them recover it.
9    So --
10       Q.   How long were Officers Prince and
11   Sullivan in the vicinity where they recovered
12   the glove and the marijuana?
13       A.   Less than a minute.
14       Q.   Could you see them from where you were
15   with Mr. Robertson?
16       A.   Yes.
17       Q.   Do you recall observing either one of
18   them get down on the ground and reach into a
19   sewer?
20       A.   No, because again, I was -- at that
21   point I was focused on Mr. Robertson who was
22   obviously injured and needed attention, so --
23       Q.   So you could see them but you weren't
24   watching them, is that correct?
25       A.   No.  At that point Mr. Robertson was

52

1
2    actually more important.
3        Q.   If we could return for a moment to the
4    beginning of the incident when you approached
5    Mr. Robertson in your car, you said you recalled
6    some conversation in the car either right before
7    or as the car was approaching Mr. Robertson,
8    like it looks like he's smoking something, we
9    should go over there and check it out, is that
10   right?
11       A.   Yes, something to that effect.  Those
12   weren't the specific words, but something to
13   that effect.
14       Q.   Did you at any point observe anything
15   that Mr. Robertson was smoking?
16       A.   I didn't, whether it was my vantage
17   point or the fact I wasn't clearly focused on
18   him yet, you know.  Again, I said before there
19   is three people in the car so I'm looking -- I
20   don't know where I was looking at the time, but
21   I know that when they first observed him I was
22   probably looking in a different direction,
23   because the first time I really saw him was when
24   the car was starting to get close to him.
25           So I don't know -- I can't speak for

53

1
2  what Police Officer Sullivan or Police Officer
3  Prince saw on their initial observation because
4  I didn't make the same observation that they
5  did.  It was subsequent to their initial
6  observation.
7      Q.  But as the car approached and got
8  closer to Mr. Robertson, you didn't yourself see
9  any cigarette or any joint or marijuana
10  cigarette that Mr. Robertson may have been
11  smoking, did you?
12     A.  No, I did not observe any such thing.
13     Q.  Did you observe Mr. Robertson at any
14  point during the incident throw anything aside
15  from the black object that we were talking about
16  earlier?
17     A.  No.  Again, for the same reasons that
18  I have explained before, because what they saw
19  prior to my focusing on my attention towards Mr.
20  Robertson, I didn't see anything.
21     Q.  Did you or Officers Prince or Sullivan
22  confirm in any way that what Mr. Robertson was
23  allegedly smoking was a marijuana cigarette?
24     MR. BROOKS:  Objection.  You can
25  answer.

54

1
2      A.  I'm not sure what you mean.  At what
3  point?
4      Q.  At any point -- well, let me come at
5  it from a different vantage point.
6      Did you or either of the officers who
7  you were with recover a marijuana cigarette from
8  the scene of the incident at any point?
9      A.  No, because had we, it would have been
10  vouchered along with the other marijuana.
11     Q.  Did you or Officer Sullivan or Prince
12  attempt to find and recover the -- any marijuana
13  cigarette?
14     MR. BROOKS:  Objection.
15     A.  Yes, I know that they looked for it on
16  the sidewalk, but, again, it would be
17  speculation on my part.  If the glove ended up
18  in the sewer, then it stands to reason that the
19  cigarette might have ended up in there, too, and
20  it was unrecoverable at that point.
21     Q.  How do you know that Officers Prince
22  and Sullivan attempted to recover the cigarette,
23  did they tell you?
24     A.  They walked around the vicinity just
25  to make sure there wasn't anything else he might

55

1
2  have thrown.
3      Q.  But do you know specifically that they
4  were looking for a marijuana cigarette?
5      A.  Do I know specifically?  No, I don't
6  know.  I didn't direct them at that point to
7  specifically look for it.  That doesn't mean
8  that they weren't, but I didn't tell them --
9      Q.  But you didn't specifically instruct
10  them to --
11     A.  No.
12     Q.  -- to find the cigarette that Mr.
13  Robertson --
14     A.  No, I didn't say:  Boys go, find --
15     MR. BROOKS:  Let her finish her
16  question first.
17     Q.  Just so I think the record was a
18  little muddled there, you didn't instruct them
19  to go find the cigarette that Mr. Robertson was
20  smoking?
21     A.  I did not, no.
22     Q.  Why didn't you instruct them to find
23  the cigarette that Mr. Robertson was smoking?
24     A.  I mean, the only reason I could think
25  of was I was, again, I was with an injured

56

1
2  prisoner, which at that point had become a
3  priority, and these are two experienced police
4  officers who knew what they had to do.  I don't
5  think I had to instruct them at that point.
6      They went back to the scene to recover
7  evidence, but I didn't direct them to
8  specifically recover anything.  I didn't -- I
9  didn't hear -- I didn't -- you got to remember,
10  at the initial point of contact I didn't see --
11  I didn't see what they saw, so there was no
12  reason for me to direct them to see -- to
13  recover something that I didn't see, so --
14     Q.  When you say they were experienced
15  police officers and they knew what they had to
16  do, what did they have to do in that
17  circumstance?
18     A.  Well, it's part of basic police
19  procedure.  Once you make an arrest, you are
20  going to go back to, you know, the actual scene
21  of the crime.  I'm just talking general terms
22  now, see if you can recover any kind of evidence
23  that was discarded or unnoticed before.
24     Q.  When no cigarette was recovered were
25  you concerned in any way?

57

1
2     A.   No.  No.
3     Q.   Why not?
4     A.   There was no reason for me to be
5  concerned.
6     Q.   But the marijuana cigarette was --
7  it's your current understanding that the
8  marijuana cigarette was the reason for your
9  approach of Mr. Robertson that evening, correct?
10          MR. BROOKS:  Objection.
11    A.   Yes.
12    Q.   But you weren't concerned that that
13 cigarette wasn't recovered?
14    A.   No, because, again, since the glove
15 was recovered by the sewer grate, it stood --
16 makes perfect sense to me that the marijuana
17 cigarette would have also been thrown into the
18 sewer grate and that it would have not been
19 recoverable because it's a small object and it
20 would have went floating down the sewer.  So,
21 no, I wasn't concerned about it.
22    Q.   After Officers Prince and Sullivan
23 returned from collecting the evidence, what
24 happened?
25    A.   He was placed into the car, they got

58

1
2  into the car, I got into the car, and we sped
3  off to the 75th Precinct.
4     Q.   Do you recall any conversation that
5  occurred in the car as you were going to the
6  75th Precinct?
7     A.   Between who?
8     Q.   Between the officers?
9     A.   I don't recall any specific content of
10 the conversations.  There was a conversation but
11 I don't remember what it was offhand.
12    Q.   Do you recall if anyone said anything
13 to Mr. Robertson in the car on the way to the
14 precinct?
15    A.   I think it might have been mentioned:
16 Why did you run for marijuana?  It was -- why
17 would it --
18    Q.   Do you recall anything that Mr.
19 Robertson said?
20    A.   No.  I don't recall anything he said
21 in particular.
22    Q.   He didn't respond to the question:
23 Why did you run for marijuana?
24    A.   No, I don't think he did.  No.
25    Q.   Did he at any point during the

59

1
2  encounter say that that wasn't his marijuana
3  that was recovered from the sewer?
4     A.   It's possible, I don't remember.
5  That's -- that's fairly typical, you know.
6     Q.   Do you recall whether Mr. Robertson
7  of any pain or injury when he
8  was in the car returning to the precinct?
9          MR. BROOKS:  Objection.
10    A.   Entirely possible but I don't recall
11 any specific complaints.
12    Q.   What happened when you returned to the
13 precinct?
14    A.   I immediately went behind the desk,
15 got the pedigree of Mr. Robertson, and I entered
16 it into the command log and -- so I entered the
17 prisoner's pedigree, the location of the arrest,
18 the arresting officer.
19        And Police Officer Sullivan and Prince
20 I believe brought him to the cell area where he
21 was kept until the ambulance arrived.  And then
22 he was removed to the hospital and then I had no
23 further contact with him.
24        In fact, I didn't have any further
25 contact with him.  From the minute we entered

60

1
2  the station house I didn't speak to him, didn't
3  say anything to him.  I just made sure that the
4  ambulance came and that was it.
5     Q.   Other than filling out his pedigree
6  and the arrest information in the command log,
7  did you create any other records or tack any
8  other notes or fill out any other reports
9  relating to the arrest of Mr. Robertson?
10          MR. BROOKS:  Objection.
11    A.   Did I?
12    Q.   Did you?
13    A.   No.
14    Q.   Just go back again for a moment to
15 discuss the car approaching Mr. Robertson.
16        You said earlier that it was your
17 understanding that the three officers -- the two
18 officers and yourself just wanted to talk to Mr.
19 Robertson at that point, is that correct?
20    A.   Yes, because, again, I hadn't observed
21 what they had observed prior to them
22 approaching, so -- it's not an extraordinary
23 thing for plain clothes officers who are charged
24 with, you know, some pressing street crime,
25 violent crime, robberies, to approach people on

61

1
2    the street and question them as to what they are
3    doing, where they are going, what their
4    actions --
5        Q.   Was Mr. Robertson under an obligation
6    to stop and speak with you when he was being
7    approached in the car?
8        MR. BROOKS:  Objection.
9        A.   By law, no.
10       Q.   In your view was he obliged to stop
11   and speak with you --
12       MR. BROOKS:  Objection.
13       Q.   -- when you were approaching in the
14   car?
15       MR. BROOKS:  Objection.
16       A.   No.
17       Q.   Is it usual when you are on patrol for
18   the anticrime unit to stop and speak with people
19   in a manner that you did with Mr. Robertson?
20       MR. BROOKS:  Objection.
21       A.   Yes.
22       Q.   Do you recall making any such stops on
23   the evening of April 14 other than your
24   conversation with Mr. Robertson?
25       A.   No, I don't, no.

62

1
2        Q.   And you don't recall observing anyone
3    else walking alone on the street in the way that
4    Mr. Robertson was?
5        A.   At that particular time, no.
6        Q.   In your view what was different or
7    special about Mr. Robertson that warranted
8    asking him to speak with you that evening?
9        MR. BROOKS:  Objection.
10       A.   I didn't make the decision to stop Mr.
11   Robertson, Police Officer Sullivan and/or Police
12   Officer Prince did that.  So I really can't
13   speak to what they saw, again, what they saw
14   prior to their contact with him.  But it's not
15   out of the ordinary for police officers to stop
16   and question people and ask them what they are
17   doing and what their address is.  It's common
18   law right of inquiry.  By law we are allowed to
19   do that.
20       Q.   Is it common -- strike that.
21       Is it out of the ordinary for a person
22   whom you are approached to speak with to refuse
23   to speak with you?
24       A.   It does happen on occasion but --
25   so -- but it's not a common occurrence.  Usually

63

1
2    people who are -- who we contact are -- will
3    talk to us.
4        Q.   Is it common or ordinary if someone
5    refuses to talk to you to pursue them?
6        MR. BROOKS:  Objection.
7        A.   Well, once somebody starts to run, I
8    mean, your level of suspicion is obviously
9    raised, because it's very natural as police
10   officers to assume or to believe at that point
11   that the person has something illegal on them,
12   contraband, possibly a weapon, or that they
13   might just have -- they were about to commit a
14   crime or they just had committed a crime or that
15   they were wanted for a past crime.
16       So once a person starts to run it's
17   very difficult for police officers to not
18   investigate the situation further.
19       Q.   I would like to pass to you what's
20   been previously marked as Exhibit 5.  Exhibit 5
21   and Exhibit 6, actually.
22       (Pause)
23       Q.   Do you recognize Exhibits 5 and 6?
24       A.   Yes.
25       Q.   What is Exhibit 5?

64

1
2        A.   It's an arrest report.
3        Q.   And Exhibit 6?
4        A.   It's a complaint report.
5        Q.   If you could also just take a look at
6    Exhibit 1, is the information from Exhibit 1 in
7    the ordinary course transposed into a computer
8    system to make either Exhibits 5 or Exhibit 6?
9        A.   Yes, it's -- Exhibit 1 is a worksheet
10   that creates Exhibit 5.
11       Q.   Exhibit 5 which is the arrest report?
12       A.   Right, the arrest report also known as
13   an online booking sheet.
14       Q.   If you could take a look again at
15   Exhibit 1, and turn to the second page of
16   Exhibit 1 marked NYC 32?
17       A.   Okay.
18       Q.   Towards the top of the page under the
19   heading that's sideways that says arresting
20   officer?
21       A.   Yes.
22       Q.   You see a box that says force used,
23   correct?
24       A.   Yes.
25       Q.   And that box is checked yes?

65

1
2    A.   Yes.
3    Q.   And that indicates that force was
4    used, right?
5    A.   Right.
6    Q.   And the box to the right of that says
7    type and the boxes for physical force and baton
8    are checked, isn't that correct?
9    A.   That's correct.
10   Q.   Does that indicate that a baton was
11   used?
12   A.   Yes.
13   Q.   Do you recall reviewing this form and
14   noting at the time when you reviewed it that
15   that box was checked for baton?
16       MR. BROOKS:  Objection.
17   A.   Yes, in fact, I insisted on it.
18   Q.   Why did you insist on it?
19   A.   Because I wanted the record to reflect
20   accurately that -- the level of physical force
21   that was utilized against Mr. Robertson.
22   Q.   If you turn to Exhibit 5, if you turn
23   to the second page of Exhibit 5 there is a box
24   under arresting officer to the right, says force
25   used.

66

1
2    A.   Hm-hmm.
3        MR. BROOKS:  You need to say yes.
4    A.   Yes.
5    Q.   And underneath force used it says
6    type, physical force, is that correct?
7    A.   Yes.
8    Q.   So this does not indicate that a baton
9    was used during your arrest of Mr. Robertson, is
10   that correct?
11   A.   It just indicates physical force.
12   Q.   But we note on Exhibit 1 that the box
13   for baton was checked on what I believe is
14   called the scratch copy of the booking sheet,
15   correct?
16   A.   Right.
17   Q.   Would it have been appropriate for a
18   baton to have been checked on this form, Exhibit
19   5 as well?
20   A.   It should have been generated on the
21   sheet.  I don't know why it wasn't.
22   Q.   You said earlier that you insisted on
23   having the box checked for baton, is that
24   correct?
25   A.   No.

67

1
2    Q.   When you reviewed the report that
3    Mr. -- that Officer Sullivan had prepared, had
4    he not checked the box for baton?
5        MR. BROOKS:  Objection.
6    A.   I think my insistence on it was prior
7    to him filling out the actual report, so I told
8    him, you know, Matt, which is his first name,
9    make sure you check off those boxes indicating
10   the physical force.
11   Q.   You say you insisted on it.  Were you
12   insisting on it over Officer Sullivan's
13   objection?
14   A.   No, not at all.  I just wanted to make
15   sure it was done.  There was no objection on his
16   part.
17   Q.   You indicated that you had no further
18   contact with Mr. Robertson after you returned to
19   the 75th Precinct, is that correct?
20   A.   Yes, that's correct.
21   Q.   Did you have any further involvement
22   with Mr. Robertson's case at all subsequent to
23   returning to the 75th Precinct?
24   A.   No.  No.
25   Q.   So you weren't contacted by anyone

68

1
2    from the District Attorney's office regarding
3    charges that might have been brought against Mr.
4    Robertson?
5    A.   No.
6    Q.   Did you have any conversations with
7    Officer Sullivan or Officer Prince regarding
8    the -- any charges or any subsequent court
9    proceedings that were brought against Mr.
10   Robertson relating to his arrest on the evening
11   of April 14th?
12       MR. BROOKS:  Objection.
13   A.   On that day or after?
14   Q.   On that day or subsequently.
15   A.   Definitely on that day.  I think
16   subsequently, no.  No.
17   Q.   Is it unusual for you not to be
18   contacted by the District Attorney's Office
19   regarding a case related to an arrest that you
20   were involved in?
21       MR. BROOKS:  Objection.
22   A.   I can't speak for the District
23   Attorney's Office.  If they didn't contact me
24   they didn't contact me, you know.
25   Q.   Putting aside the -- what -- putting

69

1
2    aside the District Attorney's intentions because
3    you, of course, you can't testify as to the
4    District Attorney's intentions, in your
5    experience are you ordinarily involved in the
6    subsequent prosecution of a case where you were
7    one of the arresting officers?
8       A.   I think that's on a case-by-case
9    basis.  Again, I can't speak for the DA, but if
10   they feel the need to have another officer
11   elaborate the events of the evening or if they
12   feel satisfied with just one officer speaking of
13   the incident, I don't know, it was their choice.
14   I mean, I was available to testify if they
15   needed me, they simply chose not to for whatever
16   reason.
17      Q.   Are you aware of whether Officer
18   Prince or Officer Sullivan attested to the
19   events of the evening for the District
20   Attorney's Office?
21      MR. BROOKS:  Objection.
22      A.   I am sure that they did, but, again, I
23   don't have any proof that they did.
24      Q.   Are you aware whether a lab test was
25   conducted to confirm that what was collected at

70

1
2    the scene of your arrest of Mr. Robertson was in
3    fact marijuana?
4       A.   Yes, that would be standard procedure
5    to perform a field test or have a field test
6    performed on the marijuana that was recovered.
7       Q.   Are you aware specifically whether
8    such a test was performed in this case?
9       A.   Four years later right now I can't
10   tell you for sure, but I can tell you that it
11   should have been done.  I don't know if it was
12   done.
13      Q.   Are you aware that the charges against
14   Mr. Robertson for -- relating to his arrest on
15   April 14 were ultimately dismissed?
16      A.   No.
17      Q.   So you don't have any knowledge
18   regarding the resolution of any of those
19   charges?
20      A.   No, I didn't follow up on the case, I
21   mean, be quite honest, it wasn't an
22   extraordinary case.  It was very -- you know,
23   there was nothing very exciting about this case.
24      Q.   How frequently are you reviewed
25   professionally?

71

1
2       MR. BROOKS:  Objection.
3       A.   In terms of what?
4       Q.   How often -- well, are formal
5    performance reviews done customarily?
6       A.   On a yearly basis.
7       Q.   On a yearly basis.  Do you get to
8    review those reviews when they are conducted?
9       A.   Yes.
10      Q.   Do you recall being reviewed during
11   2006?
12      A.   Yes.
13      Q.   And that review was conducted in
14   connection with your assignment to the anticrime
15   unit?
16      A.   Yes.
17      Q.   Have you ever prepared a review of
18   Officer Prince?
19      A.   Yes, I believe I have.
20      Q.   Have you prepared a review of Officer
21   Sullivan?
22      A.   Yes, I have.
23      Q.   So am I correct in thinking that you
24   were Officer Prince and Sullivan's supervising
25   officer during your time in the anticrime unit?

72

1
2       A.   I was their direct supervisor.
3       Q.   And it would have been part of your
4    job as their direct supervisor to prepare their
5    performance reviews for that year, is that
6    correct?
7       A.   Yes.
8       Q.   Do you recall whether on the evening
9    of April 14th you were in radio contact with any
10   other police cars in the vicinity of Pitkin and
11   Williams?
12      A.   For that incident, no.  We weren't.
13   We were not in contact with any other police
14   units.
15      Q.   When Mr. Robertson was apprehended on
16   Pitkin Avenue, was your vehicle the only vehicle
17   stopped on Pitkin Avenue?
18      A.   We were actually on Williams.
19      Q.   You were on Williams?
20      A.   Yes.
21      Q.   Then we should go back and clarify
22   that.  Mr. Robertson, I believe you said, ran --
23      A.   I'm sorry, maybe I misunderstood the
24   question.  You said when he was stopped or when
25   he was arrested?  He was arrested on Williams.

73

1
2     When he was -- when the attempt was made to stop
3     him he was on Pitkin.
4          Q.   Understood.  So when he was -- when
5     the attempt was made to stop him when your
6     vehicle approached Mr. Robertson he was on
7     Pitkin?
8          A.   He was on Pitkin.
9          Q.   And when Mr. Robertson ran, you said:
10    I believe he turned south on Williams?
11         A.   Right, he made a left turn on to
12    Williams.
13         Q.   Made a left turn on to Williams.
14              And so when he was ultimately
15    apprehended it was on Williams?
16         A.   Yes, right in the middle of the
17    street.
18         Q.   Right in middle of the street?
19         A.   Literally in the middle of the street.
20         Q.   So my question was, to correct my
21    question, when you were -- when he was finally
22    apprehended on Williams Avenue, your vehicle was
23    the only vehicle stopped in the middle of the
24    street on Williams, is that correct?
25         A.   Yes.  Williams is a northbound street

74

1     one way and we were going -- traveling against
2     that going southbound.  And we had, as I said
3     before, positioned the car so that it had cut
4     off the street, so we were on an angle, in a
5     45-degree angle to the curb, yes.
6          Q.   To confirm, as you were driving down
7     southbound on Williams Avenue directing Officer
8     Sullivan to stop at that 45-degree angle, were
9     you able to see Mr. Robertson and Detective
10    Prince?
11         A.   I could only see them once I got out
12    of the car, because the car was still in motion.
13    So when Police Officer Prince had exited the
14    car, I told Matthew to drive -- you know, drive
15    ahead of him to cut him off.  I didn't direct
16    him to go at a 45-degree angle.  That's what he
17    ended up doing.
18              But the only time I saw Prince and
19    Robertson together was when I got out of car.  I
20    didn't see the actual apprehension, I didn't see
21    when they first made contact with each other,
22    when Prince actually grabbed him.  I didn't see
23    that part, so -- because those events were
24    happening behind me at that point.  And I wasn't

75

2     able to turn and really see what was going on
3     because the car was moving fast, so --
4          Q.   I believe we had asked your counsel if
5     you could bring with you today the baton that
6     you were carrying with you on that evening.
7              Do you have it with you?
8          A.   Yes, I do.
9          MR. BROOKS:  Yes, we have it.
10         MS. HOLLOWAY:  Can I see it?
11         MR. BROOKS:  Yes, you requested an
12    inspection.  So do you have the baton?
13         THE WITNESS:  Yes, it's right in --
14         MR. BROOKS:  Can we go off the record
15    for a second?
16         MS. HOLLOWAY:  We can go off the
17    record for a second, absolutely.
18         THE VIDEOGRAPHER:  Off the record,
19    11:41 a.m.
20         (Recess).
21         THE VIDEOGRAPHER:  Back on the record,
22    11:54 a.m.  This is the beginning of disk two in
23    the deposition of Dimitri Deglas.
24    BY MS. HOLLOWAY:
25         Q.   Sergeant Deglas, before the break we

76

1
2     asked you to take out your baton.  Is that the
3     baton that you have right there that you carried
4     with you the evening of April 14?
5          A.   Yes.
6          Q.   Can you show me how it gets deployed?
7          A.   Yes.
8              (Pause)
9          Q.   So you deploy it by swinging your arm?
10         A.   In a downward motion or in an upward
11    motion.  Can also come out through the side,
12    too.
13         Q.   Can we just go back and just remind me
14    what position Mr. Robertson was in when you
15    approached him with the baton?
16         A.   Yes, Mr. Robertson was lying on his
17    back with his feet towards me and his head
18    towards Pitkin Avenue.
19         Q.   You held the baton, did you strike him
20    on the legs overhand?
21         A.   No, from the side.
22         Q.   From the side?
23         A.   Yes.
24         Q.   So a sideward motion from, say, right
25    to left because you are right handed, correct?

77

1
2     A.   Yes, from right to left.
3     Q.   Right to left?
4     A.   Right.
5     Q.   Did you strike him twice in quick
6   succession?
7     A.   Yes.
8     Q.   Okay.  I think that's it for the
9   baton.
10     A.   Okay.
11     Q.   Just to return back to when you
12   approached Mr. Robertson in the car, you didn't
13   make the decision to approach Mr. Robertson in
14   the car, is that correct?
15     A.   That's correct.
16     Q.   And you don't know what Officer
17   Sullivan's intention was in approaching him in
18   the car, is that correct?
19     A.   I didn't see what they saw that -- so,
20   in other words, I don't know what the initial
21   reason was for wanting to stop Mr. Robertson.
22     Q.   You don't know what Officer Sullivan
23   and/or Officer Prince intended to do once they
24   got closer to Mr. Robertson in the car, is that
25   correct?

78

1
2        MR. BROOKS:  Objection.
3     A.   That's correct, because, again, I had
4   a missing piece of the puzzle at that point.  I
5   knew that they saw something but there wasn't
6   time to ask them questions, hey, what did you
7   see, because I could see that a situation was
8   developing and at this point I was just going to
9   let it -- let it play out.
10     Q.   So Officer Sullivan's intention could
11   have been to arrest Mr. Robertson at that point
12   and you wouldn't know that, correct?
13        MR. BROOKS:  Objection.
14     A.   Well, again, I can't speak for what
15   was in the Police Officer Sullivan's mind at
16   that point.  Is it plausible?  Yes.
17     Q.   You testified that Officer Sullivan
18   said something to Mr. Robertson from the car as
19   the vehicle was approaching Mr. Robertson.  Had
20   the car stopped when Mr. -- when Officer
21   Sullivan started to speak to Mr. Robertson?
22     A.   No.  And neither did Mr. Robertson, he
23   continued to walk.  As I said, the distance
24   between our vehicle and Mr. Robertson was
25   continually closing, and as he kept walking at

79

2   one point we were actually parallel with him
3   prior to reaching the corner of Williams and
4   Pitkin.
5     Q.   You testified that Mr. Robertson began
6   to run before the car stopped, is that correct?
7     A.   Before the car stopped and prior to
8   Police Officer Prince exiting the vehicle.
9     Q.   But he started to run after Mr.
10   Sullivan spoke to him, Officer Sullivan spoke to
11   him, is that correct?
12     A.   Yes.
13     Q.   Did Mr. Robertson turn around and look
14   at the car before he ran?
15        MR. BROOKS:  Objection.
16     A.   He was looking at the car as it was
17   approaching.
18     Q.   But you don't recall Mr. Robertson
19   saying anything before he ran, is that correct?
20     A.   I did not hear him say anything.  It's
21   possible that he said something but I didn't
22   hear it.  I don't know.
23     Q.   Were you at this point looking at Mr.
24   Robertson out the window of the car?
25     A.   Yes, at this point as we -- as we were

80

1
2   approaching him I was focused on him at that
3   point.
4     Q.   What was your position with the police
5   department prior to your assignment with
6   anticrime unit?
7     A.   I was a detective in the Bronx
8   narcotics unit.
9     Q.   How long were you a detective in the
10   Bronx narcotics unit?
11     A.   I was in the Organized Crime Control
12   Bureau for ten years so I was a detective for
13   ten years.
14     Q.   Were you promoted to sergeant while
15   you were in the Bronx narcotics unit?
16     A.   Yes.
17     Q.   When was that?
18     A.   February of 2004.
19     Q.   Why were you assigned to the 75th
20   Precinct?
21     A.   Why was I assigned?  I'm sorry --
22   that's -- the department placed me there.  I
23   didn't ask to be put there.
24     Q.   Do you have any understanding why that
25   was your assignment after the Bronx narcotics

81

1
2    unit?
3        MR. BROOKS:  Objection.
4        A.   No, that's just the fickle pick of
5    fate.  Didn't ask for that assignment, that's
6    the way it came out.
7        Q.   You were in the 75th Precinct for a
8    year and a half, I believe you testified?
9        A.   Yes.
10       Q.   And did you request a new assignment
11   after the year and a half?
12       A.   After the 75?
13       Q.   Yes.
14       A.   It was more like a draft.  That's when
15   I went to work for the chief of patrols office.
16       Q.   More like a draft, meaning you were
17   drafted for the chief of patrols office from the
18   75th Precinct?
19       A.   The chief of patrol is a gentleman I
20   used to work for when I was in narcotics at one
21   point, and one of his captains actually proposed
22   that I go work in that office.  And I was a
23   little ambivalent about it, but they ended up
24   doing it from -- they transferred me anyway, so
25   before I knew it I was an investigator for the

82

1
2    chief of patrols office.
3        Q.   What is your current salary as a
4    sergeant in the police department?
5        A.   That's a good question.  I'm not
6    really sure.  The contracts are fairly new so
7    I'm not even sure what our top pay is right now.
8    I think it's -- I think top pay is like a
9    hundred three or something like that.
10       Q.   When you say top pay, does that mean
11   what you believe your salary to be?
12       A.   No, my salary actually exceeds that at
13   this point because of the amount of time I have
14   on and night differential and uniform allowance
15   and all the other civil service goodies that go
16   with being a New York City police officer.
17       Q.   Can you estimate how much above a
18   hundred three your salary is at this point?
19       MR. BROOKS:  Objection.
20       A.   At this point I think I'm up to the
21   high 130s, low 140s, I'm not sure.
22       Q.   Do you have any other sources of
23   income other than your salary and benefits from
24   the police department?
25       A.   No.

83

2        Q.   Prior to coming to give your testimony
3    here today and putting aside any conversations
4    you might have had with your lawyer, did you
5    have any conversations with anyone regarding the
6    substance of your testimony here today?
7        A.   Outside from Mr. Brooks?
8        Q.   Aside from Mr. Brooks?
9        A.   No.
10       Q.   Have you discussed this case or the
11   allegations in this case with either Officers
12   Prince or Officer Sullivan subsequent to its
13   being filed in 2007?
14       MR. BROOKS:  Objection.
15       A.   I tried to contact both of them but
16   they work -- I work midnights and they work days
17   so it's been impossible to get in touch with
18   them.  I left messages, they left messages with
19   me, but we have -- I have never been -- actually
20   been able to have a conversation about this
21   particular case with them.
22       Q.   So you have not had a substantive -- a
23   conversation with either Officers Prince or
24   Officer Sullivan regarding the substance of the
25   allegations in this case?

84

1
2        A.   I tried to but I haven't been able to.
3        Q.   Okay.  Earlier we spoke of your
4    escorting Officer Prince to the hospital,
5    correct?
6        A.   Yes.
7        Q.   Do you recall whether Officer
8    Prince -- strike that.
9            Was Officer Prince injured as a result
10   of the arrests on April 14, 15?
11       A.   Yes.
12       Q.   What were his injuries?
13       A.   I believe he hurt his right hand.
14   Yes, it was his right hand.
15       Q.   Do you know what kind of injury he had
16   to his right hand?
17       A.   Cuts and bruises, might have hurt his
18   wrist.  I don't remember exactly what it was.
19       Q.   So do you recall seeing any cuts or
20   abrasions or bruising or bleeding or any visible
21   injury on Mr. -- on Officer Prince's right hand?
22       MR. BROOKS:  Objection.
23       A.   I don't really recall right now.  I
24   don't remember four years later, so --
25       Q.   Do you recall what hospital --

85

1
2    A.   Yes, Jamaica Hospital.
3    Q.   -- Officer Prince was taken to?
4    Jamaica Hospital?
5         Do you recall whether Officer Prince
6    received any kind of treatment at Jamaica
7    Hospital?
8    A.   Yes, he was -- they X-rayed his hand
9    and wrist.  He was examined by a doctor, but as
10   far as treatment, I think he was given Tylenol
11   or, you know, I don't remember if they bandaged
12   his hand.  I don't remember.
13   Q.   Do you recall whether Officer Prince
14   broke any bones in his right hand?
15   A.   No, no, he definitely didn't.
16   Q.   Do you know what hospital Mr.
17   Robertson was taken to?
18   A.   No.
19   Q.   Do you know whether he was taken to
20   Jamaica Hospital?
21   A.   I don't know for sure but I think he
22   went to -- what was it called again -- I don't
23   remember the name of the hospital, it's on
24   Rockaway Parkway and Linden Boulevard.
25   Q.   You are thinking of Brookdale

86

1
2    Hospital?
3    A.   Yes, Brookdale, that would be the
4    closest one, yes.
5    Q.   Why did Officer Prince go to Jamaica
6    Hospital and not Brookdale Hospital?
7         MR. BROOKS:  Objection.
8    A.   Generally in the 75, it's not a policy
9    that I established, it was just always something
10   that they did, whenever an officer got injured
11   we always took him to Jamaica Hospital.  Why?
12   Because usually they expedited the treatment of
13   officers when they were brought there.
14   Brookdale does the same thing, but I think it
15   was generally felt that the quality of care was
16   a little bit better at Jamaica, in regards to
17   police officers, anyway.
18   Q.   Did Officer Prince take any time off
19   as a result of the injury to his right hand?
20   A.   Not that I recall.  Doesn't mean he
21   didn't, but not that I recall right now.  I
22   don't have any records to check.
23   Q.   To your knowledge has anyone ever
24   complained about how they were treated by you to
25   the Citizen Complaint Review Board?

87

1
2    A.   Sure.
3    Q.   Do you have any sense of how many
4    complaints have been filed against you?
5    A.   No, offhand, no.  I don't know.
6    Q.   Do you know whether any of those
7    complaints were made for excessive force?
8    A.   Yes.  At least one.  But I was
9    exonerated, though.
10   Q.   Do you have any recollection as to
11   when the complaint you are thinking of for
12   excessive force was filed?
13   A.   Yes, it was probably -- it was
14   definitely in the Bronx, I don't know, maybe in
15   the late nineties, '98, '99.
16   Q.   Are you aware whether any complaints
17   have been filed against you since 2006 by the
18   Citizen Complaint Review Board?
19   A.   Since 2006?
20   Q.   Yes.
21   A.   I'm sure there were some filed in 2007
22   but I don't think there has been any since then.
23   I don't know how many.
24   Q.   Have you ever been disciplined by the
25   police department for your conduct in office?

88

1
2    A.   No.
3         MS. HOLLOWAY:  Can we take a moment to
4    see if I have anything else?
5         MR. BROOKS:  Sure.
6         THE VIDEOGRAPHER:  Off the record,
7    12:08 p.m.
8         (Recess).
9         THE VIDEOGRAPHER:  Back on the record,
10   12:15 p.m.
11   BY MS. HOLLOWAY:
12   Q.   When you approached Officer Prince and
13   Mr. Robertson on the ground engaged in their
14   altercation, did you observe Officer Prince
15   punch Mr. Robertson?
16   A.   Well, they were clearly in a fight.
17   Again -- and he was -- yes, they were exchanging
18   blows at one point, sure.
19   Q.   Did there come a point when Mr.
20   Robertson stopped resisting?
21   A.   Yes.
22   Q.   Was he forced to stop resisting?
23         MR. BROOKS:  Objection.
24   A.   He ceased resisting after I struck him
25   twice with the baton, he actually stopped.

89

1
2      Q.   Before you struck him twice with the
3   baton, did you say anything to Mr. Robertson to
4   warn him that you were going to strike him with
5   the baton?
6      A.   No.  No.
7      Q.   But you did say stop resisting when
8   you were striking him with the baton?
9      A.   Yes.
10     Q.   But not before?
11     A.   No.
12     Q.   After you struck him with the baton
13  and he stopped resisting, was that the point at
14  which he was rolled over on to his stomach on
15  the ground?
16     A.   Yes.
17     Q.   Do you recall where Officer Sullivan
18  was when Mr. Robertson was struck?
19     A.   He was behind me.
20     MR. BROOKS:  Objection.
21     A.   He was behind me but I don't know what
22  his exact position was.
23     Q.   So you weren't aware at the time of
24  where Officer Sullivan was located?
25     A.   No, as I said before, at that point I

90

1   had tunnel vision so -- I was focused in
2   strictly on Police Officer Prince and Mr.
3   Robertson, that's it.
4      Q.   Do you know whether Officer Prince was
5   aware of your approach as you approached him on
6   the ground?
7      A.   No, there was no way for me to know
8   that.
9      Q.   But Officer Prince didn't acknowledge
10  you or look back to see you in any way?
11     A.   No, he had his -- he literally had his
12  hands full at that point, so I think what my
13  position was was not of his concern.  But,
14  again, I can't speak for him.  I don't know if
15  he was aware of my -- my presence at that point.
16  I don't know.
17     Q.   Was Officer Prince looking away from
18  you when Mr. Robertson was struck with the
19  baton?
20     A.   Yes, in the sense that he was looking
21  down at Mr. Robertson.  He wasn't looking at me.
22     MS. HOLLOWAY:  I don't believe I have
23  any further questions, but I would like to leave
24  the record open pending the request that we've

91

1
2   made for the documents that we believe weren't
3   produced.
4      MR. BROOKS:  Okay.  I don't have any
5   questions, but defendants request reading and
6   signing of the transcript and review of the
7   videotape pursuant to Rule 30.
8      MS. HOLLOWAY:  Thank you.
9      MR. BROOKS:  Thanks.
10     THE VIDEOGRAPHER:  Going off the
11  record, 12:18 p.m.  This is the end of tape two,
12  concludes the deposition of Dimitri Deglas.
13
14
15
16     _____
17
18
19  Subscribed and sworn to before me
20  this_____day of_____, 2009.
21
22  _____
23     NOTARY PUBLIC
24
25

92

1
2           ERRATA SHEET
3        VERITEXTREPORTING COMPANY
4           1350 BROADWAY
5         NEW YORK, NEW YORK 10018
6           212-279-9424
7   NAME OF CASE: ROBERTSON VS. SULLIVAN
8   DATE OF DEPOSITION: DECEMBER 17, 2009
9   NAME OF DEPONENT: DIMITRI DEGLAS
10  PAGE  LINE(S)    CHANGE        REASON
11  ___|_____|_____|_____
12  ___|_____|_____|_____
13  ___|_____|_____|_____
14  ___|_____|_____|_____
15  ___|_____|_____|_____
16  ___|_____|_____|_____
17  ___|_____|_____|_____
18  ___|_____|_____|_____
19  ___|_____|_____|_____
20  ___|_____|_____|_____
21  ___|_____|_____|_____
22  ___|_____|_____|_____
23  ___|_____|_____|_____
24  ___|_____|_____|_____
25     _____
26  SUBSCRIBED AND SWORN TO BEFORE ME
27  THIS___DAY OF _____, 20__.
28
29  _____   _____
30  (NOTARY PUBLIC)      MY COMMISSION EXPIRES:

93

```
1
2          C E R T I F I C A T E
3
4    STATE OF NEW YORK
5    COUNTY OF NEW YORK
6
7          I, BRANDON RAINOFF, a Federal
8    Certified Realtime Reporter and Notary Public
9    within and for the State of New York, do hereby
10   certify:
11         That DIMITRI DEGLAS, the witness whose
12    deposition is hereinbefore set forth, was duly
13   sworn by me and that such deposition is a true
14   record of the testimony given by the witness.
15         I further certify that I am not
16   related to any of the parties to this action by
17   blood or marriage, and that I am in no way
18   interested in the outcome of this matter.
19         IN WITNESS WHEREOF, I have hereunto
20   set my hand this 18th day of December, 2009.
21
22         _____
23         BRANDON RAINOFF, FCRR, CM
24
25
26
27
```

**Sullivan, Matthew 12/23/2009**

Sullivan, Matthew  12/23/2009  12:00:00 AM

1

```
1
2    UNITED STATES DISTRICT COURT
3    EASTERN DISTRICT OF NEW YORK
4    ----------------------------------x
5    DWAYNE KINTE ROBERTSON,
6              Plaintiff,
7
8      -against-         07 CV 1416
9                  (JG) (LB)
10   OFFICER MATTHEW SULLIVAN, Shield
11   #29723; OFFICER NILES PRINCE,
12   Shield #22353; SERGEANT DMITRI
13   DAGLAS, Shield #01647; and THE
14   CITY OF NEW YORK,
15             Defendants.
16   ----------------------------------x
17             December 23, 2009
18             10:15 a.m.
19
20        Videotaped Deposition of MATTHEW
21   SULLIVAN, taken by the Plaintiff, pursuant to
22   Subpoena, at the offices of Cravath Swaine &
23   Moore, LLP, 825 Eighth Avenu, New York, New
24   York, before David Levy, CSR, a Notary Public
25   of the State of New York.
```

3

```
1
2         IT IS HEREBY STIPULATED AND AGREED,
3    by and between counsel for the
4    respective parties hereto, that the
5    filing, sealing and certification of the
6    within deposition shall  be and the same
7    are hereby waived;
8         IT IS FURTHER STIPULATED AND AGREED
9    that all objections, except as to the
10   form of the question, shall be reserved to
11   the time of the trial;
12        IT IS FURTHER STIPULATED AND AGREED
13   that the within deposition may be signed
14   before any Notary Public with the same
15   force and effect as if signed and sworn to
16   before the Court.
17             -oOo-
18
19
20
21
22
23
24
25
```

2

```
1
2    A P P E A R A N C E S :
3
4    CRAVATH, SWAINE & MOORE LLP
5    Attorneys for Plaintiff
6        Worldwide Plaza
7        825 Eighth Avenue
8        New York, New York 10019-7475
9    BY:  JESSICA R. HOLLOWAY, ESQ.
10        jholloway@cravath.com
11       GABRIEL FERNANDO SOLEDAD, ESQ.
12        gsoledad@cravath.com
13       STUART GOLD, ESQ.
14        sgold@cravath.com
15       NOAH PHILLIPS, ESQ.
16        nphillips@cravath.com
17
18   HON. MICHAEL CARDOZO, Corporation Counsel
19   New York City Law Department
20       100 Church Street
21       New York, New York 10017
22   BY:  JEFFREY BROOKS, ESQ.
23       Assistant Corporation Counsel
24       Special Federal Litigation Division
25
```

4

```
1
2         VIDEOGRAPHER:  We're on the record.
3    Today's date is December 23rd, 2009.  The
4    time on the video monitor is 10:15 a.m.
5    This is the beginning of tape number one
6    in the videotape deposition of Officer
7    Matthew Sullivan in the case of Dwayne
8    Robertson versus Officer Matthew Sullivan,
9    et al., case number 07-CV-1416.  This case
10   is filed in the U.S. District Court for
11   the Eastern District of New York.  My name
12   is Deverell Write and I represent Veritext
13   Reporting.  At this time will counsel give
14   their appearances.
15       MR. SOLEDAD:  Gabriel Soledad,
16   Cravath Swaine & Moore, for Plaintiff
17   Dwayne Robertson.
18       MS. HOLLOWAY:  And Jessica Holloway,
19   Cravath Swaine & Moore, for plaintiff
20   Dwayne Robertson.
21       MR. BROOKS:  Jeffrey Brooks, from the
22   New York City Law Department, for
23   defendants.
24       VIDEOGRAPHER:  Will the reporter
25   please swear in the witness.
```

5

1
2      M A T T H E W   S U L L I V A N , having been dul
3          sworn by the Notary Public, was examined and
4          testified as follows:
5      EXAMINATION BY
6      MR. SOLEDAD:
7          Q.  Good morning, Officer Sullivan.
8          A.  Good morning.
9          Q.  At the outset, I'd like to just
10     highlight a few things.  If you don't understand
11     any of my questions, please let me know and I'll
12     try and clarify as much as I can.
13          It's important that you answer
14     audibly so that the court reporter doesn't get
15     upset.  And just let me finish my question before
16     answering so that he can get both of our
17     responses down.
18          When was the last time you spoke with
19     Sergeant Daglas?
20          A.  The other day.
21          Q.  Did you speak about this case?
22          A.  Part of it, yeah.
23          Q.  What did you discuss with him?
24          A.  Just when he was going, when he was
25     scheduled.

6

1
2          Q.  Did you discuss what happened at his
3      deposition?
4          A.  No.  I think it was before the
5      deposition.
6          Q.  It was before the deposition?  When
7      was the last time you spoke with Officer Prince?
8          A.  The other day, also.  A little before
9      that, around his birthday.
10          Q.  Okay.  When is his birthday?
11          A.  I think the 10th.  Missed it by a
12     day.  Might have been the 11th.
13          Q.  Did you speak with him about his
14     deposition?
15          A.  Yeah, he told me that he already
16     went.
17          Q.  Did you discuss anything beyond that
18     with him?
19          A.  Not much.  Just his birthday,
20     Christmas coming up.
21          Q.  I mean, more about the deposition,
22     did you discuss sort of what he was asked, how he
23     felt about it?
24          A.  He told me it ran a while, a little
25     longer than we think.

7

2          Q.  Did he discuss the kind of questions
3      he was asked?
4          A.  Not really, not in detail, no.
5          Q.  What about just generally?
6          A.  He said you just asked a lot of
7      questions, and it goes on a little while, for a
8      while.
9          Q.  Did he say he was asked questions
10     specifically about the incident?
11          A.  Yes, just from what I recollect, it
12     was a short conversation.  It was more just like,
13     "Yeah, you're going to be there a while and they
14     ask a lot of questions that you don't really --
15     you don't understand what the bearing is."
16          Q.  Did he discuss specifically the use
17     of force or --
18          A.  No, not really.
19          Q.  He didn't say anything about that?
20          A.  No.
21          Q.  Prior to giving your testimony today,
22     did you discuss this the case with anyone other
23     than your attorney, besides the two people you
24     just mentioned?
25          A.  No.

8

1
2          Q.  Prior to giving your testimony today,
3      did you discuss the fact that you were being
4      deposed in this case with anyone other than your
5      attorney?
6          A.  Hum -- just people who asked me what
7      I was doing, you know, because I'm scheduled to
8      work today.  I said I have to go get deposed on a
9      case.
10          Q.  So it was --
11          A.  Coworkers, supervisors.
12          Q.  So in the context of you not being --
13          A.  Yeah, not being available to work.
14          Q.  Okay.  Prior to your arrival here
15     today, did you meet with your attorney regarding
16     your deposition?
17          A.  Yes.
18          Q.  For how long?
19          A.  I don't know, was it -- approximately
20     two, three hours, maybe.  Two, maybe.
21          Q.  And did your attorney show you any
22     documents?
23          A.  Yeah, my arrest paperwork from the
24     case.
25      RQ      MR. SOLEDAD:  I request that, to the

9

2    extent that you showed him any documents
3    that have not been produced, that you
4    produce them, please.
5        MR. BROOKS:  Everything has been
6    produced.
7    Q.  Okay.  Were you provided with the
8    opportunity to review or read Sergeant Daglas' or
9    Officer Prince's deposition transcripts?
10   A.  No.
11       MR. BROOKS:  Objection to form.
12   Q.  Did anyone read to you from either of
13   those transcripts?
14   A.  No.
15   Q.  Have you ever been deposed before?
16   A.  Nope.  No.
17   Q.  Okay.  Did you swear an oath as a
18   police officer when you first became a police
19   officer?
20   A.  Yes.
21   Q.  Did you take that oath seriously?
22       MR. BROOKS:  Objection.
23   A.  Yes.
24   Q.  When you're the arresting officer, do
25   you take that duty seriously?

10

2    A.  Yes.
3    Q.  Do you endeavor to make sure that all
4    the documents that you submit as arresting
5    officer are accurate and truthful and complete?
6        MR. BROOKS:  Objection.
7    A.  Yes, to the best of my ability.
8    Q.  When you sign a document in your
9    capacity as arresting officer, do you consider
10   that a testament to your belief in the accuracy,
11   completeness of that particular document?
12       MR. BROOKS:  Objection.
13   A.  Yes.
14   Q.  Does that mean that you've carefully
15   reviewed that document?
16   A.  To the best of my ability, yes.
17   Q.  To the best of your ability meaning
18   you carefully read it and --
19   A.  I read it over --
20   Q.  -- and if there's something beyond
21   your knowledge or something -- okay.  What is
22   your current position with the NYPD?
23   A.  I'm detective in the 75 detective
24   squad.
25   Q.  What are your specific

11

2    responsibilities in that position?
3    A.  I investigate -- I'm assigned to the
4    robbery and burglary investigation unit.  I
5    investigate robberies and burglaries, and some
6    grand larcenies from a person.
7    Q.  How long have you held that position?
8    A.  I've been a detective since the
9    beginning of November, and I've been in the 75 --
10   Q.  Congratulations.
11   A.  -- thank you -- and I've been in the
12   detective squad since, I believe I was officially
13   assigned there in April of '08.
14   Q.  Prior to that date, did you hold a
15   different position with the NYPD, prior to April
16   of '08?
17   A.  Yes.
18   Q.  What was that?
19   A.  I was a police officer.
20   Q.  And were you assigned to a particular
21   unit while you were a police officer?
22   A.  Yes.  Prior to the detective squad, I
23   was assigned to the anticrime unit in the 75th
24   Precinct.
25   Q.  And when did that -- was that

12

2    initiated?
3    A.  When was I transferred there?  I
4    don't have the exact dates but I believe it was
5    late '05.
6    Q.  And prior to that date, did you hold
7    a different position with the NYPD?
8    A.  Prior to that, I was assigned to the
9    75 patrol, patrol in the 75th Precinct.  I did
10   the four-to-twelve shift.
11   Q.  And were you assigned a particular
12   unit when you were on patrol?
13   A.  No, I did -- we were -- our
14   assignments would vary.  But for the most part I
15   did Sector Frank and Sector Eddie Frank.
16   Q.  What does Sector Frank mean?
17   A.  A precinct is broken down into
18   certain geographical sections.
19   Q.  Okay.
20   A.  And that's how, well, I think a lot
21   of things, but mainly for a patrol officer, it's
22   how a job gets assigned.  You're responsible for
23   that section.  And all the jobs that come over,
24   you will be assigned.
25   Q.  So --

13

2    A. So they don't have you going from one

3    side to the other, back to the other.  You'll

4    just stay in your area.

5    Q. So it's partitioned off by streets,

6    is that how it works?

7    A. By streets mainly.  It's -- are the

8    cutoff, certain avenues, certain streets, rail

9    lines.

10   Q. Roughly where is Sector Frank and

11   Sector Eddie Frank?  You don't have to give me

12   precise streets, you can --

13   A. It's the western section of the

14   precinct.

15   Q. Okay.

16   A. Part of the western section.  There's

17   other sectors involved, but it's in the west

18   side.

19   Q. Sure.  And prior to being patrol on

20   the four-to-twelve shift, did you hold any

21   position with NYPD prior to that?

22   A. I was assigned to field training when

23   I first got to the precinct.

24   Q. Okay.  And that was your first

25   position?

14

2    A. At the precinct, yes.

3    Q. At the precinct.  Was there a

4    position you held prior to being at the precinct

5    with the NYPD?

6    A. I was in the Police Academy.

7    Q. Are you currently married?

8    A. No.

9    Q. Do you have any children?

10   A. No.

11   Q. What was your salary for this year?

12   A. This year?

13   Q. Yes.

14   A. Well, the year is not over, but -- I

15   don't know, approximately --

16   Q. Short at least five days, I'll take

17   that answer.

18   A. Approximately 117,000.

19   Q. And what was your salary last year?

20   A. Um -- I believe we had retro money

21   from the contract settlement.  So I believe it

22   was around 130.

23   Q. And how about the year prior?

24   A. I want to say around a hundred, give

25   or take like ten thousand -- I think it was like

15

2    in the 90s, high 90s.  I'm not exactly sure.

3    Q. For any of the years you were

4    employed by the NYPD, have you ever received any

5    other compensation aside from salary?

6    A. I'm not sure I fully understand the

7    question.

8    Q. So you receive a monthly or

9    bi-monthly paycheck, correct?

10   A. Yeah, bi-monthly.

11   Q. And that's your salary.  That's not a

12   bonus or any other kind of merit-based

13   compensation.

14   MR. BROOKS:  Objection.

15   A. No, it's just my salary.

16   Q. Okay.

17   A. Yeah.

18   Q. For example, let me give you an

19   example; at the end of the year, some companies

20   will give you a separate amount of money for you,

21   know, a job well done.

22   A. No.  No, that would be -- that would

23   be nice.

24   Q. Okay.  Do you have any other sources

25   of income outside of NYPD?

16

2    A. Besides some limited investments, no.

3    Q. What sort of limited investments?

4    MR. BROOKS:  Objection.

5    A. Just different bank accounts, you

6    know, I guess, you get the interest.

7    Q. Okay.

8    A. That would be it.

9    Q. So you're not -- do you serve as an

10   investor for other people?

11   A. Oh, no, no.

12   Q. All these investments are your

13   personal assets that you invest?

14   A. Yes.

15   Q. Can you give me a sense of your net

16   worth?

17   MR. BROOKS:  Objection.

18   Q. Net worth being all your assets minus

19   any liabilities that you have, debts, loans,

20   mortgages.

21   MR. BROOKS:  Objection.

22   A. Hum.

23   Q. Take your time.

24   A. I don't know if certain retirement

25   things are applicable.  I don't think they are

17

1
2  since I'm not going to be retired --
3      Q. You can leave those aside.  You can
4  leave those aside.
5      A. Um -- probably around nine -- maybe
6  80, $90,000.
7      Q. If a jury finds for Mr. Robertson and
8  awards him damages in this action, do you have an
9  understanding as to who will pay for those
10  damages?
11      MR. BROOKS:  It's a yes or no
12  question.
13      A. Yes.
14      Q. And who would that be?
15      A. I believe the City.
16      Q. Do you have an understanding as to
17  whether you would have any liability in that?
18      MR. BROOKS:  I'm going to instruct
19  him not to answer to the extent that
20  reveals any conversations he's had with
21  counsel.
22      So if you can answer the question in
23  any way that doesn't reveal what we spoke
24  about, you can answer the question.
25      A. I don't -- I don't know clearly how

18

1
2  to answer it.  So I'm not going to answer.
3      Q. Were you employed prior to joining
4  the NYPD?
5      A. Um -- as a full-time career?  No.  I
6  was in college.
7      Q. Did you complete your degree plan in
8  college?
9      A. I have what would be equivalent to
10  the credits.  I don't have an accredited degree,
11  though.  I left a little early.
12      Q. Why did you leave a little early?
13      A. Because I was called for the job.  I
14  always thought I could take that extra class
15  whenever.
16      Q. Did you play any sports in college?
17      A. Yes.
18      Q. What did you play?
19      A. I was a football player.
20      Q. Did you play on the varsity?
21      A. Yes.
22      Q. What college did you attend?
23      A. SUNY Brockport.
24      Q. What position did you play?
25      A. I was a defensive end and defensive

19

1
2  tackle.
3      Q. Were you recruited out of high
4  school?
5      A. Yes.
6      Q. Have you ever served in the Armed
7  Forces?
8      A. No.
9      Q. To your knowledge, has anyone ever
10  complained about his or her treatment by you in
11  your capacity as a police officer?
12      MR. BROOKS:  Objection.
13      A. I've had some disgruntled people,
14  but...
15      Q. Have any of those people issued a
16  formal complaint, to your knowledge?
17      A. Some have, yes.
18      Q. Were any of those related to the use
19  of force?
20      MR. BROOKS:  Objection.
21      A. I can't recall exactly what they were
22  complaining about.  Most of the time they come in
23  not so distinct a form.
24      Q. How do you mean "distinct a form"?
25      A. They will say what the allegations

20

1
2  are.  And it's usually through CCRB.  And they
3  will delegate what they feel the allegations are
4  into their subsection.  They say you did this,
5  it's, you know, falls under abuse of authority.
6  If it says you did this, it falls under
7  discourtesy.  Something like that.
8      Q. Were any of those complaints
9  sustained against you?
10      MR. BROOKS:  Objection.
11      A. Yes.
12      Q. Do you recall which ones?
13      A. There was an unreasonable frisk.
14      Q. Do you recall the circumstances of
15  that incident?
16      A. Yes.
17      Q. What were they?
18      A. Um -- a person was -- I pulled over a
19  person, conducting a car stop.  When I
20  approached -- when me and my partner approached
21  the car, we asked him to turn off the engine for
22  our safety 'cause the car was still running.  He
23  refused.  I -- heightening our -- our suspicion
24  and also our alarm, 'cause it's a very simple
25  thing to shut the car off for everyone's safety.

21

2    He refused, adamantly refused.  After
3    several times being asked and then ordered to
4    shut the car off, he refused.  He was taken out
5    of the car and frisked.  Because we took him out
6    of the car and now we have him on the street, we
7    shut the car off.  He started making noise
8    verbally, you know, yelling at us, cursing at us.
9    A large crowd gathered across the street where a
10   building was.  He was handcuffed and put under
11   for disorderly conduct.
12       During the course of the
13   investigation, and after we had him handcuffed,
14   the individual calmed down, we were able to
15   verify that it was his vehicle, and he somewhat
16   calmed down, apologized, and I issued him a
17   summons, Criminal Court summons for disorderly
18   conduct, and let him go.
19       Q.  And what part of that, to your
20   understanding now, was the part they sustained as
21   improper?
22       MR. BROOKS:  Objection.
23       A.  The frisk of him, once we had him out
24   of the car.
25       Q.  What should you have done?

22

2        MR. BROOKS:  Objection.
3        A.  Well, as far as we were concerned, we
4    did what was right.  And I believe the complaint
5    went on to the chief -- Police Commissioner's
6    office, and nothing ever came back on it.  So I
7    believe they deemed that we were right.  It was
8    just Civilian Complaint Review Board not really
9    being trained in everything that has to do with
10   police work, so what we did was improper.  But
11   according to our things, it was proper after the
12   Police Commissioner's office looked at it.
13       Q.  And when did this occur?
14       A.  You know, I don't have the exact
15   date.
16       MR. BROOKS:  When you say "this," you
17   mean the incident or the CCRB finding?
18       MR. SOLEDAD:  I mean the incident.
19       A.  I don't remember.  I can't exactly
20   remember.  I don't know if it was '06 or -- I
21   think it was sometime in '06.  But the exact date
22   is -- escapes me right now.
23       Q.  Can you remember the beginning of
24   '06, or the end of '06?
25       A.  I can't remember honestly.

23

2        Q.  Were you disciplined?
3        MR. BROOKS:  Objection.
4        A.  No.
5        Q.  How did you learn of the complaint
6    against you?
7        A.  Through the CCRB notification.
8        Q.  Is that a formal system of
9    notification that comes to you?
10       A.  Yeah, they will notify us to
11   investigate it.
12       Q.  Are there any other incidents?
13       MR. BROOKS:  Objection.
14       A.  That --
15       Q.  That were sustained.
16       A.  No.
17       Q.  Have you ever been disciplined for
18   any reason by the NYPD outside of that?
19       MR. BROOKS:  Objection.
20       A.  I've been given a CD for failure to
21   make it to traffic court.
22       Q.  What's a CD?
23       A.  Command discipline.  It's a formal
24   reprimand.  And for that, I was warned and
25   admonished.  It was a scheduling conflict that I

24

2    had, and I forgot about.  And then I received
3    another CD for failure to voucher a prisoner's
4    keys.
5        Q.  Are those the only two?
6        A.  Yeah.
7        Q.  How frequently are you reviewed by
8    the NYPD?
9        A.  I'm not a supervisor, so don't hold
10   me totally to this.  But I believe quarterly and
11   then annually.  But most of that is handled by
12   supervisors.  I know I have to sign off on my
13   annual.  That's yearly, right?  Yeah, my annual
14   evaluation I have to sign off on.
15       Q.  But do you receive the quarterlies as
16   well as the annual reviews?
17       A.  No.  No.  I'm just repeating what
18   I've heard from supervisors saying they are
19   quarterly, so, like I said, I'm not definitely
20   sure on that.
21       Q.  Do you receive your annual review?
22       A.  It's on -- it's done on line.  So, I
23   mean, I can print it out.  But I have to sign off
24   on it that I'm not trying to appeal it.
25       Q.  Do you have access in the same way to

25

1
2    your quarterly review?
3        MR. BROOKS:  Objection.
4        A.  No.
5        Q.  If you wanted to obtain your
6    quarterly review, could you?
7        A.  I think it would have to be something
8    done with supervisors.  I don't think it's always
9    shared.  I think it's more of a supervisory tool.
10       Q.  Have you ever attempted to obtain a
11   quarterly review?
12       A.  Nope.  Never been asked for one.
13       Q.  Do you recall getting reviewed in
14   2006?
15       A.  Vaguely.
16   RQ      MR. SOLEDAD:  Counsel, plaintiff
17   reiterates our request that all reviews be
18   provided, including those from the years
19   2006 and later.
20       MR. BROOKS:  And I'll represent again
21   that we've produced all reviews that we've
22   received, but if you want to put it in
23   writing again, I'll be happy to look at it
24   again.
25       MR. SOLEDAD:  And just to note, we

26

1
2    did put it in writing once before, on
3    December 14th, 2009, in a letter to you.
4        Q.  Who reviews you, generally?
5        A.  Your immediate supervisor.
6        Q.  Were you scheduled to work on April
7    14th, 2006?
8        A.  Yes.
9        Q.  Do you remember what time?
10       A.  The exact tour -- can I see my notes,
11   my notebook thing?
12       Q.  I want to ask you the question just
13   if you remember.  Then I can show you your notes.
14       A.  I want to say it was eight to four.
15   But my exact tour would be something like --
16   'cause I do an 8:35, when you're a police
17   officer.  So you say eight to four, but it could
18   start earlier or something like that, you know
19   what I'm saying.
20       Q.  So when you say 8:35, what does that
21   mean exactly?
22       A.  You -- a police officer works eight
23   hours and 35 minutes.  That comprises his day.
24   When it starts and when it ends is different
25   times.  But it's usually just the vernacular to

27

1
2    generalize four to twelve, eight to four.
3        Q.  So you mean shift times are
4    approximate.
5        A.  Yeah, yeah.  Since we do an extra
6    hour thirty-five as police officers.
7        Q.  Do you recall with whom you were
8    scheduled to work that evening?
9        A.  Niles Prince and Sergeant Daglas.
10       Q.  During that time period, did you
11   typically work with those two individuals?
12       MR. BROOKS:  Objection.  What time
13   period?
14       MR. SOLEDAD:  The April 14th, 2006
15   time period.
16       A.  Um -- we -- I'm not exactly sure the
17   size of the team during that time 'cause the team
18   would vary from two guys to four guys to three
19   guys, depending on when people came in and out of
20   it.  But it was very common for us to switch off
21   different times.  But I worked with Niles --
22   Prince and Daglas frequently, yes.
23       Q.  And when you say "team," what do you
24   mean?
25       A.  Our anticrime team.  The one

28

1
2    sergeant, and there's typically four to five
3    officers.  I don't know exactly who was on the
4    team on that date.  'Cause I don't know when they
5    came in.  I know I was on the team.  So...
6        Q.  But prior to April 14th, 2006, you
7    had worked with Officer Prince and Sergeant
8    Daglas at some point, correct?
9        A.  Yes.
10       Q.  What are the responsibilities of the
11   anticrime unit?  What were your responsibilities
12   as a part of it?
13       A.  We patrolled high crime areas in the
14   precinct, focusing on robbery patterns, burglary
15   patterns.  If there was a high amount of
16   shootings in the area, gang violence, whatever
17   was the hot button issue of the day.  Sometimes
18   it's robbery, sometimes it's shootings, sometimes
19   burglary.
20       Q.  How did you typically go about doing
21   so?  Would you patrol a particular area or would
22   you more respond to radio calls or intelligence
23   that had at some point been gathered?
24       MR. BROOKS:  Objection.
25       A.  We -- we wouldn't really respond to

29

1
2  radio runs unless there was something of an
3  immediate nature or there was something like a
4  shooting or a stabbing.  We mainly just patrolled
5  areas that had a high focus quantity of crime in
6  their regard, which I mentioned before.
7      Q.  And on that particular day, you said
8  there was --
9      A.  Hang on, hang on.
10     Q.  Sure.
11         (A pause in the proceedings.)
12         MR. BROOKS:  Note for the record, his
13  microphone fell off.
14         THE WITNESS:  Microphone, sorry.
15     Q.  On that particular day, what were
16  the, you said hot-button issues, to use your
17  term, that day?
18     A.  I don't remember.
19     Q.  Do you recall if there were
20  particular objectives that day?
21     A.  I can't remember.
22     Q.  Do you recall anything about anyone
23  telling you what you were going to do that day?
24     A.  I don't -- I don't really understand
25  what you're -- like -- what do you mean?

30

1
2      Q.  I mean, did anyone in any way
3  indicate to you that you would be going to a
4  particular place or attempting to curb particular
5  crimes?
6      A.  I can't --
7         MR. BROOKS:  Objection.
8      A.  -- I can't remember offhand what our
9  particular -- what was particularly going on at
10  that time.
11         MR. SOLEDAD:  I'd like to introduce a
12  two-page exhibit, actually, a three-page
13  exhibit, NYC 25 through NYC 27.  This is
14  going to be marked as Plaintiff's Exhibit
15  18.
16         (Plaintiff Exhibit 18, copy of three
17  pages from memo book, Bates numbered NYC
18  25 through NYC 27, marked for
19  identification, as of this date.)
20     Q.  Officer Sullivan, do you recognize
21  the document I've placed in front of you?
22     A.  Yes.
23     Q.  What is it?
24     A.  A copy of my memo book.
25     Q.  And what is a memo book?

31

1
2      A.  It's a department-issued notepad that
3  you record different things that you're -- I
4  guess, what's the word for it -- of what you're
5  doing on that particular day, for your
6  recollection and just for different
7  administrative things.
8      Q.  Do you record everything that happens
9  on a particular tour in this memo book?
10     A.  No.
11     Q.  What do you record?
12     A.  Just pertinent things about the --
13  anything I'm involved in particularly.
14     Q.  What would you describe as "pertinent
15  things"?
16     A.  An arrest, my start -- my beginning
17  and my end of my day for administrative reasons,
18  you know, when I ended, when I started.
19     Q.  Would you ever not record an arrest?
20         MR. BROOKS:  Objection.
21     Q.  Have you ever not recorded an arrest?
22     A.  In my memo book?  Yes, I have not.
23     Q.  And why did you not on those
24  occasions?
25     A.  I think it was one of those things

32

1
2  where I was catching it up and I just forgot to.
3      Q.  Do you record stops in your memo
4  book?
5         MR. BROOKS:  Objection.
6      A.  Stops?
7      Q.  If you detain an individual, but not
8  arrest them.
9      A.  Not usually, no.
10     Q.  On your tour that began on April
11  14th, 2006, did you record all the incidents that
12  occurred on that tour?
13         MR. BROOKS:  Objection.
14     Q.  In your memo book?
15     A.  No.
16     Q.  Do you recall which incidents that
17  occurred during that tour that you did not
18  record?
19     A.  Um -- I don't -- you asked me did
20  I -- did I record -- did I remember anything that
21  happened that day that I did not record?
22     Q.  Yes.
23     A.  Um -- in terms of what?
24     Q.  Anything.
25     A.  Like, was it dark out?

33

1
2      Q. Anything that relates to your
3   interaction with a civilian.
4      MR. BROOKS:  Objection.
5      A. I want to make sure I understand what
6   the question is.
7      Q. Sure.
8      A. You're asking me if I remember
9   anything that's not written down in my memo book
10  about interacting with any civilian that night?
11     Q. Yes.
12     A. Including the plaintiff?
13     Q. Yes.
14     A. Well, I recorded that I arrested him.
15  But any other person?
16     Q. Yes.
17     A. No.
18     Q. So as you sit here today, you don't
19  recall arresting anyone else that night?
20     A. Me formally arresting him where I do
21  the online?  No, I don't remember that.
22     Q. How about someone else as part of
23  your unit that evening?
24     A. I don't remember.
25     Q. Do you recall stopping, detaining

34

1
2   anyone during that tour?
3      MR. BROOKS:  Objection.
4      Q. Aside from Mr. Robertson.
5      MR. BROOKS:  Objection.
6      A. No.
7      Q. Do you recall speaking with any
8   civilian aside from Mr. Robertson during that
9   tour?
10     A. Not particularly, no.
11     Q. What do you mean by "not
12  particularly"?
13     A. Well, we have civilian employees in
14  our precinct that I frequently say hi to when I'm
15  coming in or going from work.  But anyone out in
16  the field, I don't remember anything.
17     Q. Can you read for me the notes that
18  you took in your memo book to make sure I
19  understand them, please?
20     A. Um-hum.
21     Q. You can start with the first line on
22  NYC 26.
23     A. NYC 26?  "Friday, 4/14/06, 1930 X
24  0405."
25     Q. Let me just stop there, and you can

35

1
2   tell me exactly what that means.
3      A. Friday, the day of the week; 4/14/06,
4   April 14th, 2006, the year; 1930, I guess that
5   would be 7:30 at night, by 0405, which is 4:05
6   the next --
7      Q. What does the "by" mean?
8      A. By -- to, I guess that would be a
9   better word for "to," I guess.
10     Q. And why did you write down those
11  dates and those times?
12     A. Well, that's the day I was working
13  and the time I was scheduled to work.
14     Q. Okay.  We can go to the next line.
15     A. Oh, "Assigned to 75 precinct."
16  That's my assignment.  I'm assigned to the 75
17  precinct.
18     Q. Next line?
19     A. "1930, present for duty."  That means
20  I'm at work.
21     Q. Next line?
22     A. "1940, assigned to anticrime."  Which
23  is my unit of subsector patrol.
24     Q. You, on this line, indicate that you
25  were assigned to anticrime.

36

1
2      A. Um-hum.
3      Q. Does that mean that you were
4   sometimes assigned to another unit?
5      MR. BROOKS:  Objection.
6      A. Well, we're a patrol unit, which is,
7   say, for instance, my supervisor wasn't in or my
8   teammates weren't in, I would fall under the
9   designation of the patrol supervisors, which is
10  the old -- the hierarchical unit, and he could
11  assign me to do actual patrol car duties like
12  answering 911 runs, or they could assign me to
13  prisoner transport.  They could assign me to
14  pretty much whatever they wanted, since they are
15  the supervisors.
16     Q. Was anticrime your primary
17  assignment?
18     A. Yes.
19     Q. Okay, we can go to the next line.
20     A. Okay.  "RMP."  That's the name of the
21  vehicles in the NYPD, radio motor patrol, 8024, I
22  believe.  And P.O. Prince as designating the
23  person I was working with.
24     Q. And what does the 8024 mean?
25     A. That's the number of the car that we

37

1
2  were using.
3      Q.  The next line?
4      A.  "1945, 98," which means resume
5  patrol, or initiate patrol.  That's just
6  connotation, okay, we're out of the precinct
7  doing our -- doing our work.
8      Q.  And 1945 is the time?
9      A.  Yes.
10     Q.  And 98 --
11     A.  Is -- means we're out, you know, the
12  car has pulled out of the precinct.
13     Q.  And the next line, please?
14     A.  "0040, one under, Williams and
15  Pitkin."
16     Q.  What does that mean?
17     A.  One person under arrest, the location
18  being Williams and Pitkin Avenue.
19     Q.  And is that referring to the arrest
20  of Mr. Robertson?
21     A.  Yes.
22     Q.  There's one more line that's visible
23  on NYC 27.
24     A.  And we have, I believe that's 0558 as
25  indicated hours, that's 5:58 in the morning, or

38

1
2  a.m., EOT, and that stands for end of tour.
3  That's when my tour concluded.
4      Q.  Are these the entirety of your notes
5  for that shift?
6      A.  Yes.
7      Q.  Is it typical that you would have
8  only made one arrest on an evening?
9          MR. BROOKS:  Objection.
10     A.  Yes.  Well, to be clear, if you made
11  an arrest, you know, we wouldn't make arrests
12  every night, but if you made an arrest, it's not
13  typical that you go back out and make another arrest
14  again.  It does happen, but it's not typical.
15     Q.  So typically, you make at most one
16  arrest per tour?
17     A.  Yes.
18         MR. BROOKS:  Objection.
19     Q.  Do you have an understanding as to
20  why that is?
21     A.  I believe it's -- it would be
22  speculation by me.  So I'm not sure, but I
23  believe it has to do with overtime and, you know,
24  just, you know, overtime, probably, the City.
25     Q.  What would require overtime?  Would

39

1
2  it be the processing of the arrestee?
3          MR. BROOKS:  Objection.
4      A.  Conferring with the Kings County DA's
5  office, since they don't work in the middle of
6  the night.
7      Q.  How often during this time period
8  while you were with the anticrime unit did you
9  return from a tour without an arrest, to your
10  recollection?
11     A.  Frequently.
12     Q.  Can you give me a percentage?
13         MR. BROOKS:  Objection.
14     A.  I don't know.  Uh -- monthly,
15  probably -- 80 percent of the time.
16     Q.  During your April 14th, 2006 shift,
17  did there come a time when you observed
18  Mr. Robertson?
19     A.  Um -- yes.
20     Q.  What time was it when you first
21  observed Mr. Robertson?
22     A.  Um -- although from the "one under"
23  was 0040, probably, approximately ten to fifteen
24  minutes prior to that.
25     Q.  Who saw Mr. Robertson first?

40

1
2          MR. BROOKS:  Objection.
3      A.  I believe it was me.
4      Q.  Where were you when you first
5  observed Mr. Robertson?
6      A.  I was driving westbound on the north
7  side of Pitkin Avenue.
8      Q.  And what was Mr. Robertson?
9      A.  He was walking westbound on the south
10  sidewalk of Pitkin Avenue.
11     Q.  So you were heading in the same
12  direction as Mr. Robertson?
13     A.  Um-hum.
14         MR. BROOKS:  Would you say a verbal
15  answer?
16         THE WITNESS:  Pardon?
17         MR. BROOKS:  You have to give a
18  verbal answer.
19     A.  Oh, yes.  Sorry.
20     Q.  Were you in your vehicle when you
21  observed Mr. Robertson?
22     A.  Yes of the.
23     Q.  Where were you seated in the vehicle?
24     A.  I was driving.
25     Q.  You said you were on this tour with

41

1
2    Officer Prince.  Where was Officer Prince seated?
3        A.  I believe he was sitting next to me
4    on the passenger side.
5        Q.  Do you recall if Sergeant Daglas was
6    with you on this tour?
7        A.  Yes.
8        Q.  Do you recall where he was sitting?
9        A.  He was sitting in the back seat.
10       Q.  Do you remember on which side?
11       A.  No.
12       Q.  Why were you at that location?
13       A.  That exact street?  I don't recall.
14       Q.  Had you received any information that
15   there might be crime afoot in that area or on
16   that street?
17           MR. BROOKS:  Objection.
18       A.  I don't recall.
19       Q.  Were there any other officers in the
20   vicinity?
21       A.  Not that I remember.
22       Q.  Can you describe Pitkin Avenue for
23   me, the way it looked that night?
24       A.  Pitkin Avenue is an industrial area,
25   all commercial buildings.  It was dark out, well

42

1    lit with street lights.  Pretty, you know, pretty
2    much it.
3        Q.  Is Pitkin Avenue a two-way street?
4        A.  Yes.  It runs east and west.
5        Q.  How many lanes?
6        A.  One.
7        Q.  One east and one west?
8        A.  Yes.
9        Q.  Were there people aside from
10   Mr. Robertson that were walking around?
11       A.  I don't recall anyone else being on
12   the street.
13       Q.  Was there other vehicular traffic
14   aside from your vehicle?
15       A.  It's a common thoroughfare.  But I
16   don't remember anything distinctly, you know, a
17   vehicle that -- being involved, no.
18       Q.  After observing Mr. Robertson, did
19   there come a time when a decision was made to
20   approach him?
21           MR. BROOKS:  Objection.
22       A.  Um -- yes, there was a decision made
23   to approach him, yeah.
24       Q.  Who made that decision?

43

1
2        A.  Mainly me.
3        Q.  And what was your intention as you
4    approached him?
5        A.  I wanted to investigate further.
6        Q.  What did you want to investigate
7    further?
8        A.  It looked like to me that he was
9    smoking a blunt and I wanted to investigate
10   further to confirm my suspicion.
11       Q.  You said it looked like he was
12   smoking a blunt.  Were there any other
13   indications that he was smoking a blunt?
14       A.  No, just from what I observed, it
15   looked to be a blunt.
16       Q.  Approximately how far away from
17   Mr. Robertson were you when you believed that you
18   could see a blunt?
19       A.  Well, seeing a blunt and the way he
20   was smoking it was what I meant by observations.
21   I was westbound, double yellow.  He was in the
22   middle of the south sidewalk.  When I approached
23   him, approached from the rear, looked over, saw
24   what I observed, what I believed to be smoking a
25   blunt.

44

1
2        Q.  So you said you approached him from
3    the rear; correct?
4        A.  More of a diagonal on each side.  But
5    I came up from behind, yes.
6        Q.  How were you able to see that he was
7    smoking a blunt if you were behind him?
8        A.  Well, you're diagonal to me.  I can
9    see you.
10       Q.  Did you smell the blunt at any point?
11       A.  Um -- part of me recalls something
12   like that, but I can't really remember exactly if
13   I smelled it.
14       Q.  So you're not sure if you smelled it.
15       A.  No, not sure.
16       Q.  Do you recall if any other officers
17   in the vehicle told you that they smelled
18   something?
19       A.  No, I don't.
20       Q.  Can you describe for the record what
21   a blunt is?
22       A.  A blunt is marijuana wrapped in a
23   broken or unwrapped cigar wrapper.  A cigar has
24   several tobacco wraps on it, but they usually use
25   the outermost wrap to wrap with marijuana on the

45

1
2    inside.
3        Q. So how does a blunt look from the
4    outside?
5        A. It has some shapes of being
6    cylindrical --
7        Q. Cylindrical?
8        A. Cylindrical -- roundness. But it's
9    also -- it's more of a broken, but it wasn't
10   properly -- it wasn't made professionally or
11   anything. It has broken parts. And the part,
12   what I was observing was actually a very small
13   bit that he had in his hand that he was holding
14   with two fingers.
15       Q. So you said he was, when you say a
16   small bit, do you mean he had smoked it to the
17   point whether it was small?
18       MR. BROOKS: Objection.
19       A. I believe it was small. I don't know
20   if he smoked the whole time. But it was small in
21   his hands. Just a little, you know, just a
22   little bit more than about an inch, maybe an
23   inch-and-a-half past his two fingers that he was
24   holding up to his mouth.
25       Q. An inch-and-a-half past his two

46

1
2    fingers, so maybe about two inches total in
3    length?
4        A. Maybe. Well, you know, from the end
5    of his fingers.
6        Q. So, was he walking under a street
7    lamp?
8        A. It was well -- it was well lit. I
9    remember that.
10       Q. So just, I just want to understand
11   your testimony. What you're saying is, you
12   approached him from a diagonal, and did you,
13   before approaching him, see this blunt --
14       A. I saw --
15       Q. -- while you continued to drive, did
16   there come a point where you crossed over the
17   double yellow into the eastbound lane?
18       A. Yes.
19       Q. And prior to that time, did you
20   observe him smoking a blunt?
21       A. I believe it was -- his motions and
22   seeing him smoking something that looked to be
23   small like a blunt, and then I, crossing over,
24   getting even closer to him, getting a better look
25   at it.

47

1
2        Q. So from outward appearances, does a
3    blunt look like a cigar?
4        MR. BROOKS: Objection.
5        A. No. No, not your typical cigar, no.
6        Q. What do you mean by "typical cigar"?
7        A. Typical cigar keeps kind of a uniform
8    shape, a roundness to it. But I'm sure you could
9    find smaller cigars. But the typical sized
10   cigar, you know, generic, no, it didn't.
11       Q. How far away were you from
12   Mr. Robertson when you crossed over the double
13   yellow?
14       A. When I crossed or after I crossed
15   and --
16       Q. Right before you crossed, right
17   before you made the decision to approach him to
18   investigate further, how far away from him were
19   you?
20       A. I was driving right on the westbound
21   with the double yellow next to me. So, I don't
22   know, I'm not good, exactly good with -- enough
23   room for the lane next to me and half the
24   sidewalk. Because he was about in the middle.
25       Q. How far away in front of you was he?

48

1
2        A. Hum. Approximation? Maybe like just
3    the hood of the car. Not very far. Not very far
4    in front. It was more of six feet, six to ten
5    feet, approximating. It's been a while.
6        Q. How fast were you driving?
7        A. Pretty slow. Pretty slow.
8        Q. Can you give me an estimate in terms
9    of miles per hour?
10       A. Um -- between five and ten. Not
11   even. Different in different cars. So trying to
12   remember it, you could be in a Crown Vic and you
13   feel like you're flying. You're in an Impala.
14   If you're in my Camry, you feel like you're
15   flying.
16       Q. Did you announce to anyone else in
17   the vehicle your intention to approach him?
18       A. I believe something was said to make
19   mention of it. But I don't exactly remember what
20   I said or spoke.
21       Q. Did you make a radio call?
22       A. No, I don't believe so.
23       Q. Did anyone else indicate to you that
24   they observed him smoking a blunt?
25       A. I can't exactly remember the other

Sullivan, Matthew  12/23/2009  12:00:00 AM

49

1
2  guys' reaction or their observations.
3      Q.  When you say you wanted to
4  investigate further, did you intend to detain
5  Mr. Robertson?
6      A.  Um -- no, just to see what was going
7  on, see if he was smoking a blunt, and if so,
8  then take police action, if it's marijuana.
9      Q.  What would that police action have
10  been had you discovered that he was smoking a
11  blunt?
12      A.  I believe it's an arrest, to be
13  smoking a cigarette, a marijuana cigarette
14  outside in public.  I believe it's an arrestable
15  offense, or summonsable.  I'm not exactly --
16  maybe he would have gotten a summons.  I don't
17  remember exactly the subsection.  I think you can
18  get a summons for certain marijuana things but I
19  think you have to arrest him if it's burning.
20  Not a hundred percent sure either way.
21      Q.  As you approached, did you do
22  anything to identify yourself as a police
23  officer?
24      A.  Yes.
25      Q.  What did you do?

50

1
2      A.  I said, "Hey, sir, how are you doing?
3  Police Department."
4      Q.  Did you turn on any of your police
5  lights or police sirens?
6          MR. BROOKS:  Objection.
7      A.  I don't believe I did.
8      Q.  Was your car equipped with police
9  lights and a police siren?
10      A.  Yes.
11      Q.  Why did you decide not to turn either
12  of those on?
13      A.  Um -- it rattles some people to have
14  a siren go off right next to you.  And at that
15  point, just making a small, you know,
16  investigation to see clearly.
17      Q.  Were any of you in uniform that
18  evening?
19      A.  No, I don't believe so.
20      Q.  Was your vehicle marked as a police
21  unit?
22      A.  It was an unmarked vehicle.
23      Q.  You said you spoke to Mr. Robertson
24  when you approached him.  Did you say anything
25  beyond the statement you just made a few minutes

51

1
2  ago?
3      A.  I believe what was said was, "Hey,
4  sir, what's going on?  Police Department.  Let me
5  talk to you a second."
6      Q.  And what was Mr. Robertson's
7  response?
8      A.  I believe he said something verbally.
9  And then he ran.
10      Q.  Do you recall what he said verbally?
11      A.  Exactly what he said, I don't
12  remember.
13      Q.  How about approximately what he said?
14      A.  I think it was an indication that,
15  "No, I'm not stopping."  And then he picked up
16  speed and took off, sprint.
17      Q.  What was your intention in
18  communicating with Mr. Robertson?
19      A.  To convey that, "I'm a police officer
20  and I want to ask you a few questions, stop you."
21      Q.  Did you ever indicate to
22  Mr. Robertson that he should stop and speak with
23  you?
24          MR. BROOKS:  Objection.
25      A.  I believe that was implied.

52

1
2      Q.  So your intention was for him to stop
3  walking.
4      A.  Yes.
5      Q.  Did you expect him to agree to your
6  request to stop walking?
7      A.  Yeah.
8      Q.  Were you okay with him ignoring your
9  request to stop walking?
10          MR. BROOKS:  Objection.
11      A.  No, 'cause then we couldn't conduct a
12  thorough investigation, make sure my suspicions
13  were either unfounded or confirmed.
14      Q.  Could you not have confirmed your
15  suspicions had he kept walking?
16      A.  I don't think properly, no.
17      Q.  Was it your intention to frisk
18  Mr. Robertson?
19          MR. BROOKS:  Objection.
20      A.  My intention in regards to what?
21      Q.  In regards to your investigation of
22  Mr. Robertson.
23      A.  I believe it was to investigate what
24  he was smoking.
25      Q.  And how would you have done so?

Sullivan, Matthew  12/23/2009  12:00:00 AM

53

1
2     A. If he stopped?
3     Q. Yes.
4     A. I would have asked to see it.  I
5  would have definitely been able to smell it once
6  I got that close, within an arm's width to him,
7  see if it smelled like marijuana, you know, maybe
8  even opened it up, see if it was marijuana.
9     Q. Were you able to smell it at any
10 point that evening?
11     MR. BROOKS:  Objection.
12     A. I can't recall.
13     Q. Did any other officers say they were
14 able to smell it?
15     MR. BROOKS:  Objection.
16     A. At that time?
17     Q. Yes.
18     A. I can't recall exactly what was said.
19     Q. Just to make sure I understand your
20 testimony, you intended for Mr. Robertson to
21 stop.
22     A. Yes.
23     Q. Correct?  And you were going to
24 conduct an investigation of his activity.
25     A. Um-hum.

54

1
2     Q. And --
3     MR. BROOKS:  Give a verbal answer.
4     A. Yes, I'm sorry.
5     Q. So he was not free to ignore your
6  request that he stop?
7     A. No.  Not at that time.
8     Q. Did you confirm at any point that he
9  was smoking a blunt?
10     MR. BROOKS:  Objection.
11     A. After the incident?  I wasn't able to
12 find it.  But there was other circumstances,
13 so...
14     Q. Was Mr. Robertson wearing gloves?
15     A. I don't believe so.
16     Q. How much time elapsed from the time
17 that you spoke to him and the time he began
18 running?
19     A. Almost instantaneously.
20     Q. So you said he said something to you,
21 correct?
22     A. I believe something was said, yes.
23     Q. How much time elapsed after he
24 finished saying something to you and then he
25 began running?

55

1
2     A. He pretty much made -- said something
3  and ran at the same time.
4     Q. Do you recall what Mr. Robertson did
5  with the blunt you observed him holding in his
6  hand when he began running?
7     A. No.
8     Q. Was there any other basis to
9  investigate Mr. Robertson aside from the blunt?
10     A. I believe the stop was -- that was
11 the main reason for the stop, yes.
12     Q. So your belief that he had a blunt
13 offered you reasonable suspicion that he was
14 engaged in some criminal activity.
15     A. Yes.
16     Q. Was there an effort made to recover
17 that blunt?
18     A. Yes.
19     Q. By whom?
20     A. Me.
21     Q. How did you try and recover that
22 blunt?
23     A. I looked for it.
24     Q. Do you recall where you looked for
25 it?

56

1
2     A. Somewhere in the area where the
3  incident happened.
4     Q. Did you look where you initially saw
5  him and spoke to him?
6     MR. BROOKS:  Objection.
7     A. I believe so.
8     Q. And then did you look along the path
9  of his running?
10     A. Yes.
11     Q. Were you concerned that you couldn't
12 find the blunt?
13     A. My concern more lay with my partner
14 who wasn't feeling too good after the incident,
15 and getting care for Mr. Robertson.
16     Q. How long did you search for the
17 blunt?
18     A. A couple of minutes.
19     Q. How long would you typically search
20 for an item that was the source of your belief
21 that there was criminal activity?
22     MR. BROOKS:  Objection.
23     A. Depending on the circumstances, I
24 think.
25     Q. Had you ever searched for such an

57

1
2  object for more than a few minutes?
3      A. Yes.
4      Q. What percentage of the time would you
5  say that you searched for more than a few
6  minutes?
7      A. A higher percentage of time. But
8  then again, the circumstances dictated that there
9  was more pressing things that needed to be done
10  at that time. So that kind of -- that cut me
11  short.
12      Q. And the more pressing things that
13  needed to be done at that time were, I recall you
14  saying, Officer Prince's injuries?
15      MR. BROOKS: Objection.
16      A. Well, it was Officer Prince's
17  injuries and also the injuries that Mr. Robertson
18  had.
19      Q. Did there come a time when Officer
20  Prince exited the vehicle?
21      A. Yes.
22      Q. When was that?
23      A. As soon as the, Mr. Robertson started
24  running.
25      Q. Was it his intention to exit the

58

1
2  vehicle prior to Mr. Robertson running?
3      MR. BROOKS: Objection.
4      A. I don't know what his intention would
5  be.
6      Q. Was it your intention to investigate
7  the blunt from your vehicle?
8      A. No. If he stopped, is that what
9  you're asking?
10      Q. Yes.
11      A. I would have exited the vehicle.
12      Q. Did any other officers exit the
13  vehicle at any point?
14      MR. BROOKS: Objection.
15      Q. Prior to Mr. Robertson running?
16      A. No. I believe I didn't even exit the
17  vehicle fully. I remember I think I just had my
18  door open.
19      Q. So you began to exit the vehicle when
20  you --
21      A. While I was speaking to him, yeah.
22      Q. While you were speaking to him. How
23  far did you get?
24      A. Not very far at all.
25      MR. BROOKS: Objection.

59

1
2      Q. Did you have one leg out?
3      A. I -- I remember I closed the door.  I
4  don't even think I had a leg out.
5      Q. You said you closed the door?  You
6  mean opened the door?
7      A. Opened the door, but I don't remember
8  if I was out of the -- but I was like, maybe had
9  a leg out, maybe a leg was in.
10      Q. So do you typically turn off the
11  ignition on your vehicle before you open the
12  door?
13      MR. BROOKS: Objection.
14      A. Turn off?  Or put in park?
15      Q. Put in park, how about that?
16      A. Yes, the car will be put in park
17  before I exit the vehicle.
18      Q. But you wouldn't turn off the
19  ignition necessarily.
20      A. No.
21      Q. So at the time that you approached
22  Mr. Robertson, you spoke to him, put the car in
23  park.  Did you put the car in park before or
24  after you began speaking to him?
25      MR. BROOKS: Objection.

60

1
2      A. It was probably more of a
3  simultaneous.
4      Q. And you had opened the door.
5      A. I believe so, yes.
6      Q. Did anyone else begin exiting the
7  vehicle?
8      A. I can't remember.
9      Q. When Mr. Robertson began running, was
10  there a conversation about what should be done
11  next amongst the officers?
12      A. No.
13      Q. Did Officer Prince indicate that he
14  would exit the vehicle and chase on foot?
15      A. Indicate or just, he did.
16      Q. He just did it?
17      A. Yeah.
18      Q. Did Sergeant Daglas instruct you to
19  do anything?
20      A. Not that I remember.
21      Q. Why did you not pursue Mr. Robertson
22  on foot?
23      A. Because I had the vehicle and it's a
24  distinct advantage.
25      Q. Are you trained to use the vehicle,

61

1
2  if you are the driver, to pursue a suspect?
3      MR. BROOKS:  Objection.
4      A.  I'm trained to use the vehicle.
5  Training in pursuing a suspect isn't conducted,
6  no.
7      Q.  Have you ever, in your past
8  experience, been the driver of a vehicle and
9  elected to pursue a suspect that was running from
10  you on foot?
11      MR. BROOKS:  Objection.
12      A.  It's not usually done.  But I can't
13  say that it's never done.
14      Q.  Did any of the other officers say
15  anything to Mr. Robertson?
16      MR. BROOKS:  Objection.
17      A.  I don't know.
18      Q.  Did you see Mr. Robertson discard
19  anything prior to running?
20      Q.  Prior to running?
21      Q.  Prior to running.
22      A.  No, not that I remember.
23      Q.  Did you see Mr. Robertson discard
24  anything after beginning to run?
25      A.  While he was running, yeah, I saw

62

1
2  something -- something fall in the path of his
3  flight, yeah.
4      Q.  Were you able to see Mr. Robertson
5  the entire time, from the time that he ran until
6  the time he was subdued?
7      A.  No.
8      Q.  At which point were you unable to see
9  Mr. Robertson?
10      A.  After I passed him.
11      Q.  So how much time elapsed from the
12  time that he began running until the time that
13  you passed him?
14      THE WITNESS:  Pardon me.
15      MR. SOLEDAD:  It's all right.
16      A.  How much time?  Seconds.
17      Q.  So it was in the first few seconds
18  that he ran, that he discarded an object?
19      A.  Yes.
20      Q.  Did you do anything when you saw that
21  he discarded an object?
22      A.  No.  He was our main focus.
23      Q.  Did you indicate to Sergeant Daglas
24  that he had discarded something?
25      A.  Not that I remember.

63

1
2      Q.  Did Sergeant Daglas indicate to you
3  that he had observed him discarding something?
4      A.  Not that I remember.
5      Q.  In which direction did Mr. Robertson
6  run?
7      A.  Southbound.
8      Q.  Earlier, you indicated that he was on
9  Pitkin and that Pitkin runs east-west.  How is it
10  that he ran southbound on Pitkin?
11      A.  On Williams, I apologize.
12      Q.  So he ran westbound on Pitkin and
13  then turned southbound on Williams?
14      A.  Um-hum.
15      MR. BROOKS:  Verbally.
16      THE WITNESS:  Oh, I'm sorry.
17      A.  Yes.
18      Q.  And where did you drive?
19      A.  Southbound on Williams.
20      Q.  So you went westbound on Pitkin --
21      A.  Southbound, yes.
22      Q.  -- southbound on Williams.
23      A.  He was approaching the corner when
24  the initial stop happened, and probably two
25  seconds, two, three seconds elapsed.

64

1
2      Q.  I'm sorry, you said that you were
3  approaching the corner where the initial stop
4  happened?
5      A.  Yeah.
6      Q.  I'm --
7      A.  I was still in the middle -- it was
8  still towards the middle of the block.  But, you
9  know, close to -- closer to the corner of
10  Williams and Pitkin.
11      Q.  He was on Williams but it was just
12  after he had turned off of Pitkin?
13      A.  I was on Pitkin, right.
14  Approximately two car lengths from the corner of
15  Pitkin and Williams.
16      Q.  That was when you initially spoke to
17  him?
18      A.  Um-hum.
19      MR. BROOKS:  Verbally.
20      A.  Yes.
21      Q.  And where he was lying when he was
22  ultimately handcuffed, where was that?
23      A.  That was on the west side of Williams
24  between Pitkin and Belmont.  On the sidewalk.
25      Q.  He was on the sidewalk?

65

1
2    A. Yes.
3    Q. How much time elapsed from the time
4    Mr. Robertson started running until any officer
5    reached him?
6        MR. BROOKS: Objection.
7    A. I'm not exactly sure of that, because
8    I passed him in order to cut off his escape.
9    Q. Where did you drive your vehicle?
10   Can you describe the route that you drove your
11   vehicle?
12   A. West on Pitkin for about two car
13   lengths, south on Williams. I passed Officer
14   Prince and Mr. Robertson a good ways, and
15   stopped.
16   Q. Did you reach the end of, or the next
17   street on Williams?
18   A. No.
19   Q. Would you say you were halfway?
20   A. I think halfway could be fair, yeah.
21   Halfway.
22   Q. And if you were halfway on Williams,
23   and Pitkin was the street that was, it would have
24   been north of your vehicle at that point, where
25   was Mr. Robertson ultimately lying once he was

66

1
2    arrested?
3    A. Somewhere between the middle of us, I
4    remember. From what I remember.
5    Q. Did you see the actual point at
6    which -- well, who caught Mr. Robertson?
7    A. I believe it was Officer Prince.
8    Q. Did you see the actual point at which
9    Officer Prince caught Mr. Robertson?
10   A. No.
11   Q. Did you see Mr. Robertson struggle
12   after being caught?
13       MR. BROOKS: Objection.
14   A. I saw there was a struggle between
15   Prince and him. But I'm looking over my shoulder
16   now, at that point.
17   Q. In what direction was the vehicle
18   when you stopped the vehicle?
19   A. Which time?
20   Q. When you ultimately, after -- once
21   Mr. Robertson ran and you passed him, did there
22   come a time when you stopped the vehicle?
23   A. Yes.
24   Q. And in which direction, north, east,
25   west, south was the vehicle --

67

1
2    A. South.
3    Q. So it was heading the same direction
4    as traffic?
5    A. Yes. Doesn't Williams run south?
6    Yeah, you're right.
7    Q. Where was Sergeant Daglas while you
8    were driving?
9    A. In the rear of the vehicle.
10   Q. Did there come a time that he exited
11   the vehicle?
12   A. Yes.
13   Q. When was that?
14   A. When I stopped after I had overtaken
15   Mr. Robertson.
16   Q. When you say overtaken, what do you
17   mean?
18   A. Passed.
19   Q. So you had stopped the vehicle and
20   then he exited?
21   A. Yes.
22   Q. Did you exit at the same time?
23   A. No.
24   Q. What were you doing?
25   A. I stayed with the vehicle.

68

1
2    Q. Did you stay seated in the vehicle?
3    A. Yup. Yes, yes.
4    Q. You said the vehicle was facing
5    southbound, correct?
6    A. Um-hum. Yes.
7    Q. So the activity, Mr. Robertson and
8    Officer Prince, would have been north of your
9    position, is that correct?
10   A. Yes.
11   Q. So your car was facing in the
12   opposite direction as the activity, correct?
13   A. Yes.
14   Q. Could you see the activity?
15   A. Limitedly.
16   Q. Why did you not exit the vehicle at
17   that point?
18   A. Because I had the vehicle. If the
19   subject was able to get away, I still have the
20   distinct advantage.
21   Q. In past experiences, do you ever step
22   out of the vehicle but still stay close to it
23   when there's other activity?
24       MR. BROOKS: Objection.
25   A. Usually, I don't exit -- sorry --

Sullivan, Matthew  12/23/2009  12:00:00 AM

69

1
2  usually you don't exit the vehicle until you know
3  the suspect's under control.
4      Q. So you said you had a limited view of
5  what was happening behind you.  How were you
6  viewing what was happening behind you?
7      A. Through the rear window.  Turned over
8  my right shoulder.
9      Q. Is it typically your practice to stay
10  in the vehicle when there's a struggle and other
11  officers are engaged with a suspect?
12      MR. BROOKS:  Objection.
13      At that point, I didn't know how much
14  was going on.  And Sergeant Daglas had already
15  exited, thereby rendering assistance.  Once I saw
16  that the suspect was down, I backed the vehicle
17  up.
18      Q. Did anyone ever indicate to you that
19  you should have exited the vehicle earlier?
20      MR. BROOKS:  Objection.
21      A. No.
22      Q. Could you see Officer Prince and
23  Sergeant Daglas at all times?
24      A. No.
25      Q. Did you ever see Sergeant Daglas

70

1
2  deploy a baton?
3      A. No.
4      Q. Did you ever see Officer Prince
5  deploy a baton?
6      A. No.
7      Q. What did you observe about the
8  struggle?  Who was involved?
9      MR. BROOKS:  Objection.  Which
10  question do you want him to answer?
11      Q. Who was involved in the struggle with
12  Mr. Robertson?
13      A. It was Sergeant Daglas, Officer
14  Prince and Mr. Robertson.
15      Q. Did you observe a point prior to
16  Sergeant Daglas arriving at Mr. Robertson?
17      A. I'm not sure I understand the
18  question.
19      Q. So, you said you overtook
20  Mr. Robertson and Officer Prince, correct?
21      A. Um-hum.
22      Q. You stopped --
23      A. Yes.
24      Q. -- the vehicle.  Were they in your
25  view prior to Sergeant Daglas exiting the

71

1
2  vehicle?
3      A. Limitedly, but yes.
4      Q. In that limited -- in that limited
5  view, what did you see?
6      A. A struggle.
7      Q. When you say "a struggle," what do
8  you mean?
9      A. Two men locked up, some sort of
10  struggle was going on.  "Struggle" seems to be
11  the best word, engaged, struggle.
12      Q. Were they standing?
13      A. Um -- for a little while.
14      Q. Did there come a time when they fell?
15      A. I believe so, yes.
16      Q. Did you see that?
17      A. Can't exactly recollect if I saw
18  that.  I remember at one point, he was up and at
19  one point he was down.  I don't really remember
20  if I saw that.
21      Q. And did Mr. Robertson appear to be
22  trying to escape or appearing to be trying to
23  harm Officer Prince?
24      MR. BROOKS:  Objection.
25      A. To categorize it, it's too close to

72

1
2  categorize.  And I wasn't there.
3      Q. Was Officer Prince hitting
4  Mr. Robertson at any point that you observed?
5      A. I saw a struggle.  I don't know if
6  there was hitting exactly involved.
7      Q. Did you ever observe Officer Prince
8  choking Mr. Robertson?
9      A. Not that I remember.
10      MR. SOLEDAD:  Why don't we take a
11  break.
12      VIDEOGRAPHER:  The time on the video
13  monitor is 11:36 a.m.  We're going off the
14  record.  This ends tape number 1.
15      (Recess taken.)
16      VIDEOGRAPHER:  We're back on the
17  record.  The time on the video monitor is
18  11:48 a.m.  This starts tape number 2.
19  EXAMINATION (Cont'd.)
20  BY MR. SOLEDAD:
21      Q. Before the break, we were discussing
22  the struggle and where you were.  You said you
23  were in the vehicle and that you were stopped
24  about halfway between -- or halfway on the block
25  between Pitkin and the street that's just south

73

1
2    of Pitkin, correct?
3        A. Yeah.  Approximately.
4        Q. Did there come a time when you moved
5    the vehicle?
6        A. Yes.
7        Q. When was that?
8        A. When I saw that they had gotten to
9    the ground, or he was on the ground, I backed up.
10       Q. How far did you back up?
11       A. Um --
12       Q. Were you even with them?
13       A. Even as -- no.  They were on the
14   sidewalk.  I was in the street.  And
15   approximately the distance?  I want to say about
16   two to three car lengths, maybe more.
17       Q. So when you say that they were on the
18   ground, was Mr. Robertson handcuffed?
19       A. No.
20       Q. Did you see cuffs placed on
21   Mr. Robertson?
22       A. I backed up, I believe the rear
23   quarter panel of the vehicle was just about
24   adjacent with Mr. Robertson.  Came around the
25   side and they were placing the cuffs on him then.

74

1
2        Q. So you backed up, and then you exited
3    the vehicle?
4        A. Yeah.
5        Q. And when you say you came around the
6    side, what do you mean?
7        A. Exited the vehicle, around the rear
8    of the driver's side, coming around the rear of
9    the vehicle and he was just about close to, about
10   lined up with where the rear tire would have been
11   on the passenger side.
12       Q. I see.  So he was on the west side of
13   the street, which would mean he's -- okay, I
14   understand.  So that would mean that he was
15   across the vehicle from the driver's side.
16       A. Yes.
17       Q. And approximately when, when you
18   exited the vehicle, how long after you exited the
19   vehicle did you see cuffs placed on him?
20       A. I believe they already had a cuff on
21   him by the time I got around the car and they
22   were just finishing off.
23       Q. Were you able to see if they had, if
24   Officer Prince had handcuffs on Mr. Robertson
25   prior to Sergeant Daglas arriving to them?

75

1
2        A. I don't believe so.
3        Q. Did you have a baton with you?
4        A. No.
5        Q. Do you have an understanding as to
6    who subdued Mr. Robertson?
7            MR. BROOKS:  Objection.
8        A. An understanding?  Well, I believe it
9    was Daglas and Prince together.
10       Q. When I say "subdued," I mean placed
11   in handcuffs.  Does that change your answer?
12           MR. BROOKS:  Objection.
13       A. Well, I believe they were both
14   assisting, you know, getting him in handcuffs.
15       Q. And you said you never saw -- did you
16   ever see Sergeant Daglas use his baton?
17       A. No, I don't remember that.
18       Q. When you arrived at the scene, did
19   anyone tell you that Sergeant Daglas had used his
20   baton?
21           MR. BROOKS:  Objection.
22       A. No, I don't believe they told me --
23   told me then.
24       Q. Did they tell you at any point?
25       A. I believe later on, when I was doing

76

1
2    the paperwork, told me that they had to.
3        Q. What did they tell you?
4        A. They had to use -- I think that one
5    of them, I think Jimmy said that he used the
6    baton.
7        Q. Who?  I'm sorry.
8        A. Daglas.  I think he said that he used
9    the baton.
10       Q. Did he describe how he used the
11   baton?
12       A. No.
13       Q. Did you ask him how he used the
14   baton?
15       A. No.
16       Q. When you exited the vehicle and
17   arrived on site, did you see Sergeant Daglas
18   holding a baton?
19       A. No.  I was mainly focused on
20   Mr. Robertson at the time.
21       Q. Did you see Officer Prince holding a
22   baton?
23       A. Not that I remember.  I'm pretty sure
24   he wasn't.
25       Q. Did you see a baton -- was a baton in

Sullivan, Matthew  12/23/2009  12:00:00 AM

77

1
2  sight anywhere?
3      A. Not that I can remember.  I was more
4  focused on Mr. Robertson and Officer Prince.  I
5  asked him how he was.
6      Q. After you exited the vehicle and saw
7  that Mr. Robertson had been placed in handcuffs,
8  what did you do then?
9      A. Um -- Mr. Robertson was bleeding.  I
10  remember helping him to his feet, and placing him
11  against the rear of the vehicle.  And then he was
12  bleeding, I think on his face and I might have
13  pushed his, like his jacket or his shirt on to
14  his face just because there was some blood coming
15  out.
16      Q. What side of his face was bleeding?
17      A. I can't recall.
18      Q. Do you recall whether there was, what
19  you would consider to be a lot of blood?
20      A. No.
21      Q. Was the blood streaming down his
22  face?
23      MR. BROOKS:  Objection.
24      A. I don't believe it was streaming, but
25  it was dripping.

78

1
2      Q. When you pressed either his jacket or
3  his shirt against his face, did it become damp
4  with blood?
5      A. Yeah, but there was blood already
6  on -- I think I was -- if you put it where his
7  blood is, it's just going to soak up whatever is
8  there.
9      Q. Did Mr. Robertson struggle at any
10  point after having handcuffs placed on him?
11      A. No, I don't recall -- I don't
12  remember him struggling after that, no.
13      Q. When you exited the vehicle, was he
14  still struggling?
15      A. They were still putting cuffs on him.
16      A. They were in the act of putting cuffs
17  on him?
18      A. Yeah, but they had him under control.
19      Q. He was not struggling at that point?
20      A. Well, you can still struggle while
21  you're, you know, while you're under control, so
22  you'd really, they would be the better persons to
23  ask.  Was he offering resistance to being cuffed?
24  I wasn't doing it, so I can't really say.
25      Q. They didn't indicate that he was --

79

1
2  did they indicate whether he was offering any
3  resistance --
4      MR. BROOKS:  Objection.
5      Q. -- to you or to him?
6      A. Wasn't a huge indication.  But it's
7  all kind of a physical act, you know.
8      Q. You said there wasn't a huge
9  indication.  Was there a not-huge indication?
10      A. Well, it was part of the initial
11  struggle.  It doesn't really stop until you get
12  the handcuffs on you, and you're placed under
13  control.  But for me to place you, your hands
14  behind your back and for you to resist in any
15  way, it wouldn't give a huge amount of
16  indication, especially at the point when he was
17  on his, you know, he was on the ground.  It would
18  look similar.  Like, you now, you could resist
19  and I wouldn't know it but if I was the person
20  with my hands on you, I'd know it.
21      Q. In those situations, do you typically
22  say something to the suspect?
23      MR. BROOKS:  Objection.
24      A. It would have to be on a
25  person-to-person basis.

80

1
2      Q. Do you?
3      A. Do I?
4      Q. Yes.
5      A. Person-to-person, as in the person
6  you're dealing with?
7      Q. Right.
8      A. Some people, I have said, like,
9  "Hey," to, you know, stop.  Other people, it's,
10  you know, it's all how you react to the
11  situation, how you deem the person.  So...
12      Q. What was Mr. Robertson's orientation
13  on the ground while he was being handcuffed?
14      A. I believe his head was facing east;
15  legs facing west.
16      Q. Was that his orientation prior to
17  being handcuffed?
18      A. Well, it was a struggle.  I really
19  don't know.
20      Q. So you didn't see the exact moment
21  that Sergeant Daglas arrived and reached
22  Mr. Robertson.
23      A. No.  Not that I remember.
24      Q. Were any additional officers present
25  at the scene?

81

1
2      A. I don't believe so.
3      Q. Did you make any radio calls or, to
4  anyone?
5      A. Not that I remember, no.
6      Q. At the point when Mr. Robertson was
7  subdued, did you believe him to be a threat to
8  his or any officer's safety?
9      MR. BROOKS:  Objection.
10      A. Well, what do you mean, "Subdued"?
11      Q. At the point when Mr. Robertson was
12  handcuffed.
13      A. Handcuffed?
14      Q. Any time after he was handcuffed.
15      A. Any time after he was handcuffed?
16      Q. Yes.
17      A. No.
18      Q. At any point after he was handcuffed,
19  did you believe that Mr. Robertson might try to
20  run again?
21      A. Uh -- it's always a possibility.
22  That's why we have to safeguard the prisoner.
23      Q. But there was no specific indication
24  that he intended to run.
25      A. Not that I can recall.

82

1
2      Q. You said you placed him against the
3  vehicle; correct?
4      A. Um-hum.
5      Q. And you pressed his shirt or his
6  jacket to his face to absorb blood.  What did you
7  do after that?
8      A. Well, once we had him under control,
9  Prince was a little slow, but he seemed okay,
10  said he was okay.  The -- Prince and Daglas
11  safeguarded him and I gave him a search --
12  searched him for contraband, weapons.  I didn't
13  find any on him.
14      Q. Was Mr. Robertson saying anything at
15  this point?
16      A. Probably, but I don't recall what it
17  was.
18      Q. Was anyone speaking to Mr. Robertson
19  at this point?
20      A. Some things were probably being said
21  but the exact verbiage of what was going on, I
22  don't remember.
23      Q. Do you remember approximately?
24      A. No.
25      Q. After you searched Mr. Robertson,

83

1
2  what did you do?
3      A. I went back to see what had fallen.
4      Q. Did anyone else indicate to you that
5  they had observed him discard something?
6      A. It might have been said, but I'm not
7  sure.
8      Q. When you went to search for whatever
9  it is that you saw, was it your decision?
10      MR. BROOKS:  Objection.
11      A. Pretty much.  I mean -- pretty much.
12  Pretty much it was, you know, we had to see what,
13  you know, we had to look for what we believed to
14  be, he was probably smoking marijuana, and he
15  didn't have anything on him.  So I went back to
16  look for the blunt and whatever else he dropped.
17      Q. Just to back up for a moment, is it
18  possible that Mr. Robertson could have been
19  struck without you seeing it?
20      A. Yes.
21      Q. Is it possible that Mr. Robertson
22  could have been struck with a baton without you
23  seeing it?
24      A. Talking to prior to me being over
25  there, putting him against the car?

84

1
2      Q. Actually, at any point.  Let's take
3  the period from running to you exiting the
4  vehicle.
5      A. Me exiting the vehicle?  It's -- it's
6  possible that he was struck without me seeing it,
7  yes.
8      Q. With a baton?
9      A. Yes.
10      Q. And how about after you left?
11      A. After I went over to --
12      Q. To search.
13      A. -- to look for the stuff?  I believe
14  it would have been apparent if that was happening
15  simply because it wasn't that far away, and it
16  was open street.
17      Q. Was he always in your line of sight
18  while you were searching?
19      A. No.  No.  But he was, you know, no
20  more than, let's say if I'm facing you, that that
21  light switch is in my line of sight.  I mean, if
22  somebody is pounding on the light switch or doing
23  anything, I would be made aware.  It would just
24  be within eye shot, within earshot.
25      Q. Where did you search for what you

85

1
2  believed Mr. Robertson had discarded?
3      A. In his path of flight. In his flight
4  path that he took.
5      Q. Did you go all the way back to the
6  point when you began speaking to him?
7      A. Yes.
8      Q. Why did you do that?
9      A. Well, I first looked for what I saw
10  him drop, and then I continued, after I recovered
11  what he dropped, I continued to, back to the
12  first point, the initial point.
13      Q. Where did you recover what he
14  dropped?
15      A. I recovered it from a storm drain.
16      Q. Can you describe the storm drain?
17      A. I believe it's a runoff drain. Some
18  people call them sewers. I believe it's for rain
19  runoff, I believe. It's -- go ahead.
20      Q. Does it appear to be sort of the kind
21  that are, kind of appear to be a cutoff of the
22  sidewalk such that water from the street could
23  run into them?
24      A. Yeah.
25      Q. And how were you able to recover what

86

1
2  it is you saw from that drain?
3      A. From what I remember, there was a --
4  it was in, like, the side where there had been a
5  little bit of buildup from, like, dirt debris,
6  you know, just dirt from the street, salt,
7  everything gets pushed in. There was a little
8  bit of a -- I guess rubbish built up. I was able
9  to recover it from there.
10      Q. So it didn't actually go into the
11  drain?
12      A. It's semantics. I mean, all the way
13  in? Where is exactly in, you know?
14      Q. Did you look in the storm drain
15  specifically?
16      A. Well, that was in the path of flight.
17  So, yes. And it appeared to be close to where I
18  saw him drop it.
19      Q. Did you use your flashlight?
20      MR. BROOKS: Objection.
21  A. I believe so.
22      Q. How long did it take you to find what
23  you believe he had discarded?
24  A. Found it pretty quickly.
25      Q. Would you say in minutes?

87

2      A. From leaving him to going over there?
3  I believe I observed it within a minute,
4  minute-and-a-half. But like I said, it's all
5  approximation. And then recovering it soon
6  after.
7      Q. And then what did you do after you
8  recovered the object you believe he had
9  discarded?
10      A. Well, I checked for more contraband,
11  weapons, drugs, anything I could see.
12      Q. Where?
13      A. In the drain, to make sure that I got
14  it all.
15      Q. Did you find any?
16      A. Any more or --
17      Q. Yes, any more.
18      A. Any more besides the stuff I had --
19      Q. Yes, you said that you found the
20  object you believe he discarded and then you
21  searched for more. Did you find any more?
22      A. Well, the object itself, I mean, I
23  saw an object drop. Now, that object could open
24  up, the object could have been containing more
25  than what it had in it. Made sure nothing fell

88

1
2  out of it. It wasn't a sealed container, so...
3      Q. So what happened after that?
4      A. I collected the evidence, checked the
5  drain thoroughly, what I could. Then I went
6  search -- looking further for anything else that
7  he may have dropped, including the blunt. And
8  then I was looking around and didn't seem to see
9  it. And then they -- I believe, I remember that
10  Mr. Robinson was bleeding. It didn't look like
11  Mr. Prince was that comfortable. So I decided to
12  end the search and go back so we could return
13  Mr. Robertson to the precinct, get him treated
14  and also have Mr. Prince looked at, Officer
15  Prince.
16      Q. How much time elapsed from the time
17  that you made sure there was nothing else in the
18  drain and collected the object that you believe
19  Mr. Robertson had discarded to the time when you
20  decided to end your search?
21      A. I guess not very much. Maybe between
22  five and ten minutes, not even.
23      Q. How long would you have searched, had
24  no one been injured?
25      MR. BROOKS: Objection.

Sullivan, Matthew  12/23/2009  12:00:00 AM

89

1
2      A.  Well, that's all relative, really.
3   Depending on what we're looking for, depending on
4   the suspect, depending on the -- the flight
5   direction.  I mean, I've had perpetrators run
6   through back yards where you can search for hours
7   and hours and hours.  So it's all relative to the
8   circumstances.
9      Q.  In similar circumstances where the
10  perpetrator stayed on surface streets and didn't
11  run a great distance, how long have you spent
12  searching for contraband?
13     MR. BROOKS:  Objection.
14     A.  Um --
15     Q.  On average.
16     MR. BROOKS:  Objection.
17     A.  I guess, you know, a good amount of
18  time until I felt it was, you know, either
19  fruitless to continue or felt that we collected
20  everything.
21     Q.  What would you say "a good amount of
22  time" is?
23     A.  Like I say, it's all relative to
24  situation.  But...
25     Q.  In a similar situation, or, as I

90

1
2   said, where he stays on surface streets.
3      MR. BROOKS:  Objection.
4      A.  I don't know.  Twenty minutes.
5      Q.  The reason I'm asking is, you said
6   that you had cut the, your search short and so
7   I'm trying to understand how short you cut it.
8      MR. BROOKS:  Objection.
9      A.  I believe -- I believe I was made
10  aware from before knowing the injuries to our
11  prisoner, and also injuries to my partner, and
12  those definitely were a focus of mine.  So...
13     Q.  Would you have searched anywhere that
14  you didn't search?
15     MR. BROOKS:  Objection.
16     A.  I would say I would search a little
17  more thoroughly.
18     Q.  What was it that you recovered from
19  the drain?
20     A.  I recovered black gloves and several
21  small ziplocks of marijuana.
22     Q.  How many black gloves?
23     A.  Two.
24     Q.  Did you observe Mr. Robertson wearing
25  those black gloves at any point?

91

1
2      A.  No.
3      Q.  Did you observe Mr. Robertson wearing
4   gloves at any point?
5      A.  No.
6      Q.  What did you believe to be in the
7   ziplock bags?
8      A.  Marijuana.
9      Q.  We asked you to bring the gloves that
10  you recovered today.
11     A.  Yes.
12     Q.  Did you do that?
13     A.  Yes, sir.
14     Q.  May I see them?
15     MR. BROOKS:  You can pass them over.
16     (A pause in the proceedings.)
17     MR. BROOKS:  Let me just note for the
18  record that we have produced black gloves
19  in an evidence envelope that's not been
20  opened.  They have been produced for
21  inspection, although we do have to take
22  them back.
23     MR. SOLEDAD:  Yes.
24     Q.  What did you do with the gloves and
25  the marijuana once you recovered it?

92

1
2      A.  I took it into my possession and
3   brought it back to the precinct.
4      Q.  When you found the gloves, was it --
5   was the marijuana inside of the gloves?
6      A.  Yes.
7      Q.  Was it inside of both gloves?
8      A.  Um -- I remember it being inside the
9   gloves and both of them were there.  But I don't
10  really remember exactly how much was in each one.
11     Q.  So there was some marijuana in each
12  glove.
13     A.  I believe so.
14     Q.  Were the gloves full of marijuana?
15     MR. BROOKS:  Objection.
16     Q.  Was there additional room to -- in
17  the glove?
18     A.  I -- I don't know if, you know, maybe
19  you could have shoved a couple of more in there.
20  I don't know, sir.  Speculation, I guess.
21     Q.  You said that you -- did you keep
22  them in your custody at all times after you
23  recovered them?
24     A.  Yes, I did.
25     Q.  Is there a particular way that you

93

1
2 store this kind of evidence prior to arriving at
3 the precinct?
4     A. In my pocket.
5     Q. Did you ever ask Mr. Robertson
6 whether the gloves belonged to him?
7     A. I don't believe that was an issue.
8     Q. Did you ever ask Mr. Robertson
9 whether the marijuana belonged to him?
10     A. No.
11     Q. Was Mr. Robertson ever placed in your
12 vehicle?
13     A. Yes.
14     Q. Who did that?
15     A. Um -- I don't exactly remember.
16 Probably would have been me.  Me and Officer
17 Prince.  I don't know, because he was kind of
18 sore.
19     Q. Did Officer Prince and officer
20 Daglas --
21     A. Sergeant.
22     Q. -- Sergeant Daglas enter your vehicle
23 as well?
24     A. Yes.
25     Q. Did you all return to the station

94

1
2 directly?
3     A. Yeah.  Yes.  Yes.
4     Q. Did Mr. Robertson say anything while
5 in the vehicle?
6     A. May have, but I don't remember.
7     Q. Did you have an understanding as to
8 the extent of Officer Prince's injuries?
9        MR. BROOKS:  Objection.
10     A. No.  But he's -- he doesn't usually
11 complain of pain or anything like that.  And he
12 was definitely in discomfort, a lot of
13 discomfort.
14     Q. Did you observe how he received those
15 injuries?
16     A. I knew it was during the struggle,
17 but exactly -- exactly what happened during the
18 struggle, I don't know.
19     Q. Did he indicate to you how it
20 happened at any point?
21     A. It happened during the struggle.
22     Q. He didn't -- did he tell you
23 specifically how?
24     A. No.
25     Q. Did you have an understanding as to

95

1
2 whether it came from Mr. Robertson or from
3 falling on the ground?
4        MR. BROOKS:  Objection.
5     A. I don't know.
6     Q. Did Officer Prince ever go to the
7 hospital for his injuries?
8     A. Yes.
9     Q. Did you accompany him to the
10 hospital?
11     A. I don't think so.  I think I stayed
12 to do the paperwork.
13     Q. Did, subsequent to that night, did
14 Officer Prince show signs of the injuries from
15 that night?
16        MR. BROOKS:  Objection.
17     A. Subsequent, that means after that
18 night?
19     Q. Yes.
20     A. He was sore for a while.  I remember
21 discussing that with him.
22     Q. Did he miss any assignments, any
23 tours?
24        MR. BROOKS:  Objection.
25     Q. To your knowledge.

96

1
2     A. I don't remember.  But he's -- he's
3 not one to go sick, even if he is in discomfort.
4     Q. Were you with Mr. Robertson when he
5 was being detained in the precinct?
6     A. No, not the whole time.
7     Q. While you were with Mr. Robertson at
8 the precinct, did he request to go to the
9 hospital?
10     A. I believe we told him he was going to
11 be treated.  "We're going to get you cleaned up,"
12 I think I told him.
13     Q. Was there any other dialogue between
14 you and Mr. Robertson?
15     A. Well, when you have then in front of
16 the desk in the precinct, you ask them their
17 pedigree information, name, address, stuff like
18 that, if you mean that kind of dialogue, then
19 that's what went on.
20     Q. Who was asking those questions?
21     A. I did.
22     Q. What was the duration between the
23 time it arrived at the precinct until he was
24 taken to the hospital?
25     A. You know, I don't know.  I don't know

97

1
2  exactly.  I don't believe it was that long.
3  'Cause we -- I know that was, like there was talk
4  that we have to get him -- they call it a
5  bus.  It's an ambulance.  We were going to get a
6  bus ordered for him pretty much, right when we
7  were walking in.  So as much time as it took for
8  the ambulance to respond there.
9      Q.  So would you say less than an hour?
10     A.  Yeah.
11     Q.  Did you take him to the hospital?
12     A.  No.
13     Q.  Who was the arresting officer?
14     A.  I am.  Or was.  Am, was.
15     Q.  What do you understand your
16  responsibilities to be as an arresting officer?
17     A.  To process the arrest.
18     Q.  And what does that mean, to process
19  the arrest?
20     A.  Do the paperwork, convey what
21  happened to the Kings County DA's office.
22     Q.  Did you speak with anyone from the
23  District Attorney's office regarding
24  Mr. Robertson?
25     A.  The ECAB representative?  Sometimes

98

1
2  it's an ADA, sometimes it's -- what's it
3  called, Legal Aid or legal person.
4      Q.  What is ECAB?
5      A.  It's the DA's intake of cases.  And
6  they draw them up for the prosecution.
7      Q.  What's the first thing you would have
8  done as the arresting officer?
9          MR. BROOKS:  Objection.
10     Q.  What's the first thing you did as the
11  arresting officer?
12     A.  Well, in terms of what?
13     Q.  In terms of, as you said, processing
14  Mr. Robertson's arrest.
15     A.  Once I got into the precinct?
16     Q.  Um-hum.
17     A.  I filled out the pedigree part.  Just
18  his, you know, name, date of birth, address.
19     Q.  What would you have done next?
20     A.  Depending on different cases --
21     Q.  What did you do next in this case?
22  I'm sorry.
23     A.  As far as I remember, I probably
24  secured a voucher, which I kept in the same
25  proximity to the command log behind the desk

99

1
2  where you do the -- where you bring in your
3  arrest.  You ask for property vouchers.
4          MR. SOLEDAD:  I'd like to introduce
5  previously marked Exhibit 3 and previously
6  marked Exhibit 4.
7          (Documents placed before the witness
8  and counsel.)
9      Q.  You just spoke about property
10  vouchers.  Are Exhibits 3 and 4 property
11  vouchers?
12     A.  Yes, they are.  Copies.  Copies.
13     Q.  Are these copies of the property
14  vouchers you filled out in this case?
15     A.  Yes, they are.
16     Q.  Did you fill out the entirety of this
17  voucher?
18     A.  Where needed.
19         MR. BROOKS:  Which one?
20     Q.  Anything that's not a form part of
21  this voucher, did you fill that out?
22         MR. BROOKS:  Which voucher are you
23  talking about?
24         MR. SOLEDAD:  Same, three.
25     A.  Is there anything, are you saying, I

100

1
2  didn't type on here?
3      Q.  Yes.
4      A.  No, I believe everything on here is
5  mine except for the Sergeant Daglas' signature.
6      Q.  Did you fill this out as part of your
7  duties as arresting officer?
8      A.  Yes.
9      Q.  Did you fill this out that same,
10  during that same tour?
11     A.  Yes.
12     Q.  Did you intend to make it as accurate
13  as possible?
14         MR. BROOKS:  Objection.
15     A.  I do my best.
16     Q.  Under, "Charging offenses under
17  investigation," do you see that line at the top?
18     A.  Yes.
19     Q.  Can you read to me what's indicated
20  there?  What you indicated there?
21     A.  These are penal law codes.  120.08,
22  215.40, and 221.10.
23     Q.  And the box to the right of that on
24  that same line?
25     A.  It indicates "Fel," which indicates

101

1
2  felony.
3       Q.  Was it your decision to use these
4  codes, these charge/offenses under investigation?
5       MR. BROOKS:  Objection.
6       A.  Could you repeat the question?
7       Q.  Sure.  I'll rephrase.  You said you
8  typed these yourself, correct?
9       A.  Um-hum, yes.
10      Q.  Did you decide that these would be
11 the charge/offense under investigation?
12      A.  Did I decide?
13      Q.  Yes.
14      A.  Well, I put forth these charges as
15 fitting the incident.  And then they are signed
16 off on by my supervisor.
17      Q.  Did your supervisor suggest charges
18 to you?
19      MR. BROOKS:  Objection.
20      A.  It's not uncommon -- it's not unheard
21 of.  But usually, especially by then in my
22 career, I knew what was going to be charged.
23      Q.  So in this case, did anyone
24 suggest --
25      A.  No, I don't think so.

102

1
2       Q.  And how did you determine what these
3  charges would be?
4       A.  Prior experience and how I
5  interpreted the penal law.
6       Q.  What is 221.10?
7       A.  I believe it's a marijuana charge.
8  But I don't know penal law verbatim.  I mean, I
9  usually have a book.
10      Q.  Sure.  And how is a marijuana charge
11 determined?
12      MR. BROOKS:  Objection.
13      A.  Can you be a little more clear with
14 the question?
15      Q.  Sure.  Are there degrees of marijuana
16 charges?
17      A.  Yes.
18      Q.  How do you determine which degree to
19 charge?
20      A.  It usually comes with -- you know, I
21 don't know exactly how it's broken down in the
22 penal law.  I believe -- I could be wrong -- it's
23 quantity and the state of the marijuana.
24      Q.  And by quantity, do you mean weight?
25      A.  Uh -- um -- I think it goes by -- not

103

1
2  just quantities and weight, but also components.
3  They have a word for it in the penal law.  What
4  the hell am I driving at?  Like, how it's broken
5  down, how many -- how many -- the quantity --
6       MR. BROOKS:  He's just asking what
7  you know.  If you need to see the penal
8  law, you can --
9       A.  Have you got a penal law?  I can get
10 into it.
11      Q.  That's okay.  When you were
12 determining this marijuana charge, did you have
13 the marijuana you recovered in front of you?
14      A.  It was either in front of me or
15 somewhere in the office where I was typing.
16      Q.  It was somewhere where you could see
17 it?
18      A.  Yeah.
19      Q.  So you based this charge based on how
20 much you approximated the marijuana was?
21      MR. BROOKS:  Objection.
22      Q.  What is the relationship between the
23 marijuana you had and the charge that you made?
24      A.  I guess it's quantity.  And how I
25 initially observed everything involved.

104

1
2       Q.  How did you determine quantity?
3       A.  By counting it.  The amount of
4  preparations -- I'm sorry, that was the word I
5  was looking for.  The amount of preparations.  In
6  this case, it was 18 small ziplocks.
7       Q.  You said the penal law determined
8  quantity by weight.
9       A.  And by preparations, as in how many,
10 in this case, there was 18, you could have had a
11 larger bag with fewer than 18, you know.  It also
12 goes by weight.
13      Q.  Did you ever weigh the marijuana?
14      A.  You know, I don't believe so.  No.
15      Q.  Did you ever approximate the weight
16 of the marijuana?
17      A.  I may have in terms of what it falls
18 under, under the penal law charge.  But like I
19 said, without a penal law in front of me, I
20 couldn't verbatim recite it to you.
21      Q.  Are you able to, by looking at
22 marijuana, determine its approximate weight?
23      MR. BROOKS:  Objection.
24      A.  No.  I mean, how -- rephrase exactly
25 what you're asking me, because I don't want to

105

1
2    get mis -- you know, misinterpret.
3        Q.  If you see a quantity of marijuana,
4    are you able to, without weighing it, determine
5    approximately how many ounces or grams that
6    quantity weighs?
7        A.  Well, I believe in this case, I
8    actually had it in my hand.  So, give a rough
9    estimate from prior knowledge how much you feel
10   it is, or just eyeballing it, you know, it could
11   be off.
12       Q.  Do you recall how much you felt it
13   was?
14       A.  Whatever the penal law charged.
15       Q.  I'd like to direct your attention to
16   Exhibit 4.  On the same line that we were just
17   discussing in Exhibit 3, charge/offense under
18   investigation, can you read to me what's written
19   there?
20       A.  120.08, 215.40.
21       Q.  And did you fill out the entirety of
22   Exhibit 4 yourself?
23       A.  Yes.
24       Q.  Did you, in the course of your duties
25   as arresting officer?

106

1
2        A.  Yes.
3        Q.  Did you do it during that tour?
4        A.  Yes.
5        Q.  Why are the charges under
6    investigation different on Exhibit 4 than they
7    are on Exhibit 3?
8        A.  I don't know.  Maybe I just forgot.
9    It's only for tracking purposes and storage, the
10   document.  So I just forgot, you know, trying to
11   type it.
12       MR. SOLEDAD:  I'd like to introduce
13   previously marked Exhibit 7.
14       (Handing document to witness.)
15       THE WITNESS:  Are we still using 4?
16       MR. SOLEDAD:  You can set that aside.
17       (A pause in the proceedings.)
18       Q.  Do you recognize this document?
19       A.  Yes.
20       Q.  What is it?
21       A.  This is a LAPS cover sheet.
22       Q.  What is a LAPS cover sheet?
23       A.  This is a tracking and organizing
24   document used by Kings County LAPS, which is the
25   arrest processing between the courts and the

107

1
2    Police Department.
3        Q.  Did you fill out this document?
4        A.  Yes.
5        Q.  The entirety?
6        A.  Yep.  Yes.
7        Q.  Did you fill it out in your capacity
8    as arresting officer?
9        A.  Yes.
10       Q.  Did you do it during that tour?
11       A.  Yes.
12       Q.  On the line towards the top of the
13   page it says, "Time of arrest."
14       Can you read to me what that line
15   says?
16       A.  0040.
17       Q.  What does that line indicate?
18       A.  What time he was placed under arrest.
19       Q.  When you say "placed under arrest,"
20   what exactly does that mean?
21       A.  Just administratively, like, we have
22   an arrest, there's going to be an arrest in
23   regard to this unit.
24       Q.  When do you consider someone to be
25   under arrest?

108

1
2        A.  As soon as you get him -- you get him
3    into custody, into handcuffs, and you have
4    control over him, that's the arrest.
5        The actual -- the time of arrest is
6    also an administrative tool.  It's usually an
7    approximation of the time you had him under
8    control after the incident.
9        Q.  The bottom portion of this form is
10   blank.
11       A.  Yes.
12       Q.  Why is that?
13       A.  That's usually filled out by people
14   keeping everything organized downtown.  I think
15   it's -- this is speculation from some of the
16   things I've seen -- I think it's one of those
17   things that, "Okay, this is done."  They check
18   off a box and give it to the next station.  And
19   then it's just organization, I believe, downtown.
20       Q.  And when you say "downtown," what do
21   you mean?
22       A.  Downtown meaning Kings County DA's
23   office.
24       MR. SOLEDAD:  I'd like to introduce
25   previously marked Exhibit 1.

109

1
2      (Handing document to witness.)
3      Q.  Do you recognize this document?
4      A.  Yes.
5      Q.  What is it?
6      A.  This is the back of the online
7   booking sheet.
8      Q.  What is an online booking sheet?
9      A.  It is the paperwork indicating an
10   arrest or processing an arrest, indicating the
11   crime and the person who is under arrest for it.
12      Q.  And when you say "this is the back,"
13   you're referring to NYC 31?
14      MR. BROOKS:  It's a two-page
15   document.
16      A.  Yeah.
17      Q.  And what about the NYC 32, what is
18   that?  If you turn it.
19      A.  Oh, I'm sorry, you stapled it.  Gave
20   me one by one.  That's the front.
21      Q.  Okay.  Are there more pages to this
22   document?
23      A.  No.
24      Q.  It's a one-page document with a front
25   and a back?

110

1
2      A.  Exactly.
3      Q.  Did you fill this out as part of your
4   duties as arresting officer?
5      A.  Yes.
6      Q.  Did you fill out the entirety of
7   these, the front and the back, what is marked
8   here as NYC 31 and NYC 32?
9      A.  Yes, except for my supervisor's
10   signature and stuff at the bottom, everything
11   else is me.
12      Q.  What is the stuff at the bottom?
13      A.  Well, you can see at the bottom of
14   NYC 32, Sergeant Daglas filled that in as his
15   approving supervisor.
16      Q.  You mean, just the last line on
17   NYC 32?
18      A.  Yes.
19      Q.  He didn't fill out anything above the
20   last line --
21      A.  No.  He just peruses it to make sure
22   that it's up to snuff and approves it.
23      Q.  Did you have conversations with
24   Sergeant Daglas prior to filling out this form?
25      A.  Yes.

111

1
2      Q.  And what were those conversations?
3      A.  Just in regards to capacity, what
4   went on, you know, going box by box, and then
5   conferring with him about, you know, different
6   things.  Location, are we going to go with, I
7   went for here, corner of Pitkin and Williams.
8   You can also do, you know, intersection -- cross
9   streets, I guess.  If you wanted to.  I mean, you
10   know, same difference.
11      And then I just told him what I was
12   charging him with, stuff like that.  And then,
13   you know, whatever his input was.
14      Q.  So did you fill it out while he was
15   in your vicinity?
16      A.  Most likely.  He might not have been
17   there the whole time, but during some time.
18      Q.  So would you discuss each box before
19   filling it in?
20      A.  No, no.
21      Q.  If you look around the middle of the
22   page, it says, "Physical force."
23      Q.  Where are you on, 32?
24      Q.  Thirty-one, sorry.
25      A.  Okay.  Okay.  "Physical force," yes.

112

1
2      Q.  What is checked there?
3      A.  "Used."
4      Q.  What did you mean by that?
5      A.  The perpetrator, Mr. Robertson, used
6   physical force.
7      Q.  What did you mean by "physical
8   force"?
9      A.  Meaning that force was used, but he
10   didn't have a weapon.
11      Q.  When you say force was used, do you
12   mean anything specific?
13      A.  His struggle, his fighting, his
14   resisting.
15      Q.  At the top of that page, there's a
16   box that says, "Offense."
17      A.  Yes.
18      Q.  What's written there?
19      A.  "Tampering."
20      Q.  What does that mean?
21      A.  It was a charge that we were charging
22   him with.  215.40.  Tampering with physical
23   evidence.
24      Q.  Why did you list that charge as
25   opposed to the other charges you listed on the

113

1
2    other forms?
3        A. I believe the other forms had the
4    other charges, didn't they?
5        Q. So, we go back to Exhibits 3 and
6    Exhibit 4, you'll see that there are three
7    charges on Exhibit 3, is that correct?
8        A. Um-hum.
9        MR. BROOKS:  Verbal response.
10       A. Yes.
11       Q. And two charges on Exhibit 4.
12       A. Yes.  Well, this is actually the
13   accusatory instrument that I'm saying what
14   happened, and the charges that we're charging him
15   with.  And this is just to safeguard the
16   evidence, and the charge is just used more as a
17   tracking tool on the property vouchers.  This is
18   actually in regards to the legal disposition of
19   the case.
20       Q. So you make a distinction between
21   what you do on these forms and what you do --
22   what you do on NYC, or rather, Exhibit 1 versus
23   what you do on Exhibit 3 and 4 with regard to
24   charges.
25       A. Yes.

114

1
2        Q. What is that distinction?
3        A. The distinction is, everything that's
4    on here --
5        MR. BROOKS:  Indicating 3 and 4 --
6        A. -- indicating 3 and 4, is mainly for
7    storage purposes of evidence.  And filing.  So
8    that, you know, it can be brought back up to
9    date, voucher number, my name, my tax number, my
10   shield, the actual charges.  I commonly only even
11   use one when I'm charging more than one thing on
12   the on-line.  I commonly just use the top charge.
13   Sometimes I'll through one more in there.  I
14   commonly just want to type faster.  The vouchers
15   have little to do with the disposition of the
16   case, more than just, "The property's been taken
17   into custody and is being safeguarded."
18       Q. How do you determine which charge is
19   the top charge?
20       A. Usually, it's just looking at penal
21   law.
22       Q. When you say "top charge," what do
23   you mean?
24       A. Top charge with, you know, most
25   serious down.

115

1
2        Q. When you say "most serious," what do
3    you mean?
4        A. Most serious felony down, top
5    felonies down to misdemeanors, down to
6    violations.  But they can be put in any order.
7        Q. Would you turn to NYC 32.  The top
8    quarter of the page, next to "Arresting Officer,"
9    there's a box that says, "Force Used."  Do you
10   see that?
11       A. Yes.
12       Q. What's filled in there?
13       A. The "yes" is indicated for "Force
14   Used."
15       Q. And what about to the right of that?
16       A. To the right?  "Physical force" and
17   "batonned" are checked.  "Handgun," "Chemical
18   agent," Rifle," "Shotgun" and "other" are not
19   checked.
20       Q. Why did you fill out those two boxes
21   the way you did?
22       A. Well, it took physical force and a
23   baton to subdue Mr. Robertson and the fight, and
24   that's the action that was taken by the police
25   side of it.  So I checked those boxes.

116

1
2        Q. Earlier, you said you didn't ever see
3    a baton, correct?
4        A. Um-hum.
5        Q. So how did you come to determine that
6    a baton had been used?
7        A. I was informed after the fact.
8        Q. By whom?
9        A. I believe it was Sergeant Daglas.
10       Q. And what did he say?
11       A. That, "I used the baton."  Or a baton
12   was used.
13       Q. Did he say where he struck
14   Mr. Robertson?
15       MR. BROOKS:  Objection.
16       A. No.
17       Q. At the far right of that same line,
18   there's a box that says, "Arresting officer
19   injured."
20       A. Um-hum.
21       MR. BROOKS:  You have to say yes or
22   no.
23       A. Yes.
24       Q. What's filled out there?
25       A. The "arresting officer injured," the

117

1
2    "yes" has an X and a circle around it and the
3    "no" has a X through it.  Indicating that the
4    yes, an officer was injured, is the main part of
5    that.
6        Q. Do you recall why you marked on both
7    boxes?
8        A. It's common for me that, when I use
9    the circle, to indicate the proper response, that
10   I'll just be filling out the paperwork quickly.
11   And in most cases, "Arresting officer injured" is
12   a "no." In fact, the huge majority of my cases.
13       Q. A little bit farther down the page,
14   there's a line that says, "Type of drug used."
15       A. "Type of drug used."
16       Q. What's filled in there?
17       A. "None."
18       Q. What's that mean?
19       A. That I indicated that there was no
20   drug used.
21       Q. By whom?
22       A. By the defendant.  Robertson.
23       Q. So that line means that you did not
24   believe Mr. Robertson had used a drug?
25       A. Well, I didn't recover it.  So...

118

1
2        Q. But you said you saw him smoking a
3    blunt.  Correct?
4        A. But I didn't recover it.  So that
5    would, you know, you can't really prove that in
6    court.  I observed what I believed to be a blunt,
7    but...
8        Q. Below that, you have four charges; is
9    that correct?
10       A. One, two, three, four.  Yup.  Yes.
11       Q. What is the second charge?
12       A. "Criminal possession of marijuana."
13       Q. And do you have a recollection of
14   what 221.15 means?
15       A. It's a marijuana charge.
16       Q. You don't have any recollection
17   beyond that?
18       A. No.  I know it's, 221 is the
19   marijuana section.  But I don't know.
20       Q. When you filled out this section, was
21   the marijuana still in your vicinity?
22       A. Yes.
23       Q. Is this your signature at the bottom
24   of the page?
25       A. Yes, it is.

119

1
2        MR. BROOKS:  Off the record.
3        (Discussion off the record.)
4        Q. Is the second line from the bottom,
5    the signature that's there, is that your
6    signature next to "Sullivan"?
7        A. Yes.
8        MR. SOLEDAD:  I'd like to introduce
9    previously marked Exhibit 5.
10       (Document placed before witness and
11   counsel.)
12       Q. Do you recognize this document?
13       A. Yes, I do.
14       Q. What is it?
15       A. It is the hard copy of the online
16   booking sheet.
17       Q. What is the online booking sheet?
18       A. That is the, I guess -- how I
19   described it before.  It's the charges describing
20   the -- it's a brief description of the incident,
21   what the charge is, and the person who is being
22   charged with it.
23       Q. Is Exhibit 1 the document to which
24   you're referring?
25       A. Yes.  This is the scratch copy.

120

1
2        Q. You make a distinction and say that's
3    a scratch copy.  Is there another copy that
4    exists?
5        A. No.  Just the scratch.  I write it
6    out in longhand and it's typed into the system.
7        Q. By whom?
8        A. It was typed into the system by
9    P.O. Casey.
10       MR. BROOKS:  Note for the record he's
11   referring to NYC 257.
12       Q. Do you review this document -- and
13   when I say "this document," I mean Exhibit 5 --
14   prior to it being submitted?
15       A. I put what's submitted to the LAPS
16   officer on the scratch copy.
17       Q. And do you ever see this form again?
18       A. Yes.
19       Q. You do?
20       A. Yes.
21       Q. At which point?
22       A. Um -- during the arrest processing.
23   Sometimes I need to get the arrest number for
24   certain documents.
25       Q. But you don't review it as to

121

1
2     accuracy, that everything is put in here.
3         A. Um -- for the most --
4         MR. BROOKS:  Objection.
5         A. -- part, I don't, no.
6         Q. Do you see the use of a baton
7     anywhere on Exhibit 5?
8         (Witness perusing document.)
9         MR. BROOKS:  Take your time to look
10    at it.
11        A. You know, as many times as I've
12    filled one of these out, I don't even know -- I
13    don't think there's a box on the computer
14    version.  Like when you're actually, set up a
15    computer program, go on line, and -- I mean, it
16    might be on here, but I don't even think there's
17    a box on the actual computer program for it.
18        I know there's a box for, I believe,
19    the -- yeah, that's it.
20        (Witness further perusing document.)
21        A. There's one section down here, "Use
22    of force, yes; physical force, yes.  Reason,
23    prevent escape," and "Officer injured, yes."  But
24    I don't believe there's any, even, box on the
25    actual computer system for, to enter "batonned"

122

1
2     or "handgun" or anything like that.
3         Q. To go back to Exhibit 1 for a moment,
4     is that document retained or is it discarded, in
5     your experience?
6         MR. BROOKS:  Objection.
7         A. Exhibit 1?
8         Q. Yes.
9         A. Is this retained?  In what capacity?
10        Q. Anywhere.  Is it retained by the
11    NYPD?
12        A. It is retained by me.
13        Q. It is retained by you?
14        A. Yes.
15        Q. And where do you keep that document?
16        A. Oh, I don't know.  Probably somewhere
17    in one of my lockers, you know.
18        THE WITNESS:  I produced it for you
19    guys, right?
20        Q. Is it your duty to retain that
21    document as arresting officer?
22        A. It also goes down to Kings County
23    DA's office.  So both of us have right to it.
24        Q. Is it your duty to maintain it?
25        A. Um -- unless they take charge of it.

123

1
2         MR. SOLEDAD:  I'd like to introduce
3     previously marked Exhibit 6.
4         (Document placed before the witness
5     and counsel.)
6         Q. Do you recognize this document?
7         A. This is the hard copy of the
8     complaint report.
9         Q. Did you fill out this form?
10        A. I filled out a scratch similar to the
11    online.  And then it's entered into the system.
12        Q. When you say "online," you mean
13    Exhibit 1?
14        A. I'm sorry.  Yes, Exhibit 1.
15 RQ      MR. SOLEDAD:  I'd like to note for
16    the record that I'm requesting Defendants'
17    counsel to produce that scratch copy.
18        MR. BROOKS:  You can put the request
19    in writing and we'll respond to it
20    appropriately.
21        MR. SOLEDAD:  I believe we have in
22    our December 14th, 2009 letter.
23        MR. BROOKS:  Okay.  And then we'll
24    respond to that appropriately.
25        Q. What is the difference between

124

1
2     Exhibit 6 and Exhibit 5?
3         A. One is the complaint report, which is
4     generated for a crime, in layman's terms, is
5     generated for a crime.  And the other is the-line
6     booking sheet, which is generated when processing
7     an arrest in regard to a perpetrator.
8         Q. So it's possible that someone may
9     have an arrest filled out but not a complaint?
10        A. No.
11        Q. It's not possible?
12        A. It's possible to do a complaint and
13    not have an arrest.
14        Q. So it's possible that someone commits
15    a crime but you don't arrest them for it?
16        MR. BROOKS:  Objection.
17        Q. I'm having trouble understanding.
18        A. Easiest way to explain it, if, say --
19    what's a good thing?  You come outside today
20    after work and your car is broken into and your
21    radio is missing.  You call the police.  They
22    generate a complaint report; right?  There may
23    never be somebody arrested in regards to it.  So
24    there will never, you know, there may never be an
25    online, but there will always be a complaint.

125

1
2      MR. SOLEDAD:  I'd like to mark as
3   Exhibit 19 a one-page document
4   Bates-stamped NYC 24.
5      (Plaintiff Exhibit 19, aided report
6   worksheet Bates-stamped NYC 24, marked for
7   identification, as of this date.)
8      Q.  Do you recognize the document I've
9   placed before you?
10     A.  Yes.
11     Q.  What is it?
12     A.  It's an aided report worksheet.
13     Q.  Did you fill out this worksheet?
14     A.  Yes.
15     Q.  Did you fill it out in your duties as
16   arresting officer?
17     A.  It doesn't always happen.  But yes,
18   if an officer is injured, you have to do an aided
19   report.
20     Q.  You can set that document aside.
21     MR. SOLEDAD:  I'm going to mark as
22   Exhibit 20 a document Bates-stamped NYC 19
23   through NYC 22.  It's a four-page
24   document.  And while we're doing that, why
25   don't we take a break.

126

1
2      VIDEOGRAPHER:  The time on the video
3   monitor is 12:54 p.m.  We're off the
4   record.  This ends tape number 2.
5      (Plaintiff Exhibit 20, document Bates-
6   numbered NYC 19, marked for
7   identification, as of this date.)
8      (Recess taken.)
9      VIDEOGRAPHER:  We're back on the
10   record.  The time on the video monitor is
11   1:07 p.m.  This starts tape number 3.
12   EXAMINATION (Cont'd.)
13   BY MR. SOLEDAD:
14     Q.  Before the break, we marked as
15   Exhibit 20 the document that's before you.
16   Do you recognize that document?
17     (Witness perusing document.)
18     A.  Um -- looks like something from
19   downtown, the courts.
20     Q.  You're referring to NYC 19?
21     A.  This one (indicating).
22     MR. SOLEDAD:  Is it cut off?
23     MR. BROOKS:  It's there.
24     A.  I'm sorry, mixed in.  Yes, it's
25   nothing that -- nothing that I filled out.  Looks

127

1
2   like something from the courts.
3      Q.  Have you ever seen this document
4   before?
5      A.  No.
6      Q.  Have you ever seen this kind of
7   document before?
8      A.  Maybe in a different case.
9      Q.  Not in this case.
10     A.  No.
11     Q.  Let's turn to NYC 20.  Is that part
12   of the same document?
13     A.  I don't believe so.  This is the
14   accusatory instrument written up by the DA's
15   office.
16     MR. SOLEDAD:  Okay.  So why don't we
17   separate those two.  So why don't we make
18   Exhibit 20 NYC 19.  And then we'll make
19   Exhibit 21, a one-page document
20   Bates-stamped NYC 20.
21     (Plaintiff Exhibit 21, one-page
22   document Bates-stamped NYC 20, marked for
23   identification, as of this date.)
24     MR. SOLEDAD:  And then we'll have
25   Exhibit 22 be a two-page document

128

1
2   Bates-stamped NYC 21 and NYC 22.
3      (Plaintiff Exhibit 22, two-page
4   document Bates-stamped NYC 21 and NYC 22,
5   marked for identification, as of this
6   date.)
7      (Documents placed before the
8   witness.)
9      A.  Which one are we talking about, sir?
10     Q.  NYC 21.
11     A.  All right.
12     Q.  Do you recognize that document?
13     A.  Yes.  This is the accusatory
14   instrument for the courts.
15     Q.  Did you complete this document?
16     A.  No.  This was written up by somebody
17   downtown.  I think it's Ms. Woods or Mr. Woods.
18   I can't really tell offhand what gender the first
19   name is.
20     Q.  The third, or on the third paragraph,
21   middle of the page, it's a paragraph that begins
22   with, "The deponent."
23     A.  Okay.
24     Q.  Can you read that line for me.
25     A.  "The deponent is informed by Police

129

1
2    Officer Matthew M. Sullivan, shield number 29723,
3    of the 75th Precinct, that at the above time and
4    place, the aforementioned observed the defendant
5    in possession of a quantity of marijuana and that
6    informant recovered said quantity of marijuana
7    from the street drain where the defendant threw
8    it."
9        Q. Is Officer Matthew Sullivan, shield
10   number 29723, you?
11       A. You, yes.
12       Q. So did you speak with this paralegal
13   Imani Woods.
14       A. Yes.
15       Q. And did you understand that she was
16   going to fill out a, whatever this form is, it
17   looks like an affidavit?
18       A. Um-hum.
19       MR. BROOKS: Objection. And you have
20   to give a verbal response.
21       A. Yes, I knew she was filling it out.
22       Q. So when you spoke to her, did you
23   speak to her in your capacity as arresting
24   officer?
25       A. Yes.

130

1
2        Q. Did you try and provide her with the
3    information as truthfully and accurately as you
4    could?
5        A. Yes.
6        Q. I want to go up for a second to the
7    line that says, there's a paragraph that begins,
8    "Intentionally prevent."
9        A. Okay, where -- what are we doing?
10   Okay.
11       Q. It says, why don't you read that
12   paragraph.
13       A. Okay. "In that the defendant did
14   intentionally prevent or attempt to prevent a
15   police officer or peace officer from effecting an
16   authorized arrest of himself or another person;
17   knowingly and unlawfully possess marijuana;
18   knowingly and unlawfully possess marijuana in a
19   public place, as defined in penal law section
20   240.00, and such marijuana is burning or open to
21   public view."
22       Q. What do you understand that last line
23   to mean, "And such marijuana is burning or open
24   to public view?
25       MR. BROOKS: Objection.

131

1
2        A. That the marijuana was burning in
3    public view.
4        Q. So does this mean that you were
5    charging him for the blunt that you believe you
6    saw?
7        A. The blunt.
8        MR. BROOKS: Objection.
9        A. The blunt, yes.
10       Q. Yet you stated earlier that you did
11   not recover the blunt.
12       A. No.
13       Q. But this charge is for the blunt.
14       A. Yes.
15       MR. BROOKS: Objection.
16       Q. Is there an additional charge for the
17   marijuana recovered?
18       A. On here?
19       Q. Yes.
20       A. Yeah. That would be the next
21   paragraph down.
22       MR. BROOKS: I just want to note for
23   the record that Officer Sullivan has
24   already testified he didn't complete this
25   document.

132

1
2        Q. Which paragraph do you mean when you
3    say "next paragraph down"?
4        A. You said we're speaking about a
5    marijuana charge, right, after this?
6        Q. Yes.
7        A. And that the --
8        Q. I see the paragraph that you read
9    earlier.
10       A. Yes.
11       Q. Okay. I'd like to turn your
12   attention to the document marked as NYC 22. Or
13   rather, Exhibit 22, sorry. Do you recognize this
14   document?
15       A. No.
16       Q. Can you turn to NYC 22.
17       A. It's the next page?
18       Q. Yes.
19       A. At the very top, I believe it says,
20   "No corrob or lab." Do you see that?
21       MR. BROOKS: Objection.
22       A. Yes.
23       Q. Do you have an understanding what
24   that means?
25       A. No. I didn't write any of this stuff

133

1
2    on here.
3        Q.  Right.  Did you create any other
4    affidavit aside from this one that you see marked
5    as Exhibit 21?
6        MR. BROOKS:  Objection.  Again, he
7    didn't create Exhibit 21.
8        MR. SOLEDAD:  Right.
9        A.  Do I know of any other affidavit in
10   regards --
11       Q.  Did you create an affidavit in this
12   case?
13       A.  Not that I can recall.  Like this
14   one?
15       Q.  Just, anything that you -- anything
16   beyond the documents that I've already shown you.
17   Did you create any documents beyond the documents
18   that I've shown you today at the deposition?
19       A.  Not to my recollection.  But, I, you
20   know, it was a long time ago.  So, I don't think
21   so.
22       Q.  Do you typically, in your past cases
23   as arresting officer, fill out forms in addition
24   to those forms that I've shown you here today?
25       A.  For the most part, no.  I mean, there

134

1
2    are some extra forms and there's, you know,
3    depending on the case.  If nothing is recovered,
4    no evidence, we don't do vouchers.  If officers
5    aren't hurt, we don't do aided cards.
6        Q.  So you never completed an affidavit
7    in this case?
8        A.  The affidavit is typed up by the
9    Kings County DA's office, a member of them.  And
10   they are the ones who type it up.
11       Q.  Okay.
12       A.  We just tell them our version of what
13   happened.  And then they type it up.
14       Q.  Did you provide any information to
15   the District Attorney's office other than the
16   information that's listed on Exhibit 21?
17       A.  Let me peruse it a little better.
18       Q.  Absolutely.
19       (A pause in the proceedings.)
20       A.  No, that's the sum and substance of
21   what took place.
22       Q.  Are you aware that the case against
23   Mr. Robertson was dismissed?
24       A.  Um -- I think somebody said it, yeah.
25       Q.  Did you have an understanding as to

135

1
2    why?
3        A.  No.
4        Q.  Did the District Attorney's office
5    ever ask you for a lab report?
6        MR. BROOKS:  Objection.
7        A.  Um -- I can't remember.
8        Q.  Did the District Attorney's office
9    ever ask you for anything in addition to
10   information you provided on Exhibit 21?
11       A.  I don't exactly understand what
12   you're saying.  Like, they asked me for anything
13   after the arrest was done, like days later, weeks
14   later?
15       Q.  Sure.  At any point after you
16   submitted all your forms, did they ask you --
17       A.  I don't remember anyone contacting me
18   about the case.
19       Q.  The only contact was that
20   memorialized in Exhibit 21?
21       A.  This was part of it.  This was part,
22   like, you said after the day?
23       Q.  Okay.  So let's start, after the day,
24   did anyone from the District Attorney's contact
25   you in relation to Mr. Robertson's case?

136

1
2        A.  After all this was said and done, no,
3    I don't remember anyone.
4        Q.  And was Exhibit 21, did you speak to
5    the District Attorney's office during your tour?
6        A.  Yes.
7        Q.  So subsequent to your tour, you had
8    no contact with the District Attorney's office;
9    is that correct?
10       A.  Subsequent?
11       Q.  After your -- after your tour.
12       A.  I don't believe, like, not like days
13   after or anything like that.
14       Q.  How about weeks after?
15       A.  No.  I don't believe so.
16       Q.  Years?
17       A.  Don't believe so.
18       Q.  Okay.  Did you attend Mr. Robertson's
19   arraignment?
20       A.  No.
21       Q.  Did you attend any of Mr. Robertson's
22   court hearings?
23       A.  No.
24       Q.  Is it your responsibility as
25   arresting officer to attend a suspect's

137

1
2  arraignment?
3      MR. BROOKS:  Objection.
4      A.  No.
5      Q.  Did you ever ask for a lab report?
6      A.  Um -- I believe it was sent to --
7  see, there's two -- there's two things that get
8  confusing.  When marijuana or drugs get
9  vouchered, it goes on a letter of transmittal,
10  the voucher and its quantities.
11      I'm not sure if that's, since it's
12  drugs, only drugs go on that, that they all go
13  down to the lab, or a specific report is
14  generated.  I'm not sure which constitutes one.
15      Q.  Do you have to do something in
16  addition to filling out a voucher form in order
17  for that process to occur?
18      A.  Uh -- there's a field test, which may
19  have been done in this case.  I don't remember if
20  it was done.  I don't see any of the paperwork
21  here, so I assume it wasn't done.
22      But if it goes down to the lab, I
23  think it can always go subsequently.  If it goes
24  down to the property clerk, it can go
25  subsequently to the lab if it's deemed so in the

138

1
2  case.
3      Q.  Did you intend for a lab test to be
4  conducted on the vouchered marijuana?
5      MR. BROOKS:  Objection.
6      A.  Well, yes, if it's needed.  I mean,
7  it's not always needed.  Sometimes people just
8  plead a, "Yes, it was marijuana," and they take
9  whatever they are offered.
10      Q.  If it were needed, would you be
11  contacted by the District Attorney's office?
12      MR. BROOKS:  Objection.
13      A.  No.  It would go between the property
14  clerk and the lab through the DA's office.
15      Q.  I'd like to just go back to a few
16  things you testified to earlier.  You can set
17  those documents aside.
18      A.  All right.
19      Q.  You said you recovered marijuana and
20  gloves, correct?
21      A.  Yes.
22      Q.  Was all the marijuana you recovered
23  in the gloves that you recovered?
24      A.  Um -- I believe since the gloves
25  cannot seal all the way, some must -- some might

139

2  have been coming out of it.  So that some might
3  have been outside of the glove.  Like, you know,
4  barely, in very close proximity to the gloves'
5  opening.  And it shared the same type of
6  container as all the marijuana inside the glove.
7      Q.  So it was your belief that all
8  marijuana you recovered had at some point been in
9  the glove.
10      A.  Yes.
11      Q.  With regard to the blunt that you
12  believed you saw Mr. Robertson holding, you
13  described its length as approximately an inch to
14  two inches, is that correct?
15      A.  Yeah, it's an approximation from
16  where I could see it.  I mean, if I can hold my
17  fingers up, maybe about that big.  Maybe it's
18  less or more.
19      MR. SOLEDAD:  Let the record show
20  that he seems to be holding up about three
21  inches?
22      MR. BROOKS:  Yes.
23      MR. SOLEDAD:  The witness is holding
24  up three inches, approximately?
25      MR. BROOKS:  We don't have a ruler.

140

1
2      MR. SOLEDAD:  We don't have a ruler
3  and it's not...
4      Q.  What was the diameter of the blunt?
5      A.  Diameter?
6      Q.  The thickness.
7      A.  It wasn't extremely thick.  It had
8  more of a broken diameter, I would say.  Of --
9  didn't have a consistent shape throughout it.  It
10  was more of, had bulky parts and thinner parts.
11  I believe the end to be a little more frayed,
12  probably where it was lit.
13      Q.  Was it close in size to a cigarette?
14      A.  Um -- I guess you can say that.
15      Q.  Do you distinguish between a
16  cigarette and a cigar?
17      A.  What's you're meaning?
18      Q.  I mean, do you see a cigarette as
19  something distinct from a cigar?
20      A.  Yes.  Are you talking about a
21  description of the, how he was smoking it?
22      Q.  No.  Let's -- let's put that aside
23  for a moment.
24      A.  Yeah, I'm --
25      Q.  Let just say, the actual thing that

141

1
2  he seemed to be smoking, would you say it's
3  closer in size and shape to a cigarette or closer
4  in size and shape to a cigar?
5      A.  Well, it was thinner than a cigar,
6  than a common cigar.  So it would be closer in,
7  you know, circumference to a cigarette.
8      But it wasn't the color of a
9  cigarette, the commonly used cigarette, the
10  white.
11     Q.  What color was it?
12     A.  It was darker in color, more of a
13  brownish-green.
14     Q.  You said how he was smoking it was
15  different.  How was he smoking it?
16     A.  He had two fingers to it.
17     MR. SOLEDAD:  He's indicating his --
18     A.  Two fingers, index finger and thumb,
19  putting it to his mouth.  People can smoke
20  cigarettes this way.  I'm a former smoker and I
21  in no ways do this, you know, I more commonly did
22  this (indicating).
23     Q.  Indicating --
24     A.  Index and middle.  And it was also
25  dark.  It was green and brown.  Brownish green.

142

1
2  Dark.
3      Q.  When you exited the vehicle and
4  observed Mr. Robertson after the struggle and
5  after he had been handcuffed, you said that you
6  observed that he was bleeding from his face,
7  correct?
8      A.  Um-hum.
9      MR. BROOKS:  You have to --
10     A.  Yes, yes.  Sorry.
11     Q.  Did you observe any other injuries on
12  Mr. Robertson?
13     A.  Not that I could recall offhand, no.
14     Q.  Do you recall Mr. Robertson
15  indicating that he had other injuries?
16     A.  Verbally?
17     Q.  Yes.
18     A.  No, not that I remember.
19     Q.  How about just in terms of his
20  movement?
21     MR. BROOKS:  Objection.
22     A.  Not that I remember, no.
23     Q.  Do you recall -- you said you didn't
24  recall what side of the face he was bleeding
25  from, is that correct?

143

1
2      A.  Yes, I don't remember, no.
3      Q.  Do you recall the size of the wound?
4      A.  No.
5      Q.  Do you recall -- go ahead.
6      A.  No, I don't.
7      Q.  Do you recall whether there were
8  multiple wounds or was it a single wound?
9      MR. BROOKS:  Objection.
10     A.  Don't remember.
11     MR. SOLEDAD:  No further questions.
12  I'd like to leave the record open as we
13  did in all of the prior depositions.
14     MR. BROOKS:  Defendants are going to
15  request reading and signing the
16  transcripts pursuant to Rule 30, and I do
17  have one quick question.
18  EXAMINATION BY
19  MR. BROOKS:
20     Q.  Detective Sullivan, I'm going to
21  refer you again to Plaintiff's Exhibit 21, which
22  you called the accusatory instrument.
23     A.  Yes.
24     Q.  Referring to the section toward the
25  top of Exhibit 21 where there are a listing of

144

1
2  penal law sections --
3      A.  Yes.
4      Q.  -- who determines what charges are
5  ultimately filed against the criminal defendant?
6      A.  The Kings County DA's office.
7      Q.  And do you have any involvement in
8  the final determination of what those charges are
9  going to be?
10     A.  No, they pretty much have the final
11  say.
12     MR. BROOKS:  Thank you.
13     VIDEOGRAPHER:  The time on the video
14  monitor is 1:29 p.m.  We're off the
15  record.  This ends the deposition.
16     (Time noted:  1:29 p.m.)
17
18
19
20
21
22
23
24
25

145

```
1
2              MATTHEW SULLIVAN
3       STATE OF NEW YORK )
4                    ss:
5       COUNTY OF NEW YORK)
6
7            I, MATTHEW SULLIVAN, the witness
8       herein, having read the foregoing testimony of
9       the pages of this deposition, do hereby certify
10      it to be a true and correct transcript, subject
11      to the corrections, if any, shown on the attached
12      page.
13            oOo
14
15
16      _____
17            MATTHEW SULLIVAN
18
19
20
21      Subscribed and sworn to before me
22      this _____ day of _____, 20___.
23
24      _____
25            Notary Public
```

147

```
1
2            C E R T I F I C A T E
3       STATE OF NEW YORK   )
4                    : ss.
5       COUNTY OF NEW YORK  )
6
7            I, DAVID LEVY, CSR, a Shorthand
8       Reporter and Notary Public within and
9       for the State of New York, do hereby
10      certify:
11            That MATTHEW SULLIVAN, the
12      witness whose deposition is hereinbefore
13      set forth, was duly sworn by me and that
14      such deposition is a true record of the
15      testimony given by the witness.
16            I further certify that I am not
17      related to any of the parties to this
18      action by blood or marriage, and that I
19      am in no way interested in the outcome
20      of this matter.
21            IN WITNESS WHEREOF, I have
22      hereunto set my hand this 1st day of
23      January, 2010.
24      _____
25            DAVID LEVY, CSR
```

146

```
1
2           *** ERRATA SHEET ***
3       NAME OF CASE: ROBERTSON v. SULLIVAN et al
4       DATE OF DEPOSITION:  DECEMBER 23, 2009
5       WITNESS:  MATTHEW SULLIVAN
6       PAGE  LINE    FROM          TO
7       ____|____|_____|_____
8       ____|____|_____|_____
9       ____|____|_____|_____
10      ____|____|_____|_____
11      ____|____|_____|_____
12      ____|____|_____|_____
13      ____|____|_____|_____
14      ____|____|_____|_____
15      ____|____|_____|_____
16      ____|____|_____|_____
17      ____|____|_____|_____
18      ____|____|_____|_____
19      ____|____|_____|_____
20      ____|____|_____|_____
21
22      _____
23            MATTHEW SULLIVAN
24
25      Subscribed and sworn to before me
26      this _____ day of _____, 20___.
27
28      _____  _____
29      (Notary Public)     My Commission Expires:
```

148

```
1
2       ----------------- I N D E X -----------------
3       WITNESS      EXAMINATION BY      PAGE
4       MATTHEW SULLIVAN   MR. SOLEDAD      5
5                   MR. BROOKS      143
6
7       INFORMATION REQUESTS (RQ)         PAGE
8       REQUEST          8
9       REQUEST          25
10      REQUEST          123
11
12      PLAINTIFF EXHIBITS        FOR IDENT.
13      Exhibit 18  Copy of three pages from   30
14            memo book, Bates numbered
15            NYC 25 through NYC 27
16      Exhibit 19  Aided report worksheet   125
17            Bates-stamped NYC 24
18
19      Exhibit 20  Document Bates numbered   126
20            NYC 19
21
22      Exhibit 21  One-page document      127
23            Bates-stamped NYC 20
24
25      Exhibit 22  Two-page document      128
26            Bates-stamped NYC 21 and
27            NYC 22
28
29
30
```