222

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2

3       - - - - - - - - - - - - - - - X
                                  :          Cv-07-1416
4    ROBERTSON,

5                                          :

6         PLAINTIFF,                       :

7                                          :
              V.                                U.S. Courthouse
8                                               Brooklyn, New York

9    MATTHEW SULLIVAN,                     :
     NILES PRINCE & DIMITRI DEGLAS
10

11        DEFENDANTS.                      :

                                             March 2, 2010
12                                           9:30 o'clock a.m.

                                           :
13       - - - - - - - - - - - - - - - X

14                    TRANSCRIPT OF TRIAL
15             BEFORE THE HONORABLE JOHN GLEESON
               UNITED STATES DISTRICT JUDGE and a jury
16

17   APPEARANCES:

18   For the Plaintiff:             JESSICA R. HOLLOWAY, ESQ.
                                    STUART W. GOLD, ESQ.
19                                  HECTOR J. VALDES, ESQ.

20

21   For the Defendants:           GABRIEL HARVIS, ESQ.
                                    JEFFREY BROOKS, ESQ.
22

23   Court Reporter:               Sheldon Silverman
                                   (718) 613-2537
24

25   Proceedings recorded by mechanical stenography, transcript
     produced by CAT.

SS       OCR       CM       CRR       CSR

1          THE COURT:    Good morning.  Bring the jury in,

2    please.

3          MR. HARVIS:   A couple of quick things?

4          THE COURT:    It will wait until the first break.  I

5    want to reinforce the jury getting here on time.

6          Does it relate to your cross?

7          MR. HARVIS:   Yes, your Honor, one thing.  Your

8    Honor said we opened the door to limited inquiry, handcuffing.

9    I have six questions, run them by your Honor.

10         THE COURT:    You can run them by me with the jury in

11   the box.  If they're out of bounds and there's an objection,

12   I'll rule on it.

13         (Jury enters courtroom.)

14         THE COURT:    Good morning.  Have a seat.  Have a

15   seat, Mr. Robertson.

16         Go ahead, Mr. Harvis.

17    CONTINUED CROSS-EXAMINATION

18   BY MR. HARVIS:

19   Q    Good morning, Mr. Robertson.

20   A    Good morning.

21   Q    Mr. Robertson, when we left off yesterday, we were

22   discussing your scar.  I asked you whether or not you have

23   ever been struck with a baton over your left eye prior to

24   April, 2006.  You told me that you had not, right?

25   A    Right.

1    Q    Mr. Robertson, we discussed the fact you had your

2    deposition taken in this case.  I want to ask you whether you

3    were asked these questions and whether you gave these answers.

4            "QUESTION:   How did -- "

5            Sorry, page 52, line five.

6            "QUESTION:  How did -- ?

7            "ANSWER:    He hit me with one of those same objects

8    that the police officers hit me we.

9            "QUESTION:   What object is that?

10           "ANSWER:   Over my left eye.  I don't know, a

11   baton, is that what you call it?  All right, a baton."

12   Q    You also sustained a gunshot wound over your left eye in

13   1988?

14   A    Yes.

15   Q    You were in fact shot with a .22 caliber bullet over your

16   left eye?

17   A    Yes.

18   Q    The gunshot resulted in what you call an explosion wound?

19   A    Yeah --  I don't know, I'm not sure.

20   Q    Mr. Robertson, at your deposition, were you asked this

21   question and did you did you give this answers?

22           "QUESTION:   With a gun?

23           "ANSWER:    With a gun and I actually --  my

24   forehead actually had an explosion wound.  You can tell that

25   it was my tissue was ripped."

Robertson-cross-Harvis                           225

1        Were you asked that question, did you give that

2   answer?

3   A    I believe so.

4   Q    You went to the hospital after you were shot in the

5   forehead?

6   A    Yes.

7   Q    You received stiches at the hospital, right?

8   A    Yes.

9   Q    It was not bonding but actual butterfly stiches?

10  A    Yes.

11  Q    At your deposition you pointed to a scar above your left

12  eye that you said was the result of the gunshot wound?

13  A    Yes.

14  Q    The scar you pointed to at your deposition is

15  approximately one inch above your left eyebrow?

16  A    I would say something like that, probably more.

17  Q    Mr. Robertson, I'm on page 48, line 20 of your

18  deposition.   Were you asked these questions, did you give

19  these answers?

20           "QUESTION:    He shot you in the head with a gun?

21           "ANSWER:    Right here, buddy (indicating).

22           "QUESTION:    Let the record reflect Mr. Robertson is

23  pointing to a scar on the left side of his forehead

24  approximately one inch above his left eyebrow.

25           "ANSWER:    Right."

SS      OCR      CM      CRR      CSR

1          Were you asked those questions, did you give those

2    answers?

3    A    Yes.

4    Q    Mr. Robertson, you're also kicked over your left eye in

5    January or February of 2006?

6    A    My left eye, no.

7    Q    Page 55, line 16.  Were you asked these questions, did

8    you give these answers?

9          "QUESTION:    What physical injuries?

10         "ANSWER:    At one time I was jumped at an incident

11   on Nostrand and kicked over my left eye at the same time.

12         "QUESTION:    Which eye?

13         "ANSWER:    At the same time, the same eye.

14         "QUESTION:    Your left eye?

15         "ANSWER:    Right."

16         Were you asked those questions, did you give those

17   answers?

18         MS. HOLLOWAY:    Objection.

19         THE COURT:    Overruled.

20   A    I only gave one, I'm only going to agree to one of those,

21   it was the right and maybe as well as on the front,

22   misunderstood.

23         THE COURT:    Objection is overruled.  You're

24   stipulating accurately to the deposition transcript?

25         MS. HOLLOWAY:    I don't believe he read it

Robertson-cross-Harvis                              227

1    accurately.

2             THE COURT:    Could I have a copy of this deposition?

3             MR. HARVIS:    Yes.

4             THE COURT:    Can someone spare that copy that I can

5    use?

6             MR. HARVIS:    Yes.

7             THE COURT:    Confer with Ms. Holloway, see if you

8    can agree on what happened.

9             (Pause.)

10            MS. HOLLOWAY:    He will read it again.

11   Q    I'm reading again from page 55, line 16.

12            "QUESTION:    What physical injuries?

13            "ANSWER:    At one time I was jumped at an incident

14   on Nostrand and kicked over my eye at the same time.

15            "QUESTION:    Which eye?

16            "ANSWER:    At the same time, it was the same eye.

17            "QUESTION:    Your left eye?

18            "ANSWER:    Right."

19            Were you asked those questions and did you give

20   those answers?

21   A    I was asked similar questions and I was responding to my

22   right eye.

23            THE COURT:    You meant your right eye?

24            THE WITNESS:    That was my answer, my final answer.

25            THE COURT:    It's your final answer?

Robertson-cross-Harvis                    228

1          THE WITNESS:   That was the final result of

2    responding.

3    Q    I'm now showing you what's been marked for identification

4    as Defendants' Exhibit X-2.  Mr. Robertson, do you recognize

5    this document?

6    A    Somewhat.  It's me, yeah.

7    Q    Is it a photograph of you that was taken on August 26th,

8    2004?

9    A    August 26th, 2004, possibly.

10   Q    Yes?

11   A    Possibility.

12          MR. HARVIS:   I would like to move this document

13   into evidence as Defendants' Exhibit 2.

14          THE COURT:   Any objection?

15          MS. HOLLOWAY:   No, can we approach?

16          THE COURT:   No.  Sustained.

17   Q    Mr. Robertson, isn't it true that in 2004 it was noted

18   that you had a scar on the left side of your forehead?

19   A    No, 2004, left side of my forehead, no.  It was August of

20   that month preparing to come home from my state prison.

21          THE COURT:   Would you listen to the question, just

22   answer the question?  The answer was no?

23          THE WITNESS:   No.

24   Q    Mr. Robertson, you claim it took almost a year for the

25   injury and your left eye that you claimed resulted from the

Robertson-cross-Harvis                              229

1   incident on April 14th, 2006 to heal?

2   A     Could you repeat the question?  I didn't get that.

3   Q     You claim that it took almost a year for the injury

4   around your left eye that you claim resulted from the

5   April 14th, 2006 incident to heal; is that correct?

6   A     I'm not sure.  I don't remember, approximately several

7   months into a year.

8   Q     Page 179, line nine.  At your deposition were you asked

9   these questions and did you give these answers?

10          "QUESTION:    Did there come a point in time when the

11  injury around your left eye healed?

12          "ANSWER:     Yeah.

13          "QUESTION:    When?

14          "ANSWER:     About --  let me see, I think my sixth

15  month.

16          "QUESTION:    Six months later?

17          "ANSWER:     Almost a year."

18          Were you asked those questions, did you give those

19  answers.

20  A     Just what I made that same statement, just about.

21          THE COURT:    The question is whether you gave those

22  answers.  Did you?

23          THE WITNESS:   Yes.

24  Q    This document is in evidence.  This is Plaintiff's

25  Exhibit 17.

1       THE COURT:    This is in evidence already?

2       MR. HARVIS:    Yes.

3       THE COURT:    I don't recall it.

4       MR. HARVIS:    Is it not in evidence?  I apologize.

5    Q    Mr. Robertson, do you recognize this document?

6    A    Yes.

7    Q    Is this a photograph that was taken of you on May 11th,

8    2006?

9    A    Yes.

10       MR. HARVIS:    I would like to offer Plaintiff's

11   Exhibit 17 into evidence.

12       MS. HOLLOWAY:    No objection.

13       THE COURT:    Received.

14       (So marked.)

15   Q    Mr. Robertson, you said this is a photograph of you taken

16   on May 11th, 2006, right?

17   A    Yes.

18   Q    This photograph shows what you looked like less than a

19   month after the events of April 14th, 2006?

20   A    Sorry, could you repeat that?  I didn't get the exact

21   time length that you're stating.

22   Q    I'm saying this picture shows what you looked like less

23   than a month after the events of April 14th, 2006?

24   A    Not true.  I was arrested the 13th of May.  This photo --

25   I'm not sure what you're saying this took place, this photo.

1    Q    You're saying this photograph was taken on May 13th?

2    A    No, I'm sorry, excuse me.  The distance of time, what

3    date in May you stated this photograph was took?

4    Q    All I want to know, was this photograph taken less than a

5    month after the events of April 14th, 2006?

6    A    Approximately, exactly a month.

7    Q    You claim that the incident on April 14th, 2006 is the

8    cause of your bad knees, right?

9    A    Yes, sir.

10   Q    But you did injure your right knee in 2002, four years

11   before this incident when you fell on it, right?

12   A    I don't recall.  I have no idea.

13   Q    Do you recall being treated at Coney Island Hospital for

14   an injury sustained when you fell on your right knee on

15   September 10th, 2002?

16   A    There was -- no, I don't recall any care for my right or

17   left knee in 2002.

18   Q    Mr. Robertson, I'm now showing you what's marked for

19   identification as Defendants' Exhibit L-1.  Please take a look

20   at this document.  Let me know if it refreshes your

21   recollection as to whether or not you were treated at Coney

22   Island Hospital for an injury to your right knee when you fell

23   on it on September 10th, 2002?

24            THE COURT:    Could you point to where you want his

25   attention drawn?

1  Q    Note the date of the document and I would also like you

2  to read to yourself what it says here under the written

3  portion here.   Let me know when you're done, Mr. Robertson.

4         THE COURT:   Don't read it out loud.

5  A    I don't understand the handwriting, sorry.

6  Q    It does not refresh your recollection?

7  A    I don't understand anything the handwriting is saying.

8  Q    Do you recall being diagnosed with osteoarthritis in your

9  right knee in 2001?

10  A    No, thank you.

11  Q    I'm now showing you a document marked for identification

12  as Defendants' U-1.  I would like you to take a look at this

13  document.  I'll point out where I would like you to look.  I'm

14  asking you to look at --  ask you if this portion of the

15  document refreshes your recollection and this portion of the

16  document refreshes your recollection whether or not you were

17  diagnosed with osteoarthritis in your right knee on

18  September 11th, 2002?

19  A    I haven't ever reported anything in 2002 about my knee or

20  knees.  I don't recall ever having a problem that soon with

21  either of my knees.  It definitely wasn't in September.  In

22  2002 I was --  excuse me, I was living in Bed-Stuy where I

23  then pick up my gun possession of the third degree in which I

24  resided in Hall Street (ph) at the time.  The record

25  reflects --

1          THE COURT:    Could you listen to the question?  The

2     question is whether this refreshes your recollection.

3          THE WITNESS:  It doesn't.

4          THE COURT:    Stop interrupting me.

5          THE WITNESS:  Okay.

6          THE COURT:    The question is whether looking at

7     this, very simple, put aside, you have an independent

8     recollection that you got diagnosed in your right knee with

9     this osteoarthritis in September of '02.  That's the question,

10    not where you were living, what you were charged with.  Focus

11    on the question.

12         Do you recollect having any such diagnosis on your

13    right knee at that time?

14         THE WITNESS:  No, sir, I apologize.

15         THE COURT:    That's it.  Wait for another question.

16    Stop rambling, okay?

17         THE WITNESS:  Yes, sir.

18    Q    Mr. Robertson, do you see your name on this document?

19    A    Yes.

20    Q    Is this document a medical record of yours?

21    A    I don't recall.  Yes, it looks exactly that way, but I

22    don't recall.

23         MR. HARVIS:   I would like to move Defendant's U-1

24    into evidence.

25         MS. HOLLOWAY:    No objection.

1          THE COURT:    Received.

2          (So marked.)

3    Q    This document is now in evidence.  I want to point out

4    for the jury here where it says --  excuse me, I'll refer you

5    to where you see here it says under I CD-9, diagnosis,

6    osteoarthritis, localize, not specified whether primary or

7    secondary, lower leg, interpretation right knee?

8          THE COURT:    It's in evidence.

9          MR. HARVIS:    Sorry.

10         THE COURT:    Don't read it.  It's in evidence.   Now

11   you've got it.

12         MR. HARVIS:    Thank you.

13   Q    Mr. Robertson, are you aware that osteoarthritis is a

14   common joint disorder?

15   A    No, I have no idea.

16   Q    Do you recall being treated at the Coney Island Hospital

17   emergency room on March 20th, 2006 for an injury to your right

18   knee?

19   A    No.

20   Q    I'm now showing you what has been marked for

21   identification as Defendant's Exhibit U-2.  I would like you

22   to take a look at this portion of the document right here,

23   this portion right here, and this portion right here.  Let me

24   know if that refreshes your recollection as to whether or not

25   you visited the Coney Island Hospital emergency room for

1    treatment for a knee injury in 2006.

2    A    I see it.   Could you repeat the question?

3    Q    Yes.   Looking at this document, does it refresh your

4    recollection as to whether or not you were treated at the

5    Coney Island Hospital emergency room for a knee injury in

6    March of 2006?

7    A    There's no recollection.   I don't remember being treated

8    for a knee injury.

9              THE COURT:   What you're trying to say here is "no",

10   you don't have a recollection?

11             THE WITNESS:   I'm --

12             THE COURT:   It's okay to say you don't recollect.

13             THE WITNESS:   I'm not sure if I could give the

14   proper response to this.

15             THE COURT:   You either have a recollection or you

16   don't.

17             THE WITNESS:   Yes, but it wasn't no injury.

18             THE COURT:   Tell us what you do recall.

19             THE WITNESS:   Okay, I recall going into the

20   emergency room requesting information, some type of diagnosis

21   which I wasn't given.   It was explained to me to follow up

22   further, with further instructions to be dated, which I did

23   not complete, for x-rays, or continued interest in completing

24   during that time.   It was just I felt it was a slight hardship

25   effect from me staying motivated too much, being, you know, a

1   single parent.   That was my main interest in entering the

2   emergency room, to seek and sought myself some type of care

3   and concern so that I can continue to care for mine.

4   Q    This is another one of your medical records?

5   A    It is to me.

6           MR. HARVIS:   I would like to move it into evidence,

7   Plaintiff's Exhibit U-2.

8           THE COURT:   Any objection?

9           MS. HOLLOWAY:   No.

10          THE COURT:   Received.

11          (So marked.)

12   Q   Mr. Robertson, your left knee was also injured on

13   May 24th, 2006, right?

14   A    On where?

15   Q    May 24th, 2006.

16   A    Injured where?  In what incident?

17          THE COURT:   Just answer the question.   Was it

18   injured on that day?

19          THE WITNESS:   No, I don't recall.

20          THE COURT:   Don't ask him questions.   Just answer

21   them.

22          THE WITNESS:   No.

23          MR. HARVIS:   I'll show the witness a document that

24   is not in evidence.

25   Q   Mr. Robertson, all I want to know about when you look at

Robertson-cross-Harvis                    237

1    this document is whether or not this document refreshes your

2    recollection as to your left knee being injured on May 24th,

3    2006.

4    A    Yeah, there's a recollection on this document because

5    it's the corrections department.

6    Q    It does refresh your recollection about that?

7    A    Of course.

8    Q    Mr. Robertson, you never mentioned a knee injury in your

9    first letter to the comptroller, William Thompson, right?

10   A    Correct.

11   Q    You never mentioned any knee injury in your second letter

12   to the comptroller, right?

13   A    Correct.

14   Q    You also never mentioned a knee injury in the complaint

15   you filed with this court, right?

16   A    No, not at all.

17   Q    You did not, okay.  In fact, the first time you ever said

18   anything about any knee injury was when you testified in your

19   deposition in December of 2008, right?

20   A    Just about, yeah.

21   Q    You claim because of what happened on April 14th, 2006

22   today you have pain in your shoulder?

23   A    Yes.

24   Q    But you actually sustained a gunshot wound to your bicep

25   on January 1st, 1993?

Robertson-cross-Harvis                    238

1   A    I'm not sure what part of the statement of bicep.  Be

2   more specific, please.

3   Q    Did you sustain a gunshot wound to your bicep on

4   January 1st, 1993?

5   A    I have no recollection of what bicep means besides

6   knowing where I was injured.

7              MR. HARVIS:    Page 44, line 14.

8              THE COURT:    Don't go there yet.  Be more specific.

9   Where did you get shot?  Show us.

10  A    I was shot in my right arm.

11  Q    You're saying you were not shot in the bicep?

12  A    I was shot in my left arm, yes.

13             THE COURT:    Could you show us where?  You don't

14  have to take your shirt off.

15             THE WITNESS:  It came in here, went out there.

16             THE COURT:    Indicating above the elbow, an inch and

17  a half above the elbow.  Go ahead.

18  Q    Mr. Robertson, because of your gunshot, your arm is not

19  normal all the time?

20  A    Yeah, sort of, yes.

21  Q    Your arm also feels heavy, right?

22  A    Sometimes.

23  Q    Again, there's no mention of a shoulder injury in your

24  first letter to the comptroller, William Thompson?

25  A    No.

1   Q     There's no mention of your shoulder in your second letter

2   to William Thompson?

3   A     No.

4   Q     You never mentioned the shoulder injury in your

5   complaint?

6   A     No.

7   Q     You didn't even mention your shoulder once in your

8   deposition in December of 2008.

9   A     I'm not sure.  I don't recall.

10  Q     Isn't it true --

11  A     Whether I did or didn't.

12  Q     Isn't it true the first time you mentioned anything about

13  your shoulder was in December of 2009, less than four months

14  ago?

15          MS. HOLLOWAY:   Objection.

16          THE COURT:  Overruled.

17  A   I'm not sure.  I don't have an answer to that because you

18  just said --

19          THE COURT:   Forget the "because." You don't know if

20  that's the case?

21          THE WITNESS:  It was further in 2008, as you said

22  the first time, so it wasn't 2009.

23  Q     What did you say in 2008, about 2008?

24  A     I'm not sure.  I'm not exactly sure, but I could give you

25  a brief explanation.  I'm sure I explained to you that in the

1  matters of my shoulder, it was just an extra --  in the

2  definition toward me adding in addition on what's relevant

3  that I didn't mark and the reason I gave you was this exact

4  same eye injury, I did not --

5           THE COURT:  Excuse me, it might be me.  I don't know

6  what you said.

7           Did you complain about your shoulder in 2008?

8           THE WITNESS:  Yes, I did.

9           THE COURT:   Go ahead.

10 Q    Mr. Robertson, you took photographs of your injuries just

11 two days after the April 14th, 2006 incident, right?

12 A    Could you repeat that, please?

13 Q    You took photographs or had photographs taken of your

14 injuries two days after the incident on April 14th, 2006.

15 A    Correct.

16 Q    You had those photographs at the time you filed your

17 complaint for this lawsuit, right?

18 A    I had those --  no, not correct.

19 Q    I'm now showing you the complaint in this lawsuit --

20         THE COURT:   This is what, plaintiff's exhibit what

21 in evidence?

22         MR. HARVIS:  It's DX-Y --

23         THE COURT:   What is it?

24         MR. HARVIS:   Defendants' Exhibit Y.

25         MS. HOLLOWAY:   Premarked.

1   Q    Mr. Robertson, I'm drawing your attention to page five of

2   the document here, section letter I.  Can you read to the jury

3   what it says?  Let me read it and tell me if that's what it

4   says or not.  Does this say, I also have 12 by 12 printed out

5   snapshots of what my face looked like --  looked and felt

6   like?

7   A    Yes.

8              THE COURT:    Could you push that mike a couple of

9   inches away from you?  That's it.  Thank you.

10             THE WITNESS:    Yes.

11  Q    Mr. Robertson, you had the photographs of your injuries

12  at the time of your deposition in 2008, right?

13  A    No.

14             MR. HARVIS:    Page 178, line 15 of the deposition.

15  Q    Were you asked this question, did you give this answer?

16             "QUESTION:    Did you ever see the photographs?

17             "ANSWER:    Yeah, I have a few copies."

18             Were you asked that question, did you give that

19  answer.

20  A    No.

21             THE COURT:    Keep going.

22             "QUESTION:    You have copies?

23             "ANSWER:    Right, I hold a few copies.  I don't

24  have them presently.

25             "QUESTION:    Where are they now?

1       "ANSWER:      They are in my mom's apartment in a safe

2   place, somewhere she put them, but yeah."

3       Were you asked those questions, did you give those

4   answers, Mr. Robertson?

5   A    I was asked those questions and no, I did not give those

6   exact answers, neither one of them you just stated.

7   Q    Did you ever provide an errata sheet with any corrections

8   to your deposition transcript in 2008?

9   A    I don't understand what you're saying.

10  Q    Did you ever provide any corrections to the deposition of

11  you that was taken in December of 2008?

12  A    No, I didn't provide any corrections.  I received one

13  copy approximately a week later.

14      THE COURT:    This is before you were represented by

15  counsel?

16      THE WITNESS:  Exactly.

17      THE COURT:    Move off that subject, please.

18      MR. HARVIS:    The entirety of the photographs, your

19  Honor?

20      THE COURT:    No, you can continue, the errata sheet,

21  move off of that.  He was pro se at the time.

22  Q    As we just discussed --  withdrawn.

23      You said the photographs were at your mother's

24  apartment, that you were going to look to them and give them

25  to me, right, Mr. Robertson?

Robertson-cross-Harvis                    243

1   A    That was correct.

2   Q    You also said at your depositions if you couldn't find

3   them, you're going to get copies from the person who took

4   them, right?

5   A    I would attempt that.  I explained it.

6   Q    But you never gave me copies of those photographs, right?

7   A    You're right, no.

8   Q    You don't have them with you here today, right?

9   A    No.

10  Q    You lost those photographs, right, Mr. Robertson?

11  A    As it was explained the first time up until now, yeah.

12  Q    Yes, you lost them?

13  A    Yeah, somehow.

14  Q    You testified yesterday that you attempted to get mental

15  health treatment at the Jewish Board and South Beach, right?

16  A    Yes.

17  Q    When was that?

18  A    A few times.

19  Q    When in time?

20  A    2005, 2006, 2007 and also again in 2008.

21  Q    You said they wanted to put you on a waiting list, right?

22  A    Yes, 2009.

23  Q    They wanted to put you on a waiting list in 2009?

24  A    All three places.

25  Q    Did you have yourself put on that waiting list?

1    A    It wasn't accessible until being interviewed through a

2    social worker, which I had to find, I had to have an

3    appointment to see one actually.  So, no.

4    Q    Did you make an appointment to see one?

5    A    I requested, but they declined.  That was my explanation.

6    Q    You requested to have an appointment made and they told

7    you you cannot make an appointment?

8    A    No, about the social worker, they didn't tell me no, I

9    couldn't.  They explained.  They basically played hard ball

10   with me.  There was no response by the social worker.

11   Q    Did you ever seek mental health treatment at Coney Island

12   Hospital or Brookdale Hospital?

13   A    Coney Island Hospital.

14   Q    What about Brookdale?

15   A    I just answered Coney Island Hospital I received

16   psychiatric treatment, and observation, sir.

17   Q    As a result of following this incident, you went to Coney

18   Island --

19   A    No.

20   Q    What I'm asking, the emotional injuries you claim

21   resulted from this incident, did you ever seek treatment for

22   those injuries, mental health facilities at Brookdale Hospital

23   or Coney Island Hospital?

24   A    No.

25   Q    Did you ever seek mental health treatment following this

1   incident at any other hospital in Brooklyn?

2   A    No.

3   Q    Mr. Robertson, you've been arrested approximately 23

4   times including the arrest on April 14th, 2006?

5           MS. HOLLOWAY:    Objection.

6           THE COURT:    I'm going to allow a little bit of

7   questioning here only because you heard testimony yesterday

8   about how circumstances of this arrest distinguished

9   themselves in terms of the police conduct from the plaintiff's

10  view from the circumstances of his other arrests.  In light of

11  that, it seems to me fair to allow a little bit of cross.

12           It's treacherous territory because there's prejudice

13  associated with someone being arrested.  You learn someone has

14  been arrested, this case is going to boil down to your

15  determination whether Mr. Robertson has proved by a

16  preponderance of the evidence the elements of his claims and

17  at the heart of that will be whether he's proved by a

18  preponderance of the evidence the mistreatment he claims he

19  was subjected to in April of 2006.  If you find the

20  evidence --  I don't know what the rest of the testimony is

21  going to be.  I'm like you, hearing it, too, for the first

22  time.  If you find the evidence is on the knife's edge, a

23  difficult call, you can't decide this claim against

24  Mr. Robertson because he had been arrested many times in the

25  past.  That wouldn't be right.  Be careful and limit the use

1   to which you put this testimony.  I'm only going to allow a

2   little bit of this testimony, a little bit of questioning, a

3   little bit of probing by Mr. Harvis.  The only permissible use

4   you can put to it is to assess this testimony, obviously to

5   test the credibility of this witness being challenged.  He's

6   testified on prior occasions he was treated a certain way that

7   was unobjectionable.  Here, the treatment he got distinguished

8   itself significantly.  Having said that, some additional

9   questioning about his treatment on these prior occasions --

10  you're going to ask questions, Mr. Harvis, about the use of

11  handcuffs, I take it?

12          MR. HARVIS:   Yes, your Honor.

13          THE COURT:   We'll get to that in a minute.  Only

14  use it to the extent, if any, you think it sheds useful light

15  on his credibility regarding what happened in April of 2006.

16  Don't allow, don't hold it against Mr. Robertson.  The last

17  thing we're going to do is try all these other events that

18  gave rise to these prior arrests.  That's irrelevant to us.

19  Don't hold it against him.  It's important that you don't do

20  that.  Understood?

21          Any objection to the limiting instruction by

22  anybody?

23          MS. HOLLOWAY:   No objection.

24          MR. HARVIS:   No.

25          THE COURT:   Go ahead, please.

Robertson-cross-Harvis                                    247

1   Q    Mr. Robertson, you've been arrested approximately 23

2   times?

3   A    Something like that, just about.

4   Q    Do you know for how many of those arrests you were

5   handcuffed?

6   A    I was arrested, I was cuffed.

7   Q    You've also been incarcerated, right?

8   A    A few times.

9        THE COURT:    Sustained.

10  Q    How many times would you say you've been handcuffed in

11  your life, Mr. Robertson?

12  A    A little over ten.

13  Q    A little over ten?

14  A    Yeah.

15  Q    You just said --  withdrawn.

16       April 14th, 2006 is the only time the handcuffing

17  was painful for you?

18  A    Yeah.

19       MR. HARVIS:    No further questions.

20       THE COURT:    Is there any redirect?

21       MS. HOLLOWAY:    Yes.

22       THE COURT:    Would you like to conduct it?

23  Go right ahead.

24       Thank you, Mr. Harvis.

25

Case 1:07-cv-01416-JG-LB   Document 134   Filed 04/27/10   Page 27 of 254 PageID #: 2110

1    REDIRECT EXAMINATION

2    BY MS. HOLLOWAY:

3    Q     Good morning.

4    A     Good morning.

5    Q     We've heard testimony you've been arrested a number of

6    times before, correct?

7    A     Yes.

8    Q     Have you ever before filed a lawsuit complaining about

9    the treatment that you received from police officers during

10   any of those arrests?

11   A     No.

12   Q     We heard testimony a moment ago about a gunshot wound to

13   your forehead, correct?

14   A     Correct.

15   Q     We heard testimony that you have a scar on your forehead

16   from that gunshot wound, correct?

17   A     Yes.

18   Q     Can you point to that scar on your forehead, please?

19   A     (Indicating).

20   Q     Can you lift your head up so the jury can see?

21   A     (Indicating).

22   Q     I can't see from here how high above your left eye it is?

23   A     (Indicating).

24         MS. HOLLOWAY:    Stipulated about an inch above his

25   left eye.

1        THE COURT:    Fair enough.

2    Q    Would you point to the scar, Mr. Robertson, when I was

3    asking you questions yesterday that you have as a result of

4    being struck with the baton on April 14th, 2006?

5    A    (Indicating).

6    Q    You're pointing to a scar that's in your eyebrow?

7    A    Yes.

8    Q    Those are two different scars you just pointed to?

9    A    Yes.

10   Q    We just heard testimony, and Mr. Harvis read some

11   testimony from your deposition transcript about a time

12   previously that you were hit with an object like a baton that

13   you described like a baton, correct?

14   A    Correct.

15   Q    Where were you hit with that baton or baton-like object?

16   A    My bottom lip on the right side.

17   Q    In fact, at your deposition, if you recall, do you recall

18   testifying that you had an injury on your lip?

19   A    I believe so.

20   Q    You saw during Mr. Harvis's questioning some medical

21   records for some injury you received to your knee, correct,

22   Mr. Robertson?

23   A    I believe so.

24   Q    It's your testimony you then received another injury to

25   your knees as a result of the arrest of April 14th, 2006,

1    correct?

2    A    Yes.

3    Q    In fact, your knees have been injured a number of times,

4    including on April 14th, 2006, right, Mr. Robertson?

5    A    I wouldn't say injured, but giving me trouble.

6    Q    Was the trouble that your knees gave you after your

7    arrest on April 14th, 2006 worse than the trouble your knees

8    were giving you before that arrest?

9    A    Yeah.

10          THE COURT:    Could you push that mike a couple of

11   inches away from your face?  Thank you.

12   Q    Mr. Robertson, you testified that you had photographs

13   taken of the injuries you sustained as a result of your

14   arrest, correct?

15   A    Right.

16   Q    Who did you to take those photographs for you?

17   A    A friends of mine's niece.

18   Q    She took those photographs and did she print out copies

19   for you?

20   A    Yes, she did.

21   Q    What did you do with those copies of the photos?

22   A    I placed them in my room in my closet, the shelf in my

23   mom's apartment, 3002 Surf Avenue.

24   Q    After you placed those photographs in your closet in your

25   mom's apartment, you were then incarcerated for your parole

1  violation, correct?

2  A     Correct.

3  Q     Approximately how long were you incarcerated and

4  therefore not living at your mother's house on Surf Avenue?

5  A     For a year, like two months.

6  Q     Do you know whether there was anyone else living in your

7  mother's apartment or sleeping in your bedroom during that

8  time?

9  A     Yes.

10 Q     Who is staying in your bedroom at that time?

11 A     My cousin and her children's father.

12 Q     When was the next time that you looked for those

13 photographs?

14 A     Once I was released.

15 Q     When you looked in your closet for the photographs you

16 had put there, they weren't there anymore?

17 A     No, they weren't.

18 Q     Do you know whether your friend's niece, who took the

19 photographs, still had copies of the photographs?

20 A     No, at the time the same person suffered from illness.

21 So, it was very difficult to even speak with them.

22 Q     Why had you asked her to take those photographs of you

23 two days after the incident on April 14th?

24 A     So that I could sought --  show more evidence and

25 background of my case, I intended.

1  Q    During my direct examination of you, you testified that

2  you weren't intoxicated during the incident on April 14th,

3  2006, correct?

4  A    Correct.

5  Q    You also testified that you hadn't consumed any alcohol

6  or used any drugs at all in the hours preceding that incident,

7  correct?

8  A    Correct.

9  Q    Then we heard testimony when Mr. Harvis was asking you

10 questions, he read from your deposition, and he elicited

11 testimony that you may have smoked marijuana at some point

12 earlier that day, correct, do you recall that?

13 A    I recall going into that.

14 Q    As we sit here today, do you recall whether you smoked

15 any marijuana on the day of the incident?

16 A    No, not really.  It might have been the day before or

17 during the morning, maybe.

18 Q    You don't recall whether you did on the morning of the

19 incident?

20 A    Right.

21 Q    Your testimony is that you certainly did not in the hours

22 preceding the incident, correct?

23 A    No, at all.

24 Q    You're not sure now, and were you sure when your

25 deposition was taken?

1   A    No, I'm sure I didn't --  well, I'm sure I didn't smoke

2   or do any drugs during that day as I'm proceeding.

3   Q    Certainly not after you left your mother's house, went to

4   your aunt's house?

5   A    No.

6   Q    Do you remember what time that was?

7   A    Approximately between two and one, a lot before three?

8   Q    Sometime in the afternoon?

9   A    Yes.

10          MS. HOLLOWAY:   That's it.

11          THE COURT:   Ms. Holloway, thank you.   Anything

12   further?

13          MR. HARVIS:   No, your Honor.

14          THE COURT:   You may step down, Mr. Robertson.

15          Call your next witness, Ms. Holloway.

16          MS. HOLLOWAY:   My next witness isn't here yet.   I

17   intended to call Ms. Tasha Ricks.   She's arriving in twenty

18   minutes.   We could either play the deposition of the officers.

19          THE COURT:   Let's do that since we don't really

20   have an option.   It's either play the deposition testimony or

21   just wait around?

22          MS. HOLLOWAY:   The other option, we'll offer the

23   testimony of Eleanor Dorfman to put into evidence --

24          THE COURT:   Whatever you prefer.

25          MS. HOLLOWAY:   I prefer to play the deposition

254

1   testimony.

2           THE COURT:    Go right ahead.

3           MR. HARVIS:    Might we have a brief side bar?

4           THE COURT:    Yes, come up.

5           (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

255

1        (Side bar.)

2        THE COURT:    Yes?

3        MR. HARVIS:    It's not clear exactly what plaintiff

4   anticipating what's happening now.  Is it that the officers'

5   deposition testimony, all three officers, be played just

6   continuously or that they will be played, then we have an

7   opportunity to call them on cross or something like that, or

8   some variation?  More as a practical question how does that

9   work?

10        THE COURT:    I assume these are being offered as

11  statements of party opponents.  There's not going to be any

12  cross because you can't cross a tape.

13        MR. HARVIS:    Is plaintiff also going to call them

14  as live witnesses?

15        MS. HOLLOWAY:    No.

16        THE COURT:    I assume not.  You're going to call

17  these folks, then put in photos and call Ms. Ricks?

18        MS. HOLLOWAY:    Yes.

19        MR. HARVIS:    One more thing.  Are there objections

20  contained in the testimony, are those objections not to be

21  ruled on?

22        THE COURT:    I'll rule on them.

23        MS. HOLLOWAY:    We designated the testimony, put in

24  our joint pretrial order.  The defendants didn't object in the

25  course of putting together the pretrial order to any of those

256

1    specific objections, didn't preserve the objections nor to any

2    cross of the testimony.

3              MR. HARVIS:    The objections are in the testimony

4    itself.

5              THE COURT:    I'll hear them.  I'm not going to rule

6    on them.

7              MR. HARVIS:    Can they be cut out?

8              MS. HOLLOWAY:    The objections were taken out of the

9    videotape.

10             THE COURT:    Do I have a transcript I can look at?

11             MS. HOLLOWAY:    We do.

12             MR. GOLD:    I note for the record if there are

13   rulings, technologically, we may have to create another DVD.

14             THE COURT:    Right.  Let me take a quick look.

15             (Pause.)

16             (Continued on next page.)

17

18

19

20

21

22

23

24

25

1          (Side bar continues.)

2          MS. HOLLOWAY:   This is Officer Prince.

3          THE COURT:   This is what you are going to play?

4          MS. HOLLOWAY:   Yes.

5          In some instances, we revised the -- this contains

6   everything that we are going to play.   The videos are somewhat

7   shorter.   We got rid of all the other things.

8          THE COURT:   So I will see on here adjacent to what

9   you play any objections that were made at the time?

10          MR. HARVIS:   Yes.

11          THE COURT:   All right.   Any reason I can't -- I will

12   look at it.   If I decide that that objection would have been

13   sustained, I will tell the jury to disregard that testimony.

14          MS. HOLLOWAY:   Okay.

15          MR. HARVIS:   Sure.

16          MR. BROOKS:   That's fine.

17          MS. HOLLOWAY:   Here are the other two.   That's

18   Sullivan.   This is Deglas.

19          THE COURT:   I look forward to it.

20          MS. HOLLOWAY:   Yes.

21          (In open court.)

22          THE COURT:   Would you like to know what's going on?

23          Okay.   The next piece of the plaintiff's case

24   consists of statements made by the defendant detectives or

25   sergeant, as the case may be, which can be offered by them as

258

1    evidence.   They are statements that were made in what we call

2    the discovery phase of the case, depositions.   You already

3    heard how depositions, sworn testimony, was given by the

4    participants in the disputed events.   You are going to hear

5    excerpts culled from the deposition, the videotaped deposition

6    testimony of each of the defendants, and you can consider it

7    as evidence.

8              All right.   Who are we starting with?

9              MS. HOLLOWAY:   We are starting with Officer Prince,

10   Your Honor.

11             Can we take a moment for a restroom break before we

12   play the videos?

13             THE COURT:   Yes.   Short break.   Don't discuss the

14   case.

15             All rise.

16             (The following occurred in the absence of the jury.)

17             THE COURT:   All right.

18             (Recess taken.)

19             THE COURT:   Are we ready to go?

20             MS. HOLLOWAY:   I have conferred with defendants'

21   counsel and we have agreed that when the jury returns I will

22   move the documents into evidence that are going to be

23   discussed during the depositions.   Defendants' counsel has no

24   objection.   These documents are their trial exhibits.   We will

25   show them to the jury and then we will play the videos.

259

1          THE COURT:   Okay.   Are you ready?

2          MR. HARVIS:   Your Honor, we are waiting for the

3    officers.

4          THE COURT:   Okay.   Please get them.

5          (Jury present.)

6          THE COURT:   Okay.   Please be seated, everyone.

7          All right.   Let's go.

8          Are going to offer some exhibits into evidence?

9          MS. HOLLOWAY:   I am.

10         THE COURT:   They are?

11         MS. HOLLOWAY:   Prior to playing the deposition

12   testimony we are going to offer some documents into evidence.

13         THE COURT:   Yes.

14         MS. HOLLOWAY:   Those documents have previously been

15   marked Plaintiff's Exhibits 11, 19, 22 -- I'm sorry -- 12, 13,

16   9 and 10.   I am going --

17         THE COURT:   I take it, there is no objection, is

18   that correct, Mr. Harvis?

19         MR. HARVIS:   That is correct, Your Honor.

20         THE COURT:   They are all received.

21         (So marked.)

22         MS. HOLLOWAY:   Plaintiff's Exhibit 19.

23         (Displayed on Elmo.)

24         Plaintiff's Exhibit 12.

25         (Displayed on Elmo.)

1        THE COURT:   What is that?  Is that the arrest

2   report?

3        MS. HOLLOWAY:   Yes.

4        THE COURT:   Is that for the event giving rise to the

5   claims in this case?

6        MS. HOLLOWAY:   This is the arrest report in Omniform

7   System.

8        THE COURT:   Okay.   What was the earlier one, memo

9   pads from one of the officers?

10        MS. HOLLOWAY:   Plaintiff's Exhibit 19 is an excerpt

11   from the memo pad of Dimitri Deglas.   This is the first page.

12   It is an excerpt from the night the incident took place.

13        This is Plaintiff's Exhibit 11, which is the scratch

14   copy or the hardcopy of the arrest report from the arrest the

15   night in question.

16        (Displayed on Elmo.)

17        This is the second page of that scratch copy.

18        THE COURT:   All right.

19        MS. HOLLOWAY:   This is the Omniform System complaint

20   related to the arrest on the night in question.

21        THE COURT:   What was that last one?

22        MS. HOLLOWAY:   Plaintiff's Exhibit 13.

23        THE COURT:   Okay.

24        MS. HOLLOWAY:   This is Plaintiff's Exhibit 9, which

25   is the property clerk's invoice relating to the 18 clear zips

1    of marijuana allegedly recovered.

2          THE COURT:  Okay.

3          MS. HOLLOWAY:  This is Plaintiff's Exhibit 10, which

4    is the property clerk's invoice for the two black gloves that

5    were allegedly --

6          MR. BROOKS:  Objection to allegedly, Your Honor.

7          THE COURT:  Why?  Isn't that in dispute in the case?

8          MR. BROOKS:  Withdrawn.

9          THE COURT:  Those are your exhibits?

10         MS. HOLLOWAY:  Yes, Your Honor.

11         THE COURT:  All right.  Sorry.  We have to take

12    another break.  This time it is my fault.

13         I will tell you why.  In this building each year

14    between 45 and 50,000 people become naturalized citizens and I

15    am on Miscellaneous Duty, which gives me the privilege today

16    of swearing in 250 of them about downstairs.  They are waiting

17    downstairs.  It only takes about 15 minutes.  It is worth the

18    wait.

19         We will resume at 11:00 o'clock.

20         Don't discuss the case.

21         All rise.

22         (The following occurred in the absence of the jury.)

23         THE COURT:  All right.  We are in recess for

24    15 minutes.

25         (Recess taken.)

262

1          THE COURT:   Where are you playing it from?   The

2    prosecution table laptop, position two?

3          MS. HOLLOWAY:   Yes.

4          THE COURT:   Okay.

5          (Jury present.)

6          THE COURT:   Please be seated, everyone.

7          Okay.   Are you ready with the excerpts from the

8    deposition?

9          Who is this?   Detective Prince?

10          MS. HOLLOWAY:   Yes, it is, Your Honor.

11          Yes, we are.

12          THE COURT:   Okay.   Go right ahead.

13          (Video plays.)

14          THE COURT:   What page are we on?

15          MS. HOLLOWAY:   21.

16          (Video continues to be played.)

17          THE COURT:   What page are we on?

18          MS. HOLLOWAY:   108.   That's it.

19          THE COURT:   Is that it?

20          MS. HOLLOWAY:   Yes.

21          (Video stops.)

22          MS. HOLLOWAY:   I apologize for the lack of linking,

23    appropriate linking in the video.   I think it will be improved

24    in the next one.

25          THE COURT:   That's all right.   The audio is fine.

263

1    We understand, these are excerpts.   Sometimes there is a

2    little lack of fit between the video and the audio feed.

3              Who is next?

4              MS. HOLLOWAY:   Deglas.

5              (Video plays.)

6              THE COURT:   Page?

7              MS. HOLLOWAY:   Nine.

8              (Video continues.)

9              (Continued on next page.)

GR        OCR        CM        CRR        CSR

264

1          (Video continues play.)

2          (Video tape stops.)

3          THE COURT:    This is finished.

4          MS. HOLLOWAY:    I marked for identification the

5    second page what's been previously marked Plaintiff's

6    Exhibit 6, the document that Officer Sullivan, the accusatory

7    instrument, I marked, I would like to mark it as 6-A, move it

8    into evidence.

9          THE COURT:    Any objection?

10         MR. HARVIS:    No.

11         THE COURT:    Received.

12         (Pause.)

13         MS. HOLLOWAY:    This is Plaintiff's Exhibit 6-A

14   (indicating).

15         THE COURT:    Call your next witness.

16         MS. HOLLOWAY:    We call Tasha Ricks.

17         MR. HARVIS:    Side bar?

18         THE COURT:    Sure.

19         (Continued on next page.)

20

21

22

23

24

25

SS       OCR       CM       CRR       CSR

1          (Side bar.)

2          THE COURT:    Yes?

3          MR. BROOKS:    The defendants renew their objections

4     to plaintiff calling Ms. Ricks as a witness.  We want to

5     expresses our concern she's going to testify about some of the

6     crucial points, about probable cause for the arrest.  As the

7     defense attorneys, we're concerned she would try to put in her

8     evaluation.

9          THE COURT:    She's not going to do that?

10         MS. HOLLOWAY:    Just testimony based on her

11    recollection of the appearances she made in this case in

12    connection with the charges that were filed against

13    Mr. Robertson.

14         MR. BROOKS:    That's fine.

15         MS. HOLLOWAY:    I don't intend to elicit any

16    testimony based on any privileged conversations Ms. Ricks had

17    with Mr. Robertson nor anything she recalls by virtue of

18    reviewing any privileged documents.  If cross-examination

19    proceeds in a way treading on this, I'm going to object on

20    those grounds.  I want to say by calling her, I don't intend

21    to waive privilege.

22         THE COURT:    As long as we're here, I reviewed --

23    I'll mark as Court Exhibits A, B and C these transcripts I

24    have of the depositions of the three individuals, the three

25    defendants.

1          The record ought to reflect the highlighted portions

2     of them include things that were not on the CD or the DVD that

3     was played.  I take it that DVD includes only what the jury

4     saw?

5               MS. HOLLOWAY:   Yes.

6               THE COURT:   If someone wants to examine what was

7     actually played, Court Exhibits A, B and C wouldn't be the

8     place to go.  That DVD --  did we mark it in evidence?

9               MS. HOLLOWAY:   We didn't.

10               THE COURT:   Let's call it?

11               MS. HOLLOWAY:   Plaintiff's Exhibit 43?

12               THE COURT:   Let's call it Plaintiff's Exhibit 100,

13     shows what was actually shown to the jury.  I reviewed the

14     objections as we went and they're all overruled.  Some of

15     them, truth be told, I couldn't quite tell the basis as I was

16     going through it.  That happens when you do it live as well.

17     In any event, the objections are overruled, so I'm not going

18     to strike anything.  I will prepare and put court exhibit

19     stickers on the transcripts so you have your objections

20     preserved.

21               THE COURT:   Government Exhibit 100 is in evidence.

22               (So marked.)

23               THE COURT:   Are you Ms. Ricks?

24               THE WITNESS:   I am.

25               THE COURT:   Please come up.  Please stand behind

1   that witness chair.  Mr. McMann will swear you in.

2            T A S H A         R I C K S ,

3                  having been duly sworn/affirmed, was examined

4   and testified as follows:

5                THE LAW CLERK: .  Take your seat, state and spell

6   your name for the record.

7                THE WITNESS:  Good afternoon, my name is Tasha

8   Ricks, R I C K S.

9   DIRECT EXAMINATION

10  BY MS. HOLLOWAY:

11  Q    Good morning, Ms. Ricks.

12  A    Good afternoon.

13  Q    Good afternoon.

14            What is your profession, Ms. Ricks?

15  A    I'm a criminal defense attorney.

16  Q    How long have you been a criminal defense attorney?

17  A    For seven years.

18  Q    Were you an attorney prior to those seven years as a

19  criminal defense attorney?

20  A    I was a practicing attorney prosecuting abuse and neglect

21  cases for the State of New York.

22  Q    Are you currently employed?

23  A    Yes, I am.

24  Q    Where are you employed?

25  A    The Legal Aid Society here in Brooklyn.

1   Q    Are you employed in the criminal defenses division of the

2   Legal Aid Society?

3   A    As a staff attorney.

4   Q    How long have you worked in the criminal defense division

5   at Legal Aid?

6   A    For seven years.

7   Q    You're working in the criminal defense division at Legal

8   Aid in 2006?

9   A    Yes.

10   Q    Have you previously met plaintiff Dwayne Robertson?

11   A    Yes.

12   Q    You understand you're testifying in an action brought by

13   Mr. Robertson relating to an April 14th, 2006 arrest?

14   A    Yes.

15   Q    Did you represent him in connection with criminal charges

16   that were filed against him in connection with that arrest?

17   A    Yes, I did.

18   Q    Were you present at his arraignment on those charges?

19   A    No, I was not.

20   Q    Were you present at other court appearances relating to

21   those charges in that arrest?

22   A    Yes.

23   Q    I would like to show you what's been previously marked as

24   Plaintiff's Exhibit 6-A entered into evidence.

25            THE COURT:    Go ahead.

1       MR. BROOKS:    This is not in evidence, your Honor.

2       THE COURT:    All right.

3       MS. HOLLOWAY:    I'm sorry --

4       (Pause.)

5   Q    Do you recognize this document, Ms. Ricks?

6       THE COURT:    What exhibit is this?

7       MS. HOLLOWAY:    6-A.

8       THE COURT:    Is it in evidence?

9       MS. HOLLOWAY:    Yes, it is in evidence.

10  A    Yes, I recognize it.

11  Q    What is this document?

12  A    It's the criminal court complaint that was filed

13  regarding the April matter.

14  Q    Is this the complaint that initiated the criminal

15  proceeding against Mr. Robertson?

16  A    Yes, ma'am.

17       MS. HOLLOWAY:    I would like to mark for

18  identification and show the witness Plaintiff's Exhibit 6-B

19  which is the third and fourth pages of what was previously

20  marked as plaintiff's Exhibit 6.

21  Q    Do you recognize this document?

22  A    I do.

23  Q    Have you seen it before?

24  A    I have.

25  Q    Do you review this kind of a document in the course of

1  your job as a residence attorney in the criminal defense

2  division?

3  A    Yes, I do.

4        MS. HOLLOWAY:   I would like to move this document

5  into evidence.

6        THE COURT:    Any objection?

7        MR. BROOKS:    Objection, foundation.

8        THE COURT:    What is this document?

9        THE WITNESS:   It's the court action summary for the

10  appearances of the attorneys and the clients that occurred on

11  the subsequent dates from the arraignment.  I appeared on

12  them.  The court made notations as to my appearance as well as

13  my client.

14        THE COURT:    Who creates this document?

15        THE WITNESS:   The document itself is created by the

16  judge's handwriting based on the attorneys that appear, the

17  client that appears, the action that occurs on the record in

18  that court.

19        THE COURT:    Where is it kept?  Is it part of your

20  file or the court file?

21        THE WITNESS:   Officially part of the court file.

22  It's part of my file if I get a copy and put it in the file

23  based on what occurred at that particular date.

24        THE COURT:    Did this come from your file?

25        THE WITNESS:   Yes.

Ricks-direct-Holloway                                    271

1              MR. BROOKS:    We were never provided a copy.

2              THE COURT:    Come up to side bar.  Bring your

3    exhibit.

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ricks-direct-Holloway                    272

1          (Open court.)

2          MR. BROOKS:   Plaintiff withheld the entire file on

3    behalf of attorney-client privilege.

4          MS. HOLLOWAY:   Mr. Brooks asked for the file.

5    I said any documents in the file that were not privileged,

6    there were duplicates in the court file, I produced them.

7    I heard no further objection from Mr. Brooks.

8          THE COURT:   What are we doing with this witness?

9    Are we establishing the circumstances surrounding the

10   dismissal of the charge?

11         MS. HOLLOWAY:   Yes.

12         THE COURT:   What is this, Plaintiff's 6?

13         MS. HOLLOWAY:   6-B.

14         THE COURT:   What's on them?  What do they say?

15         MS. HOLLOWAY:   I'm going to elicit from her each of

16   these boxes is the one court appearance that was made, each of

17   these is for a court appearance made and she appeared at all

18   these court appearances.  I'll ask her what this relates to,

19   ask her if she's familiar with the notation, "no corrob or

20   lab."  Does she recall what this is referring to that occurred

21   at this court appearance.  She will say yes.  Then I'm going

22   to introduce the transcript from this appearance, subsequent

23   appearance, ask her to review it, accords what happened in

24   that conference, whether the charges were dismissed.

25         THE COURT:   Any dispute about any of this?

Ricks-direct-Holloway                         273

1              MR. HARVIS:    No.

2              MR. BROOKS:    The concern I have is her reading the

3      notes.  She didn't make the notes.

4              THE COURT:    So what?

5              MS. HOLLOWAY:    She understands what they mean.

6      This is a notation she's familiar with.

7              MR. HARVIS:    We'll stipulate it was a 30.30

8      dismissal.

9              MS. HOLLOWAY:    We asked them to stipulate it was

10     dismissed, no corroborating affidavit --

11             THE COURT:    Don't talk at the same time, please.

12             What's your objection?

13             MR. BROOKS:    My objection is her reading the notes

14     from this document.

15             THE COURT:    Why is it impermissible?

16             MR. BROOKS:    No personal knowledge what those notes

17     mean.

18             THE COURT:    This is her file?

19             MR. BROOKS:    She didn't create it, the criminal

20     court created it.

21             THE COURT:    Objection overruled.

22             (Continued on next page.)

23

24

25

                SS      OCR      CM      CRR      CSR

Ricks-direct-Holloway                              274

1           (Open court.)

2           THE COURT:   That's received, 6-B.

3           (So marked.) Go ahead.

4    Q    Is this your handwriting on this document, Ms. Ricks?

5    A    No.

6    Q    Do you have an understanding of whose handwriting it is?

7    A    Yes.

8    Q    Whose handwriting is on this document?

9    A    For each respective date, it's the judge that was

10   presiding at that particular appearance.

11   Q    Your understanding the judge taking notes based on the

12   appearance?

13   A    Yes, the record made on that given date.

14   Q    Do each of these rows you see on this exhibit relate to

15   an appearance date?

16   A    Yes.

17           THE COURT:   Do you have a lot of cases?

18           THE WITNESS:   Yes.

19           THE COURT:    Hundreds?

20           THE WITNESS:   I would definitely say close to 100.

21           THE COURT:    Is it possible for you to remember all

22   the things about all your cases that happen in court?

23           THE WITNESS:   Each and every specific case, no.

24           THE COURT:    Do you use notes like this from your

25   file to keep track of what happened in your cases?

Ricks-direct-Holloway                    275

1          THE WITNESS:  I do, yes.

2          THE COURT:    Go ahead.

3   Q    If we could turn to the second page of this exhibit,

4   NYC-22, the bottom right-hand corner.  You see the top box,

5   Ms. Ricks?

6   A    Yes.

7   Q    Does that row relate to a specific person's date?

8   A    Yes.

9   Q    What appearance date was that?

10  A    June 22nd of 2006.

11  Q    You see the notation in the large box, it says no corrob

12  or lab, is that a notation that means something to you?

13  A    Yes.

14  Q    What does it mean?

15  A    No corrob means the district attorney's office had not

16  provided a corroborating affidavit to support the allegations

17  that were listed in the complaint, and with respect to the

18  lab, that the district attorney's office had not provided by

19  way of the police department the lab report with respect to

20  the item that the complaint named was recovered from my

21  client.

22  Q    Is that your recollection of what occurred on the

23  appearance date, June 22nd, 2006?

24  A    Yes.

25  Q    If you could look at the next row, does that row also

1  relate to a specific appearance date?

2  A    Yes, it does.

3  Q    What appearance date is that?

4  A    July 17th, 2006.

5  Q    The notation in that box, it says, I think.  DIFM and

6  sealed, does that mean something to you?

7  A    Yes.

8  Q    What does that mean?

9  A    It means that particular docket on July 17th, 2006 was

10  dismissed and sealed by the court.  The District Attorney's

11  Office had not converted their complaint into a valid or

12  sufficient information in order to proceed with that matter in

13  court within the statutory time period.

14  Q    In this case did you move to have the complaint

15  dismissed?

16  A    Yes, I did, pursuant to the criminal procedure law

17  section 3030 which is what's indicated in the notation.

18  Q    On what grounds did you move that it should be dismissed

19  personally to 3030?

20  A    Because the criminal procedure law governs the way in

21  which the cases that are brought before a criminal court judge

22  can actually proceed.  When a complaint is brought for what

23  would be considered a misdemeanor charge, then the District

24  Attorney's Office by statute has 90 days from the date of

25  arraignment.  In this case, 90 days from April 16th of 2006,

1    the arraignment being the first date that Mr. Robertson was

2    before the court on those charges, if the district attorney

3    does not change those allegations by way of having a

4    supporting deposition or a corroborating affidavit from the

5    complainants, here the New York State Police Department, if

6    they do not have an affidavit by those officers that says

7    whatever we're alleging in this complaint is true and there's

8    no hearsay, then the matter has to be dismissed within

9    90 days.

10   Q    A moment ago we looked at the complaint in this case.  Is

11   this not a corroborating affidavit?

12   A    No, it's not.  It's just a mere complaint which is a

13   piece of paper that alleges something that a person may or may

14   not have done.

15   Q    Is this complaint signed by the complaining officers?

16   A    No.  The actual complaint was drafted by a paralegal in

17   the District Attorney's Office, Ms. Woods.  It was drafted

18   based upon what is alleged to have been mentioned to her by

19   the Police Officers Sullivan and Prince.

20   Q    If we could turn back once more to Plaintiff's

21   Exhibit 6-B, the second page -- actually, the first page, the

22   third row, can you read the notes and what do they say in the

23   big box?

24   A    Defendant in and produced, warrant vacated and expunged.

25   Defendant incarcerated on date of -- looks like May 5th.

Ricks-direct-Holloway                    278

1    Q    Do you have any recollection of whether Mr. Robertson was

2    incarcerated on May 5th?

3    A    Yes.

4    Q    What's your recollection about that incarceration?

5    A    As a result of the April 16th arrest, my client was

6    violated by the Department of Parole.  When the case was

7    arraigned on April 16th, he was released on his own

8    recognizance.  Because the case was brought before the court,

9    his parole was violated and he was then subsequently put in

10   jail or incarcerated.  When the case was on May 2nd, that's

11   when Mr. Robertson was put in.

12   Q    I would like to mark --

13            THE COURT:   Could you go back to that, please, back

14   to that exhibit you just had on the screen?  Please enlarge

15   that third box.  Does that say incarcerated on other matter on

16   5-5.

17            THE WITNESS:  No, it looks like on the date.

18            THE COURT:   Is your testimony that he was

19   incarcerated in connection with the violation proceeding that

20   was brought?

21            THE WITNESS:  Exactly.

22            MS. HOLLOWAY:   I would like to mark for

23   identification, show the witness Plaintiff's Exhibit 42?

24   Q    Ms. Ricks, do you recognize this document?

25   A    Yes.

Ricks-direct-Holloway                              279

1    Q      Have you seen it before?

2    A      I have.

3    Q      What is it?

4    A      The transcript from July 17th, 2006 proceedings.

5    Q      Does this transcript conform with your recollection of

6    what occurred during the July 17th, 2006 proceeding?

7    A      Yes.

8                  MS. HOLLOWAY:   I would like to move this document

9    into evidence.

10                 THE COURT:   Any objection?

11                 MR. BROOKS:   Objection.

12                 THE COURT:   How many pages is it?

13                 MS. HOLLOWAY:   Four.

14                 THE COURT:   Could you hand it up and I'll take a

15   quick look at it?

16                 (Pause.)

17                 THE COURT:   Basis?

18                 MR. BROOKS:   Out-of-court statements.   We've had no

19   opportunity to cross examine any of these witnesses.

20                 (Pause.)

21                 THE COURT:   No, I'll allow it.   You can cross

22   Ms. Ricks, of course.   I understand your objection to the

23   other statements, but the other statements are by the court

24   and let me explain to you the purpose, the context in which

25   this evidence is being received.

1          One of the claims asserted by the plaintiff is that

2    he was subjected to a malicious prosecution.  One of the

3    ingredients of that claim --  there are some other elements as

4    well, for example, absence of probable cause, actual malice,

5    but the element of that claim to which this evidence relates

6    most directly is the requirement that the plaintiff prove that

7    the prosecution he complains about was terminated favorably to

8    him.  He got a favorable termination of this claim that was

9    brought in state court in which he was represented by

10   Ms. Ricks.

11         This is the termination, this court proceeding

12   memorialized as the judge's dismissal of the case.  For that

13   reason, it lays at the heart of the plaintiff's effort.  He

14   was then a defendant.  He's now the plaintiff.  It's in effort

15   to prove his claim because the statements of the judge bear on

16   whether or not this was a favorable termination.  I'm going to

17   allow it in.  You'll consider it to that end.  The objection

18   is overruled.  It's received.

19         (So marked.)

20

21

22

23

24

25

1    EXAMINATION CONTINUES

2    BY MR. HOLLOWAY:

3    Q    I would like to direct your attention, Ms. Ricks, to page

4    three, line 18 through 20 of the transcript.

5              The second sentence is definitely past 30.30.

6              Do you have an understanding of what that means?

7    A    Yes.  There was argument made by myself on July 17th that

8    the case should have been dismissed because the District

9    Attorney had not provided the Court or myself with the

10   necessary corroborating affidavits or the lab.  The

11   calculation by statute under article 30.30 of the criminal

12   procedure law, Section 1(b), as in boy, indicates that on a

13   misdemeanor charge, the District Attorney has 90 days or three

14   months in order to provide that information.  Therefore, being

15   ready to proceed in trial or it has to be dismissed.  The

16   calculation was that it was over or past the 90-day time

17   period as they had not provided the necessary documents to

18   show reasonable cause to continue with their case, it was

19   therefore dismissed.

20   Q    After a case has been dismissed pursuant to 30.30, does

21   it get sealed?

22   A    Yes.

23   Q    Was this case sealed?

24   A    It was.

25   Q    What does that mean?

1   A    It means that it cannot be reentered into or reopened or

2   any of the allegations that were brought under that particular

3   docket unless there is a court order.  It is as if it never

4   occurred.

5   Q    The charges then are completely dismissed?

6   A    Yes, ma'am.

7           MS. HOLLOWAY:   Thank you.

8           I have no more questions, Your Honor.

9           THE COURT:  All right.  Thank you, Ms. Holloway.

10          Mr. Brooks, would you care to cross this witness?

11          MR. BROOKS:   Yes, Your Honor.

12  CROSS-EXAMINATION

13  BY MR. BROOKS:

14  Q    Good afternoon, Ms. Ricks.

15  A    Good afternoon.

16  Q    My name is Jeffrey Brooks.  I represent the defendants in

17  this action.

18          Ms. Ricks, you are testifying here in response to a

19  subpoena, is that correct?

20  A    Yes.

21  Q    Did you receive a witness fee in the amount of $40?

22  A    No, I have not.

23  Q    Did you receive any compensation for being here today?

24  A    No, none at all.

25  Q    You are testifying here in your capacity as one of

1   Mr. Robertson's criminal defense attorneys, is that correct?

2   A    Yes.

3   Q    You are an attorney with the Legal Aid Society; is that

4   correct?

5   A    I am.

6   Q    The People of the State of New York were represented in

7   Mr. Robertson's criminal case by the Kings County District

8   Attorney; is that correct?

9   A    Yes.

10  Q    The Kings County District Attorney filed the criminal

11  charges against Mr. Robertson, right?

12  A    Yes.

13  Q    After an accusatory instrument is filed, the criminal

14  defendant has to appear at an arraignment, is that correct?

15  A    Yes.

16  Q    You were not Mr. Robertson's criminal defense attorney at

17  that arraignment, is that correct?

18  A    No.   My colleague was.

19  Q    So you weren't there at all, correct?

20  A    No, not on the 16th.

21  Q    So you have no knowledge of anything that occurred at the

22  arraignment, correct.

23  A    Incorrect.  I do have knowledge of what occurred there.

24  Q    That knowledge is simply that Mr. Robertson was

25  arraigned?

1   A    Not simply that he was arraigned.  But he was in fact

2   arraigned, yes.

3   Q    You became Mr. Robertson's criminal defense attorney with

4   the charges from his April 16, 2006 arrest only after that

5   case was combined with another criminal case, is that correct?

6   A    It wasn't combined with another criminal court case.

7            MR. BROOKS:  Your Honor, I am going to show the

8   witness a document to hopefully refresh her recollection.  I

9   need just a moment to find the right page.  This document was

10  provided to plaintiff.  I don't know whether they have given

11  it an exhibit number at this time.

12           MS. HOLLOWAY:  We have not, Your Honor.

13           (Pause.)

14  Q    I am first going to show you the cover page of this

15  document.  It will demonstrate to you the date.  I want to

16  point it out to you.

17  A    Yes.

18  Q    Okay.  I am going to show you the second page of this

19  document.  I will just have you read the section to yourself.

20           (Pause.)

21           Let me know when you are done.

22  A    I am done.

23  Q    Does that document refresh your recollection that

24  Mr. Robertson's April 15th arrest was combined with an earlier

25  arrest?

1   A    No, it wasn't combined.  One case was put on the same

2   date that another case was already pending.

3   Q    Okay.  That separate case against Mr. Robertson was

4   pending in Brooklyn's Domestic Violence court?

5   A    In DV-1, yes.

6   Q    Mr. Robertson was on parole when he was arrested on

7   April 14th, 2006, correct?

8   A    Yes.

9   Q    Mr. Robertson was also on parole while he was arrested on

10  the charges in the separate case that was already pending in

11  DV-1, correct?

12  A    Yes.

13  Q    Ms. Ricks, I am going to show you what has previously

14  been marked as Plaintiff's 6-A.  This document is in evidence,

15  if I can find it.

16       Ms. Ricks, you testified earlier that you recognize

17  this document, correct?

18  A    I do.

19  Q    You didn't write any of this document though, correct?

20  A    No.

21  Q    You were not present when any of this document was

22  written, correct?

23  A    No.

24  Q    You were not present when any of the information

25  contained in this document was provided to the person who did

1   write this document, correct?

2   A    No.

3   Q    You have never discussed the creation of this document

4   with anyone from the Kings County District Attorney's office,

5   correct?

6   A    I don't understand your question.

7   Q    I will rephrase it.

8         You don't know why the Kings County District

9   Attorney's office chose to file these particular charges

10  against Mr. Robertson, correct?

11  A    No.

12  Q    Okay.  That's the sole decision of the Kings County

13  District Attorney's office, correct?

14  A    Not entirely, Mr. Brooks.  The reason the Kings County

15  District Attorney filed these charges against Mr. Robertson is

16  because Police Officers Sullivan and Prince made

17  representations to the paralegal of the Kings County District

18  Attorney's office and that's why the complaint was filed.

19  Q    The District Attorney is the one who ultimately decides

20  to file the charges, correct?

21  A    Yes, based upon what the police or the complainant says.

22  Q    Okay.  Ms. Ricks, you earlier discussed New York Criminal

23  Procedure Law Section 30.30 on your direct examination,

24  correct?

25  A    Yes.

Ricks-cross-Brooks                    287

1    Q    Section 30.30 requires the District Attorney to have a

2    criminal case ready for trial within a certain time period,

3    correct?

4    A    Yes.

5    Q    If a criminal case is not ready within that time period,

6    it has to be dismissed, correct?

7    A    Right.

8    Q    To your knowledge, a case getting dismissed under 30.30

9    might mean the District Attorney just ran out of time to

10   prosecute it, correct?

11   A    I don't know that that's what it would mean.  I just know

12   that the District Attorney had not done what needed to have

13   been done by statute.   The case was dismissed.

14   Q    Okay.   Like yourself, Kings County District Attorney

15   might have more cases to prosecute than it can handle,

16   correct?

17   A    I don't know what they have.   But they do have a lot of

18   cases, yes.

19   Q    Okay.   A 30.30 dismissal doesn't necessarily have

20   anything to do with an accused's innocence, correct?

21   A    That's actually not necessarily true, Mr. Brooks.

22   Q    The fact that it was dismissed pursuant to 30.30 just

23   means the District Attorney ran out of time, right?

24        MS. HOLLOWAY:   Objection, Your Honor.

25   A    No.

GR      OCR      CM      CRR      CSR

1          THE COURT:  Overruled.

2          Let her answer.

3   A    No, it doesn't mean that the District Attorney ran out of

4   time.  It means that the District Attorney failed to do what

5   was needed within the amount of time in order for the case to

6   proceed.

7   Q    Charges can be dismissed on 30.30 grounds even if a

8   person might be guilty of the crimes, correct?

9   A    I don't know about whether or not a person would be

10  guilty of the charge.  What I do know is that the statute in

11  and of itself dictates if the District Attorney does not do

12  something within a particular time period, then the case must

13  be dismissed, yes.

14  Q    It is possible for the District Attorney to have probable

15  cause to prosecute a case but then the case just gets

16  dismissed on 30.30 grounds?

17  A    No.  The law says that in order to have reasonable cause,

18  you have to have a corroborating affidavit and here in this

19  case a lab in order to be able to move forward because the

20  complaint was not then sufficient without that.

21  Q    You don't know the actual reason the District Attorney

22  wasn't ready to proceed with this case, correct?

23  A    The reason I know is that the District Attorney had not

24  provided myself as counsel or the Court a corroborating

25  affidavit by the complaints, here Officers Sullivan and

Ricks-cross-Brooks                    289

1   Prince, nor had they provided the lab report relative to the

2   charges in the complaint.

3   Q    You don't know why the district attorney didn't do

4   anything, correct?

5   A    No.

6   Q    You can only therefore guess, correct?

7   A    I wouldn't even venture to guess.

8   Q    Okay.  You also don't know that the April 14th arrest was

9   the only reason for Mr. Robertson's parole getting violated,

10  is that correct?

11  A    I had communication with the parole attorney and that was

12  the information that was given to me, it was as a result of

13  the April 15th arrest.

14  Q    The sole reason?

15  A    As far as I recall, yes.

16  Q    Mr. Robertson's parole was violated, correct?

17  A    Yes.

18  Q    That's a decision of the New York Board of Parole,

19  correct?

20  A    Yes.  The Division of Parole, yes.

21  Q    Right.

22       Isn't it possible that the only reason the District

23  Attorney didn't continue prosecuting this case was that

24  Mr. Robertson was already going to -- going back to prison for

25  violating his parole?

1    A    Not at all.

2              MS. HOLLOWAY:   Objection.

3              THE COURT:   Sustained.

4    Q    Again, aside from the fact that the grounds of the

5    dismissal was Section 30.30, you have no idea whatsoever why

6    the DA allowed the case to be dismissed, correct?

7    A    The reason the District Attorney had the case dismissed

8    was that they failed to provide the necessary documents needed

9    in order to continue with the case and therefore provide

10   reasonable cause that my client actually committed the

11   allegations that were alleged in the complaint.

12   Q    Ms. Ricks, a parole warrant was issued for

13   Mr. Robertson's arrest on April 24, 2006, correct?

14   A    I don't know when the warrant was issued.  I just know

15   that he was picked up subsequently by parole.

16   Q    Okay.  Mr. Robertson was taken into custody based on that

17   warrant, correct?

18   A    Yes, sir.

19   Q    So his being taken into custody was based on that warrant

20   and not based on his April 14, 2006, arrest?

21   A    No.  Based upon my communication, it was my understanding

22   that it was as a result of the arrest from the April 15th

23   matter.  That he was then placed in custody.

24   Q    You weren't present for any of the discussions regarding

25   the violation of his parole, correct?

GR      OCR      CM      CRR      CSR

1   A    Not at the parole proceeding, no.

2   Q    So you don't actually know the reasons why his parole was

3   violated?

4   A    Based upon my recollection and my communication with the

5   parole attorney that was present, that's the basis I have.

6           MR. BROOKS:  Okay.  I have nothing further, Your

7   Honor.

8           THE COURT:  Thank you, Mr. Brooks.

9           There is nothing further, is there?

10          MS. HOLLOWAY:  Nothing further.

11          THE COURT:  You are excused.  Have a good day,

12  Ms. Ricks.

13          THE WITNESS:  Thank you, sir.

14          (Witness excused.)

15          THE COURT:  Call your next witness.

16          MS. HOLLOWAY:  Your Honor, we have no other

17  witnesses.  But we do have some documents that we would like

18  to offer into evidence.  There are a number for which

19  defendants don't have any objection.

20          THE COURT:  Okay.

21          MS. HOLLOWAY:  There is just one matter about the

22  photographs.

23          THE COURT:  Yes.

24          MS. HOLLOWAY:  We would like to call, to the extent

25  the defendants are going to continue to object to the -- to

Dorfman-direct-Holloway                292

1    the extent the defendants are not willing to stipulate to the

2    location of the -- our photograph exhibits which are PX-29

3    through 39.

4            THE COURT:  These are photographs?

5            MS. HOLLOWAY:  They are photographs of various parts

6    of the scene at the corner of --

7            THE COURT:  Would you prefer a foundation to be

8    laid?

9            MR. HARVIS:  No.  We are prepared to stipulate as to

10   PX-33.  As to the other ones, we would require a foundation.

11           THE COURT:  All right.  Call your witness.

12           MS. HOLLOWAY:  I would like to call Eleanor Dorfman.

13           THE COURT:  Ms. Holloway, have a seat while the

14   witness is sworn, please.

15           Please swear the witness.

16           THE CLERK:  Yes, Your Honor.

17           (The witness is duly sworn/affirmed by the clerk.)

18           THE CLERK:  Please be seated.

19           Please state and spell your name for the record.

20           THE WITNESS:  My name is Eleanor Dorfman,

21   E L E A N O R, D O R F M A N.

22   DIRECT EXAMINATION

23   BY MR. HOLLOWAY:

24   Q    Good morning, Ms. Dorfman.

25   A    Good morning.

GR      OCR      CM      CRR      CSR

1   Q     Are you currently employed?

2   A     I am.

3   Q     What is your job?

4   A     I am a paralegal at Cravath, Swaine and Moore.

5   Q     Have you had the opportunity before your testimony this

6   morning to review the documents that have been previously

7   marked Plaintiff Exhibits 30 through 39?

8   A     I have.

9         MS. HOLLOWAY:  I would like to mark these exhibits

10  as a group for identification.

11        THE COURT:  Okay.

12  Q     Ms. Dorfman, were you present when these photographs were

13  taken?

14  A     I was.

15  Q     When were they taken?

16  A     February 4th, around noon.

17  Q     I would like to show the witness.

18        THE COURT:  Go right ahead.

19        MS. HOLLOWAY:  Exhibit 30.

20  Q     Ms. Dorfman, do you recognize the scene depicted in this

21  photograph?

22  A     I do.

23  Q     Where is it?

24  A     It's the southeast corner of Pitkin Avenue and Williams

25  Avenue in Brooklyn.  It's I believe on Pitkin Avenue.

1          MS. HOLLOWAY:   Thank you.

2          I would like to offer this document into evidence?

3          THE COURT:   It doesn't look like a corner to me.   It

4    looks like a storm drain.   Is that where the storm drain is?

5          THE WITNESS:   Yes.   It is a couple of feet past the

6    southeast corner.

7          THE COURT:   It's on Pitkin?

8          THE WITNESS:   Yes.

9          THE COURT:   All right.   Any objection?

10         MR. BROOKS:   We do object to the introduction of

11   this document.

12         THE COURT:   On what ground?

13         MR. BROOKS:   The fact that it isn't necessarily the

14   storm drain that any evidence was recovered from.

15         THE COURT:   Understood.   It goes to the weight of

16   the evidence.   Not its admissibility.

17         Overruled.

18         Received.

19         (Marked.)

20         MS. HOLLOWAY:   I have marked for identification

21   Plaintiff's Exhibit 31.   I will show it to the witness.

22         MR. BROOKS:   In light of Your Honor's ruling, we

23   have no objection to any of the other photographs.

24         THE COURT:   All right.   You can argue the weight of

25   these obviously to the jury.   You are not precluded from doing

Dorfman-direct-Holloway                          295

1   that.

2              Just walk through it.   There is no objection.

3              31 is received.

4              Have Ms. Dorfman describe briefly what's in these

5   photographs.

6              THE WITNESS:   This is a photo of the southeast

7   corner of Pitkin and Williams and it is taken from Williams

8   Avenue.

9              THE COURT:   From where?

10             THE WITNESS:   From Williams.

11             THE COURT:   That's 31.

12             Received.

13             Go ahead.

14             32 is received.

15             (Marked.)

16  Q    Can you describe the scene, Ms. Dorfman?

17  A    Yes.   This is a photo taken from Pitkin Avenue, taken

18  from Alabama, which is further west, and it is looking down

19  Pitkin Avenue.

20  Q    Which --

21  A    It is looking west down Pitkin Avenue.

22             THE COURT:   Received.

23             (Marked.)

24  Q    Looking west on Pitkin Avenue from Alabama toward

25  Williams?

Dorfman-direct-Holloway                    296

1    A     Yes.

2          This is from the same vantage point, just taken

3    further into the middle of the intersection.

4          THE COURT:  We are now looking at 33?

5          MS. HOLLOWAY:  We are.

6          THE COURT:  Plaintiff's 33.

7          MS. HOLLOWAY:  This is Plaintiff's 33.  It's already

8    in evidence.

9          THE COURT:  All right.

10   Q     And Plaintiff's Exhibit 34?

11         THE COURT:  Received.

12         (Marked.)

13   Q     Can you describe the scene?

14   A     Yes.  This is taken from Pitkin Avenue.  It is a photo of

15   southeast corner of Pitkin and Williams.

16   Q     Plaintiff's Exhibit 35?

17         THE COURT:  Received.

18         (Marked.)

19   A     This is taken from the middle of the intersection.  It's

20   another photo of the southeast corner of Pitkin and Williams.

21   Q     Plaintiff's Exhibit 36?

22   A     This photo was taken from Williams Avenue and it is

23   another photo of the southeast corner of Pitkin and Williams.

24         THE COURT:  Received.

25         (So marked.)

GR      OCR      CM      CRR      CSR

Dorfman-direct-Holloway                              297

1          THE COURT:   When were these taken?

2          THE WITNESS:   February 4th.

3          THE COURT:   Of this year?

4          THE WITNESS:   Of 2010, yes.

5          THE COURT:   The only day in February it wasn't

6    snowing.

7    Q    Speaking of which, there is some snow in this photograph.

8    Plaintiff's Exhibit 37?

9          THE COURT:   Received.

10   A    This is a photo of a storm drain on the east side of

11   Williams Avenue.

12         (So marked.)

13   Q    Is it near the corner of Pitkin and Williams?

14   A    Yes.

15   Q    About how far away from the corner of Pitkin and Williams

16   is the storm drain?

17   A    A couple of feet.

18   Q    Plaintiff's Exhibit 38?

19         THE COURT:   38 is received.

20         (So marked.)

21   A    This is a photo of Williams Avenue taken from the

22   southeast corner, the middle of the intersection.

23   Q    Which direction is this looking on Williams Avenue?

24   A    South.

25   Q    Thank you.

1        I have one final photograph.

2        THE COURT:  39?

3        MS. HOLLOWAY:  39.

4        THE COURT:  It is received.

5        (So marked.)

6   A    This is a close-up of the storm drain on the east side of

7   Williams Avenue.

8   Q    Is that the storm drain that was in the photo that has

9   been marked Plaintiff's Exhibit 37?

10  A    Yes.

11       THE COURT:  Can you put that up for one second?

12       MS. HOLLOWAY:  Yes.

13       THE COURT:  Is that inside the storm drain?

14       THE WITNESS:  Yes.

15       THE COURT:  I see.  What did you do, hold the camera

16  inside the opening to it and shoot it down?

17       THE WITNESS:  Mr. Valdes did, yes.

18       THE COURT:  All right.

19       MS. HOLLOWAY:  If Your Honor would like to clarify,

20  this is Plaintiff's Exhibit 37.  This photo was taken from --

21  from looking down at the storm drain here, correct?

22       THE WITNESS:  Correct.

23       MS. HOLLOWAY:  Thank you.

24       MR. GOLD:  Just for the record, Your Honor, I am not

25  sure that 29 and 30 actually were actually received.

1          MS. HOLLOWAY:   Okay.

2          THE COURT:   Are there other photos?

3          MS. HOLLOWAY:   This was -- 29 is the map, which I --

4    this is Plaintiff's Exhibit 30.

5          THE WITNESS:   Which is the storm drain on Pitkin

6    Avenue.

7          THE COURT:   That's received.

8          (Marked.)

9          MS. HOLLOWAY:   Finally, there are no more photos,

10   but Plaintiff's Exhibit 29, which I can show to the witness.

11   Q    Ms. Dorfman, do you recognize this document?

12   A    I do.

13   Q    What is it?

14   A    It's a Google map's image showing the intersection of

15   Williams and Pitkin Avenue.

16   Q    Did you create this Google map image?

17   A    I did.

18         MS. HOLLOWAY:   I offer this into evidence.

19         THE COURT:   You downloaded this off the Google map

20   site?

21         THE WITNESS:   Yes.

22         THE COURT:   Any objection?

23         MR. BROOKS:   No objection.

24         THE COURT:   Received.

25         (29 is received in evidence.)

300

1       THE COURT:   29.

2       Is that it?

3       MS. HOLLOWAY:   That's it for Ms. Dorfman.

4       THE COURT:   Any cross?

5       MR. BROOKS:   No, Your Honor.

6       THE COURT:   You can step down.

7       Thank you.

8       (Witness excused.)

9       THE COURT:   Did you have other documents you were

10   going to offer in evidence or is that it?

11      MS. HOLLOWAY:   I do.

12      MR. VALDES:   Your Honor, this is a document that's

13   been premarked Plaintiff's Exhibit 20.

14      THE COURT:   Is there any objection to any of these?

15      MR. HARVIS:   We don't know what all of them are, but

16   not to this one, Your Honor.

17      THE COURT:   Any objection to 20?

18      MR. HARVIS:   No.

19      THE COURT:   Received.

20      (So marked.)

21      MR. VALDES:   Your Honor, this is a document that has

22   been premarked as Plaintiff's Exhibit 7.   We would like to

23   offer it into evidence as well.

24      THE COURT:   This is a certificate of disposition of

25   the criminal case?

GR      OCR      CM      CRR      CSR

301

1          MR. VALDES:   Exactly, Your Honor.

2          THE COURT:   Any objection?

3          MR. BROOKS:   No objection, Your Honor.

4          THE COURT:   Received.

5          (So marked.)

6          MR. VALDES:   This is a document that has been

7    premarked Plaintiff's Exhibit 28 that we would like to offer

8    into evidence as well.

9          THE COURT:   What is this?  Declaration of Detective

10   Prince?

11         MR. VALDES:   Yes.  It was a declaration submitted

12   with the defendant's summary judgment papers.

13         THE COURT:   All right.  Any objection?

14         MR. BROOKS:   Your Honor, it's a three-page document,

15   but we have no objection, other than it is cumulative of

16   Detective Prince's testimony.

17         THE COURT:   Overruled.

18         Received.

19         (So marked.)

20         MR. VALDES:   Your Honor, this is an exhibit, a

21   portion of Defendant's Exhibit X that the defendants had used

22   yesterday.  They had placed a Post-it note on a portion.  We

23   are now offering this into evidence.

24         THE COURT:   Didn't I receive this yesterday?

25         MR. HARVIS:   You did.  I think just put the word

GR      OCR      CM      CRR      CSR

302

1    redacted over where the Post-It note was.

2            THE COURT:   Fine.   We will obviously substitute it

3    for the exhibit I received yesterday.

4            Do you have many more of these documents?

5            MR. VALDES:   I believe two more, Your Honor.

6            THE COURT:   All right.

7            MR. VALDES:   This also is a -- one page out of

8    Defendant's Exhibit X that we would like to -- we have now

9    marked exhibit -- Defendant's Exhibit X-3.   We would like to

10   offer it into evidence.

11           THE COURT:   Any objection?

12           MR. HARVIS:   No, Your Honor.

13           THE COURT:   Received.

14           (Marked.)

15           MR. BROOKS:   What is the Bates number on the bottom

16   of that page?

17           MR. VALDES:   Bates number on Defendant's Exhibit X-3

18   is DKR-00302.

19           MR. BROOKS:   Thank you.

20           MR. VALDES:   Finally, this also is a page from

21   Defendant's Exhibit X that we would like to offer into

22   evidence.

23           THE COURT:   What's the Bates number on it?

24           MR. VALDES:   It's DKR00304.

25           THE COURT:   Gentlemen, any objection?

303

1          MR. HARVIS:  No, Your Honor.

2          THE COURT:  Received.

3          (So marked.)

4          MR. VALDES:  I believe that's --

5          MS. HOLLOWAY:  Again, I would like to offer into

6     evidence, Your Honor, the -- what was previously marked as

7     Plaintiff's Exhibit 27, which the transcript -- the transcript

8     from Plaintiff Robertson's April 16, 2006 arraignment.

9          THE COURT:  Any objection?

10          MR. HARVIS:  Yes, Your Honor.

11          THE COURT:  Sustained.

12          MR. HARVIS:  Thank you.

13          MS. HOLLOWAY:  Nothing further.

14          THE COURT:  All right.  Anything further from the

15     plaintiff or does the plaintiff rest?

16          MS. HOLLOWAY:  The plaintiff rests, Your Honor.

17          THE COURT:  All right.  Let me see counsel at

18     side bar, please.

19          (Side bar.)

20          THE COURT:  Okay.  Any motions?

21          MR. BROOKS:  Your Honor, we do have a partial Rule

22     50 motion.  First on the malicious prosecution point.  There

23     has been no demonstration that the police officers initiated

24     the prosecution as required by Cooke v. Sheldon at 41 F.3d 73.

25     They didn't prepare or sign the accusatory instrument and

1    there is no evidence that the officers encouraged the

2    prosecution to go forward.

3              Separate and apart from that, there is absolutely no

4    evidence of any personal involvement by Sergeant Deglas or

5    Detective Prince in initiating the prosecution against

6    Mr. Robertson.

7              THE COURT:  Who called the paralegal?

8              MR. BROOKS:  Detective Sullivan.

9              THE COURT:  Okay.

10             MR. BROOKS:  I think the paralegal called him

11   actually.

12             THE COURT:  Right.  So you are off the hook from

13   malicious prosecution even if you maliciously and falsely talk

14   to the DA and give him the information they need for a charge?

15             MR. BROOKS:  Your Honor, Cooke v. Sheldon requires

16   the officer sign the accusatory instrument which was not done

17   here.

18             THE COURT:  The answer is yes?  As long as they

19   don't sign it, as long as they get the paralegal to sign it,

20   they can falsely and maliciously provide information that will

21   get somebody jailed, in some case for years?

22             MR. BROOKS:  The District Attorney probably has an

23   obligation to investigate that sort of testimony before they

24   swear out a statement.

25             THE COURT:  If you are right about that, we will --

1  it will work itself out post-verdict.  I am not going to

2  dismiss on that ground.

3          What is your answer to the personal involvement of

4  the other two defendants?

5          MS. HOLLOWAY:  Officer Prince also is -- provided

6  information to paralegal Woods as per the accusatory

7  instrument.  Says she was informed by declarant Prince and

8  there are statements made in the -- in that instrument, that

9  she obtained some information from Officer Prince about the

10  facts relating to the incident upon which the accusatory

11  instrument was based.

12          THE COURT:  What about Deglas?

13          MS. HOLLOWAY:  With regard --

14          THE COURT:  Excuse me.  Who ws in charge?

15          MR. HARVIS:  Charge of what?

16          THE COURT:  These three guys that night.

17          MS. HOLLOWAY:  Deglas.

18          MR. HARVIS:  Deglas was the supervisor.

19          THE COURT:  I am going to deny the motion.  We can

20  sort it out post-verdict if you get an adverse verdict on the

21  malicious prosecution.

22          Any other?

23          MR. BROOKS:  The failure to intervene claim.  There

24  is no testimony that has been offered that any of the officers

25  had a reasonable time to intervene as required by cases like

1   Jean-Laurent versus Wilkinson and it is at 540 F. Supp 2d,

2   501.

3           THE COURT:  Okay.  Denied.

4           MR. BROOKS:  Finally, Your Honor, we would also move

5   on qualified immunity grounds for all three officers as to the

6   unreasonable stop and the malicious prosecution.

7           THE COURT:  All right.  That's inextricably bound up

8   in the facts of the case.  It doesn't seem to me appropriate

9   to grant that as a matter of law.

10          Your motion is denied.

11          Are you ready with your defense case?

12          MR. HARVIS:  We are, yes.

13          THE COURT:  Let's go.

14          MR. HARVIS:  Your Honor, the -- a bathroom break,

15  Your Honor?

16          THE COURT:  You can't go ten minutes?

17          MR. HARVIS:  Sure.

18          (In open court.)

19          THE COURT:  Okay.  We are at the point I said we'd

20  get to, where the plaintiff has rested his case.  Now the

21  defendants have an opportunity to present evidence in defense

22  of the claims, which we will start right now.

23          Call your next witness, Mr. Brooks.

24          MR. BROOKS:  Your Honor, the defendants call

25  Detective Niles Prince to the stand.

1            THE COURT:  Come on up, Detective Prince.

2            Be seated while your witness is sworn, Mr. Brooks.

3            THE CLERK:  Please raise your right hand.

4            (The witness is duly sworn/affirmed by the clerk.)

5            THE CLERK:  Please be seated.

6            Please state and spell your name.

7            THE WITNESS:  Detective Niles Prince, N I L E S,

8   P R I N C E.

9   DIRECT EXAMINATION

10  BY MR. BROOKS:

11           THE COURT:  All right, Mr. Brooks.

12  Q    Good afternoon, Detective Prince.

13  A    Good afternoon.

14  Q    Detective Prince, are you currently employed?

15  A    Yes.

16  Q    Who are you employed by?

17  A    New York City Police Department.

18  Q    How long have you been employed by the New York City

19  Police Department?

20  A    A little over six years.

21  Q    Prior to joining the NYPD, who were you employed by?

22  A    United States Marine Corps.

23  Q    How long were you in the Marine Corps for?

24  A    Five years and six months.

25  Q    You were eventually discharged from the Marines, is that

1   correct?

2   A     Yes.

3   Q     What type of discharge did you receive from the Marine

4   Corps?

5   A     Honorably.

6   Q     At the time of your discharge, what rank did you hold?

7   A     Sergeant.

8   Q     Sergeant is a rank you are promoted to in the Marines; is

9   that correct?

10  A     Yes.

11  Q     Turning back to your experience with the NYPD, what is

12  your current rank?

13  A     Detective.

14  Q     When were you promoted to the rank of detective?

15  A     October 2008.

16  Q     Prior to October of 2008, you were a police officer,

17  correct?

18  A     Yes.

19  Q     How long were you a police officer for?

20  A     A little over three years.

21  Q     Where are you currently assigned as a detective?

22  A     Manhattan North Vice OCCB.

23  Q     What does OCCB stand for?

24  A     Organized Crime Control Bureau.

25  Q     Briefly, what are your duties as a detective in Manhattan

Prince-direct-Brooks                           309

1   North Vice?

2   A    To investigate public moral crimes, prostitution, money

3   laundering and gangs.

4   Q    Detective Prince, I am going to focus your attention now

5   on April 14, 2006.

6             On April 14, 2006, what rank did you hold?

7   A    Police officer.

8   Q    Do you remember the events of that day and night?

9   A    Yes.

10  Q    Were you working on April 14th, 2006?

11  A    Yes.

12  Q    What command were you assigned to within the NYPD?

13  A    75th Precinct.

14  Q    Were you assigned to a particular unit within the 75th

15  Precinct?

16  A    Yes.

17  Q    What unit was that?

18  A    Anticrime.

19  Q    Briefly, what were your responsibilities as a police

20  officer in the Anticrime Unit of the 75th Precinct in April of

21  2006?

22  A    My duties were to address specific violent crimes within

23  the precinct, robbery, burglaries and criminal possession of a

24  weapon.

25  Q    Where is the 75th Precinct located?

Prince-direct-Brooks                    310

1    A    In East New York, Brooklyn, 1000 Sutter Avenue.

2         THE COURT:   Hold on one second.   Let me position the

3    microphone so we can hear you a little better.

4         THE WITNESS:   Sorry.

5    Q    What hours did you work on April 14, 2006?

6    A    1730 by 0205.

7    Q    In layman's terms, what does that mean?

8    A    5:30 pm by 0205 am.

9    Q    What were you wearing on the evening of April 14, 2006?

10   A    Plain clothes.

11   Q    What are plain clothes?

12   A    Jeans, boots and a shirt.

13   Q    Why were you wearing plain clothes that evening?

14   A    Because Anticrime is a plain clothes unit.

15   Q    Were you wearing anything that identified you as a police

16   officer?

17   A    Yes.

18   Q    What were you wearing?

19   A    My shield and possibly a raid jacket.

20   Q    What is a raid jacket?

21   A    A raid jacket is a windbreaker that has the lettering

22   NYPD on the back and two -- one NYPD patch on each arm.

23   Q    Where were you wearing your shield?

24   A    Around my neck.

25   Q    What is a shield?

GR      OCR      CM      CRR      CSR

Prince-direct-Brooks                                    311

1   A     A shield is a silver object with numbers along the

2   bottom and New York City Police Officer along the outside of

3   the shield.

4   Q     What was your shield number on April 14, 2006?

5   A     22353.

6   Q     What was your assignment on April 14, 2006?

7   A     Recorder.

8   Q     What does a recorder do?

9   A     The recorder generally takes notes.

10  Q     Were you required to take any notes that evening?

11  A     Yes.

12  Q     Okay.  Where were you assigned to patrol?

13  A     East New York.

14  Q     How were you patrolling that evening?

15  A     In an unmarked vehicle.

16  Q     Who were you on patrol with that night?

17  A     Detective Sullivan and Sergeant Deglas.

18  Q     I am going back to your assignment as a recorder.

19        Did you take any notes regarding the arrest of

20  Mr. Robertson?

21  A     No.

22  Q     Why not?

23  A     Because I -- later that evening I went to the hospital

24  because my wrist was swollen and I had injuries to my lower

25  back.

1   Q    Okay.   You said you were on patrol with Detective
2   Sullivan, correct?
3   A    Yes.
4   Q    Do you know what Detective Sullivan's assignment was that
5   night?
6   A    He was the operator of the vehicle, the driver.
7   Q    Who was your supervisor that night?
8   A    Sergeant Deglas.
9   Q    Where were you seated in the vehicle?
10  A    The passenger side.
11  Q    Do you know whether you were in the front or the back?
12  A    I believe I was in the rear of the vehicle.
13  Q    Okay.   Did there come a time where you were patrolling in
14  the vicinity of Pitkin Avenue and Williams Avenue in East
15  New York?
16  A    Yes.
17  Q    What time was it when you reached the vicinity of Pitkin
18  and Williams?
19  A    I don't recall.
20  Q    What time of day was it?
21  A    Nighttime.
22  Q    Which street were you traveling down when you first
23  reached the vicinity of Pitkin and Williams?
24  A    I believe Pitkin Avenue.
25  Q    Does Pitkin Avenue have one-way traffic or two-way

Prince-direct-Brooks                          313

1   traffic?

2   A    Two-way traffic.

3   Q    Could you please describe briefly for the jury what the

4   area was like in the vicinity of Pitkin Avenue and Williams

5   Avenue the night of April 14, 2006?

6   A    Yes.

7              Pitkin Avenue was an industrial area with street

8   lights and lights along the buildings.

9   Q    Were there any businesses open in the vicinity of Pitkin

10  and Williams?

11  A    No.

12  Q    How far away is the nearest subway stop in the vicinity

13  of Pitkin and Williams?

14  A    I would say, five blocks away.

15  Q    In your experience, are there any buses in the vicinity

16  of -- at that time?

17  A    No.

18  Q    Did there come a time on April 14, 2006, that you became

19  aware of the plaintiff Dwayne Robertson?

20  A    Yes.

21  Q    What first drew your attention to Mr. Robertson?

22  A    The smell of marijuana, and he was actually the only one

23  walking on the street.

24  Q    How were you able to smell marijuana that evening?

25  A    Because my window was rolled down.

Prince-direct-Brooks                              314

1   Q     Why was your window rolled down that evening?

2   A     To help heighten my senses.   I could hear things and see

3   things better.

4   Q     Had you smelled marijuana before in your work as a police

5   officer?

6   A     Yes.

7   Q     Approximately how many times?

8   A     Over one hundred times.

9   Q     Where was Mr. Robertson when you first saw him?

10  A     On the sidewalk.

11  Q     About how far away was he from you?

12  A     Two car lengths away.

13  Q     Was Mr. Robertson walking with anyone?

14  A     No.

15  Q     Was anyone else on the street that evening?

16  A     No.

17  Q     What did you observe as the car drew closer?

18  A     As we positioned the vehicle closer, I observed what I

19  believed at that time to be a marijuana cigarette.

20  Q     Could you describe for the jury what that marijuana

21  cigarette looked like?

22  A     Yes.   It is a -- marijuana cigarettes are wrapped in a

23  cigar-like type paper, brown paper and it is stuffed with

24  marijuana.

25  Q     Have you seen a marijuana cigarette similar to that

1  before in your work as a police officer?

2  A     Yes.

3  Q     Approximately how many times?

4  A     Over 100 times.

5  Q     What, if anything, did you say once you smelled and

6  observed the marijuana cigarette?

7  A     We then positioned the vehicle closer to defendant to

8  further investigate.

9  Q     What happened next?

10  A     At that point in time that's when I exited the vehicle

11  and identified myself and the defendant ran.

12         THE COURT:   Maybe this is a good time to break.

13         MR. BROOKS:   Sure, Your Honor.

14         THE COURT:   Let's break for lunch.

15         Don't discuss the case, ladies and gentlemen.   We

16  will resume at 2:00 o'clock.   All rise.

17         (The following occurred in the absence of the jury.)

18         THE COURT:   See you at 2:00 o'clock.

19         (Luncheon recess taken.)

20

21

22

23

24

25

1          A F T E R N O O N        S E S S I O N

2          THE COURT:   Are we ready?  Detective Prince, please

3    come back up to the stand.

4          Where is your client, Ms. Holloway?

5          MS. HOLLOWAY:   We'll get him.

6          (Pause).

7          (All parties present.)

8          (Jury enters courtroom.)

9          THE COURT:   Please be seated.  We're ready to

10   resume, Mr. Brooks.

11   CONTINUED DIRECT EXAMINATION

12   BY MR. BROOKS:

13   Q    Good afternoon again, Detective Prince.

14   A    Good afternoon.

15   Q    When we broke for lunch, you had just testified that you

16   had just stepped out of the car to confront Mr. Robertson?

17   A    Yes.

18   Q    When you stepped out of the car to confront

19   Mr. Robertson, did you identify yourself as a police officer?

20   A    Yes.

21   Q    Did you identify yourself as a police officer before or

22   after Mr. Robertson ran?

23   A    Before he ran.

24   Q    What was Mr. Robertson carrying when you stepped out of

25   the car?

Prince-direct-Brooks                          317

1    A    What I believed to be a marijuana cigarette.

2    Q    What did Mr. Robertson do with the marijuana cigarette

3    when he ran?

4    A    He threw it to the ground.

5    Q    What did you do when he ran?

6    A    I chased him.

7    Q    Was that on foot?

8    A    Yes.

9    Q    Why did you pursue Mr. Robertson on foot?

10   A    Because he was running on foot.

11   Q    Which way did Mr. Robertson run?

12   A    I believe it was southbound on Williams.

13   Q    Where was your police vehicle at this point?

14   A    Southbound on Williams.

15   Q    What did you observe after Mr. Robertson ran around the

16   corner?

17   A    I continued to pursue him.  The vehicle Detective

18   Sullivan was driving was alongside of us while we were

19   running.  He kind of positioned the vehicle to block

20   Mr. Robertson off.  At that point in time is when

21   Mr. Robertson all in one single motion turned around, pulled

22   out a black object from his waist band.

23   Q    At the point Mr. Robertson drew the object from his

24   waistband, could you tell what that object was?

25   A    Not at that time.

1    Q    What did you think that object was?

2    A    Possibly a gun.

3    Q    Why did you think possibly it was a gun?

4    A    Because in my experience, most people pull pistols or

5    guns from the waistband.

6    Q    How far was Mr. Robertson away from you when he turned

7    back?

8    A    Maybe a car length away.

9    Q    How did you feel at that moment?

10   A    My safety, my safety was a concern.

11   Q    What did Mr. Robertson do with the object he withdrew

12   from his belt?

13   A    Threw it.

14   Q    Where?

15   A    To the ground.

16   Q    What did you do after Mr. Robertson turned and withdrew

17   the object from his belt?

18   A    I attacked.

19   Q    How long was it before his drawing the object you

20   tackling him?

21   A    A matter of seconds.

22   Q    What kind of weapon did you carry?

23   A    Smith and Wesson .9 millimeter.

24   Q    Did you draw your pistol?

25   A    No.

1   Q      Where was your pistol?

2   A      On my right hip, pancake holster, leather holster that's

3   secured by one snap.

4   Q      Were you carrying a baton that evening?

5   A      No.

6   Q      Were you carrying mace that evening?

7   A      No.

8   Q      Describe for the jury how you tackled Mr. Robertson?

9   A      I tackled him like a safety tackler, a quarterback, from

10  his waist.

11  Q      Had you drawn your weapon?

12  A      No.

13  Q      What did Mr. Robertson do after you tackled him?

14  A      He resisted arrest.

15  Q      How did he resist?

16  A      By kicking, punching, flailing his arms.

17  Q      Were you on top of Mr. Robertson during the struggle the

18  entire time?

19  A      No, we were both rolling on the ground.  At one point he

20  was on top of me, then I was on top of him.

21  Q      While he was resisting you, could he have gone for your

22  gun?

23  A      Yes, easily.

24  Q      What did you do to subdue Mr. Robertson?

25  A      I placed handcuffs on him.

1  Q    When were you able to place handcuffs on him?

2  A    When I received the assistance of my two partners,

3  Sullivan an Deglas.

4  Q    Prior to their assisting you, what did you do to try to

5  get the situation under control?

6  A    I tried to grab his arms to place them behind his back.

7  Q    Were you able to do that?

8  A    No.

9  Q    What, if anything, did you say to Mr. Robertson while you

10 were struggling on the ground?

11 A    Stop resisting.

12 Q    How many times did you tell him to stop resisting?

13 A    Multiple times.

14 Q    Did Mr. Robertson comply with those orders?

15 A    No.

16 Q    What happened after you struggled with Mr. Robertson by

17 yourself on the ground?

18 A    We continued to role around on the ground.  I continually

19 tried to reach to grab his arms to place it behind his back.

20 Then seconds went by, that's when the two officers helped me

21 place handcuffs on him.

22 Q    How did you learn those two officers had arrived?

23 A    I actually saw Detective Sullivan to the opposite side of

24 Dwayne while we were placing handcuffs on him.

25 Q    When did you first learn Sergeant Deglas arrived?

1    A    I didn't know he arrived.

2    Q    Did you hear Officer Sullivan say anything to

3    Mr. Robertson during the struggle?

4    A    Yes.

5    Q    What did he say?

6    A    Stop resisting.

7    Q    Did Mr. Robertson comply with those orders?

8    A    No.

9    Q    Did you hear Sergeant Deglas say anything during the

10   struggle?

11   A    I'm not sure, I don't recall.

12   Q    Did you ever see Sergeant Deglas strike Mr. Robertson

13   with a baton?

14   A    No.

15   Q    Did you ever see Sergeant Deglas strike Mr. Robertson in

16   the head?

17   A    No.

18   Q    When did you first learn that Sergeant Deglas had used a

19   baton on Mr. Robertson's legs?

20   A    During the course of this litigation.

21   Q    If someone had struck Mr. Robertson in the head with a

22   baton while you were struggling, would you have been able to

23   see it?

24   A    Yes.

25   Q    If someone struck Mr. Robertson in the legs with a baton

Prince-direct-Brooks                              322

1    while you were struggling, would you have been able to see

2    that?

3    A    No.

4    Q    Did Mr. Robertson eventually stop resisting?

5    A    Yes.

6    Q    How long after you saw Detective Sullivan was it when

7    Mr. Robertson stopped struggling?

8    A    A matter of seconds.

9    Q    You testified that you placed Mr. Robertson in handcuffs?

10   A    With the assistance of my two partners, yes.

11   Q    Took all three of you to handcuff Mr. Robertson?

12   A    Yes.

13   Q    How long was it from your tackling Mr. Robertson on

14   Williams until his finally being placed in handcuffs?

15   A    Not even 60 seconds.

16   Q    What did Mr. Robertson do once the handcuffs were on him?

17   A    He stopped resisting.

18   Q    When the handcuffs were on Mr. Robertson, did you notice

19   any injuries to him?

20   A    No, I don't recall.

21   Q    Was Mr. Robertson bleeding?

22   A    I don't recall.

23   Q    Was Mr. Robertson conscious after the struggle?

24   A    Yes.

25   Q    What did you do once Mr. Robertson was in handcuffs?

Prince-direct-Brooks                              323

1   A    Brought him up to his feet.

2   Q    At that point did Mr. Robertson complain of any injuries

3   to you?

4   A    No.

5   Q    Did Mr. Robertson ever tell you that he had been struck

6   with a baton?

7   A    No.

8   Q    What was Mr. Robertson's demeanor at this point?

9   A    I could smell the stench of marijuana, his eyes were

10  bloodshot red.

11  Q    How did you feel after the struggle with Mr. Robertson?

12  A    I was sore.

13  Q    Did you think you were injured?

14  A    Yes.

15  Q    Where did you feel sore?

16  A    Wrist, lower back.

17  Q    Which wrist?

18  A    Right wrist.

19  Q    What did you do after Mr. Robertson was on his feet?

20  A    We then went back to the precinct.

21  Q    What happened to the marijuana cigarette that you saw

22  Mr. Robertson smoking?

23  A    It wasn't recovered.

24  Q    Do you know why it wasn't recovered?

25  A    Because it probably burnt out.

Prince-direct-Brooks                                    324

1   Q      Did you look for it?

2   A      No.

3   Q      Why not?

4   A      Because I was concerned about my injury.

5   Q      What happened to the object that you saw Mr. Robertson

6   throw?

7   A      It was later recovered and vouchered.

8   Q      Did you recover that object?

9   A      No.

10  Q      Did you eventually learn what that object was?

11  A      Yes.

12  Q      What was it?

13  A      Two gloves stuffed with marijuana, packages of marijuana.

14  Q      Did you transfer Mr. Robertson back to the precinct?

15  A      I don't recall.

16  Q      Did you fill out any arrest paperwork relating to

17  Mr. Robertson?

18  A      No.

19  Q      Why not?

20  A      Because I couldn't write because my right wrist, I went

21  to the hospital to be seen.

22  Q      What hospital did you go to?

23  A      Jamaica Hospital.

24  Q      Why did you go to Jamaica Hospital?

25  A      Because that's the hospital I would be going to as police

Prince-direct-Brooks                                    325

1   officers inside the precinct.

2   Q    What treatment did you receive at the hospital?

3   A    Pain medication, x-ray of my wrist.

4   Q    Do you recall what any diagnosis was?

5   A    No, I don't recall.

6   Q    How long were you at the hospital for?

7   A    A few hours.

8   Q    Was anyone with you at the hospital?

9   A    Yes, but I don't recall who it was.

10  Q    Where did you go after you left the hospital?

11  A    Back to the precinct.

12  Q    Had you ever had to go to the hospital due to an injury

13  that you sustained in the line of duty before?

14  A    No.

15  Q    Did you have to miss any work as a result of your injury?

16  A    No.

17  Q    Why not?

18  A    Because the next two days I was on my regular days off.

19  Q    Did you have to seek any follow-up treatment for the

20  injuries you sustained?

21  A    Yes, I went to my primary care physician.

22  Q    Did you receive any treatment from your primary care

23  physician?

24  A    No.

25  Q    Detective Prince, I'm going to show you what's been

Prince-direct-Brooks                              326

1  marked as Plaintiff's Exhibit 28.  I believe this is already

2  offered into evidence, declaration?

3           THE COURT:    Did I receive it in evidence?

4           MR. BROOKS:   I believe you have.

5           MS. HOLLOWAY:    Yes, we have it.

6  Q    I'm going to show you the first page of this document.

7  Have you seen this document before?

8  A    Yes.

9  Q    When did you first see this document?

10 A    During the course of the lawsuit.

11 Q    The lawsuit we're here about today?

12 A    Yes.

13 Q    Did you provide information that's contained within this

14 document?

15 A    Yes, I did.

16 Q    Who to your knowledge wrote this document?

17 A    The attorneys at the Corporation Counsel.

18 Q    You didn't write this document, correct?

19 A    No.

20 Q    I'll show you the third page of this document.  Is that

21 your signature on that line there?

22 A    Yes, sir.

23 Q    Did you read this document?

24 A    Yes.

25 Q    Did you read this document before you signed it?

1    A    Yes.

2    Q    I'll have you look at it again, the first page of

3    Plaintiff's Exhibit 28.   Referring to the first two lines

4    underneath the caption of this case, were you aware when you

5    signed this document you signed it under penalty of perjury?

6    A    Yes.

7    Q    When you read this document before you signed it, did you

8    believe it to be inaccurate?

9    A    No.

10   Q    I want to refer you to --

11        THE COURT:   Is this the same document?

12        MR. BROOKS:   Yes, page two of Plaintiff's

13   Exhibit 28.

14   Q    Line 17, which reads, at no time was Mr. Robertson struck

15   with a baton by any officer present.

16   A    I actually can't see it.

17   Q    I'll move it up.  Can you see it now?

18   A    Yes.

19   Q    Did I read that correctly?

20   A    At no time was Mr. Robertson struck with a baton by any

21   officer present, yes.

22   Q    You already testified that you never saw Mr. Robertson

23   struck with a baton, correct?

24   A    Yes.

25   Q    When did you first learn he had been struck with a baton?

Prince-direct-Brooks                    328

1   A      During the course of this litigation.

2   Q      Was that after you signed this document?

3   A      Yes.

4   Q      This document should say I did not observe Mr. Robertson

5   struck with a baton, correct?

6   A      Correct, yes.

7   Q      But you didn't, again, write this document, correct?

8   A      No, I did not.

9   Q      Did you ever speak with anyone from the Kings County

10  District Attorney's Office about Mr. Robertson's April 14th

11  arrest?

12  A      No.

13  Q      Did anyone from the Kings County District Attorney's

14  Office ever contact you to discuss the April 14th, 2006

15  arrest?

16  A      No.

17  Q      Did you ever encourage an Assistant District Attorney to

18  go forward with criminal charges against the plaintiff?

19  A      No.

20  Q      Were you ever called to testify in criminal court

21  regarding Mr. Mr. Robertson's April 14th arrest?

22  A      No.

23  Q      Prior to April 14th, 2006 had you ever seen Dwayne

24  Robertson before?

25  A      No.

1    Q    Have you seen Mr. Robertson since April 15th, 2006

2    excluding your time you spent in this courtroom?

3    A    No.

4    Q    At any time during your struggle with Mr. Robertson, did

5    you choke him?

6    A    No.

7    Q    At any time during your struggle with Mr. Robertson, did

8    you strike him in the head?

9    A    No.

10   Q    At any time during your struggle with Mr. Robertson did

11   you punch him?

12   A    I don't recall.

13          MR. BROOKS:   I have no further questions at this

14   time.

15          THE COURT:   Thank you, Mr. Brooks.

16          Any cross?

17          MS. HOLLOWAY:   Yes, your Honor.

18   CROSS-EXAMINATION

19   BY MS. HOLLOWAY:

20   Q    Good afternoon, Detective Prince.

21   A    Good afternoon.

22          MS. HOLLOWAY:   I would like to show the witness

23   Exhibit 28 previously shown in his direct examination which

24   has been accepted into evidence.

25          THE COURT:   Very well.

Prince-cross-Holloway                    330

1    Q      Officer Prince, I believe it was your testimony that you

2    recognize this document, correct?

3    A      Yes.

4    Q      Are you aware that this document was filed in this court

5    in connection with this action?

6    A      Yes.

7    Q      You testified that it was prepared by an attorney from

8    Corporation Counsel, correct?

9    A      Yes.

10   Q      Did you review it after it was prepared?

11   A      Yes.

12   Q      Was it your view at the time that it reflected the best

13   of your recollection at that time?

14   A      Yes.

15   Q      I would like to direct your attention to paragraphs six

16   and seven on page two.  It was your testimony today that you

17   smelled marijuana while in your car, correct?

18   A      Yes.

19   Q      Is that stated in these paragraphs of your declaration?

20   A      No, it isn't.

21   Q      In fact, there's no mention in this affidavit about

22   marijuana, is there?

23   A      No, there isn't.

24   Q      I believe it was your testimony today that you smelled

25   marijuana from your car, from two car lengths away as you're

1  approaching Mr. Robertson, correct?

2  A    Yes.

3  Q    Did there come a time when you observed what you believed

4  to be a marijuana cigarette?

5  A    Yes.

6  Q    When was that time?

7  A    As the vehicle approached the defendant.

8  Q    If I could draw your attention to paragraphs six and

9  seven once again of your sworn affidavit, this affidavit

10  states that you knew it was a marijuana cigarette because of

11  your police training the signature looked, the way

12  Mr. Robertson was smoking it?

13  A    Yes.

14  Q    It's your testimony the cigarette was brown, correct?

15  A    Yes.

16  Q    Was there anything else that you could observe about that

17  cigarette that made you believe it was a marijuana cigarette?

18  A    Besides the smell?

19  Q    Anything you could visually see on that marijuana

20  cigarette that made you believe it was a marijuana cigarette?

21  A    No.

22  Q    Was that marijuana cigarette that you believed you

23  observed the only basis for stopping Mr. Robertson, correct?

24  A    Yes.

25  Q    You didn't recognize him, correct?

Prince-cross-Holloway                    332

1   A     No.

2   Q     As you approached him, did you have any reason to believe

3   he was armed?

4   A     I did not know he was armed, no.

5   Q     Did there come a time when you discovered Mr. Robertson

6   was armed?

7   A     No.

8   Q     In fact, you never confirmed that he was in fact smoking

9   a marijuana cigarette, did you?

10  A     Correct.

11  Q     You didn't recover that cigarette?

12  A     No.

13  Q     To your knowledge neither Officer Sullivan nor

14  Sergeant Deglas recovered that marijuana cigarette, correct?

15  A     To my knowledge, yes.

16  Q     Do you recall speaking to a paralegal, Imani Woods?

17  A     Yes.

18  Q     I would like to show you what's previously marked as

19  Plaintiff's Exhibit 6-A.

20        THE COURT:   Is this in evidence?

21        MS. HOLLOWAY:   It is, your Honor.

22  Q     I would like to direct your attention to the last two

23  paragraphs of the exhibit; Officer Prince, you've seen that

24  first paragraph, deponent is informed by Police Officer Niles

25  Prince, shield number 22353 of the 75th Precinct that the

1  defendant did push upon, strike and hit and that the defendant

2  did swing defendant's arm and kick at the informed in order to

3  prevent an arrest?

4  A    Yes.

5  Q    Did you inform Imani Woods the information you see here?

6  A    No.

7  Q    Your testimony is that Imani was incorrect that she was

8  informed by you?

9  A    She was informed by Detective Sullivan.

10 Q    Paralegal was incorrect when she said she was informed by

11 you?

12        THE COURT:   Don't do that.   Your testimony is you

13 didn't speak to her, correct?

14        THE WITNESS:   Yes, your Honor.

15        THE COURT:   Don't have him comment on whether

16 someone else, right or wrong, but you could elicit the facts,

17 argue.

18        MS. HOLLOWAY:   Very well, your Honor.

19 Q    Going back to your affidavit, Officer Prince, is it your

20 testimony today that Mr. Robertson began to run the moment you

21 set foot outside the car, correct?

22 A    Yes.

23 Q    That you identified yourself as a police officer, but you

24 said nothing else to Mr. Robertson before he started running;

25 is that correct?

1   A    Correct.

2   Q    I would like to direct your attention to paragraphs 8

3   through 11.  Officer Prince, are you aware that it is

4   plaintiff Robertson's testimony that you exited the car,

5   approached him on foot and ordered him to turn around and

6   place his hands on the wall?

7   A    I'm aware it's his testimony?

8   Q    Yes.

9   A    No, I'm not.

10        THE COURT:    Sustained.

11  Q    I would like to direct your attention specifically to

12  paragraph ten of your affidavit, which reads, I then got out

13  of the vehicle and ordered Mr. Robertson to turn around and

14  place his hands on the wall behind him, you see that?

15  A    Yes.

16  Q    Did he run the moment you got out of the car or after you

17  ordered him to turn around?

18  A    The moment I got out of the car.

19  Q    This statement in your affidavit is incorrect?

20  A    During the time of this affidavit, this was correct.

21  Q    I don't believe I understand your testimony, Officer

22  Prince.  You say it was correct, what do you mean?

23  A    Well, I signed the affidavit, states on line ten I got

24  out of the vehicle, ordered Mr. Robertson to turn around,

25  place his hands on the wall behind him.

Prince-cross-Holloway                          335

1   Q     That's not your testimony today, correct?

2   A     Yes, because I don't recall.

3   Q     I would like to direct your attention to Paragraph 17 of

4   your affidavit.  This is the paragraph Mr. Brooks directed you

5   to, at no time was Mr. Robertson struck with a baton by any

6   officer present, you see that?

7   A     Yes.

8   Q     Is it your testimony today that you're not sure one way

9   or the other whether a baton was used on Mr. Robertson?

10  A     It's my testimony today, to my knowledge a baton wasn't

11  used.

12  Q     But this is a definitive statement a baton wasn't used,

13  correct?

14  A     Yes.

15  Q     I would like to show you Plaintiff's Exhibit 11 which has

16  previously been received into evidence, the second page of

17  Plaintiff's Exhibit 11, specifically to the box about a

18  quarter of the way down the page, says "force used."

19              MS. HOLLOWAY:   How do I clear --

20              THE COURT:   Press the lower right-hand corner.

21              MS. HOLLOWAY:   Thank you, your Honor.

22  Q     To the box that says "force used," if I could pull it up.

23  You see here --  first of all, do you recognize what this

24  document is, Officer Prince?

25  A     Yes.

SS      OCR      CM      CRR      CSR

1    Q    What is it?

2    A    I believe it's either an Omniform arrest report or

3    complaint.  I'll not sure.

4    Q    Do you see in the section of this report that we pulled

5    up there's a box under "force used."  It's checked yes?

6    A    Yes.

7    Q    There's a box for type of force used and physical force

8    and baton are both checked?

9    A    Yes.

10   Q    That indicates that according to the preparer of this

11   report a baton was used during the arrest of Mr. Robertson,

12   correct?

13   A    Yes, ma'am.

14   Q    Did you review this arrest report before your affidavit

15   was prepared?

16   A    No.

17   Q    Did you review any of the underlying reports or paperwork

18   regarding Mr. Robertson's arrest before your affidavit was

19   prepared and it was submitted to this court?

20   A    No.

21   Q    You testified that you were struggling with

22   Mr. Robertson, correct?

23   A    Yes.

24   Q    It was your testimony at no time did you or any other

25   officer strike or choke Mr. Robertson, correct?

Prince-cross-Holloway                                337

1    A    Correct.

2    Q    Is it that you don't remember whether he was struck or

3    choked, or it's your testimony he wasn't struck or choked by

4    any of the officers present?

5    A    It's my testimony that he wasn't choked or struck in the

6    back of the head, yes.

7    Q    Are you aware that in his deposition, Sergeant Deglas

8    testified that you were fighting, striking one another at one

9    point?

10   A    No.

11   Q    I believe you testified that the area surrounding Pitkin

12   and Williams Avenue is a desolate industrial area?

13   A    Yes.

14   Q    Very little pedestrian traffic, correct?

15   A    Yes.

16   Q    Your car was unmarked, correct?

17   A    Yes.

18   Q    You testified earlier that you were wearing a badge,

19   correct?

20   A    A shield, yes.

21   Q    That shield was around your neck, correct?

22   A    Correct, yes.

23   Q    I believe you also testified earlier that you were

24   wearing a jacket, a raid jacket that said NYPD?

25   A    I said I was possibly wearing a jacket, it was normal

Prince-cross-Holloway                            338

1   practice for me.

2   Q     You don't know one way or the other whether you were

3   wearing a raid jacket?

4   A     It's a possibility.  It's my own practice.

5   Q     If you were not wearing a raid jacket, was there anything

6   about your appearance other than the badge you testified was

7   hanging around your neck that would indicate you were a

8   New York City Police Officer?

9   A     No.

10  Q     Do you recall being deposed by me in December of last

11  year, Officer Prince?

12  A     Yes.

13  Q     During that deposition, did you give any testimony about

14  this raid jacket that you now recall possibly wearing that

15  evening?

16  A     No.

17  Q     What was it that refreshed your recollection between the

18  time you were deposed in December of 2009 and today regarding

19  this possible raid jacket?

20  A     Because I was wearing one in practice in anti-crime to

21  wear a raid jacket.  The reason that was my practice to wear a

22  raid jacket, it's because of the geographical area.

23  Q     You weren't wearing a raid jacket that night, were you?

24  A     There's a possibility I was wearing a raid jacket, yes

25  because of my own practice.

1   Q    I would like to show you  --  you testified, Officer

2   Prince, you recall being deposed by me?

3   A    Yes.

4   Q    Here are the following questions and answers, page 29.

5   Do you remember them?

6            "QUESTION:    Was your badge visible as you

7   approached Mr. Robertson?

8            "ANSWER:    Yes.

9            "QUESTION:    Where was it?

10           "ANSWER:    Around my neck.

11           "QUESTION:    And what were you wearing?

12           "ANSWER:    I don't recall.

13           "QUESTION:    Were you in a police uniform?

14           "ANSWER:    No.

15           "QUESTION:    Was there anything to identify you as a

16  police officer other than the badge around your neck?

17           "ANSWER:    The color of the day.

18           "QUESTION:    What's the color of the day?

19           "ANSWER:    Color of the day is a sweat band or

20  wrist bands we wear on arm on the outermost garment to

21  identify ourselves as police officers to other police

22  officers.

23           "QUESTION:    Does the color of that band change

24  every day?

25           "ANSWER:    Yes.

1        "QUESTION:    Would there have been a reason for

2   Mr. Robertson to recognize your color of the day bands?"

3            MR. BROOKS:    Objection.

4            THE COURT:    Overruled.

5   Q    The answer, no."

6            At the time of your deposition --

7            THE COURT:    Excuse me, there's a question whether

8   he recalls giving that testimony?

9   Q    Do you recall giving that testimony?

10  A    Yes.

11  Q    At the time of your deposition, you made no mention of

12  your raid jacket, correct?

13  A    Yes.

14  Q    Is it your testimony today that if Mr. Robertson had been

15  hit in the leg with a baton by Sergeant Deglas, you couldn't

16  have seen it, you wouldn't have seen it, correct?

17  A    Yes.

18  Q    Why is that?

19  A    Because we were both positioned on the ground and my face

20  was to his face.  We were face-to-face on the ground.

21  Q    Were you always face-to-face on the ground?

22  A    No, at one point he was on top of me and one point I was

23  on top of him.

24  Q    Now you're aware that in fact Sergeant Deglas did hit him

25  with a baton, correct?

Prince-cross-Holloway                                341

1    A    Yes, I learned, yes.

2    Q    You can't confirm the account he hit Mr. Robertson in the

3    legs with the baton because you didn't see that, correct?

4    A    Yes.

5    Q    Does a baton make a noise when it's deployed?

6    A    Yes.

7    Q    Do you recall hearing that noise the night in question?

8    A    No.

9    Q    It was your testimony today all points during your

10   struggle with Mr. Robertson you were either above him or

11   underneath him on the ground; is that correct?

12   A    Yes.

13   Q    You were struggling with him, right?

14   A    Yes.

15   Q    Yet, it is your testimony you didn't see a baton being

16   deployed at any point against the person with whom you were

17   struggling?

18   A    Yes.

19   Q    Do you know at some point that Sergeant Deglas --  sorry,

20   did you realize at some point that Mr. Robertson was injured?

21   A    No, I don't recall.

22   Q    You don't recall that he was bleeding at any point?

23   A    Yes, I don't recall.

24   Q    Are you now aware that he was injured as a result of the

25   incident on April 14th, 2006 to his face?

Prince-cross-Holloway                    342

1  A     According to the allegations of this litigation, yes.

2  Q     I would like to show you Plaintiff's Exhibit 25, offered

3  and received into evidence.   You see this photo of

4  Mr. Robertson, Officer Prince?

5  A     Yes.

6  Q     Do you see there's bruising around his left eye and some

7  kind of laceration that is closed above his left eye?

8  A     Yes.

9  Q     These type of injuries bleed quite a bit, don't they,

10 Detective Prince?

11            MR. BROOKS:    Objection.

12            THE COURT:    Lay a foundation.

13 Q     Have you ever observed a suspect that you were struggling

14 with bleed from their head?

15 A     No.

16 Q     Are you now aware that Mr. Robertson did in fact have a

17 laceration above his left eye on the evening of April 14th,

18 2006?

19 A     Because of this litigation, yes, I'm aware now.

20 Q     You weren't aware then?

21 A     No.

22 Q     You're aware Mr. Robertson was in fact transported to the

23 emergency room to have a laceration above his eye closed,

24 correct?

25 A     I wasn't aware of that at the time.   Because of this

1    litigation, yes, I'm aware now.

2    Q    It's your testimony you never saw any blood coming from a

3    laceration above Mr. Robertson's eye at any point on the

4    evening of April 14th, 2006?

5    A    It's my testimony I don't recall, yes.

6    Q    It was your testimony today that you did not collect the

7    black object that you've testified you observed Mr. Robertson

8    throw, correct?

9    A    Yes.

10   Q    You don't know where that object was when it was

11   collected, correct?

12   A    Correct, yes.

13   Q    You didn't see either Officer Prince or Sergeant Deglas

14   collect that object?

15   A    I'm Detective Prince --

16   Q    You didn't see either Detective Sullivan or

17   Sergeant Deglas collect that object, did you?

18   A    No, I don't recall.

19   Q    Are you aware Officer Deglas testified in his deposition

20   that you and Officer Sullivan went back to collect that

21   object?

22   A    No, I wasn't aware of that.

23   Q    Is that testimony incorrect?

24            THE COURT:   Don't do that.  Sustained.  Don't have

25   one witness comment on the correctness of or truthfulness of

1    another.   Just elicit testimony.

2    Q    That's not your recollection, is it?

3    A    Correct, yes.

4    Q    It's your recollection that Detective Sullivan collected

5    the black object?

6               MR. BROOKS:    Objection.

7               THE COURT:    Overruled.

8    A    It's my recollection I'm not sure who collected it.

9    Q    You do know, you do recollect you didn't collect the

10   black object, right?

11   A    Correct, yes.

12   Q    You testified regarding an injury to your wrist, did you

13   not?

14   A    Yes.

15   Q    How did you sustain that wrist injury, from rolling on

16   the ground?

17   A    Correct, yes.

18   Q    How did you injure your wrist from rolling on the ground?

19   A    I don't recall.

20   Q    This was not an injury sustained from punching

21   Mr. Robertson in the back of the head or in the chest with

22   that fist?

23   A    No.

24   Q    You testified today that you went for follow-up care with

25   your primary care physician?

Prince-cross-Holloway                    345

1    A     Yes.

2    Q     I would like to direct your attention to page 67 of your

3    deposition transcript.   During your deposition in December, do

4    you recall being asked the following question, giving the

5    following answer?

6          "QUESTION:   Did you seek any further treatment for

7    your wrist injury after you were released from Jamaica

8    Hospital on April 15th?

9          "ANSWER:    No."

10   A     Yes.

11   Q     Did you in fact receive follow-up treatment?

12   A     If the question was, did you seek any further treatment.

13   I did not seek any further treatment, but I went to my primary

14   physician to see if my wrist was usable.   So, no, I didn't

15   receive treatment, but I did go to my doctor, yes, with

16   regards to my wrist.

17   Q     It's your testimony today you did seek further treatment

18   after your treatment at Jamaica Hospital?

19   A     I didn't receive treatment for my wrist, no.   I went for

20   checking-up for my wrist.

21   Q     You did seek treatment for your wrist?

22   A     Yes.

23   Q     Did Mr. Robertson? ^ was there an answer.

24   Q     Do you recall whether you made contact at any point with

25   his fist?

SS      OCR      CM      CRR      CSR

1  A    I don't recall.

2  Q    You didn't complain of injury that evening from being

3  struck by Mr. Robertson, correct?

4  A    Correct.

5  Q    You have a copy, or we can pull up Plaintiff's

6  Exhibit 28, which is a copy of your affidavit, and if you

7  would like to see any other pages, we'll put up the first

8  page, let me know if you want to see further pages.

9         Is there any reference in this affidavit to your

10 suspicion that you articulated today, Mr. Robertson, do have

11 had a gun?

12 A    No.

13 Q    Was that a suspicion that you had at the time of the

14 incident in question, April 14th, 2006?

15 A    Yes.

16 Q    It's one that you testified about here today?

17 A    Yes.

18 Q    Yet, it's not in your affidavit?

19 A    Correct, yes.

20 Q    Why not?

21 A    Because I didn't.

22 Q    You testified here today that your suspicion that he had

23 a gun was the reason you tackled him, correct?

24 A    Yes.

25 Q    Yet that doesn't appear in this affidavit, correct?

1  A    Correct, yes.

2  Q    If you believed Mr. Robertson was in fact reaching for a

3  gun, does that mean at that time that you thought your life or

4  someone else's life could be in danger?

5  A    Correct, yes.

6  Q    I would like to direct you to page 49 of your transcript.

7  Do you recall being asked the following questions and giving

8  the following answers starting at line nine?

9          "QUESTION:    In your view when is it appropriate to

10  use deadly force?

11         "ANSWER:    In my view when is it appropriate to use

12  deadly force?  When my life or another individual's life is at

13  risk of deadly force or at risk of death.

14         "QUESTION:    Was deadly force called for in your

15  contact with Mr. Robertson on April 15th?

16         "ANSWER:    I don't understand the question.

17         "QUESTION:    In your view, was the use of deadly

18  force have been appropriate on April 15th in your contact with

19  Mr. Robertson?

20         "ANSWER:    No."

21         Do you recall giving that testimony?

22  A    Yes, yes, ma'am.

23         (Continued on next page.)

24

25

Prince - cross - Holloway                 348

1   EXAMINATION CONTINUES

2   BY MR. HOLLOWAY:

3   Q     So were you in fear for your life or were you not in fear

4   for your life on April 14, 2006?

5   A     I was in fear for my life, yes.

6   Q     That's not the testimony you gave during your deposition

7   though, was it?

8   A     Correct, yes.

9   Q     When this action was filed, did you receive notification

10  of this action?

11  A     No.

12  Q     In the course of your preparing for -- I'm sorry.

13        In the course of your preparation for your

14  affidavit, did you have a chance to review the complaint that

15  was filed in this action?

16        MR. BROOKS:   Objection.

17        THE COURT:   Overruled.

18  A     No.

19  Q     You didn't review the arrest report before preparing your

20  affidavit, correct?

21  A     Correct, yes.

22  Q     You didn't review the complaint before preparing your

23  affidavit that was submitted in this action, did you?

24  A     The complaint I was -- submitted for this lawsuit?  I did

25  review, yes.

GR      OCR      CM      CRR      CSR

Prince - cross - Holloway                          349

1   Q     You did?

2   A     I really don't recall.  I really don't recall.

3             THE COURT:  Are you referring to the complaint in

4   the criminal case or the complaint that started this lawsuit?

5             MS. HOLLOWAY:  The complaint that started this

6   lawsuit.

7   A     No, I don't recall.

8   Q     What was the basis for the facts that you set out in our

9   affidavit?

10  A     What was the basis for the facts I set out in my

11  affidavit?  The basis were what took place that evening.

12  Q     But you didn't seek to verify what took place that

13  evening by reference to the underlying documents, did you?

14  A     Yes, correct.

15  Q     It was your testimony that you -- when you tackled

16  Mr. Robertson, you could smell the stench of marijuana and his

17  eyes were bloodshot, is that correct?

18  A     It was my testimony when we picked Mr. Robertson up off

19  the ground, I could smell the stench of marijuana and I

20  noticed that his eyes were bloodshot red, yes.

21  Q     Is that -- is that information contained anywhere in the

22  affidavit that you submitted to this Court?

23  A     No.

24  Q     Is that something that you didn't recall at the time that

25  the affidavit was prepared?

GR      OCR      CM      CRR      CSR

Prince - cross - Holloway                      350

1   A    That was something I overlooked, yes.

2   Q    But you recalled it sometime between the preparation of

3   your affidavit and your testimony today?

4   A    Yes.

5   Q    Was there something that refreshed your recollection?

6   A    No.

7   Q    One more question, officer.

8        It was your testimony that when you were handcuffing

9   Mr. Robertson, that Detective Sullivan said something,

10  correct?

11  A    Yes.

12  Q    He said stop resisting, right?

13  A    Yes, ma'am.

14  Q    Where was he standing when he said that?

15  A    On the opposite side of me, or Dwayne Robertson.  I was

16  on one side.  Detective Sullivan was on the other side.

17  Q    Where was Sergeant Deglas at that point?

18  A    I am not sure.  I don't recall.

19  Q    But you do recall Officer Sullivan standing by you and

20  Mr. Robertson, right?

21  A    Yes.

22  Q    You weren't so engrossed in struggling with Mr. Robertson

23  that you didn't notice Detective Sullivan?

24  A    I was engrossed in Mr. Robertson but I used my peripheral

25  vision.

GR      OCR      CM      CRR      CSR

1    Q    You didn't see Sergeant Deglas in your peripheral vision?

2    A    No.

3    Q    You didn't see a baton being deployed in your peripheral

4    vision?

5    A    No.

6              MS. HOLLOWAY:  That's all.

7              THE COURT:  All right.  Thank you, Ms. Holloway.

8              Any re-direct?

9              MR. BROOKS:  Yes.

10             THE COURT:  Go ahead, please.

11   REDIRECT EXAMINATION

12   BY MR. BROOKS.

13   Q    Detective Prince, I am going to show you again page two

14   of Plaintiff's Exhibit 28, which is part of your declaration.

15             Referring your attention to paragraphs eight through

16   ten regarding what you said to Mr. Robertson when you stepped

17   out of your vehicle.

18             Do you see where I was referring to?

19   A    Yes, sir.

20   Q    Is it possible that you said that to Mr. Robertson?

21   A    Yes, there is a possibility.

22   Q    Regardless of what else you said to Mr. Robertson, you

23   did identify yourself as a police officer when you got out of

24   your vehicle, correct?

25   A    Yes.

Prince - redirect - Brooks                    352

1    Q     And at that point Mr. Robertson ran, correct?

2    A     Yes.

3    Q     When you were struggling with Mr. Robertson, where was

4    your attention fixed?

5    A     On Mr. Robertson.

6    Q     Why was that?

7    A     Because I was concerned about him actually grabbing my

8    firearm.

9    Q     And Detective Prince, in every situation where you fear

10   for your life, have you used deadly force?

11   A     No.

12   Q     You can use less amounts of force, correct?

13   A     Yes.

14   Q     If that resolves the situation?

15   A     Yes, correct.

16              MR. BROOKS:  I have no further questions.

17              THE COURT:  All right.  Anything further,

18   Ms. Holloway?

19              MS. HOLLOWAY:  Nothing further.

20              THE COURT:  Thank you, Mr. Brooks.

21              You can step down, Detective Prince.

22              Call your next witness, please, gentlemen.

23              MR. BROOKS:  Your Honor, defendants call Sergeant

24   Dimitri Deglas.

25              THE COURT:  All right.

Deglas - direct - Brooks                           353

1           (Mr. Prince steps down.)

2           THE COURT:  Mr. Brooks, have a seat on the bench

3    there while the witness is sworn, please.

4           Thank you.

5           Please swear the witness.

6           THE CLERK:  Please raise your right hand.

7           (The witness is duly sworn/affirmed by the clerk.)

8           THE CLERK:  Please be seated.

9           Please state and spell your name for the record.

10          THE WITNESS:  Sergeant Dimitri Deglas,

11   D I M I T R I ,  D E G L A S.

12   DIRECT EXAMINATION

13   BY MR. BROOKS:

14   Q     Good afternoon, Sergeant Deglas.

15   A     Good afternoon, sir.

16   Q     Sergeant Deglas, are you currently employed?

17   A     Yes, sir.

18   Q     Who are you currently employed by?

19   A     The New York City Police Department.

20   Q     How long have you been employed by the New York City

21   Police Department?

22   A     Twenty-two years and one month.

23   Q     What is your current rank in the New York City Police

24   Department?

25   A     I'm a sergeant.

Deglas - direct - Brooks                          354

1    Q      When did you become a sergeant in the NYPD?

2    A      February 27, 2004.

3    Q      Sergeant is a rank that you are promoted to within the

4    NYPD?

5    A      Yes, sir.

6    Q      What do you have to do to get promoted to sergeant?

7    A      You have to take a civil service exam which you have to

8    pass.   Based on that grade, you get promoted in order.

9    Q      What rank did you hold before becoming a sergeants?

10   A      I was a detective for ten years before that.

11   Q      Where were you assigned while you were a detective?

12   A      I was assigned to the Organized Crime Control Bureau, but

13   I worked in different divisions within there.   Specifically I

14   worked in the Narcotics Division, the Auto Crime Division and

15   the Organized Crime Investigative Division.

16   Q      What rank did you hold before becoming a detective?

17   A      I was a police officer.

18   Q      How long were you a police officer for?

19   A      I believe, six-and-a-half years.

20   Q      Where are you currently assigned as a sergeant?

21   A      I am assigned to the Central Robbery Section of the

22   Special Investigations Division.   That's part of the Detective

23   Bureau.

24   Q      What are your responsibilities in your current

25   assignment?

1   A    I am currently the commanding officer of the Taxi Squad.

2   We are responsible for robbery patterns concerning taxis,

3   liveries.

4   Q    How him people do you supervise in that capacity?

5   A    I have four at the moment, four detectives.

6   Q    Sergeant Deglas, I am now going to focus your attention

7   on the events of April 14, 2006.

8        Do you recall the events of April 14, 2006?

9   A    Yes, sir, I do.

10  Q    What rank did you hold on April 14, 2006?

11  A    I was a sergeant at that time.

12  Q    Were you working that day?

13  A    Yes, I was.

14  Q    What command were you assigned to?

15  A    I was assigned to the 75th Precinct, in East New York,

16  Brooklyn.

17  Q    What unit were you assigned to within the 75th Precinct?

18  A    I was assigned to the Anticrime Unit.

19  Q    What were your responsibilities within that unit?

20  A    I was the Anticrime supervisor.  I was the Anticrime

21  sergeant.

22  Q    Just briefly, what are the responsibilities of officers

23  in the Anticrime Unit?

24  A    The Anticrime Unit is primarily responsible for

25  suppressing violent street crime.  That would include gun

Deglas - direct - Brooks                          356

1   possession, robberies, assaults, burglaries; any felony crime

2   really.

3   Q     What were you wearing on April 14, 2006?

4   A     I was wearing plain clothes.

5   Q     Why were you in plain clothes?

6   A     Anticrime units perform their duties in plain clothes.

7   Q     Were you wearing anything that identified you as a police

8   officer?

9   A     No, other than a shield which I had around my neck but it

10  wasn't exposed at that time.

11  Q     What was your shield number on April 14, 2006?

12  A     The same as it is today, 1647.

13  Q     Who were you directly supervising on April 14, 2006?

14  A     At the time it was Police Officer Prince and Police

15  Officer Sullivan.

16  Q     What did the three of you do during your tour of duty on

17  April 14, 2006, generally?

18  A     We were patrolling within the confines of the

19  75th Precinct.

20  Q     What sort of vehicle were you on parole in?

21  A     We were in an unmarked car.  It was -- I believe black in

22  color with tinted windows.

23  Q     What was Detective Sullivan's assignment that night?

24  A     He was the operator of the vehicle.

25  Q     What does the operator do?

Deglas - direct - Brooks                    357

1   A      He is the driver.

2   Q      And what was Detective Prince's assignment that night?

3   A      He was the recorder, the front seat passenger.

4   Q      What does the recorder do?

5   A      Typically the recorder is responsible for any

6   administrative matters to take care within the tour.  If a

7   radio assignment would come over, he would write it down or

8   any descriptions come over because obviously the driver can't

9   be concerned with doing that while he is operating the

10  vehicle.

11  Q      Where were you seated in the vehicle?

12  A      I was seated directly behind Police Officer Prince.  I

13  was the right rear passenger.

14  Q      Did there come a time where you were on patrol in the

15  vicinity of Williams Avenue and Pitkin Avenue in East

16  New York?

17  A      Yes.

18  Q      Approximately what time of day was it when you reached

19  that vicinity?

20  A      Approximately a quarter to one, twenty to one.  I don't

21  recall the exact time.

22  Q      On April 15th?

23  A      Yes, it would have been April 15th at that moment.

24  Q      What street were you traveling down when you reached that

25  vicinity?

Deglas - direct - Brooks                                      358

1    A      Initially we were traveling on Pitkin Avenue, approaching

2    Williams Avenue.

3    Q      Were the windows in your vehicle down?

4    A      My window was maybe a quarter of the way down; Police

5    Officer Prince was three quarters to all the way down; and

6    Police Officer Sullivan, his window was all the way down.

7    Q      How do you know that they were down?

8    A      Because I was actually -- it was a cold night and several

9    times during that evening I had -- I asked both of them to put

10   the windows up because if you've ever sat in the window -- in

11   the rear seat of a car with both windows open on a cold night,

12   it gets very, very cold.

13   Q      Why generally were the windows down in the vehicle?

14   A      It is just to facilitate the detection and observation of

15   crime.  I mean, it's -- I would also tell them not to put on

16   the radio so that you could actually hear better and since the

17   window -- the windows on this vehicle were tinted and it is

18   night, it's much easier to see with the windows down.

19   Q      Could you briefly describe for the jury what the area in

20   the vicinity of Pitkin and Williams was like on April 14,

21   2006?

22   A      Yes.

23          That particular area is an industrial area.  It's

24   all -- comprised primarily of commercial establishments,

25   parking lots, small factories.  The area is fairly well-lit by

GR      OCR      CM      CRR      CSR

1   street lights and by building lights.

2   Q    To your knowledge, were there any businesses open near

3   the corner of Pitkin and Williams at that point?

4   A    No, there weren't.

5   Q    Where is the nearest subway stop?

6   A    Four to five blocks west of that location.

7   Q    To your knowledge, were there any buses running in that

8   vicinity at that time of night?

9   A    I didn't see any, no.

10  Q    Did there come a time in the evening of April 14, 2006,

11  or the very early morning hours of April 15th, that you became

12  aware of the plaintiff Dwayne Robertson?

13  A    Yes.

14  Q    What first draw your attention to Mr. Robertson?

15  A    It was a comment made by either Police Officer Prince or

16  Police Officer Sullivan, to the effect of oh, I think that guy

17  is smoking.  Let's check him out.  Those weren't the exact

18  word.  It was words to that effect.

19  Q    When you say they said he was smoking, what was your

20  understanding of what Mr. Robertson was smoking?

21  A    I really wasn't sure at the time.

22  Q    What happened next?

23  A    We were initially proceeding eastbound on Pitkin Avenue

24  approaching Williams Avenue.  When that comment was made,

25  Police Officer Sullivan made a U-turn with the vehicle so that

Deglas - direct - Brooks                    360

1   now we were going westbound on Pitkin and he started to cross

2   into the eastbound lane of traffic.  So he crossed the double

3   yellow line on Pitkin so that now we were pulling almost

4   parallel with Mr. Robertson as he was walking southbound on

5   Pitkin approaching Williams Avenue.

6   Q     What was Mr. Robertson doing when you first saw him?

7   A     When I first observed him, he was walking at a brisk

8   pace.  He was simply walking.

9   Q     What happened next?

10  A     At that point, as we drew closer to him, Police Officer

11  Sullivan, who had his window down, engaged him and said

12  something to the effect of yo, my man, police.  Can we talk to

13  you for a minute?

14  Q     What did Mr. Robertson do in response to that comment?

15  A     I don't know if he said anything.  But it seemed to me

16  that he immediately started to run.

17  Q     What did your officers do in response to that?

18  A     Police Officer Prince exited the front seat of the car

19  and he started to -- he initiated foot pursuit with

20  Mr. Robertson.  So, in other words, he was chasing

21  Mr. Robertson as Mr. Robertson was running southbound on

22  Williams Avenue.

23  Q     Did you hear Detective Prince say anything?

24  A     I didn't hear anything, no.

25  Q     Is it possible he said something and you couldn't hear

Deglas - direct - Brooks                    361

1  it?

2  A    It's entirely possible.   But I was still in the vehicle

3  at that juncture so I don't know.

4  Q    Which way did Mr. Robertson run?

5  A    He made a left turn from Pitkin Avenue southbound on to

6  Williams Avenue.

7  Q    Did you observe Detective Prince chase Mr. Robertson?

8  A    I observed the initial moments of the chase but as the

9  chase commenced, I told Police Officer Sullivan to drive past

10 Mr. Robertson in order to cut off his avenue of escape.

11 Q    What did you see Mr. Robertson do during those initial

12 moments?

13 A    I -- I saw what appeared to be a motion with his right

14 elbow coming up from his right area, from either his right

15 jacket pocket or from his right waistband, but it was -- it's

16 a momentary glimpse that I got because as the car sped off to

17 cut him off, that's -- at that point he was at the side and

18 then suddenly behind me.  So I didn't see too much.   But I did

19 see his elbow come up.

20 Q    How far away was he from you when he reached for his

21 waist?

22 A    At the most, car length, a car length away.

23 Q    What did you think when you saw him reach for his waist

24 in that manner?

25 A    Oh, in my experience, and I have been doing this a long

1   time, those actions are fairly typical of somebody who is

2   trying to remove something, contraband or weapon, from their

3   person.  Usually what happens at that point, it is not

4   necessarily that they want to use it against the officer.

5   They want to get rid of it.

6           I could tell you right now that I got scared at that

7   moment because I have been in those situations where people

8   have drawn weapons, have actually had weapons in their hand,

9   in the vicinity.  It is not a good feeling.

10  Q    Did you see what Mr. Robertson did with whatever he may

11  have reached for in his waist?

12  A    I really didn't, no.

13          It looked like a dark object came out and went to

14  the ground.  But, again, the car was moving fast at that point

15  so I really -- I can't say for sure.

16  Q    What did you see once Detective Sullivan had pulled the

17  car in front of Mr. Robertson?

18  A    As soon as I got out of the car, I think I got out before

19  Police Officer Sullivan even put the car in park, I stood up

20  and I looked northbound on to Williams Avenue and I observed

21  Police Officer Prince and Mr. Robertson rolling around the

22  street, clearly engaged in a fight, in a struggle.

23  Q    Could you describe for the jury the struggle between

24  Detective Prince and Mr. Robertson?

25  A    They were rolling around.  At one point I saw

Deglas - direct - Brooks                    363

1  Police Officer Prince on one knee.  Then he was on two knees.

2  He was trying to hold him down.  Mr. Robertson was pushing

3  away, to get up.  It looked to me like they were exchanging

4  blows.  They were clearly involved in a fight.

5  Q    What did you do once you observed that struggle?

6  A    As soon as I saw that, I -- it became apparent that I had

7  to render assistance to my officer.  So I -- as I was --

8  started running over.  Even as I was out of the car, I took

9  the baton out of my holster.  I deployed it.  Which I extended

10  it to its full length.  I started to run over to their

11  position.

12  Q    When you said you deployed it, you indicated a downward

13  stroke with your hand?

14  A    Yes, as I was running.

15  Q    When you said that you saw Detective Prince and

16  Mr. Robertson possibly exchanging blows, did you ever see

17  Detective Prince strike Mr. Robertson in the head?

18  A    No.  I can't say that I did, no.

19  Q    Were you carrying a gun that evening?

20  A    Yes.

21  Q    What kind of gun were you carrying?

22  A    I was actually carrying two guns that evening.  They were

23  both two-millimeter Glocks.  I had my service weapon and my

24  backup weapon on me too.

25  Q    Those are all pistols?

GR      OCR      CM      CRR      CSR

Deglas - direct - Brooks                    364

1   A      Yes.

2   Q      Did you draw any of those guns?

3   A      No.

4   Q      Why didn't you draw your guns?

5   A      I didn't feel that -- at that moment that it rose to that

6   level.

7   Q      Were you carrying mace that evening?

8   A      Yes, I was.

9   Q      Why didn't you use mace on Mr. Robertson?

10  A      Because by -- when I reached their position, had I used

11  mace on Mr. Robertson, chances are I would also have maced

12  Police Officer Prince because the mace tends to dissipate.

13  Q      What did you do after you deployed your baton?

14  A      When I got up to the position, they were still fighting.

15  Mr. Robertson's head was facing northbound on Williams.  His

16  feet were closer to me, his legs.  Police Officer Prince had

17  his back partially to me but he wasn't looking at me.

18  Obviously he was concentrating on Mr. Robertson at that point.

19  I had the nightstick fully deployed.  I struck Mr. Robertson

20  twice in the thigh, on his left thigh.

21  Q      Did you give Mr. Robertson any orders before you struck

22  him with the baton?

23  A      No.

24          The -- the only thing I said in conjunction with the

25  strikes was that stop resisting.  I said it maybe three or

1    four times.  I yelled it as loud as I could.

2    Q    Why didn't you give him any orders before you struck him

3    with the baton?

4    A    There simply wasn't time.  He was involved in an active

5    struggle with my officer.  My biggest concern regardless of if

6    he had a gun or not was I knew for a fact that police

7    officer -- I mean, Police Officer Prince had a gun on him.

8    There is always a very real possibility when a police officer

9    is actively engaged with a -- in a fight with somebody that

10   gun could be taken away from him.

11   Q    Sergeant Deglas, do you have your baton with you here

12   today?

13   A    Yes, sir.

14   Q    It is the same baton that you had on April 14, 2006?

15   A    The very same one; I've had this baton since 1998.

16   Q    Could you, with Your Honor's permission, stand up and

17   demonstrate on your leg where exactly you struck Mr. Robertson

18   with the baton?

19   A    Yes.

20        THE COURT:  Yes, you can do so.

21   A    The area that I struck him in is the area located between

22   the knee and the hip, directly into this nerve center right

23   here.  The effect that it has, when this is struck, it

24   contracts the muscles involuntarily.  If you've ever had a

25   dead leg or Charlie horse you know that feeling.

1        So what happens is, it delivers a lot of pain to the

2   area.  It is a temporary pain.  It dissuades whoever is

3   fighting, it makes them think twice about continuing the

4   struggle.  That was my intent there, to end the struggle

5   immediately before anybody got hurt.

6   Q    Did you ever strike Mr. Robertson in the head?

7   A    No.

8   Q    Why not?

9   A    Because this is effectively a metal pipe.  It's a hollow

10  metal pipe.  If I was to strike anybody in the head,

11  Mr. Robertson, probably would have fractured his orbital

12  socket with no problem.  So no, head strikes are completely

13  prohibited by the New York City Police Department with batons.

14        The designated strike areas are in the arms and the

15  legs and large muscle mass groups.

16  Q    Let the record reflect when the sergeant was giving that

17  answer he was showing the jury the expanded baton.

18        How long did you strike Mr. Robertson for?

19  A    I would say, just one second.

20        There were two rapid strikes in succession.  That's

21  really all that was needed because he immediately complied

22  after that.  He didn't -- no longer struggled.

23  Q    How long was it from you initially deploying your baton

24  to your striking Mr. Robertson?

25  A    It was a matter of seconds.  By the time I got out of the

Deglas - direct - Brooks                    367

1   car to the time I reached him, the distance would be less than

2   from the witness stand to where you are standing, sir.

3   Q    What did Mr. Robertson do after you had struck him with

4   the baton?

5   A    He brought his knees up to his chest.  He brought his

6   elbows in and he tried to turn over.  He was trying to protect

7   himself.  Obviously he thought more strikes were coming.

8           Once I saw that, I saw the opportunity to handcuff

9   him and end the struggle, which at that point Police Officer

10  Prince was trying to get his arm behind his back.  I was

11  trying to do the same thing.  By then Police Officer Sullivan

12  had already joined us.  So it took the three of us to handcuff

13  him.

14  Q    What did you do with your baton after you struck

15  Mr. Robertson?

16  A    Before I was -- I even tried to get the handcuffs on him,

17  I collapsed the baton.  The way you collapse it is you hit it

18  against a hard surface.

19          Your Honor, if you -- I can demonstrate?  If you

20  feel it is necessary?

21          THE COURT:  Any objection?

22          MS. HOLLOWAY:  No objection.

23          THE COURT:  Go ahead.

24  A    This night -- it might not immediately because it is a

25  carpet.  You just strike it to the ground and it goes back to

GR      OCR      CM      CRR      CSR

1   its original state and I put it back into my holster to have

2   my hand free so I could actually handcuff or aid in the

3   handcuffing of Mr. Robertson.

4           So the whole process, from the deployment to

5   striking to collapsing is very, very fast.  I could probably

6   do it in two seconds.

7   Q    Who actually handcuffed Mr. Robertson?

8   A    I -- I don't know.  It was a collaborative effort at that

9   point.  Typically, handcuffing somebody who doesn't want the

10  be handcuffed is not always easy.  Clothing gets in the way.

11  You know, its -- it's not textbook.

12  Q    What did you observe after -- sorry.  Withdrawn.

13          What did you do after the handcuffs were on

14  Mr. Robertson?

15  A    At that point I think we all kind of like stood up and I

16  just took a breather because we had all -- Police Officer

17  Prince was -- obviously a little tired at that point.  We all

18  were.

19          I recall after that there was a -- a preliminary

20  search done to make sure he wasn't armed, he had no knife or

21  gun or anything else that might hurt is.  At that point he was

22  on his stomach, handcuffed, and I turned my attention to

23  Police Officer Prince who was holding up his wrist and he was

24  circling it around.  I said Niles, are you all right.  He

25  said -- his actual words to me were no, boss, I think I hurt

Deglas - direct - Brooks                    369

1    my wrist.  I said okay.  We'll take care of that.

2         Then I turned my attention to Mr. Robertson who was

3    lying in front of me.  I noticed some drops of blood forming

4    underneath his eye, on to the pavement, directly beneath his

5    head.

6    Q    At that point was Mr. Robertson conscious?

7    A    Yes.  He was conscious, yes.

8    Q    Do you know what caused the drops of blood to form?

9    A    Well, he had sustained an injury.  At that point I

10   remember that we turned him over and sat him up.  I could

11   clearly see that he had a cut and that there was blood coming

12   from that wound.

13   Q    Where was that cut located?

14   A    Directly above his -- in his eyebrow area, above his left

15   eye.

16   Q    Could you see how big the cut was at that point?

17   A    No.  It was obscured by the blood.  I really couldn't

18   tell how big it was.

19   Q    What happened next?

20   A    At that point I -- now we had an injured prisoner.  Once

21   he's in our custody, it's our responsibility to provide

22   treatment for him.  So I made mention -- what I said was, we

23   got to get him a bus.  A bus in police jargon is an ambulance.

24   I knew that we had to get him medical attention.  I also knew

25   that Police Officer Prince was injured.  I knew he would have

GR      OCR      CM      CRR      CSR

1  to get medical attention.  So all these things were going

2  through my mind at this point.

3  Q    Did there come a time where you became aware that

4  Detective Prince had observed Mr. Robertson throw away an

5  object?

6  A    Yes.  At some point there was a conversation about that.

7  I directed Police Officer Prince to go back to the area, which

8  he did, and I was still talking with Police Officer Sullivan

9  at that point and I told him I said, Matt, go help him out.

10 See -- I could see that he wasn't -- he couldn't immediately

11 find what he was looking for.  I remained with Mr. Robertson,

12 who -- and I could still see my two officers on the corner.

13 They were on the southeast corner looking for something.

14 Eventually they came back.

15 Q    How long did that take them?

16 A    I -- I really don't know.  It took a minute, maybe two at

17 the most.  I am not sure.

18 Q    What to your knowledge, did they find?

19 A    When they came back, Police Officer Sullivan came back

20 with -- I remember in one hand he had some crumpled up -- it

21 looked to me like one glove, crumpled up, and then he had bags

22 of marijuana in the other hand.  He showed me what it was.  I

23 said okay.  Let's wrap this up.  Let's get out of here.  At

24 this point I just wanted to get him back to the precinct and

25 get him an ambulance so we could end this.

Deglas - direct - Brooks                    371

1    Q    When you say him, who are you referring to?

2    A    The plaintiff, Mr. Robertson.

3    Q    Was Mr. Robertson conscious throughout all of this?

4    A    Yes, the entire time.

5    Q    What did his demeanor seem to you to be?

6    A    Well, he appeared to me to be intoxicated because

7    he -- all he kept saying was what happened, what did I do,

8    what happened, what did I do.  He kept saying it over and

9    over, to the point where I just tuned him out.  I just wanted

10   to get him back to the precinct.  I really didn't want to

11   listen to him anymore.

12   Q    What happened once you got back to the printing?

13   A    Once we got back to the precinct, I immediately went

14   behind the desk and I had Mr. Robertson's pedigree

15   information.  I entered that into the Command Log so there was

16   a record of the arrest and he was brought to the station

17   house.  I believe in fact on the way to the precinct I had

18   already requested an ambulance be dispatched to the precinct.

19   Q    So Mr. Robertson eventually went to the hospital?

20   A    Yes.  Eventually he went to the hospital, yes.

21   Q    Do you know which hospital he went to?

22   A    Yes.

23   Q    What hospital is that?

24   A    Brookdale Hospital.

25   Q    Did you go with Mr. Robertson to the hospital?

GR       OCR       CM       CRR       CSR

1   A    No, I did not.

2   Q    What did you do?

3   A    I eventually went to Jamaica Hospital with Police Officer

4   Prince.

5   Q    How long were you at the hospital with Detective Prince

6   for?

7   A    We were there for a while.  The biggest problem was

8   getting the X-ray technician.  So I would say, an hour and a

9   half, two hours.

10  Q    Where did you go after the hospital?

11  A    We returned to the precinct.

12  Q    Are you aware that Detective Sullivan completed the

13  arrest paperwork for Mr. Robertson?

14  A    Yes.  By the time we got back from the hospital, he had

15  already done that, yes.

16  Q    Did you review that paperwork?

17  A    Yes, I did.

18  Q    What paperwork did you review?

19  A    There was a complaint report, an arrest report, a

20  property clerk's invoice, and there might have been two

21  property clerk's invoices, and some other paperwork which I

22  don't really remember at this time.

23  Q    Was in your opinion Detective Sullivan's paperwork

24  consistent with what happened during the incident?

25  A    Prior to leaving to the hospital I had discussed with

1    Police Officer Sullivan the charges that we would eventually

2    bring against Mr. Robertson and I was satisfied that the

3    outlines that I had given to him were met.  So I signed off on

4    the paperwork.

5    Q    Sergeant Deglas, what happens to drugs when they are

6    recovered from the scene of an arrest?

7    A    A voucher is prepared, a full description of the item is

8    entered on to the property clerk's invoice.  The narcotics or

9    the marijuana is placed into a narcotics envelope and then it

10   is sealed up.  It is placed into a narcotics locker, where

11   eventually it is taken to the lab, the police lab for

12   examination.

13   Q    Do you as a sergeant transport the drugs to the lab?

14   A    No, no.

15   Q    Would the officers under your direct supervision that

16   might have responsibility for transporting the drugs to the

17   lab?

18   A    No.

19   Q    Do you as a sergeant have access to the locker in which

20   those drugs are kept before they are transported to the lab?

21   A    Only if I am assigned as the Desk Officer.  So in other

22   words, the -- the supervisor, the lieutenant or the sergeant

23   who is behind the desk is responsible for narcotics.

24   Q    That was not your assignment that evening, correct?

25   A    No.  I was the Anticrime supervisor.

Deglas - direct - Brooks                    374

1   Q     Do you as a sergeant perform chemical tests on drugs

2   recovered at the scene of an arrest?

3   A     I did not that night, no.

4   Q     Would the police officers under your direct supervision

5   that night have been responsible for performing chemical lab

6   tests on the drugs recovered that evening?

7   A     The only way you can actually perform those tests is if

8   you are qualified to do so.  So in other words, you have to

9   receive the training to do so.  When I was in narcotics I was

10  qualified.  Once I got promoted that qualification ended.  So

11  I had to get retrained.  So I was not eligible to do it.

12          As far as I know, neither Police Officer Prince or

13  Police Officer Sullivan were trained at that time to do it.

14  Q     Do you have the authority to order the drugs be

15  destroyed?

16  A     Absolutely not.

17  Q     Did you ever speak with anyone from the Kings County

18  District Attorney's office regarding the arrest of

19  Mr. Robertson?

20  A     No, sir, I did not.

21  Q     Were you ever contacted by anyone from the District

22  Attorney's office regarding Mr. Robertson?

23  A     No, sir, I wasn't.

24  Q     Did you ever encourage anyone from the District

25  Attorney's office to proceed with the prosecution of

GR      OCR      CM      CRR      CSR

Deglas - direct - Brooks                    375

1    Mr. Robertson?

2    A    No.

3    Q    Did you ever testify in Criminal Court about

4    Mr. Robertson's arrest?

5    A    No.

6    Q    Do you know the outcome of the charges against

7    Mr. Robertson?

8    A    I didn't find out the outcome of the charges until the

9    start of this litigation.

10   Q    Prior to April 14, 2006, had you ever seen Dwayne

11   Robertson before?

12   A    Never.

13   Q    Since April 15, 2006, and outside of this courtroom, have

14   you ever seen Mr. Robertson?

15   A    No.

16   Q    At any time during the April 14, 2006 incident, did you

17   observe Detective Prince choke Mr. Robertson?

18   A    Choke, no.

19   Q    Did you ever choke Mr. Robertson?

20   A    No, I didn't.

21   Q    At any time during the incident did you observe Detective

22   Prince strike Mr. Robertson in the head?

23   A    I can't say that I did.  I know that they were actively

24   engaged in a struggle but I didn't see specifically

25   where -- where he struck Mr. Robertson or where Mr. Robertson

Deglas - direct - Brooks                              376

1    struck him.

2    Q    At any point during the -- the struggle with

3    Mr. Robertson, did you strike Mr. Robertson in the head?

4    A    In the head, no.

5    Q    At the time during the struggle with Mr. Robertson, did

6    you punch him?

7    A    No, I did not.

8    Q    At any time during the struggle with Mr. Robertson, did

9    you strike Mr. Robertson in the head with your baton?

10   A    Absolutely not.

11          MR. BROOKS:  That's all the questions that I have at

12   this time.

13          THE COURT:  Okay.  Thank you, Mr. Brooks.

14          Let's take or afternoon break.

15          Don't discuss the case.

16          We will resume in ten minutes.

17          All rise.

18          (The following occurred in the absence of the jury.)

19          THE COURT:  We are in recess on the case on trial

20   until 3:35.

21          (Recess taken.)

22          (Continued on next page.)

23

24

25

Deglas-cross-Holloway                    377

1          THE COURT:    After Sergeant Deglas, you have the

2    other detective?

3          MR. HARVIS:    That's it.

4          THE COURT:    Be ready to sum up tomorrow.

5          MR. HARVIS:    We will.

6          (Jury enters courtroom.)

7          THE COURT:    We're ready for the cross.

8    Mr. Holloway?

9    CROSS-EXAMINATION

10   BY MS. HOLLOWAY:

11   Q    Good afternoon, Sergeant Deglas.

12   A    Ms. Holloway.

13   Q    You testified earlier that you didn't make the decision

14   to approach Mr. Robertson; is that correct?

15   A    That's correct.

16   Q    It was Mr. Sullivan who made the decision to approach

17   Mr. Robertson?

18   A    Yes.

19   Q    It was your understanding that decision was made because

20   Officer Sullivan observed Mr. Robertson smoking something,

21   correct?

22   A    The comment that was made was -- I don't remember who

23   said it, was "Let's check out that guy. I think he's smoking

24   something."

25   Q    But it is your current understanding that marijuana

Deglas-cross-Holloway                          378

1    cigarette was the reason for your approach of Mr. Robertson

2    that evening, correct?

3    A    Yes, although at the time I didn't know.

4    Q    But at the time Officer Sullivan did say something in the

5    car to the effect let's go talk to that guy, I think he's

6    smoking something, correct?

7    A    Yes, we didn't have a whole conversation about it.   A

8    short amount of time elapsed between their initial visual

9    contact with Mr. Robertson and our actual physical contact.

10   Q    As your car approached Mr. Robertson, got closer to

11   Mr. Robertson, you didn't yourself see any cigarette or any

12   marijuana cigarette that Mr. Robertson may have been smoking,

13   did you?

14   A    No, I did not.

15   Q    In fact, you didn't ever see or smell any marijuana

16   cigarette, did you?

17   A    My position in the right rear of the passenger seat with

18   the window closed, no.

19   Q    When you say the window closed, you mean the left rear

20   window was closed?

21   A    Yes, the window directly opposite me, the left rear door,

22   that window was closed.   On my side, I had it open a quarter

23   of the way.

24   Q    You testified that window is tinted?

25   A    Yes, all four windows are tinted on that vehicle.

1    Q    Which makes it difficult to see out that tinted window at

2    night, correct?

3    A    From my advantage point at certain angles, it would be

4    difficult to see.

5    Q    Through Officer Sullivan's window you didn't at any point

6    see any cigarette or marijuana cigarette that Mr. Robertson

7    was smoking as you approached him, did you?

8    A    No, I did not.

9    Q    You didn't at any point smell the smell of marijuana

10   smoke coming through the windows of the car?

11   A    No, not at that point, no.

12   Q    At any moment?

13   A    Later on that evening, of course when the marijuana was

14   vouchered, I smelled marijuana.

15   Q    When you are in the car, you didn't smell marijuana smoke

16   coming through the window of the car?

17   A    That's right.

18   Q    You testified when you're in the back seat of the car,

19   the front seat window is open, the air coming in through the

20   front window flows on you.  It was making you cold that

21   evening, correct?

22   A    It's not only the air but the speed of the vehicle that

23   really dictates what kind of temperature.  The faster the car

24   goes, the more air, the colder it gets.  The car is

25   stationary.  The wind might come in.  You understand the point

1  I'm making?

2  Q    I do.  That air coming in, the right-hand side, passenger

3  side window, the front of the car didn't smell, you didn't

4  smell marijuana smoke, did you?

5  A    I didn't smell any marijuana, no.

6  Q    You testified that at a certain point you observed

7  Mr. Robertson, I think you said bring his elbow up reach to

8  his waist?

9  A    That's correct.

10  Q    Where was Mr. Robertson when you observed that happening?

11  A    On the southeast corner of Pitkin Avenue and

12  Williams Avenue.

13  Q    Was he on Pitkin Avenue?

14  A    Yes, on the corner.  We're at both avenues meet,

15  southeast corner.

16  Q    You saw him doing that through Sullivan's window?

17  A    I could really see through both windows although I had a

18  much clearer picture through Sullivan's window.  It was open,

19  obviously.

20  Q    You saw Mr. Robertson reach for his waist through

21  Officer Sullivan's window?

22  A    Yes.

23  Q    You didn't see the marijuana cigarette Mr. Robertson was

24  smoking?

25  A    I didn't see a marijuana cigarette, didn't smell

Deglas-cross-Holloway                    381

1    marijuana smoke.

2    Q    When you saw Mr. Robertson reach for his waist, how soon

3    after when he started running was that?

4    A    It was immediately after he started running.

5    Q    Was it before or after Officer Prince got out of the car?

6    A    He started running before Police Officer Prince exited

7    the car.  That's my recollection of events.

8    Q    But he reached for his waist after Mr. Prince exited the

9    car?

10   A    I believe so, yes.

11   Q    But before he turned left onto Williams Avenue?

12   A    I would say as he was turning left onto Williams Avenue.

13   Q    If he was turning left onto Williams Avenue, running away

14   from Officer Prince, correct?

15   A    That's correct.

16   Q    You followed Officer Prince and Mr. Robertson in your

17   car, correct?

18   A    We were parallel with him at one point.  We passed him

19   and we drove past Mr. Robertson to cut him off.

20   Q    While you were driving, you couldn't see what was

21   transpiring between Officer Prince and Mr. Robertson, correct?

22   A    Not until I exited the vehicle.

23   Q    But you did observe him reach for his waist?

24   A    As he started to run, yes.

25   Q    The next time you saw Officer Prince and Mr. Sullivan,

Deglas-cross-Holloway                          382

1    they were both on the ground, correct?

2    A    Yes.

3    Q    You didn't observe the initial contact between

4    Officer Prince and Mr. Sullivan --  Mr. Robertson?

5    A    No, I did not.

6    Q    But you did observe at one point Officer Prince and

7    Mr. Robertson exchanging blows?

8    A    That's correct, they were clearly involved in a struggle,

9    in a fight in the middle of the street when I first observed

10   them as I exited my vehicle.

11   Q    Sergeant Deglas, do you have your baton with you?

12   A    Yes.

13   Q    It is now in it's shorter form, correct?

14   A    Collapsed form, yes.

15   Q    Could you, just so the jury can hear what it sounds like

16   when you deploy the baton, could you stand up, deploy the

17   baton for the jury, please?

18             THE WITNESS:  Your Honor?

19             THE COURT:    Sure.

20   A    I'll deploy it in the same exact manner I did that night,

21   straight down (indicating).

22   Q    The baton makes a noise when you deploy it?

23   A    A very distinct sound.

24   Q    When you collapse it on the ground, it also made a very

25   loud noise?

1  A    Again, I attribute that to the hollowness of the wood,

2  that's how it amplifies it, the stair (indicating).

3  Q    How did Mr. Robertson react when you hit him with the

4  baton?

5  A    As I stated before, prior to my strikes that were

6  delivered to Mr. Robertson, he was actively engaged in a fight

7  with one of my officers.  Once I delivered the second blow, he

8  stopped.  His reaction was, you know, very evident.  He

9  brought his knees up to his chest, brought his elbows in,

10  trying to protect himself.  At that point, we took full

11  advantage of that because he's no longer fighting, we

12  handcuffed him.

13  Q    Did he say anything when you struck him?  Did he make a

14  noise, react to the pain of being struck with the baton?

15  A    I don't remember him making a noise because I was

16  screaming "Stop resisting."

17  Q    It's your testimony earlier there were drops of blood

18  forming on Mr. Robertson's left brow, correct?

19  A    No, actually when I first observed blood, it was actually

20  on the pavement, the street directly below Mr. Robertson's

21  face.

22  Q    It wasn't drops of blood; it was quite a bit of blood, a

23  pool of blood, correct?

24  A    I wouldn't say it was an enormous amount of blood but

25  clearly there was blood flowing from Mr. Robertson's wound,

1   yes.

2   Q     There was a pool of blood on the pavement underneath

3   Mr. Robertson's face, correct?

4   A     You really have to define pool for me.  Swimming pool?

5   No, it's a small, you know, pool of blood about this size

6   (indicating), about the size a little bigger than a quarter.

7   Q     Do you recall my taking your deposition on December 17th,

8   2009?

9   A     Yes.

10  Q     Do you recall being asked this question and giving this

11  answer?  This is page 43, line 18.

12          "QUESTION:    Did Mr. Robertson say anything to you

13  after he had been struck by the baton?

14          "ANSWER:    Did he say anything?  You know what, I

15  wasn't really paying attention to what he was saying at that

16  point because my concern with him, my primary concern at that

17  point was my officer, both my officers whether or not they

18  were injured and safe and then after Mr. Robertson had been

19  handcuffed, he was lying on his stomach at that point, I

20  noticed there was a pool of blood forming underneath his,

21  under where his head was, so we turned him over and got him

22  up."

23          Do you recall giving that testimony,

24  Sergeant Deglas?

25  A     Yes.

Deglas-cross-Holloway                    385

1   Q    You testified that you hit someone in the head with a

2   baton, a metal pipe, you could fracture their orbital socket,

3   correct?

4   A    Yes, very easily.

5   Q    You also testified that there are times when you can use

6   deadly force but you can choose to use less than deadly force,

7   correct?

8   A    I believe that was Police Officer Prince that testified

9   to that.  That wasn't me.  I would agree with that.

10  Q    Isn't it also true that you can swing a baton and cause a

11  fracture or cause a concussion but you could also use less

12  force, cause less injury, correct?

13  A    I'm sorry, could you rephrase it?  I'm not sure what

14  you're getting at.

15  Q    Isn't it true you could swing a baton with your full

16  force and that might cause a fracture to an orbital socket or

17  concussions, correct?

18            MR. BROOKS:    Objection.

19            THE COURT:    Overruled.

20  A    Of course.

21  Q    You could also swing that baton with less force.  That

22  would cause less injury, correct?

23  A    Yes, I suppose so, yes.

24  Q    Is it your testimony you didn't collect the black object

25  from the storm drain, correct?

1  A    That is my testimony, yes.

2  Q    The storm drain from which it was collected is on the

3  southeast corner of Pitkin and Williams?

4  A    Yes.

5  Q    Was that storm drain on Williams Avenue or on Pitkin?

6  A    I really don't know.  Like I said, I remained with

7  Mr. Robertson.  I could observe my officers peripherally, in

8  other words within my field of vision but I didn't focus on

9  them.  I was focused on the prisoner because it has happened

10  handcuffed prisoners have tried to escape.  My attention was

11  on Mr. Robertson but I could actually see where my officers

12  were.  The specific location they went to, I don't know which

13  storm drain they went to.  There's actually two storm drains;

14  one on the south side of Pitkin, one on the east side of

15  Williams.  They were in the vicinity.

16  Q    When Officer Sullivan returned, he showed you what it is

17  that he had recovered from that vicinity, correct?

18  A    I believe in his right hand he had the glove, what

19  appeared to be one glove crumpled up and exposed bags of

20  marijuana, small baggies of marijuana.  I don't know how many.

21  I didn't count them at the scene, but yes.

22  Q    As a police officer, you've had experience collecting

23  marijuana evidence, correct?

24  A    Yes, unfortunately, yes, hundreds of times.

25  Q    Do you recall the approximate quantity --  you can't

1  remember how many baggies, but in terms of volume how much

2  marijuana Officer Sullivan showed you?

3  A    No.   Again, at the scene, I really wasn't concerned with

4  the evidence, counting the evidence.  I knew it was time to do

5  that at the precinct.  As far as I was concerned, we had two

6  priorities, a prisoner and an injured police officer to attend

7  to.

8         THE COURT:   Listen to the question.   Just answer

9  the question.

10        THE WITNESS:  I'm sorry, your Honor.

11 Q    Do you have any recollection of the volume of marijuana?

12 Was it a large handful of marijuana?

13 A    It was a handful, yes.

14 Q    In separate small Ziploc bags?

15 A    That's correct.

16 Q    Your experience as a police officer doesn't give you any

17 basis on which to approximate what the volume of that

18 marijuana was?

19 A    No.

20 Q    Is it your testimony you struck Mr. Robertson in the

21 thigh, between his hip and his knee with your baton, correct?

22 A    Yes, midway between.

23 Q    You struck him twice in the leg.  Which leg was it?

24 A    The left leg.

25 Q    Twice in the left leg with a metal pipe that can cause a

1    concussion if used on a person, correct?

2    A     Yes.

3              MS. HOLLOWAY:   I have nothing more.

4              THE COURT:    Thank you, Ms. Holloway.

5              Is there any redirect?

6              MR. BROOKS:   No redirect.

7              THE COURT:    You can step down, Sergeant Deglas.

8    Call your next witness.

9              MR. HARVIS:   Detective Matthew Sullivan to the

10   stand.

11             THE COURT:  Swear the witness, please.

12             M A T T H E W      S U L L I V A N,

13             having been duly sworn/affirmed, was examined

14   and testified as follows:

15             THE LAW CLERK:  Please have a seat, state your name

16   and spell it for the record.

17             THE WITNESS:  Detective Matthew Sullivan,

18   S U L L I V A N.

19   DIRECT EXAMINATION

20   BY MR. HARVIS:

21   Q     Good afternoon, Detective Sullivan.

22   A     Good afternoon.

23   Q     How are you doing today?

24   A     Good.

25   Q     Are you currently employed?

1   A       Yes.

2   Q       By whom?

3   A       The New York City Police Department.

4   Q       How long have you been employed by the New York City

5   Police Department?

6   A       Just under nine years.

7   Q       What is your current rank?

8   A       Detective.

9   Q       When were you promoted, detective?

10  A       November of '09.

11  Q       Where are you currently assigned?

12  A       75th Detective Squad.

13  Q       Just briefly, what are your duties and responsibilities

14  as a detective in 75th Precinct Detective Squad?

15  A       My primary function is to investigate robberies,

16  burglaries.  I also assist in shootings, homicides, sexual

17  assaults, grand larcenies, things like that.

18  Q       I would like to focus your attention to April 14th, 2006.

19  On April 14th, 2006 what rank did you hold?

20  A       I was a police officer.

21  Q       Do you remember that day?

22  A       Yes.

23  Q       Were you working?

24  A       Yes.

25  Q       What command were you assigned to?

Sullivan-direct-Harvis                               390

1   A     75th Precinct.

2   Q     Were you assigned to a particular unit within

3   75th Precinct?

4   A     Anti-crime Unit.

5   Q     What hours did you work on April 14th, 2006?

6   A     I think we worked eight to four.

7   Q     Is that 8:00 p.m. to 4:00 a.m.?

8   A     Yes.

9   Q     Where is the 75th Precinct located?

10  A     East New York, Brooklyn.

11  Q     How would you describe the general crime level in

12  75th Precinct?

13  A     It's historically the most violent precinct in the city.

14  Q     Do you know what you were wearing that day?

15  A     Plain clothes of some sort.

16  Q     Why would you be in plain clothes?

17  A     It's the uniform for anti-crime police officers.

18  Q     Do you recall what police equipment you had with you that

19  night?

20  A     I had my shield, my vest, my radio, my gun, extra

21  magazines, handcuffs.

22  Q     Were you carrying a baton?

23  A     No.

24  Q     Were you wearing anything that identified you as a police

25  officer?

1    A    I have my police shield around my neck sitting on my

2    chest.

3    Q    What is anti-crime?

4    A    Anti-crime is a subset of patrol inside the police

5    department, focuses on violent crimes, shootings, gun-related

6    crimes, robberies, burglaries.

7    Q    What do you typically do when you're on an anti-crime

8    squad, what is involved?

9    A    We patrol the highest crime areas inside the precinct

10   that happened to be springing up at that time.  We go looking

11   for criminals.

12   Q    Do you that on foot or in a vehicle?

13   A    A vehicle.

14   Q    Is it fair to say you sort of drive around looking for

15   crime?

16   A    It's a good assumption, yes.

17   Q    The vehicle that you drive around in, is that a marked or

18   unmarked police vehicle?

19   A    Unmarked vehicle.

20   Q    Do you recall who were you partnered with on April 14th,

21   2006?

22   A    Police Officer Prince.

23   Q    Do you recall who your supervisor was that night?

24   A    Sergeant Deglas.

25   Q    Had you worked with Detective Prince and Sergeant Deglas

Sullivan-direct-Harvis                           392

1    prior to April 14th, 2006?

2    A     Yes.

3    Q     That evening, where were you seated in the vehicle?

4    A     I was the driver.

5    Q     Did there come a time you were patrolling in the vicinity

6    of Pitkin Avenue and Williams Avenue?

7    A     Yes.

8    Q     Is Pitkin and Williams Avenue within the confines of the

9    75th Precinct?

10   A     Yes, it is.

11   Q     What time of day was it when you reached the vicinity of

12   Pitkin and Williams?

13   A     Around midnight.

14        MR. HARVIS:    This document is not yet in evidence.

15   Q     I'll show you a document, 3 pages, previously marked for

16   identification as Defendants' Exhibit G.  This is the first

17   page.  This is the second page and this is the third page.

18        Do you recognize the document I'm showing you?

19   A     Yes.

20   Q     What is it?

21   A     That's my memo book, a portion of my memo book.

22   Q     What is a memo book?

23   A     It's a note pad that we keep our daily activities that we

24   conduct while we're at work.

25   Q     Is the writing in this document your handwriting?

Sullivan-direct-Harvis                      393

1    A     Yes.

2    Q     Did you prepare this document in the ordinary course of

3    your duties as a New York City Police Department officer?

4    A     Yes.

5          MR. HARVIS:   At this time I would like to offer

6    into evidence Defendants' Exhibit G.

7          THE COURT:   Any objection?

8          MS. HOLLOWAY:   No objection.

9          THE COURT:   Received.

10         (So marked.)

11   Q     Detective Sullivan, I'm going to show you this.   This is

12   the first page of the document.   Then I'm going to show you

13   the second page and ask you if you can read it on your screen

14   there, read what you have written there.   As you're going

15   through it, translate police jargon into common language.

16   A     Friday, F R I, the day of the week, the date 4/14/06,

17   1930 times 0405.   That's 7:30 at night by 4:05 in the morning.

18   The next line is assigned to 75th Precinct, 1930, the next

19   line down, present for duty, 1940, assigned to anti-crime.

20   Next line down is R & D which stands for radio motor patrol.

21   Should I explain it?

22         THE COURT:   No, spare us that.

23   A     The vehicle number, P O Prince, my partner, 1945 98, a

24   radio term for reassuming or starting patrol.   That would be

25   on the radio and then 0040, one under Williams and Pitkin.

SS      OCR      CM      CRR      CSR

Sullivan-direct-Harvis                          394

1    Q    One more entry.  What does that say?

2    A    0558 hours, E O T as end of tour.

3              THE COURT:   One under means one under arrest?

4              THE WITNESS:  Yes, sir.

5    Q    When you work in the vicinity of Pitkin and Williams,

6    which street were you traveling down?

7    A    Pitkin.

8    Q    Is Pitkin a one-way or two-way street?

9    A    It's a two-way.

10   Q    Just briefly describe for the jury what the area in the

11   vicinity of Pitkin and Williams Avenue was like in April of

12   2006.

13   A    Dark out, near midnight.  Streets have street lights,

14   lights from the building, industrial area with warehouses,

15   some small factories, storage, commercial area.

16   Q    What did you observe when your vehicle reached the

17   vicinity of Pitkin and Williams?

18   A    A male on the south sidewalk.

19   Q    Do you now know who that person was that night?

20   A    Yes.

21   Q    Who was it?

22   A    Mr. Robertson.

23   Q    What, if anything, drew your attention to Mr. Robertson?

24   A    After observing him, I believe he was smoking a marijuana

25   cigarette.

1   Q    What made you think it was a marijuana cigarette that he

2   was smoking?

3   A    Well, to look at it, its shape, non-uniform structure,

4   also color was darker and the way he was smoking.

5   Q    Can you demonstrate for the jury the way you observed him

6   smoking that evening?

7   A    With his index finger and thumb, back of the palm to the

8   mouth (indicating).

9   Q    Prior to April 14th, 2006, had you ever seen someone

10  smoking a marijuana cigarette before?

11  A    Yes.

12  Q    Can you describe for the jury what the portion of the

13  marijuana cigarette you could observe looked like to you that

14  evening?

15  A    Probably the end of it.

16  Q    How fast was your vehicle traveling when you observed

17  what you believed to be Mr. Robertson smoking marijuana?

18  A    Pretty slow.

19  Q    Do you know what the speed limit is in that area?

20  A    No, not offhand.  I believe it's 30 if it's not marked.

21  Q    Do you think you were going above the speed limit?

22  A    No, well under.

23  Q    Was Mr. Robertson with anyone when you saw him?

24  A    No, he was alone.

25  Q    When you observed Mr. Robertson smoking what you believed

Sullivan-direct-Harvis                    396

1   to be marijuana, what did you do?

2   A    I moved closer to investigate.

3   Q    What did you do with your vehicle in order to move

4   closer?

5   A    I crossed the double yellow, driving westbound, crossed

6   the double yellow, right up against the curb and Mr. Robertson

7   was right parallel to my window.

8   Q    Once you had Mr. Robertson parallel to your window, what

9   happened next?

10  A    The window was down.  I engaged him in conversation, let

11  him know I was the police.  Exactly what I said I'm not sure,

12  probably in effect, hey buddy, how are you doing?  Police

13  department.  Could I have a minute of your time, sum and

14  substance, like that.

15  Q    You said your window was down, right?

16  A    Yes.

17  Q    Do you know when you had rolled your window down?

18  A    My window stays down when I do anti-crime.

19  Q    Is that for the reasons Sergeant Deglas mentioned?

20  A    Yes, sir.

21  Q    Do you remember any recollection of smelling marijuana

22  before you spoke to Mr. Robertson?

23  A    This date I don't remember.

24  Q    When you spoke to Mr. Robertson, were you still inside

25  your police vehicle?

1   A    Yes.

2   Q    What, if anything, did you do while you were speaking to

3   Mr. Robertson?

4   A    I was attempting to put the car in park, exit the

5   vehicle.

6   Q    Had you begun the process of exiting the vehicle?

7   A    I believe I had the door open.

8   Q    Do you know whether Sergeant Deglas or Detective Prince

9   had gotten out of the police vehicle or started to get out of

10  the vehicle --  sorry, excuse me, withdrawn.

11       When you asked Mr. Robertson to have a word with

12  you, what happened next?

13  A    He paused for a brief moment, said something.  In sum and

14  substance he said something to the effect of no, I'm not

15  stopping and he ran.

16  Q    Do you know whether Sergeant Deglas or Detective Prince

17  had gotten out of the vehicle or started to get out of the

18  vehicle at the moment the plaintiff ran?

19  A    I don't know.

20  Q    What happened after Mr. Robertson started running?

21  A    He started running and Police Officer Prince exited the

22  vehicle and gave chase on foot.

23  Q    Do you know why Mr. Robertson started running?

24  A    No.

25  Q    What did you do after Detective Prince began his foot

1  pursuit?

2  A    After he passed in front of me, I put the car in gear.  I

3  had it is already in gear, I'm not really sure at this point,

4  went west on Pitkin, left off the corner, that was Williams.

5  I drove the car past Prince, then past Mr. Robertson who was

6  running ahead of Officer Prince.

7  Q    What if anything did you observe as you were driving west

8  on Pitkin?

9  A    I observed something fall from Mr. Robertson's person.

10  Q    Can you describe for the jury what you saw drop as

11  Mr. Robertson ran?

12  A    Black dark object.

13  Q    When Detective Prince got out of the vehicle, why didn't

14  you get out of the vehicle also?

15  A    I'm the driver.  Having the vehicle is a distinct

16  advantage in those situations.

17  Q    When Mr. Robertson started running, what, if anything

18  were you focusing on?

19  A    My partner and also Mr. Robertson.

20  Q    Were you focused at all on what Mr. Robertson did with

21  the marijuana that you had seen in his hand when he was

22  smoking it?

23  A    No, I don't believe so.

24  Q    What happened after you made a left onto Williams Avenue?

25  A    Made a left onto Williams, drove past both of them.  I

SS        OCR        CM        CRR        CSR

Sullivan-direct-Harvis                        399

1   got out a sufficient amount in front at which time I stopped

2   the vehicle, Sergeant Deglas exited.

3   Q    Detective Prince was chasing after Mr. Robertson?

4   A    Yes.

5   Q    Did you actually see Detective Prince reach

6   Mr. Robertson?

7   A    No, sir.

8   Q    Were you able to see what was going on between plaintiff

9   and Detective Prince when you stopped the car and

10  Sergeant Deglas got out?

11  A    I briefly glanced behind my right shoulder and saw a

12  violent struggle going on between Prince and Robertson.

13  Q    When you were observing this struggle, were Prince and

14  Robertson on the ground or standing up or something else?

15  A    I believe they were standing up at first.  Then they were

16  on the ground.

17  Q    Could you see whether punches were being thrown and if so

18  by whom?

19  A    I couldn't see the exact who was doing what.  It just

20  looked like a violent struggle.

21  Q    Do you know where Sergeant Deglas went when he got out of

22  the vehicle?

23  A    He went right to the two of them.

24  Q    Did you see Sergeant Deglas reach the struggle --

25  A    No.

1   Q    No, he did not?

2   A    No.

3   Q    Did you exit the vehicle when the sergeant did?

4   A    No.

5   Q    Why didn't you get out of the vehicle when the sergeant

6   did?

7   A    At that point it was just Detective Prince locked up with

8   him.  It's happened before where subjects are trying to get

9   away.  I have the vehicle which was able to cut him off or if

10  he went the other way, I could speed past him, thereby boxing

11  him in.

12  Q    Is it fair to say that the reason you stayed in your car

13  you thought Mr. Robertson could still get away?

14  A    At that point it was still uncertain whether he was under

15  control.

16  Q    What did you do next?

17  A    I was backing the car up.

18  Q    Did you call for backup at that time?

19  A    No.

20  Q    Why not?

21  A    I didn't deem it necessary.

22  Q    How far did you back the car up?

23  A    I would say two to three car lengths.

24  Q    Did you back the car up to where the struggle was

25  actually happening?

SS      OCR      CM      CRR      CSR

1  A    The rear of the car was by where the struggle, I guess

2  ended.

3  Q    What did you do then?

4  A    I exited the car, came around the back.

5  Q    Why did you decide to exit your vehicle at that point?

6  A    At that point he was on the ground with Officer Prince,

7  seemed like the struggle had died down a little bit,

8  Sergeant Deglas was there.  At that time I deemed it

9  responsible to get out of the car.

10  Q    What, if anything, did you observe when you got out of

11  that police vehicle?

12  A    I believe he was in the process of getting cuffed.  I

13  believe they had one cuff on him, trying to get him in the

14  other cuff.

15  Q    At any time did you observe Detective Prince actually

16  strike plaintiff?

17  A    Not that I remember.

18  Q    At any time did you observe Sergeant Deglas strike

19  plaintiff?

20  A    No, I don't think so.

21  Q    At any time did you observe anyone at any time strike

22  Mr. Robertson in the face with a baton?

23  A    No, I didn't.

24  Q    Was Mr. Robertson handcuffed when you got out of your

25  vehicle?

Sullivan-direct-Harvis                    402

1   A    He was, I think, one on, trying to get him into the other

2   one.

3   Q    What did you do at that point?

4   A    It's a little -- I remember distinctly helping him to

5   his feet.  I believe I was on the ground with him so I

6   probably assisted in the handcuffing.

7   Q    Do you recall how you did that?

8   A    We rolled him over onto his bottom, butt, told him to

9   plant his feet.  Then I was going to pick him up.

10  Q    Do you know if Detective Prince was injured?

11  A    He was definitely moving around with some concern.  He

12  definitely had discomfort.  He was looking at his hand or

13  wrist with some concern.

14  Q    Do you know if Mr. Robertson was injured?

15  A    I believe he had a cut.

16  Q    Would you say there was a lot of blood on Mr. Robertson's

17  face?

18  A    I've seen a lot of blood.  It's tough for me to be the

19  judge of it, but he was bleeding, not like not pouring out of

20  him.

21  Q    After you helped lift Mr. Robertson to his feet, what

22  happened next?

23  A    I remember placing him against the back of the car,

24  giving him a further search for weapons or contraband.

25  Q    Why did you conduct a search of Mr. Robertson at that

1   time?

2   A    At that point he was under control.  Sergeant Deglas and

3   Officer Prince are recovering from the struggle.

4   Q    At the time you searched Mr. Robertson, did you know for

5   certain whether or not he had any kind of weapon on him?

6   A    No, not until I was done with the search.

7   Q    Did you did your search of Mr. Robertson's person

8   disclose any contraband?

9   A    No, I didn't find anything on him.

10  Q    After you searched Mr. Robertson, what happened next?

11  A    I asked the other officers if they were okay.  I told

12  him --  one of us stayed with Mr. Robertson.  I believe it was

13  Sergeant Deglas and Officer Prince stayed with Mr. Robertson.

14  I gave a search of the area to see what he had dropped when he

15  had ran.

16  Q    When you left plaintiff in the custody of Sergeant Deglas

17  and Detective Prince, was he standing up?

18  A    I believe so, yes.

19  Q    You said you searched the area?

20  A    Yes.

21  Q    What did that search consist of?

22  A    I searched the area where the struggle was.  Then I went

23  back, I searched the area where it began.

24  Q    Did you use your flashlight as part of your search?

25  A    Yes.

Sullivan-direct-Harvis                               404

1   Q     Did you find anything?

2   A     Yes.

3   Q     What did you find?

4   A     I found a black glove, like a batting glove type,

5   contained several Ziploc baggies of marijuana.

6   Q     Where did you find that glove and marijuana?

7   A     On the sewer grade or drainage grate of the storm drain

8   or sewer.

9   Q     Where geographically was that?

10  A     That would have been on Williams towards the southeast

11  corner.

12  Q     Southeast corner of Williams and Pitkin?

13  A     Yes, on the Williams side.

14  Q     Was anything else recovered during your search of the

15  general area?

16  A     Another black glove was recovered.

17  Q     Do you know where that other black glove was found?

18  A     I don't remember.

19  Q     Did the second black glove match the first black glove?

20  A     Yes, they did.

21  Q     At the time you recovered it, what did you do with the

22  gloves and the marijuana?

23  A     I put them in my pocket.

24  Q     Did you find the marijuana cigarette that you had

25  observed Mr. Robertson smoking?

1    A    No, I didn't.

2    Q    Did you look for it?

3    A    Yeah.

4    Q    Do you have any idea what might have happened to it?

5    A    It could have gone down the drain where I recovered the

6    marijuana.  It could have gone into the fenced-in commercial

7    property on that corner.  I wasn't able to observe it, no.

8    Q    How much time did you spend conducting the total search

9    of the area?

10   A    Minutes.

11   Q    Why didn't you spend more time on your search?

12   A    At that point it looked like my partner was in a lot of

13   discomfort, prisoner needed to have medical attention.  I

14   deemed it was more important to return to the precinct.

15   Q    What happened next when the search was over?

16   A    We returned to the precinct.

17   Q    You said Mr. Robertson needed medical care, right?

18   A    Yes.

19   Q    Why didn't you call an ambulance to the scene of the

20   arrest?

21   A    His injuries didn't seem to be life threatening in any

22   way.

23   Q    Did you ever observe Mr. Robertson lose consciousness?

24   A    No.

25   Q    Who was Mr. Robertson's arresting officer that night?

1   A    I was.

2   Q    What are the duties of an arresting officer when they

3   make an arrest?

4   A    Process the arrest paperwork, voucher the property if

5   property is recovered, speak to the DA's office.

6   Q    Can you approximate how many times you've been the

7   arresting officer for an arrest?

8   A    Probably over 250.

9   Q    What happened when you got back to the precinct?

10  A    I went to return to the precinct.  We collected the

11  subject's pedigree information which is name, date of birth,

12  address, that stuff, stuff of that nature.

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1   EXAMINATION CONTINUES

2   BY MR. HARVIS:

3   Q    Did Mr. Robertson receive medical attention at the

4   precinct?

5   A    Yes.  I think a bus -- an ambulance was ordered for him.

6   Q    Do you know who ordered it?

7   A    I believe one of the supervisors did.

8   Q    Do you have any idea about how long after you arrived at

9   the precinct the EMS people arrived?

10  A    It wasn't there for the entire thing, but I believe

11  pretty quickly.

12  Q    Do you know if Mr. Robertson went to the hospital?

13  A    Yes.

14  Q    Did you transport Mr. Robertson to the hospital?

15  A    No, I didn't.

16  Q    Why not?

17  A    I am the arresting officer.  Paperwork has to be in,

18  expedited.

19  Q    Did you ever tell Mr. Robertson not to go to the

20  hospital?

21  A    No.

22  Q    Did you ever hear anyone tell Mr. Robertson that night

23  not to go to the hospital?

24  A    No.

25  Q    Do you know if Detective Prince went to the hospital?

1    A    Yes, he did.

2    Q    Did you go with Detective Prince to the hospital?

3    A    I don't believe I went with him initially.  I might have

4    gone later on to check up, see if he's okay.

5    Q    Detective, when you sit down to do arrest paperwork and

6    you are the arresting officer, what is the first thing that

7    you do?

8    A    The online generally.

9    Q     What is an online?

10   A    Online is the paperwork that's done for an arrest.

11   Q    Okay.  I am now going to show you -- this has previously

12   been received into evidence as Plaintiff's Exhibit 11.

13         Let me do this -- I think this is out of order.

14   This is actually the first page of this document, is that

15   right, detective?

16   A    That's correct.

17   Q    Okay.  Now, just take a look at this.  It -- does -- is

18   this the online that you prepared for the arrest of Dwayne

19   Robertson?

20   A    Yes.

21   Q    Do you know when you prepared it?

22   A    Sometime that morning.

23   Q    What happens to this form once you complete it?

24   A    This form is submitted to the LAPS officer who does the

25   data entry and enters it into a system.

Sullivan-direct-Harvis                              409

1   Q     This handwritten form is entered by someone in a computer

2   system?

3   A     Yes.

4   Q     Are you personally involved in the process of inputting

5   this handwritten form into the computer?

6   A     No.

7   Q     You are not the person who actually enters it into the

8   computer, right?

9   A     No.

10  Q     Can you read for the jury what you listed under charges,

11  just the description, please?

12  A     Description, first one is going to be tampering with

13  evidence.   The second one is CPM, assistance for criminal

14  possession of marijuana.   Third one, resisting arrest.   And

15  the fourth one is going to be assault on a PO.

16  Q     Now, why did you list these charges on this form?

17  A     Because those were the charges that I observed him to

18  commit.

19  Q     Whose decision was it to list these charges?

20  A     Mine and I also consulted with my supervisor.

21  Q     By listing these charges on this form, does that mean

22  that the District Attorney is going to prosecute Mr. Robertson

23  for these particular charges?

24  A     No.

25  Q     Why not?

1   A    It is up to them.

2   Q    Now, in the -- let me just -- in the arresting officer

3   section under force used, can you -- can you tell me what that

4   says?

5   A    Force used, yes.  Type, physical force and baton were

6   checked.

7   Q    Now, why did you complete the form in that way?

8   A    Because during the apprehension of the subject, physical

9   force was used and also a baton.

10  Q    How did you know that a baton had been used?

11  A    I believe Sergeant Deglas informed me.

12  Q    Now, detective, why -- you see here on the left it says

13  arresting officer next to all this information?

14  A    Yes, I do.

15  Q    Why would the Sergeant Deglas's use of a baton be listed

16  in the section for the arresting officer?

17  A    Well, there is no box on the form for assisting officers.

18  And this I felt was the most truthful way to fill it out.

19  Q    Okay.  Similarly, under arresting officer, it says,

20  the -- it says -- right here, it says arresting officer

21  injured and both yes and no have been checked.

22       Is that right?

23  A    Yes.

24  Q    Why is that?

25  A    Very few of my arrests that -- is the arresting officer

1    injured.  So after doing so many arrests and, you know, you go

2    through checking and you know you pretty much do it almost by

3    memory sometimes.  I mistakenly checked that there was no

4    officer injured.  So I went back and corrected my mistake with

5    the X and the circle around the yes.

6    Q    Detective, you were not injured that night, right?

7    A    No.

8    Q    Why would Detective Prince's injuries be listed in the

9    arresting officer section of this paperwork?

10   A    Pretty much the form doesn't allow for the assisting

11   officer is injured.  I felt that was the most truthful way to

12   fill it out.

13   Q    Now, I am going to direct you down here to, in the

14   defendant information section.

15   A    Yes.

16   Q    Under type of drug used, you checked none.  Right?

17   A    Yes.

18   Q    Now, why did you check none even though you observed

19   Mr. Robertson using marijuana?

20   A    I never recovered the marijuana cigarette.  So I didn't

21   charge him with it.  Because I couldn't prove it.

22   Q    Okay.  Now, I am going to turn your attention down here

23   to where it says, narrative.  I have just -- I will ask you to

24   read that narrative portion for the jury, please, if you can?

25   A    At TPO, which stands for time, place and occurrence,

1    above perp, stands for perpetrator, did throw two gloves full

2    of marijuana down drain.  When AO attempted to arrest perp,

3    perpetrator, perp did flail his arms and legs at arresting

4    officers causing pain and swelling to officer's hand and back.

5    Q    Now, why didn't you include in your narrative of the

6    events that you saw Mr. Robertson smoking a blunt?

7    A    There really just wasn't any room in the small area given

8    and I wanted to have the top charges on there.

9    Q    Similarly, you said that there were two gloves full of

10   marijuana, but what you just testified to is that you only

11   recovered one glove that actually had marijuana in it, right?

12   A    That's what I recall, yes.

13   Q    So how come you put in the narrative section that you

14   recovered two gloves full of marijuana?

15   A    Honestly, I felt that was just the easiest way and the

16   smallest space provided to put in two gloves were recovered.

17   Q    What did you do with the marijuana and the gloves that

18   you had recovered then?

19   A    I vouchered them.

20   Q    I am now showing a document that's previously been

21   admitted into evidence under -- as PX-9.

22        Is this one of the vouchers that you prepared that

23   evening?

24   A    Yes.

25   Q    The -- this form was completed by you with the exception

1   of the signature of your -- of the desk officer, is that

2   right?

3   A    No.   That's Sergeant Deglas's signature.

4   Q    Oh, okay.   Okay.   Apologize.

5              But the typing that was done, the form is actually

6   typed on a typewriter, is that right?

7   A    Yes, it is.

8   Q    Okay.   You are the one who is actually sitting at the

9   typewriter typing it up?

10  A    Yes, sir.

11  Q    Why did you list 18 zip locks of marijuana on this form?

12  A    After counting them up, that's what were inside the

13  glove.

14  Q    So -- and in addition to preparing this form, is there

15  anything actually done with the marijuana itself?

16  A    It is placed in a narcotics envelope, which you can see

17  at the bottom of the narrative, and then you can see NARCO

18  envelope and then -- did I --

19  Q    You have to hit the lower right corner to clear that.

20  A    Oh.   Narcotics envelope and then it is placed in a

21  security envelope and it is given back to the desk officer,

22  whoever is working there.

23  Q    So once -- once that process is completed, this document

24  has been prepared, the marijuana has been placed into that

25  envelope, and it is given to the desk officer, where is it

1   stored?

2   A    In the drug locker.

3   Q    What is a drug locker?

4   A    Drug locker, on the 75th, it is like a converted mailbox.

5   The way you see one on the street where you drop it in and you

6   close it up.  So you can only make deposits.

7   Q    Okay.  It is like a drop box?

8   A    Yes.  It looks just like a mailbox that you see on the

9   street though.

10  Q    Where in the 75th Precinct is that locker located?

11  A    It's located directly behind the desk sergeant.

12  Q    Are you aware of who has access, or I guess in 2006, who

13  had access to the narcotics locker?

14  A    Whoever was assigned as desk sergeant at the time.

15  Q    In April of 2006, did you have access to the narcotics

16  locker at the 75th Precinct?

17  A    No.

18  Q    Have you ever accessed the narcotics locker at the

19  75th Precinct?

20  A    No.

21  Q    Do you know what happened ultimately to the marijuana

22  listed on this voucher?

23  A    I believe it was destroyed.

24  Q    Is it uncommon for marijuana to be destroyed?

25  A    No.

1    Q    When you voucher marijuana, are you responsible as the

2    arresting officer for sending it to the laboratory for

3    analysis?

4    A    No.

5    Q    Do you know who does that?

6    A    No.

7    Q    Are you responsible as the arresting officer for

8    preparing what is known as a corroborating affidavit?

9    A    No.

10   Q    Do you know who does that?

11   A    A member of ECAB or DA's office.

12   Q    Once you had prepared the voucher and secured the

13   marijuana in the envelope and given it to the desk officer,

14   did you personally have any obligation to do anything else

15   with that marijuana?

16   A    No.

17   Q    I am now showing you what's previously been entered into

18   evidence as PX-10.

19        Is this the voucher for the two black gloves that

20   you found that night?

21   A    Yes, it is.

22   Q    Is there any difference in the process that happens when

23   you are vouchering gloves than there is when you are

24   vouchering marijuana?

25   A    Besides you -- being just put it in a regular security

1    envelope.   You don't have to put it in a special narcotics

2    envelope.   But as far as I am concerned, no, I just -- I give

3    both -- all the property to the desk officer.

4    Q    Okay.   Do you -- do you know what happened to the gloves

5    that are listed on this voucher?

6    A    I believe they went to the property clerk.

7    Q    Did you prepare any paperwork related to Detective

8    Prince's injuries that evening?

9    A    Yes.

10   Q    What paperwork would you have prepared?

11   A    An aided card.

12           MR. HARVIS:   Your Honor, I would like to show an

13   exhibit that's only for the witness, please.

14           THE COURT:   Okay.

15   Q    Detective, I am now showing you what has been marked for

16   identification as Defendant's Exhibit F.   Just take a look at

17   this, please.

18           What is this document, detective?

19   A    This is police department aided report worksheet.

20   Q    What is an police department aided report worksheet?

21   A    It is a report generated when there is an injury to a

22   complainant or a member of the service.

23   Q    Who prepared this particular aided report worksheet?

24   A    I did.

25   Q    Do you know when you prepared it?

Sullivan-direct-Harvis                    417

1    A    Sometime that morning.

2    Q    Does your signature appear on this document?

3    A    Yes.

4    Q    Did you prepare this document in the ordinary course of

5    your duties as a New York City Police Department officer?

6    A    Yes.

7    Q    Do you have a duty to record the information in this

8    document accurately?

9    A    The best of my ability, yes.

10   Q    Did you in fact record the information in this document

11   accurately?

12   A    Yes, I did.

13   Q    To your knowledge, is this document maintained in the

14   ordinary course of business of the New York City Police

15   Department?

16   A    Yes.

17           MR. HARVIS:  Your Honor, at this time I would like

18   to have this document admitted into evidence as Defendant's

19   Exhibit F.

20           THE COURT:  Any objection?

21           MS. HOLLOWAY:  No objection.

22           THE COURT:  Received.

23           (So marked.)

24   Q    Detective, it's -- would you please read the narrative

25   portion of this document for the jury?

1  A    At the TPO, time, place, occurrence, MOS, referring to

2  Officer Prince, aided, injured his right hand and back while

3  effecting a lawful arrest of combative perp, perpetrator.

4  Q    MOS means member of the service?

5  A    That is correct.

6  Q    You meant Detective Prince, right?

7  A    Yes, sir.

8  Q    Detective Prince's information is actually listed in the

9  other portion.

10          Let me just turn this around so you can see?

11          This information all relates to Detective Niles

12  Prince, right?

13  A    Yes.

14  Q    Detective, did you speak with anyone in the District

15  Attorney's office about the arrest of Dwayne Robertson?

16  A    Yes.

17  Q    Do you know who you spoke to?

18  A    A member of ECAB.

19  Q    What is ECAB?

20  A    ECAB is the Kings County DA's office intake for new

21  arrests.

22  Q    Do you recall how you spoke to the person at ECAB?

23  A    By phone.

24  Q    Do you know if you called them or if they called you?

25  A    They usually call.

1   Q     What did you tell them when you spoke to them?

2   A     I just gave them a brief synopsis of the events that

3   transpired earlier that morning.

4   Q     Do you know who drafted the Criminal Court complaint in

5   this case?

6   A     That would be ECAB.

7   Q     Did ECAB or anyone at the District Attorney's office ask

8   you what charges should be brought against Mr. Robertson?

9   A     No.

10  Q     Did --

11          THE COURT:   ECAB is an acronym for what?

12          MR. HARVIS:   Early case --

13          THE COURT:   Not you.

14          MR. HARVIS:   I believe it's early --

15          THE COURT:   You are not the witness.

16          MR. HARVIS:   I'm sorry.

17          THE WITNESS:   I apologize.   I don't know what it

18  stands for.

19          THE COURT:   It is not a person, right?

20          THE WITNESS:   No.   It is --

21          THE COURT:   It is an entity down at the DA's office?

22          THE WITNESS:   Yes.   It is a subsection of the DA's

23  office.

24  Q     Did anyone at the District Attorney's office ask you

25  whether or not Mr. Robertson should be prosecuted?

Sullivan-direct-Harvis                    420

1   A    No.

2   Q    Was the arrest paperwork that you completed that morning

3   provided to the District Attorney's office?

4   A    Yes.

5   Q    After your phone call with the person at ECAB, did anyone

6   from the Kings County District Attorney's office ever contact

7   you to discuss the April 14, 2006, incident?

8   A    No, I don't believe so.

9   Q    After your phone call with ECAB, did you call the

10  District Attorney's office to discuss Mr. Robertson or his

11  prosecution?

12  A    No.

13  Q    Did you ever testify in Criminal Court regarding

14  Mr. Robertson's arrest?

15  A    No.

16  Q    Are you aware of the outcome of the charges against

17  Mr. Robertson?

18  A    Yes.

19  Q    When did you become aware of the outcome of those

20  charges?

21  A    During this proceeding.

22  Q    Prior to April 14, 2006, had you ever seen Dwayne

23  Robertson before?

24  A    No.

25  Q    Have you, aside from seeing him in this courtroom, have

Sullivan-cross-Valdes                        421

1    you ever seen Mr. Robertson since April 15, 2006?

2    A    I don't believe so.

3    Q    Did you plant marijuana on Dwayne Robertson on April 14,

4    2006?

5    A    No.

6    Q    Did you observe anyone plant marijuana on Dwayne

7    Robertson on April 14, 2006?

8    A    No.

9              MR. HARVIS:  I have no further questions.

10             THE COURT:  Thank you, Mr. Harvis.

11             Mr. Valdes, any cross?

12             MR. VALDES:  Yes, Your Honor.

13   CROSS-EXAMINATION

14   BY MR. VALDES:

15   Q    Good afternoon, Detective Sullivan?

16   A    Good afternoon.

17             What's your name, sir?

18   Q    Hector Valdes.

19             Detective Sullivan, when you first spotted

20   Mr. Robertson on the night of April 14th, early morning of

21   April 15th, you had never seen or met Mr. Robertson before, is

22   that correct?

23   A    I don't believe so, no.

24   Q    So you had no prior knowledge about Mr. Robertson?

25   A    No, sir.

GR      OCR      CM      CRR      CSR

Sullivan-cross-Valdes                                    422

1    Q    At that time you were not investigating a tip that had

2    been called in about anybody matching the description of

3    Mr. Robertson; is that correct?

4    A    I don't believe so.

5    Q    So the -- I believe you have testified that the decision

6    that you made to approach Mr. Robertson was based entirely on

7    what you observed that evening?

8    A    Yes.

9    Q    When you first spoke to Mr. Robertson, did you show him

10   your badge?

11   A    I was in the car.  My badge was on my -- on my chest.  He

12   may be -- he probably was able to see it.  But I didn't hold

13   it up.  No, I did not.

14   Q    Is the badge contained in sort of a wallet that can open

15   and close or is it fully displayed at all times?

16   A    It's just the -- I don't know exactly what it's made out

17   of.  But the metal badge with the like a safety pin through

18   the back.  And I had it with a metal -- the most common way is

19   the thing you see at the bank that holds the pen in there,

20   that beaded thing, I had that holding it around my neck.

21   Q    It is not actually covered by a wallet?

22   A    No, no, it was just sitting there on my chest.

23   Q    I believe you have testified that the observations that

24   led to your decision to approach Mr. Robertson were two

25   things.  One, the observation of the actual cigarette that he

GR        OCR        CM        CRR        CSR

Sullivan-cross-Valdes                           423

1   was holding, and secondly, the way that he was holding the

2   cigarette; is that correct?

3   A    Yes.

4   Q    Detective Sullivan, you did not smell marijuana as you

5   approached Mr. Robertson, correct?

6   A    I can't remember at this time.

7   Q    But I believe you testified on direct that you did not?

8   A    I said I can't remember.  I can't remember if I did or

9   didn't.

10  Q    Do you recall anybody in the car saying that they had

11  smelled marijuana?

12  A    No, I don't remember that.

13  Q    Your window was closer to Mr. Robertson than Officer

14  Prince's window was, is that correct?

15  A    I believe so, yes.

16  Q    Can you describe the actual appearance of the cigarette

17  that you saw Mr. Robertson carrying?

18  A    Small, the exact length, not exactly sure of, because I

19  don't know how much was actually hidden in his thumb but it

20  was dark in color, non-uniform in shape, and semi-broken.

21  Q    Detective Sullivan, you have testified that your car was

22  in the westbound lane of Pitkin Avenue; is that correct?

23  A    Yes.

24  Q    Mr. Robertson was walking along the southern sidewalk on

25  Pitkin Avenue?

GR      OCR      CM      CRR      CSR

1    A    Yes.

2    Q    Approximately how far would you say you were from

3    Mr. Robertson when you first spotted him?

4    A    The -- first spotted him smoking, what I believe to be,

5    or just first spotted him?

6    Q    When you first spotted him and believed that he was

7    smoking marijuana.

8    A    Approximately three to four car lengths, two to three,

9    three to four.

10            MR. VALDES:  Pull up PX-33, please.  This is already

11    in evidence.

12            THE COURT:  Yes.

13    Q    Detective Sullivan, do you recognize this scene as a

14    picture of Pitkin Avenue facing westward?

15    A    We'd be at like the intersection of Alabama, right?

16    Q    Right.  The street immediately to the east of Williams.

17    A    Okay, yes, yes.  You asked if this is Pitkin?

18    Q    This is Pitkin facing towards Williams?

19    A    Yes, sir.  Yes, sir.

20    Q    So you -- your car would have been next to -- to the left

21    of some of these large trucks that are shown in this picture,

22    is that about right?

23    A    Yes.

24    Q    Mr. Robertson would be walking along this sidewalk next

25    to this brick building?

Sullivan-cross-Valdes                                      425

1    A    Maybe a little up towards the fence.

2            THE COURT:   The brick building on the right of the

3    photo?

4            THE WITNESS:   The left of the photo, sir.   My car

5    would be on the right, somewhere between these two trucks

6    here.

7            THE COURT:   Okay.

8    Q    Approximately how many feet -- you said three to four car

9    lengths behind him.   But how many feet?

10   A    No.   From him, sir?

11   Q    From him.   Diagonally from him?

12   A    Yes.

13   Q    Okay.   This picture was taken during the daytime.   The

14   scene on that actual evening was, I imagine, much darker than

15   is reflected here, is that correct?

16   A    It's -- it was dark out because it was midnight, but it

17   is a pretty well lit street.

18   Q    So there are street lamps on this street?

19   A    Yes.   You could see they are up and down.   Then you have

20   building lights.

21   Q    Okay.   The street lamps face over towards the street as

22   opposed to the sidewalk, correct?

23   A    Yes.   But they -- they encompass the sidewalk also, when

24   they are lit.

25   Q    Do you see any lights in this photograph on the building

GR        OCR        CM        CRR        CSR

Sullivan-cross-Valdes                    426

1   on the left, where Mr. Robertson was walking?

2   A    There might be.  It's not a completely -- I don't see any

3   readily available.  But I mean, it's not a great -- I am not

4   going to bet my life on it, that there is not lights on

5   there.

6   Q    I am asking you can't --

7   A    I can't see them on here, no.

8   Q    Were there any cars parked between you and the sidewalk

9   on the left-hand side, or was it deserted?

10  A    I believe there was no cars either side of the street.

11  Q    Detective Sullivan, you wear eyeglasses, correct?

12  A    Yes.  And contacts.

13  Q    Do you normally wear either the eyeglasses or contacts

14  when you are on patrol?

15  A    It varies.  You know, there is no rule -- I always wear

16  them, I never wear them.  It can vary.

17  Q    Sometimes you are on patrol where you are wearing neither

18  your eyeglasses nor your contact lenses?

19  A    No.  I wouldn't -- you don't want me driving without

20  the -- I'd wear one or the other.

21  Q    Okay.  Detective Sullivan, it is your testimony that

22  despite the relatively dark lighting conditions and the

23  distance that you had from Mr. Robertson, that you were able

24  to see the size and the color and the shape of the cigarette

25  that he was smoking; is that correct?

Sullivan-cross-Valdes                    427

1    A     Approximately, approximately.

2    Q     Now, the other basis for your decision to approach

3    Mr. Robertson besides seeing the cigarette was the way that he

4    was smoking it, is that correct?

5    A     Yes, sir.

6    Q     Can I trouble you to demonstrate one more time how he was

7    smoking the cigarette?

8    A     Thumb and forefinger.  I mean, index finger.  Index

9    finger.  Like this.

10   Q     So he was using his right hand between his thumb and his

11   forefinger.  I'm sorry.  His index finger and his thumb and he

12   had the other three fingers sort of up or --

13   A     I think up.

14   Q     Okay.  He had that pressed against his lips?

15   A     Yes.  At one point or another.

16   Q     Okay.  Detective Sullivan, you said that you approached

17   him from the rear.  You sort of looked over until you had

18   become parallel with him?

19          He was directly to your left, is that correct?

20   A     Yes.

21          Wait.  Repeat the question.

22   Q     You approached him from the rear, is that correct?

23   A     Yes, diagonally from the rear.

24   Q     Then eventually you went into the eastbound lane to get

25   closer to him and at some point got parallel to him when you

1   actually began to speak to him; is that correct?

2   A    Yes, sir.

3   Q    If Mr. Robertson were smoking with his right hand in the

4   way that you have just described, and he were to the right of

5   you and he were holding it like this, how is it that you were

6   actually able to see the cigarette and that it wasn't obscured

7   by his palm?

8   A    Depends on where he was facing.  He could have been

9   facing like this, looking around.  I just remember.  It's as

10  far as memory after four years.  He could have had his neck

11  turned.  He didn't have to be facing directly west the entire

12  time.

13  Q    If he was holding --

14       THE COURT:  You are arguing with him now.  We get

15  it.  You can argue it later.

16  Q    Detective Sullivan, would you say it is possible that you

17  didn't quite get as good a look at the cigarette as you recall

18  that you did?

19  A    I remember seeing him smoking.  It looked to be like a

20  blunt.  So that was my recollection.  How exactly he was

21  facing or, you know, the direction he was facing, I can't

22  exactly say for certain.

23  Q    Putting side for the moment the appearance of the

24  cigarette itself, is it your view that the way that

25  Mr. Robertson was holding the cigarette is indicative of

Sullivan-cross-Valdes                                429

1   smoking marijuana as opposed to a regular cigarette?

2   A    No.

3          I've -- I used to be a smoker, unfortunately.  And

4   I'd smoke sometimes this way, sometimes this way, but commonly

5   I saw whenever -- whenever people smoked marijuana, smokes

6   like this.

7   Q    So if you see somebody on the street holding a cigarette

8   in that manner that you have indicated Mr. Robertson was doing

9   it, would you say it is more likely than not that they are

10  smoking marijuana as opposed to a regular cigarette?

11  A    No.

12         It might make you give a second look.  Maybe

13  something like oh, wait.  Is he smoking?  I only approached

14  him because I wanted to see better.

15  Q    Is it your view that seeing somebody smoking a cigarette

16  in that manner gives you cause to detain them?

17  A    Detain?  No.  But stop and talk to, investigate further,

18  yes.

19  Q    So you say it gives you cause to stop them.

20         Does that give you reasonable suspicion to conduct a

21  stop and a search of somebody?

22  A    A stop?

23  Q    Yes.

24  A    To investigate further?  The stop could have resulted in

25  him stopping, talking to me and showing me what it was and me

GR      OCR      CM      CRR      CSR

1  maybe driving away like oh, sorry.  I thought you were smoking

2  weed.  It could have resulted in that.  But, unfortunately,

3  Mr. Robertson didn't do that.

4  Q    But it is your view that you would have the right to

5  order somebody to stop and speak to you as a result of making

6  that observation, correct?

7  A    Yes, sir.  It would give me the suspicion.

8  Q    I would like to introduce PX 11.  It is already in

9  evidence.

10            I believe you have testified this was the online

11  form, part of the paperwork?

12  A    Yes.  Scratch copy, sir.

13  Q    Is this something you filled out when you returned to the

14  precinct after arresting Mr. Robertson?

15  A    Yes, sir.

16  Q    Would you fill out this document before you fill out any

17  property vouchers, for example?

18  A    Usually.

19  Q    When you fill out a report like this one, do you attempt

20  to include all of the key information about the incident that

21  occurred?

22  A    You do your best to what the -- the way the report is

23  designed.  It is a general copy -- it is a general report.  So

24  sometimes you can encompass everything, sometimes you can't.

25  Q    Detective Sullivan, as part of your training originally

Sullivan-cross-Valdes                    431

1   as a police officer, did you receive training on what is meant

2   by reasonable suspicion and probable cause?

3   A    Yes.

4           MR. HARVIS:   Objection.

5           THE COURT:   Overruled.

6   Q    Are you aware, Detective Sullivan, that if you stop

7   somebody and you don't have reasonable suspicion or probable

8   cause, that even if you find some evidence on them, that may

9   later be excluded when that person is prosecuted?

10          MR. HARVIS:   Objection.

11          THE COURT:   Sustained.

12  A    I don't really understand.

13          THE COURT:   Sustained.

14          THE WITNESS:   That means I don't talk?

15          THE COURT:   That means don't answer the question.

16          THE WITNESS:   Sorry, sir.

17          MR. VALDES:   Let me try to rephrase.

18  Q    Do you have an understanding that the procedures that you

19  as a police officer follow can have an effect on whether

20  evidence ends up being admissible or not in a criminal case?

21          MR. HARVIS:   Objection.

22          THE COURT:   Overruled.

23  A    Yes.

24  Q    What is that understanding?

25          THE COURT:   Sustained.

GR      OCR      CM      CRR      CSR

Sullivan-cross-Valdes                    432

1   Q    Is it normally your practice then that when you fill out

2   a document like this you want to include in there the

3   information that gave you the initial right to approach a

4   suspect?

5   A    It can be in there.  Like I said, there was only a

6   limited amount of space given.  I wanted to outline the top

7   charges.  But I've commonly had, you know, larger cases, you

8   know, where we charged a new -- a bunch of charges that

9   actually filled up the entire charge bracket that's given on

10  the form.  We've had to articulate that to the DA's office so

11  they wouldn't even show up on the form.

12           Do you understand what I am getting at?

13  Q    So you would write it on a separate form?

14  A    No.  We would just tell the DA's office.

15  Q    You wouldn't include that information in the arrest

16  report?

17  A    No.

18           There is only so much room given.  So if there is

19  more than so many crimes that are broken or violated, you

20  wouldn't put it on.  There wouldn't be room for it.

21  Q    Let me turn to the second page of this exhibit.

22           If we can look down at the narrative section that

23  you read before.

24           Okay.  Is it your testimony that there is no space

25  on this form to say anything else?

Sullivan-cross-Valdes                          433

1    A     No.   There is a little bit of space.   But I guess I

2    didn't feel I was enough of a wordsmith to fit everything in

3    there.   I knew I was going to be speaking to the DA's office

4    about it anyway so I didn't deem it necessary.

5    Q     If we look up a little further up on this document, the

6    section that says type of drug used and you marked none.

7          There is a separate section -- let's keep that part

8    up.   There is a separate section below that says charges.

9    A     What do you want me to look at now, sir?

10   Q     She is going to pull it up in one second.

11         That bottom portion there, charges, is that where

12   you include all of the information that relates to the charges

13   that are actually recommending be brought against the suspect?

14   A     These will be the charges that I felt the suspect

15   violated or that he should be charged with, is that the

16   question?

17   Q     Yes.

18   A     Yes.

19   Q     So the section that says type of drug used, that part

20   doesn't only call for information about crimes with which you

21   are charging the suspect, correct?

22   A     No.   But what's --

23   Q     That section type of drug used you marked none.   Does

24   that not mean that you did not believe he had used marijuana?

25   A     I believe in the way I was filling it out that I couldn't

Sullivan-cross-Valdes                                    434

1   prove it because I hadn't recovered the -- what I believed to

2   be the marijuana blunt.

3   Q    So you only include information on this report that you

4   believe the District Attorney can later prove?

5   A    No.  I'm saying what I could.  I couldn't find the blunt.

6   So I couldn't -- I thought he was smoking one but then upon

7   further investigation I couldn't find it to confirm my

8   suspicion.  So I didn't put it down.

9   Q    Based on your training as a police officer, you didn't

10  believe that it would be relevant for the District Attorney's

11  office to know why you were justified in approaching the

12  suspect in the first place?

13              MR. HARVIS:  Objection.

14              THE COURT:  Sustained.

15  A    That was --

16              THE COURT:  Sustained.

17              When I say "sustained," wait for another question.

18              THE WITNESS:  Sorry, sir.  I apologize.

19              THE COURT:  That's all right.

20  Q    Despite the fact that you believed you couldn't prove

21  that he had been smoking marijuana, you didn't believe it was

22  relevant to include in this form that you had observed him

23  smoking marijuana?

24              MR. HARVIS:  Objection.

25              THE COURT:  Sustained.

1   Q     Right above that portion that says type of drug used

2   there is another section I want to bring your attention to,

3   physical condition.

4           Detective Sullivan, you see that there are sections

5   in this physical condition portion of the form that refer to

6   intoxication from alcohol, intoxication from drugs or

7   intoxication from an unknown source?

8           Do you see that?

9   A     Yes.

10  Q     You see that none of those boxes are checked?

11  A     Yes.

12  Q     Why is it that you didn't check those boxes?

13  A     Maybe I forgot.  I don't know.

14  Q     You have testified today as to the recollection that you

15  have and the size and shape of the marijuana cigarette.  You

16  are saying that you didn't recall at that point that that had

17  occurred?

18  A     No.  I'm saying maybe I just forgot to skip the -- I

19  skipped the box and didn't --

20  Q     Do you view it as part of your job as a police officer to

21  include all relevant information in this these?

22  A     I try to.

23           MR. HARVIS:  Objection.

24           THE COURT:  Overruled.

25           What did you say?

1      THE WITNESS:  I try to.

2  Q    Would you agree, Detective Sullivan, that there is no

3  reference anywhere on this form to the fact that you believed

4  he was smoking marijuana at the time, is that correct?

5  A    That's correct.

6  Q    Bring up PX 12.  It is also already in evidence.

7      Detective Sullivan, I believe you testified that

8  this is a document that is -- basically they use the

9  information in your scratch copy and they type up this form,

10  is that correct?

11  A    Yes, sir.

12  Q    That's done by the LAPS officer that types it?

13  A    Yes, sir.

14  Q    If you would take a look through this document and if you

15  could tell me whether you see any reference in this document

16  to the fact that you thought he was -- that you thought

17  Mr. Robertson was smoking a marijuana cigarette?

18      THE COURT:  It's in evidence.  You can argue from it

19  later.

20      I assume your position is there is no reference to

21  it?

22      MR. VALDES:  Correct, Your Honor.

23      THE COURT:  If you are right, you can argue from it

24  later.  The jury has access to the document.  Let's not give

25  him a homework assignment here.

Sullivan-cross-Valdes                        437

1          MR. VALDES:  Bring up PX 13.

2     Q    Briefly, Detective Sullivan, you are not aware of a

3     reference to the marijuana cigarette in this document either?

4     A    This is the complaint?  No, I don't believe so.  I can't

5     really read it.

6     Q    Bring up PX six.

7          MR. BROOKS:  Your Honor, this document is not in

8     evidence.

9          THE COURT:  All right.

10         MR. VALDES:  I apologize.  It should be 6-A.

11         THE COURT:  That's okay.  This is in evidence,

12    right?

13         MR. VALDES:  Yes.

14    Q    Detective Sullivan, you testified previously about this

15    document.

16         Can you just tell us what this is again?

17    A    This is the -- the accusatory instrument generated by the

18    DA's office, I believe.

19    Q    Do you see it as part of your job as a police officer to

20    provide all relevant information to the District Attorney's

21    office so that they can then prosecute the individual you

22    apprehended?

23    A    Yes.

24    Q    Do you see any reference in this document to the

25    marijuana cigarette that you believe Mr. Robertson was

Sullivan-cross-Valdes                    438

1   smoking?

2   A    I previously read it and I don't believe so.

3   Q    You provided information as the arresting officer to

4   Ms. Woods of the District Attorney's office to allow her to

5   create this affidavit, is that correct?

6   A    Yes.

7   Q    You knew that you were providing that information in

8   order that the District Attorney might use it in a criminal

9   prosecution against Mr. Robertson?

10  A    Yes.

11  Q    Are you aware, Detective Sullivan, of any other document

12  created at or around the time of the incident that contains a

13  reference to the marijuana cigarette you believe he was

14  smoking?

15  A    No.

16  Q    Isn't it true that the first time that the marijuana

17  cigarette was mentioned was in an affidavit that Officer

18  Prince submitted in this case?

19  A    I talked to the DA's office about it.  If she doesn't

20  choose to deem it necessary to charge him with it, that's up

21  to her.

22  Q    Maybe you misunderstood the question.  I am asking about

23  a reference to the marijuana cigarette itself.

24          Are you aware that the first time that marijuana

25  cigarette was mentioned in any of the paperwork or any other

Sullivan-cross-Valdes                       439

1   document that we are aware of, it was in an affidavit that

2   Officer Prince submitted in this litigation?

3           THE COURT:  That wasn't your first question.  Your

4   first question was just mentioned, not in a document.  You are

5   focusing only on documents?

6           MR. VALDES:  Yes, Your Honor.

7           THE COURT:  All right.  Go ahead.  You can answer

8   the question.

9   A    If you say so.  I wasn't really keeping track of all

10  the -- you put in a lot of documents before.  You are saying

11  that am I aware that this is the first time in this case that

12  it was mentioned?  Or the documentation was mentioned of it?

13  Q    Correct.

14  A    I guess so, yes.

15  Q    After Mr. Robertson was arrested on the early morning of

16  April 15th, you went back to search for the marijuana

17  cigarette, is that correct?

18  A    Yes, after he was taken into custody.

19           (Continued on next page.)

20

21

22

23

24

25

GR      OCR      CM      CRR      CSR

1  CONTINUED CROSS-EXAMINATION

2  BY MR. VALDES:

3  Q    You never found that marijuana cigarette?

4  A    No, sir.

5  Q    You testified earlier that when Mr. Robertson was running

6  you saw something fall in the path of his flight; is that

7  correct?

8  A    Yes.

9  Q    Is it correct that you didn't actually see him throw

10  something off of his person, you simply saw it fall in the

11  flight of his path; is that correct?

12  A    It could have been said that his arms were in up and down

13  motion.  That's also the same motion when a person runs.  It's

14  the best way to describe it fell from him.  Now, could he have

15  thrown it down?  Yes, it's very probable that he did but it

16  also could have been off of him when he running.

17  Q    You didn't actually observe him while running throw

18  something away?

19  A    I believe I did at the time.  It made sense to me.

20  Q    The object, did it fall in his path or fall a few feet

21  away from him right in his direction?

22  A    Right in his path.

23  Q    When the object fell, did you get a good look what the

24  object was?

25  A    No, I wasn't focused on it.

Sullivan-cross-Valdes                    441

1  Q    You had no reason to believe that it was of any

2  particular thing, just saw an object fall; you continued your

3  pursuit; is that correct?

4  A    Yes.

5  Q    How soon after Mr. Robertson started running did you see

6  the object fall?

7  A    Pretty soon after.  It was right after he went off the

8  curb to go diagonally south on Williams, was just about the

9  same time he came off the curb.

10 Q    I believe you said it fell while he was running west on

11 Pitkin Avenue on direct; do you recall that?

12 A    He still would have been going west, southwest, a better

13 description, I guess.

14 Q    Your testimony is as he was turning on to

15 Williams Avenue; is that correct?

16 A    He didn't exactly make a turn like he was in a car.  He

17 went diagonal because he was on foot, as any of us can do.

18 Q    At the time that that object fell, Mr. Robertson had his

19 back to Officer Prince; is that correct?

20 A    I believe so but I don't know what Officer Prince's

21 position was.  I could remember what mine was.

22 Q    As far as you know, it was in the first few seconds he

23 started running so Officer Prince was chasing him from behind,

24 correct?

25 A    I would say it would be more coming from the side.  He

SS      OCR      CM      CRR      CSR

Sullivan-cross-Valdes                     442

1    still had to get around wherever he was, the door open, get

2    around the car.  It would be more from the side.

3           MR. VALDES:   I would like to introduce P X 29 which

4    is already in evidence.

5    Q    There's been testimony earlier this is a satellite image

6    of the intersection of Pitkin and Williams Avenue.  Does that

7    comport with your recollection of that area?

8    A    Yes.

9    Q    Where would you say Mr. Robertson was standing when you

10   first spoke to him, if you could point on the block on Pitkin?

11   A    It will go in there?

12          THE COURT:   A dot will appear if you touch the

13   screen.

14   A    Somewhere from what I recollect, right around here.

15   That's way far to the left, more to the right than I was

16   saying.

17          THE COURT:   Why don't you use your powers of

18   description?

19          THE WITNESS:   You see where the corner of the

20   fence -- I believe the fence would be on the southeast corner

21   of the intersection, that fence line right there, the darker

22   gray area as described.  Can everyone see that?  He would be

23   somewhere right about where the door is which would be

24   indicated on Pitkin by the darker section.

25          THE COURT:   Right there (indicating)?

Sullivan-cross-Valdes                443

1        THE WITNESS:   Yes, sir, somewhere around there,

2   probably towards the left side of it.

3        THE COURT:    By the arrow?

4        THE WITNESS:   Yes.

5   Q    Mr. Robertson ran west initially; is that correct?

6   A    Yes, sir.

7   Q    After he started to run, you started to go forward in

8   your car, I assume; is that correct?

9   A    Yes.

10  Q    When he turned onto Williams Avenue, were you already

11  turning onto Williams Avenue at the same time?

12  A    I believe I had to get around the curb.

13  Q    You did or did not get around the curb?

14  A    I had to get around the curb when I go over it.

15  Q    At some point did Mr. Robertson cross in front of the

16  path of your vehicle?

17  A    He was nearly across the street on the sidewalk by the

18  time I was turning fully onto Williams.

19  Q    When Mr. Robertson was eventually handcuffed, where did

20  he actually end up?  Can you point out that area?

21  A    I believe it was somewhere around here --  this is way

22  off.

23        THE COURT:    Why don't you slide that cursor over

24  there, tell us where to stop?

25        THE WITNESS:   You're going to the other side of the

Sullivan-cross-Valdes                    444

1   street --  other side of the street, you're right in the

2   middle of the street now.  Hold, very cool --  sorry, Judge.

3   Now you're going to come south a little bit on the sidewalk,

4   south a little bit, south --  right about there,

5   approximately.

6   Q    That's where he actually ended up on the ground, correct?

7   A    Approximately, sir.

8   Q    That's around where you saw him struggling with

9   Officer Prince; is that correct?

10  A    Yes, there and about.

11  Q    Did you observe at any time that Mr. Robertson stopped

12  and changed direction back towards the direction of

13  Officer Prince?

14  A    No.

15  Q    You testified that you recovered a glove from a sewer

16  drain.  Can you point out on this map approximately where that

17  drain is located?

18  A    I think we saw two drains --  I believe the one on

19  Williams, the southeast corner is the one that I was speaking

20  of.

21          THE COURT:    Southeast corner is the one by the

22  lower right quadrant?

23          THE WITNESS:  It's --

24          THE COURT:    Down in this picture is south?

25          THE WITNESS:  Yes.

445

1           THE COURT:    East is to the right?

2           THE WITNESS:   Yes.   Yes, right around there would be

3      the drain.

4      Q    Is that anywhere near the area where he ended up on the

5      ground with Officer Prince?

6      A    No, it was farther down here.

7           THE COURT:    How much more do you have?

8           MR. VALDES:    About 20 minutes, your Honor.

9           THE COURT:    We'll break for the day.   You'll hear

10     summations in the morning and my jury charge.   You'll be

11     deliberating tomorrow just to let you know where we are in the

12     case.

13          Don't let information find you.   Don't go looking

14     for information.   You know the drill by now.

15          Safe home.   Be here on time, please.   We'll start

16     promptly at 9:30.

17          Have a nice evening.   Good night.   All rise.

18          (Jury leaves courtroom.)

19          THE COURT:    I'll put a draft charge together, have

20     it for you in the morning.   At the conclusion of the evidence

21     we'll have a charge conference and you'll sum up.

22          MR. GOLD:    I apologize to the court.   I have

23     another commitment for another client.   We'll have another

24     associate from my office here tomorrow.

25          THE COURT:    No problem. Good night.

446

CROSS-EXAMINATION                                          223

REDIRECT EXAMINATION                                       248
T A S H A      R I C K S                                    267
DIRECT EXAMINATION                                         267
CROSS-EXAMINATION                                          282
E L E A N O R, D O R F M A N                               292
DIRECT EXAMINATION                                         292
N I L E S,                                                  307
P R I N C E
DIRECT EXAMINATION                                         307
CONTINUED DIRECT EXAMINATION                               316
CROSS-EXAMINATION                                          329
REDIRECT EXAMINATION                                       351
Dimitri Deglas                                             353
DIRECT EXAMINATION                                         353
CROSS-EXAMINATION                                          377
BY MS. HOLLOWAY
M A T T H E W      S U L L I V A N                         388
DIRECT EXAMINATION                                         388
CROSS-EXAMINATION                                          421
CONTINUED CROSS-EXAMINATION                                440
BY MR. VALDES

447

| | | |
|---|---|---|
| 17 | | 230 |
| 11, 19 | | 259 |
| 12, 13, 9 and 10 | | 259 |
| 6-A | | 264 |
| 100 | | 266 |
| 6-B | | 274 |
| 42 | | 278 |
| 30 | | 293 |
| 31 | | 295 |
| 31 | | 295 |
| 32 | | 295 |
| 34 | | 296 |
| 35 | | 296 |
| 36 | | 296 |
| 37 | | 297 |
| 38 | | 297 |
| 39 | | 298 |
| 30 | | 299 |
| 29 | | 299 |
| 20 | | 300 |
| 7 | | 300 |
| 28 | | 301 |
| U-1 | | 233 |
| U-2 | | 236 |

SS        OCR        CM        CRR        CSR

448

| | | |
|---|---|---|
| 1 | X-3 | 302 |
| 2 | DKR00304 | 302 |
| 3 | G | 393 |
| 4 | F | 417 |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

SS          OCR          CM          CRR          CSR

## $

**$40** [1] - 282:21

## '

**'02** [1] - 233:9
**'09** [1] - 389:10

## 0

**0040** [1] - 393:25
**0205** [2] - 310:6, 310:8
**0405** [1] - 393:17
**0558** [1] - 394:2

## 1

**1(b** [1] - 281:12
**10** [3] - 259:16, 261:3, 447:4
**100** [5] - 266:12, 266:21, 274:20, 315:4, 447:6
**1000** [1] - 310:1
**108** [1] - 262:18
**10th** [2] - 231:15, 231:23
**11** [8] - 259:15, 260:13, 334:3, 335:15, 335:17, 408:12, 430:8, 447:3
**11:00** [1] - 261:19
**11th** [3] - 230:7, 230:16, 232:18
**12** [6] - 241:4, 259:15, 259:24, 436:6, 447:4
**13** [4] - 259:15, 260:22, 437:1, 447:4
**13th** [2] - 230:24, 231:1
**14** [27] - 238:7, 290:20, 309:5, 309:6, 310:5, 310:9, 311:4, 311:6, 313:5, 313:18, 348:4, 355:7, 355:8, 355:10, 356:3, 356:11, 356:13, 356:17, 358:20, 359:10, 365:14, 375:10, 375:16, 420:7, 420:22, 421:3, 421:7
**14th** [36] - 229:1, 229:5, 230:19, 230:23, 231:5, 231:7, 237:21, 240:11, 240:14, 245:4, 247:16, 249:4, 249:25, 250:4, 250:7, 251:23, 252:2, 268:13, 285:7, 289:8, 309:10, 328:10, 328:14, 328:21, 328:23, 341:25, 342:17, 343:4, 346:14, 389:18, 389:19, 390:5, 391:20, 392:1, 395:9, 421:20
**15** [5] - 241:14, 261:17, 261:24, 375:13, 421:1
**15th** [12] - 284:24, 289:13, 290:22, 329:1, 345:8, 347:15, 347:18, 357:22, 357:23, 359:11, 421:21, 439:16
**16** [4] - 226:7, 227:11, 284:4, 303:8
**1647** [1] - 356:12
**16th** [4] - 276:25, 278:5, 278:7, 283:20
**17** [5] - 229:25, 230:11, 327:14, 335:3, 447:2
**1730** [1] - 310:6
**178** [1] - 241:14
**179** [1] - 229:8

**17th** [6] - 276:4, ?279:4, 279:6, 281:7, 384:7
**18** [4] - 260:25, 281:4, 384:11, 413:11
**19** [4] - 259:15, 259:22, 260:10, 447:3
**1930** [2] - 393:17, 393:18
**1940** [1] - 393:19
**1945** [1] - 393:23
**1988** [1] - 224:13
**1993** [2] - 237:25, 238:4
**1998** [1] - 365:15
**1st** [2] - 237:25, 238:4

## 2

**2** [2] - 222:11, 228:13
**20** [6] - 225:17, 281:4, 300:13, 300:17, 445:8, 447:21
**2001** [1] - 232:9
**2002** [7] - 231:10, 231:15, 231:17, 231:23, 232:18, 232:19, 232:22
**2004** [5] - 228:8, 228:9, 228:17, 228:19, 354:2
**2005** [1] - 243:20
**2006** [88] - 223:24, 226:5, 229:1, 229:5, 230:8, 230:16, 230:19, 230:23, 231:5, 231:7, 234:17, 235:1, 235:6, 236:13, 236:15, 237:3, 237:21, 240:11, 240:14, 243:20, 245:4, 245:19, 246:15, 247:16, 249:4, 249:25, 250:4, 250:7, 252:3, 268:8, 268:13, 275:10, 275:23, 276:4, 276:9, 276:25, 279:4, 279:6, 284:4, 285:7, 290:13, 290:20, 303:8, 309:5, 309:6, 309:10, 309:21, 310:5, 310:9, 311:4, 311:6, 313:5, 313:18, 328:14, 328:23, 329:1, 341:25, 342:18, 343:4, 346:14, 348:4, 355:7, 355:8, 355:10, 356:3, 356:11, 356:13, 356:17, 358:21, 359:10, 365:14, 375:10, 375:13, 375:16, 389:18, 389:19, 390:5, 391:21, 392:1, 394:12, 395:9, 414:12, 414:15, 420:7, 420:22, 421:1, 421:4, 421:7
**2007** [1] - 243:20
**2008** [12] - 237:19, 239:8, 239:21, 239:23, 240:7, 241:12, 242:8, 242:11, 243:20, 308:15, 308:16
**2009** [6] - 239:13, 239:22, 243:22, 243:23, 338:18, 384:8
**2010** [2] - 222:11, 297:4
**20th** [1] - 234:17
**21** [1] - 262:15
**22** [2] - 224:15, 259:15
**223** [1] - 446:2
**22353** [2] - 311:5, 332:25
**22nd** [2] - 275:10, 275:23
**23** [2] - 245:3, 247:1
**230** [1] - 447:2
**233** [1] - 447:24
**236** [1] - 447:25
**24** [1] - 290:13
**248** [1] - 446:5
**24th** [3] - 236:13, 236:15, 237:2
**25** [1] - 342:2

**250** [2] - 261:16, 406:8
**259** [2] - 447:3, 447:4
**264** [1] - 447:5
**266** [1] - 447:6
**267** [2] - 446:6, 446:7
**26th** [2] - 228:7, 228:9
**27** [2] - 303:7, 354:2
**274** [1] - 447:7
**278** [1] - 447:8
**28** [8] - 301:7, 326:1, 327:3, 327:13, 329:23, 346:6, 351:14, 447:23
**282** [1] - 446:8
**29** [8] - 298:25, 299:3, 299:10, 299:25, 300:1, 339:4, 442:3, 447:20
**292** [2] - 446:9, 446:10
**293** [1] - 447:9
**295** [3] - 447:10, 447:11, 447:12
**296** [3] - 447:13, 447:14, 447:15
**297** [2] - 447:16, 447:17
**298** [1] - 447:18
**299** [3] - 447:19, 447:20
**2:00** [2] - 315:16, 315:18
**2d** [1] - 306:1
**2nd** [1] - 278:10

## 3

**3** [1] - 392:15
**30** [7] - 293:7, 293:19, 298:25, 299:4, 395:20, 447:9, 447:19
**30.30** [12] - 273:7, 281:5, 281:11, 281:20, 286:23, 287:1, 287:8, 287:19, 287:22, 288:7, 288:16, 290:5
**300** [2] - 447:21, 447:22
**3002** [1] - 250:23
**301** [1] - 447:23
**302** [2] - 448:1, 448:2
**3030** [2] - 276:17, 276:19
**307** [2] - 446:11, 446:13
**31** [5] - 294:21, 295:3, 295:11, 447:10, 447:11
**316** [1] - 446:14
**32** [2] - 295:14, 447:12
**329** [1] - 446:15
**33** [3] - 296:4, 296:6, 296:7
**34** [2] - 296:10, 447:13
**35** [2] - 296:16, 447:14
**351** [1] - 446:16
**353** [2] - 446:17, 446:18
**36** [2] - 296:21, 447:15
**37** [4] - 297:8, 298:9, 298:20, 447:16
**377** [1] - 446:19
**38** [3] - 297:18, 297:19, 447:17
**388** [2] - 446:21, 446:22
**39** [5] - 292:3, 293:7, 298:2, 298:3, 447:18
**393** [1] - 448:3
**3:35** [1] - 376:20

## 4

**4/14/06** [1] - 393:16
**41** [1] - 303:24
**417** [1] - 448:4
**42** [2] - 278:23, 447:8
**421** [1] - 446:23
**43** [2] - 266:11, 384:11
**44** [1] - 238:7
**440** [1] - 446:24
**45** [1] - 261:14
**48** [1] - 225:17
**49** [1] - 347:6
**4:00** [1] - 390:7
**4:05** [1] - 393:17
**4th** [2] - 293:16, 297:2

## 5

**5-5** [1] - 278:16
**50** [1] - 303:22
**50,000** [1] - 261:14
**501** [1] - 306:2
**52** [1] - 224:5
**540** [1] - 306:1
**55** [2] - 226:7, 227:11
**5:30** [1] - 310:8
**5th** [2] - 277:25, 278:2

## 6

**6** [3] - 264:6, 269:20, 272:12
**6-A** [8] - 264:7, 264:13, 268:24, 269:7, 285:14, 332:19, 437:10, 447:5
**6-B** [5] - 269:18, 272:13, 274:2, 277:21, 447:7
**60** [1] - 322:15
**613-2537** [1] - 222:23
**67** [1] - 345:2

## 7

**7** [2] - 300:22, 447:22
**718** [1] - 222:23
**73** [1] - 303:24
**75th** [20] - 309:13, 309:14, 309:20, 309:25, 332:25, 355:15, 355:17, 356:19, 389:12, 389:14, 390:11, 390:3, 390:9, 390:12, 392:9, 393:18, 414:4, 414:10, 414:16, 414:19
**7:30** [1] - 393:17

## 8

**8** [1] - 334:2
**8:00** [1] - 390:7

## 9

**9** [4] - 259:16, 260:24, 318:23, 447:4
**90** [4] - 276:24, 276:25, 277:9, 281:13
**90-day** [1] - 281:16
**98** [1] - 393:23
**9:30** [2] - 222:12, 445:16

## A

**a.m** [2] - 222:12, 390:7
**ability** [1] - 417:9
**able** [12] - 288:19, 313:24, 320:1, 320:7, 321:22, 322:1, 399:8, 400:9, 405:7, 422:12, 426:23, 428:6
**absence** [5] - 258:16, 261:22, 280:4, 315:17, 376:18
**Absolutely** [2] - 374:16, 376:10
**absolutely** [1] - 304:3
**abuse** [1] - 267:20
**accepted** [1] - 329:24
**access** [5] - 373:19, 414:12, 414:13, 414:15, 436:24
**accessed** [1] - 414:18
**accessible** [1] - 244:1
**According** [1] - 342:1
**according** [1] - 336:10
**accords** [1] - 272:23
**account** [1] - 341:2
**accurately** [4] - 226:24, 227:1, 417:8, 417:11
**accusatory** [7] - 264:6, 283:13, 303:25, 304:16, 305:6, 305:10, 437:17
**accused's** [1] - 287:20
**acronym** [1] - 419:11
**action** [5] - 268:12, 270:9, 270:17, 282:17, 330:5, 348:9, 348:10, 348:15, 348:23
**actions** [1] - 362:1
**active** [1] - 365:4
**actively** [3] - 365:9, 375:23, 383:6
**activities** [1] - 392:23
**actual** [9] - 225:9, 277:16, 280:4, 288:21, 368:25, 378:9, 422:25, 423:16, 425:14
**adding** [1] - 240:2
**addition** [2] - 240:2, 413:14
**additional** [1] - 246:8
**address** [2] - 309:22, 406:12
**adjacent** [1] - 257:8
**administrative** [1] - 357:6
**admissibility** [1] - 294:16
**admissible** [1] - 431:20
**admitted** [2] - 412:21, 417:18
**advantage** [3] - 379:3, 383:11, 398:16
**adverse** [1] - 305:20
**affidavit** [34] - 273:10, 275:16, 277:4, 277:6, 277:11, 288:18, 288:25, 330:21, 331:9, 333:19, 334:12, 334:19, 334:20, 334:23, 335:4, 336:14, 336:18, 346:6, 346:9, 346:18, 346:25, 348:14, 348:20,

**affidavits** [1] - 281:10
**afternoon** [20] - 253:8, 267:7, 267:12, 267:13, 282:14, 282:15, 307:12, 307:13, 316:13, 316:14, 329:20, 329:21, 353:14, 353:15, 376:14, 377:11, 388:21, 388:22, 421:15, 421:16
**ago** [2] - 239:14, 248:12, 277:10
**agree** [4] - 226:20, 227:8, 385:9, 436:2
**agreed** [1] - 258:21
**ahead** [16] - 223:16, 238:17, 240:9, 246:25, 247:23, 254:2, 262:12, 268:25, 274:3, 275:2, 293:18, 295:13, 351:10, 367:23, 398:6, 439:7
**aid** [1] - 368:2
**Aid** [5] - 267:25, 268:2, 268:5, 268:8, 283:3
**aided** [5] - 416:11, 416:19, 416:20, 416:23, 418:2
**air** [4] - 379:19, 379:22, 379:24, 380:2
**Alabama** [3] - 295:18, 295:24, 424:15
**alcohol** [2] - 252:5, 435:6
**allegations** [5] - 275:16, 277:3, 282:2, 290:11, 342:1
**alleged** [2] - 277:18, 290:11
**allegedly** [3] - 261:1, 261:5, 261:6
**alleges** [1] - 277:13
**alleging** [1] - 277:7
**allow** [8] - 245:6, 245:11, 246:1, 246:16, 279:21, 280:17, 411:10, 438:4
**allowed** [1] - 290:6
**almost** [4] - 228:24, 229:3, 360:3, 411:2
**Almost** [1] - 229:17
**alone** [1] - 395:24
**alongside** [1] - 317:18
**ambulance** [5] - 369:23, 370:25, 371:18, 405:19, 407:5
**amount** [6] - 282:21, 288:5, 378:8, 383:24, 399:1, 432:6
**amounts** [1] - 352:12
**amplifies** [1] - 383:2
**analysis** [1] - 415:3
**angles** [1] - 379:3
**answer** [22] - 225:2, 227:24, 227:25, 228:22, 236:17, 236:20, 239:17, 241:15, 241:19, 288:2, 304:18, 305:3, 340:5, 345:5, 345:23, 366:17, 384:11, 387:8, 431:15, 439:7
**ANSWER** [29] - 224:7, 224:10, 224:23, 225:21, 225:25, 226:10, 226:13, 226:15, 227:13, 227:16, 227:18, 229:12, 229:14, 229:17, 241:17, 241:23, 242:1, 339:8, 339:10, 339:12, 339:14, 339:17, 339:19, 339:25, 345:9, 347:11, 347:16, 347:20, 384:14
**answered** [1] - 244:15
**answers** [14] - 224:3, 224:21, 225:19, 226:2, 226:8, 226:17, 227:20, 229:9, 229:19, 229:22, 242:4, 242:6, 339:4, 347:8
**anti** [6] - 338:20, 390:17, 391:3, 391:7,

3

393:19, 396:18
**Anti** [2] - 390:4, 391:4
**anti-crime** [6] - 338:20, 390:17, 391:3, 391:7, 393:19, 396:18
**Anti-crime** [2] - 390:4, 391:4
**anticipating** [1] - 255:4
**Anticrime** [10] - 309:18, 309:20, 310:14, 355:18, 355:20, 355:23, 355:24, 356:6, 373:25
**anyway** [1] - 433:4
**AO** [1] - 412:2
**apart** [1] - 304:3
**apartment** [5] - 242:1, 242:24, 250:23, 250:25, 251:7
**Apologize** [1] - 413:4
**apologize** [7] - 230:4, 233:14, 262:22, 419:17, 434:18, 437:10, 445:22
**apparent** [1] - 363:6
**appear** [5] - 270:16, 283:14, 346:25, 417:2, 442:12
**appearance** [16] - 270:12, 272:16, 272:17, 272:21, 272:22, 272:23, 274:10, 274:12, 274:15, 275:9, 275:23, 276:1, 276:3, 338:6, 423:16, 428:23
**APPEARANCES** [1] - 222:17
**appearances** [4] - 265:11, 268:20, 270:10, 272:18
**appeared** [5] - 270:11, 272:17, 361:13, 371:6, 386:19
**appointment** [4] - 244:3, 244:4, 244:6, 244:7
**apprehended** [1] - 437:22
**apprehension** [1] - 410:8
**approach** [8] - 228:15, 377:14, 377:16, 378:1, 422:6, 422:24, 427:2, 432:3
**approached** [10] - 331:7, 332:2, 334:5, 339:7, 378:10, 379:7, 423:5, 427:16, 427:22, 429:13
**approaching** [5] - 331:1, 358:1, 359:24, 360:5, 434:11
**appropriate** [5] - 262:23, 306:8, 347:9, 347:11, 347:18
**approximate** [3] - 386:25, 387:17, 406:6
**April** [89] - 223:24, 229:1, 229:5, 230:19, 230:23, 231:5, 231:7, 237:21, 240:11, 240:14, 245:4, 245:19, 246:15, 247:16, 249:4, 249:25, 250:4, 250:7, 251:23, 252:2, 268:13, 269:13, 276:25, 278:5, 278:7, 284:4, 284:24, 285:7, 289:8, 289:13, 290:13, 290:20, 290:22, 303:8, 309:5, 309:6, 309:10, 309:20, 310:5, 310:9, 311:4, 311:6, 313:5, 313:18, 328:10, 328:14, 328:21, 328:23, 329:1, 341:25, 342:17, 343:4, 345:8, 346:14, 347:15, 347:18, 348:4, 355:7, 355:8, 355:10, 356:3, 356:11, 356:13, 356:17, 357:22, 357:23, 358:20, 359:10, 359:11, 365:14, 375:10, 375:13, 375:16, 389:18, 389:19, 390:5, 391:20, 392:1, 394:11, 395:9, 414:15, 420:7, 420:22, 421:1, 421:3, 421:7, 421:20, 421:21, 439:16

**area** [30] - 313:4,     337:11, 337:12, 338:22, 358:19, 358:23, 358:25, 361:14, 365:21, 366:2, 369:14, 370:7, 394:10, 394:14, 394:15, 395:19, 403:14, 403:19, 403:22, 403:23, 404:15, 405:9, 412:7, 442:7, 442:22, 443:20, 445:4
**areas** [2] - 366:14, 391:9
**argue** [4] - 294:24, 333:17, 428:15, 436:18, 436:23
**arguing** [1] - 428:14
**argument** [1] - 281:7
**arm** [8] - 238:10, 238:12, 238:18, 238:21, 310:22, 333:2, 339:20, 367:10
**armed** [4] - 332:3, 332:4, 332:6, 368:20
**arms** [6] - 319:16, 320:6, 320:19, 366:14, 412:3, 440:12
**arraigned** [4] - 278:7, 283:25, 284:1, 284:2
**arraignment** [8] - 268:18, 270:11, 276:25, 277:1, 283:14, 283:17, 283:22, 303:8
**arrest** [58] - 245:4, 245:8, 249:25, 250:7, 250:8, 250:14, 260:1, 260:6, 260:14, 260:20, 265:6, 268:13, 268:16, 268:21, 278:5, 284:4, 284:24, 284:25, 289:8, 289:13, 290:13, 290:20, 290:22, 311:19, 319:14, 324:16, 328:11, 328:15, 328:21, 333:3, 336:2, 336:11, 336:14, 336:18, 348:19, 371:16, 372:13, 372:19, 373:6, 374:2, 374:18, 375:4, 394:3, 405:20, 406:3, 406:4, 406:7, 408:5, 408:10, 408:18, 409:14, 412:2, 418:3, 418:15, 420:2, 420:14, 432:15
**arrested** [11] - 230:24, 245:3, 245:13, 245:14, 245:24, 247:1, 247:6, 248:5, 285:6, 285:9, 439:15
**arresting** [17] - 405:25, 406:2, 406:7, 407:17, 408:6, 410:2, 410:13, 410:16, 410:19, 410:20, 410:25, 411:9, 412:3, 415:2, 415:7, 430:14, 438:3
**arrests** [7] - 245:10, 246:18, 247:4, 248:10, 410:25, 411:1, 418:21
**arrived** [5] - 320:22, 320:25, 321:1, 407:8, 407:9
**arriving** [1] - 253:17
**arrow** [1] - 443:3
**article** [1] - 281:11
**articulate** [1] - 432:10
**articulated** [1] - 346:10
**aside** [3] - 233:7, 290:4, 420:25
**assault** [1] - 409:15
**assaults** [2] - 356:1, 389:17
**asserted** [1] - 246:4
**assess** [1] - 246:4
**assigned** [19] - 308:21, 309:12, 309:14, 311:12, 354:11, 354:12, 354:20, 354:21, 355:14, 355:15, 355:17, 355:18, 373:21, 389:11, 389:25, 390:2, 393:18, 393:19, 414:14
**assignment** [9] - 311:6, 311:18, 312:4,

354:25, 356:23, 357:2, 357:7, 373:24, 436:25
**assist** [1] - 389:16
**assistance** [4] - 320:2, 322:10, 363:7, 409:13
**Assistant** [1] - 328:17
**assisted** [1] - 402:6
**assisting** [3] - 320:4, 410:17, 411:10
**associate** [1] - 445:24
**associated** [1] - 245:13
**assume** [4] - 255:10, 255:16, 436:20, 443:8
**assumption** [1] - 391:16
**attacked** [1] - 318:18
**attempt** [2] - 243:5, 430:19
**attempted** [2] - 243:14, 412:2
**attempting** [1] - 397:4
**attend** [1] - 387:6
**attention** [28] - 231:25, 241:1, 281:3, 309:4, 313:21, 330:15, 331:8, 332:22, 334:2, 334:11, 335:3, 345:2, 351:15, 352:4, 355:6, 359:14, 368:22, 369:2, 369:24, 370:1, 384:15, 386:10, 389:18, 394:23, 405:13, 407:3, 411:22, 435:2
**Attorney** [24] - 281:9, 281:13, 283:8, 283:10, 286:15, 286:19, 287:1, 287:9, 287:12, 287:14, 287:23, 288:3, 288:4, 288:11, 288:14, 288:21, 288:23, 289:23, 290:7, 304:22, 328:17, 409:22, 434:4, 438:8
**attorney** [16] - 267:15, 267:16, 267:18, 267:19, 267:20, 268:3, 270:1, 272:3, 277:2, 283:3, 283:16, 284:3, 289:3, 289:11, 291:5, 330:7
**Attorney's** [21] - 276:10, 276:24, 277:17, 286:4, 286:9, 286:13, 286:18, 328:10, 328:13, 374:18, 374:22, 374:25, 418:15, 419:7, 419:24, 420:3, 420:6, 420:10, 434:10, 437:20, 438:4
**attorney's** [2] - 275:15, 275:18
**attorney-client** [1] - 272:3
**attorneys** [5] - 265:7, 270:10, 270:16, 283:1, 326:17
**attribute** [1] - 383:1
**audio** [2] - 262:25, 263:2
**August** [3] - 228:7, 228:9, 228:19
**aunt's** [1] - 253:4
**authority** [1] - 374:14
**Auto** [1] - 354:14
**available** [1] - 426:3
**Avenue** [58] - 250:23, 251:4, 293:24, 293:25, 295:8, 295:17, 295:19, 295:21, 295:24, 296:14, 296:22, 297:11, 297:21, 297:23, 298:7, 299:6, 299:15, 310:1, 312:14, 312:24, 312:25, 313:4, 313:5, 313:7, 337:12, 357:15, 358:1, 358:2, 359:23, 359:24, 360:5, 360:22, 361:5, 361:6, 362:20, 380:11, 380:12, 380:13, 381:11, 381:12, 381:13, 386:5, 392:6, 392:8, 394:11, 398:24, 423:22, 423:25, 424:14, 441:11, 441:15, 442:6, 443:10, 443:11
**avenue** [1] - 361:10

4

**avenues** [1] - 380:14
**aware** [29] - 234:13, 313:19, 327:4, 330:4, 334:3, 334:7, 337:7, 340:24, 341:24, 342:16, 342:19, 342:20, 342:22, 342:25, 343:1, 343:19, 343:22, 359:12, 370:3, 372:12, 414:12, 420:16, 420:19, 431:6, 437:2, 438:11, 438:24, 439:1, 439:11

## B

**background** [1] - 251:25
**backing** [1] - 400:17
**backup** [2] - 363:24, 400:18
**bad** [1] - 231:8
**badge** [8] - 337:18, 338:6, 339:6, 339:16, 422:10, 422:11, 422:14, 422:17
**baggies** [3] - 386:20, 387:1, 404:5
**bags** [3] - 370:21, 386:19, 387:14
**ball** [1] - 244:9
**band** [3] - 317:22, 339:19, 339:23
**bands** [2] - 339:20, 340:2
**bank** [1] - 422:19
**bar** [8] - 254:3, 255:1, 257:1, 264:17, 265:1, 271:2, 303:18, 303:19
**Based** [4] - 290:21, 291:4, 354:8, 434:9
**based** [12] - 265:10, 265:16, 270:16, 270:23, 274:11, 277:18, 286:21, 290:16, 290:19, 290:20, 305:11, 422:6
**basis** [8] - 266:15, 291:5, 331:23, 349:8, 349:10, 349:11, 387:17, 427:2
**Basis** [1] - 279:17
**Bates** [3] - 302:15, 302:17, 302:23
**bathroom** [1] - 306:14
**baton** [63] - 223:23, 224:11, 249:4, 249:12, 249:13, 249:15, 319:4, 321:13, 321:19, 321:22, 321:25, 323:6, 327:15, 327:20, 327:23, 327:25, 328:5, 335:5, 335:9, 335:10, 335:12, 336:8, 341:15, 340:15, 340:25, 341:3, 341:5, 341:15, 351:3, 363:9, 364:13, 364:22, 365:3, 365:11, 365:14, 365:15, 365:18, 366:17, 366:23, 367:4, 367:14, 367:17, 376:9, 382:11, 382:16, 382:17, 382:22, 383:4, 383:14, 384:13, 385:2, 385:10, 385:15, 385:21, 387:21, 390:22, 401:22, 410:5, 410:9, 410:10, 410:15
**baton-like** [1] - 249:15
**batons** [1] - 366:13
**batting** [1] - 404:4
**Beach** [1] - 243:15
**beaded** [1] - 422:20
**bear** [1] - 280:15
**became** [5] - 234:3, 313:18, 359:11, 363:6, 370:3
**become** [4] - 261:14, 354:1, 420:19, 427:18
**becoming** [2] - 354:9, 354:16
**Bed** [1] - 232:22
**Bed-Stuy** [1] - 232:22
**bedroom** [2] - 251:7, 251:10

**BEFORE** [1] - 22
**began** [4] - 333:20, 397:25, 403:23, 428:1
**begun** [1] - 397:6
**behalf** [1] - 272:3
**behind** [14] - 266:25, 320:6, 320:19, 334:14, 334:25, 357:12, 361:18, 367:10, 371:14, 373:23, 399:11, 414:11, 425:9, 441:23
**below** [2] - 383:20, 433:8
**belt** [2] - 318:12, 318:17
**bench** [1] - 353:2
**beneath** [1] - 369:4
**best** [4] - 330:12, 417:9, 430:22, 440:14
**bet** [1] - 426:14
**better** [5] - 310:3, 314:3, 358:16, 429:14, 441:12
**between** [17] - 253:7, 261:14, 263:2, 338:17, 350:2, 362:23, 365:21, 378:8, 381:21, 382:3, 387:21, 387:22, 399:8, 399:12, 425:5, 426:8, 427:10
**bicep** [5] - 237:24, 238:1, 238:3, 238:5, 238:11
**big** [3] - 277:23, 369:16, 369:18
**bigger** [1] - 384:6
**biggest** [2] - 365:5, 372:7
**birth** [1] - 406:11
**bit** [11] - 245:6, 245:11, 246:2, 246:3, 342:9, 383:22, 401:7, 433:1, 444:3, 444:4
**Black** [1] - 398:12
**black** [13] - 261:4, 317:22, 343:7, 344:5, 344:10, 356:21, 385:24, 404:4, 404:16, 404:17, 404:19, 415:19
**bleed** [2] - 342:9, 342:14
**bleeding** [3] - 322:21, 341:22, 402:19
**block** [2] - 317:19, 442:10
**blocks** [2] - 313:14, 359:6
**blood** [17] - 343:2, 369:3, 369:8, 369:11, 369:17, 383:17, 383:19, 383:22, 383:23, 383:24, 383:25, 384:2, 384:5, 384:20, 402:16, 402:18
**bloodshot** [3] - 323:10, 349:17, 349:20
**blow** [1] - 383:7
**blows** [3] - 363:4, 363:16, 382:7
**blunt** [4] - 412:6, 428:20, 434:2, 434:5
**Board** [2] - 243:15, 289:18
**boil** [1] - 245:14
**bonding** [1] - 225:9
**book** [3] - 392:21, 392:22
**boots** [1] - 310:12
**boss** [1] - 368:25
**bottom** [7] - 249:16, 275:4, 302:15, 311:2, 402:8, 413:17, 433:11
**bound** [1] - 306:7
**bounds** [1] - 223:11
**box** [13] - 223:11, 275:4, 275:11, 276:5, 277:23, 278:15, 335:17, 335:22, 336:5, 336:7, 410:17, 414:7, 435:19
**boxes** [3] - 272:16, 435:10, 435:12
**boxing** [1] - 400:10

**boy** [1] - 281:12
**bracket** [1] - 432:9
**break** [9] - 223:4, 258:11, 258:13, 261:12, 306:14, 315:12, 315:14, 376:14, 445:9
**breather** [1] - 368:16
**brick** [2] - 424:25, 425:2
**brief** [4] - 239:25, 254:3, 397:13, 419:2
**briefly** [7] - 295:4, 313:3, 355:22, 358:19, 389:13, 394:10, 399:11
**Briefly** [3] - 308:25, 309:19, 437:2
**bring** [3] - 373:2, 380:7, 435:2
**Bring** [5] - 223:1, 271:2, 436:6, 437:1, 437:6
**brisk** [1] - 360:7
**broke** [1] - 316:15
**broken** [2] - 423:20, 432:19
**Brookdale** [4] - 244:12, 244:14, 244:22, 371:24
**Brooklyn** [7] - 222:8, 245:1, 267:25, 293:25, 310:1, 355:16, 390:10
**Brooklyn's** [1] - 285:4
**BROOKS** [56] - 222:21, 257:16, 261:6, 261:8, 265:3, 265:14, 269:1, 270:7, 271:1, 272:2, 273:2, 273:13, 273:16, 273:19, 279:11, 279:18, 282:11, 282:13, 284:7, 291:6, 294:10, 294:13, 294:22, 299:23, 300:5, 301:3, 301:14, 302:15, 302:19, 303:21, 304:8, 304:10, 304:15, 304:22, 305:23, 306:4, 306:24, 307:10, 315:13, 316:12, 326:4, 327:12, 329:13, 340:3, 342:11, 344:6, 348:16, 351:9, 351:12, 352:16, 352:23, 353:13, 376:11, 385:18, 388:6, 437:7
**Brooks** [16] - 272:4, 272:7, 282:10, 282:16, 286:14, 287:21, 291:8, 306:23, 307:2, 307:11, 316:10, 329:15, 335:4, 352:20, 353:2, 376:13
**brought** [7] - 268:12, 276:21, 276:22, 278:8, 278:20, 280:9, 282:2, 367:5, 371:16, 383:9, 419:8, 433:13
**Brought** [1] - 323:1
**brow** [1] - 383:18
**brown** [2] - 314:23, 331:14
**bruising** [1] - 342:6
**buddy** [2] - 225:21, 396:12
**building** [7] - 261:13, 359:1, 394:14, 424:25, 425:2, 425:20, 425:25
**buildings** [1] - 313:8
**bullet** [1] - 224:15
**bunch** [1] - 432:8
**Bureau** [3] - 308:24, 354:12, 354:23
**burglaries** [4] - 309:23, 356:1, 389:16, 391:6
**burnt** [1] - 323:25
**bus** [3] - 369:23, 407:5
**buses** [2] - 313:15, 359:7
**business** [1] - 417:14
**businesses** [2] - 313:9, 359:2
**butt** [1] - 402:8
**butterfly** [1] - 225:9
**BY** [19] - 223:18, 248:2, 267:10, 281:2,

5

282:13, 292:23, 307:10, 316:12, 329:19, 348:2, 351:12, 353:13, 377:10, 388:20, 407:2, 421:14, 440:2, 446:20, 446:25

## C

**calculation** [2] - 281:11, 281:16
**caliber** [1] - 224:15
**camera** [1] - 298:15
**cannot** [2] - 244:7, 282:1
**capacity** [2] - 282:25, 355:4
**caption** [1] - 327:4
**car** [62] - 314:12, 314:17, 316:16, 316:18, 316:25, 318:8, 330:17, 330:25, 333:21, 334:4, 334:16, 334:18, 337:16, 356:21, 358:11, 360:18, 361:16, 361:22, 362:14, 362:17, 362:18, 362:19, 363:8, 367:1, 378:5, 378:10, 379:10, 379:15, 379:16, 379:18, 379:23, 379:24, 380:3, 381:5, 381:7, 381:9, 381:17, 397:4, 398:2, 398:5, 399:9, 400:12, 400:17, 400:22, 400:23, 400:24, 401:1, 401:4, 401:9, 402:23, 422:11, 423:10, 423:21, 424:8, 424:20, 425:4, 425:8, 441:16, 442:2, 443:8
**card** [1] - 416:11
**care** [11] - 231:16, 236:2, 236:3, 282:10, 325:21, 325:22, 344:24, 344:25, 357:6, 369:1, 405:17
**careful** [1] - 245:25
**carpet** [1] - 367:25
**carry** [1] - 318:22
**carrying** [9] - 316:24, 319:4, 319:6, 363:19, 363:21, 363:22, 364:7, 390:22, 423:17
**cars** [2] - 426:8, 426:10
**case** [62] - 224:2, 239:20, 245:14, 251:25, 257:23, 257:25, 258:2, 258:14, 260:5, 261:7, 261:20, 265:11, 274:23, 276:14, 276:25, 277:10, 278:6, 278:8, 278:10, 280:12, 281:8, 281:18, 281:20, 281:23, 283:7, 284:5, 284:6, 285:1, 285:2, 285:3, 285:10, 287:2, 287:5, 287:8, 287:13, 288:5, 288:12, 288:15, 288:19, 288:22, 289:23, 290:6, 290:7, 290:9, 300:25, 304:21, 306:8, 306:11, 306:20, 315:15, 327:4, 349:4, 376:15, 376:19, 419:5, 419:12, 431:20, 438:18, 439:11, 445:12
**cases** [9] - 267:21, 274:17, 274:22, 274:25, 276:21, 287:15, 287:18, 305:25, 432:7
**CAT** [1] - 222:25
**caused** [1] - 369:8
**causing** [1] - 412:4
**CD** [1] - 266:2
**CD-9** [1] - 234:5
**center** [1] - 365:22
**Central** [1] - 354:21
**certain** [6] - 246:6, 287:2, 379:3, 380:6, 403:5, 428:22

**certainly** [1] - 25
**Certainly** [1] - 253:3
**certificate** [1] - 300:24
**chair** [1] - 267:1
**challenged** [1] - 246:5
**chance** [1] - 348:14
**chances** [1] - 364:11
**change** [2] - 277:3, 339:23
**changed** [1] - 444:12
**charge** [12] - 272:10, 276:23, 281:13, 288:10, 304:14, 305:14, 411:21, 432:9, 438:20, 445:10, 445:19, 445:21
**Charge** [1] - 305:15
**charged** [3] - 233:10, 432:8, 433:15
**Charges** [1] - 288:7
**charges** [34] - 265:12, 268:15, 268:18, 268:21, 272:24, 277:2, 282:5, 283:11, 284:4, 285:10, 286:9, 286:15, 286:20, 289:2, 328:18, 373:1, 375:6, 375:8, 409:10, 409:16, 409:17, 409:19, 409:21, 409:23, 412:8, 419:8, 420:16, 420:20, 432:7, 432:8, 433:8, 433:11, 433:12, 433:14
**charging** [1] - 433:21
**Charlie** [1] - 365:25
**chase** [4] - 361:7, 361:8, 361:9, 397:22
**chased** [1] - 317:6
**chasing** [3] - 360:20, 399:3, 441:23
**check** [5] - 359:17, 377:23, 408:4, 411:18, 435:12
**checked** [7] - 336:5, 336:8, 410:6, 410:21, 411:3, 411:16, 435:10
**checking** [2] - 345:20, 411:2
**checking-up** [1] - 345:20
**chemical** [2] - 374:1, 374:5
**chest** [6] - 344:21, 367:5, 383:9, 391:2, 422:11, 422:22
**children's** [1] - 251:11
**choke** [4] - 329:5, 336:25, 375:17, 375:19
**Choke** [1] - 375:18
**choked** [2] - 337:3, 337:5
**choose** [2] - 385:6, 438:20
**chose** [1] - 286:9
**cigar** [1] - 314:23
**cigar-like** [1] - 314:23
**cigarette** [56] - 314:19, 314:21, 314:25, 315:6, 317:1, 317:2, 323:21, 331:4, 331:10, 331:14, 331:17, 331:20, 331:22, 332:9, 332:11, 332:14, 378:1, 378:11, 378:12, 378:16, 379:6, 380:23, 380:25, 394:25, 395:1, 395:10, 395:13, 404:24, 411:20, 422:25, 423:2, 423:16, 426:24, 427:3, 427:7, 428:6, 428:17, 428:24, 428:25, 429:1, 429:7, 429:10, 429:15, 435:15, 436:17, 437:3, 437:25, 438:13, 438:17, 438:23, 438:25, 439:17, 440:3
**cigarettes** [1] - 314:22
**circle** [1] - 411:5
**circling** [1] - 368:24
**circumstances** [3] - 245:8, 245:10,

272:9
**citizens** [1] - 261:14
**City** [13] - 307:17, 307:18, 311:2, 338:8, 353:19, 353:20, 353:23, 366:13, 389:3, 389:4, 393:3, 417:5, 417:14
**city** [1] - 390:13
**civil** [1] - 354:7
**claim** [12] - 228:24, 229:3, 229:4, 237:21, 237:21, 244:20, 245:23, 280:3, 280:5, 280:8, 280:15, 305:23
**claimed** [1] - 228:25
**claims** [5] - 245:16, 245:18, 260:5, 280:1, 306:22
**clarify** [1] - 298:19
**clear** [4] - 255:3, 260:25, 335:19, 413:19
**clearer** [1] - 380:18
**clearly** [5] - 362:22, 363:4, 369:11, 382:8, 383:25
**clerk** [2] - 292:17, 307:4, 353:7, 416:6
**CLERK** [6] - 267:5, 292:16, 292:18, 307:3, 307:5, 353:6, 353:8, 388:15
**clerk's** [5] - 260:25, 261:4, 372:20, 372:21, 373:8
**client** [5] - 270:13, 270:17, 272:3, 275:21, 278:5, 290:10, 316:4, 445:23
**clients** [1] - 270:10
**close** [4] - 274:20, 298:6, 414:6, 422:15
**close-up** [1] - 298:6
**closed** [6] - 342:7, 342:23, 378:18, 378:19, 378:20, 378:22
**closer** [10] - 314:17, 314:18, 315:7, 360:10, 364:16, 378:10, 396:2, 396:4, 423:13, 427:25
**closet** [3] - 250:22, 250:24, 251:15
**clothes** [9] - 310:10, 310:11, 310:13, 310:14, 356:4, 356:5, 356:6, 390:15, 390:16
**Clothing** [1] - 368:10
**cold** [4] - 358:8, 358:11, 358:12, 379:20
**colder** [1] - 379:24
**collaborative** [1] - 368:8
**collapse** [2] - 367:17, 382:24
**Collapsed** [1] - 382:14
**collapsed** [1] - 367:17
**collapsing** [1] - 368:5
**colleague** [1] - 283:18
**collect** [6] - 343:6, 343:14, 343:17, 343:20, 344:9, 385:24
**collected** [5] - 343:11, 344:4, 344:8, 386:2, 406:10
**collecting** [1] - 386:22
**color** [8] - 339:17, 339:18, 339:23, 340:2, 356:22, 395:4, 423:20, 426:24
**Color** [1] - 339:19
**combative** [1] - 418:3
**combined** [4] - 284:5, 284:6, 284:24, 285:1
**coming** [9] - 343:2, 361:14, 367:7, 369:11, 379:10, 379:16, 379:19, 380:2,

6

441:25

**command** [3] - 309:12, 355:14, 389:25
**Command** [1] - 371:15
**commanding** [1] - 355:1
**commenced** [1] - 361:9
**comment** [6] - 333:15, 343:25, 359:15, 359:24, 360:14, 377:22
**commercial** [3] - 358:24, 394:15, 405:6
**commit** [1] - 409:18
**commitment** [1] - 445:23
**committed** [1] - 290:10
**common** [3] - 234:14, 393:15, 422:18
**commonly** [2] - 429:4, 432:7
**communication** [3] - 289:11, 290:21, 291:4
**compensation** [1] - 282:23
**complain** [3] - 240:7, 323:2, 346:2
**complainant** [2] - 286:21, 416:22
**complainants** [2] - 277:5, 288:25
**complaining** [2] - 248:8, 277:15
**complains** [1] - 280:7
**complaint** [31] - 237:14, 239:5, 240:17, 240:19, 260:19, 269:12, 269:14, 275:17, 275:20, 276:11, 276:14, 276:22, 277:7, 277:10, 277:12, 277:15, 277:16, 286:18, 288:20, 289:2, 290:11, 336:3, 348:14, 348:22, 348:24, 349:3, 349:4, 349:5, 372:19, 419:4, 437:4
**complete** [3] - 235:23, 408:23, 410:7
**completed** [4] - 372:12, 412:25, 413:23, 420:2
**completely** [3] - 282:5, 366:12, 426:2
**completing** [1] - 235:23
**complied** [1] - 366:21
**comply** [2] - 320:14, 321:7
**comport** [1] - 442:7
**comprised** [1] - 358:24
**comptroller** [3] - 237:9, 237:12, 238:24
**computer** [3] - 409:1, 409:5, 409:8
**concentrating** [1] - 364:18
**concern** [9] - 236:3, 265:5, 273:2, 318:10, 365:5, 384:16, 402:11, 402:13
**concerned** [7] - 265:7, 324:4, 352:7, 357:9, 387:3, 387:5, 416:2
**concerning** [1] - 355:2
**conclusion** [1] - 445:20
**concussion** [2] - 385:11, 388:1
**concussions** [1] - 385:17
**condition** [2] - 435:3, 435:5
**conditions** [1] - 426:22
**conduct** [5] - 245:9, 247:22, 392:24, 402:25, 429:20
**conducting** [1] - 405:8
**Coney** [10] - 231:13, 231:21, 234:16, 234:25, 235:5, 244:11, 244:13, 244:15, 244:17, 244:23
**Confer** [1] - 227:7
**conference** [2] - 272:24, 445:21
**conferred** [1] - 258:20

**confines** [2] - 35        92:8
**confirm** [2] - 341:2, 434:7
**confirmed** [1] - 332:8
**conform** [1] - 279:5
**confront** [2] - 316:16, 316:18
**conjunction** [1] - 364:24
**connection** [5] - 265:12, 268:15, 268:16, 278:19, 330:5
**conscious** [4] - 322:23, 369:6, 369:7, 371:3
**consciousness** [1] - 405:23
**consider** [2] - 258:6, 280:17
**considered** [1] - 276:23
**consist** [1] - 403:21
**consistent** [1] - 372:24
**consists** [1] - 257:24
**consulted** [1] - 409:20
**consumed** [1] - 252:5
**contact** [9] - 328:14, 345:24, 347:15, 347:18, 378:9, 382:3, 420:6, 426:18
**contacted** [1] - 374:21
**contacts** [2] - 426:12, 426:13
**contained** [6] - 255:20, 285:25, 326:13, 349:21, 404:5, 422:14
**contains** [2] - 257:5, 438:12
**context** [1] - 279:24
**continually** [1] - 320:18
**continue** [6] - 236:3, 422:20, 281:18, 289:23, 290:9, 291:25
**Continued** [10] - 254:5, 256:16, 263:9, 264:19, 271:4, 273:22, 347:23, 376:22, 406:13, 439:19
**CONTINUED** [5] - 223:17, 316:11, 440:1, 446:14, 446:24
**continued** [4] - 235:23, 317:17, 320:18, 441:2
**continues** [4] - 257:1, 262:16, 263:8, 264:1
**CONTINUES** [3] - 281:1, 348:1, 407:1
**continuing** [1] - 366:3
**continuously** [1] - 255:6
**contraband** [3] - 362:2, 402:24, 403:8
**contracts** [1] - 365:24
**Control** [2] - 308:24, 354:12
**control** [3] - 320:5, 400:15, 403:2
**conversation** [3] - 370:6, 378:7, 396:10
**conversations** [1] - 265:16
**converted** [2] - 276:11, 414:4
**Cooke** [2] - 303:24, 304:15
**cool** [1] - 444:2
**copies** [8] - 241:17, 241:22, 241:23, 243:3, 243:6, 250:18, 250:21, 251:19
**copy** [12] - 227:2, 227:4, 242:13, 260:14, 260:17, 270:22, 271:1, 346:5, 346:6, 430:12, 430:23, 436:9
**corner** [30] - 275:4, 292:6, 293:24, 294:3, 294:6, 295:7, 296:15, 296:20, 296:23, 297:13, 297:15, 297:22, 317:16, 335:20, 359:3, 370:12, 370:13, 380:11, 380:14, 380:15, 386:3, 398:4, 404:11, 404:12, 405:7, 413:19, 442:19,

442:20, 444:19, 444:21
**Corporation** [2] - 326:17, 330:8
**Corps** [3] - 307:22, 307:23, 308:4
**Correct** [26] - 237:10, 237:13, 240:15, 248:14, 249:14, 251:2, 252:4, 252:8, 298:22, 328:6, 332:10, 334:1, 337:1, 337:22, 343:12, 344:3, 344:11, 344:17, 346:4, 346:19, 347:1, 347:5, 348:8, 348:21, 436:22, 439:13
**correct** [167] - 229:5, 240:18, 243:1, 248:6, 248:13, 248:16, 249:13, 249:21, 250:1, 250:14, 251:1, 252:3, 252:7, 252:12, 252:22, 259:18, 259:19, 282:19, 283:1, 283:4, 283:8, 283:14, 283:17, 283:19, 283:22, 284:5, 285:7, 285:11, 285:17, 285:19, 285:22, 286:1, 286:5, 286:10, 286:13, 286:20, 286:24, 287:3, 287:6, 287:10, 287:16, 287:20, 288:8, 288:22, 289:4, 289:6, 289:10, 289:16, 289:19, 290:6, 290:13, 290:17, 290:25, 298:21, 308:1, 308:9, 308:17, 312:2, 326:18, 327:23, 328:5, 328:7, 330:2, 330:8, 330:17, 331:1, 331:14, 331:23, 331:25, 332:14, 333:13, 333:21, 333:25, 334:20, 334:22, 335:1, 335:13, 336:12, 336:22, 336:25, 337:14, 337:16, 337:19, 337:21, 340:12, 340:16, 340:25, 341:3, 341:11, 342:24, 343:8, 343:11, 346:3, 346:23, 346:25, 348:20, 349:14, 349:17, 350:10, 351:24, 352:1, 352:12, 352:15, 373:24, 377:14, 377:15, 377:21, 378:2, 378:6, 379:2, 379:21, 380:9, 381:14, 381:15, 381:17, 381:21, 382:1, 382:8, 382:13, 383:18, 383:23, 384:3, 385:3, 385:7, 385:12, 385:17, 385:22, 385:25, 386:17, 386:23, 387:15, 387:21, 388:1, 408:16, 418:5, 421:22, 422:3, 423:2, 423:5, 423:14, 423:22, 425:15, 425:22, 426:11, 426:25, 427:4, 427:19, 427:22, 428:1, 430:6, 433:21, 436:4, 436:5, 436:10, 438:5, 439:17, 440:7, 440:9, 440:11, 441:3, 441:15, 441:19, 441:24, 443:5, 443:8, 444:6, 444:9
**corrected** [1] - 411:4
**corrections** [4] - 237:5, 242:7, 242:10, 242:12
**correctly** [1] - 327:19
**correctness** [1] - 343:25
**corrob** [3] - 272:19, 275:11, 275:15
**corroborating** [8] - 273:10, 275:16, 277:4, 277:11, 281:10, 288:18, 288:24, 415:8
**counsel** [5] - 242:15, 258:21, 258:23, 288:24, 303:17
**Counsel** [2] - 326:17, 330:8
**count** [1] - 386:21
**counting** [1] - 387:4, 413:12
**County** [13] - 283:7, 283:10, 286:4, 286:8, 286:12, 286:14, 286:17, 287:14, 328:9, 328:13, 374:17, 418:20, 420:6
**couple** [5] - 223:3, 241:8, 250:10, 294:5, 297:17

7

**course** [14] - 237:7, 255:25, 269:25, 279:22, 321:20, 326:10, 328:1, 348:12, 348:13, 379:13, 385:20, 393:2, 417:4, 417:14

**COURT** [327] - 222:1, 223:1, 223:4, 223:10, 223:14, 226:19, 226:23, 227:2, 227:4, 227:7, 227:23, 227:25, 228:14, 228:16, 228:21, 229:21, 230:1, 230:3, 230:13, 231:24, 232:4, 233:1, 233:4, 233:6, 233:15, 234:1, 234:8, 234:10, 235:9, 235:12, 235:15, 235:18, 236:8, 236:10, 236:17, 236:20, 238:8, 238:13, 238:16, 239:16, 239:19, 240:5, 240:9, 240:20, 240:23, 241:8, 241:21, 242:14, 242:17, 242:20, 245:6, 246:13, 246:25, 247:9, 247:20, 247:22, 249:1, 250:10, 253:11, 253:14, 253:19, 253:24, 254:2, 254:4, 255:2, 255:10, 255:16, 255:22, 256:5, 256:10, 256:14, 257:3, 257:8, 257:11, 257:19, 257:22, 258:13, 258:17, 258:19, 259:1, 259:4, 259:6, 259:10, 259:13, 259:17, 259:20, 260:1, 260:4, 260:8, 260:18, 260:21, 260:23, 261:2, 261:7, 261:9, 261:11, 261:23, 262:1, 262:4, 262:6, 262:12, 262:14, 262:17, 262:19, 262:25, 263:6, 264:3, 264:9, 264:11, 264:15, 264:18, 265:2, 265:9, 265:22, 266:6, 266:10, 266:12, 266:21, 266:23, 266:25, 268:25, 269:2, 269:6, 269:8, 270:6, 270:8, 270:14, 270:19, 270:24, 271:2, 272:8, 272:12, 272:14, 272:25, 273:4, 273:11, 273:15, 273:18, 273:21, 274:2, 274:17, 274:19, 274:21, 274:24, 275:2, 278:13, 278:18, 279:10, 279:12, 279:14, 279:17, 279:21, 282:9, 288:1, 290:3, 291:8, 291:11, 291:15, 291:20, 291:23, 292:4, 292:7, 292:11, 292:13, 293:11, 293:18, 294:3, 294:7, 294:9, 294:12, 294:15, 294:24, 295:9, 295:11, 295:22, 296:4, 296:6, 296:9, 296:11, 296:17, 296:24, 297:1, 297:3, 297:5, 297:9, 297:19, 298:2, 298:4, 298:11, 298:13, 298:15, 298:18, 299:2, 299:7, 299:19, 299:22, 299:24, 300:1, 300:4, 300:6, 300:9, 300:14, 300:17, 300:19, 300:24, 301:2, 301:4, 301:9, 301:13, 301:17, 301:24, 302:2, 302:6, 302:11, 302:13, 302:23, 302:25, 303:2, 303:9, 303:11, 303:14, 303:17, 303:20, 304:7, 304:9, 304:12, 304:18, 304:25, 305:12, 305:14, 305:16, 305:19, 306:3, 306:7, 306:13, 306:16, 306:19, 307:1, 307:11, 310:2, 315:12, 315:14, 315:18, 316:2, 316:9, 326:3, 327:11, 329:15, 329:25, 332:20, 333:12, 333:15, 334:10, 335:20, 340:4, 340:7, 342:12, 343:24, 344:7, 348:17, 349:3, 351:7, 351:10, 352:17, 352:20, 352:25, 353:2, 365:20, 367:21, 367:23, 376:13, 376:19, 377:1, 377:4, 377:7, 382:19, 385:19, 387:8, 388:4, 388:7, 388:11, 393:7, 393:9, 393:22, 394:3, 416:14, 417:20, 417:22, 419:11,

419:13, 419:15, 4       419:21, 421:10, 424:12, 425:2, 425:7, 428:14, 431:5, 431:11, 431:13, 431:15, 431:22, 431:25, 434:14, 434:16, 434:19, 434:25, 435:24, 436:18, 436:23, 437:9, 437:11, 439:3, 439:7, 442:12, 442:17, 442:25, 443:3, 443:23, 444:21, 444:24, 445:1, 445:7, 445:9, 445:19, 445:25

**court** [36] - 237:15, 257:21, 266:18, 268:20, 269:12, 270:9, 270:12, 270:18, 270:20, 270:21, 272:1, 272:6, 272:16, 272:17, 272:18, 272:21, 273:20, 274:1, 274:22, 276:10, 276:13, 276:21, 277:2, 278:8, 279:18, 279:23, 280:9, 280:11, 282:3, 284:6, 285:4, 306:18, 328:20, 330:4, 336:19, 445:22

**Court** [9] - 222:23, 265:23, 266:7, 281:9, 288:24, 349:22, 375:3, 419:4, 420:13

**Courthouse** [1] - 222:7

**courtroom** [7] - 223:13, 316:8, 329:2, 375:13, 377:6, 420:25, 445:18

**cousin** [1] - 251:11

**cover** [1] - 284:14

**covered** [1] - 422:21

**CPM** [1] - 409:13

**Cravath** [1] - 293:4

**create** [4] - 256:13, 273:19, 299:16, 438:5

**created** [3] - 270:15, 273:20, 438:12

**creates** [1] - 270:14

**creation** [1] - 286:3

**credibility** [2] - 246:5, 246:15

**Crime** [4] - 308:24, 354:12, 354:14, 354:15

**crime** [14] - 338:20, 355:25, 356:1, 358:15, 390:4, 390:11, 390:17, 391:3, 391:4, 391:7, 391:9, 391:15, 393:19, 396:18

**crimes** [7] - 288:8, 309:2, 309:22, 391:5, 391:6, 432:19, 433:20

**criminal** [33] - 267:15, 267:16, 267:19, 268:1, 268:4, 268:7, 268:15, 269:12, 269:14, 270:1, 273:19, 276:16, 276:20, 276:21, 281:11, 283:1, 283:7, 283:10, 283:13, 283:16, 284:3, 284:5, 284:6, 287:2, 287:5, 300:25, 309:23, 328:18, 328:20, 349:4, 409:13, 431:20, 438:8

**Criminal** [4] - 286:22, 375:3, 419:4, 420:13

**criminals** [1] - 391:11

**cross** [16] - 223:6, 245:11, 255:7, 255:12, 256:2, 265:18, 279:19, 279:21, 282:10, 300:4, 329:16, 360:1, 377:7, 421:11, 443:15

**CROSS** [12] - 223:17, 282:12, 329:18, 377:9, 421:13, 440:1, 446:2, 446:8, 446:15, 446:19, 446:23, 446:24

**cross-examination** [1] - 265:18

**CROSS-EXAMINATION** [12] - 223:17, 282:12, 329:18, 377:9, 421:13, 440:1, 446:2, 446:8, 446:15, 446:19, 446:23, 446:24

**crossed** [3] - 360:2, 396:5

**crucial** [1] - 265:6

**crumpled** [3] - 370:20, 370:21, 386:19

**cuff** [2] - 401:13, 401:14

**cuffed** [2] - 247:6, 401:12

**culled** [1] - 258:5

**cumulative** [1] - 301:15

**curb** [6] - 396:6, 441:8, 441:9, 443:12, 443:13, 443:14

**current** [5] - 308:12, 353:23, 354:24, 377:25, 389:7

**cursor** [1] - 443:23

**custody** [6] - 290:16, 290:19, 290:23, 369:21, 403:16, 439:18

**cut** [4] - 256:7, 361:10, 361:17, 369:11, 369:13, 369:16, 381:19, 400:9, 402:15

**Cv-07-1416** [1] - 222:3

---

# D

**DA** [2] - 290:6, 304:14

**DA's** [10] - 406:5, 415:11, 418:20, 419:21, 419:22, 432:10, 432:14, 433:3, 437:18, 438:19

**daily** [1] - 392:23

**danger** [1] - 347:4

**dark** [5] - 362:13, 398:12, 423:20, 425:16, 426:22

**Dark** [1] - 394:13

**darker** [4] - 395:4, 425:14, 442:21, 442:24

**data** [1] - 408:25

**date** [20] - 231:3, 232:1, 270:23, 274:9, 274:13, 274:15, 275:7, 275:9, 275:23, 276:1, 276:3, 276:24, 277:1, 277:25, 278:17, 284:15, 285:2, 393:16, 396:23, 406:11

**dated** [1] - 235:22

**dates** [1] - 270:11

**days** [9] - 240:11, 240:14, 251:23, 276:24, 276:25, 277:9, 281:13, 325:18

**daytime** [1] - 425:13

**dead** [1] - 365:25

**deadly** [8] - 347:10, 347:12, 347:13, 347:14, 347:17, 352:10, 385:6

**death** [1] - 347:13

**December** [8] - 237:19, 239:8, 239:13, 242:11, 338:10, 338:18, 345:3, 384:7

**decide** [3] - 245:23, 257:12, 401:5

**decides** [1] - 286:19

**decision** [9] - 286:12, 289:18, 377:13, 377:16, 377:19, 409:19, 422:5, 422:24, 427:2

**declarant** [1] - 305:7

**Declaration** [1] - 301:9

**declaration** [4] - 301:11, 326:2, 330:19, 351:14

**declined** [1] - 244:5

**deem** [3] - 400:21, 433:4, 438:20

**deemed** [2] - 401:8, 405:14

**Defendant** [2] - 277:24, 277:25

**defendant** [9] - 257:24, 280:14,

283:14, 315:7, 315:11, 331:7, 333:1, 411:14

**Defendant's** [9] - 233:23, 234:21, 301:21, 302:8, 302:9, 302:17, 302:21, 416:16, 417:18

**defendant's** [2] - 301:12, 333:2

**DEFENDANTS** - 222:10

**defendants** [13] - 255:24, 258:6, 265:3, 265:25, 282:16, 291:19, 291:25, 292:1, 301:21, 305:4, 306:21, 306:24, 352:23

**Defendants** [1] - 222:21

**defendants'** [1] - 258:20

**Defendants'** [8] - 228:4, 228:13, 231:19, 232:12, 240:24, 258:23, 392:16, 393:6

**defense** [12] - 265:7, 267:15, 267:16, 267:19, 268:4, 268:7, 270:1, 283:1, 283:16, 284:3, 306:11, 306:21

**defenses** [1] - 268:1

**define** [1] - 384:4

**definitely** [5] - 232:21, 274:20, 281:5, 402:11, 402:12

**definition** [1] - 240:2

**definitive** [1] - 335:12

**DEGLAS** [1] - 222:9

**Deglas** [53] - 257:18, 260:11, 263:4, 304:4, 305:12, 305:17, 305:18, 311:17, 312:8, 320:3, 320:25, 321:9, 321:12, 321:15, 321:18, 332:14, 337:7, 340:15, 340:24, 341:19, 343:13, 343:17, 343:19, 350:17, 351:1, 352:24, 353:10, 353:14, 353:16, 355:6, 365:11, 373:5, 377:1, 377:11, 382:11, 384:24, 388:7, 391:24, 391:25, 396:19, 397:8, 397:16, 399:2, 399:10, 399:21, 399:24, 401:8, 401:18, 403:2, 403:13, 403:16, 410:11, 446:17

**Deglas's** [2] - 410:15, 413:3

**degree** [1] - 232:23

**deliberating** [1] - 445:11

**delivered** [2] - 383:6, 383:7

**delivers** [1] - 366:1

**demeanor** [2] - 323:8, 371:5

**demonstrate** [5] - 284:15, 365:17, 367:19, 395:5, 427:6

**demonstration** [1] - 303:23

**Denied** [1] - 306:3

**denied** [1] - 306:10

**deny** [1] - 305:19

**Department** [13] - 277:5, 278:6, 307:17, 307:19, 353:19, 353:21, 353:24, 366:13, 389:3, 389:5, 393:3, 417:5, 417:15

**department** [6] - 237:5, 275:19, 391:5, 396:13, 416:19, 416:20

**depicted** [1] - 293:20

**deploy** [4] - 382:16, 382:20, 382:22

**deployed** [7] - 341:5, 341:16, 351:3, 363:9, 363:12, 364:13, 364:19

**deploying** [1] - 366:23

**deployment** [1] - 368:4

**deponent** [1] - 332:24

**deposed** [3] - 33        38:18, 339:2

**deposition** [36] - 224:2, 224:20, 225:11, 225:14, 225:18, 226:24, 227:2, 229:8, 237:19, 239:8, 241:12, 241:14, 242:8, 242:10, 249:11, 249:17, 252:10, 252:25, 253:18, 253:20, 253:25, 255:5, 258:5, 259:11, 262:8, 277:4, 337:7, 338:13, 340:6, 340:11, 343:19, 345:3, 348:6, 384:7

**depositions** [5] - 243:2, 258:2, 258:3, 258:23, 265:24

**deposits** [1] - 414:6

**describe** [13] - 295:4, 295:16, 296:13, 313:3, 314:20, 358:19, 362:23, 390:11, 394:10, 395:12, 398:10, 423:16, 440:14

**Describe** [1] - 319:8

**described** [3] - 249:13, 428:4, 442:22

**Description** [1] - 409:12

**description** [5] - 373:7, 409:11, 422:2, 441:13, 442:18

**descriptions** [1] - 357:8

**deserted** [1] - 426:9

**designated** [2] - 255:23, 366:14

**designed** [1] - 430:23

**desk** [9] - 371:14, 373:23, 413:1, 413:21, 413:25, 414:11, 414:14, 415:13, 416:3

**Desk** [1] - 373:21

**desolate** [1] - 337:12

**Despite** [1] - 434:20

**despite** [1] - 426:22

**destroyed** [3] - 374:15, 414:23, 414:24

**detain** [1] - 429:16

**Detain** [1] - 429:17

**detection** [1] - 358:14

**detective** [2] - 308:14, 308:21, 308:25, 354:10, 354:11, 354:16, 377:2, 389:9, 389:14, 408:15, 410:12, 416:18

**Detective** [96] - 262:9, 301:9, 301:16, 304:5, 304:8, 306:25, 307:1, 307:7, 307:12, 307:14, 308:13, 309:4, 311:17, 312:1, 312:4, 316:2, 316:13, 317:17, 320:23, 322:6, 325:25, 329:20, 333:9, 342:10, 343:15, 343:16, 344:4, 350:9, 350:16, 350:23, 351:13, 352:9, 352:21, 354:22, 356:23, 357:2, 360:23, 361:7, 362:16, 362:24, 363:15, 363:17, 370:4, 372:5, 372:12, 372:23, 375:17, 375:21, 388:9, 388:17, 388:21, 389:8, 389:12, 389:14, 391:25, 393:11, 397:8, 397:16, 397:25, 398:13, 399:9, 399:5, 399:9, 400:7, 401:15, 402:10, 403:17, 407:25, 408:2, 408:5, 411:6, 411:8, 416:7, 416:15, 417:24, 418:6, 418:8, 418:11, 418:14, 421:15, 421:19, 423:4, 423:21, 424:13, 426:11, 426:21, 427:16, 428:16, 430:25, 431:6, 435:4, 436:2, 436:7, 437:2, 437:14, 438:11

**detectives** [2] - 257:24, 355:5

**determination** [1] - 245:15

**diagnosed** [3] - 232:8, 232:17, 233:8

**diagnosis** [4] - 233:12, 234:5, 235:20, 325:4

**diagonal** [1] - 441:17

**Diagonally** [1] - 425:11

**diagonally** [2] - 427:23, 441:8

**dictates** [2] - 288:11, 379:23

**died** [1] - 401:7

**difference** [1] - 415:22

**different** [2] - 249:8, 354:13

**difficult** [4] - 245:23, 251:21, 379:1, 379:4

**DIFM** [1] - 276:5

**Dimitri** [4] - 260:11, 352:24, 353:10, 446:17

**DIMITRI** [1] - 222:9

**DIRECT** [12] - 267:9, 292:22, 307:9, 316:11, 353:12, 388:19, 446:7, 446:10, 446:13, 446:14, 446:18, 446:22

**direct** [17] - 252:1, 281:3, 286:23, 329:23, 330:15, 332:22, 334:2, 334:11, 335:3, 345:2, 347:6, 351:8, 373:15, 374:4, 411:13, 423:7, 441:11

**directed** [2] - 335:4, 370:7

**direction** [5] - 297:23, 428:21, 440:21, 444:12

**Directly** [1] - 369:14

**directly** [10] - 280:6, 356:13, 357:12, 365:22, 369:4, 378:21, 383:20, 414:11, 427:19, 428:11

**discharge** [2] - 308:3, 308:6

**discharged** [1] - 307:25

**disclose** [1] - 403:8

**discomfort** [2] - 402:12, 405:13

**discovered** [1] - 332:5

**discovery** [1] - 258:2

**discuss** [5] - 258:13, 261:20, 315:15, 328:14, 376:15, 420:7, 420:10

**discussed** [6] - 224:1, 242:22, 258:23, 286:3, 286:22, 372:25

**discussing** [1] - 223:22

**discussions** [1] - 290:24

**dismiss** [1] - 305:2

**dismissal** [5] - 272:10, 273:8, 280:12, 287:19, 290:5

**dismissed** [20] - 272:24, 273:10, 276:10, 276:15, 276:18, 277:8, 281:8, 281:15, 281:19, 281:20, 282:5, 287:6, 287:8, 287:13, 287:22, 288:7, 288:13, 288:16, 290:6, 290:7

**disorder** [1] - 234:14

**dispatched** [1] - 371:18

**displayed** [1] - 422:15

**Displayed** [3] - 259:23, 259:25, 260:16

**disposition** [1] - 300:24

**dispute** [2] - 261:7, 272:25

**disputed** [1] - 258:4

**disregard** [1] - 257:13

**dissipate** [1] - 364:12

**dissuades** [1] - 366:2

**distance** [3] - 231:2, 367:1, 426:23

**distinct** [2] - 382:23, 398:15

**distinctly** [1] - 402:4

**distinguished** [2] - 245:8, 246:7

**District** [45] - 276:10, 276:23, 277:17,

281:8, 281:13, 283:7, 283:10, 286:4, 286:8, 286:13, 286:15, 286:17, 286:19, 287:1, 287:9, 287:12, 287:14, 287:23, 288:3, 288:4, 288:11, 288:14, 288:21, 288:23, 289:22, 290:7, 304:22, 328:10, 328:13, 328:17, 374:18, 374:21, 374:24, 409:22, 418:14, 419:7, 419:24, 420:3, 420:6, 420:10, 434:4, 434:10, 437:20, 438:4, 438:8

**DISTRICT** [3] - 222:1, 222:1, 222:15

**district** [4] - 275:15, 275:18, 277:2, 289:3

**division** [4] - 268:1, 268:4, 268:7, 270:2

**Division** [5] - 289:20, 354:14, 354:15, 354:22

**divisions** [1] - 354:13

**DKR-00302** [1] - 302:18

**DKR-00304** [2] - 302:24, 448:2

**docket** [2] - 276:9, 282:3

**doctor** [1] - 345:15

**document** [102] - 228:5, 228:12, 229:24, 230:5, 231:20, 232:1, 232:11, 232:13, 232:15, 232:17, 233:18, 233:20, 234:3, 234:22, 235:3, 236:23, 237:1, 237:4, 241:2, 264:6, 269:5, 269:11, 269:21, 269:25, 270:4, 270:8, 270:14, 270:15, 273:14, 274:4, 274:8, 278:24, 279:8, 284:8, 284:9, 284:15, 284:19, 284:23, 285:14, 285:17, 285:19, 285:21, 285:25, 286:1, 286:3, 294:2, 294:11, 299:11, 300:12, 300:21, 301:6, 301:14, 326:6, 326:7, 326:9, 326:14, 326:16, 326:18, 326:20, 326:23, 326:25, 327:5, 327:7, 327:11, 328:2, 328:4, 328:7, 330:2, 330:4, 335:24, 392:14, 392:15, 392:18, 392:25, 393:2, 393:12, 408:14, 412:20, 413:23, 416:18, 417:2, 417:4, 417:8, 417:10, 417:13, 417:18, 417:25, 430:16, 432:2, 433:5, 436:8, 436:14, 436:15, 436:24, 437:3, 437:7, 437:15, 437:24, 438:11, 439:1, 439:4

**documentation** [1] - 439:12

**documents** [15] - 258:22, 258:24, 259:12, 259:14, 265:18, 272:5, 281:17, 290:8, 291:17, 293:6, 300:9, 302:4, 349:13, 439:5, 439:10

**Domestic** [1] - 285:4

**done** [14] - 232:3, 277:14, 284:21, 284:22, 287:12, 287:13, 304:16, 368:20, 372:15, 403:6, 408:10, 413:5, 413:15, 436:12

**door** [5] - 223:8, 378:21, 397:7, 442:1, 442:23

**Dorfman** [1] - 253:23, 292:12, 292:20, 292:24, 293:12, 293:20, 295:4, 295:16, 299:11, 300:3

**dot** [1] - 442:12

**double** [3] - 360:2, 396:5, 396:6

**down** [46] - 245:14, 253:14, 295:18, 295:21, 298:16, 298:21, 300:6, 312:22, 313:25, 314:1, 335:18, 352:21, 353:1,

357:7, 357:24, 35      3:4, 358:5, 358:6, 358:7, 358:13, 358:18, 360:11, 363:2, 382:21, 388:7, 393:19, 393:20, 394:6, 396:10, 396:15, 396:17, 396:18, 401:7, 405:5, 408:5, 411:13, 411:22, 412:2, 419:21, 425:19, 432:22, 434:8, 440:12, 440:15, 445:6

**Down** [1] - 444:24

**downloaded** [1] - 299:19

**downstairs** [2] - 261:16, 261:17

**downward** [1] - 363:12

**draft** [1] - 445:19

**drafted** [3] - 277:16, 277:17, 419:4

**drain** [20] - 294:4, 294:14, 297:10, 297:16, 298:6, 298:8, 298:13, 298:21, 299:5, 385:25, 386:2, 386:5, 386:13, 404:7, 405:5, 412:2, 444:16, 444:17, 445:3

**drainage** [1] - 404:7

**drains** [2] - 386:13, 444:18

**draw** [3] - 318:24, 331:8, 359:14, 364:2, 364:4

**drawing** [2] - 241:1, 318:19

**drawn** [3] - 231:25, 319:11, 362:8

**drew** [5] - 313:21, 314:17, 317:23, 360:10, 394:23

**drill** [1] - 445:14

**drive** [3] - 361:9, 391:14, 391:17

**driver** [5] - 312:6, 357:1, 357:8, 392:4, 398:15

**driving** [6] - 317:18, 381:20, 396:5, 398:7, 426:19, 430:1

**drop** [3] - 398:10, 414:5, 414:7

**dropped** [1] - 403:14

**drops** [4] - 369:3, 369:8, 383:17, 383:22

**drove** [3] - 381:19, 398:5, 398:25

**drug** [7] - 411:16, 414:2, 414:3, 433:6, 433:19, 433:23, 435:1

**Drug** [1] - 414:4

**drugs** [10] - 252:6, 253:2, 373:5, 373:13, 373:16, 373:20, 374:1, 374:6, 374:14, 435:6

**due** [1] - 325:12

**duly** [5] - 267:3, 292:17, 307:4, 353:7, 388:13

**duplicates** [1] - 272:6

**during** [30] - 235:24, 248:9, 249:20, 251:7, 252:2, 252:17, 253:2, 258:23, 279:6, 319:17, 321:3, 321:9, 329:4, 329:7, 329:10, 336:11, 341:9, 348:6, 356:16, 358:9, 361:11, 372:24, 375:16, 375:21, 376:2, 376:5, 376:8, 404:14, 410:8, 425:13

**During** [8] - 252:1, 321:20, 326:10, 328:1, 334:20, 338:13, 345:3, 420:21

**duties** [7] - 308:25, 309:22, 356:6, 389:13, 393:3, 406:2, 417:5

**duty** [4] - 325:13, 356:16, 393:19, 417:7

**Duty** [1] - 261:15

**DV-1** [2] - 285:5, 285:11

**DVD** [4] - 256:13, 266:2, 266:3, 266:8

**Dwayne** [12] - 268:10, 313:19, 320:24, 328:23, 350:15, 359:12, 375:10, 408:18, 418:15, 420:22, 421:3, 421:6

**DX** [1] - 240:22

**DX-Y** [1] - 240:22

# E

**Early** [1] - 419:12

**early** [4] - 359:11, 419:14, 421:20, 439:15

**easier** [1] - 358:18

**easiest** [1] - 412:15

**easily** [2] - 319:23, 385:4

**East** [7] - 310:1, 311:13, 312:14, 355:15, 357:15, 390:10, 445:1

**east** [4] - 297:10, 298:6, 386:14, 424:16

**eastbound** [3] - 359:23, 360:2, 427:24

**EASTERN** [1] - 222:1

**easy** [1] - 368:10

**ECAB** [10] - 415:11, 418:18, 418:19, 418:20, 418:22, 419:6, 419:7, 419:11, 420:5, 420:9

**edge** [1] - 245:22

**effect** [9] - 235:25, 359:16, 359:18, 360:12, 365:23, 378:5, 396:12, 397:14, 431:19

**effecting** [1] - 418:3

**effectively** [1] - 366:9

**effort** [3] - 280:13, 280:14, 368:8

**eight** [2] - 351:15, 390:6

**either** [13] - 232:21, 235:15, 253:18, 253:20, 336:2, 341:10, 343:13, 343:16, 359:15, 361:14, 426:10, 426:13, 437:3

**elapsed** [1] - 378:8

**elbow** [5] - 238:16, 238:17, 361:14, 361:19, 380:7

**elbows** [2] - 367:6, 383:9

**Eleanor** [3] - 253:23, 292:12, 292:20

**element** [1] - 280:5

**elements** [2] - 245:16, 280:3

**elicit** [4] - 265:15, 272:15, 333:16, 344:1

**elicited** [1] - 252:10

**eligible** [1] - 374:11

**Elmo** [3] - 259:23, 259:25, 260:16

**emergency** [6] - 234:17, 234:25, 235:5, 235:20, 236:2, 342:23

**emotional** [1] - 244:20

**employed** [13] - 267:22, 267:24, 268:1, 293:1, 307:14, 307:16, 307:18, 307:21, 353:16, 353:18, 353:20, 388:25, 389:4

**EMS** [1] - 407:9

**encompass** [2] - 425:23, 430:24

**encourage** [2] - 328:17, 374:24

**encouraged** [1] - 304:1

**end** [7] - 280:17, 366:4, 367:9, 370:25, 394:2, 395:15, 443:20

**ended** [4] - 374:10, 401:2, 444:6, 445:4

**ends** [1] - 431:20

10

**engaged** [6] - 360:11, 362:22, 365:9, 375:24, 383:6, 396:10
**engrossed** [2] - 350:22, 350:24
**enlarge** [1] - 278:14
**enormous** [1] - 383:24
**entered** [5] - 268:24, 371:15, 373:8, 409:1, 415:17
**entering** [1] - 236:1
**enters** [5] - 223:13, 316:8, 377:6, 408:25, 409:7
**entire** [6] - 272:2, 319:18, 371:4, 407:10, 428:11, 432:9
**entirely** [3] - 286:14, 361:2, 422:6
**entirety** [1] - 242:18
**entity** [1] - 419:21
**entry** [2] - 394:1, 408:25
**envelope** [9] - 373:9, 413:16, 413:18, 413:20, 413:21, 413:25, 415:13, 416:1, 416:2
**equipment** [1] - 390:18
**errata** [2] - 242:7, 242:20
**escape** [2] - 361:10, 386:10
**ESQ** [5] - 222:18, 222:18, 222:19, 222:21, 222:21
**establishing** [1] - 272:9
**establishments** [1] - 358:24
**evaluation** [1] - 265:8
**evening** [34] - 310:9, 310:13, 311:10, 311:14, 311:23, 313:24, 314:1, 314:15, 319:4, 319:6, 338:15, 342:17, 343:4, 346:2, 349:11, 349:13, 358:9, 359:10, 363:19, 363:22, 364:7, 373:24, 374:6, 378:2, 379:13, 379:21, 392:3, 395:6, 395:14, 412:23, 416:8, 422:7, 425:14, 445:17
**event** [2] - 260:4, 266:17
**events** [11] - 230:19, 230:23, 231:5, 246:17, 258:4, 309:8, 355:7, 355:8, 381:7, 412:6, 419:2
**eventually** [9] - 307:25, 322:4, 324:10, 371:19, 372:3, 373:1, 373:11, 427:24, 443:19
**Eventually** [2] - 370:14, 371:20
**evidence** [78] - 228:13, 229:24, 230:1, 230:4, 230:11, 233:24, 234:3, 234:8, 234:10, 236:6, 236:24, 240:21, 245:16, 245:18, 245:20, 245:22, 251:24, 253:23, 258:1, 258:7, 258:22, 259:8, 259:12, 264:8, 266:8, 266:21, 268:24, 269:1, 269:8, 269:9, 270:5, 279:9, 279:25, 280:5, 285:14, 291:18, 294:2, 294:14, 294:16, 296:8, 299:18, 299:25, 300:10, 300:23, 301:8, 301:23, 302:10, 302:22, 303:6, 304:1, 304:4, 306:21, 326:2, 326:3, 329:24, 332:20, 335:16, 342:3, 386:23, 387:4, 392:14, 393:6, 408:12, 409:13, 412:21, 415:18, 417:18, 424:11, 430:9, 431:8, 431:20, 436:6, 436:18, 437:8, 437:11, 442:4, 445:20
**evident** [1] - 383:8
**exact** [6] - 230:20, 240:3, 242:6, 357:21, 359:17, 382:20, 399:19, 423:18

**exactly** [10] - 231       :21, 239:24, 255:3, 365:17, 422:16, 423:18, 428:20, 428:22, 441:16
**Exactly** [4] - 242:16, 278:21, 301:1, 396:11
**exam** [1] - 354:7
**EXAMINATION** [31] - 223:17, 248:1, 267:9, 281:1, 282:12, 292:22, 307:9, 316:11, 329:18, 348:1, 351:11, 353:12, 377:9, 388:19, 407:1, 421:13, 440:1, 446:2, 446:5, 446:7, 446:8, 446:10, 446:13, 446:14, 446:15, 446:16, 446:18, 446:19, 446:22, 446:23, 446:24
**examination** [5] - 252:1, 265:18, 286:23, 329:23, 373:12
**examine** [2] - 266:6, 279:19
**examined** [2] - 267:3, 388:13
**example** [2] - 280:4, 430:17
**exception** [1] - 412:25
**excerpt** [2] - 260:10, 260:12
**excerpts** [3] - 258:5, 262:7, 263:1
**exchanging** [3] - 363:3, 363:16, 382:7
**excluded** [1] - 431:9
**excluding** [1] - 329:2
**Excuse** [3] - 240:5, 305:14, 340:7
**excuse** [4] - 231:2, 232:22, 234:4, 397:10
**excused** [3] - 291:11, 291:14, 300:8
**exhibit** [4] - 240:20, 266:18, 269:6, 271:3, 274:14, 275:3, 278:14, 284:11, 301:20, 302:3, 302:9, 332:23, 416:13, 432:21
**Exhibit** [60] - 228:4, 228:13, 229:25, 230:11, 231:19, 234:21, 236:7, 240:24, 259:22, 259:24, 260:10, 260:13, 260:22, 260:24, 261:3, 264:6, 264:13, 266:11, 266:12, 266:21, 268:24, 269:18, 269:20, 277:21, 278:23, 293:19, 294:21, 296:10, 296:16, 296:21, 297:8, 297:18, 298:9, 298:20, 299:4, 299:10, 300:13, 300:22, 301:7, 301:21, 302:8, 302:9, 302:17, 302:21, 303:7, 326:1, 327:3, 327:13, 329:23, 332:19, 335:15, 335:17, 342:2, 346:6, 351:14, 392:16, 393:6, 408:12, 416:16, 417:19
**exhibits** [5] - 258:24, 259:8, 261:9, 292:2, 293:9
**Exhibits** [4] - 259:15, 265:23, 266:7, 293:7
**exit** [3] - 397:4, 400:3, 401:5
**exited** [10] - 315:10, 334:4, 360:18, 381:6, 381:8, 381:22, 382:10, 397:21, 399:2, 401:4
**exiting** [1] - 397:6
**expanded** [1] - 407:18
**expedited** [1] - 407:18
**experience** [6] - 308:11, 313:15, 318:4, 361:25, 386:22, 387:16
**explain** [2] - 279:24, 393:21
**explained** [4] - 235:21, 239:25, 243:5, 243:11, 244:9
**explanation** [2] - 239:25, 244:5

**explosion** [2] - 224:18, 224:24
**exposed** [2] - 356:10, 386:19
**expresses** [1] - 265:5
**expunged** [1] - 277:24
**extended** [1] - 363:9
**extent** [3] - 246:14, 291:24, 292:1
**extra** [2] - 240:1, 390:20
**eye** [30] - 223:23, 224:10, 224:12, 224:16, 225:12, 226:4, 226:6, 226:11, 226:12, 226:13, 226:14, 227:14, 227:15, 227:16, 227:17, 227:22, 227:23, 228:25, 229:4, 229:11, 240:4, 248:22, 248:25, 342:6, 342:7, 342:17, 342:23, 343:3, 369:4, 369:15
**eyebrow** [4] - 225:15, 225:24, 249:6, 369:14
**eyeglasses** [3] - 426:11, 426:13, 426:18
**eyes** [3] - 323:9, 349:17, 349:20

---

## F

**F.3d** [1] - 303:24
**face** [14] - 241:5, 250:11, 340:19, 340:20, 340:21, 341:25, 383:21, 384:3, 401:22, 402:17, 425:21
**face-to-face** [2] - 340:20, 340:21
**facilitate** [1] - 358:14
**facilities** [1] - 244:22
**facing** [6] - 364:15, 424:14, 424:18, 428:8, 428:9, 428:11, 428:21
**fact** [24] - 224:1, 224:15, 237:17, 249:17, 250:3, 284:1, 287:22, 290:4, 294:13, 330:21, 332:8, 340:24, 342:16, 342:22, 345:11, 347:2, 365:6, 371:17, 378:15, 417:10, 434:20, 436:3, 436:16
**factories** [2] - 358:25, 394:15
**facts** [5] - 305:10, 306:8, 333:16, 349:8, 349:10
**failed** [2] - 288:4, 290:8
**failure** [1] - 305:23
**Fair** [1] - 249:1
**fair** [3] - 245:11, 391:14, 400:12
**fairly** [2] - 358:25, 362:1
**fall** [7] - 398:9, 440:6, 440:10, 440:20, 441:2, 441:6
**falsely** [2] - 304:13, 304:20
**familiar** [2] - 272:19, 273:6
**far** [14] - 289:15, 297:15, 313:12, 314:11, 318:6, 361:20, 374:12, 387:5, 400:22, 416:2, 424:2, 428:10, 441:22, 442:15
**fast** [3] - 362:14, 368:5, 395:16
**faster** [1] - 379:23
**father** [1] - 251:11
**fault** [1] - 261:12
**favorable** [2] - 280:8, 280:16
**favorably** [1] - 280:7
**fear** [4] - 348:3, 348:5, 352:9
**February** [5] - 226:5, 293:16, 297:2, 297:5, 354:2
**fee** [1] - 282:21

**feed** [1] - 263:2
**feet** [1] - 294:5, 297:17, 323:1, 323:19, 364:16, 402:5, 402:9, 402:21, 425:8, 425:9, 440:20
**fell** [7] - 231:11, 231:14, 231:22, 440:14, 440:23, 441:10, 441:18
**felony** [1] - 356:1
**felt** [6] - 235:24, 241:5, 410:18, 411:11, 412:15, 433:14
**fence** [4] - 425:1, 442:20, 442:21
**fenced** [1] - 405:6
**fenced-in** [1] - 405:6
**few** [8] - 241:17, 241:23, 243:18, 247:8, 325:7, 410:25, 440:20, 441:22
**field** [1] - 386:8
**fight** [5] - 362:22, 363:4, 365:9, 382:9, 383:6
**fighting** [4] - 337:8, 364:14, 366:3, 383:11
**file** [14] - 270:20, 270:21, 270:22, 270:24, 272:2, 272:4, 272:5, 272:6, 273:18, 274:25, 286:9, 286:20
**filed** [13] - 237:15, 240:16, 248:8, 265:12, 268:16, 269:12, 283:10, 283:13, 286:15, 286:18, 330:4, 348:9, 348:15
**fill** [7] - 324:16, 410:18, 411:12, 430:16, 430:19, 432:1
**filled** [2] - 430:13, 432:9
**filling** [1] - 433:25
**final** [4] - 227:24, 227:25, 228:1, 298:1
**Finally** [3] - 299:9, 302:20, 306:4
**finally** [1] - 322:14
**fine** [3] - 257:16, 262:25, 265:14
**Fine** [1] - 302:2
**finger** [4] - 395:7, 427:8, 427:9, 427:11
**fingers** [1] - 427:12
**finished** [1] - 264:3
**firearm** [1] - 352:8
**First** [1] - 303:22
**first** [51] - 223:4, 237:9, 237:17, 238:24, 239:12, 239:22, 243:11, 245:21, 260:11, 277:1, 277:21, 284:14, 312:22, 313:21, 314:9, 320:25, 321:18, 326:6, 326:9, 327:2, 327:3, 327:25, 332:24, 335:23, 346:7, 359:14, 360:6, 360:7, 382:9, 383:19, 392:16, 393:12, 399:15, 404:19, 408:6, 408:14, 409:12, 421:19, 422:9, 424:3, 424:4, 424:5, 424:6, 434:12, 438:16, 438:24, 439:3, 439:4, 439:11, 441:22, 442:10
**fist** [2] - 344:22, 345:25
**fit** [2] - 263:2, 433:2
**Five** [1] - 307:24
**five** [4] - 224:5, 241:1, 313:14, 359:6
**fixed** [1] - 352:4
**flail** [1] - 412:3
**flailing** [1] - 319:16
**flashlight** [1] - 403:24
**flight** [2] - 440:6, 440:11
**flowing** [1] - 383:25
**flows** [1] - 379:20

**focus** [4] - 309:4      386:8, 389:18
**Focus** [1] - 233:10
**focused** [3] - 386:9, 398:20, 440:25
**focuses** [1] - 391:5
**focusing** [2] - 398:18, 439:5
**folks** [1] - 255:17
**follow** [5] - 235:21, 325:19, 344:24, 345:11, 431:19
**follow-up** [3] - 325:19, 344:24, 345:11
**followed** [1] - 381:16
**following** [11] - 244:17, 244:25, 258:16, 261:22, 315:17, 339:4, 345:4, 345:5, 347:7, 347:8, 376:18
**follows** [2] - 267:4, 388:14
**foot** [10] - 317:7, 317:9, 317:10, 333:21, 334:5, 360:19, 391:12, 397:22, 397:25, 441:17
**force** [20] - 335:18, 335:22, 336:5, 336:7, 347:10, 347:12, 347:13, 347:14, 347:18, 352:10, 352:12, 385:6, 385:12, 385:16, 385:21, 410:3, 410:5, 410:9
**Force** [1] - 410:5
**forefinger** [2] - 427:8, 427:11
**forehead** [8] - 224:24, 225:5, 225:23, 228:18, 228:19, 248:13, 248:15, 248:18
**Forget** [1] - 239:19
**forgot** [2] - 435:13, 435:18
**form** [25] - 369:8, 382:13, 382:14, 408:23, 408:24, 409:1, 409:5, 409:16, 409:21, 410:7, 410:17, 411:10, 412:25, 413:5, 413:11, 413:14, 430:11, 432:10, 432:11, 432:13, 432:25, 434:22, 435:5, 436:3, 436:9
**forming** [3] - 369:3, 383:18, 384:20
**forward** [5] - 257:19, 288:19, 304:2, 328:18, 443:7
**foundation** [4] - 270:7, 292:7, 292:10, 342:12
**Four** [2] - 279:13, 359:6
**four** [11] - 231:10, 239:13, 355:5, 365:1, 378:25, 390:6, 424:8, 424:9, 425:8, 428:10
**fourth** [2] - 269:19, 409:15
**fracture** [3] - 385:2, 385:11, 385:16
**fractured** [1] - 366:11
**free** [1] - 368:2
**Friday** [1] - 393:16
**friend's** [1] - 251:18
**friends** [1] - 250:17
**front** [12] - 226:21, 312:11, 357:3, 360:18, 362:17, 369:3, 379:19, 379:20, 380:3, 398:2, 399:1, 443:15
**full** [7] - 363:10, 373:7, 383:10, 385:15, 412:1, 412:9, 412:14
**fully** [3] - 364:19, 422:15, 443:18
**function** [1] - 389:15

**G**

**GABRIEL** [1] - 222:21
**gangs** [1] - 309:3
**garment** [1] - 339:20

**gear** [2] - 398:2, 398:3
**general** [4] - 390:11, 404:15, 430:23
**generally** [4] - 311:9, 356:17, 358:13, 408:8
**generated** [2] - 416:21, 437:17
**Gentlemen** [1] - 302:25
**gentlemen** [2] - 315:15, 352:22
**geographical** [1] - 338:22
**geographically** [1] - 404:9
**given** [13] - 235:21, 258:3, 274:13, 284:10, 289:12, 373:3, 412:7, 413:21, 413:25, 415:13, 432:6, 432:9, 432:18
**glanced** [1] - 399:11
**GLEESON** [1] - 222:15
**glimpse** [1] - 361:16
**Glocks** [1] - 363:23
**glove** [13] - 370:21, 386:18, 386:19, 404:4, 404:6, 404:16, 404:17, 404:19, 412:11, 413:13, 444:15
**gloves** [11] - 261:4, 324:13, 404:22, 412:1, 412:9, 412:14, 412:16, 412:17, 415:19, 415:23, 416:4
**GOLD** [4] - 222:18, 256:12, 298:24, 445:22
**Google** [3] - 299:14, 299:16, 299:19
**Government** [1] - 266:21
**governs** [1] - 276:20
**grab** [2] - 320:6, 320:19
**grabbing** [1] - 352:7
**grade** [2] - 354:8, 404:7
**grand** [1] - 389:17
**grant** [1] - 306:9
**grate** [1] - 404:7
**gray** [1] - 442:22
**great** [1] - 426:3
**ground** [25] - 294:12, 305:2, 317:4, 318:15, 319:19, 320:10, 320:17, 320:18, 340:19, 340:20, 340:21, 341:11, 344:16, 344:18, 349:19, 362:14, 367:25, 382:1, 382:24, 399:14, 399:16, 401:6, 402:5, 444:6, 445:5
**grounds** [6] - 265:20, 276:18, 288:7, 288:16, 290:4, 306:5
**group** [1] - 293:10
**groups** [1] - 366:15
**guess** [5] - 289:6, 289:7, 401:1, 414:12, 433:1, 439:14, 441:13
**guilty** [2] - 288:8, 288:10
**gun** [19] - 224:22, 224:23, 225:20, 232:23, 318:2, 318:3, 319:22, 346:11, 346:23, 347:3, 355:25, 363:19, 363:21, 365:6, 365:7, 365:10, 368:21, 390:20, 391:5
**gun-related** [1] - 391:5
**guns** [4] - 318:5, 363:22, 364:2, 364:4
**gunshot** [8] - 224:12, 224:18, 225:12, 237:24, 238:3, 238:18, 248:12, 248:16
**guy** [3] - 359:16, 377:23, 378:5
**guys** [1] - 305:16

11

SS      OCR      CM      CRR      CSR

**12**

## H

**half** [3] - 238:17, 354:19, 372:9
**Hall** [1] - 232:24
**hand** [19] - 275:4, 279:14, 307:3, 335:20, 353:6, 362:8, 363:13, 368:2, 370:20, 370:22, 380:2, 386:18, 398:21, 402:12, 412:4, 418:2, 426:9, 427:10, 428:3
**handcuff** [4] - 322:11, 367:8, 367:12, 368:2
**handcuffed** [10] - 247:5, 247:10, 368:7, 368:10, 368:22, 383:12, 384:19, 386:10, 401:24, 443:19
**handcuffing** [6] - 223:8, 247:16, 350:8, 368:3, 368:9, 402:6
**handcuffs** [13] - 246:11, 319:25, 320:1, 320:21, 320:24, 322:9, 322:14, 322:16, 322:18, 322:25, 367:16, 368:13, 390:21
**handful** [2] - 387:12, 387:13
**handle** [1] - 287:15
**hands** [3] - 334:6, 334:14, 334:25
**handwriting** [7] - 232:5, 232:7, 270:16, 274:4, 274:6, 274:8, 392:25
**handwritten** [2] - 409:1, 409:5
**hanging** [1] - 338:7
**hard** [2] - 244:9, 367:18
**hardcopy** [1] - 260:14
**hardship** [1] - 235:24
**Harvis** [8] - 223:16, 246:3, 246:10, 247:24, 249:10, 252:9, 259:18, 421:10
**HARVIS** [70] - 222:21, 223:3, 223:7, 223:18, 227:3, 227:6, 228:12, 230:2, 230:4, 230:10, 233:23, 234:9, 234:12, 236:6, 236:23, 238:7, 240:22, 240:24, 241:14, 242:18, 244:12, 246:24, 247:19, 253:13, 254:3, 255:3, 255:13, 255:19, 256:3, 256:7, 257:10, 257:15, 259:2, 259:19, 264:10, 264:17, 273:1, 273:7, 292:9, 300:15, 300:18, 301:25, 302:12, 303:1, 303:10, 303:12, 305:15, 305:18, 306:12, 306:14, 306:17, 377:3, 377:5, 388:9, 388:20, 392:14, 393:5, 407:2, 416:12, 417:17, 419:12, 419:14, 419:16, 421:9, 431:4, 431:10, 431:21, 434:13, 434:24, 435:23
**Harvis's** [1] - 249:20
**head** [20] - 225:20, 248:20, 321:16, 321:21, 329:8, 337:6, 342:14, 344:21, 363:17, 364:15, 366:6, 366:10, 366:12, 369:5, 375:22, 376:3, 376:4, 376:9, 384:21, 385:1
**heal** [2] - 229:1, 229:5
**healed** [1] - 229:11
**health** [4] - 243:15, 244:11, 244:22, 244:25
**hear** [13] - 256:5, 258:4, 310:3, 314:2, 321:2, 321:9, 358:16, 360:23, 360:24, 360:25, 382:15, 407:22, 445:9
**heard** [8] - 245:7, 248:5, 248:12, 248:15, 249:10, 252:9, 258:3, 272:7

**hearing** [2] - 245      1:7
**hearsay** [1] - 277:8
**heart** [2] - 245:17, 280:13
**heavy** [1] - 238:21
**Hector** [1] - 421:18
**HECTOR** [1] - 222:19
**heighten** [1] - 314:2
**help** [2] - 314:2, 370:9
**helped** [2] - 320:20, 402:21
**helping** [1] - 402:4
**hidden** [1] - 423:19
**high** [1] - 248:22
**highest** [1] - 391:9
**highlighted** [1] - 266:1
**himself** [2] - 367:7, 383:10
**hip** [3] - 319:2, 365:22, 387:21
**historically** [1] - 390:13
**hit** [12] - 224:7, 224:8, 249:12, 249:15, 333:1, 340:15, 340:24, 341:2, 367:17, 383:3, 385:1, 413:19
**Hold** [2] - 310:2, 444:2
**hold** [12] - 241:23, 246:16, 246:19, 298:15, 308:6, 309:6, 354:9, 354:16, 355:10, 363:2, 389:19, 422:12
**holding** [8] - 368:23, 422:20, 423:1, 428:5, 428:13, 428:25, 429:7
**holds** [1] - 422:19
**hollow** [1] - 366:9
**Holloway** [11] - 227:7, 253:11, 253:15, 282:9, 292:13, 316:4, 351:7, 352:18, 377:8, 377:12, 388:4
**HOLLOWAY** [127] - 222:18, 226:18, 226:25, 227:10, 228:15, 230:12, 233:25, 236:9, 239:15, 240:25, 245:5, 246:23, 247:21, 248:2, 248:24, 253:10, 253:16, 253:22, 253:25, 255:15, 255:18, 255:23, 256:8, 256:11, 257:2, 257:4, 257:14, 257:17, 257:20, 258:9, 258:20, 259:9, 259:11, 259:14, 259:22, 260:3, 260:6, 260:10, 260:19, 260:22, 260:24, 261:3, 261:10, 262:3, 262:10, 262:15, 262:18, 262:20, 262:22, 263:4, 263:7, 264:4, 264:13, 264:16, 265:10, 265:15, 266:5, 266:9, 266:11, 267:10, 269:3, 269:7, 269:9, 269:17, 270:4, 272:4, 272:11, 272:13, 272:15, 273:5, 273:9, 278:22, 279:8, 279:13, 281:2, 282:7, 284:12, 287:24, 290:2, 291:10, 291:16, 291:21, 291:24, 292:5, 292:12, 292:23, 293:9, 293:19, 294:1, 294:20, 296:5, 296:7, 298:3, 298:12, 298:19, 298:23, 299:1, 299:3, 299:9, 299:18, 300:3, 300:11, 303:5, 303:13, 303:16, 305:5, 305:13, 305:17, 316:5, 326:5, 329:17, 329:19, 329:22, 332:21, 333:18, 335:19, 335:21, 348:2, 349:5, 351:6, 352:19, 367:22, 377:10, 388:3, 393:8, 417:21, 446:20
**hollowness** [1] - 383:1
**holster** [4] - 319:2, 363:9, 368:1
**home** [2] - 228:20, 445:15
**homework** [1] - 436:25
**homicides** [1] - 389:16

**Honestly** [1] - 412:15
**Honor** [60] - 223:7, 223:8, 223:9, 242:19, 246:12, 253:13, 258:10, 259:2, 259:19, 261:6, 261:10, 262:10, 269:1, 282:8, 282:11, 284:7, 284:12, 287:24, 291:7, 291:16, 292:16, 298:19, 298:24, 300:5, 300:12, 300:16, 300:21, 301:1, 301:3, 301:14, 301:20, 302:5, 302:12, 303:1, 303:6, 303:10, 303:16, 303:21, 304:15, 306:4, 306:14, 306:15, 306:24, 315:13, 329:17, 332:21, 333:14, 333:18, 335:21, 352:23, 367:19, 382:18, 387:10, 416:12, 417:17, 421:12, 436:22, 437:7, 439:6, 445:8
**Honor's** [2] - 294:22, 365:16
**HONORABLE** [1] - 222:15
**Honorably** [1] - 308:5
**hook** [1] - 304:12
**hopefully** [1] - 284:8
**horse** [1] - 365:25
**hospital** [27] - 225:4, 225:7, 245:1, 311:23, 324:21, 324:22, 324:25, 325:2, 325:6, 325:8, 325:10, 325:12, 371:19, 371:20, 371:21, 371:23, 371:25, 372:5, 372:10, 372:14, 372:25, 407:12, 407:14, 407:20, 407:23, 407:25, 408:2
**Hospital** [17] - 231:13, 231:22, 234:16, 234:25, 235:5, 244:12, 244:13, 244:15, 244:22, 244:23, 324:23, 324:24, 345:8, 345:18, 371:24, 372:3
**hour** [1] - 372:8
**hours** [5] - 252:6, 252:21, 310:5, 325:7, 359:11, 372:9, 390:5, 394:2
**house** [4] - 251:4, 253:3, 253:4, 371:17
**hundred** [1] - 314:8
**Hundreds** [1] - 274:19
**hundreds** [1] - 386:24
**hurt** [3] - 366:5, 368:21, 368:25

## I

**idea** [5] - 231:12, 234:15, 290:5, 405:4, 407:8
**identification** [11] - 228:3, 231:19, 232:11, 234:21, 264:4, 269:18, 278:23, 293:10, 294:20, 392:16, 416:16
**identified** [5] - 310:15, 315:11, 333:23, 356:7, 390:24
**identify** [5] - 316:19, 316:21, 339:15, 339:21, 351:23
**illness** [1] - 251:20
**image** [3] - 299:14, 299:16, 442:5
**imagine** [1] - 425:14
**Imani** [3] - 332:16, 333:5, 333:7
**immediately** [8] - 360:16, 366:5, 366:21, 367:24, 370:10, 371:13, 381:4, 424:16
**immunity** [1] - 306:5
**impermissible** [1] - 273:15
**important** [2] - 246:19, 405:14
**improved** [1] - 262:23

**inaccurate** [1] - 327:8
**incarcerated** [8] - 247:7, 250:25, 251:3, 277:25, 278:2, 278:10, 278:15, 278:19
**incarceration** [1] - 278:4
**inch** [4] - 225:15, 225:24, 238:16, 248:24
**inches** [2] - 241:9, 250:11
**incident** [28] - 226:10, 227:13, 229:1, 229:5, 231:7, 231:11, 236:16, 240:11, 240:14, 244:17, 244:21, 245:1, 251:23, 252:2, 252:6, 252:15, 252:19, 252:22, 260:12, 305:10, 341:25, 346:14, 372:24, 375:16, 375:21, 420:7, 430:20, 438:12
**include** [10] - 266:2, 355:25, 412:5, 430:20, 432:2, 432:15, 433:12, 434:3, 434:22, 435:21
**includes** [1] - 266:3
**including** [2] - 245:4, 250:4
**Incorrect** [1] - 283:23
**incorrect** [4] - 333:7, 333:10, 334:19, 343:23
**independent** [1] - 233:7
**Index** [1] - 427:8
**index** [3] - 395:7, 427:8, 427:11
**indicate** [1] - 338:7
**indicated** [4] - 276:17, 363:12, 429:8, 442:24
**indicates** [2] - 281:12, 336:10
**Indicating** [1] - 238:16
**indicating** [2] - 384:6, 442:25
**Indicating)** [4] - 248:19, 248:21, 248:23, 249:5
**indicating)** [5] - 225:21, 264:14, 382:21, 383:2, 395:8
**indicative** [1] - 428:25
**individual** [1] - 437:21
**individual's** [1] - 347:12
**individuals** [1] - 265:24
**industrial** [4] - 313:7, 337:12, 358:23, 394:14
**inextricably** [1] - 306:7
**inform** [1] - 333:5
**information** [33] - 235:20, 276:12, 281:14, 285:24, 289:12, 304:14, 304:20, 305:6, 305:9, 326:13, 333:5, 349:21, 371:15, 406:11, 410:13, 411:14, 417:7, 417:10, 418:8, 418:11, 430:20, 432:3, 432:15, 433:12, 433:20, 434:3, 435:21, 436:9, 437:20, 438:3, 438:7, 445:13, 445:14
**informed** [7] - 305:7, 332:24, 333:2, 333:8, 333:9, 333:10, 410:11
**ingredients** [1] - 280:3
**initial** [5] - 361:8, 361:11, 378:8, 382:3, 432:3
**initiated** [3] - 269:14, 303:23, 360:19
**initiating** [1] - 304:5
**injure** [2] - 231:10, 344:18
**injured** [21] - 236:12, 236:18, 237:2, 238:6, 250:3, 250:5, 323:13, 341:20,

341:24, 369:20, 3       384:18, 387:6, 402:10, 402:14, 410:21, 411:1, 411:4, 411:6, 411:11, 418:2
**Injured** [1] - 236:16
**injuries** [16] - 226:9, 227:12, 240:10, 240:14, 241:11, 244:20, 244:22, 250:13, 311:24, 322:19, 323:2, 325:20, 342:9, 405:21, 411:8, 416:8
**injury** [32] - 228:25, 229:3, 229:11, 231:14, 231:22, 234:17, 235:1, 235:5, 235:8, 235:17, 237:8, 237:11, 237:14, 237:18, 238:23, 239:4, 240:4, 249:18, 249:21, 249:24, 324:4, 325:12, 325:15, 344:12, 344:15, 344:20, 345:7, 346:2, 369:9, 385:12, 385:22, 416:21
**innocence** [1] - 287:20
**inputting** [1] - 409:4
**inquiry** [1] - 223:8
**inside** [7] - 298:13, 298:16, 325:1, 391:4, 391:9, 396:24, 413:12
**instances** [1] - 257:5
**instruction** [1] - 246:21
**instructions** [1] - 235:22
**instrument** [8] - 264:7, 283:13, 303:25, 304:16, 305:7, 305:8, 305:11, 437:17
**intake** [1] - 418:20
**intend** [2] - 265:15, 265:20
**intended** [2] - 251:25, 253:17
**intent** [1] - 366:4
**interest** [2] - 235:23, 236:1
**interpretation** [1] - 234:7
**interrupting** [1] - 233:4
**intersection** [7] - 296:3, 296:19, 297:22, 299:14, 424:15, 442:6, 442:21
**intervene** [2] - 305:23, 305:25
**interviewed** [1] - 244:1
**intoxicated** [2] - 252:2, 371:6
**intoxication** [1] - 435:6, 435:7
**introduce** [3] - 272:22, 430:8, 442:3
**introduction** [1] - 294:10
**investigate** [7] - 304:23, 309:2, 315:8, 389:15, 396:2, 429:17, 429:24
**investigating** [1] - 422:1
**investigation** [1] - 434:7
**Investigations** [1] - 354:22
**Investigative** [1] - 354:15
**invoice** [4] - 260:25, 261:4, 372:20, 373:8
**invoices** [1] - 372:21
**involuntarily** [1] - 365:24
**involved** [5] - 363:4, 365:4, 382:8, 391:8, 409:4
**involvement** [2] - 304:4, 305:3
**irrelevant** [1] - 246:18
**Island** [10] - 231:13, 231:22, 234:16, 234:25, 235:5, 244:11, 244:13, 244:15, 244:18, 244:23
**issued** [2] - 290:12, 290:14
**item** [2] - 275:20, 373:7
**itself** [8] - 246:8, 256:4, 270:15, 288:11, 305:1, 413:15, 428:24, 438:23

## J

**jacket** [16] - 310:19, 310:20, 310:21, 337:24, 337:25, 338:3, 338:5, 338:14, 338:19, 338:21, 338:22, 338:23, 338:24, 340:12, 361:15
**jail** [1] - 278:10
**jailed** [1] - 304:21
**Jamaica** [5] - 324:23, 324:24, 345:7, 345:18, 372:3
**January** [3] - 226:5, 237:25, 238:4
**jargon** [2] - 369:23, 393:15
**Jean** [1] - 306:1
**Jean-Laurent** [1] - 306:1
**Jeans** [1] - 310:12
**Jeffrey** [1] - 282:16
**JEFFREY** [1] - 222:21
**JESSICA** [1] - 222:18
**Jewish** [1] - 243:15
**job** [4] - 270:1, 293:3, 435:20, 437:19
**JOHN** [1] - 222:15
**joined** [1] - 367:12
**joining** [1] - 307:21
**joint** [2] - 234:14, 255:24
**judge** [5] - 274:9, 274:11, 276:21, 280:15, 402:19
**JUDGE** [1] - 222:15
**Judge** [1] - 444:2
**judge's** [2] - 270:16, 280:12
**judgment** [1] - 301:12
**July** [5] - 276:4, 276:9, 279:4, 279:6, 281:7
**jumped** [2] - 226:10, 227:13
**juncture** [1] - 361:3
**June** [2] - 275:10, 275:23
**Jury** [6] - 223:13, 259:5, 262:5, 316:8, 377:6, 445:18
**jury** [32] - 222:15, 223:1, 223:5, 223:10, 234:4, 241:2, 248:20, 257:13, 258:16, 258:21, 258:25, 261:22, 266:3, 266:13, 294:25, 313:3, 314:20, 315:17, 319:8, 358:19, 362:23, 366:17, 376:18, 382:15, 382:17, 394:10, 395:5, 395:12, 398:10, 409:10, 411:24, 417:25, 436:24, 445:10
**justified** [1] - 434:11

## K

**Keep** [1] - 241:21
**keep** [3] - 274:25, 392:23, 433:7
**keeping** [1] - 439:9
**kept** [4] - 270:19, 371:7, 371:8, 373:20
**key** [1] - 430:20
**kick** [1] - 333:2
**kicked** [3] - 226:4, 226:11, 227:14
**kicking** [1] - 319:16
**kind** [8] - 269:25, 317:19, 318:22, 342:7, 363:21, 368:15, 379:23, 403:5
**Kings** [13] - 283:7, 283:10, 286:4, 286:8, 286:12, 286:14, 286:17, 287:14,

328:9, 328:13, 374:17, 418:20, 420:6
  **knee** [24] - 231:10, 231:14, 231:17, 231:22, 232:9, 232:17, 232:19, 233:8, 233:13, 234:7, 234:18, 235:1, 235:5, 235:8, 236:12, 237:2, 237:8, 237:11, 237:14, 237:18, 249:21, 363:1, 365:22, 387:21
  **knees** [10] - 231:8, 232:20, 232:21, 249:25, 250:3, 250:6, 250:7, 363:1, 367:5, 383:9
  **knife** [1] - 368:20
  **knife's** [1] - 245:22
  **knowing** [1] - 238:6
  **knowledge** [14] - 273:16, 283:21, 283:23, 283:24, 287:8, 326:16, 332:13, 332:15, 335:10, 359:2, 359:7, 370:18, 417:13, 421:24
  **known** [1] - 415:8

# L

  **L-1** [1] - 231:19
  **lab** [13] - 272:20, 275:12, 275:18, 275:19, 281:10, 288:19, 289:1, 373:11, 373:13, 373:17, 373:20, 374:5
  **laboratory** [1] - 415:2
  **laceration** [4] - 342:7, 342:17, 342:23, 343:3
  **lack** [2] - 262:22, 263:2
  **ladies** [1] - 315:15
  **laid** [1] - 292:8
  **lamps** [2] - 425:18, 425:21
  **lane** [3] - 360:2, 423:22, 427:24
  **language** [1] - 393:15
  **LAPS** [2] - 408:24, 436:12
  **laptop** [1] - 262:2
  **larcenies** [1] - 389:17
  **large** [4] - 275:11, 366:15, 387:12, 424:21
  **larger** [1] - 432:7
  **last** [4] - 246:16, 260:21, 332:22, 338:10
  **laundering** [1] - 309:3
  **Laurent** [1] - 306:1
  **LAW** [2] - 267:5, 388:15
  **law** [5] - 276:16, 276:20, 281:12, 288:17, 306:9
  **Law** [1] - 286:23
  **lawful** [1] - 418:3
  **lawsuit** [8] - 240:17, 240:19, 248:8, 326:10, 326:11, 348:24, 349:4, 349:6
  **Lay** [1] - 342:12
  **layman's** [1] - 310:7
  **lays** [1] - 280:13
  **learn** [6] - 245:13, 320:22, 320:25, 321:18, 324:10, 327:25
  **learned** [1] - 341:1
  **leather** [1] - 319:2
  **leaves** [1] - 445:18
  **leaving** [1] - 372:25
  **led** [1] - 422:24
  **left** [53] - 223:21, 223:23, 224:10,

224:12, 224:16, 2     225:15, 225:23, 225:24, 226:4, 226:6, 226:11, 226:14, 227:17, 228:18, 228:19, 228:25, 229:4, 229:11, 231:17, 236:12, 237:2, 238:12, 248:22, 248:25, 253:3, 325:10, 342:6, 342:7, 342:17, 361:5, 364:20, 369:14, 378:19, 378:21, 381:11, 381:12, 381:13, 383:18, 387:24, 387:25, 398:4, 398:24, 398:25, 403:16, 410:12, 424:20, 425:4, 426:1, 426:9, 427:19, 442:15, 443:2
  **left-hand** [1] - 426:9
  **leg** [8] - 234:7, 340:15, 365:17, 365:25, 387:23, 387:24, 387:25
  **Legal** [5] - 267:25, 268:2, 268:5, 268:7, 283:3
  **legs** [6] - 321:19, 321:25, 341:3, 364:16, 366:15, 412:3
  **length** [6] - 230:21, 318:8, 361:22, 363:10, 423:18
  **lengths** [5] - 314:12, 330:25, 400:23, 424:8, 425:9
  **lenses** [1] - 426:18
  **less** [11] - 230:18, 230:22, 231:4, 239:13, 352:12, 367:1, 385:6, 385:11, 385:12, 385:21, 385:22
  **letter** [5] - 237:9, 237:11, 238:24, 239:1, 241:2
  **lettering** [1] - 310:21
  **level** [2] - 364:6, 390:11
  **lieutenant** [1] - 373:22
  **life** [11] - 247:11, 347:3, 347:4, 347:12, 348:3, 348:4, 348:5, 352:10, 405:21, 426:4
  **lift** [2] - 248:20, 402:21
  **light** [3] - 245:10, 246:14, 294:22
  **lighting** [1] - 426:22
  **lights** [9] - 313:8, 359:1, 394:13, 394:14, 425:20, 425:25, 426:4
  **likely** [1] - 429:9
  **limit** [3] - 245:25, 395:19, 395:21
  **limited** [2] - 223:8, 432:6
  **limiting** [1] - 246:21
  **Line** [1] - 327:14
  **line** [18] - 224:5, 225:17, 226:7, 227:11, 229:8, 238:7, 241:14, 281:4, 325:13, 326:21, 334:23, 347:8, 360:3, 384:11, 393:18, 393:19, 393:20, 442:21
  **lines** [1] - 327:3
  **linking** [2] - 262:22, 262:23
  **lip** [2] - 249:16, 249:18
  **lips** [1] - 427:14
  **list** [6] - 243:21, 243:23, 243:25, 409:16, 409:19, 413:11
  **listed** [7] - 275:17, 409:10, 410:15, 411:8, 414:22, 416:5, 418:8
  **listen** [3] - 228:21, 233:1, 371:11
  **Listen** [1] - 387:8
  **listing** [1] - 409:21
  **lit** [3] - 358:25, 425:17, 425:24
  **litigation** [7] - 321:20, 328:1, 342:1, 342:19, 343:1, 375:9, 439:2

  **live** [2] - 255:14, 266:16
  **liveries** [1] - 355:3
  **living** [4] - 232:22, 233:10, 251:4, 251:6
  **localize** [1] - 234:6
  **located** [7] - 309:25, 365:21, 369:13, 390:9, 414:10, 414:11, 444:17
  **location** [3] - 292:2, 359:6, 386:12
  **locked** [1] - 400:7
  **locker** [9] - 373:10, 373:19, 414:2, 414:3, 414:4, 414:10, 414:13, 414:16, 414:18
  **locks** [1] - 413:11
  **Log** [1] - 371:15
  **look** [27] - 231:19, 232:12, 232:13, 232:14, 234:22, 236:25, 242:24, 256:10, 256:14, 257:12, 257:19, 275:25, 279:15, 294:3, 324:1, 327:2, 395:3, 405:2, 408:17, 416:16, 428:17, 429:12, 432:22, 433:5, 433:9, 436:14, 440:23
  **looked** [18] - 230:18, 230:22, 241:5, 251:12, 251:15, 277:10, 314:21, 331:11, 362:13, 362:20, 363:3, 370:21, 395:13, 399:20, 405:12, 427:17, 428:19
  **looking** [14] - 233:6, 295:18, 295:21, 296:4, 297:23, 298:21, 364:17, 370:11, 370:13, 391:10, 391:14, 402:12, 428:9, 445:13
  **Looking** [1] - 235:3, 295:24
  **looks** [6] - 233:21, 277:25, 278:17, 294:4, 414:8
  **lose** [1] - 405:23
  **lost** [2] - 243:10, 243:12
  **loud** [3] - 232:4, 365:1, 382:25
  **lower** [6] - 234:7, 311:24, 323:16, 335:20, 413:19, 444:22
  **lunch** [2] - 315:14, 316:15
  **Luncheon** [1] - 315:19
  **lying** [2] - 369:3, 384:19

# M

  **ma'am** [5] - 269:16, 282:6, 336:13, 347:22, 350:13
  **mace** [5] - 319:6, 364:7, 364:9, 364:11, 364:12
  **maced** [1] - 364:11
  **magazines** [1] - 390:21
  **mailbox** [2] - 414:4, 414:8
  **main** [1] - 236:1
  **maintained** [1] - 417:13
  **male** [1] - 394:18
  **malice** [1] - 280:4
  **malicious** [5] - 280:2, 303:22, 304:13, 305:21, 306:6
  **maliciously** [2] - 304:13, 304:20
  **man** [1] - 360:12
  **Manhattan** [2] - 308:22, 308:25
  **manner** [4] - 361:24, 382:20, 429:8, 429:16
  **map** [4] - 299:3, 299:16, 299:19,

444:16
map's [1] - 299:14
March [3] - 222:11, 234:17, 235:6
marijuana [106] - 252:11, 252:15, 261:1, 313:22, 313:24, 314:4, 314:19, 314:20, 314:22, 314:24, 314:25, 315:6, 317:1, 317:2, 323:9, 323:21, 324:13, 330:17, 330:22, 330:25, 331:4, 331:10, 331:17, 331:19, 331:20, 331:22, 332:9, 332:14, 349:16, 349:19, 370:22, 373:9, 377:25, 378:12, 378:15, 379:6, 379:9, 379:13, 379:14, 379:15, 380:4, 380:5, 380:23, 380:25, 381:1, 386:20, 386:23, 387:2, 387:11, 387:12, 387:18, 394:24, 395:1, 395:10, 395:13, 395:17, 396:1, 396:21, 398:21, 404:5, 404:6, 404:22, 404:24, 405:6, 409:14, 411:19, 411:20, 412:2, 412:10, 412:11, 412:14, 412:17, 413:11, 413:15, 413:24, 414:21, 414:24, 415:1, 415:13, 415:15, 415:24, 421:3, 421:6, 423:4, 423:11, 424:7, 429:1, 429:5, 429:10, 433:24, 434:2, 434:21, 434:23, 435:15, 436:4, 436:17, 437:3, 437:25, 438:13, 438:16, 438:23, 438:24, 439:16, 440:3
Marine [3] - 307:22, 307:23, 308:3
Marines [2] - 307:25, 308:8
mark [8] - 240:3, 264:7, 265:23, 266:8, 269:17, 278:12, 278:22, 293:9
marked [41] - 228:3, 230:14, 231:18, 232:11, 234:2, 234:20, 236:11, 259:15, 259:21, 264:4, 264:5, 264:7, 266:22, 268:23, 269:20, 274:3, 280:19, 285:14, 293:7, 294:20, 296:25, 297:12, 297:20, 298:5, 298:9, 300:20, 301:5, 301:19, 302:9, 303:3, 303:6, 326:1, 332:18, 391:17, 392:15, 393:10, 395:20, 416:15, 417:23, 433:6, 433:23
Marked [7] - 294:19, 295:15, 295:23, 296:12, 296:18, 299:8, 302:14
mass [1] - 366:15
match [1] - 404:19
matching [1] - 422:2
Matt [1] - 370:9
matter [10] - 269:13, 276:12, 277:8, 278:15, 290:23, 291:21, 306:9, 318:21, 322:8, 366:25
matters [2] - 240:1, 357:6
MATTHEW [1] - 222:9
Matthew [2] - 388:9, 388:17
McMann [1] - 267:1
mean [19] - 273:5, 273:17, 275:14, 276:6, 276:8, 281:25, 287:9, 287:11, 288:3, 310:7, 334:22, 347:3, 358:15, 365:7, 378:19, 409:21, 426:3, 427:8, 433:24
means [12] - 238:5, 275:12, 275:15, 276:9, 281:6, 282:1, 287:23, 288:4, 394:3, 418:4, 431:14, 431:15
meant [1] - 227:23, 418:6, 431:1
mechanical [1] - 222:25
medical [8] - 233:20, 236:4, 249:20, 369:24, 370:1, 405:13, 405:17, 407:3

medication [1] -
meet [1] - 380:14
member [4] - 415:11, 416:22, 418:4, 418:18
memo [5] - 260:8, 260:11, 392:21, 392:22
memorialized [1] - 280:12
memory [2] - 411:3, 428:10
mental [2] - 243:14, 244:11, 244:22, 244:25
mention [6] - 238:23, 239:1, 239:7, 330:21, 340:11, 369:22
mentioned [12] - 237:8, 237:11, 237:14, 239:4, 239:12, 277:18, 396:19, 438:17, 438:25, 439:4, 439:12
mere [1] - 277:12
met [3] - 268:10, 373:3, 421:21
metal [6] - 366:9, 366:10, 385:2, 387:25, 422:17, 422:18
microphone [1] - 310:3
middle [5] - 296:3, 296:19, 297:22, 382:9, 444:2
midnight [3] - 392:13, 394:13, 425:16
midway [1] - 387:22
Might [1] - 254:3
might [14] - 240:5, 252:16, 287:9, 287:15, 288:8, 367:24, 368:21, 372:20, 373:16, 379:25, 385:16, 405:4, 408:3, 426:2, 429:12, 438:8
mike [2] - 241:8, 250:10
millimeter [2] - 318:23, 363:23
mind [1] - 370:2
Mine [1] - 409:20
mine [2] - 236:3, 441:21
mine's [1] - 250:17
minute [4] - 246:13, 360:13, 370:16, 396:13
Minutes [1] - 405:10
minutes [6] - 253:18, 261:17, 261:24, 306:16, 376:16, 445:8
Miscellaneous [1] - 261:15
misdemeanor [2] - 276:23, 281:13
miss [1] - 325:15
mistake [1] - 411:4
mistakenly [1] - 411:3
mistreatment [1] - 245:18
misunderstood [2] - 226:22, 438:22
mom's [3] - 242:1, 250:23, 250:25
moment [16] - 248:12, 258:11, 277:10, 284:9, 318:9, 333:20, 334:16, 334:18, 355:5, 357:23, 362:7, 364:5, 379:12, 397:13, 397:18, 428:23
momentary [1] - 361:16
moments [2] - 361:8, 361:12
money [1] - 309:2
month [7] - 228:20, 229:15, 230:19, 230:23, 231:5, 231:6, 353:22
months [6] - 229:7, 229:16, 239:13, 251:5, 281:14, 307:24
Moore [1] - 293:4
moral [1] - 309:2
morning [22] - 223:1, 223:14, 223:19,

223:20, 248:3, 248:4, 252:17, 252:18, 267:11, 292:24, 292:25, 293:6, 359:11, 393:17, 408:22, 417:1, 419:3, 420:2, 421:20, 439:15, 445:10, 445:20
MOS [2] - 418:1, 418:4
most [8] - 280:6, 318:4, 361:22, 370:17, 390:13, 410:18, 411:11, 422:18
mother's [4] - 242:23, 251:4, 251:7, 253:3
motion [7] - 303:22, 305:19, 306:10, 317:21, 361:13, 440:13
motions [1] - 303:20
motivated [1] - 235:25
motor [1] - 393:20
mouth [1] - 395:8
Move [1] - 242:17
move [14] - 228:12, 233:23, 236:6, 242:21, 258:22, 264:7, 270:4, 276:14, 276:18, 279:8, 288:19, 306:4, 327:17, 396:3
moved [1] - 396:2
moving [2] - 362:14, 402:11
MR [155] - 223:3, 223:7, 223:18, 227:3, 227:6, 228:12, 230:2, 230:4, 230:10, 233:23, 234:9, 234:12, 236:6, 236:23, 238:7, 240:22, 240:24, 241:14, 242:18, 246:12, 246:24, 247:19, 253:13, 254:3, 255:3, 255:13, 255:19, 256:3, 256:7, 256:12, 257:10, 257:15, 257:16, 259:2, 259:19, 261:6, 261:8, 264:10, 264:17, 265:3, 265:14, 269:1, 270:7, 271:1, 272:2, 273:1, 273:2, 273:7, 273:13, 273:16, 273:19, 279:11, 279:18, 281:2, 282:11, 282:13, 284:7, 291:6, 292:9, 292:23, 294:10, 294:13, 294:22, 298:24, 299:23, 300:5, 300:12, 300:15, 300:18, 300:21, 301:1, 301:3, 301:6, 301:11, 301:14, 301:20, 301:25, 302:5, 302:7, 302:12, 302:15, 302:17, 302:19, 302:20, 302:24, 303:1, 303:4, 303:10, 303:12, 303:21, 304:8, 304:10, 304:15, 304:22, 305:15, 305:18, 305:23, 306:4, 306:12, 306:14, 306:17, 306:24, 307:10, 315:13, 316:12, 326:4, 327:12, 329:13, 340:3, 342:11, 344:6, 348:2, 348:16, 351:9, 351:12, 352:16, 352:23, 353:13, 376:11, 377:3, 377:5, 385:18, 388:6, 388:9, 388:20, 392:14, 393:5, 407:2, 416:12, 417:17, 419:12, 419:14, 419:16, 421:9, 421:12, 421:14, 424:10, 431:4, 431:10, 431:17, 431:21, 434:13, 434:24, 435:23, 436:22, 437:1, 437:7, 437:10, 437:13, 439:6, 440:2, 442:3, 445:8, 445:22, 446:25
MS [123] - 226:18, 226:25, 227:10, 228:15, 230:12, 233:25, 236:9, 239:15, 240:25, 245:5, 246:23, 247:21, 248:2, 248:24, 253:10, 253:16, 253:22, 253:25, 255:15, 255:18, 255:23, 256:8, 256:11, 257:2, 257:4, 257:14, 257:17, 257:20, 258:9, 258:20, 259:9, 259:11, 259:14, 259:22, 260:3, 260:6, 260:10, 260:19, 260:22, 260:24, 261:3, 261:10,

262:3, 262:10, 262:15, 262:18, 262:20, 262:22, 263:4, 263:7, 264:4, 264:13, 264:16, 265:10, 265:15, 266:5, 266:9, 266:11, 267:10, 269:3, 269:7, 269:9, 269:17, 270:4, 272:4, 272:11, 272:13, 272:15, 273:5, 273:9, 278:22, 279:8, 279:13, 282:7, 284:12, 287:24, 290:2, 291:10, 291:16, 291:21, 291:24, 292:5, 292:12, 293:9, 293:19, 294:1, 294:20, 296:5, 296:7, 298:3, 298:12, 298:19, 298:23, 299:1, 299:3, 299:9, 299:18, 300:3, 300:11, 303:5, 303:13, 303:16, 305:5, 305:13, 305:17, 316:5, 326:5, 329:17, 329:19, 329:22, 332:21, 333:18, 335:19, 335:21, 349:5, 351:6, 352:19, 367:22, 377:10, 388:3, 393:8, 417:21, 446:20
**Multiple** [1] - 320:13
**muscle** [1] - 366:15
**muscles** [1] - 365:24
**must** [1] - 288:12

**N**

**name** [11] - 233:18, 267:6, 267:7, 282:16, 292:19, 292:20, 307:6, 353:9, 388:15, 406:11, 421:17
**named** [1] - 275:20
**NARCO** [1] - 413:17
**Narcotics** [2] - 354:14, 413:20
**narcotics** [10] - 373:8, 373:9, 373:10, 373:23, 374:9, 413:16, 414:13, 414:15, 414:18, 416:1
**narrative** [7] - 411:23, 411:24, 412:5, 412:13, 413:17, 417:24, 432:22
**naturalized** [1] - 261:14
**nature** [1] - 406:12
**NC** [2] - 307:8, 446:12
**near** [4] - 297:13, 359:2, 394:13, 445:4
**nearest** [2] - 313:12, 359:5
**nearly** [1] - 443:17
**necessarily** [4] - 287:19, 287:21, 294:13, 362:4
**necessary** [7] - 281:10, 281:17, 290:8, 367:20, 400:21, 433:4, 438:20
**neck** [9] - 310:24, 337:21, 338:7, 339:10, 339:16, 356:9, 391:1, 422:20, 428:10
**need** [2] - 284:9, 304:14
**needed** [6] - 287:12, 288:5, 290:8, 366:21, 405:13, 405:17
**neglect** [1] - 267:20
**nerve** [1] - 365:22
**never** [15] - 237:8, 237:11, 237:14, 239:4, 243:6, 271:1, 282:3, 286:3, 327:22, 332:8, 343:2, 411:20, 421:21, 426:16, 440:3
**Never** [1] - 375:12
**NEW** [1] - 222:1
**new** [2] - 418:20, 432:8
**New** [25] - 222:8, 267:21, 277:5, 283:6, 286:22, 289:18, 307:17, 307:18, 310:1,

311:2, 311:13, 31        38:8, 353:19, 353:20, 353:23, 355:15, 357:16, 366:13, 389:3, 389:4, 390:10, 393:3, 417:5, 417:14
**Next** [1] - 393:20
**next** [39] - 251:12, 253:15, 253:16, 254:5, 256:16, 257:23, 262:24, 263:3, 263:9, 264:15, 264:19, 271:4, 273:22, 275:25, 291:15, 306:23, 315:9, 325:18, 347:23, 352:22, 359:22, 360:9, 369:19, 376:22, 381:25, 388:8, 393:18, 396:9, 397:12, 400:16, 402:22, 403:10, 405:15, 406:13, 410:13, 424:20, 424:24, 439:19
**nice** [1] - 445:17
**niece** [2] - 250:17, 251:18
**night** [33] - 260:12, 260:15, 260:20, 305:16, 309:8, 311:16, 312:5, 312:7, 313:5, 338:23, 341:7, 356:23, 357:2, 358:8, 358:11, 358:18, 359:8, 367:24, 374:3, 374:5, 379:2, 382:20, 390:19, 391:23, 393:17, 394:19, 405:25, 407:22, 411:6, 415:20, 421:20, 445:17, 445:25
**nightstick** [1] - 364:19
**Nighttime** [1] - 312:21
**NILES** [1] - 222:9
**Niles** [5] - 306:25, 307:7, 332:24, 368:24, 418:11
**Nine** [1] - 263:7
**nine** [3] - 229:8, 347:8, 389:6
**noise** [6] - 341:5, 341:7, 382:22, 382:25, 383:14, 383:15
**non** [2] - 395:3, 423:20
**non-uniform** [2] - 395:3, 423:20
**none** [6] - 282:24, 411:16, 411:18, 433:6, 433:23, 435:10
**noon** [1] - 293:16
**normal** [2] - 238:19, 337:25
**normally** [2] - 426:13, 432:1
**North** [2] - 308:22, 309:1
**northbound** [2] - 362:20, 364:15
**Nostrand** [2] - 226:11, 227:14
**notation** [6] - 272:19, 273:6, 275:11, 275:12, 276:5, 276:17
**notations** [1] - 270:12
**Note** [1] - 232:1
**note** [4] - 256:12, 301:22, 302:1, 392:23
**noted** [1] - 228:17
**notes** [10] - 273:3, 273:13, 273:16, 274:11, 274:24, 277:22, 311:9, 311:10, 311:19
**nothing** [4] - 291:6, 291:9, 333:24, 388:3
**Nothing** [3] - 291:10, 303:13, 352:19
**notice** [2] - 322:18, 350:23
**noticed** [3] - 349:20, 369:3, 384:20
**notification** [1] - 348:9
**November** [1] - 389:10
**number** [11] - 248:5, 250:3, 284:11, 291:18, 302:15, 302:17, 302:23, 311:4, 332:25, 356:11, 393:23

**numbers** [1] - 311:1
**NYC-22** [1] - 275:4
**NYPD** [8] - 307:21, 308:11, 309:12, 310:22, 337:24, 354:1, 354:4

**O**

**o'clock** [4] - 222:12, 261:19, 315:16, 315:18
**object** [35] - 224:9, 249:12, 249:15, 255:24, 265:19, 291:25, 294:10, 311:1, 317:22, 317:23, 317:24, 318:1, 318:11, 318:17, 318:19, 324:5, 324:8, 324:10, 343:7, 343:10, 343:14, 343:17, 343:21, 344:5, 344:10, 362:13, 370:5, 385:24, 398:12, 440:20, 440:23, 440:24, 441:2, 441:6, 441:18
**Objection** [21] - 226:18, 226:23, 239:15, 245:5, 261:6, 270:7, 273:21, 279:11, 287:24, 290:2, 340:3, 342:11, 344:6, 348:16, 385:18, 431:4, 431:10, 431:21, 434:13, 434:24, 435:23
**objection** [39] - 223:11, 228:14, 230:12, 233:25, 236:8, 246:21, 246:23, 257:12, 258:24, 259:17, 264:9, 270:6, 272:7, 273:12, 273:13, 279:10, 279:22, 280:17, 291:19, 294:9, 294:23, 295:2, 299:22, 299:23, 300:14, 300:17, 301:2, 301:3, 301:13, 301:15, 302:11, 302:25, 303:9, 367:21, 367:22, 393:7, 393:8, 417:20, 417:21
**objections** [11] - 255:19, 255:20, 256:1, 256:3, 256:8, 257:9, 265:3, 266:14, 266:17, 266:19
**objects** [1] - 224:7
**obligation** [2] - 304:23, 415:14
**obscured** [2] - 369:17, 428:6
**observation** [4] - 244:16, 358:14, 422:25, 430:6
**observations** [1] - 422:23
**observe** [24] - 314:17, 317:15, 328:4, 331:16, 361:7, 368:12, 375:17, 375:21, 381:23, 382:3, 382:6, 386:7, 394:16, 395:13, 398:7, 401:10, 401:15, 401:18, 401:21, 405:7, 405:23, 421:6, 440:17, 444:11
**observed** [25] - 314:18, 315:6, 331:3, 331:23, 342:13, 343:7, 360:7, 361:8, 362:20, 363:5, 370:4, 377:20, 380:6, 380:10, 382:9, 383:19, 395:5, 395:16, 395:25, 398:9, 404:25, 409:17, 411:18, 422:7, 434:22
**observing** [2] - 394:24, 399:13
**obtained** [1] - 305:9
**obviously** [6] - 246:4, 294:25, 302:2, 357:8, 368:17, 380:19
**Obviously** [2] - 364:18, 367:7
**occasions** [2] - 246:6, 246:9
**OCCB** [2] - 308:22, 308:23
**occurred** [14] - 258:16, 261:22, 270:10, 270:23, 272:20, 275:22, 279:6, 282:4, 283:21, 283:23, 315:17, 376:18,

17

430:21, 435:17
**occurrence** [2] - 411:25, 418:1
**occurs** [1] - 270:17
**October** [2] - 308:15, 308:16
**OF** [2] - 222:1, 222:14
**offer** [14] - 230:10, 253:22, 259:8, 259:12, 291:18, 294:2, 299:18, 300:10, 300:23, 301:7, 302:10, 302:21, 303:5, 393:5
**offered** [5] - 255:10, 257:25, 305:24, 326:2, 342:2
**offering** [1] - 301:23
**offhand** [1] - 395:20
**Office** [5] - 276:11, 276:24, 277:17, 328:10, 328:14
**office** [29] - 275:15, 275:18, 286:4, 286:9, 286:13, 286:18, 374:18, 374:22, 374:25, 406:5, 415:11, 418:15, 418:20, 419:7, 419:21, 419:23, 419:24, 420:3, 420:6, 420:10, 432:10, 432:14, 433:3, 434:11, 437:18, 437:21, 438:4, 438:19, 445:24
**Officer** [84] - 257:2, 258:9, 264:6, 305:5, 305:9, 311:2, 321:2, 330:1, 332:13, 332:23, 332:24, 333:19, 334:3, 334:21, 335:24, 338:8, 338:11, 339:1, 342:4, 343:13, 343:19, 343:20, 350:19, 356:14, 356:15, 357:12, 358:5, 358:6, 359:15, 359:16, 359:25, 360:10, 360:18, 361:9, 362:19, 362:21, 363:1, 364:12, 364:16, 365:7, 367:9, 367:11, 368:16, 368:23, 369:25, 370:7, 370:8, 370:19, 372:3, 373:1, 373:21, 374:12, 374:13, 377:20, 378:4, 379:5, 380:21, 381:5, 381:6, 381:14, 381:16, 381:21, 381:25, 382:4, 382:6, 385:8, 386:16, 387:2, 391:22, 397:21, 398:6, 401:6, 403:3, 403:13, 418:2, 423:13, 438:17, 439:2, 441:19, 441:20, 441:23, 444:9, 444:13, 445:5
**officer's** [1] - 412:4
**Officers** [3] - 277:19, 286:16, 288:25
**officers** [31] - 224:8, 248:9, 253:18, 255:5, 259:3, 260:9, 277:6, 277:15, 303:23, 304:1, 305:24, 306:5, 320:20, 320:22, 325:1, 337:4, 339:21, 339:22, 355:22, 360:17, 370:12, 373:15, 374:4, 383:7, 384:17, 386:7, 386:11, 390:17, 403:11, 410:17, 412:4

**officers'** [1] - 255:
**Officially** [1] - 270:21
**Omniform** [3] - 260:6, 260:19, 336:2
**once** [12] - 239:7, 277:20, 315:5, 322:16, 322:25, 331:9, 362:16, 363:5, 371:12, 408:23, 413:23
**Once** [8] - 251:14, 367:8, 369:20, 371:13, 374:10, 383:7, 396:8, 415:12
**one** [84] - 223:7, 224:7, 225:15, 225:24, 226:10, 226:20, 227:13, 236:4, 242:6, 242:12, 244:3, 244:4, 253:7, 260:8, 260:9, 260:21, 262:24, 272:16, 282:25, 286:19, 291:21, 298:1, 298:11, 300:16, 302:7, 310:2, 310:22, 312:25, 313:22, 314:8, 317:21, 319:3, 319:19, 335:8, 337:8, 338:2, 338:20, 340:22, 343:25, 346:16, 350:16, 353:22, 357:20, 362:25, 363:1, 365:15, 366:19, 370:20, 370:21, 381:18, 382:6, 383:7, 386:14, 386:19, 393:25, 394:3, 394:8, 401:13, 402:1, 402:2, 403:12, 407:7, 409:12, 409:13, 409:14, 409:15, 412:11, 412:22, 413:8, 414:5, 426:20, 427:6, 427:15, 430:19, 433:10, 434:6, 444:18, 444:19, 444:21
**One** [14] - 255:19, 280:1, 280:2, 285:1, 350:7, 394:1, 394:3, 422:25
**one-way** [2] - 312:25, 394:8
**ones** [1] - 292:10
**online** [4] - 408:8, 408:9, 408:18, 430:10
**Online** [1] - 408:10
**Open** [2] - 272:1, 274:1
**open** [11] - 257:21, 306:18, 313:9, 358:11, 359:2, 378:22, 379:19, 380:18, 397:7, 422:14, 442:1
**opened** [1] - 223:8
**opening** [1] - 298:16
**operating** [1] - 357:9
**operator** [3] - 312:6, 356:24, 356:25
**opinion** [1] - 372:23
**opponents** [1] - 255:11
**opportunity** [5] - 255:7, 279:19, 293:5, 306:21, 367:8
**opposed** [3] - 425:22, 429:1, 429:10
**opposite** [3] - 320:23, 350:15, 378:21
**option** [2] - 253:20, 253:22
**orbital** [3] - 366:11, 385:2, 385:16
**order** [17] - 255:24, 255:25, 276:12, 281:14, 282:3, 288:5, 288:17, 288:19, 290:9, 333:2, 354:8, 361:10, 374:14, 396:3, 408:13, 430:5, 438:8
**ordered** [6] - 334:5, 334:13, 334:17, 334:24, 407:5, 407:6
**orders** [4] - 320:14, 321:7, 364:21, 365:2
**ordinary** [3] - 393:2, 417:4, 417:14
**Organized** [3] - 308:24, 354:12, 354:15
**original** [1] - 368:1
**originally** [1] - 430:25
**osteoarthritis** [5] - 232:8, 232:17, 233:9, 234:6, 234:13

**ought** [1] - 266:1
**ourselves** [1] - 339:21
**Out-of-court** [1] - 279:18
**outcome** [4] - 375:6, 375:8, 420:16, 420:19
**outermost** [1] - 339:20
**outline** [1] - 432:6
**outlines** [1] - 373:3
**outside** [3] - 311:2, 333:21, 375:13
**overlooked** [1] - 350:1
**Overruled** [12] - 226:19, 239:16, 288:1, 294:17, 301:17, 340:4, 344:7, 348:17, 385:19, 431:5, 431:22, 435:24
**overruled** [5] - 226:23, 266:14, 266:17, 273:21, 280:18
**own** [3] - 278:7, 338:4, 338:25

**P**

**p.m** [1] - 390:7
**pace** [1] - 360:8
**packages** [1] - 324:13
**pad** [2] - 260:11, 392:23
**pads** [1] - 260:9
**page** [50] - 224:5, 225:17, 227:11, 241:1, 254:5, 256:16, 260:11, 260:17, 262:14, 262:17, 263:9, 264:5, 264:19, 271:4, 273:22, 275:3, 277:21, 281:3, 284:9, 284:14, 284:18, 301:14, 302:7, 302:16, 302:20, 326:6, 326:20, 327:2, 327:12, 330:16, 335:16, 335:18, 339:4, 345:2, 346:8, 347:6, 347:23, 351:13, 376:22, 384:11, 392:17, 393:12, 393:13, 406:13, 408:14, 432:21, 439:19
**Page** [5] - 226:7, 229:8, 238:7, 241:14, 263:6
**pages** [5] - 269:19, 279:12, 346:7, 346:8, 392:15
**pain** [5] - 237:22, 366:1, 366:2, 383:14, 412:4
**Pain** [1] - 325:3
**painful** [1] - 247:17
**palm** [2] - 395:7, 428:7
**pancake** [1] - 319:2
**paper** [2] - 277:13, 314:23
**papers** [1] - 301:12
**paperwork** [17] - 324:16, 336:17, 372:13, 372:16, 372:18, 372:21, 372:23, 373:4, 406:4, 408:5, 408:10, 411:9, 416:7, 416:10, 420:2, 430:11, 438:25
**Paperwork** [1] - 407:17
**paragraph** [3] - 332:24, 334:12, 335:4
**Paragraph** [1] - 335:3
**paragraphs** [6] - 330:15, 330:19, 331:8, 332:23, 334:2, 351:15
**paralegal** [8] - 277:16, 286:17, 293:4, 304:7, 304:10, 304:19, 305:6, 332:16
**Paralegal** [1] - 333:10
**parallel** [6] - 360:4, 381:18, 396:7, 396:8, 427:18, 427:25
**parent** [1] - 236:1

18

**park** [2] - 362:19, 397:4
**parked** [1] - 426:8
**parking** [1] - 358:25
**Parole** [3] - 278:6, 289:18, 289:20
**parole** [15] - 250:25, 278:9, 285:6, 285:9, 289:9, 289:11, 289:16, 289:25, 290:12, 290:15, 290:25, 291:1, 291:2, 291:5, 356:20
**part** [13] - 238:1, 270:19, 270:21, 270:22, 351:14, 354:22, 403:24, 430:11, 430:25, 433:7, 433:19, 435:20, 437:19
**partial** [1] - 303:21
**partially** [1] - 364:17
**participants** [1] - 258:4
**particular** [12] - 270:23, 274:10, 276:9, 282:2, 286:9, 288:12, 309:14, 358:23, 390:2, 409:23, 416:23, 441:2
**parties** [1] - 316:7
**partner** [3] - 393:23, 398:19, 405:12
**partnered** [1] - 391:20
**partners** [2] - 320:2, 322:10
**parts** [1] - 292:5
**party** [1] - 255:11
**pass** [1] - 354:8
**passed** [2] - 381:18, 398:2
**passenger** [5] - 312:10, 357:3, 357:13, 378:17, 380:2
**past** [10] - 245:25, 281:5, 281:16, 294:5, 361:9, 381:19, 398:5, 398:25, 400:10
**patch** [1] - 310:22
**path** [5] - 440:6, 440:11, 440:20, 440:22, 443:16
**patrol** [10] - 311:12, 311:16, 312:1, 357:14, 391:4, 391:9, 393:20, 393:24, 426:14, 426:17
**patrolling** [4] - 311:14, 312:13, 356:18, 392:5
**patterns** [1] - 355:2
**Pause** [8] - 227:9, 256:15, 264:12, 269:4, 279:16, 279:20, 284:13, 284:20
**Pause)** [1] - 316:6
**paused** [1] - 397:13
**pavement** [3] - 369:4, 383:20, 384:2
**paying** [1] - 384:15
**pedestrian** [1] - 337:14
**pedigree** [2] - 371:14, 406:11
**pen** [1] - 422:19
**penalty** [1] - 327:5
**pending** [3] - 285:2, 285:4, 285:10
**people** [6] - 261:14, 318:4, 355:4, 362:7, 407:9, 429:5
**People** [1] - 283:6
**per** [1] - 305:6
**perform** [3] - 356:6, 374:1, 374:7
**performing** [1] - 374:5
**period** [5] - 276:13, 281:17, 287:2, 287:5, 288:12
**peripheral** [3] - 350:24, 351:1, 351:3
**peripherally** [1] - 386:7
**perjury** [1] - 327:5

**permissible** [1] -
**permission** [1] - 365:16
**perp** [4] - 412:1, 412:2, 412:3, 418:3
**perpetrator** [3] - 412:1, 412:3, 418:3
**person** [19] - 243:3, 251:20, 277:13, 285:25, 288:8, 288:9, 341:16, 362:3, 388:1, 394:19, 398:9, 403:7, 409:7, 418:22, 419:19, 420:5, 431:9, 440:10, 440:13
**person's** [1] - 275:7
**personal** [2] - 273:16, 304:4, 305:3
**personally** [3] - 276:19, 409:4, 415:14
**ph** [1] - 232:24
**phase** [1] - 258:2
**phone** [3] - 418:23, 420:5, 420:9
**photo** [15] - 230:24, 230:25, 295:6, 295:17, 296:14, 296:20, 296:22, 296:23, 297:10, 297:21, 298:8, 298:20, 342:3, 425:3, 425:4
**photograph** [12] - 228:7, 230:7, 230:15, 230:18, 231:1, 231:3, 231:4, 292:2, 293:21, 297:7, 298:1, 425:25
**photographs** [25] - 240:10, 240:13, 240:16, 241:11, 241:16, 242:18, 242:23, 243:6, 243:10, 250:12, 250:16, 250:18, 250:24, 251:13, 251:15, 251:19, 251:22, 291:22, 292:4, 292:5, 293:12, 294:23, 295:5
**photos** [4] - 250:21, 255:17, 299:2, 299:9
**physical** [8] - 226:9, 227:12, 336:7, 378:9, 410:5, 410:8, 435:3, 435:5
**physician** [4] - 325:21, 325:23, 344:25, 345:14
**pick** [2] - 232:23, 402:9
**picked** [2] - 290:15, 349:18
**picture** [6] - 230:22, 380:18, 424:14, 424:21, 425:13, 444:24
**piece** [2] - 257:23, 277:13
**pin** [1] - 422:17
**pipe** [3] - 366:9, 366:10, 385:2, 387:25
**pistol** [2] - 318:24, 319:1
**pistols** [2] - 318:4, 363:25
**Pitkin** [61] - 293:24, 293:25, 294:7, 295:7, 295:17, 295:19, 295:21, 295:24, 296:14, 296:15, 296:20, 296:23, 297:13, 297:15, 299:5, 299:15, 312:14, 312:17, 312:23, 312:24, 312:25, 313:4, 313:7, 313:9, 313:13, 337:11, 357:15, 358:1, 358:20, 359:3, 359:23, 360:1, 360:3, 360:5, 361:5, 380:11, 380:13, 386:3, 386:5, 386:14, 392:6, 392:8, 392:12, 393:25, 394:5, 394:7, 394:8, 394:11, 394:17, 398:4, 398:8, 404:12, 423:22, 423:25, 424:14, 424:17, 424:18, 441:11, 442:6, 442:10, 442:24
**place** [16] - 230:25, 242:2, 260:12, 266:8, 320:1, 320:6, 320:19, 320:21, 334:6, 334:14, 334:25, 349:11, 349:12, 411:25, 418:1, 434:12
**placed** [12] - 250:22, 250:24, 290:23, 301:22, 319:25, 322:9, 322:14, 373:9, 373:10, 413:16, 413:20, 413:24

**places** [1] - 243:24
**placing** [2] - 320:24, 402:23
**Plain** [2] - 310:10, 390:15
**plain** [7] - 310:11, 310:13, 310:14, 356:4, 356:5, 356:6, 390:16
**PLAINTIFF** [1] - 222:6
**plaintiff** [22] - 255:3, 255:13, 265:4, 268:10, 280:1, 280:6, 280:14, 284:10, 303:15, 303:16, 306:20, 313:19, 328:18, 334:4, 359:12, 371:2, 397:18, 399:8, 401:16, 401:19, 403:16
**Plaintiff** [4] - 222:18, 272:2, 293:7, 303:8
**Plaintiff's** [47] - 229:24, 230:10, 236:7, 259:15, 259:22, 259:24, 260:10, 260:13, 260:22, 260:24, 261:3, 264:5, 264:13, 266:11, 266:12, 268:24, 269:18, 272:12, 277:20, 278:23, 285:14, 294:21, 296:6, 296:7, 296:10, 296:16, 296:21, 297:8, 297:18, 298:9, 298:20, 299:4, 299:10, 300:13, 300:22, 301:7, 303:7, 326:1, 327:3, 327:12, 332:19, 335:15, 335:17, 342:2, 346:5, 351:14, 408:12
**plaintiff's** [5] - 240:20, 245:9, 257:23, 269:20, 280:13
**plant** [3] - 402:9, 421:3, 421:6
**play** [9] - 253:18, 253:20, 253:25, 257:3, 257:6, 257:9, 258:12, 258:25, 264:1
**played** [6] - 244:9, 255:5, 255:6, 262:16, 266:3, 266:7
**playing** [2] - 259:11, 262:1
**plays** [2] - 262:13, 263:5
**pm** [1] - 310:8
**PO** [1] - 409:15
**pocket** [2] - 361:15, 404:23
**point** [78] - 229:10, 231:24, 232:13, 234:3, 248:18, 249:2, 252:11, 284:16, 296:2, 303:22, 306:19, 315:10, 317:13, 317:20, 317:23, 319:19, 323:2, 323:8, 337:9, 340:22, 341:16, 341:19, 341:20, 341:22, 343:3, 345:24, 350:17, 352:1, 359:3, 360:10, 361:17, 362:3, 362:14, 362:25, 364:18, 367:9, 368:9, 368:15, 368:17, 368:21, 369:6, 369:9, 369:16, 369:20, 370:2, 370:6, 370:9, 370:24, 371:9, 376:2, 379:3, 379:5, 379:9, 379:11, 379:25, 380:6, 381:18, 382:6, 383:10, 384:16, 384:17, 384:19, 398:3, 400:7, 400:14, 401:5, 401:6, 402:3, 403:2, 405:12, 427:15, 427:25, 435:16, 442:10, 443:15, 443:20, 444:16
**pointed** [3] - 225:11, 225:14, 249:8
**pointing** [2] - 225:23, 249:6
**points** [2] - 265:6, 341:9
**Police** [52] - 277:5, 277:19, 286:16, 307:17, 307:19, 309:7, 311:2, 332:24, 338:8, 353:19, 353:21, 353:23, 356:14, 357:12, 358:4, 358:6, 359:15, 359:16, 359:25, 360:10, 360:18, 361:9, 362:19, 362:21, 363:1, 364:12, 364:16, 365:7, 366:13, 367:9, 367:11, 368:16, 368:23,

369:25, 370:7, 370:8, 370:19, 372:3, 373:1, 374:12, 374:13, 381:6, 385:8, 389:3, 389:5, 391:22, 393:3, 396:12, 397:21, 417:5, 417:14

**police** [54] - 224:8, 245:9, 248:9, 275:19, 286:21, 303:23, 308:16, 308:19, 309:19, 310:15, 314:4, 315:1, 316:19, 316:21, 317:13, 324:25, 331:11, 333:23, 339:13, 339:16, 339:21, 351:23, 354:17, 354:18, 356:7, 360:12, 365:6, 365:8, 369:23, 373:11, 374:4, 386:22, 387:6, 387:16, 389:20, 390:17, 390:18, 390:24, 391:1, 391:4, 391:18, 393:15, 396:11, 396:25, 397:9, 401:11, 416:19, 416:20, 431:1, 431:19, 434:9, 435:20, 437:19

**pool** [6] - 383:23, 384:2, 384:4, 384:5, 384:20

**portion** [16] - 232:3, 232:14, 232:15, 234:22, 234:23, 301:21, 301:22, 392:21, 395:12, 411:24, 417:25, 418:9, 433:11, 435:1, 435:5

**portions** [1] - 266:1

**position** [8] - 262:2, 310:2, 363:11, 364:10, 364:14, 378:17, 436:20, 441:21

**positioned** [4] - 314:18, 315:7, 317:19, 340:19

**possession** [4] - 232:23, 309:23, 356:1, 409:14

**possibility** [4] - 338:4, 338:24, 351:21, 365:8

**Possibility** [1] - 228:11

**possible** [8] - 274:21, 288:14, 289:22, 338:19, 351:20, 360:25, 361:2, 428:16

**possibly** [6] - 228:9, 310:19, 318:3, 337:25, 338:14, 363:16

**Possibly** [1] - 318:2

**post** [2] - 305:1, 305:20

**Post** [2] - 301:22, 302:1

**Post-it** [2] - 301:22, 302:1

**post-verdict** [2] - 305:1, 305:20

**pouring** [1] - 402:19

**powers** [1] - 442:17

**practical** [1] - 255:8

**practice** [6] - 338:1, 338:4, 338:20, 338:21, 338:25, 432:1

**practicing** [1] - 267:20

**preceding** [2] - 252:6, 252:22

**Precinct** [18] - 309:13, 309:15, 309:20, 309:25, 332:25, 355:15, 355:17, 356:19, 389:14, 390:1, 390:3, 390:9, 390:12, 392:9, 393:18, 414:10, 414:16, 414:19

**precinct** [21] - 309:23, 323:20, 324:14, 325:1, 325:11, 370:24, 371:10, 371:13, 371:17, 371:18, 372:11, 387:5, 390:13, 391:9, 405:14, 405:16, 406:9, 406:10, 407:4, 407:9, 430:14

**precluded** [1] - 294:25

**prefer** [3] - 253:24, 253:25, 292:7

**prejudice** [1] - 245:12

**preliminary** [1] - 368:19

**premarked** [3] - 300:13, 300:22, 301:7

**Premarked** [1] - :

**preparation** [2] - 348:13, 350:2

**prepare** [5] - 266:18, 303:25, 393:2, 416:7, 417:4

**prepared** [15] - 292:9, 330:7, 330:10, 336:15, 336:19, 349:25, 373:7, 408:18, 408:21, 412:22, 413:24, 415:12, 416:10, 416:23, 416:25

**preparer** [1] - 336:10

**preparing** [6] - 228:20, 348:12, 348:19, 348:22, 413:14, 415:8

**preponderance** [2] - 245:16, 245:18

**present** [16] - 259:5, 262:5, 268:18, 268:20, 285:21, 285:24, 290:24, 291:5, 293:12, 306:21, 316:7, 327:15, 327:21, 335:6, 337:4, 393:19

**presently** [1] - 241:24

**preserve** [1] - 256:1

**preserved** [1] - 266:20

**presiding** [1] - 274:10

**Press** [1] - 335:20

**pressed** [1] - 427:14

**pretrial** [2] - 255:24, 255:25

**Pretty** [3] - 395:18, 411:10, 441:7

**pretty** [3] - 407:11, 411:2, 425:17

**prevent** [1] - 333:3

**previously** [18] - 249:12, 259:14, 264:5, 268:10, 268:23, 269:19, 285:13, 293:6, 303:6, 329:23, 332:18, 335:16, 392:15, 408:11, 412:20, 415:17, 437:14, 438:2

**primarily** [2] - 355:24, 358:24

**primary** [7] - 234:6, 325:21, 325:22, 344:25, 345:13, 384:16, 389:15

**Prince** [108] - 257:2, 258:9, 262:9, 277:19, 286:16, 289:1, 301:10, 304:5, 305:5, 305:7, 305:9, 306:25, 307:1, 307:7, 307:12, 307:14, 309:4, 316:2, 316:13, 325:25, 329:20, 330:1, 332:23, 332:25, 333:19, 334:3, 334:22, 335:24, 338:11, 339:2, 342:4, 342:10, 343:13, 343:15, 351:13, 352:9, 352:21, 353:1, 356:14, 357:12, 358:5, 359:15, 360:18, 360:23, 361:7, 362:21, 362:24, 363:1, 363:15, 363:17, 364:12, 364:16, 365:7, 367:10, 368:17, 368:23, 369:25, 370:4, 370:7, 372:4, 372:5, 374:12, 375:17, 375:22, 381:5, 381:6, 381:8, 381:14, 381:16, 381:21, 381:25, 382:4, 382:6, 385:8, 391:22, 391:25, 393:23, 397:8, 397:16, 397:21, 397:25, 398:5, 398:6, 398:13, 399:3, 399:5, 399:9, 399:12, 399:13, 400:7, 401:6, 401:15, 402:10, 403:3, 403:13, 403:17, 407:25, 408:2, 418:2, 418:6, 418:12, 438:18, 439:2, 441:19, 441:23, 444:9, 444:13, 445:5

**PRINCE** [1] - 222:9

**Prince's** [7] - 301:16, 357:2, 411:8, 416:8, 418:8, 423:14, 441:20

**print** [1] - 250:18

**printed** [1] - 241:4

**printing** [1] - 371:12

**priorities** [1] - 387:6

**prison** [2] - 228:20, 289:24

**prisoner** [4] - 369:20, 386:9, 387:6, 405:13

**prisoners** [1] - 386:10

**privilege** [3] - 261:15, 265:21, 272:3

**privileged** [3] - 265:16, 265:18, 272:5

**pro** [1] - 242:21

**probable** [6] - 265:6, 280:4, 288:14, 431:2, 431:7, 440:15

**probing** [1] - 246:3

**problem** [4] - 232:20, 366:12, 372:7, 445:25

**Procedure** [1] - 286:23

**procedure** [3] - 276:16, 276:20, 281:12

**procedures** [1] - 431:18

**proceed** [6] - 276:12, 276:22, 281:15, 288:6, 288:22, 374:25

**proceeding** [8] - 253:2, 269:15, 278:19, 279:6, 280:11, 291:1, 359:23, 420:21

**proceedings** [1] - 279:4

**Proceedings** [1] - 222:25

**proceeds** [1] - 265:19

**process** [6] - 368:4, 397:6, 401:12, 409:4, 413:23, 415:22

**Process** [1] - 406:4

**produced** [3] - 222:25, 272:6, 277:24

**profession** [1] - 267:14

**prohibited** [1] - 366:13

**promoted** [7] - 308:8, 308:14, 354:3, 354:6, 354:8, 374:10, 389:9

**promptly** [1] - 445:16

**proper** [1] - 235:14

**property** [11] - 260:25, 261:4, 372:20, 372:21, 373:8, 405:7, 406:4, 406:5, 416:3, 416:6, 430:17

**prosecute** [5] - 287:10, 287:15, 288:15, 409:22, 437:21

**prosecuted** [2] - 419:25, 431:9

**prosecuting** [1] - 267:20, 289:23

**prosecution** [13] - 262:2, 280:2, 280:7, 303:22, 303:24, 304:2, 304:5, 304:13, 305:21, 306:6, 374:25, 420:11, 438:9

**prostitution** [1] - 309:2

**protect** [2] - 367:6, 383:10

**prove** [6] - 280:6, 280:15, 411:21, 434:1, 434:4, 434:20

**proved** [2] - 245:15, 245:17

**provide** [10] - 242:7, 242:10, 242:12, 281:14, 290:8, 290:9, 304:20, 326:13, 369:21, 437:20

**provided** [13] - 271:1, 275:16, 275:18, 281:9, 281:17, 284:10, 285:25, 288:24, 289:1, 305:5, 412:16, 420:3, 438:3

**providing** [1] - 438:7

**psychiatric** [1] - 244:16

**public** [1] - 309:2

**pull** [4] - 318:4, 335:22, 346:5, 433:10

**Pull** [1] - 424:10

**pulled** [3] - 317:21, 336:4, 362:16

**pulling** [1] - 360:3

**punch** [2] - 329:11, 376:6
**punches** [1] - 399:17
**punching** [2] - 319:16, 344:20
**purpose** [1] - 279:24
**pursuant** [3] - 276:16, 281:20, 287:22
**pursue** [2] - 317:9, 317:17
**pursuit** [3] - 360:19, 398:1, 441:3
**push** [3] - 241:8, 250:10, 333:1
**pushing** [1] - 363:2
**put** [35] - 233:7, 242:2, 243:21, 243:23, 243:25, 246:1, 246:4, 251:16, 253:23, 255:17, 255:23, 265:7, 266:18, 270:22, 278:9, 278:11, 285:1, 298:11, 301:25, 346:7, 358:9, 358:15, 362:19, 368:1, 397:4, 398:2, 404:23, 412:13, 412:16, 415:25, 416:1, 432:20, 434:8, 439:10, 445:19
**putting** [1] - 255:25
**Putting** [1] - 428:23
**PX** [4] - 430:8, 436:6, 437:1, 437:6
**PX-10** [1] - 415:18
**PX-29** [1] - 292:2
**PX-33** [2] - 292:10, 424:10
**PX-9** [1] - 412:21

## Q

**quadrant** [1] - 444:22
**qualification** [1] - 374:10
**qualified** [3] - 306:5, 374:8, 374:10
**quantity** [1] - 386:25
**quarter** [5] - 335:18, 357:20, 358:4, 378:22, 384:6
**quarterback** [1] - 319:9
**quarters** [1] - 358:5
**QUESTION** [31] - 224:4, 224:6, 224:9, 224:22, 225:20, 225:22, 226:9, 226:12, 226:14, 227:12, 227:15, 227:17, 229:10, 229:13, 229:16, 241:16, 241:22, 241:25, 339:6, 339:9, 339:11, 339:13, 339:15, 339:18, 339:23, 340:1, 345:6, 347:9, 347:14, 347:17, 384:12
**questioning** [4] - 245:7, 246:2, 246:9, 249:20
**questions** [24] - 223:9, 224:3, 225:18, 226:1, 226:7, 226:16, 227:19, 227:21, 229:9, 229:18, 236:20, 242:3, 242:5, 246:10, 247:19, 249:3, 252:10, 282:8, 329:13, 339:4, 347:7, 352:16, 376:11, 421:9
**quick** [3] - 223:3, 256:14, 279:15
**quickly** [1] - 407:11
**quite** [4] - 266:15, 342:9, 383:22, 428:17

## R

**radio** [6] - 357:7, 358:16, 390:20, 393:20, 393:24, 393:25
**raid** [13] - 310:19, 310:20, 310:21, 337:24, 338:3, 338:5, 338:14, 338:19,

338:21, 338:22, 3     338:24, 340:12
**raise** [2] - 307:3, 353:6
**rambling** [1] - 233:16
**ran** [15] - 287:9, 287:23, 288:3, 315:11, 316:22, 316:23, 317:3, 317:5, 317:15, 352:1, 397:15, 397:18, 398:11, 403:15, 443:5
**rank** [12] - 308:6, 308:8, 308:12, 308:14, 309:6, 353:23, 354:3, 354:9, 354:16, 355:10, 389:7, 389:19
**rapid** [1] - 366:20
**ray** [2] - 325:3, 372:8
**rays** [1] - 235:23
**re** [1] - 351:8
**re-direct** [1] - 351:8
**reach** [8] - 320:19, 361:23, 380:7, 380:20, 381:2, 381:23, 399:5, 399:24
**reached** [11] - 312:17, 312:23, 357:18, 357:24, 361:20, 362:11, 364:10, 367:1, 381:8, 392:11, 394:16
**reaching** [1] - 347:2
**react** [2] - 383:3, 383:14
**reaction** [1] - 383:8
**read** [23] - 226:25, 227:10, 232:2, 232:4, 234:10, 241:2, 241:3, 249:10, 252:10, 277:22, 284:19, 326:3, 326:25, 327:7, 327:19, 393:13, 393:14, 409:10, 411:24, 417:24, 432:23, 437:5, 438:2
**readily** [1] - 426:3
**reading** [3] - 227:11, 273:2, 273:13
**reads** [2] - 327:14, 334:12
**ready** [12] - 258:19, 259:1, 262:7, 281:15, 287:2, 287:5, 288:22, 306:11, 316:2, 316:9, 377:4, 377:7
**real** [1] - 365:8
**realize** [1] - 341:20
**really** [24] - 252:16, 253:19, 349:2, 356:2, 359:21, 362:12, 362:15, 366:21, 369:17, 370:16, 371:10, 372:22, 379:23, 380:17, 384:4, 384:15, 386:6, 387:3, 398:3, 412:7, 431:12, 437:5, 439:9
**rear** [10] - 312:12, 357:13, 358:11, 378:17, 378:19, 378:21, 401:1, 427:17, 427:22, 427:23
**reason** [17] - 240:3, 257:11, 280:13, 286:14, 288:21, 288:23, 289:9, 289:14, 289:22, 290:7, 332:2, 338:21, 340:1, 346:23, 378:1, 400:12, 441:1
**reasonable** [7] - 281:18, 288:17, 290:10, 305:25, 429:20, 431:2, 431:7
**reasons** [2] - 291:2, 396:19
**reassuming** [1] - 393:24
**recalled** [1] - 350:2
**receive** [14] - 282:21, 282:23, 301:24, 308:3, 325:2, 325:22, 326:3, 345:11, 345:15, 345:19, 348:9, 374:9, 407:3, 431:1
**received** [22] - 225:7, 242:12, 244:15, 248:9, 249:21, 249:24, 259:20, 274:2, 279:25, 280:18, 295:3, 295:14, 297:19, 298:4, 298:25, 299:7, 299:25, 302:3,

320:2, 335:16, 342:3, 408:12
**Received** [19] - 230:13, 234:1, 236:10, 264:11, 294:18, 295:12, 295:22, 296:11, 296:17, 296:24, 297:9, 299:24, 300:19, 301:4, 301:18, 302:13, 303:2, 393:9, 417:22
**recess** [2] - 261:23, 315:19, 376:19
**Recess** [3] - 258:18, 261:25, 376:21
**recognizance** [1] - 278:8
**recognize** [15] - 228:4, 230:5, 269:5, 269:10, 269:21, 278:24, 285:16, 293:20, 299:11, 330:2, 331:25, 335:23, 340:2, 392:18, 424:13
**recollect** [4] - 233:12, 235:12, 344:9, 442:14
**recollection** [35] - 231:21, 232:6, 232:15, 232:16, 233:2, 233:8, 234:24, 235:4, 235:7, 235:10, 235:15, 237:2, 237:4, 237:6, 238:5, 265:11, 275:22, 278:1, 278:4, 279:5, 284:8, 284:23, 291:4, 330:13, 338:17, 344:2, 344:4, 344:8, 350:5, 381:7, 387:11, 396:21, 428:20, 435:14, 442:7
**recommending** [1] - 433:13
**record** [16] - 225:22, 232:24, 233:20, 266:1, 267:6, 270:17, 274:13, 292:19, 298:24, 353:9, 366:16, 371:16, 388:16, 417:7, 417:10
**recorded** [1] - 222:25
**Recorder** [1] - 311:7
**recorder** [6] - 311:8, 311:9, 311:18, 357:3, 357:4, 357:5
**records** [2] - 236:4, 249:21
**recover** [2] - 324:8, 332:11
**recovered** [23] - 261:1, 275:20, 294:14, 323:23, 323:24, 324:7, 332:14, 373:6, 374:2, 374:6, 386:17, 404:14, 404:16, 404:21, 405:5, 406:5, 411:20, 412:11, 412:14, 412:16, 412:18, 434:1, 444:15
**recovering** [1] - 403:3
**red** [2] - 323:10, 349:20
**redacted** [1] - 302:1
**redirect** [3] - 247:20, 388:5, 388:6
**REDIRECT** [4] - 248:1, 351:11, 446:5, 446:16
**reentered** [1] - 282:1
**refer** [3] - 234:4, 327:10, 435:5
**reference** [9] - 346:9, 349:13, 436:3, 436:15, 436:20, 437:3, 437:24, 438:13, 438:23
**Referring** [2] - 327:3, 351:15
**referring** [5] - 272:20, 349:3, 351:18, 371:1, 418:1
**reflect** [3] - 225:22, 266:1, 366:16
**reflected** [2] - 330:12, 425:15
**reflects** [1] - 232:25
**refresh** [5] - 232:6, 235:3, 237:6, 284:8, 284:23
**refreshed** [2] - 338:17, 350:5
**refreshes** [6] - 231:20, 232:15, 232:16, 233:2, 234:24, 237:1
**regard** [1] - 305:13

**regarding** [12] - 246:15, 269:13, 290:24, 311:19, 328:21, 336:18, 338:18, 344:12, 351:16, 374:18, 374:22, 420:13

**regardless** [1] - 365:5

**Regardless** [1] - 351:22

**regards** [1] - 345:16

**regular** [4] - 325:18, 415:25, 429:1, 429:10

**reinforce** [1] - 223:5

**relate** [4] - 223:6, 274:14, 275:7, 276:1

**related** [3] - 260:20, 391:5, 416:7

**relates** [4] - 272:18, 280:5, 418:11, 433:12

**relating** [5] - 260:25, 268:13, 268:20, 305:10, 324:16

**relative** [1] - 289:1

**relatively** [1] - 426:22

**released** [3] - 251:14, 278:7, 345:7

**relevant** [5] - 240:2, 434:10, 434:22, 435:21, 437:20

**remained** [2] - 370:11, 386:6

**remember** [27] - 229:6, 235:7, 253:6, 274:21, 309:8, 337:2, 339:5, 369:10, 370:20, 372:22, 377:22, 383:15, 387:1, 389:21, 396:21, 396:23, 401:17, 402:4, 402:23, 404:18, 423:6, 423:8, 423:12, 428:9, 428:19, 441:21

**remove** [1] - 362:2

**render** [1] - 363:7

**renew** [1] - 265:3

**reopened** [1] - 282:1

**Repeat** [1] - 427:21

**repeat** [4] - 229:2, 230:20, 235:2, 240:12

**rephrase** [3] - 286:7, 385:13, 431:17

**report** [21] - 260:2, 260:6, 260:14, 275:19, 289:1, 336:2, 336:4, 336:11, 336:14, 348:19, 372:19, 416:19, 416:20, 416:21, 416:23, 430:19, 430:22, 430:23, 432:16, 434:3

**reported** [1] - 232:19

**Reporter** [1] - 222:23

**reports** [1] - 336:17

**represent** [2] - 268:15, 282:16

**representations** [1] - 286:17

**represented** [3] - 242:14, 280:9, 283:6

**requested** [3] - 244:5, 244:6, 371:18

**requesting** [1] - 235:20

**require** [1] - 292:10

**required** [3] - 303:24, 305:25, 311:10

**requirement** [1] - 280:6

**requires** [2] - 287:1, 304:15

**resided** [1] - 232:24

**residence** [1] - 270:1

**resist** [1] - 319:15

**resisted** [1] - 319:14

**resisting** [10] - 319:21, 320:11, 320:12, 321:6, 322:4, 322:17, 350:12, 364:25, 383:16, 409:14

**resolves** [1] - 352:14

**respect** [2] - 275:17, 275:19

**respective** [1] - 2

**responding** [2] - 227:21, 228:2

**response** [5] - 235:14, 244:10, 282:18, 360:14, 360:17

**responsibilities** [5] - 309:19, 354:24, 355:19, 355:22, 389:13

**responsibility** [2] - 369:21, 373:16

**responsible** [8] - 355:2, 355:24, 357:5, 373:23, 374:5, 401:9, 415:1, 415:7

**rest** [2] - 245:20, 303:15

**rested** [1] - 306:20

**restroom** [1] - 258:11

**rests** [1] - 303:16

**result** [12] - 225:12, 228:1, 244:17, 249:3, 249:25, 250:13, 278:5, 289:12, 290:22, 325:15, 341:24, 430:5

**resulted** [6] - 224:18, 228:25, 229:4, 244:21, 429:24, 430:2

**resume** [4] - 261:19, 315:16, 316:10, 376:16

**retrained** [1] - 374:11

**return** [2] - 405:14, 406:10

**returned** [4] - 372:11, 386:16, 405:16, 430:13

**returns** [1] - 258:21

**review** [12] - 269:25, 272:23, 293:6, 330:10, 336:14, 336:17, 348:14, 348:19, 348:22, 348:25, 372:16, 372:18

**reviewed** [2] - 265:22, 266:13

**reviewing** [1] - 265:18

**revised** [1] - 257:5

**Ricks** [23] - 253:17, 255:17, 264:16, 265:4, 265:16, 266:23, 267:8, 267:11, 267:14, 269:5, 274:4, 275:5, 278:24, 279:22, 280:10, 281:3, 282:14, 282:18, 285:13, 285:16, 286:22, 290:12, 291:12

**rid** [2] - 257:7, 362:5

**right-hand** [3] - 275:4, 335:20, 380:2

**ripped** [1] - 224:25

**rise** [7] - 246:18, 258:15, 260:4, 261:21, 315:16, 376:17, 445:17

**risk** [2] - 347:13

**robberies** [3] - 356:1, 389:15, 391:6

**robbery** [2] - 309:23, 355:2

**Robbery** [1] - 354:21

**ROBERTSON** [1] - 222:4

**Robertson** [331] - 223:15, 223:19, 223:21, 224:1, 224:20, 225:17, 225:22, 226:4, 228:4, 228:17, 228:24, 230:5, 230:15, 231:18, 232:3, 233:18, 234:13, 236:12, 236:25, 237:8, 238:18, 240:10, 241:1, 241:11, 242:4, 242:25, 243:10, 245:3, 245:15, 245:24, 246:16, 247:1, 247:11, 249:2, 249:22, 250:4, 250:12, 253:14, 265:13, 265:17, 268:10, 268:13, 269:15, 277:1, 278:1, 278:11, 283:11, 283:24, 285:3, 285:6, 285:9, 286:10, 286:15, 289:24, 290:16, 304:6, 311:20, 313:19, 313:21, 314:9, 314:13, 316:16, 316:19, 316:22, 316:24, 317:2, 317:9, 317:11, 317:15, 317:20, 317:21, 317:23, 318:6, 318:11, 318:16, 319:8, 319:13, 319:17, 319:24, 320:9, 320:14, 320:16, 321:3, 321:7, 321:12, 321:15, 321:21, 321:25, 322:4, 322:7, 322:9, 322:11, 322:13, 322:16, 322:18, 322:21, 322:23, 322:25, 323:2, 323:5, 323:11, 323:19, 323:22, 324:5, 324:14, 324:17, 327:14, 327:20, 327:22, 328:4, 328:24, 329:1, 329:4, 329:7, 329:10, 331:1, 331:12, 331:23, 332:5, 333:20, 333:24, 334:13, 334:24, 335:5, 335:9, 336:11, 336:22, 336:25, 339:7, 340:2, 340:14, 341:2, 341:10, 341:20, 342:4, 342:16, 342:22, 343:7, 344:21, 345:23, 346:3, 346:10, 347:2, 347:15, 347:19, 349:14, 349:18, 350:9, 350:15, 350:20, 350:22, 350:24, 351:16, 351:20, 351:22, 352:1, 352:3, 352:5, 359:12, 359:14, 359:20, 360:4, 360:6, 360:14, 360:20, 360:21, 361:4, 361:7, 361:10, 361:11, 362:10, 362:17, 362:21, 362:24, 363:2, 363:16, 363:17, 364:9, 364:11, 364:18, 364:19, 364:21, 365:17, 366:6, 366:11, 366:18, 366:24, 367:3, 367:15, 368:3, 368:7, 368:14, 369:2, 369:6, 370:4, 370:11, 371:2, 371:3, 371:19, 371:25, 372:13, 373:2, 374:19, 374:22, 375:1, 375:7, 375:11, 375:14, 375:17, 375:19, 375:22, 375:25, 376:3, 376:5, 376:8, 376:9, 377:14, 377:17, 377:20, 378:1, 378:9, 378:10, 378:11, 378:12, 379:6, 380:7, 380:10, 380:20, 380:23, 381:2, 381:16, 381:19, 381:21, 382:4, 382:7, 383:3, 383:6, 384:12, 384:18, 386:7, 386:11, 387:20, 394:22, 394:23, 395:17, 395:23, 395:25, 396:6, 396:8, 396:22, 396:24, 397:3, 397:11, 397:20, 397:23, 398:5, 398:11, 398:17, 398:19, 398:20, 399:3, 399:6, 399:12, 399:14, 400:13, 401:22, 401:24, 402:14, 402:21, 402:25, 403:4, 403:10, 403:12, 403:13, 404:25, 405:17, 405:23, 407:3, 407:12, 407:14, 407:19, 407:22, 408:19, 409:22, 411:19, 412:6, 418:15, 419:8, 419:25, 420:10, 420:17, 420:23, 421:1, 421:3, 421:7, 421:20, 421:21, 421:24, 422:3, 422:6, 422:9, 422:24, 423:5, 423:13, 423:17, 423:24, 424:3, 424:24, 426:1, 426:23, 427:3, 428:3, 428:25, 429:8, 430:3, 430:14, 436:17, 437:25, 438:9, 439:15, 440:5, 441:5, 441:18, 442:9, 443:5, 443:15, 443:19, 444:11

**Robertson's** [28] - 283:1, 283:7, 283:16, 284:3, 284:24, 289:9, 289:16, 290:13, 303:8, 321:19, 323:8, 328:10, 328:21, 334:4, 336:18, 343:3, 364:15, 371:14, 375:4, 383:18, 383:20, 383:25, 384:3, 398:9, 402:16, 403:7, 405:25, 420:14

**role** [1] - 320:18

**rolled** [4] - 313:25, 314:1, 396:17, 402:8

**rolling** [5] - 319:19, 344:15, 344:18, 362:21, 362:25

**room** [10] - 234:17, 234:25, 235:5, 235:20, 236:2, 250:22, 342:23, 412:7, 432:18, 432:20
**rose** [1] - 364:5
**row** [4] - 275:7, 275:25, 277:22
**rows** [1] - 274:14
**Rule** [1] - 303:21
**rule** [4] - 223:12, 255:22, 256:5, 426:15
**ruled** [1] - 255:21
**ruling** [1] - 294:22
**rulings** [1] - 256:13
**run** [10] - 223:9, 223:10, 317:11, 333:20, 334:16, 360:16, 361:4, 363:10, 381:24, 443:7
**running** [22] - 317:10, 317:19, 333:24, 359:7, 360:21, 363:8, 363:14, 381:3, 381:4, 381:6, 381:13, 397:20, 397:21, 397:23, 398:6, 398:17, 440:5, 440:16, 440:17, 441:5, 441:10, 441:23
**runs** [1] - 440:13

**S**

**safe** [1] - 242:1, 384:18
**Safe** [1] - 445:15
**safety** [4] - 318:10, 319:9, 422:17
**sat** [2] - 358:10, 369:10
**satellite** [1] - 442:5
**satisfied** [1] - 373:2
**saw** [32] - 249:20, 266:4, 314:9, 320:23, 322:6, 323:21, 324:5, 327:22, 343:2, 360:6, 361:13, 361:23, 362:25, 363:6, 363:15, 367:8, 380:16, 380:20, 381:2, 381:25, 395:23, 398:10, 399:11, 412:6, 423:17, 429:5, 440:6, 440:10, 441:2, 444:8, 444:18
**scar** [4] - 223:22, 225:11, 225:14, 225:23, 228:18, 248:15, 248:18, 249:2, 249:6
**scared** [1] - 362:6
**scars** [1] - 249:8
**scene** [11] - 292:6, 293:20, 295:16, 296:13, 373:6, 374:2, 386:21, 387:3, 405:19, 424:13, 425:14
**scratch** [3] - 260:13, 260:17, 436:9
**Scratch** [1] - 430:12
**screaming** [1] - 383:16
**screen** [3] - 278:14, 393:13, 442:13
**se** [1] - 242:21
**sealed** [5] - 276:6, 276:10, 281:21, 281:23, 373:10
**search** [14] - 368:20, 402:24, 402:25, 403:6, 403:7, 403:14, 403:21, 403:24, 404:14, 405:8, 405:11, 405:15, 429:21, 439:16
**searched** [5] - 403:4, 403:10, 403:19, 403:22, 403:23
**seat** [12] - 223:14, 223:15, 267:5, 292:13, 353:2, 357:3, 358:11, 360:18, 378:17, 379:18, 379:19, 388:15
**seated** [11] - 259:6, 262:6, 292:18,

307:2, 307:5, 312        :9, 353:8, 357:11, 357:12, 392:3
**second** [20] - 237:11, 239:1, 260:17, 264:5, 275:3, 277:21, 281:5, 284:18, 298:11, 310:2, 335:16, 366:19, 383:7, 392:17, 393:13, 404:19, 409:13, 429:12, 432:21, 433:10
**secondary** [1] - 234:7
**secondly** [1] - 423:1
**seconds** [7] - 318:21, 320:20, 322:8, 322:15, 366:25, 368:6, 441:22
**Section** [5] - 281:12, 286:23, 287:1, 290:5, 354:21
**section** [17] - 241:2, 276:17, 284:19, 336:4, 410:3, 410:16, 411:9, 411:14, 412:13, 432:22, 433:6, 433:7, 433:8, 433:19, 433:23, 435:2, 442:24
**sections** [1] - 435:4
**secured** [2] - 319:3, 415:12
**security** [2] - 413:21, 415:25
**see** [98] - 227:7, 229:14, 233:18, 234:5, 235:2, 241:16, 244:3, 244:4, 248:20, 248:22, 257:8, 274:14, 275:4, 275:11, 298:15, 303:17, 314:2, 321:12, 321:15, 321:23, 322:1, 326:9, 327:16, 327:17, 331:19, 333:5, 334:14, 335:6, 335:23, 336:4, 341:3, 341:15, 342:3, 342:6, 343:13, 343:16, 345:14, 346:7, 346:8, 351:1, 351:3, 351:18, 358:18, 359:9, 361:11, 361:18, 361:19, 362:10, 362:16, 363:16, 369:11, 369:16, 370:10, 370:12, 375:24, 378:11, 378:15, 379:1, 379:4, 379:6, 380:17, 380:23, 380:25, 381:20, 386:11, 399:5, 399:8, 399:17, 399:19, 399:24, 403:14, 408:4, 410:12, 413:16, 413:17, 414:5, 414:8, 418:10, 422:12, 422:19, 425:19, 425:25, 426:2, 426:7, 426:24, 428:6, 429:7, 429:14, 435:4, 435:8, 435:10, 436:15, 437:19, 437:24, 440:9, 441:5, 442:19, 442:22
**See** [2] - 315:18, 370:10
**seeing** [4] - 420:25, 427:3, 428:19, 429:15
**seek** [11] - 236:2, 244:11, 244:21, 244:25, 325:19, 345:6, 345:12, 345:13, 345:17, 345:21, 349:12
**seem** [3] - 306:8, 371:5, 405:21
**semi** [1] - 423:20
**semi-broken** [1] - 423:20
**sending** [1] - 415:2
**sense** [1] - 440:19
**senses** [1] - 314:2
**sentence** [1] - 281:5
**separate** [6] - 285:3, 285:10, 387:14, 432:13, 433:7, 433:8
**Separate** [1] - 304:3
**September** [5] - 231:15, 231:23, 232:18, 232:21, 233:9
**sergeant** [16] - 257:25, 353:25, 354:1, 354:6, 354:20, 355:11, 355:21, 366:16, 373:13, 373:19, 373:22, 374:1, 400:3, 400:5, 414:11, 414:14

**Sergeant** [49] - 304:4, 308:7, 308:8, 311:17, 312:8, 320:25, 321:9, 321:12, 321:15, 321:18, 332:14, 337:7, 340:15, 340:24, 341:19, 343:13, 343:17, 350:17, 351:1, 352:23, 353:10, 353:14, 353:16, 354:3, 355:6, 365:11, 373:5, 377:1, 377:11, 382:11, 384:24, 388:7, 391:24, 391:25, 396:19, 397:8, 397:16, 399:2, 399:10, 399:21, 399:24, 401:8, 401:18, 403:2, 403:13, 403:16, 410:11, 410:15, 413:3
**sergeants** [1] - 354:9
**service** [4] - 354:7, 363:23, 416:22, 418:4
**set** [3] - 333:21, 349:8, 349:10
**seven** [5] - 267:17, 267:18, 268:6, 330:16, 331:9
**several** [3] - 229:6, 358:8, 404:5
**sewer** [3] - 404:7, 404:8, 444:15
**sexual** [1] - 389:16
**shape** [4] - 395:3, 423:20, 426:24, 435:15
**sheds** [1] - 246:14
**sheet** [2] - 242:7, 242:20
**Sheldon** [3] - 222:23, 303:24, 304:15
**shelf** [1] - 250:22
**shield** [13] - 310:19, 310:23, 310:25, 311:1, 311:3, 311:4, 332:25, 337:20, 337:21, 356:9, 356:11, 390:20, 391:1
**shirt** [2] - 238:14, 310:12
**shoot** [1] - 298:16
**shootings** [2] - 389:16, 391:5
**short** [1] - 378:8
**Short** [1] - 258:13
**shorter** [2] - 257:7, 382:13
**shot** [7] - 224:15, 225:4, 225:20, 228:9, 238:10, 238:11, 238:12
**shoulder** [9] - 237:22, 238:23, 239:1, 239:4, 239:7, 239:13, 240:1, 240:7, 399:11
**show** [32] - 236:23, 238:13, 251:24, 258:25, 268:23, 269:18, 278:23, 281:18, 284:7, 284:14, 284:18, 285:13, 293:17, 294:21, 299:10, 325:25, 326:6, 326:20, 329:22, 332:18, 335:15, 339:1, 342:3, 392:15, 393:11, 393:12, 408:11, 416:12, 422:9, 432:11
**Show** [1] - 238:9
**showed** [3] - 370:22, 386:16, 387:2
**showing** [12] - 228:3, 231:18, 232:11, 234:20, 240:19, 299:14, 366:17, 392:18, 412:20, 415:17, 416:15, 429:25
**shown** [3] - 266:13, 329:23, 424:21
**shows** [3] - 230:18, 230:22, 266:13
**side** [29] - 225:23, 228:18, 228:19, 249:16, 254:3, 271:2, 297:10, 298:6, 303:18, 312:10, 320:23, 350:15, 350:16, 361:17, 378:22, 380:2, 380:3, 386:14, 404:13, 426:9, 426:10, 428:23, 441:25, 442:2, 443:2, 443:25, 444:1
**Side** [5] - 255:1, 257:1, 264:17, 265:1, 303:19
**sidewalk** [9] - 314:10, 394:18, 423:24,

424:24, 425:22, 425:23, 426:8, 443:17, 444:3

**sign** [4] - 303:25, 304:16, 304:19

**signature** [5] - 326:21, 331:11, 413:1, 413:3, 417:2

**signed** [8] - 277:15, 326:25, 327:5, 327:7, 328:2, 334:23, 373:3

**significantly** [1] - 246:8

**silver** [1] - 311:1

**Silverman** [1] - 222:23

**similar** [2] - 227:21, 314:25

**Similarly** [2] - 410:19, 412:9

**simple** [1] - 233:7

**simply** [5] - 283:24, 284:1, 360:8, 365:4, 440:10

**single** [2] - 236:1, 317:21

**sit** [2] - 252:14, 408:5

**site** [1] - 299:20

**sitting** [3] - 391:1, 413:8, 422:22

**situation** [3] - 320:5, 352:9, 352:14

**situations** [2] - 362:7, 398:16

**Six** [1] - 229:16

**six** [7] - 223:9, 307:20, 307:24, 330:15, 331:8, 354:19, 437:6

**six-and-a-half** [1] - 354:19

**sixth** [1] - 229:14

**size** [4] - 384:5, 384:6, 426:24, 435:15

**skip** [1] - 435:18

**skipped** [1] - 435:19

**sleeping** [1] - 251:7

**slide** [1] - 443:23

**slight** [1] - 235:24

**slow** [1] - 395:18

**Small** [1] - 423:18

**small** [6] - 358:25, 384:5, 386:20, 387:14, 394:15, 412:7

**smallest** [1] - 412:16

**smell** [15] - 313:22, 313:24, 323:9, 331:18, 349:16, 349:19, 378:15, 379:9, 379:15, 380:3, 380:4, 380:5, 380:25, 423:4

**smelled** [6] - 314:4, 315:5, 330:17, 330:24, 379:14, 423:11

**smelling** [1] - 396:21

**Smith** [1] - 318:23

**smoke** [6] - 253:1, 379:10, 379:15, 380:4, 381:1, 429:4

**smoked** [3] - 252:11, 252:14, 429:5

**smoker** [1] - 429:3

**smokes** [1] - 429:5

**smoking** [41] - 323:22, 331:12, 332:8, 359:17, 359:19, 359:20, 377:20, 377:23, 378:6, 378:12, 379:7, 380:24, 394:24, 395:2, 395:4, 395:6, 395:10, 395:17, 395:25, 398:22, 404:25, 412:6, 424:4, 424:7, 426:25, 427:4, 427:7, 428:3, 428:19, 429:1, 429:10, 429:13, 429:15, 430:1, 434:6, 434:21, 434:23, 436:4, 436:17, 438:1, 438:14

**snap** [1] - 319:3

**snapshots** [1] - 241:5

**snow** [1] - 297:7

**snowing** [1] - 29

**social** [3] - 244:2, 244:8, 244:10

**Society** [3] - 267:25, 268:2, 283:3

**socket** [3] - 366:12, 385:2, 385:16

**sole** [2] - 286:12, 289:14

**someone** [11] - 227:4, 245:13, 266:6, 321:21, 321:25, 333:16, 347:4, 385:1, 395:9, 409:1

**Sometime** [3] - 253:8, 408:22, 417:1

**sometime** [1] - 350:2

**sometimes** [5] - 411:3, 429:4, 430:24

**Sometimes** [3] - 238:22, 263:1, 426:17

**Somewhat** [1] - 228:6

**somewhat** [1] - 257:6

**Somewhere** [1] - 442:14

**somewhere** [5] - 242:2, 425:5, 442:23, 443:1, 443:21

**soon** [6] - 232:20, 362:18, 363:6, 381:2, 441:5, 441:7

**sore** [2] - 323:12, 323:15

**Sorry** [7] - 224:5, 230:20, 234:9, 261:11, 310:4, 431:16, 434:18

**sorry** [14] - 231:2, 232:5, 259:15, 269:3, 341:19, 348:12, 368:12, 385:13, 387:10, 397:10, 419:16, 427:11, 430:1, 444:2

**sort** [9] - 238:20, 304:23, 305:20, 356:20, 390:15, 391:14, 422:14, 427:12, 427:17

**sought** [2] - 236:2, 251:24

**sound** [1] - 382:23

**sounds** [1] - 382:15

**source** [1] - 435:7

**South** [2] - 243:15, 297:24

**south** [7] - 386:14, 394:18, 441:8, 444:3, 444:4, 444:24

**southbound** [4] - 317:12, 360:4, 360:21, 361:5

**Southbound** [1] - 317:14

**southeast** [14] - 293:24, 294:6, 295:6, 296:15, 296:20, 296:23, 297:22, 370:13, 380:11, 380:15, 386:3, 404:10, 442:20, 444:19

**Southeast** [2] - 404:12, 444:21

**southern** [1] - 423:24

**southwest** [1] - 441:12

**space** [4] - 412:16, 432:6, 432:24, 433:1

**spare** [2] - 227:4, 393:22

**speaking** [4] - 332:16, 397:2, 433:3, 444:19

**Speaking** [1] - 297:7

**special** [1] - 416:1

**Special** [1] - 354:22

**specific** [8] - 238:2, 238:8, 256:1, 274:23, 275:7, 276:1, 309:22, 386:12

**specifically** [3] - 334:11, 335:17, 375:24

**Specifically** [1] - 354:13

**specified** [1] - 234:6

**sped** [1] - 361:16

**speed** [4] - 379:22, 395:19, 395:21,

400:10

**spell** [5] - 267:5, 292:19, 307:6, 353:9, 388:16

**spend** [2] - 405:8, 405:11

**spent** [1] - 329:2

**spotted** [5] - 421:19, 424:3, 424:4, 424:5, 424:6

**springing** [1] - 391:10

**Squad** [3] - 355:1, 389:12, 389:14

**squad** [1] - 391:8

**staff** [1] - 268:3

**stair** [1] - 383:2

**stand** [8] - 266:25, 306:25, 308:23, 316:3, 365:16, 367:2, 382:16, 388:17

**standing** [7] - 350:14, 350:19, 367:2, 399:14, 399:15, 403:17, 442:9

**stands** [4] - 393:20, 411:25, 412:1, 419:18

**start** [4] - 306:22, 375:9, 445:15

**started** [22] - 333:24, 349:4, 349:5, 360:1, 360:16, 360:19, 363:8, 363:10, 381:3, 381:4, 381:6, 381:24, 397:9, 397:17, 397:20, 397:21, 397:23, 398:17, 441:5, 441:23, 443:7

**starting** [4] - 258:8, 258:9, 347:8, 393:24

**state** [8] - 228:20, 267:5, 280:9, 292:19, 307:6, 353:9, 368:1, 388:15

**State** [3] - 267:21, 277:5, 283:6

**statement** [5] - 229:20, 238:1, 304:24, 334:19, 335:12

**statements** [8] - 255:11, 257:24, 258:1, 279:18, 279:23, 280:15, 305:8

**States** [1] - 307:22

**STATES** [2] - 222:1, 222:15

**states** [2] - 331:10, 334:23

**stating** [1] - 230:21

**station** [1] - 371:16

**stationary** [1] - 379:25

**statute** [4] - 276:24, 281:11, 287:13, 288:10

**statutory** [1] - 276:13

**stayed** [3] - 400:12, 403:12, 403:13

**staying** [2] - 235:25, 251:10

**stays** [1] - 396:18

**stench** [4] - 323:9, 349:16, 349:19

**stenography** [1] - 222:25

**step** [4] - 253:14, 300:6, 352:21, 388:7

**stepped** [4] - 316:16, 316:18, 316:24, 351:16

**steps** [1] - 353:1

**stiches** [2] - 225:7, 225:9

**stickers** [1] - 266:19

**still** [10] - 251:19, 361:2, 364:14, 370:8, 370:12, 396:24, 400:13, 400:14, 441:12, 442:1

**stipulate** [4] - 273:7, 273:9, 292:1, 292:9

**Stipulated** [1] - 248:24

**stipulating** [1] - 226:24

**stomach** [2] - 368:22, 384:19

**stood** [2] - 362:19, 368:15

**Stop** [5] - 233:4, 233:16, 320:11, 321:6, 383:16

stop [15] - 306:6, 313:12, 320:12, 322:4, 350:12, 359:5, 364:25, 429:17, 429:19, 429:21, 429:22, 429:24, 430:5, 431:6, 443:24

**stopped** [6] - 322:7, 322:17, 383:8, 399:1, 399:9, 444:11

**stopping** [3] - 331:23, 397:15, 429:25

**stops** [2] - 262:21, 264:2

**storage** [1] - 394:15

**stored** [1] - 414:1

**storm** [16] - 294:4, 294:14, 297:10, 297:16, 298:6, 298:8, 298:13, 298:21, 299:5, 385:25, 386:2, 386:5, 386:13, 404:7

**straight** [1] - 382:21

**street** [27] - 312:22, 313:7, 313:23, 314:15, 355:25, 357:24, 359:1, 362:22, 382:9, 383:20, 394:6, 394:8, 394:13, 414:5, 414:9, 424:16, 425:17, 425:18, 425:21, 426:10, 429:7, 443:17, 444:1, 444:2

**Street** [1] - 232:24

**Streets** [1] - 394:13

**strike** [18] - 266:18, 321:12, 321:15, 329:8, 333:1, 336:25, 363:17, 366:6, 366:10, 366:14, 366:18, 367:25, 375:22, 376:3, 376:9, 401:16, 401:18, 401:21

**strikes** [5] - 364:25, 366:12, 366:20, 367:7, 383:5

**striking** [3] - 337:8, 366:24, 368:5

**stroke** [1] - 363:13

**struck** [30] - 223:23, 249:4, 321:21, 321:25, 323:5, 327:14, 327:20, 327:23, 327:25, 328:5, 335:5, 337:2, 337:3, 337:5, 346:3, 364:19, 364:21, 365:2, 365:17, 365:21, 365:23, 367:3, 367:14, 375:25, 376:1, 383:13, 383:14, 384:13, 387:20, 387:23

**structure** [1] - 395:3

**struggle** [30] - 319:17, 321:3, 321:10, 322:23, 323:11, 329:4, 329:7, 329:10, 341:10, 362:22, 362:23, 363:5, 365:5, 366:4, 367:9, 375:24, 376:2, 376:5, 376:8, 382:8, 399:12, 399:13, 399:20, 399:24, 400:24, 401:1, 401:7, 403:3, 403:22

**struggled** [2] - 320:16, 366:22

**struggling** [5] - 320:10, 321:22, 322:1, 322:7, 336:21, 341:13, 341:17, 342:13, 350:22, 352:3, 444:8

**STUART** [1] - 222:18

**stuff** [2] - 406:12

**stuffed** [2] - 314:23, 324:13

**Stuy** [1] - 232:22

**subdue** [1] - 319:24

**subject** [2] - 242:17, 410:8

**subject's** [1] - 406:11

**subjected** [2] - 245:19, 280:2

**subjects** [1] - 400:8

**submitted** [8] - 301:11, 336:19,

348:23, 348:24, 3        408:24, 438:18, 439:2

**subpoena** [1] - 282:19

**subsection** [1] - 419:22

**subsequent** [2] - 270:11, 272:22

**subsequently** [2] - 278:9, 290:15

**subset** [1] - 391:4

**substance** [2] - 396:14, 397:14

**substitute** [1] - 302:2

**subway** [2] - 313:12, 359:5

**succession** [1] - 366:20

**suddenly** [1] - 361:18

**suffered** [1] - 251:20

**sufficient** [3] - 276:12, 288:20, 399:1

**SULLIVAN** [1] - 222:9

**Sullivan** [64] - 257:18, 264:6, 277:19, 286:16, 288:25, 304:8, 311:17, 312:2, 317:18, 320:3, 320:23, 321:2, 322:6, 332:13, 333:9, 343:16, 343:20, 344:4, 350:9, 350:16, 350:19, 350:23, 356:15, 358:6, 359:16, 359:25, 360:11, 361:9, 362:16, 362:19, 367:11, 370:8, 370:19, 372:12, 373:1, 374:13, 377:16, 377:20, 378:4, 381:25, 382:4, 386:16, 387:2, 388:9, 388:17, 388:21, 393:11, 421:15, 421:19, 423:4, 423:21, 424:13, 426:11, 426:21, 427:16, 428:16, 430:25, 431:6, 435:4, 436:2, 436:7, 437:2, 437:14, 438:11

**Sullivan's** [7] - 312:4, 356:23, 372:23, 379:5, 380:16, 380:18, 380:21

**sum** [4] - 377:4, 396:13, 397:13, 445:21

**summary** [2] - 270:9, 301:12

**summations** [1] - 445:10

**supervise** [1] - 355:4

**supervising** [1] - 356:13

**supervision** [2] - 373:15, 374:4

**supervisor** [7] - 305:18, 312:7, 355:20, 373:22, 373:25, 391:23, 409:20

**supervisors** [1] - 407:7

**Supp** [1] - 306:1

**support** [1] - 275:16

**supporting** [1] - 277:4

**suppose** [1] - 385:23

**suppressing** [1] - 355:25

**Surf** [2] - 250:23, 251:4

**surface** [1] - 367:18

**surrounding** [2] - 272:9, 337:11

**suspect** [6] - 342:13, 432:4, 433:13, 433:14, 433:21, 434:12

**suspicion** [8] - 346:10, 346:13, 346:22, 429:20, 430:7, 431:2, 431:7, 434:8

**sustain** [2] - 238:3, 344:15

**sustained** [10] - 224:12, 231:14, 237:24, 250:13, 257:13, 325:13, 325:20, 344:20, 369:9, 434:17

**Sustained** [12] - 228:16, 247:9, 290:3, 303:11, 334:10, 343:24, 431:11, 431:13, 431:25, 434:14, 434:16, 434:25

**Sutter** [1] - 310:1

**Swaine** [1] - 293:4

**swear** [4] - 267:1, 292:15, 304:24, 353:5

**Swear** [1] - 388:11

**swearing** [1] - 261:16

**sweat** [1] - 339:19

**swelling** [1] - 412:4

**Swimming** [1] - 384:4

**swing** [4] - 333:2, 385:10, 385:15, 385:21

**swollen** [1] - 311:24

**sworn** [5] - 258:3, 292:14, 307:2, 331:9, 353:3

**sworn/affirmed** [5] - 267:3, 292:17, 307:4, 353:7, 388:13

**synopsis** [1] - 419:2

**System** [2] - 260:7, 260:19

**system** [2] - 408:25, 409:2

# T

**table** [1] - 262:2

**tackled** [5] - 319:8, 319:9, 319:13, 346:23, 349:15

**tackler** [1] - 319:9

**tackling** [2] - 318:20, 322:13

**tampering** [1] - 409:12

**tape** [2] - 255:12, 264:2

**Tasha** [3] - 253:17, 264:16, 267:7

**Taxi** [1] - 355:1

**taxis** [1] - 355:2

**technician** [1] - 372:8

**technologically** [1] - 256:13

**temperature** [1] - 379:23

**temporary** [1] - 366:2

**ten** [8] - 247:12, 247:13, 306:16, 334:12, 334:23, 351:16, 354:10, 376:16

**tends** [1] - 364:12

**term** [1] - 393:24

**terminated** [1] - 280:7

**termination** [3] - 280:8, 280:11, 280:16

**terms** [3] - 245:9, 310:7, 387:1

**territory** [1] - 245:12

**test** [1] - 246:5

**testified** [44] - 237:18, 243:14, 246:6, 250:12, 252:1, 252:5, 267:4, 285:16, 316:15, 322:9, 327:22, 330:7, 336:21, 337:8, 337:11, 337:18, 337:23, 338:6, 339:1, 343:7, 343:19, 344:12, 344:24, 346:16, 346:22, 377:13, 378:24, 379:18, 380:6, 385:1, 385:5, 385:8, 388:14, 412:10, 422:5, 422:23, 423:7, 423:21, 430:10, 435:14, 436:7, 437:14, 440:5, 444:15

**testify** [4] - 265:5, 328:20, 375:3, 420:13

**testifying** [4] - 249:18, 268:12, 282:18, 282:25

**testimony** [76] - 245:7, 245:20, 246:1, 246:2, 246:4, 246:5, 248:12, 248:15, 249:10, 249:11, 249:24, 252:9, 252:11,

252:21, 253:20, 253:23, 254:1, 255:5,
255:20, 255:23, 256:2, 256:3, 257:13,
258:3, 258:6, 259:12, 265:10, 265:16,
278:18, 293:5, 301:16, 304:23, 305:24,
330:1, 330:16, 330:24, 331:14, 333:7,
333:12, 333:20, 334:4, 334:7, 334:21,
335:1, 335:8, 335:10, 336:24, 337:3,
337:5, 338:13, 340:8, 340:9, 340:14,
341:9, 341:15, 343:2, 343:5, 343:6,
343:23, 344:1, 345:17, 347:21, 348:6,
349:15, 349:18, 350:3, 350:8, 383:17,
384:23, 385:24, 386:1, 387:20, 426:21,
432:24, 441:14, 442:5

**tests** [3] - 374:1, 374:6, 374:7
**textbook** [1] - 368:11
**THE** [402] - 222:15, 223:1, 223:4,
223:10, 223:14, 226:19, 226:23, 227:2,
227:4, 227:7, 227:23, 227:24, 227:25,
228:1, 228:14, 228:16, 228:21, 228:23,
229:21, 229:23, 230:1, 230:3, 230:13,
231:24, 232:4, 233:1, 233:3, 233:4,
233:5, 233:6, 233:14, 233:15, 233:17,
234:1, 234:8, 234:10, 235:9, 235:11,
235:12, 235:13, 235:15, 235:17,
235:18, 235:19, 236:8, 236:10, 236:17,
236:19, 236:20, 236:22, 238:8, 238:13,
238:15, 238:16, 239:16, 239:19,
239:21, 240:5, 240:8, 240:9, 240:20,
240:23, 241:8, 241:10, 241:21, 242:14,
242:16, 242:17, 242:20, 245:6, 246:13,
246:25, 247:9, 247:20, 247:22, 249:1,
250:10, 253:11, 253:14, 253:19,
253:24, 254:2, 254:4, 255:2, 255:10,
255:16, 255:22, 256:5, 256:10, 256:14,
257:3, 257:8, 257:11, 257:19, 257:22,
258:13, 258:17, 258:19, 259:1, 259:4,
259:6, 259:10, 259:13, 259:17, 259:20,
260:1, 260:4, 260:8, 260:18, 260:21,
260:23, 261:2, 261:7, 261:9, 261:11,
261:23, 262:1, 262:4, 262:6, 262:12,
262:14, 262:17, 262:19, 262:25, 263:6,
264:3, 264:9, 264:11, 264:15, 264:18,
265:2, 265:9, 265:22, 266:6, 266:10,
266:12, 266:21, 266:23, 266:24,
266:25, 267:5, 267:7, 268:25, 269:2,
269:6, 269:8, 270:6, 270:8, 270:9,
270:14, 270:15, 270:19, 270:21,
270:24, 270:25, 271:2, 272:8, 272:12,
272:14, 272:25, 273:4, 273:11, 273:15,
273:18, 273:21, 274:2, 274:17, 274:18,
274:19, 274:20, 274:21, 274:23,
274:24, 275:1, 275:2, 278:13, 278:17,
278:18, 278:21, 279:10, 279:12,
279:14, 279:17, 279:21, 282:9, 288:1,
290:3, 291:8, 291:11, 291:13, 291:15,
291:20, 291:23, 292:4, 292:7, 292:11,
292:13, 292:16, 292:18, 292:20,
293:11, 293:18, 294:3, 294:5, 294:7,
294:8, 294:9, 294:12, 294:15, 294:24,
295:6, 295:9, 295:10, 295:11, 295:22,
296:4, 296:6, 296:9, 296:11, 296:17,
296:24, 297:1, 297:2, 297:3, 297:4,
297:5, 297:9, 297:19, 298:2, 298:4,

298:11, 298:13, 2         298:15,
298:17, 298:18, 298:22, 299:2, 299:5,
299:7, 299:19, 299:21, 299:22, 299:24,
300:1, 300:4, 300:6, 300:9, 300:14,
300:17, 300:19, 300:24, 301:2, 301:4,
301:9, 301:13, 301:17, 301:24, 302:2,
302:6, 302:11, 302:13, 302:23, 302:25,
303:2, 303:9, 303:11, 303:14, 303:17,
303:20, 304:7, 304:9, 304:12, 304:18,
304:25, 305:12, 305:14, 305:16,
305:19, 306:3, 306:7, 306:13, 306:16,
306:19, 307:1, 307:3, 307:5, 307:7,
307:11, 310:2, 310:4, 315:12, 315:14,
315:18, 316:2, 316:9, 326:3, 327:11,
329:15, 329:25, 332:20, 333:12,
333:14, 333:15, 334:10, 335:20, 340:4,
340:7, 342:12, 343:24, 344:7, 348:17,
349:3, 351:7, 351:10, 352:17, 352:20,
352:25, 353:2, 353:6, 353:8, 353:10,
365:20, 367:21, 367:23, 376:13,
376:19, 377:1, 377:4, 377:7, 382:18,
382:19, 385:19, 387:8, 387:10, 388:4,
388:7, 388:11, 388:15, 388:17, 393:7,
393:9, 393:22, 394:3, 394:4, 416:14,
417:20, 417:22, 419:11, 419:13,
419:15, 419:17, 419:19, 419:20,
419:21, 419:22, 421:10, 424:12, 425:2,
425:4, 425:7, 428:14, 431:5, 431:11,
431:13, 431:14, 431:15, 431:16,
431:22, 431:25, 434:14, 434:16,
434:18, 434:19, 434:25, 435:24, 436:1,
436:18, 436:23, 437:9, 437:11, 439:3,
439:7, 442:12, 442:17, 442:19, 442:25,
443:1, 443:3, 443:4, 443:23, 443:25,
444:21, 444:23, 444:24, 444:25, 445:1,
445:2, 445:7, 445:9, 445:19, 445:25

**themselves** [1] - 245:9
**thereby** [1] - 400:10
**Therefore** [1] - 281:14
**therefore** [4] - 251:4, 281:19, 289:6,
290:9
**thigh** [3] - 364:20, 387:21
**third** [6] - 232:23, 269:19, 277:22,
278:15, 326:20, 392:17
**Third** [1] - 409:14
**Thompson** [3] - 237:9, 238:24, 239:2
**threatening** [1] - 405:21
**three** [22] - 243:24, 253:7, 255:5,
265:24, 281:4, 281:13, 301:14, 305:16,
306:5, 308:20, 322:11, 356:16, 358:5,
364:25, 367:12, 400:23, 424:8, 424:9,
425:8, 427:12
**three-page** [1] - 301:14
**threw** [1] - 317:4
**Threw** [1] - 318:13
**throughout** [1] - 371:3
**throw** [6] - 324:6, 343:8, 370:4, 412:1,
440:9, 440:17
**thrown** [2] - 399:17, 440:15
**Thumb** [1] - 427:8
**thumb** [4] - 395:7, 423:19, 427:10,
427:11
**tinted** [5] - 356:22, 358:17, 378:24,

378:25, 379:1
**tip** [1] - 422:1
**tired** [1] - 368:17
**tissue** [1] - 224:25
**today** [26] - 237:22, 243:8, 252:14,
261:15, 282:23, 326:11, 330:16,
330:24, 333:20, 335:1, 335:8, 335:10,
338:18, 340:14, 341:9, 343:6, 344:24,
345:17, 346:10, 346:16, 346:22, 350:3,
356:12, 365:12, 388:23, 435:14
**together** [2] - 255:25, 445:19
**tomorrow** [3] - 377:4, 445:11, 445:24
**Took** [1] - 322:11
**took** [17] - 228:24, 229:3, 230:25,
231:3, 240:10, 240:13, 243:3, 250:18,
251:18, 260:12, 349:11, 349:12, 363:8,
367:12, 368:16, 370:16, 383:10
**top** [8] - 275:4, 319:17, 319:20,
340:22, 340:23, 412:8, 432:6
**total** [1] - 405:8
**touch** [1] - 442:12
**tough** [1] - 402:18
**tour** [3] - 356:16, 357:6, 394:2
**toward** [2] - 240:2, 295:24
**towards** [6] - 404:10, 424:18, 425:1,
425:21, 443:2, 444:12
**TPO** [2] - 411:25, 418:1
**track** [2] - 274:25, 439:9
**traffic** [5] - 312:25, 313:1, 313:2,
337:14, 360:2
**trained** [1] - 374:13
**training** [5] - 331:11, 374:9, 430:25,
431:1, 434:9
**TRANSCRIPT** [1] - 222:14
**transcript** [13] - 222:25, 226:24, 242:8,
249:11, 256:10, 272:22, 279:4, 279:5,
281:4, 303:7, 345:3, 347:6
**transcripts** [2] - 265:23, 266:19
**transfer** [1] - 324:14
**translate** [1] - 393:15
**transpired** [1] - 419:3
**transpiring** [1] - 381:21
**transport** [2] - 373:13, 407:14
**transported** [2] - 342:22, 373:20
**transporting** [1] - 373:16
**traveling** [5] - 312:22, 357:24, 358:1,
394:6, 395:16
**treacherous** [1] - 245:12
**treading** [1] - 265:19
**treated** [6] - 231:13, 231:21, 234:16,
235:4, 235:7, 246:6
**treatment** [22] - 235:1, 243:15, 244:11,
244:16, 244:21, 244:25, 246:7, 246:9,
248:9, 325:2, 325:19, 325:22, 345:6,
345:11, 345:12, 345:13, 345:15,
345:17, 345:18, 345:19, 345:21, 369:22
**trial** [4] - 258:24, 281:15, 287:2,
376:19
**TRIAL** [1] - 222:14
**tried** [5] - 320:6, 320:19, 367:6,
367:16, 386:10
**trouble** [4] - 250:5, 250:6, 250:7, 427:6

**26**

**trucks** [2] - 424:21, 425:5
**true** [9] - 228:17, 230:24, 239:10, 239:12, 277:7, 287:21, 385:10, 385:15, 438:16
**truth** [1] - 266:15
**truthful** [2] - 410:18, 411:11
**truthfulness** [1] - 343:25
**try** [6] - 246:17, 265:7, 320:4, 431:17, 435:22, 436:1
**trying** [10] - 235:9, 362:2, 363:2, 367:6, 367:10, 367:11, 383:10, 400:8, 401:13, 402:1
**tuned** [1] - 371:9
**turn** [13] - 275:3, 277:20, 334:5, 334:13, 334:17, 334:24, 359:25, 361:5, 367:6, 411:22, 418:10, 432:21, 441:16
**turned** [10] - 317:21, 318:6, 318:16, 368:22, 369:2, 369:10, 381:11, 384:21, 428:11, 443:10
**turning** [5] - 381:12, 381:13, 441:14, 443:11, 443:18
**Turning** [1] - 308:11
**twenty** [2] - 253:17, 357:20
**Twenty** [1] - 353:22
**Twenty-two** [1] - 353:22
**twice** [3] - 364:20, 366:3, 387:23
**Twice** [1] - 387:25
**two** [49] - 240:11, 240:14, 249:8, 251:5, 251:23, 253:7, 257:17, 261:4, 262:2, 302:5, 305:4, 310:22, 312:25, 320:2, 320:20, 320:22, 322:10, 325:18, 327:3, 327:12, 330:16, 330:25, 332:22, 366:20, 368:6, 370:12, 370:16, 372:9, 372:20, 386:13, 387:5, 394:8, 394:9, 399:23, 400:23, 412:1, 412:9, 412:14, 412:16, 415:19, 422:24, 424:8, 425:5, 444:18
**Two** [3] - 313:2, 314:12, 324:13
**two-millimeter** [1] - 363:23
**two-way** [3] - 312:25, 394:8, 394:9
**Two-way** [1] - 313:2
**type** [13] - 235:20, 236:2, 308:3, 314:23, 336:7, 342:9, 404:4, 411:16, 433:6, 433:19, 433:23, 435:1, 436:9
**Type** [1] - 410:5
**typed** [1] - 413:6
**types** [1] - 436:12
**typewriter** [2] - 413:6, 413:9
**typical** [1] - 362:1
**Typically** [2] - 357:5, 368:9
**typically** [1] - 391:7
**typing** [2] - 413:5, 413:9

# U

**U-1** [3] - 232:12, 233:23, 447:24
**U-2** [3] - 234:21, 236:7, 447:25
**U-turn** [1] - 359:25
**U.S** [1] - 222:7
**ultimately** [2] - 286:19, 414:21
**uncertain** [1] - 400:14

**uncommon** [1] -
**Under** [1] - 411:16
**under** [22] - 232:2, 234:5, 281:11, 282:2, 287:8, 320:5, 327:5, 336:5, 373:15, 374:4, 384:21, 389:6, 393:25, 394:3, 395:22, 400:14, 403:2, 409:10, 410:3, 410:19, 412:21
**underlying** [2] - 336:17, 349:13
**underneath** [1] - 327:4, 341:11, 369:4, 384:2, 384:20
**Understood** [2] - 246:20, 294:15
**unfortunately** [3] - 386:24, 429:3, 430:2
**uniform** [4] - 339:13, 390:17, 395:3, 423:20
**unit** [6] - 309:14, 309:17, 310:14, 355:17, 355:19, 390:2
**Unit** [5] - 309:20, 355:18, 355:23, 355:24, 390:4
**United** [1] - 307:22
**UNITED** [2] - 222:1, 222:15
**units** [1] - 356:6
**unknown** [1] - 435:7
**unless** [1] - 282:3
**unmarked** [4] - 311:15, 337:16, 356:21, 391:18
**Unmarked** [1] - 391:19
**unobjectionable** [1] - 246:7
**unreasonable** [1] - 306:6
**up** [84] - 232:23, 235:21, 243:11, 248:20, 254:4, 266:25, 271:2, 279:14, 290:15, 298:6, 298:11, 306:7, 307:1, 316:3, 323:1, 325:19, 327:17, 335:22, 336:5, 344:24, 345:11, 345:20, 346:5, 346:7, 349:18, 358:10, 361:14, 361:19, 362:19, 363:3, 364:14, 365:16, 367:5, 368:15, 368:23, 369:10, 370:20, 370:21, 370:23, 373:10, 377:4, 380:7, 382:16, 383:9, 384:22, 386:19, 391:10, 396:6, 399:14, 399:15, 400:7, 400:17, 400:22, 400:24, 402:9, 403:17, 408:4, 410:1, 413:9, 413:12, 414:6, 422:13, 424:10, 425:1, 425:19, 427:12, 427:13, 431:20, 432:9, 432:11, 433:5, 433:8, 433:10, 436:6, 436:9, 437:1, 437:6, 438:20, 440:12, 443:20, 444:6, 445:4, 445:21
**usable** [1] - 345:14
**useful** [1] - 246:14

# V

**vacated** [1] - 277:24
**Valdes** [3] - 298:17, 421:11, 421:18
**VALDES** [26] - 222:19, 300:12, 300:21, 301:1, 301:6, 301:11, 301:20, 302:5, 302:7, 302:17, 302:20, 302:24, 303:4, 421:12, 421:14, 424:10, 431:17, 436:22, 437:1, 437:10, 437:13, 439:6, 440:2, 442:3, 445:8, 446:25
**valid** [1] - 276:11
**vantage** [1] - 296:2

**variation** [1] - 255:8
**varies** [1] - 426:15
**various** [1] - 292:5
**vary** [1] - 426:16
**vehicle** [58] - 311:15, 312:6, 312:9, 312:12, 314:18, 315:7, 315:10, 317:13, 317:17, 317:19, 331:7, 334:13, 334:24, 351:17, 351:24, 356:20, 356:24, 357:10, 357:11, 358:3, 358:13, 358:17, 359:25, 361:2, 378:25, 379:22, 381:22, 382:10, 391:12, 391:13, 391:17, 391:18, 391:19, 392:3, 393:23, 394:16, 395:16, 396:3, 396:25, 397:5, 397:6, 397:9, 397:10, 397:17, 397:18, 397:22, 398:13, 398:14, 398:15, 399:2, 399:22, 400:3, 400:5, 400:9, 401:5, 401:11, 401:25, 443:16
**venture** [1] - 289:7
**verdict** [3] - 305:1, 305:20
**verify** [1] - 349:12
**versus** [1] - 306:1
**vest** [1] - 390:20
**Vice** [2] - 308:22, 309:1
**vicinity** [20] - 312:14, 312:17, 312:23, 313:4, 313:9, 313:12, 313:15, 357:15, 357:19, 357:25, 358:20, 359:8, 362:9, 386:15, 386:17, 392:5, 392:11, 394:5, 394:11, 394:17
**Video** [5] - 262:13, 262:16, 262:21, 263:5, 263:8, 264:1, 264:2
**video** [2] - 262:23, 263:2
**videos** [3] - 257:6, 258:12, 258:25
**videotape** [1] - 256:9
**videotaped** [1] - 258:5
**view** [9] - 245:10, 330:12, 347:9, 347:11, 347:17, 428:24, 429:15, 430:4, 435:20
**violated** [7] - 278:6, 278:9, 289:9, 289:16, 291:3, 432:19, 433:15
**violating** [1] - 289:25
**violation** [3] - 251:1, 278:19, 290:25
**Violence** [1] - 285:4
**violent** [6] - 309:22, 355:25, 390:13, 391:5, 399:12, 399:20
**virtue** [1] - 265:17
**visible** [1] - 339:6
**vision** [4] - 350:25, 351:1, 351:4, 386:8
**visited** [1] - 234:25
**visual** [1] - 378:8
**visually** [1] - 331:19
**volume** [3] - 387:1, 387:11, 387:17
**voucher** [7] - 373:7, 406:4, 414:22, 415:1, 415:12, 415:19, 416:5
**vouchered** [1] - 324:7, 379:14, 412:19
**vouchering** [2] - 415:23, 415:24
**vouchers** [2] - 412:22, 430:17

# W

**waist** [10] - 317:22, 319:10, 361:21, 361:23, 362:11, 380:8, 380:20, 381:2, 381:8, 381:23

**waistband** [3] - 317:24, 318:5, 361:15
**Wait** [2] - 233:15, 427:21
**wait** [5] - 223:4, 253:21, 261:18, 429:13, 434:17
**waiting** [5] - 243:21, 243:23, 243:25, 259:2, 261:16
**waive** [1] - 265:21
**walk** [1] - 295:2
**walking** [8] - 313:23, 314:13, 360:4, 360:7, 360:8, 423:24, 424:24, 426:1
**wall** [3] - 334:6, 334:14, 334:25
**wallet** [2] - 422:14, 422:21
**wants** [1] - 266:6
**warehouses** [1] - 394:14
**warrant** [5] - 277:24, 290:12, 290:14, 290:17, 290:19
**weapon** [7] - 309:24, 318:22, 319:11, 362:2, 363:23, 363:24, 403:5
**weapons** [3] - 362:8, 402:24
**wear** [8] - 338:21, 339:20, 426:11, 426:13, 426:15, 426:16, 426:20
**wearing** [21] - 310:9, 310:13, 310:15, 310:18, 310:23, 337:18, 337:24, 337:25, 338:3, 338:5, 338:14, 338:20, 338:23, 338:24, 339:11, 356:3, 356:4, 356:7, 390:14, 390:24, 426:17
**weed** [1] - 430:2
**week** [1] - 242:13, 393:16
**weight** [2] - 294:15, 294:24
**well-lit** [1] - 358:25
**Wesson** [1] - 318:23
**west** [10] - 295:18, 295:21, 295:24, 359:6, 398:4, 398:7, 428:11, 441:10, 441:12, 443:5
**westbound** [3] - 360:1, 396:5, 423:22
**westward** [1] - 424:14
**whatsoever** [1] - 290:5
**whole** [2] - 368:4, 378:7
**Wilkinson** [1] - 306:1
**William** [3] - 237:9, 238:24, 239:2
**Williams** [65] - 293:24, 295:7, 295:10, 295:25, 296:15, 296:20, 296:22, 296:23, 297:11, 297:13, 297:15, 297:21, 297:23, 298:7, 299:15, 312:14, 312:18, 312:23, 313:4, 313:10, 313:13, 317:12, 317:14, 322:14, 337:12, 357:15, 358:2, 358:20, 359:3, 359:24, 360:5, 360:22, 361:6, 362:20, 364:15, 380:12, 381:11, 381:12, 381:13, 386:3, 386:5, 386:15, 392:6, 392:8, 392:12, 393:25, 394:5, 394:11, 394:17, 398:4, 398:24, 398:25, 404:10, 404:12, 404:13, 424:16, 424:18, 441:8, 441:15, 442:6, 443:10, 443:11, 443:18, 444:19
**willing** [1] - 292:1
**wind** [1] - 379:25
**windbreaker** [1] - 310:21
**window** [30] - 313:25, 314:1, 358:4, 358:6, 358:10, 358:17, 360:11, 378:18, 378:19, 378:20, 378:21, 378:22, 378:24, 379:1, 379:5, 379:16, 379:19, 379:20, 380:3, 380:16, 380:18, 380:21, 396:7, 396:8, 396:10, 396:15, 396:17,

396:18, 423:13, 4
**windows** [10] - 356:22, 358:3, 358:10, 358:11, 358:13, 358:17, 358:18, 378:25, 379:10, 380:17
**Withdrawn** [2] - 261:8, 368:12
**withdrawn** [3] - 242:22, 247:15, 397:10
**withdrew** [2] - 318:11, 318:16
**withheld** [1] - 272:2
**Witness** [2] - 291:14, 300:8
**witness** [35] - 236:23, 246:5, 253:15, 253:16, 264:15, 265:4, 267:1, 269:18, 272:8, 278:23, 282:10, 282:21, 284:8, 291:15, 292:11, 292:14, 292:15, 292:17, 293:17, 294:21, 299:10, 306:23, 307:2, 307:4, 329:22, 343:25, 352:22, 353:3, 353:5, 353:7, 367:2, 388:8, 388:11, 416:13, 419:15
**WITNESS** [67] - 227:24, 228:1, 228:23, 229:23, 233:3, 233:5, 233:14, 233:17, 235:11, 235:13, 235:17, 235:19, 236:19, 236:22, 238:15, 239:21, 240:8, 241:10, 242:16, 266:24, 267:7, 270:9, 270:15, 270:21, 270:25, 274:18, 274:20, 274:23, 275:1, 278:17, 278:21, 291:13, 292:20, 294:5, 294:8, 295:6, 295:10, 297:2, 297:4, 298:14, 298:17, 298:22, 299:5, 299:21, 307:7, 310:4, 333:14, 353:10, 382:18, 387:10, 388:17, 394:4, 419:17, 419:20, 419:22, 425:4, 431:14, 431:16, 434:18, 436:1, 442:19, 443:1, 443:4, 443:25, 444:23, 444:25, 445:2
**witnesses** [3] - 255:14, 279:19, 291:17
**wood** [1] - 383:1
**Woods** [5] - 277:17, 305:6, 332:16, 333:5, 438:4
**word** [3] - 301:25, 359:18, 397:11
**words** [6] - 359:18, 360:20, 368:25, 373:22, 374:8, 386:8
**wordsmith** [1] - 433:2
**worker** [3] - 244:2, 244:8, 244:10
**worksheet** [3] - 416:19, 416:20, 416:23
**worse** [1] - 250:7
**worth** [1] - 261:17
**wound** [10] - 224:12, 224:18, 224:24, 225:12, 237:24, 238:3, 248:12, 248:16, 369:12, 383:25
**wrap** [1] - 370:23
**wrapped** [1] - 314:22
**Wrist** [1] - 323:16
**wrist** [18] - 311:24, 323:17, 323:18, 324:20, 325:3, 339:20, 344:12, 344:15, 344:18, 345:7, 345:14, 345:16, 345:19, 345:20, 345:21, 368:23, 369:1, 402:13
**write** [7] - 285:19, 286:1, 324:20, 326:18, 328:7, 357:7, 432:13
**writing** [1] - 392:25
**written** [4] - 232:2, 285:22, 393:14
**wrote** [1] - 326:16
**ws** [1] - 305:14

**X**

27

**X-2** [1] - 228:4
**X-3** [3] - 302:9, 302:17, 448:1
**X-ray** [1] - 372:8
**x-ray** [1] - 325:3
**x-rays** [1] - 235:23

**Y**

**year** [8] - 228:24, 229:3, 229:7, 251:5, 261:13, 297:3, 338:11
**years** [13] - 231:10, 267:17, 267:18, 268:6, 304:21, 307:20, 307:24, 308:20, 353:22, 354:10, 354:19, 389:6, 428:10
**yelled** [1] - 365:1
**yellow** [3] - 360:3, 396:5, 396:6
**yesterday** [7] - 223:21, 243:14, 245:7, 249:3, 301:22, 301:24, 302:3
**yo** [1] - 360:12
**YORK** [1] - 222:1
**York** [25] - 222:8, 267:21, 277:5, 283:6, 286:22, 289:18, 307:17, 307:18, 310:1, 311:2, 311:13, 312:15, 338:8, 353:19, 353:20, 353:23, 355:15, 357:16, 366:13, 389:3, 389:4, 390:10, 393:3, 417:5, 417:14
**yourself** [10] - 232:2, 243:25, 284:19, 287:14, 316:19, 316:21, 320:17, 333:23, 351:23, 378:11

**Z**

**zip** [1] - 413:11
**Ziploc** [2] - 387:14, 404:5
**zips** [1] - 260:25