UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
DWAYNE KINTE ROBERTSON,

                                        *Plaintiff*,

                                                        MEMORANDUM AND
                -against-                                ORDER
                                                        07-CV-1416
OFFICER MATTHEW SULLIVAN, Shield #29723;
OFFICER NILES PRINCE, Shield #22353, and
SERGEANT DIMITRI DEGLAS, Shield #01647,

                                        *Defendants*.
------------------------------------------------------------------x
A P P E A R A N C E S :


        CRAVATH, SWAINE & MOORE LLP
        835 Eighth Avenue
        New York, New York 10019
        By:     Stuart W. Gold
                Jessica Holloway
                Hector J. Valdes
        *Attorneys for Plaintiff*

        NEW YORK CITY LAW DEPARTMENT
        Office of the Corporation Counsel
        Special Federal Litigation Division
        100 Church Street
        New York, NY 10007
        By:     Jeffrey C. Brooks
                Gabriel P. Harvis
        *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

                This simple case arose out of a routine street encounter between a citizen and the

police.  It occurred late at night in an industrial neighborhood, so there was no one around other

than the plaintiff, Dwayne Kinte Robertson, and the three defendants, Detectives Niles Prince

and Matthew Sullivan and Sergeant Dimitri Deglas.  Robertson said the three officers pulled up

beside him in their unmarked car and wanted to speak to him.  He declined, saying "No thanks,

I'm good," and kept walking. According to Robertson, the officers asked again, more insistent this time, and he again declined. The officers did not take kindly to that response, Robertson testified. One of them, Detective Prince, got out of the car, annoyed, and in a threatening manner ordered Robertson to stop. Robertson took off instead, causing Prince to chase him on foot and the others to follow in the car. Prince finally tackled Robertson and subdued him. While Robertson was still on the ground, handcuffed behind his back, Deglas approached him, flicked open his extendable baton and cracked Robertson across the forehead with the baton, opening up a cut above the left eyebrow that bled profusely. Robertson, who had been arrested many times before, asked Deglas if the baton blow was really called for, being that he was already handcuffed and on the ground. According to Robertson, Deglas responded, "Oh, come on, you caused my boys to run. Now you're leaking," referring to the blood. To camouflage their illegal stop and unlawful use of force, Robertson testified, the officers fabricated a case against him, claiming they had seen (and smelled) him with marijuana and charging him with resisting arrest. Those charges died on the vine in the state court, essentially abandoned by the prosecutor.

For their part, the defendant officers gave testimony that, if believed, would have established that there was reasonable suspicion to stop Robertson to investigate whether he possessed marijuana, that there was probable cause to arrest Robertson for possessing marijuana, and that Deglas's baton was used only to strike the back of Robertson's legs to subdue him when he resisted arrest. The jury did not believe the officers' testimony, no doubt because it was rife with inconsistencies and anomalies. The jury found that the initial stop before the chase was unlawful (that is, was unsupported by even a suspicion of criminal activity), that the ensuing arrest was not supported by probable cause, that Robertson was hit in the forehead with a baton after he was subdued and in handcuffs, that the officers initiated a malicious prosecution of

Robertson to camouflage their own misbehavior, and that they acted with sufficient malice and indifference to his constitutional rights to warrant punitive relief in addition to compensatory relief. Specifically, the jury awarded Robertson $5,000 in compensatory damages and $50,000 in punitive damages.

The defendants now move for judgment as a matter of law or, in the alternative, for a new trial. For the reasons set forth below, the motion is denied.

DISCUSSION

A.      *The Defendants' Motion for Judgment as a Matter of Law*

The defendants argue that, as a matter of law, they are entitled to qualified immunity on all of Robertson's claims. A police officer sued under § 1983 is entitled to qualified immunity if (a) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) even if the law and the scope of the defendant's permissible conduct were both clearly established, it was nonetheless objectively reasonable for the officer to believe (albeit incorrectly) that his actions were lawful. *Taravella v. Town of Wolcott*, 599 F.3d 129, 133-35 (2d Cir. 2010).

Whether an officer is entitled to qualified immunity is a question for the court, not the jury, and the defendants do not contend otherwise. *See* Tr. 470 (Defense Counsel: "[Q]ualified immunity should be reserved for the court to decide after the jury returns with the facts decided."). If the material historical facts are in dispute, as was the case here, the qualified immunity decision can be made only after a jury has resolved the disputed facts. *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007).

Though the reasonableness inquiry at the heart of the qualified immunity analysis is distinct from the reasonableness inquiry under the Fourth Amendment,[1] they frequently coalesce. In other words, where there is a stark factual dispute about what happened, the merits of the a plaintiff's Fourth Amendment claim and the defendant's claim of qualified immunity can both ride on whether the jury believes the plaintiff or the defendant.

That was the case here. As defense counsel put it during his summation, Robertson was "asking [the jury] to believe his word over the word of these three police officers." Tr. 519. Thus, with regard to Robertson's claim that the initial stop was an unlawful seizure, the jury needed to credit either Robertson's testimony that he was doing nothing wrong and was stopped solely because he declined to speak to the police or the defendants' claim "that they had a reasonable suspicion that Mr. Robertson was smoking a marijuana cigarette at the time they initially stopped him." Tr. 545 (jury charge). The jury rejected the defendants' testimony. *See* Verdict Sheet (Claim 1). Since the reasonableness of their conduct – both under the Fourth Amendment and for the purposes of qualified immunity – depended on the truth of

---

[1] The Second Circuit explained the distinction as follows in *Oliveira v. Mayer*, 23 F.3d 642 (2d Cir. 1994):

> [W]e have been authoritatively instructed that the objective reasonableness component of the inquiry as to lawfulness is not the same as the objective reasonableness component of the inquiry as to qualified immunity. In *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Court considered and rejected the contention that it is not possible to say that "one 'reasonably' acted unreasonably." *Id.* at 643, 107 S.Ct. at 3041. The Court invoked its prior precedent of *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), *see Anderson,* 483 U.S. at 643, 107 S.Ct. at 3041, and also argued that the reasonableness component of the lawfulness standard could as well be served by a concept that avoided the word "reasonable" and instead used the word "undue." *Id.* The result of the distinction between reasonableness as a component of a Fourth Amendment violation and reasonableness as a component of an immunity defense is that an officer is protected in some circumstances even when he "mistakenly conclude[s] that probable cause is present," *id.* at 641, 107 S.Ct. at 3039-40, *i.e.,* when he reasonably believes that a reasonably prudent police officer would have acted even though a reasonably prudent police officer would not have acted.

*Id.* at 648-49 (footnote omitted).

their claim that they saw (or smelled) Robertson smoking marijuana, the verdict defeats the defendants' claim of qualified immunity.

Similarly, the defendants' qualified immunity defense with regard to the false arrest and malicious prosecution claims, like their Fourth Amendment positions on those subjects, depended on their factual claims that (a) they had at least a reasonable suspicion that Robertson was in possession of marijuana, and when they sought to investigate he bolted; or (b) they actually observed (or smelled) him smoking marijuana, giving them probable cause to arrest. Tr. 546 (jury charge). The jury's verdicts rejected those claims. *See* Verdict Sheet (Claim 2). No reasonable officer could believe that the arrest was lawful in the absence of even a suspicion of criminal activity, and thus the defendants are not entitled to qualified immunity.

Robertson's constitutional claim regarding excessive force depended on the jury believing his testimony that he was struck in the forehead with a baton while handcuffed (in retaliation for making the officers run) over the defendants' claims that he was stuck only on the back of the legs while resisting arrest. Once the jury accepted Robertson's testimony, the qualified immunity defense was extinguished as well, for their claim of objectively reasonable behavior depended on the truth of the testimony the jury rejected. [2]

Before trial and throughout the trial itself, at least until the jury returned its verdicts, the defendants were in agreement with the foregoing view that, in the circumstances of this case, the merits of the § 1983 claims and the defense of qualified immunity coalesced, that is, they depended on the same findings by the jury. At the oral argument on the defense motion

---

[2]     Though it is cast as a qualified immunity argument, the claim by Prince and Sullivan that they had no reasonable opportunity to intervene is simply a sufficiency claim. In order to find those defendants liable for the excessive force, the jury had to conclude, *inter alia*, that each one "had a realistic opportunity to intervene" before Deglas assaulted Robertson. Tr. 553 (jury charge). There was evidence from which the jury could infer that Detectives Prince and Sullivan (a) were with Robertson, having just effected his arrest; (b) were notified by visual and aural means that Deglas had deployed his collapsible baton (even though Robertson was already subdued and in handcuffs); and (c) chose not to say or do anything to stop Deglas from inflicting punishment on Robertson for making them run.

for summary judgment, I expressed my view that "the qualified immunity argument collapses with the merits," and defense counsel agreed.  10/2/09 Oral Arg. Tr. at 11.  I also observed at that time that there could be some factual "nuances" bearing on the qualified immunity defense about which additional jury findings might also be necessary, envisioning the possibility of obtaining both general verdicts from the jury as well as answers to written interrogatories.  *See* Fed. R. Civ. P. 49(b).[3]  No such need occurred to me at trial, and none was brought to my attention by the parties before the summations, the jury instructions and the announcement of the jury's verdicts.

After those verdicts were announced, defense counsel approached the sidebar and asked, for the first time, that I submit to the jury *forty-six* written special interrogatories set forth in a seven-page document.  My denial of this unorthodox request is one basis of the defendants' motion for a new trial.  The argument is both procedurally deficient and meritless.

The procedural deficiency arises from the nature and timing of the request for interrogatories.  The questions defendants wanted me to submit to the jury were not framed to provide some targeted additional findings of fact that might bear on the issue of qualified immunity.  Rather, the proposed interrogatories sought jury verdicts on virtually every factual issue in the case (many of which had already been necessarily decided against the defendants).  The request is thus more properly evaluated under the provisions of Rule 49 that govern the little-used method of obtaining only special verdicts from the jury in lieu of general verdicts.  *See* Fed. Rule Civ. P 49(a).[4]  Obviously, a request for such a procedure is defaulted if it is made only

---

[3]      Rule 49(b) reads in pertinent part:  "The court may submit to the jury forms for a general verdict, together with written questions on one or more issues of fact that the jury must decide.  The court must give the instructions and explanations necessary to enable the jury to render a general verdict and answer the questions in writing, and must direct the jury to do both."

[4]      Rule 49(a) reads in pertinent part:  "The court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact … A party waives the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted to the jury unless, before the jury retires, the party demands its submission to the jury."

after general verdicts have already been returned, as was the case here. And under the express terms of Rule 49(a)(3) any special verdicts not requested by a party before the jury retires to deliberate are waived.

Even if the requested interrogatories could properly be viewed as a request for written questions under Rule 49(b), the request was untimely. "The district judge's decision to use interrogatories along with a general verdict, and which interrogatories to submit, ordinarily should be made well before the case is submitted to the jury so that the parties can react to the court's decision." 9B C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2512 at 194 (3d ed. 2008). Advocates deserve the chance to tailor their summations to the specific questions the jury will be asked to answer. Judges, taking into account the difficulties juries can experience in reaching unanimous verdicts on numerous discrete and intermediate factual disputes, *id.* at § 2505 at 116, need to consider limits on the number of interrogatories to be posed to the jury and to ensure that each question is carefully crafted so the jury's answers actually provide the needed findings. None of this can happen when a lawyer shows up at sidebar -- post-summation and post-verdict -- with seven pages of questions that could easily have been discussed earlier in the proceedings.

As for the merits of the requested interrogatories, counsel offered no explanation as to how they would fill a need with respect to determining the availability of the qualified immunity defense that the factfindings inherent in the jury's general verdicts did not also fill. And many of the questions asked for findings that would have been irreconcilable with the verdicts just announced. In sum, putting aside its untimeliness, the defendants' request that I submit interrogatories to the jury was denied because it was part of a defense strategy to hope for

favorable general verdicts based on an aggressive attack on the plaintiff's credibility,[5] and, failing that, to have the jury not only revisit the factual issues it already decided in rendering those verdict but several dozen others as well. There would have been little fairness in allowing that to happen, and the defendants' request that they deserve a new trial because it did not happen is therefore denied.

Finally with respect to the qualified immunity issue, the jury's award of punitive damages makes the defendants' claims seem especially hollow. The jury exercised its authority to award not only compensatory damages but punitive damages as well -- on each defendant. It could do so only upon a finding that each defendant acted "maliciously or wantonly, that is, if [the defendant] was prompted by ill will or spite toward the plaintiff or [acted with] a reckless or reckless or callous disregard or indifference to the plaintiffs' rights." Tr. 555 (jury charge) The jury having found that each defendant deserved to be punished for engaging in such behavior, it is difficult to fathom the defendants' post-verdict claim that I should find them immune on the ground that acted in an objectively reasonable manner.

B.      *The Remaining New Trial Claims*

In addition to the new trial claim addressed and rejected above, the defendants seek a new trial on other grounds that have no merit and warrant little discussion. The claim that the jury's verdicts were against the weight of the evidence mostly reiterates factual assertions the jury rejected, no doubt, as mentioned above, because the defendants' testimony was riddled with inconsistencies and anomalies. Juries are entitled to believe plaintiffs, even ones with significant criminal histories and histories of substance abuse, and this jury believed Robertson. I acknowledge my authority under Fed. R. Civ. P. 59 to weigh the evidence myself and to grant a

---

[5]      The cross-examination of Robertson included virtually no questions about his encounter with the officers on April 14-15, 2006.

new trial where appropriate.  I also acknowledge that though my authority to grant such relief is clear, "[t]he standard that is to control in passing on motions of this kind is not."  11 C. Wright & A. Miller, Federal Practice and Procedure:  Civil § 2806 at 63 (2d ed. 1998).  But I have no doubt in this setting that it would be inappropriate to set aside the jury's verdicts.

The defendants argue that a new trial is warranted because I erroneously admitted the testimony of Tasha Ricks, the defense attorney in the criminal case the defendants initiated against Robertson.  The argument is procedurally defaulted and without merit.  The defendants not only failed to object to a good deal of the challenged testimony, they actually elicited that testimony themselves.  In any event, Ricks's testimony was both admissible and directly relevant to an issue the defendants elected to dispute, that is, whether the criminal case was terminated in a manner favorable to Robertson.

C.      *The Challenge to the Punitive Damage Award*

The defendants seek a new trial on punitive damages or, in the alternative, remittitur.  They argue the punitive damages award was excessive.  I disagree.

A jury may award punitive damages in a § 1983 action "when the defendant[s'] conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Lee v. Edwards,* 101 F.3d 805, 808 (2d Cir. 1996)(quoting *Smith v. Wade,* 461 U.S. 30, 56 (1983)).  Punitive damages are awarded to punish the defendants' unlawful conduct and deter any repetition of such conduct.  *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 568 (1996).

If the punitive damages awarded by the jury are "so high as to shock the judicial conscience and constitute a denial of justice," a district court may refuse to uphold the jury's award.  *Hughes v. Patrolmen's Benevolent Ass'n of New York, Inc.*, 850 F.2d 876, 883 (2d Cir.

1988).  In such a situation, the court "may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount."  *Tingley Sys., Inc. v. Norse Sys., Inc.,* 49 F.3d 93, 96 (2d Cir. 1995).

The Supreme Court has identified three "guideposts" a court should consider when evaluating whether a punitive damage award is excessive:  (1) the reprehensibility of the defendants' conduct; (2) the disparity between the award and the harm or potential harm to the plaintiff; and (3) the comparable civil and criminal penalties available for the defendants' conduct.  *Gore,* 517 U.S. at 575.

1.      *Reprehensibility*

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant[s'] conduct."  *Id.* at 575.  There are three "aggravating factors" that are linked to reprehensible conduct.  *Id.* at 576-77.  The first is whether the defendants' conduct was violent.  Here, the jury found that Deglas assaulted Robertson with his baton and that Prince and Sullivan could have intervened but did not.  The second aggravating factor is whether the defendants acted with malice or deceit, and the jury's verdict for Robertson on his malicious prosecution claim necessarily established that the defendants acted with malice.  The third factor is whether the defendants' have engaged in repeated acts of misconduct and admittedly no such evidence was presented at the trial, but on the whole the reprehensibility guidepost supports a substantial punitive damage award.

2.      *Disparity Between the Award and the Harm or Potential Harm*

The second *Gore* factor is the disparity between the punitive damages award and the harm or potential harm inflicted on the plaintiff.  The jury awarded Robertson $5,000 in

compensatory damages and $50,000 in punitive damages. The defendants argue that the plaintiff's injuries cannot justify the punitive damages award. They argue that the 10:1 ratio between compensatory and punitive damages demonstrates a vast disparity between the award and the injuries actually inflicted on Robertson. I disagree.

The Second Circuit has repeatedly held that "the use of a multiplier to assess punitive damages is not the best tool" in determining the reasonableness of a punitive damages award. *Lee,* 101 F.3d at 811*; DiSorbo v. Hoy,* 343 F.3d 172, 187 (2d Cir. 2003). This is particularly true in civil rights cases. "[V]iolations of civil rights may very well be 'particularly egregious' acts that result in only 'a small amount of economic damages' or injuries whose monetary value is 'difficult to determine.'" *Lee*, 101 F.3d at 811 (quoting *Gore*, 517 U.S. at 582). Here, Robertson's physical and emotional injuries were not overwhelming, but the defendants' willful and deliberate conduct was egregious. The defendants unlawfully stopped, arrested, and struck Robertson; they fabricated evidence and knowingly provided false information to the District Attorney's office. Accordingly, I am not troubled by the ratio between the amount of compensatory damages and punitive damages. *Gore*, 517 U.S. at 582.

3.     *Civil and Criminal Penalties Available for the Defendants' Conduct*

The third *Gore* factor is whether the penalties that defendants would otherwise be subject to for their conduct provided them "fair notice" that their conduct could produce the punitive award. *Gore* 517 U.S. at 574. Here, the punitive award, $50,000 spread over all three defendants, was less than $17,000 per defendant. If they were prosecuted for their conduct, the defendants could be subject to charges of assault, fabrication of evidence and making a false statement. Those charges carry significant prison time and fines, as the defendants were no doubt aware. *DiSorbo*, 343 F.3d at 188. Thus, considering the comparable criminal penalties, I

conclude that each defendant had ample notice of a possible punitive award against them in the amount of $16,666.

In sum, review of the three *Gore* factors warrants the conclusion that the punitive damages award is justified in this case.

4.    *Remittitur*

The defendants argue, in the alternative, for a remittitur, a device that allows a court to condition the denial of a new trial on the plaintiff's acceptance of a reduction of the punitive damage award.  In determining whether remittitur is appropriate in a given case, a court should consider the awards in similar state and federal cases.  *Id*.  The defendants cite two cases in support of the claimed the need for a remittitur here.  In *DiSorbo v. Hoy*, the plaintiff was awarded $625,000 in punitive damages for an excessive force claim and $650,000 for her abuse of process claims -- for a total of $1.275 million in punitive damages.  *Id.* at 186.  The Second Circuit remanded for a new trial unless the plaintiff accepted $75,000 in punitive damages.  *Id.* at 189.  The Court determined that an award of $75,000 was "comparable to the upper limits of the punitive damages awarded in similar police brutality cases."  *Id.*  The Court noted, in contrast to other cases where a higher award was upheld, the misconduct in *DiSorbo* case involved the acts of only a single officer.  *Id.*

In *Lee v. Edwards*, the plaintiff was awarded $200,000 in punitive damages for a claim of malicious prosecution. 101 F.3d at 808.  Again, the Second Circuit ordered a new trial unless the plaintiff accepted $75,000 in punitive damages.  *Id.* at 813.  As in *DiSorbo,* the claim in *Lee* was against a single officer.  In concluding that the award was excessive, the Second Circuit noted that the punitive damage award was "solely for malicious prosecution."  *Id.* at 812-13.

These cases serve only to highlight the appropriateness of the jury's punitive damage award in this case. Robertson had four claims against three officers. The jury found for him on every claim as against every officer. The jury found that the officers unlawfully stopped him, falsely arrested him, used excessive force against him and caused him to be maliciously prosecuted. Given the number of defendants and the number of claims, the punitive damage award amounts to $4166 per claim per defendant. When compared to similar cases, the punitive damages awarded are, if anything, at the low end of the range of reasonable awards. Accordingly, remittitur is not proper here.

CONCLUSION

The defendants' motion for judgment as a matter of law or, in the alternative, for a new trial is denied. Having concluded the punitive damage award is justified in this case, the defendant's motion for a new trial on punitive damages or, in the alternative, remittitur is also denied.

So Ordered.

John Gleeson, U.S.D.J.

Date: May 12, 2010
       Brooklyn, New York